## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

JOHN PLAINTIFF,
an individual,

                      Case No.

    Plaintiff,                  Hon.

v.

WAYNE STATE UNIVERSITY,
WAYNE STATE UNIVERSITY
SCHOOL OF MEDICINE,
NIKOLINA CAMAJ,                  **JURY TRIAL DEMANDED**
MARGIT CHADWELL,
MATT JACKSON,
RICHARD S. BAKER, and
R. DARIN ELLIS,
in their individual and official capacities,
jointly and severally,

    Defendants.

---

## PLAINTIFF'S COMPLAINT

**NOW COMES,** John Plaintiff (the "Plaintiff"), by and through his counsel, and for his Complaint against Defendants Wayne State University ("WSU" or "University"), Wayne State University School of Medicine ("SOM"), and Richard S. Baker ("Baker"), R. Darin Ellis ("Ellis"), Nikolina Camaj ("Camaj"), Margit Chadwell ("Chadwell"), and Matt Jackson ("Jackson"), in their individual and official capacities (hereinafter, the "Defendants"), jointly and severally, and states as follows:

1

## I.     THE PARTIES

1.     Plaintiff John Plaintiff, who requests anonymity in this matter as an alleged perpetrator of harassment who has never been criminally charged or investigated, is a resident of Wayne County, Michigan who was also, prior to the violation of his Constitutional, common law, and contractual rights a student at Defendant WSU where he obtained his Bachelor's and Master's degrees and successfully completed his first year of Medical School. Plaintiff respectfully requests that he be permitted to proceed anonymously and will file the appropriate Motion to Proceed Anonymously if requested by the Court.

2.     Based on the facts detailed below, Defendants will be able to identify Plaintiff and will not be prejudiced by the use of a pseudonym.

3.     Defendant WSU is a public university located in Detroit, Michigan.

4.     The events at issue occurred in Wayne County, Michigan which lies in the Eastern District of Michigan.

5.     Defendant Nikolina Camaj was at all times relevant to this complaint Associate Director and Student Conduct Officer in the Office of the WSU Dean of Students; she was the principal investigator for WSU in this matter; she was aware of the due process requirements set forth in the

University's conduct rules; she disregarded the University's own rules and regulations and denied Plaintiff his due process rights pursuant to the 5th and 14th Amendments to the United States Constitution.

6.     Defendant Margit Chadwell was at all times relevant to this complaint Associate Dean of Student Affairs and Career Development at Defendant WSU School of Medicine and, based on information and belief, responsible for assigning and overseeing the work of Defendant Camaj to investigate cases of student misconduct, including allegations made against Plaintiff.

7.     Defendant Matt Jackson was, at all times relevant to this complaint, Assistant Dean for Basic Science and Chair of the WSU School of Medicine Professionalism Committee that had the authority and responsibility of adjudicating misconduct complaints through a hearing before the Committee and did not afford Plaintiff an opportunity to confront his accuser by being present when she testified before the Professionalism Committee or allowing Plaintiff or his counsel an opportunity to cross-examine his accuser although he was aware that the results of said hearing could result in his dismissal.

8.     Defendant Richard S. Baker was, at all times relevant to this complaint, Chair of the Student Promotions Committee ("Promotions

Committee") and Vice Dean for Medical Education at Defendant WSU School of Medicine that had the responsibility to review cases referred by the Professionalism Committee and the authority to reject or adopt recommendations from the Professionalism Committee regarding whether to dismiss a student from the School of Medicine and did, in the instant case, dismiss Plaintiff without ensuring that Plaintiff received the due process guaranteed him by the Constitution of the United States.

9.     Defendant R. Darin Ellis was, at all times relevant to this complaint, Associate Provost for Academic Programs and Institutional Effectiveness at Defendant WSU and the one individual who, acting alone, could reverse the decision of the promotion committee and protect Plaintiff from the capricious use of a hearing system that denied him constitutionally protected due process rights that were required under federal law, as held by the  United States Court of Appeals for the Sixth Circuit, which law was, at the time of the dismissal of Plaintiff, binding precedent for almost two years.

## II.    THE NATURE OF THIS ACTION

10.    This Complaint is brought to ensure that the intentional and blatant efforts by Defendants to harm a citizen of the United States by denying him the right to due process as guaranteed by the Fourteenth Amendment to the United States Constitution, Article 1, § 17 of the State of Michigan's

Constitution, and Defendants' own internal policies and guidelines, pursuant to Fed. R. Civ. P. 23(b)(2), and in flagrant disregard of established precedent in this Circuit establishing that public universities must provide a student accused of a conduct violation that could result in his dismissal a hearing at which he is able to confront his accuser and avail himself of the greatest opportunity to discover truth and engage in cross-examination of witnesses. *See* e.g. *Plaintiff v. Baum, et al.,* 903 F.3d 575, 581 (6th Cir. 2018) (Quoting from *University of Cincinnati,* 872 F.3d 393, 401-402 (6th Cir. 2017).

11.    As a result of the Defendants' actions, which make it impossible for Plaintiff to be accepted into any other M.D. program in the United States, Plaintiff's dream of a medical career has been eviscerated by an investigation and interrogation conducted by ambush that intentionally kept Plaintiff in the dark as to the specific allegations against him and in violation of rights promised by Defendants WSU and its SOM, by testimony that was never recorded, and without affording Plaintiff a hearing on contested facts where he could cross-examine his accuser, though it was a right to which he was entitled pursuant to WSU's disciplinary policy effective December 7, 2018. (**Exhibit A**, *Interim Administrative Hearing Guidelines*).

12.    As a result of the University's actions, on May 23, 2019, Plaintiff was expelled and has sustained tremendous damages, including, without

limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages. To redress this gross injustice, Plaintiff, in his Complaint, hereby sues Wayne State, the Wayne State School of Medicine and the responsible University officials and agents of the University.

13.     The motivation behind Defendants' decision to expel Plaintiff, then President of the SOM class of 2021, and who had an exemplary record until the Defendants' sham investigation robbed him of his personal and professional reputation, is largely unknown and in question, as Defendants prevented Plaintiff from directly questioning his accuser, failed to provide him with a transcript, recording or summary of the portions of the Professionalism Committee's hearing during which Plaintiff was not present, and the Defendant investigator failed to fully investigate the allegations against Plaintiff or Plaintiff's contrary claims and evidence that he offered in defense.

14.     Upon information and belief, in or about May of 2018, the U.S. Department of Education's Office of Civil Rights ("OCR") initiated an investigation against WSU and its SOM for retaliation against a female medical student who sought to assert her rights under Title IX, and which just became public knowledge on June 4, 2020, and, consequently, at all times relevant to this Complaint, Defendants knew about the OCR investigation for

6

violation of Title IX. Therefore, Defendants (a) had an interest in proving to the OCR that they did not improperly dismiss allegations of harassment by female students, (b) were motivated to avoid any additional claim(s) by female students that its SOM did not take allegations of harassment seriously, (c) were aware that if they accepted Roe's allegations against Plaintiff as true, they would avoid the possibility of Roe filing her own Title IX complaint while the OCR investigation was ongoing, and (d) in tandem with the Department of Education's highly publicized effort to force colleges and universities to side with female victims over accused males, alongside the ongoing investigation against Plaintiff, suffered a motivation and predisposition to accept Roe's accusations against Plaintiff, which concluded with his dismissal, as the best way forward to protect Defendants from possible sanctions and further public scrutiny.[1]

---

[1]At the time Defendants were engaged in considering the charges against Plaintiff, WSU faced additional civil rights investigations under Title IX for Denial of Benefits (opened on January 23, 2019), Discipline (opened on March 19, 2019), and Retaliation (opened on August 16, 2018). Upon information and belief, Defendants knew that the University was already under active scrutiny by the Department of Education, and that after almost a decade of intense efforts to force schools to better defend female students and advance their interests in harassment claims, Defendants opted for a quick and permanent end in this case, and subjected Plaintiff to an excessive punishment based on the arbitrary and capricious use of an investigative and disciplinary process that intentionally kept Plaintiff in the dark as to both the accusations and the possible outcome of the process, so that he would not be able to mount a meaningful defense.

15.     Further, and among other things, Defendants' failure to conduct a full and fair inquiry, even though they had the resources, expertise, and time to conduct such an investigation, Defendant Camaj's delivery of her investigative report on December 4, 2018, and the failure by Defendants to conduct a full and fair hearing that included cross-examination of witnesses, collectively, and among other things, supports the conclusion that Defendants were always going to side with Plaintiff's female accuser, making Defendants' expulsion a wrongful and unsubstantiated demonstration of sex discrimination, rather than a full and fair inquiry into whether Plaintiff's denials and claims were true.

16.     Not only is Plaintiff's sanction based upon a flawed investigation and process, it is unduly punitive. In issuing this sanction, the University failed to give any reasons beyond a summary recitation of generalized reasons, without any specific justification or explanation tied to the particular finding, thus making the right to an appeal before Defendant Ellis meaningless and again depriving Plaintiff of his right to due process.

17.     Plaintiff has also filed a Notice of Intention to File Claims with the Michigan Court of Claims pursuant to MCL 600.6431. The Notice of Intention to File Claims was received by the Clerk's Office and filed on Thursday May 21, 2020 via hand delivery.

III.   **JURISDICTION AND VENUE**

18.   This Court has federal and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. §1367 because: (a) the case arises under the laws of the United States; (b) the claims brought under Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 *et seq*., and 42 U.S.C. § 1983 are federal civil rights claims; and (c) the state law claims are so closely related to the Title IX and § 1983 federal law claims as to form the same case or controversy under Article III of the U.S. Constitution. This Court has personal jurisdiction over Defendants on the grounds that Defendants are conducting business at Wayne State University and its School of Medicine within the Eastern District of Michigan.

19.   Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because the events or omissions giving rise to the claim occurred in this judicial district and because virtually all of the Defendants are located in this judicial district.

IV.   **FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

A. **Defendants were predisposed to accept accusations of misconduct by female students thereby discriminating against male students and encouraged by the U.S. Department of Education to support the radical view that male students accused of misconduct could be dismissed without due process of law.**

20.     On April 4, 2011, the OCR of the United States Department of Education (the "Dept. Plaintiff") published a "Dear Colleague" Letter to colleges and universities (the "Letter"). (**Exhibit B**, *Dear Colleague Letter*).

21.     The Letter addressed how the Obama Administration viewed the requirements of Title IX and demanded numerous changes to how many universities and colleges address sexual violence on campus.

22.     On numerous occasions, Dept. Plaintiff and OCR publicly admonished colleges and universities for moving too slowly in making the changes demanded by the Letter and threatened dire financial and legal penalties if investigative and hearing procedures and policies did not change. *See* Meredith Clark, *Colleges come together to address campus sexual assault,* MSNBC.com, July 21, 2014. (**Exhibit C**, *MSNBC Article*).

23.     Chief among the changes announced in the Letter were: (a) the rejection of mediation in cases of sexual assault, even on a voluntary basis; (b) the requirement that victims alone receive protection during the investigation of the complaint; (c) the required use of a "preponderance of evidence" standard, rejecting the use of the higher "clear and convincing" evidence standard; and (d) allowing victims to appeal determinations that went against them, subjecting accused students to double jeopardy.

24.     On September 22, 2017, OCR rescinded the Letter and provided interim guidance to colleges and universities that receive federal funding, via a Q&A publication regarding campus sexual misconduct. (**Exhibit D**, *DOE Q&A Publication*).

25.     On September 25, 2017, the United States Court of Appeals for the Sixth Circuit issued its opinion in *Doe v. University of Cincinnati,* 872 F.3d 393 (6th Cir. 2017), holding that cross-examination is essential to due process when the finder of fact must choose between believing an accuser and an accused.

26.     On September 7, 2018, the United States Court of Appeals for the Sixth Circuit issued its opinion in *Doe v. Baum*, 903 F.3d 575, (6th Cir. 2018), holding that "if a public university has to choose between competing narratives to resolve a case, the university must give the accused student or his agent an opportunity to cross-examine the accuser and adverse witnesses in the presence of a neutral fact-finder."

27.     On October 11, 2018, the United States Court of Appeals for the Sixth Circuit denied Defendant University of Michigan's request for a rehearing by the full Court of Appeals, making it clear that its decision in *Baum* was the law of the Circuit, binding on all public universities in

Michigan, including Wayne State University and its officials, faculty, and staff.

28.     Immediately thereafter, media and press coverage of the decision was provided by various major Michigan news outlets, including the Detroit Free Press, which reported the decision in the *Baum* case.

29.     Nevertheless, in spite of these clear judicial decisions and wide dissemination to the public, including to WSU officials, faculty, and staff, Defendant WSU took no action to change their investigative and disciplinary process.

30.     By that time, Defendant WSU and its Title IX investigative process were fully invested in the victim-centered approach that afforded female victims preferential and disparate treatment at the expense of accused male students.

31.     Moreover, based upon information and belief, in or about May of 2018 the OCR initiated an investigation of the WSU School of Medicine for retaliation against a female medical student who sought to assert her rights under Title IX.

32.     Based upon information and belief, the Defendants became aware in or about May of 2018 when WSU received notice from OCR that it

was under investigation for a Title IX violation by retaliating against a student who had complained of sexual harassment by a medical school professor.

33.     Based upon information and belief, on or about June 4, 2020 OCR found that the WSU School of Medicine expelled the female medical student in retaliation for her complaint to OCR in violation of Title IX.

34.     That at all times relevant to this Complaint Defendants knew about the OCR investigation for violation of Title IX.

35.     That although Defendants were aware of the investigation, Plaintiff did not learn of the investigation and findings until after June 4, 2020 when they were made public by the female victim of WSU's retaliation.

36.     That at all times relevant to this Complaint Defendants had an interest in proving to OCR that it did not improperly dismiss allegations of harassment by female students.

37.     That Defendants were motivated to avoid any additional claim by female students that the SOM did not take allegations of harassment seriously.

38.     That Defendants were, at all times relevant to this Complaint, aware that if they accepted Roe's allegations against Plaintiff, they would avoid the possibility of Roe, in Plaintiff's case, filing a Title IX complaint while the OCR investigation was ongoing.

39.    That the combination of the Department of Education's highly publicized effort to force colleges and universities to side with female victims over accused males together with the ongoing investigation created in Defendants a motivation and predisposition to accept Roe's allegations against Plaintiff, which concluded with his dismissal, as the best way forward to protect Defendants from possible sanctions and further public scrutiny.

40.    Not until December 7, 2018 did Defendant WSU implement an interim investigation and disciplinary process in an attempt to reflect the Court's opinions in *Baum, University of Cincinnati*, and other recent and precedential case law, as well as revised Title IX guidelines.

41.    Accordingly, Defendants were aware of the due process rights they were required to provide to Plaintiff, including the right to cross-examine witnesses against him and to receive notice of the charges prior to any investigation or hearing no later than October 11, 2018, and prior to the filing of the complaint against Plaintiff, and almost four months prior to the investigative hearing conducted by the Professionalism Committee.

**B. The University's investigation and hearing process was constitutionally flawed at the time Plaintiff was questioned, the investigation and hearing were conducted, and Plaintiff was dismissed from the School of Medicine.**

> **1. The Professionalism Committee hearing process to which Plaintiff was subjected lacked constitutionally required due process protections.**

42.     The SOM's Professionalism Committee claims to function as the SOM's "institutional entity that ensures that the medical education program has a fair and formal process for taking any action that may affect the status of a medical student, including timely notice of the impending action, disclosure of the evidence on which the action would be based, an opportunity for the medical student to respond, and an opportunity to appeal any adverse decision related to advancement, graduation, or dismissal." (**Exhibit E**, *Professionalism Committee By-laws*, at 4, § 2.0).

43.     The SOM Professionalism Committee has not established its own due process procedures, but, instead, "conform[s] to the due process procedures of the Wayne State University Student Code of Conduct (the "Code") (*See* **Exhibit F**, *WSU Student Code of Conduct*) and the guidelines for implementing the Student Code of Conduct as adopted by the School of Medicine." *Id. at* 5.

44.     The SOM Professionalism Committee "is an oversight and decision-making entity. The major responsibility of the committee is to shape

15

medical students' professional growth through the school's four-year longitudinal curriculum that promotes positive interactions with faculty, residents, patients, patients' families, other health care providers, clerical personnel, and peers. Appropriate and mature behavior is expected by students both on and off campus. Instances where students violate either the Professionalism core value and attributes or the Student Code of Conduct are referred to the Professionalism Committee." *Id.* at 4 (§ 2.0).

45.     As stated therein, Professionalism Core Values and Attributes include: (a) Professional Responsibility; (b) Competence and Self-Improvement; (c) Respect for others and professional relationships;         (d) Honesty including academic integrity; (e) Personal responsibility; and    (f) Social responsibility. *Id.* at 4.

46.     The Professionalism Committee's By-laws set forth the following roles for the Committee: (a) to monitor reports of medical students' unprofessional behavior and promote the development of professionalism; (b) to conduct investigations of all reports of unprofessional student conduct referred to the committee; (c) to convene formal hearings at the behest of the committee chair to determine whether a student is in violation of either the professionalism core values and attributes or of the Student Code of Conduct;

16

and (d) following a formal hearing, [to] . . . determine a remediation. *Id.* at 4 (§ 3.0).

47.     Based on information and belief, the Professionalism Committee took testimony from Roe during the hearing conducted on February 7, 2019.

48.     Based on information and belief, Roe was accompanied into the hearing by a family member.

49.     At no time was Plaintiff provided an opportunity to hear Roe's testimony.

50.     At no time was Plaintiff provided an opportunity to submit questions for the Professionalism Committee to ask of Roe.

51.     At no time was any information about Roe's testimony provided to Plaintiff prior to providing his testimony and statement to the Professionalism Committee.

52.     At no time did the Professionalism Committee provide a list of other witnesses called by the Professionalism Committee and, if called, whether they attended the hearing and provided testimony.

53.     At no time before, during, or after the hearing conducted by the Professionalism Committee was Plaintiff ever provided with a summary of the testimony taken by the Committee or a transcript or recording of the testimony.

54.     At no time did the Professionalism Committee provide or allow for Plaintiff to record or document the proceedings.

55.     At all times relevant to this Complaint, Plaintiff alone bore the burden of proving his innocence and refuting evidence to which he was not privy.

56.     At the conclusion of the Professionalism Committee's hearing, the Committee failed to provide Plaintiff with any findings relative to information he presented to the Committee, including, specifically:

a.      That the reason for Plaintiff's initial contact with Roe regarding passwords was the unauthorized access to his computer;

b.      That Plaintiff had not hacked Roe's computer as claimed by Roe;

c.      That Plaintiff had not attempted to obtain photographs of Roe to which he was not entitled;

d.      That Plaintiff had not impersonated an attorney;

e.      That Plaintiff had not sent a document to Roe purporting to constitute a summons or court notification to be present in court on a certain date in time;

f.      That Plaintiff had not intended to harass or cause Roe any unease; or

g.      That Plaintiff did not have a romantic or sexual interest in Roe.

57.     On February 11, 2019, the Professionalism Committee announced its decision to "refer your case to the School of Medicine promotions committee with a recommendation for dismissal." (**Exhibit G**, *Jackson Letter*).

58.     The decision was announced without accompanying factual support, using only conclusory language that "you [Plaintiff] have demonstrated a pattern of harassment and misrepresentation that is not consistent with the values and attributes that are the core professionalism standards for Wayne State School of Medicine: Professional responsibility; Competence and self-improvement; Respect for others and for professional relationships; Honesty including academic integrity; Personal responsibility; and Social responsibility." *Id*.

59.     The Professionalism Committee is a sub-committee of the Promotions Committee. Any appeal of a Professionalism Committee decision is made to the Promotions Committee for definitive disposition. The Professionalism Committee may use any and all disciplinary sanctions but cannot dismiss students from the medical school. The committee adjudicates professional breaches through appropriate means including referral to the Promotions Committee which may dismiss medical students.

60.    Plaintiff was denied any meaningful opportunity to defend himself before the Promotions Committee and the Professionalism Committee did not provide Plaintiff with a factual record, any information they gathered during the hearing unless it had already been provided by Plaintiff, or an explanation of the facts supporting the specific reasons for recommending dismissal or whether the decision was unanimous.

### 2. The Promotions Committee hearing process to which Plaintiff was subjected lacked constitutionally required due process protections.

61.    The Promotions Committee's "authority originates by delegated powers from the School of Medicine Faculty Executive Committee." (**Exhibit H**, *Promotions Committee By-laws*, at 4) (citing by-laws of the Faculty: Article IV. Committees, Section II. Standing Committees).

62.    The SOM charges the Promotions Committee with the responsibility to "ensure[] that the medical education program has a fair and formal process for taking any action that may affect the status of a medical student, including timely notice of the impending action, disclosure of the evidence on which the action would be based, an opportunity for the medical student to respond, and an opportunity to appeal any adverse decision related to advancement, graduation, or dismissal." *Id.* at 4 (§ 2.0).

63.     The Promotions Committee is the final decision-making entity at the SOM regarding the promotions and graduation process and has the responsibility of determining the student's fitness and suitability for the study and practice of medicine.

64.     The Promotions Committee has the responsibility of assuring that constitutional due process requirements and the rules and policies of the SOM are followed.

65.     Promotions Committee hearings are for students who face the possibility of dismissal due to reasons other than for administrative academic dismissals. Hearings are also provided where a student is appealing a decision of the Professionalism Committee.

66.     The Promotions Committee has the role of determining the disposition of students whose behavior is inconsistent with the school's professional standards.

67.     Students who face the possibility of dismissal will be invited to a hearing with the Promotions Committee.

68.     The Student is provided an opportunity to submit a statement to their counselor summarizing "whatever information the student wishes the Committee to consider, supported by facts" regarding the reason for appearing before the Committee.

69.     The Student may bring a support person, but the support person's role is unspecified.

70.     Members of the Committee may ask questions but are not required to make inquiries, thereby placing the entire burden of proof on the accused.

71.     The Committee's deliberations are confidential, occur without the student being present, and are not recorded.

72.     The Promotions Committee can (1) decide to postpone action pending receipt of additional information, and consider the student's entire academic record to date, which includes (a) pre-entry data and medical school transcript information, (b) performance data from the current academic year, and (c) information regarding any student issues which appear to have impaired academic or professional performance; and (2) make recommendations and establish requirements relative to remediating unsatisfactory student performance and/or behavior in lieu of dismissal.

73.     The Promotions Committee did not provide to Plaintiff all documents and evidence developed during the Professionalism Committee's investigation, thereby denying Plaintiff of notice as to the evidence against him.

74.     The Promotions Committee communicates its decision in an official letter provided to the student.

75.     In this case, Defendant Baker informed Plaintiff in an official letter dated February 27, 2019 of the Promotions Committee's decision to dismiss him.

76.     While the letter announced the dismissal, the Promotions Committee failed to specify the basis for its decision to dismiss Plaintiff, referring generally to an "evaluation and discussion of [Plaintiff's] entire academic record, academic progress and the information you provided to the committee at your hearing."

77.     The Committee failed to address any accusations, specify its factual findings, or articulate the specific basis on which dismissal was appropriate.

78.     These failures, among others, constituted a denial of due process by failing to provide Plaintiff with sufficient notice of the basis of the dismissal decision to allow Plaintiff to meaningfully access his right to appeal his dismissal to the Promotions Committee or directly to the Provost.

79.     Notwithstanding the Promotions Committee's duty and responsibility of assuring that due process and rules and policies of the SOM are followed, no by-laws exist that constrain members of the Promotions

Committee from: (a) consideration of evidence not known to the accused student; (b) conducting their own investigation or considering information gathered or received outside of the investigative process of the Professionalism Committee; (c) failing to advise or inform the student facing dismissal what data the Committee has already seen, reviewed, or obtained, or the source of such information; (d) calling a student to appear before the Committee without providing notice through a detailed statement of facts and claims that the Committee will consider; or (e) announcing the standard of review the Promotions Committee will use to avoid making arbitrary or capricious decisions.

80.    Courts of law, as well as the WSU Appellate system that handles both civil and criminal appeals, have clear standards of review reflecting the level of deference an appellate court gives to a decision of the lower court; generally, the standard of review on appeal will be: (a) *de novo* for questions of law; (b) clearly erroneous for determinations of fact; and (c) abuse of discretion for application of the law to the facts.

81.    The SOM's Promotions Committee functions as an appellate body. Even on issues as serious as dismissal, the Promotions Committee did not identify to Plaintiff the standard of review for its deliberations. Any student, including Plaintiff, coming before the Promotions Committee is

therefore denied the ability to understand how, and under what standard of review, decisions will be made or what information he must provide to the Committee.

82.     On March 6, 2019, Plaintiff met with Defendant Baker in person to discuss his options, given the Promotions Committee's decision to dismiss Plaintiff, and the issuance of a voluntary withdrawal from the SOM if the Promotions Committee denied his appeal.

83.     At the March 6, 2019 meeting, Dr. Baker informed Plaintiff that while he, as Chairman of the Committee, had the authority to overturn the decision, he would elect to reconvene the Committee and discuss the decision with them if Plaintiff appealed.

84.     Defendant Baker also informed Plaintiff in answer to his question of whether, if the Promotions Committee denied his appeal would he have the ability to withdraw, that "[y]es, I believe so. If it stays within the medical school and you do not take the step to appeal to the Provost's Office, you will be able to withdraw if the promotions committee appeal does not go in your favor."

85.     In spite of Defendant Baker's assurance to Plaintiff, Plaintiff was not permitted to voluntarily withdraw after the Promotions Committee's

subsequent denial of Plaintiff's appeal. *See* Email from V. Muhammad to Plaintiff, dated May 9, 2019. (**Exhibit I**, *Muhammad Email*).

### 3. Plaintiff has a constitutionally protected property interest in his education and contractual rights that have been violated by Defendants.

86. Plaintiff has been an undergraduate, graduate, and medical student at WSU since 2010, and he has a constitutionally protected property interest in, *inter alia*, his education program, to which he has expended in excess of $225,000.

87. The law in this Circuit is clear, the Due Process Clause is implicated by higher education disciplinary decisions.

88. As a student, Plaintiff and WSU have been bound by contract, as reflected in WSU's policies and procedures, since his matriculation, and at all times relevant to his claims.

89. These policies and procedures are found in the WSU Student Code of Conduct, the by-laws of the SOM's Professionalism and Promotions Committees, and Interim Administrative Hearing Guidelines, made effective on December 7, 2019.

90. The WSU Code also states that "[a]s integral members of the academic community, students have the right to expect that their rights are protected from arbitrary, capricious and malicious acts on the part of other

members of the academic community … [and] to assure that students who are alleged to have engaged in unacceptable conduct receive fair and impartial consideration as specified in this code." (**Exhibit F**, at 1, § 1.2).

91.     The Code has limited application and "shall apply to conduct that occurs on University or Housing premises and at University or Housing sponsored activities that occur on or off-campus." *Id.* at 3 (§ 3.2).

92.     Disciplinary action under the Code is likewise limited to conduct that "occurs on University or Housing premises, or in connection with a University course or University documents, or at a University-sponsored activity." *Id.* at 4-5 (§ 4.0).

93.     Under the contracts between Plaintiff and Defendants, and Roe, Defendants breached their agreements with Plaintiff when they improperly subjected Plaintiff to disciplinary rules that did not apply, as the alleged harassment occurred when Roe was no longer a student at WSU, did not occur on property owned or operated by the University, and did not impact in any way any academic or administrative program of the University or SOM to which Roe was a part.

94.     In subjecting Plaintiff to the disciplinary rules for conduct between Plaintiff and Roe, Defendants subjected Plaintiff to an arbitrary and capricious application of rules that did not apply, or, if applicable, were

improperly applied as to Plaintiff because he did not engage in harassment, sexual harassment, sexual abuse, or other conduct to which the SOM's rules applied, thereby breaching the contracts between Plaintiff and Defendants.

95.    In dismissing Plaintiff on the basis that he engaged in conduct that was outside the reach of the WSU and SOM Code of Conduct, and because Defendants failed to investigate any of Plaintiff's factual claims that contradicted Roe's allegations, Defendants breached their contract with Plaintiff and denied him due process of law.

**4. Plaintiff was actively denied clearly-established rights in this Circuit, including the right to cross-examine the accuser where dismissal was a possible outcome, to view all adversarial evidence, and to have notice of all allegations, as required under law and under Plaintiff's contracts with Defendants, thus obviating Defendants' claim to qualified immunity from Plaintiff's constitutional claims.**

**i. The fact-finding procedures required under the WSU Code of Conduct *prior* to December 7, 2018.**

96.    As set forth in the Code, "[u]pon receipt of the charges, the Student Conduct Officer (the "Conduct Officer") shall initiate an investigation, which must include an opportunity for the student(s) … to participate in a fact-finding conference with the Conduct Officer, and may include a conference by the [] Conduct Officer with the person making the charges, in order to determine whether further proceedings are appropriate."

97.    The Code requires that "[a] notice shall be sent to the student(s) … with a copy to the Dean of Students or the Academic Dean, within ten school days of the Student Conduct Officer's receipt of the charges, and at least five school days prior to the conference. The notice shall contain the following information: a)  the alleged infraction; b)  the nature of the evidence submitted; c)  the time and place of the conference; and d)  a copy of this code, with a statement that it is the governing policy and that the student should retain it for use throughout the proceeding." *See* Code at 12 (§ 11.2).

98.    The Code permits the Conduct Officer up to ten (10) days following the fact-finding conference to determine whether to take further action or refer the matter to the Dean of Students.

99.    In the event that the Dean of Students determines that the complaint is well founded, the Dean of Students shall notify the student that he/she may either meet with him/her in (a) an Informal Disciplinary Conference pursuant to Section 14.0 of the Student Conduct Code, or (b) choose to have the decision and/or sanction of the Student Conduct Officer heard by a formal Hearing Committee convened by the Dean of Students pursuant to Section 15.0 of the Student Conduct Code. *See* Code at 14 (§ 12.1).

100.    Students or student organizations subject to, or electing to participate in, an Informal Disciplinary Conference before the Academic

Dean, or his/her designee, or the Dean of Students, shall be accorded the following procedure: (a) the student or representative of the student organization shall have access to the case file, prior to and during the conference; (b) the student shall have an opportunity to respond to the evidence and to call appropriate witnesses; and (c) the student shall have the right to be accompanied and assisted by an advisor or attorney only in the manner provided in Section 15.9 of the Code. *See* Code at 15-16 (§ 14.0 *et al.*).

101.   The Dean shall render a decision within ten (10) school days. If the Dean sustains the charges, the Dean shall decide the appropriate sanctions as specified in the Code. The Dean shall notify the student or representative, the charging party, and the Student Conduct Officer of the decision, in writing, within ten (10) school days. The decision of the Dean shall be final. The Dean shall, at this time, return the original file to the Student Conduct Officer. In those cases in which the nature of the sanction requires notice to the Registrar, the Student Conduct Officer shall forward the Dean's notice to the Registrar.

102.   Students subject to, or electing to participate in, a formal hearing before the appropriate Dean shall be accorded the following procedure: (a) the committee shall consist of three faculty members and two students; (b) the student may strike a maximum of two names from each panel, before the

committee is drawn from the panels; and (c) if related students fail to agree as to the names (if any) to be stricken, then no names shall be struck.

103. The Code requires that the Committee hearing the case shall conduct a fair and impartial hearing, the student shall be given notice of the hearing date at least five (5) school days in advance of the hearing, and shall be accorded access to the case file, pursuant to Code (§11.4), prior to and during the hearing.

104. The Code states that the accused student and the charging party should be present at the hearing. If the student fails to appear, the hearing may proceed without him/her, and if the charging party fails to appear, the hearing may proceed without him/her; both the student and the charging party shall have the opportunity to be heard.

105. The student may not be required to testify against herself/himself. Both the student and the charging party shall have the opportunity to question opposing witnesses.

106. The Dean may subpoena witnesses upon the request of either party or on his/her own motion. University students and employees are expected to comply with subpoenas issued pursuant to this procedure, unless compliance would result in significant and unavoidable personal hardship or substantial interference with normal University activities.

107. Any party may bring an advisor or an attorney to the Disciplinary Hearing, provided that the party must notify the Dean, in writing, of the name of the advisor or attorney at least 48 hours prior to the hearing. The role of the advisor or attorney during the hearing is solely to counsel and assist the party and he may not participate actively in the conduct of the hearing.

108. Hearings are closed to the public, except that, in the discretion of the Chairperson, an open hearing may be held if requested by the accused student. In the case of related students, if any student in the group desires a closed hearing, the hearing shall be closed.

109. The Chairperson shall exercise control over the hearing to avoid needless consumption of time and to prevent the harassment or intimidation of witnesses. Any person, including the student, who disrupts a hearing or who fails to adhere to the rulings of the Chairperson may be excluded from the proceedings.

110. Hearings will normally be recorded. However, the Code does not require that hearings be recorded, and the failure to record all or part of a hearing, or the technical inadequacy or loss of any recording made, does not invalidate the hearing or the procedure. Whether or not a recording is made, the decision must include a summary of the testimony, and shall be sufficiently detailed to permit review by the President or his/her designee.

111.   The Chairperson may exclude witnesses other than the charging party and the charged party from the hearing during the testimony of other witnesses; formal rules of evidence shall not apply in disciplinary proceedings conducted pursuant to the Code. The Chairperson shall admit all matters into evidence which reasonable persons would accept as having persuasive value in the conduct of their affairs. Unduly repetitious or irrelevant evidence may be excluded.

112.   Affidavits shall not be admitted into evidence unless signed by the affiant, and notarized, and shall not be admitted in any case unless the Chairperson finds that there is good cause to accept an affidavit instead of actual testimony.

113.   The Committee may be advised by a representative of the Office of the General Counsel, except that, if the Office of the General Counsel shall have acted in the case as proponent of any party, then the Committee shall be advised by independent, outside counsel; and a decision by the Committee that the charges are sustained must be based upon a preponderance of the evidence at the hearing. (A preponderance of the evidence is that which is sufficient to convince the Committee that it is more probable than not that the student's alleged misconduct occurred.). *See* Code at 16-18 (§ 15 *et al.*).

114.   Under the Code, a hearing will be scheduled to be held within fifteen (15) school days of the student's request for a hearing, except where the academic calendar makes a longer interval appropriate. The Dean or designee shall be present at the hearing but shall not be present during the Committee deliberations. A simple majority of the Committee members shall be present for the hearing. If a majority of the members are not present, the student may decide to proceed with the hearing before those members who are present, or to reschedule the meeting. In the case of related students, if 50% or more of the students prefer to proceed, the hearing shall proceed. *See* Code at 18 (§ 16 *et al.*).

115.   Under the Code, within ten school days of the hearing, the Committee shall prepare and send to the Dean its decision, including a summary of the hearing and of its decision-making process. If the Committee sustains the charges, it shall recommend a sanction or sanctions.

116.   If the Committee sustains the charges, then, within five (5) school days, the Dean shall decide appropriate sanctions as specified in Section 5. The Dean may adopt the sanctions recommended by the Committee or may impose sanctions more or less severe than those recommended by the Committee. The Dean shall notify the student, the charging party, and the Student Conduct Officer of the decision and the sanction(s), in writing, within

34

the five-school-day period. The Dean shall return the original file to the Student Conduct Officer. In those cases in which the nature of sanction(s) requires notice to the Registrar, the Student Conduct Officer shall forward the dean's notice to the Registrar.

### ii. The appeals process under the WSU Code of Conduct applicable to Plaintiff *prior* to December 7, 2018.

117.   If, as the result of a formal hearing process, a sanction is imposed, the student may request the President or his/her designee to review the decision on the record. A written Request for Review must be signed and submitted by the student or representative himself/herself (not by an advisor or an attorney) to the Student Conduct Officer, with a copy to the Dean of the college, or the Dean of Students, postmarked within twenty (20) school days of the postmark of the college's final decision.

118.   The Student Conduct Officer will forward the appeal, with the record, to the President or his/her designee. Appellate review of the college's decision will proceed as soon as practicable after notification by the student of his/her wish to seek review.

119.   The President or his/her designee may affirm, reverse, or modify the decision or the sanction, or, in unusual circumstances, may send the matter back to the college. The President or his/her designee shall notify the student,

the Dean, the charging party, and the Student Conduct Officer of the decision, in writing, within a reasonable time.

120.   Exceptions to the Appeal procedure may be granted by the President or his/her designee upon a showing of good and sufficient cause. The decision of the President or his/her designee shall be final.

### iii. The fact-finding procedures under the Code *after* December 6, 2018.

121.   Effective December 7, 2018, Defendant WSU issued its Interim Administrative Hearing Guidelines (the "Guidelines") to the WSU Student Code of Conduct.  (**Exhibit A**).

122.   WSU intends for these Guidelines to apply only in those cases in which: (a) WSU undertakes an investigation into alleged student misconduct, whether by a Title IX investigator or by an individual authorized to conduct investigations under the Student Code of Conduct; (b) the investigation documents competing narratives about the alleged sexual misconduct such that credibility is an issue that is material to the outcome; (c) if the alleged victim's narrative is determined to be more credible than that of the alleged perpetrator, the finding would necessarily be a violation of university policy; and (d) the investigator determines that the alleged sexual misconduct is serious enough that the potential sanction against the alleged perpetrator, if found responsible, could be suspension or expulsion.

123.   Where all of the foregoing circumstances are present, WSU will designate and retain an experienced attorney (hereinafter referred to as the "Hearing Officer") to: (a) manage the hearing process; (b) assist the Committee (which is selected pursuant to Sections 15.1, 15.2 and 15.3 of the Student Code of Conduct) in assessing responsibility under the preponderance of the evidence standard; and (c) where responsibility for violation of University policy is found, on the Committee's request, assist the Committee in recommending appropriate sanction(s).

124.   In addition to the *Hearing Procedures* set forth in Section 15 of the Code, the Guidelines make the following modifications and additions to comply with the precedential decision in *Baum*: (a) the Title IX Director will be responsible for providing the Committee with a copy of the investigator's final report, the report will be accepted as evidence by the Committee, and the investigator will be available as a witness and may be examined on the contents of the report; (b) upon request, the complainant and respondent may review the documents, statements or other material in the Title IX investigator's file, including the final report (*See* Code, § 11.4); (c) all participants are expected to be respectful of each other in the hearing process and to conduct themselves according to the direction of the hearing officer; (d) at the request of either party, made not less than five (5) business days

before the hearing, or at the hearing officer's discretion, the hearing officer may adopt additional procedures as are necessary and appropriate so as to minimize the likelihood that the hearing itself will contribute to the traumatization of the complainant and so as to support the privacy needs of the parties and/or other potential hearing participants; and (e) the Hearing Officer may, but is not required to, alter the hearing room setup and decide to use of multiple rooms, video-conferencing equipment, or other electronic means of communicating.

125.   The Guidelines also prohibit the complainant and respondent from sitting in the same room at the same time unless they choose to do so. However, the hearing officer shall insure that whatever party is being cross-examined is present in the same hearing room as the Committee so that the Committee can assess that individual's demeanor first-hand.

126.   The Guidelines require that: "Pertinent records, exhibits, and written statements provided during the investigation stage of the process shall be admitted into evidence unless, in the judgment of the hearing officer: (a) the item is so prejudicial as to outweigh any probative value; or (b) is not relevant to the determination to be made by the Committee. Any additional information may be accepted for consideration by the hearing officer at his/her discretion." (**Exhibit A**, at 3).

127.   The Guidelines require, consistent with the holding in *Doe v. Baum*, that the respondent be allowed to cross-examine the complainant and the complainant's witnesses; and, where such cross-examination occurs, the complainant shall also be allowed to cross-examine the respondent and the respondent's witnesses. The following rules shall apply with regard to such cross-examination: (a) either party may waive his/her right to examine or cross-examine the opposing party or a witness; (b) the Hearing officer will establish reasonable time frames for an individual's testimony, including cross-examination; (c) examination and cross-examination generally shall be limited to matters relevant to the circumstances of the alleged misconduct, which may include circumstances leading to the alleged misconduct, as well as testimony regarding the impact of the alleged misconduct; (d) there will be no questioning of the parties about their prior sexual activity, although questions about the parties' prior sexual relationship, if any, may be allowed at the discretion of the Hearing Officer; (e) cross-examination will be monitored closely by the hearing officer to avoid the creation of an unduly intimidating or hostile environment; (f) the Hearing Officer may, at his or her discretion, allow argument out of the hearing of the Committee on whether a particular line of questioning may be pursued; and (g) the Hearing Officer or

the Committee in his/her/their discretion, may pose additional questions to the respondent, the complainant, the investigator, and any witnesses presented.

### iv. The post-hearing procedures under the Code *after* December 6, 2018.

128.   Within ten (10) business days of the hearing, the Committee conducting the hearing, with the assistance of the Hearing Officer, as desired, shall prepare and send, to the Dean of Students and Title IX Director, the Committee's decision, including a summary of the hearing and of its decision-making process. (*See* Code § 16.1).

129.   If the Committee sustains the charges, i.e. finds, based upon a preponderance of the evidence, that the respondent violated University policy with regard to any form of sexual misconduct, the Committee shall recommend a sanction or sanctions as provided in Section 5 of the Code. (*See* Code § 16.1).

130.   If the Committee sustains the charges, the Dean of Students shall, within ten (10) business days of receipt of the Committee's decision, decide an appropriate sanction or sanctions as provided in Section 5 of the Code. The Dean may adopt the sanction(s) recommended by the Committee or may impose sanction(s) more or less severe than those recommended by the Committee. (*See* Code § 16.2).

131.   The Dean of Students shall simultaneously notify the complainant and the respondent, in writing, of the Committee's decision and of the sanction(s) imposed. (*See* Code § 16.2).

### v. The procedures for appeal under the Code *after* December 6, 2018.

132.   Either the complainant or the respondent may request the WSU President, or his/her designee, to review the decision of the Committee and/or of the Dean of Students on the record. (*See* Code § 18.1).

133.   In order to appeal, a written Request for Review must be signed and submitted by the student (not by an advisor or attorney) to the Student Conduct Officer, with a copy to the Dean of Students and Title IX Director, postmarked within twenty (20) business days of the written notice of outcome. (*See* Code § 18.1).

134.   The Student Conduct Officer will forward the appeal, with the record, to the WSU President or his/her designee. Appellate review will proceed as soon as practicable after notification by the complainant or respondent of his/her wish to seek review. (*See* Code § 18.1).

135.   The WSU President or his/her designee may affirm, reverse, or modify the decision or the sanction. (*See* Code § 18.1).

136.   The WSU President or his/her designee shall notify the complainant and the respondent simultaneously, and in writing, of the

decision on the appeal within a reasonable time. Copies of the decision will also be provided to the Dean of Students, the Student Conduct Officer, and the Title IX Director. (*See* Code § 19.0).

**5. The process and procedures utilized by the Defendants to investigate and prosecute Plaintiff differ significantly from those in the Code and failed to provide Plaintiff with notice or due process.**

137. To this day, Plaintiff has been unable to determine the specific facts found by the Professionalism Committee or the Promotions Committee to support their decisions and determination.

138. To this day, no record of any witness testimony or hearing evidence has been provided to Plaintiff.

139. Based upon information and belief, to this day, no record of any witness testimony or hearing evidence was provided to the Office of the Provost for use in reviewing the disciplinary process and outcome.

140. Plaintiff was not provided a right to cross-examine his accuser or other witnesses against him and is unaware of any other witness beyond Roe that may have testified at the hearing before the Professionalism Committee.

141. Based on information and belief, documents and writings produced by the Professionalism Committee members hearing Plaintiff's case were provided to one or more members of the Promotions Committee but were never provided to Plaintiff or the Office of the Provost.

142.   None of the procedural protections provided for in the Code, either prior to or after December 6, 2018, were provided to Plaintiff by the Professionalism and Promotions Committees or the Office of the WSU Dean of Students.

**C. Plaintiff was falsely accused of misconduct and dismissed without being afforded his due process rights under University policy, Sixth Circuit precedent, and/or the Constitutions of the State of Michigan and United States of America.**

**1. Plaintiff's educational history at WSU and interactions with Roe.**

143.   Plaintiff began his education at WSU in the fall of 2010 as a pre-medical student majoring in biology and psychology.

144.   Plaintiff graduated from WSU in 2015 with a bachelor's degree of Science in Biological Sciences and a bachelor's degree of Science in Psychology.

145.   Plaintiff continued his education at Defendant WSU in 2016 and graduated in 2017 with a master's degree, actually conferred by the SOM, in Medical Science, maintaining a 3.9/4.0 grade point average. During the 2016 academic year, Plaintiff was on the student senate and was involved in multiple school government activities, including participation in *Festifall 2016*, an orientation event to provide incoming students an opportunity to ask

questions of upperclassmen and familiarize themselves with service, club, and academic resources.

146.   During *Festifall 2016*, among many other students, he met a female freshman student who shall be referred to in this Complaint as "Jane Roe," "Roe," or "Accuser," as the actual identity of Jane Roe will be evident to the Defendants, and her true name and identity is not relevant to this Complaint.

147.   At the time of their initial meeting, Roe was accompanied by her parents, and the nature of the conversation dealt with the stress she felt about her ability to pass certain science courses.

148.   During the brief interaction, Roe and Plaintiff exchanged telephone numbers, so that she could call him if she had other questions or school-related issues she needed help with.

149.   Plaintiff offered to provide Roe with BIO 1510 exam benchmark questions from 2010 to study with and, to facilitate transmission of this information, provided Roe his cloud storage password so that she could download the materials.

150.   Shortly after Plaintiff provided this help, he noticed that multiple of his accounts were routinely breached and accessed by an individual, or individuals, without his authorization or permission. At least one account

being accessed was the same account that held the digital materials accessed by Roe.

151.    Although Plaintiff contacted Roe on numerous occasions concerning the breach of his cloud account, the contacts were limited and coincided with ongoing and developing incidents related to the unauthorized access of his computer. Plaintiff's first text message contact with Roe occurred on or about November 17, 2016, approximately 77 days after meeting Roe.

152.    The next three text message contacts occurred in November of 2016.

153.    Between January 28, 2017 and April 10, 2017, text messages were sent between Plaintiff and Roe on the issue of breaches of his electronic and computer accounts.

154.    From on or about April 10, 2017 until on or about August of 2018, Plaintiff had not communicated with Roe.

155.    In the Fall of 2017, Plaintiff started medical school at WSU's SOM, and was active in student affairs, running and winning the office of the WSU SOM Class of 2021 Student Body President. Earlier, as President of the WSU Student Senate, Plaintiff concurrently had a seat as class representative on the Board of Governors, and regularly volunteered in the community.

While on the Board of Governors, he worked on a successful effort to freeze tuition and improve testing procedures and academic support for medical students.

156.   While in medical school, on or about August of 2018, Plaintiff received information that his electronic and computer accounts had again been improperly accessed, and without authority, from an address in Colorado where Plaintiff believed Roe lived, as she was no longer a student at WSU.

157.   Between on or about August 6, 2018 and on or about October 27, 2018, Plaintiff contacted Roe to again attempt to get help in securing his computer.

158.   On or about October 27, 2018, Plaintiff received multiple phone calls from Colorado, and during one call Plaintiff was called a racial slur and threatened.

159.   Since on or about October 27, 2018, Plaintiff has had no contact with Roe.

160.   In 2018, at the start of Plaintiff's second year at the SOM, a significant issue surrounding testing protocols arose, and Plaintiff worked with the Board and other SOM leadership to reduce time gaps between testing groups, which ultimately helped to resolve issues and improve testing procedures.

161.   In March of 2019, the SOM announced that it was making a significant change to its school calendar that would have significant financial implications for students. In response, and as a result of work that Plaintiff did in developing a solution, the SOM was able to rescind this policy change and fix the negative financial situation facing many students.

162.   In May of 2019, at the end of Plaintiff's second year of medical school, he had a track record of success academically, socially, within the leadership of the SOM and his class, and looked forward to a successful third year at the SOM.

**2.   Defendant WSU's Associate Director and Student Conduct Officer, Defendant Nikolina Camaj, engaged in a flawed and gender-biased course of conduct that denied Plaintiff his right to due process.**

163.   On October 29, 2018, Roe filed an online complaint against Plaintiff for harassment using the University's Online Complaint Form. *See* the Investigative Report made by Defendant Nikolina Camaj (the "Camaj Report"). (**Exhibit J**, *Camaj Report*).

164.   On November 15, 2018, Nikolina Camaj (or "Camaj") engaged in a telephonic conference call with Roe, during which time Defendant Camaj discussed the online complaint report filed by Roe.

165.   During this conference call between Defendant Camaj and Roe, Roe agreed to provide Camaj with text messages sent between Plaintiff and

Roe from November 17, 2016 until October 26, 2018; however, Defendant Camaj took no steps to determine whether the text messages provided by Roe were, *inter alia*, complete, had been altered, and/or were reliable.

166.   Due to the nature of the investigative interview conducted on November 15, 2018 and during the conference call, Defendant Camaj was unable to make visual observations of Roe's demeanor, failed to document her affect during the conversation in her notes or summary, did not challenge Roe's account of the alleged incidents, and failed to record the call.

167.   According to the Camaj Report, Roe stated to Defendant Camaj that she filed a police report in Colorado and spoke with the Wayne State University police department. However, at no time did Defendant Camaj corroborate these statements, or make any effort to obtain a copy of the police reports Roe claimed to have filed in Colorado, or even identify the Police Department in Colorado where the alleged police report was filed. *See* **Exhibit J**.

168. According to Defendant Camaj, during the call with Roe, Roe alleged that she had spoken with the Wayne State University Police. Defendant Camaj did not include any evidence corroborating Roe's claim to have spoken with the Wayne State Police Department or obtain any documentation that such a conversation took place. *Id.*

169.    Roe alleged to Defendant Camaj that she received a text message from Plaintiff that he had contacted an attorney and that she should keep an eye on her email account for a communication from that lawyer. Roe claimed that she did receive an email from the Wolff-Smith Law Firm in Lake Orion, Michigan claiming that she was to appear in court on November 15, 2018. *Id*.

170.    In the online WSU Complaint Form, as attached to the Camaj Report, Roe reported that she called the law firm to confirm that the email from [Plaintiff's] "lawyer" was not from them nor any of their lawyers. Roe claimed that she also called the 36th District Court and confirmed that her name was not on the docket for November 15, 2018. *Id*.

171.    Based on information and belief, Defendant Camaj failed to obtain the email Roe claimed she received from the law firm, Wolff-Smith, allegedly directing her to appear in court on November 15, 2018.

172.    Based on information and belief, Defendant Camaj failed to obtain copies of the Snapchat photos that Roe claimed Plaintiff wanted or to collect any evidence that on three separate occasions Roe's photographer was contacted by an individual claiming that they "lost the file with all the pictures from the shoot, can you resend it."

173.    Without any corroboration of these claims that Plaintiff had impersonated an attorney or had fraudulently attempted to obtain Roe's

photoshoot pictures, Defendant Camaj nevertheless included these baseless allegations in an attempt to influence decision makers on the SOM's Professionalism and Promotions Committees.

174.   Roe informed Defendant Camaj that she had not received any further communications from Plaintiff since October 26, 2018.

175.   On November 27, 2018, Defendant Camaj notified Plaintiff that she "would like to meet with [him] for a Fact-Finding Conference to discuss concerns reported to me about your alleged behavior on Wayne State University's campus which may be in violation of the Student Code of Conduct." Defendant Camaj scheduled the meeting for November 30, 2018 at 12:00 p.m. in the Office of the Dean of Students. *See* Defendant Camaj's Letter to Plaintiff, dated November 27, 2018 (hereinafter the "Letter"). (**Exhibit K**, *Camaj Letter to Plaintiff*).

176.   Section 11.2 of the Code requires that "[a] notice shall be sent to the student(s) … with a copy to the Dean of Students or the Academic Dean, within ten school days of the Student Conduct Officer's receipt of the charges." In the instant case, the Code required that Plaintiff receive a notice on or before November 11, 2018, which Defendant Camaj failed to provide.

177.   Based on information and belief, Defendant Camaj did no independent investigation work that caused her to violate the notice requirement timetable.

178.   Despite the extended time Defendant Camaj took in "inviting" Plaintiff to meet with her, Defendant Camaj shortened the amount of time Plaintiff had to prepare for his fact-finding conference with Defendant Camaj and refused to provide notice of the allegations as required.

179.   The Code requires that Students receive at least five (5) school days before appearing at any conference, and, given the violation of the Code by Defendant Camaj in giving Plaintiff a late notification, the earliest date for Defendant Camaj to schedule the conference was December 5, 2018.

180.   Even under the unfair procedure being utilized by WSU at the time of the conference with Defendant Camaj, and which violated the *Baum* decision, the five (5) day period between receiving the notification and appearing at an investigative conference provided a minimum of time to review the notice, which notice must contain the following information: (a) the alleged infraction; (b)  the nature of the evidence submitted; (c)  the time and place of the conference; and (d)  a copy of the Code, with a statement that it is the governing policy and that the student should retain it for use throughout the proceeding. *See* Code, at 12 (§11.2).

181.   Defendant Camaj failed to provide any of the required information, except the time and place of the conference that was scheduled, in violation of the Code and Plaintiff's due process rights.

182.   On November 29, 2018, Plaintiff contacted Defendant Camaj by email to her WSU email address (i.e. as provided on the "invitation" to the fact-finding conference), requesting that, pursuant to the Code, Defendant Camaj provide the missing information so that he could prepare for the meeting. Plaintiff further informed Defendant Camaj that he was unaware of the purpose of the meeting and that he was not even sure, based on the notice, whether there were any charges currently pending against him, or if the meeting was designed to determine whether charges would be filed. *See* Plaintiff's email to Defendant Camaj, dated November 29, 2018. (**Exhibit L**, *Email from Plaintiff to Camaj*).

183.   Plaintiff received no answers from Defendant Camaj, and, instead, she admitted to Plaintiff during the introductory portion of the meeting that she intended to keep him in the dark and that was her preferred way of conducting an investigation.

184.   On December 4, 2018, Defendant Camaj closed her investigation, prepared a written report, and filed it with Margit Chadwell,

M.D., Associate Dean of Student Affairs and Career Development at the SOM.

185.   Defendant Camaj's investigative report did not include evidence pertaining to the following factual issues in dispute between Plaintiff and Roe: (a) any information that either corroborated or disproved Plaintiff's claim that his texts and other communications were not intended to harass but had a legitimate purpose – to stop the unauthorized access of his electronic and computer accounts; (b) copies of the police reports allegedly filed by Roe in Colorado and with the WSU police department; (c) whether other students or friends of Plaintiff, from whom he requested help in stopping the unauthorized access of his electronic and computer accounts could verify the account of events that Plaintiff stated to Defendant Camaj; (d) a report from the University's IT department or WSU engaged expert as to whether Plaintiff's claims were possible; (e) whether the telephone number identified by Plaintiff was connected in any way with Roe, her family, or individuals known to her; (f) whether the Cloud storage company used by Plaintiff had records of his requests for assistance and complaints; (g) the location of the events in question to establish jurisdiction; (h) the nature of the prohibited conduct set out in the Section 4 of the Code; (i) banking records connected to the unauthorized access to Roe's bank account; and (j) the alleged impact, if any,

on Roe from the alleged harassment caused by receiving text and other Internet-facilitated messages from Plaintiff.

186.   In violation of WSU policy, Defendant Camaj intentionally turned a fact-finding conference with Plaintiff into an interrogation by ambush, denying him any ability to defend himself by bringing to the conference information or evidence exonerating him, and depriving him of his right to knowingly exercise his right to waive his voluntary participation in the conference and proceed to a formal hearing, where he could be accompanied by counsel.

187.   On December 4, 2018, based on information and belief, Defendant Camaj concluded a rushed, biased, and woefully incomplete investigation that was motivated, at least in part, by reverse gender discrimination, and not only failed to comply with WSU policy and procedures as they existed at the time she filed her investigative report, but that she knew would be in violation of a new WSU disciplinary hearing policy that would become effective on December 7, 2018. (**Exhibit A**).

188.   Upon information and belief, Defendant Camaj performed no significant investigative work because she assumed that Roe, a female, was correct in her assumptions, allegations, and factual assertions, thus treating Plaintiff in a discriminatory manner simply because he is a man.

189. From on or about November 17, 2018 to December 4, 2018, Defendant Camaj engaged in a knowing and reckless course of conduct demonstrating bias against Plaintiff because he was a male student and with the intent to deprive Plaintiff of his due process rights, as contained in the Interim Guidelines and Constitutions of Michigan and the United States.

190. Demonstrating a complete disregard for the guilt or innocence of Plaintiff, Defendant Camaj exhibited a clear bias on behalf of Roe, by accepting at face value Roe's version of events and proffered documents without subjecting them to any significant scrutiny while failing to make any effort to corroborate the truth and veracity of Plaintiff's competing explanation or justification for contacting Roe.

191. Defendant Camaj by her own admission stated in her investigative report that in a telephone call on or about November 17, 2018 with Roe, Defendant Camaj only reviewed and confirmed Roe's statement without challenge or an attempt to determine the statement's veracity.

192. In contrast, Defendant Camaj admitted to Plaintiff when he voluntarily appeared in-person at the fact-finding conference on November 30, 2018 that she invited him to that she intentionally withheld the necessary notice and information that she was required to provide Plaintiff because she wanted to surprise him and keep him from preparing a defense to which he

was entitled under due process. In so doing, she revealed her bias in favor of Roe and against Plaintiff. Both Roe and Plaintiff had competing versions of events, justifications for their conduct, and witnesses to their version of events. Yet Defendant Camaj only challenged the male respondent's statement and subjected him to an investigative ambush to intentionally deny him of the due process to which he was entitled.

193. On December 4, 2018, Defendant Camaj completed her investigative report and referred the case to Defendant Chadwell, Associate Dean of Student Affairs and Career Development, at WSU's SOM, for adjudication and review. On the basis of Camaj's report, Defendant Chadwell was on notice and knew that Defendant Camaj had failed to perform any independent investigation and that the report she was given was deficient and did not support further action by Defendants, nevertheless, Defendant Chadwell recklessly referred the complaint to the Professionalism Committee without requiring that Defendant Camaj properly investigate the complaint.

194. In her report, Defendant Camaj failed to list any independent evaluation, corroboration or investigation of the claims of either Roe or Plaintiff basing her recommendation entirely on the unsubstantiated complaint even though she had seventeen days to prepare to challenge Roe's complaint during her telephone interview of Roe.

195.   Defendant Camaj concluded her investigation only four days after her ambush interview of Plaintiff that was designed to and resulted in Plaintiff's inability to prepare a defense.

196.   Defendant Camaj's report contained no analysis or conclusions regarding the truth and veracity of any statements or evidence, contained no original investigative findings and ignored Plaintiff's statement which Defendant Camaj failed to investigate and attempt to corroborate.

### 3. The University denied Plaintiff's right to due process by subjecting him to an impermissibly vague Student Code of Conduct.

197.   Defendant WSU's Code of Conduct is so vague that it fails to provide sufficiently specific notice, as required under the Constitutions of both Michigan and the United States, of what constitutes prohibited conduct and of the sanctions to be imposed if such conduct occurs. *See* the Code's "Preamble." (**Exhibit F**).

198.   Although Defendant Camaj charged Plaintiff with Academic misconduct, at no time did the University or the SOM specify how or what academic rule prohibited Plaintiff from "provid[ing] [Roe] with old Biology exams." (**Exhibit J**).

199.   "The Student Code of Conduct shall apply to conduct that occurs on University or Housing premises and at University or Housing sponsored activities that occur on or off-campus." (**Exhibit F**, at 3, § 3.0).

200.   There is no evidence in the Camaj Report that the alleged misconduct investigated by Defendant Camaj "occur[red] on University or Housing premises and at University or Housing sponsored activities that occur on or off-campus," as required by the Code.

201.   The Code failed to put Plaintiff on notice that, *inter alia*, providing old practice tests to another student for purposes of studying violates the Code's provisions against and/or otherwise constitutes academic misbehavior, and, further, neither the Professionalism Committee nor the Promotions Committee ever asked Plaintiff about this, treating the same as a non-issue.

202.   The Code's definition of academic misbehavior and involving cheating fails to define what constitutes "unauthorized materials, information or assistance in any academic exercise."

203.   Roe's complaint cited harassment by Plaintiff as the gravamen of the behavior she complained about. Roe did not complain about Plaintiff engaging in conduct which threatened or endangered her.

204.   WSU and the School of Medicine do not define "harassment" in any code or set of bylaws for either the Professional or Promotions Committees.

205.   The Michigan Penal Code defines harassment as "conduct directed toward a victim that includes, but is not limited to, repeated or continuing unconsented contact that would cause a reasonable individual to suffer emotional distress and that actually causes the victim to suffer emotional distress. Harassment does not include constitutionally protected activity or conduct that serves a legitimate purpose." Michigan Penal Code, §750.411h.

206.   Defendants, in failing to investigate Plaintiff's allegations that his contact was for a legitimate purpose, i.e., namely, to prevent the unauthorized access to his computer and banking accounts, and therefore not harassment, denied him his rights to a competent, unbiased, and reasonable investigation before being referred to the SOM for adjudication and review.

207.   The student Code of Conduct lacks a standard of proof to control the actions of Defendant Camaj as the Student Conduct Officer in this case, even when Defendant Camaj makes critical decisions as to whether to refer a case for further action, and has totally unfettered discretion to "concurrently propose to the charged party a recommended disposition of the charge." *See*

the Provost's letter denying Plaintiff's Appeal. (**Exhibit M**, *Provost Letter Denying Appeal*, at 1).

208.   In failing to conduct a competent investigation, Defendant Camaj engaged in biased, arbitrary, and capricious decision-making in referring Roe's complaint to the SOM without offering Plaintiff a recommended disposition, and, as a result, denied Plaintiff of due process.

### 4. The SOM's Professionalism and Promotions Committees failed to properly carry out their institutional roles and engaged in an intentional course of conduct that denied Plaintiff of his right to due process.

209.   The SOM describes the Professionalism Committee as an "oversight and decision-making entity," in its by-laws. (**Exhibit E**).

210.   The SOM identifies the Role of the Professionalism Committee to include:

a. Monitoring reports of medical students' unprofessional behavior and promote the development of professionalism;

b. Conducting investigations of all reports of unprofessional student conduct referred to the committee;

c. Convening formal hearings at the behest of the committee chair to determine whether a student is in violation of either the professionalism core values and attributes or of the Student Code of Conduct; and

d. Following a formal hearing, the committee may determine a remediation. If remediation is rejected the committee forwards case to Promotions Committee.

*Id*.

211.   The Faculty Senate By-laws, Section II of Article IV thereof, identifies the student Promotions Committee as one of seven Standing Committees. The Professionalism Committee Guide identifies the Professionalism Committee as a subcommittee of the Promotions Committee. "Accordingly, any appeal of a Professionalism Committee decision is made to the Promotions Committee for definitive disposition."

212.   The Professionalism Committee adjudicates professional breaches through appropriate means, including referral to the Promotions Committee who may ultimately dismiss medical students.

213.   The Professionalism Committee is the only Committee before whom testimony from students or witnesses is taken.

214.   Students have a right to appeal decisions of the Promotions Committee back to the Promotions Committee and, if denied, to appeal to the Provost of the University.

215.   On or about January 25, 2019, Defendant Matt Jackson, as Chair of the Professionalism Committee and Assistant Dean of the SOM, met with Plaintiff and provided him with notice of the hearing date and an opportunity to review documents that he claimed were provided to the Professionalism Committee. (**Exhibit G**).

216.   The purpose of the January 25, 2019 meeting was to provide Plaintiff with notice of the charges against him and to understand the nature of the proceeding that would be conducted by the Professionalism Committee on a later date (February 7, 2019); however, although Plaintiff was shown numerous documents, he was not provided with copies of the documents he was shown so that he could prepare a defense.

217.   Defendant Jackson knew at all times relevant to this complaint that dismissal was a possible outcome and when Plaintiff specifically asked him that question, Defendant Jackson intentionally attempted to prevent Plaintiff from understanding the great risk of jeopardy he faced by avoiding the question and telling Plaintiff he did not believe Plaintiff was at risk of dismissal, but rather the matter would likely result in a mark on Plaintiff's MSPE (Medical Student Performance Evaluation) letter, which is provided to residency programs when medical students submit with their residency applications, among the least severe outcomes possible.

218.   Given the seriousness of the January 25, 2019 meeting, Plaintiff asked Defendant Jackson if he should hire an attorney, and Defendant Jackson told him that he did not need to do so at that time, and that the lawyer would not be able to speak on his behalf or represent him during the Committee's meeting, making Plaintiff's hiring of an attorney "not useful."

219.   Defendant Jackson did not provide Plaintiff with any documents that he could take with him that documented this meeting, the substance of the documents he was shown depriving him of the ability to meaningfully analyze his rights as a student or prepare to appear before the Professionalism Committee.

220.   On or about February 7, 2019, the Professionalism Committee convened a hearing to review the reported and alleged violations of the SOM's professionalism standards. (**Exhibit G**, at 1).

221.   Notwithstanding Defendant Jackson's statements to Plaintiff, prior to and during the February 7, 2019 hearing, Defendant Jackson and the other members of the Professionalism Committee knew that they had the authority to recommend the dismissal of Plaintiff to the Promotions Committee, and that a recommendation of dismissal was a foreseeable outcome.

222.   Prior to and at all times during the hearing, the Professionalism Committee was aware that the Professionalism Committee had secured the testimony of the alleged victim, Roe, and that they would be taking live testimony from the accuser immediately before taking live testimony from Plaintiff.

223.   Notwithstanding Defendant Jackson's statements to Plaintiff regarding dismissal, at the hearing convened by the Professionalism Committee, the potential sanction against Plaintiff, if found responsible, clearly included suspension or dismissal.

224.   During the hearing, Plaintiff was asked, "how would you feel if we recommended to dismiss you?"

225.   Although Plaintiff faced the draconian penalty of dismissal, the Professionalism Committee did not allow Plaintiff to, *inter alia*, cross-examine his accuser or the accuser's witnesses and kept him in a waiting room while the alleged victim testified before the Professionalism Committee.

226.   Defendant Jackson's efforts to discourage Plaintiff from hiring an attorney or offering evidence and witnesses for the Committee to examine effectively denied Plaintiff the ability to defend himself as he reasonably concluded that he faced only minimal discipline, even if ultimately found responsible for the alleged violations.

227.   In addition to denying Plaintiff his right to cross-examine witnesses against him, the SOM did not even provide Plaintiff an opportunity to listen to his accuser's testimony live; read or hear the alleged victim's transcribed or recorded testimony with time provided to review and prepare a response; or even read a detailed summary of her testimony. As a result, the

SOM deprived Plaintiff of his rights to due process under the Constitutions of Michigan and the United States.

228.   The Professionalism Committee did not provide Plaintiff with a list of the questions asked of Roe by its members so that he could determine what issues, evidence, or concerns, among others, motivated the Professionalism Committee members or appeared to be important to them. Instead, Plaintiff was left to guess as to the charges and evidence against him.

229.   This deprivation of the right to due process resulted in Plaintiff not being able to determine whether the Professionalism Committee viewed this case as involving sexual harassment, stalking, harassment under the general Michigan harassment statute, or all three together.

230.   Plaintiff was ambushed and questioned by the Professionalism Committee along several lines of alleged misconduct without having been provided with a statement of the charges he faced after Roe's testimony.

231.   On or about February 11, 2019, Plaintiff received a letter from the Professionalism Committee setting forth their decision to "refer your case to the School of Medicine Promotions Committee with a recommendation for dismissal," along with a form letter from Defendant Baker inviting Plaintiff to appear before the Promotions Committee.

232.   On or about February 13, 2019, Plaintiff met with "Margit Chadwell … and Loretta Robichaud, [Plaintiff's] advisor to discuss with [Plaintiff] the procedures for the Promotions Committee hearing and [his] preparation for that hearing so that [Plaintiff] was fully informed of the process." (**Exhibit M**).

233.   Contrary to the statements rendered in the Provost's Decision Letter, at no time during the February 13, 2019 meeting did the SOM representatives provide Plaintiff with any substantive information, to wit: transcripts, recordings, or detailed summaries of testimony; lists of witnesses; forensic analysis; or witness statements submitted to or relied upon by the Professionalism Committee from witnesses that did not testify in person.

234.   In spite of the Professionalism Committee's knowledge that the Promotions Committee functioned as a decision-making body on the issue of dismissal, the Professionalism Committee failed to provide notice to Plaintiff of the case against him, and the basis of their recommendation, providing instead only a laundry list of "general categories of what values and attributes were involved: (1) Professional responsibility; (2) Competence and self-improvement; (3) Respect for others and for professional relationships; (4) Honesty including academic integrity; (5) Personal responsibility; and (6) Social responsibility."

235.   By failing to provide Plaintiff with specific information upon which to challenge the finding by the Professionalism Committee, the SOM denied Plaintiff  his rights to due process under Section 5.2 of the Promotions Committee rules, and both the Michigan and United States Constitutions, by failing to put him on notice of the evidence supporting the Professionalism's decision and on which it was urging his dismissal.

**5.   The Promotions Committee denied Plaintiff his right to due process failing to provide notice reasonably calculated to afford Plaintiff with an opportunity to present a defense.**

236.   Section 5.2 of the Promotions Committee's hearing rules sets forth the following process:

a.   Students who are appealing a decision of the Professionalism Committee, are requested to submit an appeal letter to their counselor within 10 days of receipt of the decision of the Professionalism Committee and a copy to records and registration. This appeal letter should state the main reason for the appeal, supported by facts;

b.   A student can bring a support person to a hearing. If that support person is an attorney, the Vice Dean for Medical Education or his/her designee must be notified 10 days prior to the hearing;

c.   Recordings are not allowed;

d.   The student will be introduced to the voting members of the committee;

e.   Members of the Committee may ask questions of the student;

f.    The student is permitted to summarize his/her situation;

g.    Deliberations are confidential, are based upon the academic decision making of the Committee, and occur without the student being present;

h.    The Promotions Committee can decide to postpone action pending receipt of additional information;

i.    An official letter of the decision will be provided to the student; and

j.    In the process of making decisions regarding students, the Promotions Committee considers the student's entire academic record to date, which includes: pre-entry data and medical school transcript information; performance data from the current academic year; and information regarding any student issues which appear to have impaired academic or professional performance.

237.    Notwithstanding the hearing rules set forth in the Promotions Committee's by-laws, Plaintiff was invited to appear before the Promotions Committee on February 27, 2018 and was not provided with any information about the testimony or evidence submitted by the Professionalism Committee to the Promotions Committee beyond the general statement that he had demonstrated a pattern of harassment and misrepresentation that violated the core professionalism standards for the SOM. (**Exhibit M**, at 2).

238.    When Plaintiff inquired of his Counselor whether he should be worried about dismissal and should bring an attorney to the Promotions Committee meeting on February 27, 2018, the Counselor minimized the

seriousness of the hearing and discouraged Plaintiff from bringing an attorney to the hearing.

239.   On February 27, 2018, Plaintiff appeared before the Promotions Committee.   Prior to appearing before the Committee, and as required pursuant to the Promotions Committee hearing rules (Section 5.2), Plaintiff submitted a statement to his counselor that attempted to summarize for the Committee information Plaintiff wished the Committee to consider, supported by facts, in light of the reason Plaintiff was called before the Committee for a hearing.

240.   The requirement for student provided information set forth in the Promotions Committee's hearing rules denied Plaintiff the reasonable notice required to reasonably determine whether the Committee had "all relevant data" by denying him access to the testimony, records, information, and other evidence the Professionalism Committee based their decision on and subsequently transmitted to the Promotions Committee in support of their recommendation for dismissal.   Therefore, Plaintiff was left to guess as to what to communicate to the Committee and what evidence was in dispute, incorrect, or missing from the record.

241.   The Promotions Committee's hearing rules continued the SOM's denial of Plaintiff's right to due process by exposing Plaintiff to a Hobbesian

choice – he could go before the Committee blindfolded, and perhaps unknowingly contributing to his ouster, because Committee members questioning him had information he was not privy to and could parse it unfairly and without the oversight of a judge or independent arbiter, *or* he could reject the invitation to appear and guarantee his dismissal.

242.   As a result of the Promotions Committee's failure to provide adequate notice of the charges he faced or the issues of importance to the Committee, Plaintiff was left to anticipate and hope that what he offered in his testimony would result in a determination not to dismiss him from the SOM, denying him a real and meaningful opportunity to be heard.

243.   The Promotions Committee's demands on Plaintiff, without providing him with access to the full record being used by the Committee, and without being informed of the Committee's specific questions, issues, or areas of interest, provided an illusory opportunity for Plaintiff to explain why he should not be dismissed, when in reality it worked as a trap to provide the Promotions Committee with an opportunity to further build their record against Plaintiff who they kept in the dark as to what they were focused on, what issues they considered important, and what evidence they were relying on.

244.   Based on information and belief, the Promotions Committee failed to conduct a searching inquiry of Roe's account, accepting it at face value, because she was a woman, and subjecting Plaintiff to a star-chamber type process where he was not provided notice, he was offered false hope that an apology to the victim might suffice to prevent dismissal, and, without proof, he was assumed to have a sexual or romantic interest in his accuser because he was a man.

245.   Immediately after the February 27, 2018 meeting of the Promotions Committee, the Committee issued a letter to Plaintiff informing him that they had decided to dismiss him from the SOM. For the first time, the Committee stated that in addition to evidence surrounding his alleged non-academic misconduct, they had based their decision, in part, "upon an evaluation and discussion of [his] entire academic record/academic progress." At no time during the Professionalism Committee hearing or the Promotions Committee meeting was any question raised as to Plaintiff's academic record or his academic progress. Moreover, when Plaintiff attempted to offer them, the Promotions Committee refused to consider them saying they were unimportant.

**D. The School of Medicine's violation of Plaintiff's due process denies Plaintiff his right to voluntarily withdraw.**

246.   Plaintiff asserts that the SOM deprived him of his due process rights under the WSU and SOM guidelines, by-laws, and rules, and the rights guaranteed by the Michigan and United States Constitutions as they applied to Plaintiff's appeal rights regarding his dismissal.

247.   Under the SOM's disciplinary rules, the SOM offers students who the Promotions Committee have decided to dismiss the opportunity to voluntarily withdraw or to appeal the decision to the Promotions Committee. In the February 27, 2018 letter from the Promotions Committee (the "Baker Letter") to Plaintiff, there is no information provided to put Plaintiff on notice that if he chose to appeal to the Promotions Committee, voluntary withdrawal was no longer possible. (**Exhibit N**, *Baker Letter*).

248.   The Promotions Committee's rules, and the WSU Student Code of Conduct, do not address voluntary withdrawal, and there is no mention of this right or option, and nothing stating that appealing a decision of the Promotions Committee to the Committee or the Provost results in the waiver of a student's right to withdraw from the SOM.

249.   On March 6, 2019, Plaintiff met with Defendant Baker, Vice Dean for Medical Education at WSU's SOM. In response to a direct question by Plaintiff and regarding the opportunity to withdraw from the SOM if he appealed to the Promotions Committee, Defendant Baker informed Plaintiff

that he would still have the option to withdraw unless he appealed a denial of his appeal to the Promotions Committee to the Office of the WSU Provost.

250.   On March 7, 2019, and again before taking an appeal to the Promotions Committee, Plaintiff was informed by his class counselor, Defendant Robichaud, that he retained the option of voluntarily withdrawing as long as he did not appeal a denial of his appeal to the Promotions Committee to the WSU Provost.

251.   Contrary to claims that Defendant Baker "clearly articulated to [Plaintiff] in his dismissal letter of February 27, 2019 and in [his] meeting of March 6, 2019, [] [that] (1) You had the option of withdrawing by March 14, 2019, which would have been 10 business days after receipt of the dismissal letter; or (2) [Plaintiff] could appeal to the Promotions Committee and then to the Provost," no such instruction was ever provided to Plaintiff.

252.   Indeed, there is no WSU or SOM policy indicating that the appeal to the Promotions Committee acts to waive a student's right to withdraw voluntarily from the University.

253.   Defendant Baker's February 27, 2019 letter offered two options: voluntary withdrawal or appeal of the dismissal decision. The letter is silent as to whether the withdrawal option is lost if any appeal is pressed. Indeed,

the letter offers two appellate options: the School/College appeal path and a Provost review.

254.   Plaintiff was devastated by the Promotions Committee's decision to dismiss him, and he was unclear as to his options. As a result, he requested a meeting with Defendant Baker to discuss his options and requested additional time to reach a decision.

255.   On March 6, 2019, Plaintiff met with Defendant Baker, who admitted that it was in his power as Chairman of the Committee to rescind the dismissal on his own authority.

256.   Based on the information Plaintiff received from Defendant Baker, Plaintiff appealed to the Promotions Committee and requested that the Committee reconsider its decision dismissing Plaintiff from the SOM.

257.   Defendant Baker's efforts to appear reasonable and minimize Plaintiff's response to losing his life's dream of becoming a physician after nine years of schooling, together with his express statement that Plaintiff could preserve his right to withdraw if he did not remove the issue from the SOM, was calculated on Defendant Baker's part to encourage Plaintiff to appeal to the Promotions Committee, even though he knew as the Committee's Chairman that he would not grant the appeal.

258.   Defendant Baker's actions constituted an intentional and gross effort to manipulate Plaintiff, a young and hopeful medical student, to cause Plaintiff to lose his right to voluntarily withdraw, and thereby cause harm to Plaintiff's professional and personal reputation and ability to pursue his medical career at another medical school.

**E. The excessive penalty imposed by Defendants on Plaintiff additionally constitutes a substantive due process violation.**

259.   WSU and the SOM may impose a wide variety of sanctions and penalties where academic and non-academic misbehavior is found to have occurred.

260.   These sanctions and penalties include, but are not limited to:

a.  a disciplinary reprimand;

b.  disciplinary probation;

c.  loss of privileges;

d.  discretionary sanctions, including but not limited to assignments, essays, service to the University, or other related discretionary assignments;

e.  residence hall suspension;

f.  residence hall expulsion;

g.  suspension;

h.  school expulsion;

i.  restitution;

j.  transcript disciplinary record, for a period of time, or permanently; and

k.  other sanctions as determined by the Provost or his designee.

261.  The University and SOM have denied Plaintiff the ability to defend himself, and to reasonably respond to the sanctioning committee or official determining his appeal, resulting in a blind process where Plaintiff was forced to make admissions and statements against his interest in violation of his right to due process under the U.S. and Michigan Constitutions, WSU Code of Conduct, and SOM Professionalism and Promotions Committee's By-laws and rules.

262.  In this case, Roe did not specifically allege sexual harassment, sexual abuse, threats of physical harm, threats through physical confrontation, engaging others to threaten, sexually harass, or confront her, or engage in constant repetitive contact over the two-year period at issue (because there was none), but alleged only contact during sporadic periods to resolve personal issues involving unauthorized access to his computer and bank accounts.

263.  Roe's complaint is inconsistent, and actually supports significant portions of the information provided by Plaintiff to Defendant Camaj that Defendant Camaj made no effort to investigate.

264. Even though Defendant Camaj found the two accounts in conflict, she adopted Roe's account from the outset and attempted to blindside Plaintiff in an effort to secure information that she could then parse as incriminatory, ignoring all other relevant, credible, and acquitting information.

265. According to the findings set forth in the Camaj Report, over the 26-month period from when Roe and Plaintiff met, and until Roe filed her complaint, Defendant Camaj only documented 37 text messages, and no other Facebook messages or emails, with the majority of contacts taking place in four months, i.e. November of 2016, and February, March, and April of 2017. Indeed, Defendant Camaj's report documents only two text messages after April 10, 2017.

266. Each time contact was renewed with Roe, Plaintiff had a legitimate, non-harassing reason for contacting her and attempting to obtain her cooperation in addressing the unauthorized access of his computer and bank accounts, issues described herein, and no evidence was discovered or offered by Defendant Camaj that disproved or even attempted to rebut Plaintiff's claims of unauthorized access to his computer or bank accounts.

267. Prior to his termination, Plaintiff was well into his second year of medical school, a good academic performer, the class president, and had

invested considerable money and time studying at WSU for 7 years prior to medical school.

268.   During his overall academic career, he was a top student, performed various community service tasks, won student government positions, and served as a student representative to the WSU Board of Trustees.

269.   At all times until he was accused by Roe, Plaintiff was an exemplary student who was an asset to the WSU and SOM community.

270.   Plaintiff is of Middle Eastern ancestry, born in Michigan, a life-long resident of the state, and a first-generation college and medical school student.

271.   As a member of a minority group, Plaintiff's presence and participation as a medical student at the SOM made him particularly visible and subject to both praise and criticism.

272.   Plaintiff's conflict with Roe did not involve any scholastic activity, did not occur on school property or at an off-campus school activity, and therefore did not interfere with any WSU or SOM operation.

273.   Given Plaintiff's established history of excellent scholarship and University leadership, together with his history of exemplary conduct, and the fact that Roe sought only for Plaintiff to be reprimanded, a disciplinary system

that is intended to protect the arbitrary and capricious decision-making of professors – but can result, without any sexual abuse, in the most dire of penalties being dismissal from the SOM, or conversely, dismissal of the charges, without ever disclosing the underlying record used to make such a decision – is fundamentally unfair and constitutes both a substantive and procedural due process violation.

274.  WSU and SOM officials engaged in protected misconduct by repeatedly misleading and lying to Plaintiff when discussing his options, his situation, his exposure to dismissal, and his need for legal counsel, the latter of which was repeatedly discouraged, further preventing him from exercising his rights to both substantive and procedural due process.

275.  At no time did this matter ever become a criminal matter, in spite of the unverified claim by Roe that she had contacted police departments in Colorado, and the University's own department, reflecting the relatively minor actions at issue in this case, and that simply do not, and did not, support Plaintiff's dismissal from the SOM.

276.  In issuing their decisions, both the Professionalism and Promotions Committees failed to specifically make findings that justified dismissal, and, in doing so, acted consistently with the old demands of the pre-2017 U.S. Department of Education's Office of Civil Rights, i.e. to take a "no-

holds-barred" approach to any male accused of harassment and "send a message" that women who came forward would be believed and their demands satisfied.

277.   At no point, from receipt of the initial online complaint, to the dismissal by the Promotions Committee, and consideration of Plaintiff's appeal to the Provost, was any reasonable investigation done, ultimately resulting in each level of the University and SOM rubber-stamping the original uncorroborated, biased, and flawed "findings" of the Conduct Officer, Defendant Camaj.

278.   On May 10, 2019, Plaintiff was forced to and did appeal his termination to the Office of the Provost, again without the benefit of knowing the basis for the decision made by the Professionalism Committee, without receiving a record of the proceedings before the Professionalism Committee, and without being provided with the reasoning of the Promotions Committee.

279.   On May 23, 2019, Defendant Dr. Darin Ellis, the Associate Provost, informed Plaintiff that his appeal was denied.

280.   In doing so, Defendant Ellis ignored the new *Interim Administrative Hearing Guidelines,* i.e. the established law in the Sixth Circuit, and did not address the lack of procedural and due process protections

that characterized the hearing before both the Professionalism and Promotions Committees in violation of *Doe v. Baum.*

### F. The harms suffered by Plaintiff.

281.   Due to the denial of due process that rendered Plaintiff's efforts in light of the University and SOM's efforts to keep Plaintiff blind to his predicament, the evidence arrayed against him, and the reasoning of the various committees and members who sat in judgment on Plaintiff, Plaintiff was dismissed from the SOM.

282.   Because Plaintiff's wrongful dismissal resulted in his virtual disappearance from the SOM's Board activities and student government, Plaintiff's professional reputation in the SOM community and larger University community has been damaged, as rumors and innuendo have raised questions about Plaintiff, his conduct, and his reasons for disappearance from the SOM.

283.   The SOM has placed highly damaging entries into his academic file, thereby making it impossible for him to apply for or gain admittance to any other U.S.-based medical school.

284.   Due to the Defendants' outrageous, arbitrary, and capricious disciplinary process that operates in almost total darkness, preventing Plaintiff from gathering the necessary information with which to defend himself, and

the discriminatory gender-biased investigation, Plaintiff's pursuit of a professional career as a physician has been currently rendered impossible.

285.   Plaintiff's dismissal has also resulted in significant economic harm, even if he were to gain entry to another medical school, as he cannot graduate with his matriculated class, and the delay would result in additional loans, loss of earning capacity, and other expenses.

286.   Plaintiff is unable to obtain the necessary documents from the SOM to allow him to apply to another medical school.

287.   Even assuming Plaintiff were able to obtain a medical degree, the dismissal and accompanying entries in his transcript and academic record will severely limit his ability to seek the quality of residency and other training positions that are required to obtain high-quality appointments, fellowships, and employment, resulting in harm to his personal and professional reputation and reduced future earning potential.

288.   Plaintiff has been depressed and socially isolated from a community in which he invested substantial time, money, and effort to be a member of. He has sought treatment for the emotional and mental devastation, including suicidal ideation, that his unwarranted dismissal has caused.

## COUNT I
## 42 U.S.C. § 1983: DENIAL OF
## FOURTEENTH AMENDMENT DUE PROCESS

### *(AGAINST ALL DEFENDANTS)*

289.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

290.   The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property without due process of law."

291.   All Defendants in this case are state actors subject to the Fourteenth Amendment.

292.   42 U.S.C. § 1983 prohibits any person acting under color of state law from subjecting or causing to be subjected any citizen of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States or its laws.

293.   And in the event that such deprivation occurs, that person "shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…." *Id*.

294.   Plaintiff has a protected liberty interest in, *inter alia*, his good name, reputation, honor and integrity, of which he cannot be deprived without due process.

295.   Plaintiff has a protected property interest in pursuing his medical school education, as well as in future education and employment

83

opportunities, and the liberty to pursue other opportunities of which he cannot be deprived without due process.

296.   Defendants, by their acts and omissions, have deprived Plaintiff of his constitutionally protected property interest in his continued enrollment at WSU, and his right to complete his medical school education at the SOM and obtain his license to practice medicine as a physician.

297.   Defendants engaged in a course of conduct that included intentional, negligent, arbitrary, and capricious acts that resulted in the deprivation of his constitutionally protected property interests in his education and medical career.

298.   Plaintiff's constitutionally protected property interest in his right to continued enrollment at WSU also arises from the express and implied contract between Plaintiff and WSU, and the policies and procedures set forth by WSU in its Student Code of Conduct, together with the practices, patterns of conduct, and understandings established by WSU and its SOM.

299.   It is well and clearly established that the Fourteenth Amendment due process protections apply to the investigative and disciplinary processes and systems at public higher educational institutions such as WSU.

300.   Plaintiff's admission to WSU's SOM created a protected property interest in continuing his education until he has completed his course

of study, and Defendants cannot deprive him of this interest, among others, without due process.

301.   As a result of Defendants' actions in subjecting Plaintiff to an investigative and disciplinary process that exposed him to possible dismissal without providing him with the minimum procedural due process required in such a case, including notice and an opportunity to be heard, Defendants failed in their duty to provide him with due process of law.

302.   In denying Plaintiff, *inter alia*, the opportunity to hear the evidence of witnesses against him, and to be provided with a complete record of the evidence relied upon in the decision by Defendants to dismiss Plaintiff, Defendants denied Plaintiff notice of the charges and evidence against him in violation of the Fourteenth Amendment.

303.   In denying Plaintiff, *inter alia*, the opportunity to hear the testimony against him, be present during the entire hearing, and cross-examine the witness or witnesses against him, as WSU has yet to provide Plaintiff with a list of witnesses heard by the Professionalism Committee, Defendants have denied Plaintiff of his property and liberty interests without due process.

304.   In reaching the decision to dismiss Plaintiff, Defendants were presented with two completely different and conflicting accounts: Roe's

account that she was an innocent freshman student stalked by Plaintiff and continually harassed online over a two-year period, in which Plaintiff impersonated an attorney, and was pursuing a romantic or sexual relationship that caused her pain, anguish, and emotional harm; and Plaintiff's account where he had no romantic or sexual interest in Roe but was simply attempting to stop Roe and anyone else from improperly accessing his computer and banking accounts, and therefore was not engaged in any course of harassment, had no intent to cause Roe pain, anguish, or emotional harm, and did not attempt to impersonate an attorney by sending her an email purporting to be an attorney.

305.   In such a case, this Circuit has commanded and requires that, "(1) if a student is accused of misconduct, the university must hold some sort of hearing before imposing a sanction as serious as expulsion or suspension, and (2) when the university's determination turns on the credibility of the accuser, the accused, or witnesses, that hearing must include an opportunity for cross-examination." *Baum* at 399-402.

306.   Where, as in this case, the Promotions Committee heard from witnesses and questioned Plaintiff about his intent, the purpose behind his actions, and whether he engaged in actions to impersonate an attorney, as

alleged, it is clear that the Professionalism Committee was engaged in determining the truth or veracity of Plaintiff's claims and position.

307. Where, as in this case, the Professionalism Committee heard from at least one witness against Plaintiff, Roe, it is reasonable to conclude that the Committee inquired as to her injury, the extent to which Plaintiff's actions caused her harm, and her perceptions of Plaintiff's actions and intent, which all were issues relevant to the accusation of harassment.

308. Accordingly, under the law in this Circuit, Defendant WSU deprived Plaintiff of his constitutionally protected property and liberty interests without due process, as they did not provide him with an opportunity to hear the evidence against him or cross-examine Roe, and other witnesses that may have also appeared or provided testimonial evidence through other means, and which still remains unknown to Plaintiff at present.

309. In the course of their investigative and disciplinary process, Defendants violated Plaintiff's rights by engaging in a flagrant course of conduct meant to surprise, ambush, and otherwise render him incapable of defending himself in any meaningful manner, and thereby denying him any real opportunity to obtain the protections of his constitutionally protected right to due process on the basis that, *inter alia*, Defendants had prejudged the

matter and were predisposed to find Plaintiff, a male, guilty on the uncorroborated allegations of Roe, a female.

310.   Defendant WSU's decision to use a single-investigator model for initial adjudication of the validity of a complaint violated Plaintiff's right to due process.

311.   Under the Code, Defendant WSU invested Student Conduct Officer and Defendant Camaj with the authority to: (1) serve as the sole investigator of Roe's complaint; (2) decide of her own accord, and not immediately reviewable that no further action will be taken; (3) decide that the matter will be referred to the Dean of Students for further and more serious action; and (4) determine on her own to propose to the charged party a less serious recommended disposition of the charge and, if accepted, the recommended disposition would not be forwarded to the Dean of Students, but only to the charged party. Code at § 11.6-7.

312.   Under the Code, Defendant Camaj, as the Student Conduct Officer, is also authorized and responsible for maintaining records about disciplinary matters and "prepar[ing] an annual report for the Board of Governors describing how this code has functioned during the year and, if the Student Conduct Officer believes changes are desirable, recommending those changes." Code at § 9.0.

313. Under the Code, Defendant Camaj is the University official charged with investigating and resolving disciplinary matters in the first instance, and with this power is able to force accused students to submit to her arbitrary and capricious investigative methods, while in violation of the Code, because any challenge will likely result in her referral of charges to the Dean of Students in the accused's college or school.

314. In the instant case, Defendant Camaj intentionally deprived Plaintiff of notice guaranteed by the Code and the ability to prepare for the fact-finding conference to which Plaintiff was arbitrarily and capriciously subjected.

315. By investing Defendant Camaj with total authority to dismiss complaints at their outset, offer the equivalent of a lesser plea, or severely increase the exposure of accused students to serious disciplinary outcomes by deciding to recommend further proceedings, WSU has created an environment that turns Defendant Camaj's personal views about misconduct, gender equality, and due process into the unknown but official policy of WSU and its SOM, and that is subject only to the personal whims of Defendant Camaj and the very definition of an arbitrary and capricious system of discipline.

316.   When Plaintiff agreed to meet with Defendant Camaj, he was aware of the tremendous authority she held to refer charges or dismiss any complaint. Thus, even though he asked for but did not receive notice of the charges against him, he was forced to submit to the meeting demand, disguised as an invitation.

317.   When Plaintiff appeared before Defendant Camaj, he became aware that she had already spoken to his accuser, yet Plaintiff had no way of knowing which questions were actually asked of Roe by Defendant Camaj, Roe's answers, or if the responses were less or more definite than represented by Defendant Camaj.

318.   Because Defendant Camaj, at the initial fact-finding meeting, was acting not simply as the investigator but as a judge that determines guilt, and in referring cases to the Dean of Students makes a judgment that a lesser disposition is not appropriate, the process itself denied Plaintiff of his right to due process of law where the roles of investigator, prosecutor, and judge are separate, and instead functioned as an inquisition that violated the constitutional protections that due process is designed to provide.

319.   Accordingly, by, *inter alia*, declaring Plaintiff's actions as meriting referral to the WSU's SOM for adjudication and review without ever attempting to verify and corroborate Plaintiff's claims, or Roe's competing

allegations, Defendants WSU and Defendant Camaj violated Plaintiff's well established constitutional rights.

320.   By, *inter alia*, accepting Defendant Camaj's woefully inept and incomplete investigative report, and using it as a basis for the Professionalism Committee's hearing without providing Plaintiff with his clearly established right to cross-examine all witnesses against him, Defendants WSU, its SOM, Chadwell, Jackson, and Camaj violated Plaintiff's well established constitutional rights.

321.   When, *inter alia*, the Promotions Committee accepted the recommendation of the Professionalism Committee that did not afford Plaintiff a right to cross-examine witnesses against him, and denied Plaintiff notice of the evidence against him as contained in the Professionalism Committee's referral and record, Defendants WSU, WSU SOM, Chadwell, Jackson, Baker, and Camaj violated Plaintiff's clearly established constitutional rights.

322.   When, *inter alia*, the Promotions Committee denied Plaintiff's appeal of their original decision, it violated Plaintiff's well-established constitutional rights by denying him access to the record on which the Committee based its original decision, thereby making it impossible for

Plaintiff to prepare a meaningful appeal that addressed the key issues and findings of the Promotions Committee.

323.   When, *inter alia*, the Provost denied Plaintiff's appeal of the Promotions Committee's decision to dismiss Plaintiff without requiring that a new hearing take place that afforded Plaintiff all of his clearly established constitutional rights, Defendant Ellis ended all possible efforts to cure the constitutional violations inherent in the WSU system of discipline and caused Plaintiff to be finally and permanently separated from WSU as a medical student.

324.   The process, from investigation to final disposition by the Office of the Provost, afforded Defendants the opportunity to engage in discriminatory decision-making in favor of a prior female freshman student at the expense of a male SOM student.

325.   Defendants, as well as other agents, representatives, and employees of WSU, were acting under color of state law when they showed intentional, outrageous, and reckless disregard for Plaintiff's well-established constitutional rights.

326.   Defendants all agreed to, approved of, and otherwise ratified their unconstitutional process of imposing discipline, even though they were aware that the process included dismissal of Plaintiff as a possible outcome,

the most severe discipline the University and its SOM, through its various agents, representatives, and employees, could impose.

327.   As a result of these numerous and egregious due process violations, Plaintiff has suffered, and continues to suffer, ongoing harm, including reputational harm, loss of employment in the medical and health care fields, diminished professional and economic opportunities, and impact to his mental health, and other non-economic damages.

328.   In particular, Plaintiff, not only as one of many medical students, but the President of his medical school class, has been permanently damaged as the Defendants' denial of his due process has resulted in a denial of the benefits of education at his chosen school, the loss of his reputation among his former class members who elected him as class President, and his stature as a model student and leader in his minority community.

329.   Accordingly, Defendants are liable to Plaintiff in violation of 42 U.S.C. § 1983 for their numerous and egregious violations of the Due Process Clause of the Fourteenth Amendment, and for all damages arising therefrom.

330.   As a direct and proximate result of the above actions and conduct, Plaintiff sustained, and continues to incur, tremendous damages, including without limitation, emotional distress; loss of educational and career

opportunities; economic injuries; and other direct and consequential damages. Plaintiff's interests in the results of the disciplinary process are significant.

331.   Given the severity of Defendants' punishment, the nature of the uncorroborated allegations, and the denial of Plaintiff's clearly existing rights, Defendants' actions as described herein constitute a malicious, reckless, wantonly negligent, and/or a deliberately indifferent course of conduct, such that Plaintiff is entitled to an award of punitive damages.

332.   As a result of the foregoing, Plaintiff seeks damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, together with punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

333.   Plaintiff also seeks declaratory and injunctive relief declaring the disciplinary process to which he was subjected as unconstitutional, and expunging or vacating all findings, sanctions, or other records created or resulting from the unconstitutional process, plus an injunction enjoining violations of the Fourteenth Amendment in the process of investigating and adjudicating misconduct allegations, whether or not involving sexual

misconduct or harassment, and requiring WSU to destroy all disciplinary records concerning Plaintiff.

## COUNT II
## VIOLATION OF TITLE IX
## OF THE EDUCATION AMENDMENTS OF 1972
### *(AGAINST DEFENDANTS WSU, SOM)*

334.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

335.   Title IX of the Education Amendments of 1972 states that "[n]o person in the United States shall, on the basis of sex be … denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

336.   At all times relevant to this Complaint, Title IX applied to WSU, WSU's SOM, and its officials, as the Defendant University receives federal financial assistance that the 2020 Current Funds Budget, published by the University, identifies as exceeding $100,000,000 in Federal Grants and Contracts and in excess of $30,000,000 in federal financial assistance to students.

337.   Title IX may be violated when a Defendant treats similarly situated persons differently on the basis of the sex of the individual.

338.   In this case, Defendants have treated Plaintiff and Roe differently on the basis of sex.

339.   Under the law of this Circuit, Plaintiff may plead an erroneous outcome theory of liability under Title IX. *See e.g. Doe v. Miami University,* 882 F.3d 579, 589 (6th Cir. 2018).

340.   To plead an erroneous-outcome claim under Title IX, a Plaintiff found guilty of sexual assault by a university must allege: "(1) 'facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding' and (2) a 'particularized . . . causal connection between the flawed outcome and gender bias.'" *Id.* at 592 (internal citations omitted).

341.   In the instant case, Defendants' decision to deprive Plaintiff of his right to cross-examine or question witnesses against him did not only constitute a *risk* of an erroneous deprivation of a private interest in remaining a student, it led to his *actual* dismissal. *Doe v. University of Michigan,* 325 F.Supp.3d 821, 827 (E.D. Mich. 2018).

342.   The discriminatory and different treatment is evident in, *inter alia*, external pressures Defendants faced by the OCR, and how Defendant Camaj handled her initial contacts with Roe and Plaintiff.

96

343. As previously stated herein, and based upon information and belief, in or about May of 2018 the U.S. Department of Education's Office of Civil Rights ("OCR") initiated an investigation of the WSU School of Medicine for retaliation against a female medical student who sought to assert her rights under Title IX, and, therefore, at all times relevant to this Complaint, Defendants knew about the OCR investigation for violation of Title IX.

344. Consequently, at all times relevant to this Complaint Defendants (a) had an interest in proving to OCR that it did not improperly dismiss allegations of harassment by female students, (b) were motivated to avoid any additional claim by female students that the SOM did not take allegations of harassment seriously, (c) were aware that if they accepted Roe's allegations against Plaintiff they would avoid the possibility of Roe in Plaintiff's case filing a Title IX complaint while the OCR investigation was ongoing, and (d) in tandem with the Department of Education's highly publicized effort to force colleges and universities to side with female victims over accused males, alongside the ongoing investigation against Plaintiff, suffered a motivation and predisposition to accept the accusations against Plaintiff and his dismissal as the best way forward to protect Defendants from possible sanctions and further public scrutiny.

345.   Moreover, with Roe, Defendant Camaj was highly deferential and described the investigative call as allowing Roe, as Complainant, to "review[] her Complaint Report and confirm that the statement … was accurate." Camaj Report at 20.

346.   Defendant Camaj's Report does not document any challenge to Roe's account and accepts it at face value.

347.   Defendant Camaj's Report does not contain copies of the alleged Police Report or identify the police agency to which it was made.

348.   Defendant Camaj's Report fails to include any documentation or record regarding Roe's alleged statement made to Police at Defendant WSU.

349.   Defendant Camaj's Report does not document that she asked Roe for, or otherwise obtained a copy of, the alleged email Roe claims Plaintiff sent her impersonating an attorney.

350.   Roe made sensationalized claims, without offering any evidence, that created the specter that Plaintiff's actions were sexual in nature, yet Defendant Camaj included them in her Report knowing, as an experienced Student Conduct Officer, that allegations of sexual abuse and/or harassment are treated substantially more seriously than annoying or repetitive contact, and that the Dean of Students and any disciplinary or school judicial entity would be much more likely to be sympathetic to the alleged victim, Roe.

351.   In treating Roe deferentially on the basis of her sex and failing to challenge her uncorroborated allegations, Defendant Camaj allowed unsupported allegations to become part of the investigative record, and intentionally created the impression that Plaintiff was a predator that Roe was correct in fearing.

352.   As a result of Defendant WSU's decision to permit Defendant Camaj to privately question Roe, "[p]laintiff has no way of knowing which questions are actually being asked of Claimant or her response to those questions. Without a live proceeding that includes cross-examination, the risk of an erroneous deprivation of Plaintiff's interest in his reputation, education, and employment is significant." *Doe. v. Univ. of Michigan,* 325 F.Supp.3d 821, 828 (E.D. Mich. 2018).

353.   In contrast to the deferential treatment afforded to Roe, on November 27, 2018, Defendant Camaj "invited" Plaintiff to a fact-finding conference and failed to inform Plaintiff of the purpose of the meeting.

354.   Based on information and belief, Defendant Camaj intentionally attempted to keep Plaintiff in the dark as to the purpose of her investigation and described it only as involving, as stated in the Camaj Letter, his "alleged behavior on Wayne State University's campus." (**Exhibit K**).

355.   Because Plaintiff was unaware of having committed any infraction of University rules, or otherwise, Plaintiff sent Defendant Camaj an email asking her to give him notice of the purpose of the meeting and the topic to be discussed pursuant to the Code's notice requirements. (**Exhibit L**).

356.   On November 30, 2018, when Plaintiff appeared for the meeting, he again asked Defendant Camaj what the meeting was about and why she did not provide the required notice under the Code.

357.   Defendant Camaj answered Plaintiff by telling him that she likes keeping targets in the dark, and that this is how she likes to do her work, because it keeps targets off balance.

358.   Plaintiff was aware before, during, and after meeting with Defendant Camaj that Defendant Camaj had considerable power to punish him if he were to leave the meeting or refuse to answer questions by referring the matter to a University Dean, thereby creating a disciplinary record that would follow him for a substantial period of time, if not forever, if he could not get it dismissed thereafter.

359.   Plaintiff was aware that if Defendant Camaj referred the matter to the Dean of the SOM then he could face a full disciplinary process, and as a result of that fear he remained and attempted to answer questions without

preparation, in an agitated state, and without benefit of documents or the ability to offer any evidence with which to defend himself.

360.   Unlike her interview of Roe, Defendant Camaj's report only documents challenges to Plaintiff's statements during the fact-finding conference, and there is no documentation in the Camaj Report that Defendant Camaj re-interviewed Roe after her interview of Plaintiff to challenge her account, and, instead, she ultimately referred the case to the SOM for adjudication on the basis of the wholesale adoption of Roe's online complaint.

361.   Upon information and belief, Defendant Camaj had already determined that the individual to be believed was the female complainant, Roe, and the conditions under which questioning was done by Defendant Camaj of Plaintiff, and the lack of notice, and total surprise at his inquisition, renders it substantially likely that the record created would lead to an erroneous decision in the outcome of the disciplinary proceeding.

362.   At the time Plaintiff appeared before the Professionalism Committee, the Code provided that, "[b]oth the student and the charging party shall have the opportunity to question opposing witnesses." (Code at § 15.7).

363.   At the time Plaintiff appeared before the Professionalism Committee, if the Committee believed that it was now reviewing Plaintiff's conduct in the context of sexual abuse or harassment, then the *Interim*

*Administrative Hearing Guidelines* in effect directed that "the respondent will be allowed to cross examine the complainant and the complainant's witnesses." (Interim Guidelines at § 6).

364.   Upon information and belief, Defendant Jackson denied Plaintiff any opportunity to challenge Roe's testimony, in any form or manner, in order to spare Roe further anguish as she claimed in her online complaint that Plaintiff's actions had caused her to experience.

365.   Defendant Jackson did not allow Plaintiff to cross-examine or question Roe or any other witness against him.

366.   Defendant Jackson did not allow Plaintiff to attend Roe's testimony, or that of any other witness against him, and ordered him to remain secluded in the building until after the witnesses against him finished testifying, when he was readily available to at least observe Roe's testimony, and the testimony of any and all other witnesses.

367.   Upon information and belief, to prevent Plaintiff from taking legal action against Roe, or to fully avail himself to his right to defend himself to the Promotions Committee, or appeal in the event of an adverse decision by the Promotions Board, Defendant Jackson refused to create a record, document the proceedings, or provide Plaintiff with any information

pertaining to the witnesses and evidence against him that was developed at the hearing.

368.   Upon information and belief, Defendant Jackson acted on a discriminatory basis to protect the female accuser of Plaintiff because he had prejudged the case on the basis of Defendant Camaj's Report and did not wish to be seen as controverting the pre-2017 Department of Education policy of providing preferential treatment for female accusers.

369.   Upon information and belief, Defendant Baker also viewed Plaintiff in an unnecessarily negative light because Plaintiff was a man who Defendant Baker believed had sexually harassed or stalked a woman, Roe.

370.   During the hearing before the Promotions Committee, Plaintiff was asked multiple times about his intent and motive for contacting Roe and whether he had a romantic or similar interest in Roe.

371.   Plaintiff denied, and denies, having any romantic or sexual interest in Roe.

372.   After voting to dismiss Plaintiff, Defendant Baker met with Plaintiff to explain the process of appeal or withdrawal.

373.   During that meeting, based upon information and belief, the Promotions Committee viewed the nature of the offense as constituting some type of sexually oriented offense, and Defendant Baker was personally

offended that Plaintiff defended himself and did not immediately apologize to Roe.

374.   During that post-dismissal meeting, when Plaintiff questioned the severity of the punishment, Defendant Baker refused to allow Plaintiff to defend himself and informed him that in contesting his punishment Plaintiff was expressing a sentiment that Defendant Baker and the Committee did not like because both viewed it as seriously wrong.

375.   Plaintiff continued to attempt to get specific information from Defendant Baker about what the Committee believed Plaintiff had done, however, Defendant Baker refused to answer Plaintiff's request stating that the Committee's deliberations were confidential.

376.   Defendants involved in the disciplinary process, from investigation through final disposition and dismissal, favored Roe at each step and treated Plaintiff's positions, justifications, defenses, and rights to due process differently on the basis that they needed to protect and otherwise defer to the female accuser, even when her allegations were uncorroborated and Defendants' investigation failed to generate any evidence to support those claims.

377.   Here, Defendants' discriminatory conduct, and finding that Plaintiff had engaged in such egregious conduct that he was guilty of some

type of unspecified sexual offense, to which he was not provided either notice or the right to be heard, resulted in an utterly erroneous decision to dismiss Plaintiff.

378.   The facts recounted herein and above do not support Roe's allegations that Plaintiff's contact constituted harassment, sexual or otherwise, but rather that Plaintiff, in trying to address the continued unauthorized access to his computer and bank accounts, was trying to obtain help he believed was necessary.

379.   The facts recounted herein and above do not support Defendants' decision to subject Plaintiff to the disciplinary system, as the conduct did not even implicate the University as required under the Code.

380.   The facts recounted herein and above do not include any personal confrontations, harassing or obscene telephone calls, coordinated actions against Roe by persons known to Plaintiff, or any other act that could constitute, alone or in tandem with others, harassment or an effort to manipulate or control Roe.

381.   The facts recounted herein and above cast more than articulable doubt on the accuracy and efficacy of Defendants' investigation and Roe's assertions that Plaintiff impersonated an attorney.

382. Plaintiff and Roe clearly viewed the contact, issues raised, and reasons behind their interactions from two different positions and perspectives, making it clear from the outset that there were two competing narratives, and that cross-examination was a necessary component of any constitutional disciplinary process to prevent an erroneous decision by Defendants.

383. Plaintiff has pleaded sufficient facts to show the existence of bias, and its connection to the erroneous outcome above, and include, but are not limited to:

    a. The disparate manner to which Defendant Camaj treated Plaintiff and Roe during their interviews when the only individual known to Defendants had a stellar reputation for honesty, hard work, academic and social success, and elected leadership;

    b. The willingness of Defendant Camaj to accept without corroboration all of Roe's allegations and refusal to credit Plaintiff's entire account;

    c. Inclusion of information that was not corroborated that tended to impugn the character of Plaintiff and buttress Roe's account; and

    d. Defendant Camaj's refusal to investigate easily verified information contained in Roe's allegations such as police reports, attempts to improperly obtain private photographs, and impersonation of an attorney.

384. The disparate treatment of Plaintiff at each stage of the disciplinary process was the result of gender bias, and a clear act of sex

discrimination, leading directly to Defendants' decision that dismissal was the proper penalty for the conduct they found.

385.   The erroneous outcome in Plaintiff's case was a direct result of decisions by Defendants' administrators, staff, and faculty to adopt a practice to credit female students' claims of sexual discrimination, harassment, and abuse at the expense of accused male students.

386.   Defendants were determined to avoid the type of negative publicity that had surrounded their sister institution, the Michigan State University, which had properly been the focus of unyielding attention due to the long-term and gross abuse of students by Larry Nassar that resulted in a $500,000,000 settlement with more than 300 female students.

387.   Defendants' sexual discrimination against Plaintiff was so egregious as to result in the situation where today, Plaintiff is still unaware of the specific facts for which he was dismissed, even though Roe, whose testimony before the Professionalism Committee, and who faces no sanction, knows exactly what Plaintiff was accused of doing.

388.   As a result of the foregoing, Plaintiff is entitled to a judgment against Defendants, awarding Plaintiff damages in an amount to be determined at trial, including without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and

future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and an injunction against and enjoining violations of the Title IX in the process of investigating and adjudicating sexual misconduct complaints, expunging Plaintiff's records, requiring Defendant WSU and its SOM to destroy all disciplinary records concerning Plaintiff, and reinstating Plaintiff to the SOM for future studies.

## COUNT III
## VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION
### *(AGAINST ALL DEFENDANTS)*

389. Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

390. The Fourteenth Amendment to the United States Constitution provides, in pertinent part:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

391. The allegations of gender discrimination made in Count II above, and elsewhere in this Complaint, demonstrate that Defendants violated

Plaintiff's clearly established right not to be discriminated against on the basis of sex, in violation of the Fourteenth Amendment and, therefore, 42 U.S.C. § 1983.

392.  As a result of the foregoing, Plaintiff is entitled to a judgment against Defendants, awarding Plaintiff an injunction against further violations of the United States Constitution in the process of investigating and adjudicating sexual misconduct complaints, including Plaintiff's, expunging Plaintiff's records, requiring Defendant WSU and its SOM to destroy all disciplinary records concerning Plaintiff and reinstating Plaintiff to the University for future studies, and, against the individual Defendants in their personal capacities, damages, including punitive damages, in an amount to be determined at trial, including, without limitation, damages to Plaintiff's physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT IV
### STATE LAW PROMISSORY ESTOPPEL AND RELIANCE
### *(AGAINST DEFENDANTS WSU, SOM)*

393.  Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

394. Defendants' various policies, which are clear and definite, constitute representations and promises that WSU should have reasonably expected to induce action or forbearance of a definite and substantial character by Plaintiff.

395. Defendants expected or should have expected Plaintiff to accept its offer of admission, incur tuition and fee expenses, and choose not to attend other colleges based on its express and implied promises that it would not tolerate, and Plaintiff would not suffer harassment by fellow students; and it would not deny Plaintiff his procedural rights should he be accused of a violation of WSU's Policies.

396. Plaintiff, in fact, reasonably relied to his detriment on these express and implied promises and representations made by Defendants, and those acting for and on their behalf, such that the promises and representations made by Defendants must be enforced if injustice is to be avoided.

397. Based on the foregoing, Defendants WSU and its SOM are liable to Plaintiff based on promissory estoppel.

398. Plaintiff is entitled to recover damages for WSU's breach of the express and/or implied contractual obligations described above. As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational

and other career opportunities, economic injuries and other direct and consequential damages.

**COUNT V**
**VIOLATION OF PLAINTIFF'S DUE PROCESS**
**RIGHTS UNDER ARTICLE 1, § 17 OF MICHIGAN'S**
**CONSTITUTION – DUE PROCESS, FAIR AND JUST TREATMENT**
**IN THE COURSE OF LEGISLATIVE AND EXECUTIVE**
**INVESTIGATIONS AND HEARINGS**
**(*AGAINST ALL DEFENDANTS*)**

399. Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

400. Plaintiff has the right, under the Michigan Constitution, among others, to not be deprived of life, liberty, or property without due process of law, and to fair and just treatment in the course of an investigation and/or hearings.

401. Defendants, by virtue of custom and policy, and under color of law, have violated Plaintiff's rights conferred by the Michigan Constitution by, among other things:

   a. Denying him due process, as described in detail in Count I, *supra*;

   b. Denying him fair and just treatment in the course of an investigation;

      i.   Seeking to placate and eliminate Roe's complaint rather than conducting a fair and impartial investigation by, among other things;

ii.     Ignoring the inconsistencies in Roe's narrative in a manner designed to bolster her account to the detriment of the male accused and failing to investigate Roe's allegations to determine whether they could be corroborated rather than offering them as true without investigation;

iii.    Failing to provide Plaintiff the opportunity to be heard in front of a fair and impartial tribunal;

iv.     Failing to provide Plaintiff the opportunity to confront and cross-examine Roe and any adverse witnesses at a fair hearing; and

v.      Arbitrarily and capriciously dismissing Plaintiff from WSU.

402.    The foregoing acts were intentional, unlawful, unprivileged, and without protection of any immunity.

403.    As a direct and proximate cause of Defendants' actions in violation of Plaintiff's constitutional rights, Plaintiff suffered, and continues to suffer, tremendous damages, including, without limitation, emotional distress; loss of educational and other career opportunities; economic injuries and other direct and consequential damages.

404.    Defendants' conduct as described herein was so egregious, malicious, and willful as to warrant an award of exemplary damages under Michigan law.

405.    As a result of the foregoing, Plaintiff seeks damages in an amount to be determined at trial, including, without limitation, damages to physical

well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, together with punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

406.   Plaintiff seeks declaratory and injunctive relief declaring Defendants' disciplinary process, as applied to him, unconstitutional, and concomitantly expunging/vacating the findings and sanctions resulting from the unconstitutional process, plus an injunction enjoining violations of the Fourteenth Amendment in the process of investigating and adjudicating sexual misconduct complaints and requiring Defendants WSU and its SOM to destroy all disciplinary records concerning Plaintiff.

**COUNT VI**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(*AGAINST ALL DEFENDANTS*)**

407.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

408.   Defendants' conduct, as more fully outlined herein and above, including but not limited to failing to provide due process, and specifically failing to provide Plaintiff with a hearing or an opportunity to cross-examine his accuser and any adverse witnesses, was intentional, or, in the alternative, reckless.

409.   Defendants' conduct as more fully outlined herein and above, including but not limited to failing to provide due process, and specifically failing to provide Plaintiff with a hearing or an opportunity to cross-examine his accuser and any adverse witnesses, was extreme, outrageous, and of such character as not to be tolerated by a civilized society, e.g. where the accused is provided no meaningful opportunity to defend himself against false and secret allegations, or otherwise fully informed as to the allegations made against him.

410.   Defendants' conduct as more fully outlined herein and above, was for one or more ulterior motives or purposes that are as yet unknown to Plaintiff, as Defendants have refused to provide Plaintiff with the specific basis or bases for his dismissal and, based on information and belief, may include Defendants' desires to appease Roe and avoid further scrutiny from OCR concerning Defendants that could result in widespread criticism and bad publicity in light of Defendant WSU's proximity to Michigan State University and the University of Michigan, which have each come under sustained and substantial criticism concerning widespread sexual abuse of female students.

411.   Defendants' conduct caused and resulted in severe and serious emotional distress to Plaintiff.

412.   As a direct and proximate result of Defendants' conduct, Plaintiff has suffered emotional and psychological distress, humiliation and embarrassment, sleeplessness and depression, suicidal ideation, and other damages that may arise during the course of discovery and the course of trial in this matter.

413.   Defendants' conduct as described herein was so egregious, malicious, and willful as to warrant an award of exemplary damages under Michigan law.

## PRAYER FOR RELIEF

**WHEREFORE,**   for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

(i) On the first cause of action for violation of constitutional due process under 42 U.S.C. § 1983, a judgment against the individual Defendants awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, together with punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; declaratory and injunctive relief declaring WSU's disciplinary process unconstitutional, and

concomitantly expunging/vacating the findings and sanctions resulting from the unconstitutional process, plus an injunction enjoining violations of the Fourteenth Amendment in the process of investigating and adjudicating sexual misconduct complaints and requiring WSU to destroy all disciplinary records concerning Plaintiff;

(ii) On the second cause of action for violation of Title IX of the Education Amendments of 1972, a judgment against WSU awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction against and enjoining violations of the Title IX in the process of investigating and adjudicating sexual misconduct complaints, expunging Plaintiff's records, requiring WSU to destroy all disciplinary records concerning Plaintiff; and reinstating Plaintiff to the University for future studies;

(iii) On the third cause of action for violation of the Equal Protection Cause of the Fourteenth Amendment to the United States Constitution under 42 U.S.C. § 1983, a judgment against all Defendants awarding Plaintiff an

injunction against violations of the United States Constitution in the process of investigating and adjudicating sexual misconduct complaints, expunging Plaintiff's records, requiring WSU to destroy all disciplinary records concerning Plaintiff and reinstating Plaintiff to the University for future studies and, against the individual Defendants, damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv) On the fourth cause of action for state law breach estoppel and reliance, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v) On the fifth cause of action for violation of the Michigan Constitution, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-

being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, together with punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; declaratory and injunctive relief declaring WSU's disciplinary process unconstitutional, and concomitantly expunging/vacating the findings and sanctions resulting from the unconstitutional process, plus an injunction enjoining violations of the Fourteenth Amendment in the process of investigating and adjudicating sexual misconduct complaints and requiring WSU to destroy all disciplinary records concerning Plaintiff;

(vi) On the sixth cause of action for Intentional Infliction of Emotional Distress, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, and treatment of same, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, exemplary damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; and

(vii) Awarding Plaintiff such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues presented herein that are capable of being tried by a jury.

Dated: June 26, 2020

Respectfully submitted,

**ROSSMAN SAXE, P.C.**
*Attorneys for Plaintiff*

By:   /s/ Mark C. Rossman
Mark C. Rossman (P63034)
Jacob M. Campbell (P83900)
2145 Crooks Road, Suite 220
Troy, Michigan 48084
Telephone: 248.385.5481
Facsimile: 248.480.4936
mark@rossmansaxe.com
jacob@rossmansaxe.com

J. Robert Flores, Esq.
10410 Hampton Road
Fairfax Station, Virginia 22039
Attorney for Plaintiff
Seeking EDMI Admission
Telephone: 703.609.8731
Facsimile: 703.995.4307
rfloresesq@verizon.net