## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

ANTHONY EID,
an individual,

Case No. 20-cv-11718
Hon. Gershwin A. Drain

     Plaintiff,

v.

<u>**JURY TRIAL DEMANDED**</u>

WAYNE STATE UNIVERSITY,
WAYNE STATE UNIVERSITY
SCHOOL OF MEDICINE,
NIKOLINA CAMAJ,
MARGIT CHADWELL,
MATT JACKSON,
RICHARD S. BAKER, and
R. DARIN ELLIS,
in their individual and official capacities,
jointly and severally,

     Defendants.

---

## <u>PLAINTIFF'S FIRST AMENDED COMPLAINT</u>

**NOW COMES,** Anthony Eid ("Plaintiff"), by and through his counsel, and for his First Amended Complaint against Defendants Wayne State University ("WSU" or "University"), Wayne State University School of Medicine ("SOM"), and Richard S. Baker ("Baker"), R. Darin Ellis ("Ellis"), Nikolina Camaj ("Camaj"), Margit Chadwell ("Chadwell"), and Matt Jackson ("Jackson"), in their individual and official capacities (hereinafter, the "Defendants"), jointly and severally, who states as follows:

1

I.    **THE PARTIES**

1.      Plaintiff Anthony Eid is a resident of Wayne County, Michigan who was also, prior to the violation of his Constitutional, common law, and contractual rights, a student at Defendant WSU where he obtained his bachelor's and master's degrees and successfully completed his first year of medical school.

2.      Prior to his unlawful termination from WSU's SOM, Plaintiff was well into his second year of medical school, a good academic performer, the class president, and had invested considerable money and time studying at WSU for 7 years prior to medical school.

3.      At all times until he was accused by his accuser (hereinafter, Jane "Roe"), Plaintiff was an exemplary student who was an asset to the WSU and SOM community.

4.      Plaintiff is of Middle Eastern ancestry, born in Michigan, a life-long resident of the state, and a first-generation college and medical school student.

5.      Defendant WSU is a public university located in Detroit, Michigan.

6.      The events at issue occurred in Wayne County, Michigan which lies in the Eastern District of Michigan.

7.    Defendant Camaj was, at all times relevant to this amended complaint, Associate Director and Student Conduct Officer in the Office of the WSU Dean of Students.

8.    Defendant Chadwell was, at all times relevant to this amended complaint, Associate Dean of Student Affairs and Career Development at Defendant WSU's SOM and, based on information and belief, responsible for assigning and overseeing the work of Defendant Camaj to investigate cases of student misconduct, including allegations made against Plaintiff.

9.    Defendant Jackson was, at all times relevant to this amended complaint, Assistant Dean for Basic Science and Chair of the WSU's SOM Professionalism Committee ("Professionalism Committee").

10.    Defendant Baker was, at all times relevant to this amended complaint, Chair of the Student Promotions Committee ("Promotions Committee") and Vice Dean for Medical Education at the SOM.

11.    Defendant Ellis was, at all times relevant to this amended complaint, Associate Provost for Academic Programs and Institutional Effectiveness at Defendant WSU.

## II.    THE NATURE OF THIS ACTION

12.    This Action is brought to address the harm caused by Defendants to Plaintiff, to wit: the denial of the right to due process as guaranteed by the

3

Fourteenth Amendment to the United States Constitution, Article 1, § 17 of the State of Michigan's Constitution, and Defendants' own internal policies and guidelines; violation of Title IX; denial of equal protection under the United States Constitution; the infliction of damages and harm to Plaintiff's well-being, emotional and psychological health, reputational harm, past and future economic losses, loss of educational opportunities, and loss of future career prospects and costs associated with bringing the instant suit; and the threat to his future career as a result of the creation of school and education records based on the aforementioned violations.

### III.   JURISDICTION AND VENUE

13.   This Court has federal and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. §1367 because: (a) the case arises under the laws of the United States; (b) the claims brought under Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 *et seq*., and 42 U.S.C. § 1983 are federal civil rights claims; and (c) the state law claims are so closely related to the Title IX and § 1983 federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

14.   This Court has personal jurisdiction over Defendants on the grounds that Defendants are conducting business at Wayne State University and its School of Medicine within the Eastern District of Michigan.

4

15.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because the events or omissions giving rise to the claim occurred in this judicial district and because virtually all of the Defendants are located in this judicial district.

## IV.     FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

16.     Plaintiff began his education at WSU in the fall of 2010 as a pre-medical student majoring in biology and psychology.

17.     Plaintiff graduated from WSU in 2015 with a bachelor's degree of science in biological sciences and a bachelor's degree of science in psychology.

18.     Plaintiff continued his education at Defendant WSU in 2016 and graduated in 2017 with a master's degree, actually conferred by the SOM, in Medical Science, maintaining a 3.9/4.0 grade point average.

19.     During the 2016 academic year, Plaintiff was on the student senate and was involved in multiple school government activities, including participation in *Festifall 2016*, an orientation event to provide incoming students an opportunity to ask questions of upperclassmen and familiarize themselves with service, club, and academic resources.

20.     Plaintiff has a constitutionally protected property interest in, *inter alia*, his education program, to which he has expended in excess of $225,000.

21.     As a student, Plaintiff and WSU have been bound by contract, as reflected in WSU's policies and procedures, since his matriculation, and at all times relevant to his claims.

22.     During *Festifall 2016*, among many other students, he met freshman student Jane Roe (i.e., Plaintiff's accuser, as the actual identity of Jane Roe will be evident to the Defendants, and her true name is not relevant to this Complaint).

23.     At the time of their initial meeting, Roe was accompanied by her parents, and the nature of the conversation dealt with the stress she felt about her ability to pass certain science courses.

24.     During the brief interaction, Roe and Plaintiff exchanged telephone numbers, so that she could call him if she had other questions or school-related issues with which she needed help.

25.     Plaintiff offered to provide Roe benchmark questions from an old exam he had taken for the purpose of studying and getting familiar with college level examinations.

26.     Plaintiff allowed Roe to email the document from Plaintiff's computer to her computer and in doing so provided Roe with his cloud storage password so that she could download the materials.

27.     Shortly after Plaintiff provided this help, he noticed that multiple of his accounts were routinely breached and accessed by an individual, or individuals, without his authorization or permission.

28.     In an effort to resolve the unauthorized access of his cloud account and protect other computer accounts, Plaintiff contacted Roe on a number of occasions.

29.     In each case the computer contacts were limited and coincided with ongoing and developing incidents related to the unauthorized access of Plaintiff's computer.

30.     In the Fall of 2017, Plaintiff started medical school at WSU's SOM, and was active in student affairs, running and winning the office of the WSU SOM Class of 2021 Student Body President.

31.     While in medical school, on or about August of 2018, Plaintiff received information that his electronic and computer accounts had again been improperly accessed without authority from an address in Colorado where Plaintiff believed Roe lived, as she was no longer a student at WSU.

32.     Between on or about August 6, 2018 and on or about October 27, 2018, Plaintiff contacted Roe to again attempt to get help in securing his computer.

33.     On or about October 27, 2018, Plaintiff received multiple phone calls from Colorado, and during one call Plaintiff was called a racial slur and threatened.

34.     On October 29, 2018, Roe filed an online complaint against Plaintiff for harassment using Defendant's online complaint form. (*See* **Exhibit A**, *Defendant Camaj's Investigative Report*) (hereinafter, the "Camaj Report").

35.     On November 15, 2018, Defendant Camaj engaged in a telephonic conference call with Roe, during which time Defendant Camaj discussed the online complaint report filed by Roe.

36.     During this conference call between Defendant Camaj and Roe, Roe agreed to provide Camaj with text messages sent between Plaintiff and Roe from November 17, 2016 until October 26, 2018.

37.     Based on information and belief, Defendant Camaj took no steps to determine whether the text messages provided by Roe were, *inter alia*, complete, had been altered, and/or were reliable.

38.     Defendant Camaj did not challenge Roe's account of the alleged incidents and did not record the call.

39.     According to the Camaj Report, Roe stated to Defendant Camaj that she filed a police report in Colorado and spoke with the Wayne State University police department.

40.     Based on information and belief, at no time did Defendant Camaj corroborate Roe's statements, or make any effort to obtain a copy of the police reports Roe claimed to have filed in Colorado, or even identify the Police Department in Colorado where the alleged police report was filed.

41.     Roe alleged to Defendant Camaj that she received a text message from Plaintiff that he had contacted an attorney at the Wolff-Smith Law Firm in Lake Orion, Michigan claiming that she was to appear in court on November 15, 2018.

42.     Based on information and belief, Defendant Camaj failed to ask for or obtain the email Roe claimed she received from the law firm.

43.     Camaj also failed to collect evidence connecting Plaintiff to additional allegations made by Roe concerning Plaintiff.

44.     Without corroboration of any of Roe's claims concerning Plaintiff, Defendant Camaj included these baseless allegations in an attempt

to influence Defendant Chadwell to pass the report on to decision makers on the SOM's Professionalism and Promotions Committees.

45.     Defendant Camaj further violated several WSU Student Code regulations in her dealings with Plaintiff. (*See* **Exhibit B**, *WSU Student Code of Conduct*) (hereinafter the "Code").

46.     Pursuant to the Code's notice provisions, the earliest date for Defendant Camaj to schedule the conference was December 5, 2018.

47.     However, on November 27, 2018 Defendant Camaj notified Plaintiff that she "would like to meet with [him] for a Fact-Finding Conference [on November 30, 2018] to discuss concerns reported to me about [Plaintiff's] alleged behavior on Wayne State University's campus which may be in violation of the Student Code of Conduct." (*See* **Exhibit C**, *Camaj Letter*) (hereinafter "Camaj Letter" or "Letter").

48.     The Letter failed to meet WSU's internal due process notice requirements as the notice failed to contain the following information: (a) the alleged infraction; (b) the nature of the evidence submitted; and (c) a copy of the Code, with a statement that it is the governing policy and that the student should retain it for use throughout the proceeding. **Exhibit B** at 12, §11.2.

49.    Defendant Camaj provided only the time and place of the conference that was scheduled, in violation of the Code and Plaintiff's due process rights.

50.    On November 29, 2018, Plaintiff contacted Defendant Camaj by email to her WSU email address (i.e., as provided on the "invitation" to the fact-finding conference), requesting that, pursuant to the Code, Defendant Camaj provide the missing information so that he could prepare for the meeting.

51.    Plaintiff further informed Defendant Camaj that he was unaware of the purpose of the meeting and that he was not even sure, based on the notice, whether there were any charges currently pending against him, or if the meeting was designed to determine whether charges would be filed. (*See* **Exhibit D**, *Email from Plaintiff to Camaj*).

52.    Plaintiff received no answers from Defendant Camaj, and when questioned by Plaintiff as to why she failed to respond to his requests and follow the Code, she admitted to Plaintiff that she did so to keep him in the dark as that was her preferred way of conducting an investigation.

53.    On December 4, 2018, Defendant Camaj closed her investigation, and filed the Camaj Report with Margit Chadwell, M.D., Associate Dean of Student Affairs and Career Development at the SOM. **Exhibit A**.

11

54.     Defendant Camaj's "investigation" and report was a sham, and she failed to inquire into Plaintiff's claim that his text messages and other communications were not intended to harass but had a legitimate purpose – to stop the unauthorized access of his electronic and computer accounts.

55.     Defendant Camaj failed to obtain copies of the police reports allegedly filed by Roe in Colorado and with the WSU police department.

56.     Defendant Camaj failed to interview other students or friends of Plaintiff, from whom he requested help in stopping the unauthorized access of his electronic and computer accounts and could verify the account of events that Plaintiff provided to Defendant Camaj.

57.     Defendant Camaj failed to obtain any assistance from any expert to assist her in determining whether Plaintiff's claims were possible or could be corroborated by a forensic exam.

58.     Defendant Camaj failed to determine whether the telephone number identified by Plaintiff was connected in any way with Roe, her family, or individuals known to her.

59.     Defendant Camaj failed to investigate or determine whether the Cloud storage company used by Plaintiff had records of his requests for assistance and complaints.

60.     Defendant Camaj failed to determine whether the location of the events in question took place and feel under the jurisdiction of WSU or the SOM.

61.     Defendant Camaj failed to make any effort to obtain banking records connected to the unauthorized access to Roe's bank account.

62.     Defendant Camaj failed to investigate or independently determine the impact, if any, on Roe from the alleged harassment caused by receiving text and other Internet-facilitated messages from Plaintiff.

63.     In violation of WSU policy, Defendant Camaj intentionally denied Plaintiff the ability to defend himself by bringing to the conference information or evidence exonerating him.

64.     In violation of WSU policy, Defendant Camaj deprived Plaintiff of his right to knowingly exercise his right to waive his voluntary participation in the conference and proceed to a formal hearing, where he could be accompanied by counsel.

65.     Based on information and belief, Defendant Camaj was aware that a new WSU disciplinary hearing policy would become effective on December 7, 2018 that provided significantly greater due process to a student accused of misconduct where there was a conflict between the accounts of the accuser and accused and rushed her investigative report to avoid that deadline.

13

66.     Based upon information and belief, Defendant Camaj performed no significant investigative work because she assumed that Roe, a woman, was correct in her assumptions, allegations, and factual assertions, thus treating Plaintiff in a discriminatory manner simply because he is a man.

67.     Defendant Camaj by admission stated in her investigative report that in a telephone call on or about November 17, 2018 with Roe, Defendant Camaj only reviewed and confirmed Roe's statement without challenge or an attempt to determine the statement's veracity. **Exhibit A**.

68.     In contrast, Defendant Camaj admitted to Plaintiff that she intentionally withheld the necessary notice and information that she was required to provide Plaintiff because she wanted to surprise him and keep him from preparing a defense to which he was entitled under due process.

69.     In so doing, she revealed her bias in favor of Roe and against Plaintiff as both Roe and Plaintiff had competing versions of events, justifications for their conduct, and witnesses to their version of events.

70.     From on or about November 17, 2018 to December 4, 2018, Defendant Camaj engaged in a knowing and reckless course of conduct demonstrating bias against Plaintiff because he was a male student and with the intent to deprive Plaintiff of his due process rights, as contained in the the Code, and Constitutions of Michigan and the United States.

14

71.     On December 4, 2018, based on information and belief, Defendant Camaj concluded her rushed, biased, and woefully incomplete investigation that was motivated, at least in part, by reverse gender discrimination.

72.     On the basis of the Camaj Report, Defendant Chadwell negligently referred the inadequate and one-sided investigation and subsequent report to the Professionalism Committee without requiring that Defendant Camaj properly investigate Roe's complaints.

73.     On or about January 25, 2019, Defendant Matt Jackson, as Chair of the Professionalism Committee and Assistant Dean of the SOM, met with Plaintiff.

74.     The purpose of the meeting was to provide Plaintiff with notice of the hearing date and an opportunity to review documents that Jackson claimed were provided to the Professionalism Committee. (*See* **Exhibit E**, *Jackson Letter*).

75.     Defendant Jackson knew at all times relevant to this amended complaint that Plaintiff's dismissal was a possible outcome.

76.     Plaintiff specifically asked Jackson about the possibility of dismissal and Defendant Jackson intentionally prevented Plaintiff from

understanding the great risk of jeopardy he faced by avoiding the question and telling Plaintiff he did not believe Plaintiff was at risk of dismissal.

77.    Jackson stated that the matter would likely result in a mark on Plaintiff's "MSPE" (i.e., Medical Student Performance Evaluation) letter, among the least severe outcomes possible.

78.    Plaintiff asked Defendant Jackson if Plaintiff should hire an attorney, and Defendant Jackson told him that he did not need to do so at that time, and that the lawyer would not be able to speak on his behalf or represent him during the Committee's meeting, making Plaintiff's hiring of an attorney "not useful."

79.    Defendant Jackson did not provide Plaintiff with any documents that he could take with him that documented this meeting, the substance of the documents he was shown, or the ability to meaningfully analyze his rights as a student and prepare to appear before the Professionalism Committee.

80.    On or about February 7, 2019, the Professionalism Committee convened a hearing to review the reported and alleged violations of the SOM's professionalism standards. (*See* **Exhibit F**, *Professionalism Committee's Bylaws*, at 1).

81.    Notwithstanding Defendant Jackson's statements to Plaintiff, prior to and during the February 7, 2019 hearing, Defendant Jackson and the

other members of the Professionalism Committee knew that they had the authority to recommend the dismissal of Plaintiff to the Promotions Committee and that a recommendation of dismissal was a foreseeable outcome.

82.    The SOM's Professionalism Committee functions as the SOM's institutional entity that ensures that the medical education program has a fair and formal process for taking any action that may affect the status of a medical student. (**Exhibit F** at 4, § 2.0).

83.    The SOM Professionalism Committee has not established its own due process procedures, but, instead, "conform[s] to the due process procedures of the Code and the guidelines for implementing the Student Code of Conduct as adopted by the School of Medicine." *Id*. at 5.

84.    At its hearing, the Professionalism Committee did not inform Plaintiff of what witnesses, testimony, or evidence it received during the hearing.

85.    At its hearing, the Professionalism Committee did not inform Plaintiff of what witnesses it called but did not participate or provide evidence or testimony.

86.    Plaintiff is only aware of what testimony and information he provided to the Professionalism Committee during the hearing.

17

87.    At no time during its hearing was Plaintiff provided an opportunity to hear Roe's testimony.

88.    At no time before, during, or after the hearing was Plaintiff ever provided with a summary of the testimony expected or taken by the Committee or a transcript or recording of the testimony.

89.    At no time was Plaintiff provided an opportunity to submit questions for the Professionalism Committee to ask of Roe.

90.    At no time did the Professionalism Committee provide or allow for Plaintiff to record or document the proceedings.

91.    At all times relevant to this Complaint, Plaintiff alone bore the burden of proving his innocence and refuting evidence to which he was not privy.

92.    At the conclusion of the Professionalism Committee's hearing, the Committee failed to provide Plaintiff with its factual findings relative to information he or the accuser presented to the Committee.

93.    On February 11, 2019, the Professionalism Committee announced its decision to "refer your case to the School of Medicine promotions committee with a recommendation for dismissal." (*See* **Exhibit E**, *Jackson Letter*).

94.    The decision was announced without accompanying factual support, using only conclusory language that made it impossible to know with any certainty what Defendants believed Plaintiff had specifically done.

95.    Plaintiff was denied any meaningful opportunity to defend himself before the Professionalism Committee.

96.    Plaintiff was not permitted to cross examine witnesses that appeared before the Professionalism Committee.

97.    Plaintiff was not provided a record of the proceedings before the Professionalism Committee.

98.    Plaintiff was not provided with an explanation of the facts supporting the Committee's specific reasons for recommending dismissal or whether the decision was unanimous.

99.    The Promotions Committee's "authority originates by delegated powers from the School of Medicine Faculty Executive Committee." (**Exhibit G**, *Promotions Committee Bylaws*, at 4).

100.   As part of its authority, the Promotions Committee is the final decision-making entity at the SOM regarding the promotions and graduation process and has the responsibility of determining the student's fitness and suitability for the study and practice of medicine.

101.   The Promotions Committee placed the entire burden of proof on Plaintiff who appeared before them without being provided with the evidentiary record supporting the Professionalism Committee's recommendation for dismissal.

102.   The failure of the Promotions Committee to provide Plaintiff with all documents and evidence developed during the Professionalism Committee's investigation denied Plaintiff of notice of the evidence against him and due process.

103.   Prior to appearing before the Committee, and as required pursuant to the Promotions Committee hearing rules at § 5.2, Plaintiff submitted a statement to his counselor that attempted to summarize for the Promotions Committee information Plaintiff wished the Committee to consider, supported by facts, in light of the reason Plaintiff was called before the Committee for a hearing.

104.   The Professionalism and Promotions Committees rules made it impossible for Plaintiff to know the reason he was called before the Committee, by, *inter alia*, denying Plaintiff access to the testimony, records, information, and other evidence the Professionalism Committee based their decision on and subsequently transmitted to the Promotions Committee in support of their recommendation for dismissal.

105.   Immediately after its "hearing," the Promotions Committee communicated its decision to Plaintiff in an official letter from Defendant Baker dated February 27, 2019 to dismiss him. (*See* **Exhibit H**, *Baker Letter*).

106.   The Promotions Committee failed to specify the basis for its decision to dismiss Plaintiff, referring for the very first time to an "evaluation and discussion of [Plaintiff's] entire academic record, academic progress and the information you provided to the committee at your hearing."

107.   At no time during the Professionalism Committee hearing or the Promotions Committee meeting was any question raised as to Plaintiff's academic record or his academic progress.

108.   Based on information and belief, the Promotions Committee failed to conduct a searching inquiry of Roe's account, accepting it at face value in spite of the fact that the Promotions Committee based its inquiry on the Camaj Report that had virtually no corroborating evidence in support of Roe's complaint.

109.   Moreover, when Plaintiff attempted to offer his academic record and record of accomplishment at WSU to them, the Promotions Committee refused to consider them saying they were unimportant.

110.   The Committee failed to address any accusations, specify its factual findings, or articulate the specific basis on which dismissal was appropriate.

111.   These failures constitute a denial of due process by failing to provide Plaintiff with sufficient notice of the basis of the dismissal decision to allow Plaintiff to meaningfully access his right to appeal his dismissal to the Promotions Committee or directly to the Provost.

112.   Plaintiff could not determine prior to deciding on whether to appeal and continues to be unaware today whether members of the Professionalism or Promotions Committees considered evidence not known to the accused student, conducted their own investigation, had personal or professional relationships with witnesses or considered, gathered or received information or evidence outside of the investigative process of the Committees as there are no regulations barring such actions.

113.   However, even on an issue as serious as dismissal, the Promotions Committee did not identify to Plaintiff the standard of review for its deliberations.

114.   Any student, including Plaintiff, coming before the Promotions Committee is therefore denied the ability to understand how, and under what

standard of review, decisions will be made or what information he must provide to the Committee.

115.   On March 6, 2019, Plaintiff met with Defendant Baker in person to discuss his options, given the Promotions Committee's decision to dismiss Plaintiff, and the issuance of a voluntary withdrawal from the SOM if the Promotions Committee denied his appeal.

116.   At the meeting, Dr. Baker informed Plaintiff that while he, as Chairman of the Committee, had the authority to overturn the decision, he would elect to reconvene the Committee and discuss the decision with them if Plaintiff appealed.

117.   Defendant Baker informed Plaintiff that if the Promotions Committee denied his appeal Plaintiff would he have the ability to withdraw if it stays within the medical school and was not appealed to the Provost's Office.

118.   Defendant Baker stated further that Plaintiff would be able to withdraw if the promotions committee appeal did not go in his favor.

119.   Based on the information Plaintiff received from Defendant Baker, that he could withdraw if the Promotions Committee denied his appeal, Plaintiff appealed to the Promotions Committee and requested that the Committee reconsider its decision dismissing Plaintiff from the SOM.

120.   Defendant Baker's efforts to appear reasonable and minimize Plaintiff's response to losing his life's dream of becoming a physician after nine years of schooling, together with his express statement that Plaintiff could preserve his right to withdraw if he did not remove the issue from the SOM, was calculated on Defendant Baker's part to encourage Plaintiff to appeal to the Promotions Committee, even though he knew as the Committee's Chairman that he would not grant the appeal.

121.   On May 9, 2019, and in spite of Defendant Baker's assurance to Plaintiff, Plaintiff was not permitted to voluntarily withdraw after the Promotions Committee's denial of Plaintiff's appeal. (**Exhibit I**, *Muhammad Email*).

122.   Defendant Baker's actions constituted an intentional and gross effort to manipulate Plaintiff, a young and hopeful medical student, to cause Plaintiff to lose his right to voluntarily withdraw, and thereby cause harm to Plaintiff's professional and personal reputation and ability to pursue his medical career at another medical school.

123.   On May 10, 2019, Plaintiff was forced to and did appeal his termination to the Office of the Provost.

124.   Plaintiff took his appeal without the benefit of knowing the basis for the decision made by the Professionalism Committee and without

receiving a record of the proceedings or reasoning of the Professionalism Committee

125. On May 23, 2019, Defendant Dr. Darin Ellis, the Associate Provost, informed Plaintiff that his appeal was denied.

126. In doing so, Defendant Ellis ignored the new *Interim Administrative Hearing Guidelines* that applied to Plaintiff's case and the established law in the Sixth Circuit and did not address the lack of procedural and due process protections that characterized the hearing before both the Professionalism and Promotions Committees.

127. Because Plaintiff's wrongful dismissal resulted in his virtual disappearance from the SOM's Board activities and student government, Plaintiff's professional reputation in the SOM community and larger University community has been damaged, as rumors and innuendo have raised questions about Plaintiff, his conduct, and his reasons for disappearance from the SOM.

128. The SOM has placed highly damaging entries into his academic file, thereby making it impossible for him to apply for or gain admittance to any other U.S.-based medical school.

129.   At no time did this matter ever become the subject of a criminal investigation or prosecution reflecting the relatively minor actions at issue in this case.

130.   Disagreements between individuals, one of whom was no longer a student when the alleged conduct took place, do not justify the imposition of the most draconian penalty available to a university or medical school—dismissal.

131.   Such a penalty constitutes a substantive due process violation where no independent evidence exists that anyone was injured.

132.   Due to the Defendants' outrageous, arbitrary, and capricious disciplinary process that operates in almost total darkness, preventing Plaintiff from gathering the necessary information with which to defend himself, and the discriminatory gender-biased investigation, Plaintiff's pursuit of a professional career as a physician has been currently rendered impossible.

133.   Plaintiff's dismissal has also resulted in significant economic harm, even if he were to gain entry to another medical school, as he cannot graduate with his matriculated class, and the delay would result in additional loans, loss of earning capacity, and other expenses.

134.   Plaintiff is unable to obtain the necessary documents from the SOM to allow him to apply to another medical school.

135.   If Plaintiff is ultimately able to obtain a medical degree, the dismissal and accompanying entries in his transcript and academic record will severely limit his ability to seek the quality of residency and other training positions that are required to obtain high-quality appointments, fellowships, and employment, resulting in harm to his personal and professional reputation and reduced future earning potential.

136.   Plaintiff has been depressed and socially isolated from a community in which he invested substantial time, money, and effort to be a member of. He has sought treatment for the emotional and mental devastation, including suicidal ideation, that his unwarranted dismissal has caused.

## COUNT I
### 42 U.S.C. § 1983: Denial of Fourteenth Amendment Due Process
### *(Against All Defendants)*

137.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

138.   The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property without due process of law."

139.   All Defendants in this case are state actors subject to the Fourteenth Amendment.

140.   42 U.S.C. § 1983 prohibits any person acting under color of state law from subjecting or causing to be subjected any citizen of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States or its laws.

141.   And in the event that such deprivation occurs, that person "shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…."

142.   Plaintiff has a protected liberty interest in, *inter alia*, his good name, reputation, honor and integrity, of which he cannot be deprived without due process.

143.   Plaintiff also has a protected property interest in, *inter alia*, pursuing his medical school education as well as in future education and employment opportunities and liberty to pursue other opportunities that he cannot be deprived of without due process.

144.   Defendants by their acts and omissions have deprived Plaintiff of his Constitutionally protected property interests in his continued enrollment at Defendant Wayne State University and his right to complete his medical school education and obtain his license as a physician.

145.   Defendants engaged in a course of conduct that included intentional, negligent, arbitrary, and capricious acts that resulted in the

deprivation of his Constitutionally protected property interests in his education and medical career.

146. Plaintiff's Constitutionally protected property interest in his Constitutionally protected right to continued enrollment at WSU also arises from the express and implied contract between Plaintiff and WSU, the policies and procedures set forth by WSU in its Student Code of Conduct together with the practices, patterns of conduct, and understandings established by WSU.

147. As a result of these due process violations, Plaintiff continues to suffer ongoing harm, including reputational harm, loss of employment in the medical and health care fields, diminished professional and economic opportunities, and impact to his mental health and other non-economic damages.

148. Accordingly, Defendants are liable to Plaintiff in violation of 42 U.S.C, § 1983 for violations of the Due Process Clause of the Fourteenth Amendment, and for all damages arising therefrom.

149. As a direct and proximate result of the above actions and conduct, Plaintiff sustained tremendous damages, including without limitation, emotional distress; loss of educational and career opportunities; economic injuries; and other direct and consequential damages.

150.   Defendants' actions as described herein constitute a malicious, reckless, wantonly negligent, and deliberately indifferent course of conduct such that Plaintiff is entitled to an award of punitive damages.

151.   Plaintiff also seeks declaratory and injunctive relief declaring the disciplinary process to which he was subjected as unconstitutional and expunging or vacating all findings, sanctions, or other record created or resulting from the unconstitutional process, plus an injunction enjoining violations of the Fourteenth Amendment in the process of investigating and adjudicating misconduct allegations, whether or not involving sexual misconduct or harassment, and requiring WSU to destroy all disciplinary records concerning Plaintiff.

### COUNT II
### Violation of Title IX of the Education Amendments of 1972
### *(Against Defendant WSU)*

152.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

153.   Title IX of the Education Amendments of 1972 states that "[n]o person in the United States shall, on the basis of sex be … denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

30

154.   At all times relevant to this complaint, Title IX applied to WSU, the WSU SOM, and its officials.

155.   Title IX may be violated when it treats similarly situated persons differently on the basis of the sex of the individual, and in this case, Defendants treated Plaintiff and Roe differently on the basis of sex.

156.   Under the law of this Circuit, Plaintiff may plead an erroneous outcome theory of liability under Title IX.

157.   In the instant case, Defendants' decision to deprive Plaintiff of his right to cross-examine or question witnesses against him did not only constitute a risk of an erroneous deprivation of a private interest in remaining a student, it led to his actual dismissal.

158.   The discriminatory and different treatment is evident in, *inter alia*, how Defendant Camaj handled her initial contacts with Roe and Plaintiff.

159.   Defendants involved in the disciplinary process from investigation through final disposition and dismissal favored Roe at each step and treated Plaintiff's allegations, justifications, defenses, and rights to due process differently on the basis that they needed to protect and defer to the female accuser even when her allegations were uncorroborated and Defendant WSU's investigation failed to generate any evidence to support those claims.

31

160.   The facts recounted above do not support WSU's decision to subject Plaintiff to the disciplinary system as the conduct did not implicate the University as required under the Code.

161.   The facts recounted above do not include any personal confrontations, harassing or obscene telephone calls, coordinated action against Roe by persons known to Plaintiff, or any other act that could constitute alone or in tandem with others, harassment or an effort to manipulate or control Roe.

162.   The facts recounted above cast more than articulable doubt on the accuracy of the investigation and assertions that Plaintiff impersonated an attorney.

163.   The existence of Defendants' bias and its connection to the erroneous outcome above and include, but are not limited to:

a.   The disparate manner to which Defendant Camaj treated Plaintiff and Roe during their interviews when the only individual known to Defendant University had a stellar reputation for honesty, hard work, academic and social success, and elected leadership.

b.   The willingness of Defendant Camaj to accept without corroboration all of Roe's allegations and refusal to credit Plaintiff's entire account.

    c.  Inclusion of information that was not corroborated that tended to impugn the character of Plaintiff and buttress Roe's account.

    d.  Defendant Camaj's refusal to investigate easily verified information contained in Roe's allegations such as police reports, attempts to improperly obtain private photographs, and impersonation of an attorney.

164.   The disparate treatment of Plaintiff at each stage of the disciplinary process was the result of gender bias and a clear act of sex discrimination leading directly to Defendant WSU's decision that dismissal was the proper penalty for the conduct they found.

165.   The erroneous outcome in Plaintiff's case was a direct result of a decision by WSU administrators, staff, and faculty to adopt a practice to credit female students' claims of sexual discrimination, harassment, and abuse at the expense of accused male students.

166.   Defendants' sexual discrimination against Plaintiff was so great as to result in the situation where today, Plaintiff is still unaware of the specific facts for which he was dismissed even though Roe, whose testimony before the Professionalism Committee and who faces no sanction, knows exactly what he is accused of.

167.   As a result of the foregoing, Plaintiff is entitled to a judgment against WSU awarding Plaintiff damages in an amount to be determined at trial, including without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction against and enjoining violations of the Title IX in the process of investigating and adjudicating sexual misconduct complaints, expunging Plaintiff's records, requiring WSU to destroy all disciplinary records concerning Plaintiff; and reinstating Plaintiff to the SOM for future studies.

### COUNT III
**Violation of the Equal Protection Clause of**
**the Fourteenth Amendment to the United States Constitution**
***(Against All Defendants)***

168.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

169.   The Fourteenth Amendment to the United States Constitution provides in pertinent part: All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor

shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

170.   The allegations of gender discrimination made in Count II above and elsewhere in this Complaint further demonstrate that Defendants violated Plaintiff's clearly established right not to be discriminated against on the basis of sex, in violation of the Fourteenth Amendment and, therefore, 42 U.S.C. § 1983.

171.   As a result of the foregoing, Plaintiff is entitled to a judgment against Defendant WSU awarding Plaintiff an injunction against further violations of the United States Constitution in the process of investigating and adjudicating sexual misconduct complaints, including Plaintiff's, expunging Plaintiff's records, requiring WSU to destroy all disciplinary records concerning Plaintiff and reinstating Plaintiff to the University for future studies and, against the individual defendants in their personal capacities, damages, including punitive damages, in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT IV
### State Law Estoppel and Reliance
### (Against Defendant WSU)

172.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

173.   WSU's various policies constitute representations and promises that WSU should have reasonably expected to induce action or forbearance by Plaintiff.

174.   WSU expected or should have expected Plaintiff to accept its offer of admission, incur tuition and fee expenses, and choose not to attend other colleges based on its express and implied promises that it would not tolerate, and Plaintiff would not suffer harassment by fellow students; and it would not deny Plaintiff his procedural rights should he be accused of a violation of WSU's Policies.

175.   Plaintiff relied to his detriment on these express and implied promises and representations made by WSU.

176.   Based on the foregoing, WSU is liable to Plaintiff based on estoppel.

177.   Plaintiff is entitled to recover damages for WSU's breach of the express and/or implied contractual obligations described above. As a direct and proximate result of the above conduct, Plaintiff sustained tremendous

damages, including, without limitation, emotional distress, loss of educational and other career opportunities, economic injuries and other direct and consequential damages.

## COUNT V
**Violation of Plaintiff's Due Process Rights Pursuant to Article 1, § 17 of Michigan's Constitution – Due Process, Fair and Just Treatment in the Course of Legislative and Executive Investigations and Hearings**
*(Against All Defendants)*

178. Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

179. Plaintiff has the right under the Michigan Constitution, among others, to not be deprived of life, liberty, or property without due process of law, and to fair and just treatment in the course of an investigation and/or hearing.

180. Defendants, by virtue of custom and policy and under color of law, have violated Plaintiff's rights conferred by the Michigan Constitution by, among other things –

    a. denying him due process, as described in detail in Count I, supra;

    b. denying him fair and just treatment in the course of an investigation;

        i. Seeking to placate and eliminate Roe's complaint rather than conducting a fair and impartial investigation by, among other things;

37

ii.  Ignoring the inconsistencies in Roe's narrative in a manner designed to bolster her account to the detriment of the male accused and failing to investigate Roe's allegations to determine whether they could be corroborated rather than offering them as true without investigation; inconsistencies;

iii.  Failing to provide Plaintiff the opportunity to be heard in front of a fair and impartial tribunal;

iv.  Failing to provide Plaintiff the opportunity to confront and cross-examine Roe and any adverse witnesses at a fair hearing; and

v.  Arbitrarily and capriciously dismissing Plaintiff from WSU.

181.  The foregoing acts were intentional, unlawful, unprivileged, and without protection of any immunity.

182.  As a direct and proximate cause of Defendants' actions in violation of Plaintiff's Constitutional rights, Plaintiff suffered and continues to suffer tremendous damages, including, without limitation, emotional distress; loss of educational and other career opportunities; economic injuries and other direct and consequential damages. Defendants' conduct as described herein was so egregious, malicious, and willful as to warrant an award of exemplary damages under Michigan law.

183.   As a result of the foregoing, Plaintiff seeks damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, together with punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

184.   Plaintiff seeks declaratory and injunctive relief declaring WSU's disciplinary process as applied to him unconstitutional, and concomitantly expunging/vacating the findings and sanctions resulting from the unconstitutional process, plus an injunction enjoining violations of the Fourteenth Amendment in the process of investigating and adjudicating sexual misconduct complaints and requiring WSU to destroy all disciplinary records concerning Plaintiff.

## COUNT VI
## Intentional Infliction of Emotional Distress
### (Against All Defendants)

185.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

186.   Defendants' conduct as more fully outlined above, including but not limited to failing to provide due process, and specifically failing to provide

Plaintiff with a hearing or an opportunity to cross-examine his accuser and any adverse witnesses was intentional.

187. Defendants' conduct as more fully outlined above including but not limited to failing to provide due process, and specifically failing to provide Plaintiff with a hearing or an opportunity to cross-examine his accuser and any adverse witnesses, was extreme, outrageous, and of such character as not to be tolerated by a civilized society, i.e., where the accused is provided no meaningful opportunity to defend himself against false and secret allegations.

188. Defendants' conduct as more fully outlined above was for one or more an ulterior motives or purposes that are as yet unknown to Plaintiff as WSU has refused to provide Plaintiff with the specific basis for his dismissal and based on information and belief may include Defendants' desire's to appease Roe and avoid further scrutiny from OCR concerning WSU that could result in widespread criticism and bad publicity in light of Defendant WSU's proximity to Michigan State University and the University of Michigan that have each come under sustained and substantial criticism for widespread sexual abuse of female students.

189. Defendants' conduct resulted in severe and serious emotional distress.

190.   As a direct and proximate result of Defendants' conduct, Plaintiff has suffered emotional and psychological distress, humiliation and embarrassment, sleeplessness and depression, suicidal ideation; and other damages that may arise during the course of discovery and the course of trial in this matter.

191.   Defendants' conduct as described herein was so egregious, malicious, and willful as to warrant an award of exemplary damages under Michigan law.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

**(i)** on the first cause of action for violation of constitutional due process under 42 U.S.C. § 1983, a judgment against the individual defendants awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, together with punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; declaratory and injunctive relief declaring WSU's disciplinary process unconstitutional, and

concomitantly expunging/vacating the findings and sanctions resulting from the unconstitutional process, plus an injunction enjoining violations of the Fourteenth Amendment in the process of investigating and adjudicating sexual misconduct complaints and requiring WSU to destroy all disciplinary records concerning Plaintiff;

**(ii)** on the second cause of action for violation of Title IX of the Education Amendments of 1972, a judgment against WSU awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction against and enjoining violations of the Title IX in the process of investigating and adjudicating sexual misconduct complaints, expunging Plaintiff's records, requiring WSU to destroy all disciplinary records concerning Plaintiff; and reinstating Plaintiff to the University for future studies;

**(iii)** on the third cause of action for violation of the Equal Protection Cause of the Fourteenth Amendment to the United States Constitution under 42 U.S.C. § 1983, a judgment against all Defendants awarding Plaintiff an

injunction against violations of the United States Constitution in the process of investigating and adjudicating sexual misconduct complaints, expunging Plaintiff's records, requiring WSU to destroy all disciplinary records concerning Plaintiff and reinstating Plaintiff to the University for future studies and, against the individual Defendants, damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements;

**(iv)** on the fourth cause of action for state law breach estoppel and reliance, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

**(v)** on the fifth cause of action for violation of the Michigan Constitution, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-

43

being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, together with punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; declaratory and injunctive relief declaring WSU's disciplinary process unconstitutional, and concomitantly expunging/vacating the findings and sanctions resulting from the unconstitutional process, plus an injunction enjoining violations of the Fourteenth Amendment in the process of investigating and adjudicating sexual misconduct complaints and requiring WSU to destroy all disciplinary records concerning Plaintiff;

**(vi)** on the sixth cause of action for Intentional Infliction of Emotional Distress, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, and treatment of same, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, exemplary damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; and

**(vii)** awarding Plaintiff such other and further relief as the Court deems just, equitable and proper.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury of all issues presented herein that are capable of being tried by a jury.

Respectfully submitted,

By:   */s/ J. Robert Flores*
 J. Robert Flores, Esq.
 Virginia Bar No. 42080
 10410 Hampton Road
 Fairfax Station, Virginia 22039
 Attorney for Plaintiff
 703-609-8731 (telephone)
 703-995-4307 (fax)
 rfloresesq@verizon.net

 **ROSSMAN, P.C.**
 *Attorneys for Plaintiff*
 Mark C. Rossman (P63034)
 Jacob M. Campbell (P83900)
 2145 Crooks Road, Suite 220
 Troy, Michigan 48084
 Telephone: 248.385.5481
 Facsimile: 248.480.4936
 mark@rossmanpc.com
 jacob@rossmanpc.com

Dated: February 15, 2021