UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

ANTHONY EID, an individual,

     Plaintiff,

v.

WAYNE STATE UNIVERSITY,
WAYNE STATE UNIVERSITY
SCHOOL OF MEDICINE,
NIKOLINA CAMAJ, MARGIT
CHADWELL, MATT JACKSON,
RICHARD S. BAKER, and
R. DARIN ELLIS, in their individual and
official capacities, jointly and severally,

     Defendants.

Case No: 20-cv-11718

Hon. Gershwin A. Drain
Mag. Judge David R. Grand

_____/

Mark C. Rossman (P63034)
Elizabeth M. Vincent (P76446)
ROSSMAN, P.C.
Attorneys for Plaintiff
2145 Crooks Road, Suite 220
Troy, MI  48084
(248) 385-5481
mark@rossmanpc.com
liz@rossmanpc.com

J. Robert Flores
Attorney for Plaintiff
10410 Hampton Road
Fairfax Station, VA  22039
(703) 609-8731
rfloresesq@verizon.net

KIENBAUM HARDY VIVIANO
 PELTON & FORREST, P.L.C.
By: Elizabeth Hardy (P37426)
    David A. Porter (P76785)
Attorneys for Defendants
280 N. Old Woodward Ave., Suite 400
Birmingham, MI  48009
(248) 645-0000
ehardy@khvpf.com
dporter@khvpf.com

_____/

**Defendants' Motion for Summary Judgment**

Defendants Wayne State University, Wayne State University School of Medicine, Nikolina Camaj, Margit Chadwell, Matt Jackson, Richard S. Baker, and R. Darin Ellis request that this Court enter summary judgment in their favor under Federal Rule of Civil Procedure 56 and dismiss Plaintiff's amended complaint with prejudice. In support of their motion, Defendants rely on their accompanying brief and the attached exhibits and declarations.

On January 26, 2022, Defendants' counsel sought concurrence in this motion from Plaintiff's counsel, explaining the nature of the motion and its legal basis. Plaintiff's counsel did not concur, necessitating this motion.

KIENBAUM HARDY VIVIANO
PELTON & FORREST, P.L.C.

By:   */s/ Elizabeth Hardy*
        Elizabeth Hardy (P37426)
        David Porter (P76785)
Attorneys for Defendants
280 N. Old Woodward Ave., Suite 400
Birmingham, MI  48009
(248) 645-0000
ehardy@khvpf.com
Dated: January 31, 2022          dporter@khvpf.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

ANTHONY EID, an individual,

     Plaintiff,

v.

                                     Case No: 20-cv-11718

WAYNE STATE UNIVERSITY,
WAYNE STATE UNIVERSITY            Hon. Gershwin A. Drain
SCHOOL OF MEDICINE,              Mag. Judge David R. Grand
NIKOLINA CAMAJ, MARGIT
CHADWELL, MATT JACKSON,
RICHARD S. BAKER, and
R. DARIN ELLIS, in their individual and
official capacities, jointly and severally,

     Defendants.

                                                          /

| | |
|---|---|
| Mark C. Rossman (P63034) | KIENBAUM HARDY VIVIANO |
| Elizabeth M. Vincent (P76446) |  PELTON & FORREST, P.L.C. |
| ROSSMAN, P.C. | By: Elizabeth Hardy (P37426) |
| Attorneys for Plaintiff |     David Porter (P76785) |
| 2145 Crooks Road, Suite 220 | Attorneys for Defendants |
| Troy, MI  48084 | 280 N. Old Woodward Ave., Suite 400 |
| (248) 385-5481 | Birmingham, MI  48009 |
| mark@rossmanpc.com | (248) 645-0000 |
| liz@rossmanpc.com | ehardy@khvpf.com |
| | dporter@khvpf.com |
| J. Robert Flores | |
| Attorney for Plaintiff | |
| 10410 Hampton Road | |
| Fairfax Station, VA  22039 | |
| (703) 609-8731 | |
| rfloresesq@verizon.net | |

                                                          /

**Brief in Support of Defendants' Motion for Summary Judgment**

# TABLE OF CONTENTS

TABLE OF CONTENTS..........................................................................i

INDEX OF AUTHORITIES...................................................................iii

ISSUES PRESENTED.........................................................................viii

CONTROLLING AUTHORITY................................................................x

INTRODUCTION ..................................................................................1

FACTS ................................................................................................2

    Professionalism at the School of Medicine ..........................................2

    The School Learns of Eid's Unprofessional Behavior ..........................3

    Camaj Interviews Eid and Roe and Sends a Summary to the School ................6

    The Professionalism Committee Recommends Eid's Dismissal .......................8

    The Promotions Committee Dismisses Eid..........................................10

    The Provost Concludes Eid was Afforded Due Process ...................14

    Eid Sues and Reinforces the School's Professionalism Assessment ...............15

LEGAL STANDARD............................................................................15

ARGUMENT .....................................................................................16

    I.    Sovereign immunity bars the bulk of Eid's claims for relief....................16

    II.    Defendants are entitled to summary judgment on Eid's due process claim. ....................................................................................17

        A.    Eid lacks a protected liberty or property interest and, regardless, he was given more process than is required for academic dismissals................................................................17

        B.    Eid's substantive due process claim fails as a matter of law. .............21

i

    C.     The individual Defendants are entitled to qualified immunity from Eid's due process claim. ............................................................22

III.   Eid's Title IX fails because there is no evidence that gender influenced the Promotions Committee's decision. ....................................23

    A.     Eid's "selective enforcement" claim fails for lack of a proper comparator. ..........................................................................24

    B.     Eid's "erroneous outcome" theory fails because he admitted to the underlying misconduct and there is no causal connection between his dismissal and gender bias. ................................24

IV.   Eid's equal protection claim fails for lack of a proper comparator. ..........26

V.   The University is entitled to summary judgment on Eid's state-law promissory estoppel claim. ............................................................26

VI.   Eid's fair and just treatment claim fails because the provision does not apply to the University and, regardless, Eid was treated fairly. ..........27

VII.  Eid's emotional distress claim is barred by governmental immunity and fails on the facts in any event. ............................................................28

CONCLUSION .........................................................................................29

# INDEX OF AUTHORITIES

## Cases

*Al-Dabagh v. Case W. Rsrv. Univ.*,
  777 F.3d 355 (6th Cir. 2015) ......................................................................... 21, 22

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ........................................................................................17

*Bd. of Curators of Univ. of Mo. v. Horowitz*,
  435 U.S. 78 (1978) ..................................................................................... passim

*Beischel v. Stone Bank Sch. Dist.*,
  362 F.3d 430 (7th Cir. 2004) ..........................................................................20

*Bishop v. Wood*,
  426 U.S. 341 (1976) ........................................................................................20

*Brosseau v. Haugen*,
  543 U.S. 194 (2004) ........................................................................................28

*By Lo Oil Co. v. Dep't of Treasury*,
  703 N.W.2d 822 (Mich. Ct. App. 2005) ...........................................................37

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ........................................................................................17

*Courser v. Allard*,
  969 F.3d 604 (6th Cir. 2020) ...........................................................................36

*Courser v. Michigan House of Representatives*,
  831 F. App'x 161 (6th Cir. 2020) .....................................................................38

*Cuddihy v. Wayne State Univ.*,
  413 N.W.2d 692 (Mich. Ct. App. 1987) ...................................................... 20, 36

*Curto v. Smith*,
  248 F. Supp. 2d 132 (N.D.N.Y. 2003) ..............................................................31

*Doe 2 by & through Doe 1 v. Fairfax Cty. Sch. Bd.*,
  384 F. Supp. 3d 598 (E.D. Va. 2019)................................................................31

*Doe v. Baum*,
    903 F.3d 575 (6th Cir. 2018)................................................................. 25, 26

*Doe v. Case W. Rsrv. Univ.*,
    809 F. App'x 276 (6th Cir. 2020)................................................................32

*Doe v. Columbia Univ.*,
    101 F. Supp. 3d 356 (S.D.N.Y. 2015)........................................................30

*Doe v. Fairfax Cty. Sch. Bd.*,
    403 F. Supp. 3d 508 (E.D. Va. 2019)........................................................33

*Doe v. Miami Univ.*,
    882 F.3d 579 (6th Cir. 2018).............................................................. 32, 33

*Doe v. Syracuse Univ.*,
    457 F. Supp. 3d 178 (N.D.N.Y. 2020) ......................................................34

*Doe v. Univ. of Dayton*,
    766 F. App'x 275 (6th Cir. 2019)..............................................................30

*Doe v. Univ. of St. Thomas*,
    240 F. Supp. 3d 984 (D. Minn. 2017) ................................................ 32, 34

*Doe v. Valencia Coll.*,
    903 F.3d 1220 (11th Cir. 2018)..................................................................32

*Ewing v. Bd. of Regents of Univ. of Michigan*,
    559 F. Supp. 791 (E.D. Mich. 1983) ................................................ 19, 27, 28

*Fenje v. Feld*,
    398 F.3d 620 (7th Cir. 2005).......................................................................21

*Firester v. Bd. of Governors of Wayne State Univ.*,
    908 F.2d 973 (6th Cir. 1990).......................................................................28

*Flaim v. Med. Coll. Of Ohio*,
    418 F.3d 629 (6th Cir. 2005).............................................................. 25, 26, 27

*Fuller v. Schoolcraft Coll.*,
    909 F. Supp. 2d 862 (E.D. Mich. 2012)......................................................28

*Goss v. Lopez,*
    419 U.S. 565 (1975) ...................................................................................27

*Kentucky v. Graham,*
    473 U.S. 159 (1985) ...................................................................................18

*Klein v. HP Pelzer Auto. Sys., Inc.,*
    854 N.W.2d 521 (Mich. Ct. App. 2014) ...................................................35

*Kreipke v. Wayne State Univ.,*
    807 F.3d 768 (6th Cir. 2015)......................................................................18

*Ku v. State of Tennessee,*
    322 F.3d 431 (6th Cir. 2003)......................................................................23

*Linebaugh v. Sheraton Michigan Corp,*
    497 N.W.2d 585 (Mich. Ct. App. 1993) ...................................................39

*Lipian v. Univ. of Michigan,*
    453 F. Supp. 3d 937 (E.D. Mich. 2020) ....................................................34

*Mays v. Governor,*
    916 N.W.2d 227 (Mich. Ct. App. 2018) ...................................................38

*Mbawe v. Ferris State Univ.,*
    751 F. App'x 832 (6th Cir. 2018)...............................................................22

*Odom v. Wayne Cnty.,*
    760 N.W.2d 217 (Mich. 2008) ..................................................................38

*Paul v. Davis,*
    424 U.S. 693 (1976) ...................................................................................20

*Pennhurst State Sch. & Hosp. v. Halderman,*
    465 U.S. 89 (1984) .....................................................................................18

*Saqr v. Univ. of Cincinnati,*
    Case No. 18-cv-542, 2019 WL 699347 (S.D. Ohio Dec. 2, 2019) ...........16

*Scott v. Harris,*
    550 U.S. 372 (2007) .....................................................................................6

*Siegert v. Gilley*,
   500 U.S. 226 (1991) ..........................................................................20

*Simmons v. Wayne Cty. Cmty. Coll. Dist.*,
   No. 11-cv-14936, 2014 WL 764632 (E.D. Mich. Feb. 25, 2014)......................22

*Stevenson v. Owens State Cmty. Coll.*,
   562 F. Supp. 2d 965 (N.D. Ohio 2008) ........................................... 22, 29

*U.S. SEC v. Sierra Brokerage Services, Inc.*,
   712 F.3d 321 (6th Cir. 2013) ...............................................................17

*Varlesi v. Wayne State Univ.*,
   909 F. Supp. 2d 827 (E.D. Mich. 2012) ...............................................29

*Vigil v. Regents of Univ. of Michigan*,
   980 F. Supp. 2d 790 (E.D. Mich. 2013) ...............................................28

*Vredevelt v. GEO Grp., Inc.*,
   145 F. App'x 122 (6th Cir. 2005).........................................................39

*Will v. Michigan Dep't of State Police*,
   491 U.S. 58 (1989) .............................................................................18

*Yaldo v. Wayne State Univ.*,
   266 F. Supp. 3d 988 (E.D. Mich. 2017) ...............................................22

*Yoder v. Univ. of Louisville*,
   526 F. App'x 537 (6th Cir. 2013)......................................... 21, 27, 29

*Zwick v. Regents of Univ. of Mich.*,
   No. 06-cv-12639, 2008 WL 1902031 (E.D. Mich. Apr. 28, 2008)......................35

**Statutes**

20 U.S.C. § 1681 .................................................................................30

42 U.S. § 1983.....................................................................................18

**Constitutional Provisions**

Mich. Const. 1963 Art. IV, § 53 .........................................................37

Mich. Const. 1963 Art. V, § 2.............................................................37

Mich. Const. 1963 Art. VIII, §§ 4, 5 ........................................................37

Mich. Const. 1963 Art. I, § 17 ...............................................................36

## ISSUES PRESENTED

1. Sovereign immunity bars federal courts from entertaining suits against states seeking monetary damages or retrospective relief for violations of § 1983 or state law. Wayne State University and university officials sued in their official capacity are considered the state for purposes of sovereign immunity.

   Does sovereign immunity bar Plaintiff's claims in Counts I and III–VI for monetary and prospective relief against the University and the other Defendants in their official capacity?

2. The Fourteenth Amendment's Due Process Clause requires only that a university provide informal notice and carefully deliberate before dismissing a student for academic reasons. Plaintiff was notified orally and in writing about concerns regarding his professionalism, submitted multiple written statements and evidence, appeared at two lengthy committee hearings, and pursued two institutional appeals.

   Was this process sufficient to satisfy the "far less stringent" due process requirements for academic dismissals, entitling Defendants to summary judgment on Plaintiff's due process claim?

3. Title IX's prohibition on gender discrimination requires Plaintiff to prove that the University treated similarly situated persons of the opposite gender more favorably than Plaintiff. Plaintiff's only proposed comparator did not engage in similar conduct and was not subject to the same standards as Plaintiff.

   Is the University entitled to summary judgment on Plaintiff's Title IX claim?

4. Like Title IX, the Equal Protection Clause's prohibition on gender discrimination requires Plaintiff to prove that Defendants treated similarly situated persons of the opposite gender more favorably than Plaintiff. Again, Plaintiff's only proposed comparator did not engage in similar conduct and was not subject to the same standards as Plaintiff.

Are Defendants entitled to summary judgment on Plaintiff's equal protection claim?

5.  To establish a promissory estoppel claim under Michigan law, Plaintiff must identify a specific promise by Defendants that induced reasonable reliance. Plaintiff relies on an irrelevant code of conduct and generic references to implied promises that Michigan courts have historically rejected as a basis for promissory estoppel claims.

   Is the University entitled to summary judgment on Plaintiff's promissory estoppel claim?

6.  The Fair and Just Treatment Clause of the Michigan Constitution applies only to "executive" hearings and investigations and guarantees only that individuals will be treated respectfully during such proceedings. The University is not an executive agency, and Defendants treated Plaintiff with dignity and respect throughout his professionalism process.

   Are Defendants entitled to summary judgment on Plaintiff's Fair and Just Treatment claim?

7.  To establish a claim for intentional infliction of emotional distress under Michigan law, Plaintiff must present evidence of outrageous, conscience-shocking behavior by Defendants. Plaintiff adduced no evidence of conduct that meets this extremely high standard under Michigan law.

   Are Defendants entitled to summary judgment on Plaintiff's intentional infliction of emotional distress claim?

# CONTROLLING AUTHORITY

Issue I:     *Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989)
               *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89 (1984)
               *Kreipke v. Wayne State Univ.*, 807 F.3d 768 (6th Cir. 2015)

Issue II:    *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78 (1978)
               *Al-Dabagh v. Case W. Rsrv. Univ.*, 777 F.3d 355 (6th Cir. 2015)
               *Brosseau v. Haugen*, 543 U.S. 194 (2004)

Issue III:   *Doe v. Univ. of Dayton*, 766 F. App'x 275 (6th Cir. 2019)
               *Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018)
               *Doe v. Case W. Rsrv. Univ.*, 809 F. App'x 276 (6th Cir. 2020)

Issue IV:   *Lipian v. Univ. of Michigan*, 453 F. Supp. 3d 937 (E.D. Mich. 2020)

Issue V:    *Klein v. HP Pelzer Auto. Sys., Inc*., 854 N.W.2d 521 (Mich. Ct. App. 2014)
               *Cuddihy v. Wayne State Univ.*, 413 N.W.2d 692 (Mich. Ct. App. 1987)

Issue VI:   *Courser v. Allard*, 969 F.3d 604, 618 (6th Cir. 2020)
               Mich. Const. 1963 Art. I, § 17
               Mich. Const. 1963 Art. VIII, §§ 4, 5
               Mich. Const. 1963 Art. V, § 2

Issue VII:  *Courser v. Michigan House of Representatives*, 831 F. App'x 161 (6th Cir. 2020)
               *Linebaugh v. Sheraton Michigan Corp*, 497 N.W.2d 585 (Mich. Ct. App. 1993)
               *Vredevelt v. GEO Grp., Inc.*, 145 F. App'x 122 (6th Cir. 2005)

## INTRODUCTION

As former medical student Anthony Eid will tell you, "Medical school is more than learning about the art of healing—it's also a time to develop the traits of a physician: honesty, professionalism, and integrity." And as he will also tell you, "When it came to exhibit[ing] these important qualities, [he] was severely lacking."

Eid is right on both counts. The Wayne State University School of Medicine requires students to meet professionalism standards to earn a medical degree. After learning that Eid sent deceitful and harassing texts to a former student, the School began a lengthy and careful professionalism inquiry, which revealed troubling behaviors by Eid, and which ended with the School determining that he severely lacked the character traits required of a doctor.

Eid sued the University and several officials involved in the professionalism process, claiming denial of due process, gender discrimination, and several state-law claims. But discovery supported none of Eid's theories and, in fact, only reinforced the School's assessment concerning his character deficiencies. The School treated Eid fairly, and it scrupulously complied with the procedures for professionalism cases, including notice, hearings, and appeals—far more than what the Constitution requires for academic dismissals. For that reason and the others discussed below, Defendants ask this Court to grant them summary judgment on all counts.

1

# FACTS

## *Professionalism at the School of Medicine*

To graduate from Wayne State University's School of Medicine, students must do more than show they can perform a differential diagnosis or stitch a wound. To become a physician, students are required as "part of the academic requirements of the M.D. program" to uphold the School's Professionalism Standards from matriculation to graduation, both in and out of the classroom and clinic. (Ex. 1A, Handbook, pp. 18, 83; Ex. 1C, Prof. Comm. Bylaws, p. 4.)

Students exhibiting unprofessional behaviors are referred first to the School's Professionalism Committee. After initial fact gathering and a hearing before the Committee involving the relevant parties, the Committee "determine[s] whether [the] student is in violation of . . . the professionalism core values" and whether remediation is appropriate. (Ex. 1C, Prof. Comm. Bylaws, p. 4, 9.) If the Committee concludes the behavior warrants dismissal, it refers the student to the Promotions Committee, the only entity with the authority to dismiss students. (*Id.*)

The Promotions Committee is the School's "final decision-making entity" regarding each student's "fitness and suitability for the study and practice of medicine." (Ex. 1B, Prom. Comm. Bylaws, p. 4.) Students referred to the Committee may submit a statement and are invited to a hearing before the Committee "to ensure that all relevant data is available." (*Id.*) During deliberations, which are an exercise

2

of "academic decision making," the Committee considers the student's entire academic record to date, as well the issue affecting the student's academic or professional performance. (*Id.* at 7-8.)

A student may seek reconsideration of the Promotions Committee's decision within ten business days. (*Id.* at 9.) In cases of dismissal, students may also "voluntarily and permanently withdraw" in lieu of dismissal within ten business days of the dismissal decision. (Ex. 1A, Handbook, p. 56.) But "[t]he offer to withdraw becomes null and void if the student elects to request reconsideration of the dismissal to the Chair of the Promotions Committee." (*Id.*) If the Promotions Committee reaffirms its decision, the student may appeal the decision to the University Provost, who reviews the decision on the record.  (Ex. 1B, Prom. Comm. Bylaws, p. 9.)

### The School Learns of Eid's Unprofessional Behavior

On October 29, 2018, former WSU undergraduate student Jane Roe[1] filed a university complaint about then-second-year medical student Anthony Eid and a series of concerning text messages he sent beginning in Fall 2016, when the two met at a campus orientation event. (Ex. 2, Camaj Report, WSU/Eid 222–23.)[2] At that

---

[1] Eid referred to this person pseudonymously as "Jane Roe" in his complaint, and the parties agreed to continue the pseudonym throughout discovery since Roe's actual identity is irrelevant for purposes of this motion.

[2] Roe filed it using the University's general online complaint form, which is separate from the procedure used to file a charge under the Student Code of Conduct or Title IX. *See* https://cm.maxient.com/reportingform.php?WayneStateUniv&layout_id=4.

event, Eid provided Roe electronic study materials saved on his iCloud account and the two exchanged phone numbers. (*Id.*) Several weeks later, Eid texted Roe, telling her that he "was hacked . . . by someone in Asia." (*Id.*) He said (falsely) that Apple advised him he needed to log into Roe's account on his computer in order to secure his account. (Ex. 3, Roe-Eid Texts, WSU/Eid 231.) Roe ignored him at first. But Eid persisted, claiming (again, falsely) that Apple suggested that she needed to turn off her two-step verification to secure his account. (*Id.* at WSU/Eid 230.) After months of unreturned texts, Eid grew frustrated. He told Roe he was filing a "complaint" the next day if she didn't help him. (*Id.* at WSU/Eid 233.)

That got Roe's attention. She offered several of her passwords that Eid said did not solve his problem. (*Id.* at WSU/Eid 233-234.) After weeks' more of cajoling, including yet another (false) appeal to authority ("I just called Apple and . . . [t]hey said . . .") Roe eventually gave Eid a password that he said worked. (*Id.* at WSU/Eid 235–238; Ex. 2, Camaj Report, WSU/Eid 222.)

Eid stopped texting Roe for several months, until he texted again in August 2018, claiming that his account had been hacked and that she was somehow involved. (Ex. 3, Roe-Eid Texts, WSU/Eid 226.) He said (falsely) that he had contacted the police and that "[t]hey tracked the IP address" to a mailing address that matched hers. Eid said (again, falsely) that the police "recommended [he] reach out to [her]." (*Id.*) She declined to help, telling him to "[p]lease stop contacting me."

4

Case 2:20-cv-11718-GAD-DRG   ECF No. 43, PageID.773   Filed 01/31/22   Page 18 of 43

(*Id.* at WSU/Eid 227.) Eid responded that he was "going to have to file a lawsuit with the 36th district court for damages" and that she "may hear from [his] lawyer if this is not resolved." (*Id.* at WSU/Eid 228.)

Several weeks later, on October 25, 2018, Roe received an email from wolffsmithlawfirm@gmail.com.[3] (Ex. 4, Atty Email, WSU/Eid 203.) The "author," Alexander Wolff-Smith, purported to be an attorney representing Eid in a case against Roe in the 36th District Court. (*Id.*) He "strongly encouraged" Roe to settle with Eid, telling her to contact Eid at the number he's been using to text her. (*Id.*) The next day, Eid texted Roe: "Hi. My lawyer told me he emailed you yesterday. Take a look and lmk [let me know] what you wanna do. I'm open to a better resolution. Thanks!"[4] (Ex. 3, Roe-Eid Texts, WSU/Eid 228.)

Roe told her parents, who helped her determine that the email was not sent by a real attorney. (Ex. 5, Mrs. Roe Email, WSU/Eid 198.) They encouraged her to make a report with Wayne State University, which she did, reciting the events described above. Roe's mother, who also happened to be a nurse at a Detroit-area

---

[3]   According to business records subpoenaed from Google, the "wolffsmithlawfirm@gmail.com" account was created the same day, just over an hour before the email was sent. (Ex. 6, Google Records.)

[4] During his deposition, Eid acknowledged sending all the texts except this one, even though it is part of the same conversation as all the other texts. (Ex. 29, Eid Dep. II, pp. 260–61.) Eid's testimony notwithstanding, there is no *genuine* dispute that Eid sent this text. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). Eid couldn't explain how the text showed up in his conversation with Roe.

hospital, mentioned the ordeal to a physician who encouraged her to notify the medical school. (Ex. 25, Chadwell Dep., pp. 21-22.) She contacted the Associate Dean of Student Affairs and Career Development, Dr. Margit Chadwell, and relayed her daughter's story. (*Id.*) Chadwell recognized the obvious professionalism concerns and immediately notified the Chairs of the Professionalism and Promotions Committees, Dr. Matt Jackson and Dr. Richard Baker. (*Id.* at 31-32, 34–36.)

**Camaj Interviews Eid and Roe and Sends a Summary to the School**

The first step in the professionalism process is assembling the pertinent information. (Ex. 1C, Prof. Comm. Bylaws, p. 9.) To assist with that task, the School enlisted Nikolina Camaj, who works in the University's Dean of Students Office as the Student Conduct Officer. (Ex. 26, Camaj Dep., pp. 43, 84–85.) In her role, Camaj handles not only charges under the University's Student Code of Conduct, but also other reports of concerning behavior by members of the WSU community, which are not subject to the Student Code of Conduct. (*Id.* at 46, 51–54.) Eid's case fell into the latter category. Camaj was asked by the School to interview Roe and Eid and prepare a report of their statements, including any additional evidence.[5] (*Id.* at

---

[5] Roe did not file a charge under the Code of Conduct. As Camaj explained during her deposition, if no charges under the Code are filed, then the Student Code of Conduct does not apply. (Ex. 26, Camaj Dep., p. 95; Ex. 27, Jackson Dep., p. 117.)

86–87, 95–97; Ex. 27, Jackson Dep., p. 64.) She was not tasked with making credibility findings or any conclusions. (Ex. 26, Camaj Dep., pp. 86–87.)

Camaj interviewed Roe by phone on November 15, 2018. (Ex. 2, Camaj Report, WSU/Eid 240.) Roe reiterated the version of events from her online complaint. (*Id.*) Afterwards, she sent Camaj text messages between her and Eid. (Ex. 26, Camaj Dep., p. 116.)[6]

On November 27, 2018, Camaj emailed Eid inviting him to meet with her to discuss the reported concerns.[7] (Ex. 7, Camaj Letter, WSU/Eid 245.) At the outset of their meeting, she explained to Eid that this was not a Student Code of Conduct matter, but rather a report of concerning behavior and that her only role was to take statements and forward them to the medical school for handling through the Professionalism process. (Ex. 26, Camaj Dep., pp. 109-110; Ex. 8, Chadwell-Camaj Email Chain, WSU/EID 340.) Eid confirmed that he knew Roe and explained that he had been texting her in an effort to secure his online accounts. (Ex. 26, Camaj Dep., p. 116; Ex. 2, Camaj Report, WSU/Eid 241.) He acknowledged that he

---

[6] The screenshots of the texts that Roe sent to Camaj, and which Camaj appended to her report, were not in chronological order. For convenience, Defendants reorganized the texts into chronological order. (*See* Ex. 3, Roe-Eid Texts.)

[7] Eid responded to Camaj's email the same day at 3:52 p.m. According to business records subpoenaed from Google, 15 minutes later, the "wolffsmithlawfirm@gmail.com" account was deleted by the account holder. (Ex. 6, Google Records.)

"stretched the truth" with Roe and had lied about contacting the police and Apple and having a lawyer (hence, the "false" parentheticals above). (Ex. 2, Camaj Report, WSU/EID 241.) But he denied sending the fake attorney email. (*Id.*)

Camaj told Eid he could write a statement for review by the medical school. (Ex. 26, Camaj Dep., pp. 114–15.) He did so and in it took "full responsibility for the text messages/Facebook messages." (Ex. 2, Camaj Report, WSU/Eid 243) He admitted that he "lied to [Roe] about many things," including his representation about contacting Apple and the police and about having an attorney (*Id.*) At the same time, Eid insisted that his actions had no bearing on his fitness to be a doctor: "[W]hile these actions do represent a character flaw that I deeply regret," he wrote, "I think it is also important to note that the actions in themselves are not a medical school issue, but rather a civil one."  (*Id.* at WSU/Eid 244.)

### *The Professionalism Committee Recommends Eid's Dismissal*

With Camaj's report and supporting documents in hand, Dr. Jackson scheduled a Professionalism Committee hearing. (Ex. 9, Jackson Email, WSU/Eid 362.) He notified Eid of the hearing and met with him in advance to explain the process. (*Id.*) At the meeting, Eid reviewed a copy of the materials being presented to the Committee (the Camaj Report and accompanying documents).  (Ex. 29, Eid Dep. II, pp. 300, 479; Ex. 27, Jackson Dep., p. 80.)

At the hearing, the Committee heard first from Roe and her mother. (Ex. 10, Prof. Comm. Minutes, WSU/Eid 20-22.) Roe recounted her communications with Eid. (*Id.*) She also told the Committee that she suspected Eid was trying to hack her accounts to obtain personal information, though she had no hard proof of that. (*Id.*)

The Committee then heard separately from Eid. (*Id.* at WSU/Eid 22.)[8] He read the statement he sent to Camaj and offered a five-part remediation plan that included meeting with a therapist and his class counselor, taking an online ethics course, and writing a reflection paper and apology letter. (*Id.*; Ex. 27, Jackson Dep., pp. 79-80.) As before, Eid admitted that he lied to Roe about contacting the police and Apple and about having an attorney, but only so that Roe would "take the situation seriously." (Ex. 10, Prof. Comm. Minutes, WSU/Eid 22; Ex. 27, Jackson Dep., pp 114–15.) He fielded questions about how his actions measured up to the School's professionalism standards. (*Id.* at WSU/Eid 23.) Following deliberations, the Committee "unanimously decided" that, due to his "repeated lying and harassment," "Eid's behavior was not consistent with that of a future physician." (*Id.*) The Committee voted unanimously to refer Eid to the Promotions Committee with a recommendation for dismissal. (Ex. 11, Prof. Comm. Letter, WSU/Eid 410.)

---

[8] Before the hearing, and at multiple points throughout the process, Eid met with his class counselor, Defendant Loretta Robichaud, who provided non-substantive feedback on his statements, helped him find a therapist, and answered his questions to the best of her knowledge.  (Ex. 29, Eid Dep. II, pp. 303–308.)

***The Promotions Committee Dismisses Eid***

Eid took the opportunity to submit a new written statement to the Promotions Committee, which opened with a stunning admission: "**Medical school is more than learning about the art of healing. It's also a time to develop the traits of a physician: honesty, professionalism, and integrity. When it came to exhibit[ing] these important qualities**," he said, "**I was severely lacking**." (Ex. 12, Prom. Comm. Statement, WSU/Eid 777; *see also id.* at WSU/Eid 778-79 (making other admissions).) Sadly, other statements cast serious doubt on Eid's genuineness: "This whole situation," he insisted, "has no bearing, in any way on my studies, my future patients, or any other members of the SOM community." (*Id.* at WSU/Eid 779.) And despite "tak[ing] these charges seriously," he viewed the recommendation like "receiving the death penalty for shoplifting." (*Id.* at WSU/Eid 780.)

At the Promotions Committee hearing, the Committee members reviewed the materials submitted to the Professionalism Committee, Eid's second statement, and his entire academic file. (Ex. 13, Prom. Comm. Minutes, WSU/Eid 783.) Eid appeared and in prepared remarks reiterated many of the same points he made in his previous statements.[9] (Ex. 14, Prom. Comm. Remarks, AE 289-90.) He admitted that his conduct presented a "difficult decision" for the Committee. (*Id.*)

---

[9] Eid testified that he was asked to stop reading his remarks. (Ex. 29, Eid Dep. II, p. 396.) Assuming that's true, his remarks were duplicative of his written statements.

The Committee then asked Eid questions, focusing not on his interactions with Roe but on whether Eid appreciated the professionalism concerns raised by his admitted conduct. Ex. 13, Prom. Comm. Minutes, WSU/Eid 783; Ex. 28, Baker Dep., p. 41–44, 54; Ex. 1, Gray Dec., ¶ 10; Ex. 15, Braun Dec., ¶ 6; Ex. 16, Waineo Dec, ¶ 6.) The Committee prodded to see whether Eid had the capacity for reflection and genuine self-improvement in the face of obvious character deficiencies. (*Id.*) Eid was defiant and evasive, lacked self-awareness, and failed to demonstrate accountability for his admittedly unprofessional behavior. (*Id.* at 45-46; Ex. 1, Gray Dec., ¶¶ 10–11; Ex. 13, Prom. Comm. Minutes, WSU/Eid 783.)

Following "lengthy deliberation," the Promotions Committee voted unanimously to dismiss Eid from the School. (*Id.*) As they later recounted, the deceitful and harassing texts that Eid admitted sending to Roe raised serious concerns about Eid's judgment. Those concerns took on new dimensions when the Committee realized that Eid was merely paying lip service to the School's professionalism standards. Eid refused to acknowledge that his behavior had any bearing on his fitness to be doctor, someone who would be entrusted with sensitive patient information and to work closely with vulnerable populations. In short, his communications with Roe, his written statements, and his presentation before the Promotions Committee all demonstrated to the Committee a fundamental lack of integrity, self-awareness, and capacity for the kind of fundamental change necessary

to uphold the School's and the medical profession's professionalism values. (Ex. 1, Gray Dec., ¶¶ 13–17; Ex. 15, Braun Dec., ¶¶ 8–13; Ex. 16, Waineo Dec, ¶¶ 8–13.)

In his letter notifying Eid of the decision, Dr. Baker informed him of his procedural options moving forward, which were to "voluntarily withdraw from the of Medicine or to appeal this decision." (Ex. 17, Prom. Comm. Letter, AE 303; *see also* Ex. 1A, Handbook, p. 56.) If he chose one of those options, he was required to notify the School by letter within 10 business days. (*Id.*) Several days later, Eid sent an email asking for an extension of the 10-day deadline to make his "decision," saying that "ten days is simply not enough time for me to make a decision of his magnitude." (Ex. 18, Eid Extension Email, WSU/Eid 501.) He also asked to extend the withdrawal option mentioned in Dr. Baker's letter in the event the Provost denied his appeal. (*Id.*) Dr. Baker agreed to extend the deadline to appeal or withdraw, but he did not alter the School's appeal-or-withdraw policy.[10] (Ex. 19, Muhammad-Chadwell Email, WSU/Eid 497.)

Eid elected to appeal to the Promotions Committee for rehearing, thereby negating his ability to voluntarily withdraw. (Ex. 20, Prom. Comm. Appeal,

---

[10] Eid disputes the latter point, claiming that Dr. Baker told him he could withdraw *before* his appeal to the Provost. Eid's testimony does not match up with the email he sent, which refers to possible withdraw *after* the Provost appeal (not before). (*See* Ex. 18, Eid Extension Email, WSU/Eid 501.) And a contemporaneous email recapping the meeting made clear that Eid had until "March 20th to submit his appeal or withdraw." (Ex. 19, Muhammad-Chadwell Email, WSU/Eid 497.)

WSU/Eid 525–65.) He submitted a written statement reiterating his explanation for his actions and pointing to additional documents that he said shows his accounts were hacked. (*Id.* at WSU/Eid 530–33.) Most important, Eid claimed to "understand the issues that [the Committee members] are worried about." (*Id.* at WSU/Eid 530.) He promised to not "use [his] position (hopefully as a physician) for personal gain, [or] . . . to access any information, or abuse [his] power in any way shape or form." (*Id.*) Recognizing that his actions warranted action by the Committee, Eid requested he be placed on "extended probation" for the rest of medical school and, if his behavior did not change, he would "willfully accept a dismissal without a hearing, without the option to withdraw." (*Id.* at WSU/Eid 532.)

Eid also wrote an apology letter to Roe. (*Id.* at WSU/Eid 534.) He told her that he "regret[s] nothing more in [his] life than what [he did] to [Roe]," referring to conduct that, just weeks earlier, he had compared to mere "shoplifting." (*Id.*) And despite offering evidence to the Promotions Committee implying Roe's culpability, he faulted himself for not believing her: "I did the one thing I shouldn't have done: I chose not to believe you, and I negated your experience. It shouldn't have taken me so long to realize that you had been telling the truth all along[.]" (*Id.*)

The Promotions Committee decided to deny Eid's appeal because his written statement and additional information "was not sufficient to reverse their decision of dismissal." (Ex. 21, Prom. Comm. Appeal Letter, WSU/Eid 671.)

***The Provost Concludes Eid was Afforded Due Process***

Eid subsequently appealed to the University's Provost Office.[11] (Ex. 22, Provost Appeal, WSU/Eid 74–77.) Contrary to his statement to the Promotions Committee in which he claimed to understand the Committee's professionalism concerns, Eid now claimed that he "ha[d] yet to be informed what specific violations [he had] made that would warrant dismissal from the School of Medicine." (*Id.* at WSU/Eid 75.) Eid also argued that he was denied due process because the School failed to follow portions of the Student Code of Conduct and because he was denied the option to withdraw after being told he could. (*Id.* at WSU/Eid 74-77.)

Associate Provost Dr. Darin Ellis issued a decision denying Eid's appeal. (Ex. 24, Provost Letter, WSU/Eid 705-708.) As Camaj had done at the outset, Dr. Ellis explained that the Student Code of Conduct did not apply to Eid's professionalism proceedings. (*Id.* at WSU/Eid 706.) He also documented the School's compliance with the professionalism procedures, before concluding: "[A]ll evidence points to the fact that the decision to dismiss you was based solely upon the collective academic decision making of the promotions committee." (*Id.* at WSU/Eid 707.)

---

[11] Before that, Eid inquired with Dr. Baker's office about withdrawing from school. (Ex. 23, Eid-Muhamad Email, WSU/Eid 702.) Dr. Baker's assistant corrected Eid's false assertion that Dr. Baker permitted him to withdraw after appealing to the Promotions Committee. (*Id*. at WSU/Eid 701.) Eid never responded.

***Eid Sues and Reinforces the School's Professionalism Assessment***

Officially dismissed from the School of Medicine, Eid filed suit against the University, the School of Medicine, and six WSU employees involved in Eid's professionalism process who had no decision- or policy-making authority.[12]

His deposition confirmed the Promotions Committee's assessment that his "purported claims of contrition in writing and before the committee were completely insincere, said only to placate members of the committee." (Ex. 1, Gray Dec., ¶ 16.) Wishing that he would have been *more* defensive, Eid retracted a number of admissions, including that his behavior exposed a "major character flaw." (Ex. 29, Eid Dep. II, p. 273 ("That's what I wrote, I understand, but I don't think it actually was a major character flaw."); *see also id.* at 391–94, 442–43.) And while he still agreed that he lied to Roe, *id.* at 276, he continued to ignore the significance of his conduct under the School's Professionalism Standards. (*Id.* at 289.) "It wasn't any of the business of the medical school." (*Id.* at 291; *see also id*. at 289.)

## LEGAL STANDARD

Rule 56 entitles the moving party to summary relief if it can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment

---

[12] Although Eid separately named the School of Medicine as a defendant, as stated in Defendants' Answer, the School of Medicine is not a separate legal entity but is merely a part of the University. It is not properly listed as a separate defendant. *Saqr v. Univ. of Cincinnati*, Case No. 18-cv-542, n.1 (S.D. Ohio Dec. 2, 2019).

as a matter of law." *U.S. SEC v. Sierra Brokerage Services, Inc.,* 712 F.3d 321, 326–27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)).  A moving party can carry its burden by showing "there is an absence of evidence to support the non-moving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). To avoid summary judgment, the plaintiff must identify evidence in record on which the jury could reasonably find [in their favor]."  *Anderson,* 477 U.S. at 252.

## ARGUMENT

### I.  Sovereign immunity bars the bulk of Eid's claims for relief.

The Eleventh Amendment of the U.S. Constitution bars federal courts from entertaining suits against states seeking monetary damages or retrospective relief. That prohibition applies to claims against Wayne State University, as an "arm of the state," *Kreipke v. Wayne State Univ.*, 807 F.3d 768, 781 (6th Cir. 2015), as well as claims against the individual Defendants in their official capacity, *see Kentucky v. Graham*, 473 U.S. 159, 167 (1985). The immunity covers his § 1983 claims (I and III). *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66 (1989).[13] It also covers Eid's state-law claims (Counts IV–VI). *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 106 (1984). This Court should therefore dismiss Counts I

---

[13] In *Will,* the Supreme Court also held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983," 491 U.S. at 71, and for that reason as well Eid's § 1983 claims should be dismissed.

and III–VI to the extent they seek monetary damages or retroactive injunctive relief

from the University or the individual defendants in their official capacity.

## II. Defendants are entitled to summary judgment on Eid's due process claim.

### A. Eid lacks a protected liberty or property interest and, regardless, he was given more process than is required for academic dismissals.

Eid's procedural due process claim fails at the outset because it lacks a

constitutionally protect property or liberty interest. His claim of a "property

interest[ ] in his continued enrollment" under the Student Code of Conduct overlooks

that the promotions and graduation requirements come from the School of

Medicine's handbook, not the Code of Conduct. (Am.Compl., ECF No.24,

PageID.545–46.) In any event, Michigan law does not recognize this kind of

property interest. *See Ewing v. Bd. of Regents of Univ. of Michigan*, 559 F. Supp.

791, 800 (E.D. Mich. 1983) (statement in university publication did not create

entitlement); *Cuddihy v. Wayne State Univ.*, 413 N.W.2d 692, 695 (Mich. Ct. App.

1987) (advisor's statement that student would graduate did not create entitlement).[14]

Eid also claims a liberty interest in his reputation (*see* Am.Compl., ECF

No.24, PageID.545), but to establish that he must show, among other things, that the

University publicly disclosed stigmatizing information in connection with his

---

[14] Eid's contrary assertion amounts to no more than a common law breach of contract claim, which is barred by sovereign immunity. *Pennhurst,* 465 U.S. at 106.

dismissal. *See Paul v. Davis*, 424 U.S. 693, 710–12 (1976); *Siegert v. Gilley*, 500 U.S. 226, 233 (1991). Yet the only communications about Eid's dismissal were private letters issued to him and University officials involved that simply set forth the Committee's decision. (Ex. 11, Prof. Comm. Letter, WSU/Eid 410–11; Ex. 17, Prom. Comm. Letter, AE 303.) *See Bishop v. Wood,* 426 U.S. 341, 348–49 (1976); *Beischel v. Stone Bank Sch. Dist.*, 362 F.3d 430, 439 (7th Cir. 2004).

Even assuming *arguendo* that Eid had alleged a cognizable property or liberty interest, he must also show that the University denied him sufficient process. The amount of process due to Eid depends on whether his dismissal was an "academic" decision. The procedural due process requirements for academic dismissals are "far less stringent" than for disciplinary dismissals because such academic decisions require "an expert evaluation of cumulative information and [are] not readily adapted to the procedural tools of judicial or administrative decision making." *Horowitz*, 435 U.S. at 86, 90, 92. In recognition of the fact that "[u]niversity faculties must have the widest range of discretion in making judgment as to the academic performance of students and their entitlement to promotion or graduation," *id.* at 96 n. 6 (Powell, J., concurring), the Fourteenth Amendment requires *only* that the school "fully inform [the student] of the faculty's dissatisfaction" and come to a "careful and deliberate" decision. *Ku v. State of Tennessee*, 322 F.3d 431, 436 (6th Cir. 2003) (quoting *Horowitz*, 435 U.S. at 90, 92). No hearing is required. *Id.*

As this Court observed, "[i]n the Sixth Circuit," and certainly at WSU, "dismissing a medical student for lack of professionalism is academic evaluation." *Yaldo v. Wayne State Univ.*, 266 F. Supp. 3d 988, 1005 (E.D. Mich. 2017) (Drain, J.); *Al-Dabagh*, 777 F.3d at 359–60; *Fenje v. Feld*, 398 F.3d 620, 624 (7th Cir. 2005). There is no question the School dismissed Eid for lack of professionalism. Faced with admitted behavior that, on its face, posed professionalism concerns, *infra*, pp. 4–9, and writings that cycled from assertions of contrition to defiance, *infra*, pp. 8–12, the Promotions Committee members prodded Eid during his hearing to see whether he truly understood why there were grave questions about his character and integrity. *Infra*, pp. 11–12. They did not resolve disputes of objective fact, but rather engaged in an evaluative assessment of Eid's character and capacity to exhibit the School's professionalism values. *Infra*, pp. 11–12. After considering Eid's varying explanations and how he presented himself, the Committee unanimously decided to dismiss Eid because he lacked the character traits required of a medical doctor. *Infra*, p. 12. (Ex. 1A, Handbook, pp. 18, 83.) This judgment was a quintessential academic decision. *Horowitz*, 435 U.S. at 90.

Eid was also provided all the process ordinarily due for academic dismissals and then some. He was fully informed of the School's concerns regarding his professionalism. *Infra*, pp. 8–11. Moreover, Eid went through a lengthy process that involved interviews, multiple opportunities to submit written statements, multiple

meetings with University officials to assist Eid through the process, and appearances at *two* hearings (despite no hearing being required for an academic dismissal) where Eid made statements. *See infra*, pp. 7–15. The final hearing before the Promotions Committee lasted roughly two hours. (Ex. 13, Prom. Comm. Minutes, WSU/Eid 783.) The Committee considered all evidence submitted to it, including multiple statements from Eid and deliberated at length over whether Eid displayed the requisite fitness to become a doctor. (See Ex. 1, Gray Dec., ¶ 12–18; Ex. 13, Prom. Comm. Letter, AE 303 (stating decision came after "careful committee deliberation").) Notably, while due process does not require *any* appeal procedure, *see Flaim v. Med. Coll. Of Ohio*, 418 F.3d 629, 646 (6th Cir. 2005), Eid had the right to appeal for reconsideration to the Promotions Committee and again to the Provost.

Despite being afforded more process than was due under the 14th Amendment for academic dismissals, Eid faults the School for not doing more. The student in *Horowitz* made a similar argument, claiming that academic dismissals "require the fundamental safeguards of representation by counsel, confrontation, and cross-examination of witnesses." *Horowitz*, 435 U.S. at 86 n.2. The Supreme Court rejected that position—indeed, it rejected the proposition that a student in Eid's position is entitled to any hearing at all.

Eid's primarily complaint is the lack of cross-examination during his professionalism hearing. But cross-examination was irrelevant here because Eid

admitted, from the outset, to the conduct that brought him before the Committee and the *legal significance* of his conduct (i.e. that it fell short of the School's professionalism standards). (Ex. 2, Camaj Report, WSU/Eid 241, 243.) *See Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 641 (6th Cir. 2005) (holding that cross-examination was not constitutionally required because the plaintiff admitted to the conduct that led to his dismissal); *Baum*, 903 F.3d at 584. Also, the Promotions Committee did not weigh Eid's credibility against Roe; its decision was based solely on Eid's admissions and his behavior during the professionalism review process. (Ex. 27, Jackson Dep., p. 93; Ex. 28, Baker Dep., p. 54; Ex. 1, Gray Dec., ¶ 20; Ex. 15, Braun Dec., ¶ 16; Ex. 16, Waineo Dec., ¶ 16.)[15]

**B. Eid's substantive due process claim fails as a matter of law.**

Eid's substantive due process claim fares no better. The "[the Sixth Circuit] has rejected the notion that substantive due process protects a medical . . . student's interest in his or her continued enrollment." *Yoder*, 526 F. App'x at 549 (citing cases). Beyond that, the substantive due process standard in the academic context is

---

[15] Even if Eid's dismissal were "disciplinary," as opposed to "academic," he was afforded sufficient process because he was given "effective notice" and multiple "informal hearing[s]" in which he had a chance to "give his version of the events" and demonstrate to the School that he was fit to be a physician. *Goss v. Lopez*, 419 U.S. 565, 583 (1975); *cf. Flaim*, 418 F.3d at 640 (holding no procedural due process right to an attorney during disciplinary proceeding if it is not complex and there is no attorney presenting for the University, and no right to cross-examination if student admits the misconduct).

exceedingly deferential. Courts must "show great respect for the faculty's professional judgment" and may not "override" that judgment "unless it is such a substantial departure from accepted academic norms as to demonstrate that the . . . committee responsible did not actually exercise professional judgment." *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985). That evidence is missing here. *See infra*, pp. 10–15. *Cf. Horowitz*, 435 U.S. at 91 (upholding dismissal of medical student for failing to observe "personal hygiene" and "timeliness"); *Firester v. Bd. of Governors of Wayne State Univ.*, 908 F.2d 973 (6th Cir. 1990) (failing to exhibit "proper attitudes toward patients"); *Fuller v. Schoolcraft Coll.*, 909 F. Supp. 2d 862, 876 (E.D. Mich. 2012) ("lack of candor").[16]

### C. The individual Defendants are entitled to qualified immunity from Eid's due process claim.

The individual Defendants are entitled to qualified immunity regarding Eid's procedural and substantive due process claims. To overcome qualified immunity, a plaintiff must show that the right being asserted was clearly established in a "particularized sense" such that a reasonable official confronted with the same situation would have known that her actions would violate that right. *Brosseau v. Haugen*, 543 U.S. 194, 199-200 (2004).

---

[16] Eid's due process claim under the Michigan Constitution fails for the same reasons his claim under the 14th Amendment fails. *See Vigil v. Regents of Univ. of Michigan*, 980 F. Supp. 2d 790, 803 (E.D. Mich. 2013) (applying same legal standard).

First, not one of the individual Defendants was a voting member of that Committee and, thus, not involved in the alleged deprivation of Plaintiff's due process rights. (Ex. 27, Jackson Dep., p. 79; Ex. 28, Baker Dep., p. 19; Ex. 10, Prof. Comm. Minutes, WSU/Eid 20; Ex. 13, Prom. Comm. Minutes, WSU/Eid 783.) Second, there is no "clearly established" law that Eid was denied a constitutionally protected interest for purposes of his procedural and substantive due process claim. *See Yoder*, 526 F. App'x at 549 (citing cases); *Varlesi v. Wayne State Univ.*, 909 F. Supp. 2d 827, 861 (E.D. Mich. 2012) (Goldsmith, J.). And third, the individual Defendants acted reasonably in treating Eid's case as an academic decision, *see Yoder*, 526 F. App'x at 550; *Stevenson*, 562 F. Supp. 2d at 965 (N.D. Ohio 2008), and in concluding that the process afforded him was adequate.  For these reasons, the individual Defendants are entitled to qualified immunity.

**III.    Eid's Title IX fails because there is no evidence that gender influenced the Promotions Committee's decision.**

Next, Eid claims in Count II that the University (not the individual Defendants) violated his rights under Title IX. Among the various legal theories a plaintiff can pursue under Title IX, Eid relies on two: "selective enforcement" and "erroneous outcome." (Am.Compl., ECF No. 24, PageID.548); *see Doe v. Univ. of Dayton*, 766 F. App'x 275, 280 (6th Cir. 2019).

## A. Eid's "selective enforcement" claim fails for lack of a proper comparator.

To prevail under a "selective enforcement" theory, Eid "must show that a similarly-situated member of the opposite sex was treated more favorably than [him] due to [his] gender." *Doe*, 766 F. App'x at 284. A person is similarly situated under Title IX if she is subject to the same discipline standards and engaged in comparable conduct. *Doe v. Columbia Univ.*, 101 F. Supp. 3d 356, 374 (S.D.N.Y. 2015).

The only "comparator" Eid has offered is Roe. But Roe is not a proper comparator because Eid never filed a University complaint against her. See *Doe 2 by & through Doe 1 v. Fairfax Cty. Sch. Bd.*, 384 F. Supp. 3d 598, 609 n.6 (E.D. Va. 2019) (person who engaged in similar behavior not proper comparator because the plaintiff "never made any complaints against" her) (citing cases). Moreover, Eid and Roe were not subject to the same standards—unlike Roe, Eid was subject to the medical school's professionalism standards and the subjective judgment of the Promotions Committee about his fitness to be a doctor; Roe was not. *See Curto v. Smith*, 248 F. Supp. 2d 132, 147 (N.D.N.Y. 2003).

## B. Eid's "erroneous outcome" theory fails because he admitted to the underlying misconduct and there is no causal connection between his dismissal and gender bias.

To prevail under an "erroneous outcome" theory, Eid must show (1) that the outcome of his proceeding was tainted by some "articulable doubt" and (2) that gender bias caused the doubt. *Doe v. Miami Univ.*, 882 F.3d 579, 592 (6th Cir. 2018).

Eid cannot show that his proceeding was tainted by doubt because he admitted critical facts underlying the decision—*i.e.*, he admitted to sending deceitful texts to obtain Roe's passwords and that his conduct gave rise to professionalism concerns. *See Doe v. Case W. Rsrv. Univ.*, 809 F. App'x 276, 280 (6th Cir. 2020) ("[Plaintiff's] concession is enough to dispel the notion that his hearing resulted in an "erroneous outcome."); *Doe v. Valencia Coll.*, 903 F.3d 1220, 1236 (11th Cir. 2018).

There is also no evidence establishing that the outcome had "a particularized causal connection" to gender bias. *Doe*, 882 F.3d at 592.  Insofar as Eid relies on a comparator theory to show gender bias, that approach fails. *See infra*, p. 28. Beyond that, Eid has not shown that the decision makers exhibited anti-male bias or that the University has "a pattern of decision-making tending to show that male students were disciplined more harshly than comparably situated female students." *Doe v. Fairfax Cty. Sch. Bd.*, 403 F. Supp. 3d 508, 518 (E.D. Va. 2019). His original complaint suggested that the Defendants were influenced by several investigations of Wayne State University or the School of Medicine by the U.S. Department of Education's Office of Civil Rights. (Compl., ECF No. 1, PageID.6–7.) But the defendants who were asked about those investigations said they either did not know about them or their outcome. (Ex. 27, Jackson Dep., pp. 110–11; Ex. 28, Baker Dep., pp. 31–32; Ex. 25, Chadwell Dep., pp. 65–66; Ex. 26, Camaj Dep., pp. 133–34.) The same is true for the decision-makers. (Ex. 1, Gray Dec., ¶ 21; Ex. 15, Braun Dec., ¶

17; Ex. 16, Waineo Dec., ¶ 17.) Nor is there any evidence of "directives from the University that encouraged . . . adjudicators to view women's stories more favorably than men's." *Doe v. Syracuse Univ.*, 457 F. Supp. 3d 178, 202 (N.D.N.Y. 2020).

## IV.   Eid's equal protection claim fails for lack of a proper comparator.

Eid's equal protection claim fails for the same reason as his Title IX claim. Eid must show "that he was treated differently—under the same facts and circumstances—than a member of the opposite gender." *Lipian v. Univ. of Michigan*, 453 F. Supp. 3d 937, 964 (E.D. Mich. 2020). Eid has adduced no evidence of proper comparators. *See infra*, p. 28. *See also Zwick v. Regents of Univ. of Mich.*, No. 06-cv-12639, 2008 WL 1902031, at *8 (E.D. Mich. Apr. 28, 2008). Thus, this claim fails.

## V.   The University is entitled to summary judgment on Eid's state-law promissory estoppel claim.

Eid next alleges a state-law promissory claim against the University, claiming that "WSU's various policies constitute representations and promises that WSU should have reasonably expected to induce action or forbearance by Plaintiff." (Am.Compl., ECF No. 24, PageID.553.) But courts applying Michigan law have repeatedly rejected Eid's position that student handbooks and other informational material published by a university constitute promises that induce reasonable reliance. *Infra,* pp. 18–19. Eid has not identified a specific promise contained in

"WSU's various policies" that induced his reasonable reliance. *Klein v. HP Pelzer Auto. Sys.*, 854 N.W.2d 521, 530 (Mich. Ct. App. 2014).

## VI.     Eid's fair and just treatment claim fails because the provision does not apply to the University and, regardless, Eid was treated fairly.

Next to last, Eid contends that Defendants violated his rights under the Michigan Constitution's Fair and Just Treatment Clause. That Clause promises that "[t]he right of all individuals . . . to fair and just treatment in the course of legislative and executive investigations and hearings shall not be infringed." Mich. Const. 1963 Art. I, § 17.  Eid's claim fails because the Clause does not apply to the University and, regardless, Eid was not mistreated during his professionalism proceedings.[17]

The School's professionalism hearing process does not constitute an "executive investigation[ or] hearing[]." Neither the School of Medicine nor Wayne State University is an "executive" agency. Rather Wayne State University is an "institution of higher education" that is governed by a constitutionally independent Board of Governors, which does not answer to the Governor or any other executive official. Mich. Const. 1963 Art. VIII, §§ 4, 5; *see also id.*, Art. IV, § 53 ("[G]overning boards of the institutions of higher education" are "solely responsible

---

[17] Under Michigan law, a plaintiff seeking damages under the state constitution must sue state officials in their official capacities. *Courser v. Allard*, 969 F.3d 604, 618 (6th Cir. 2020). Eid's claim against the individual defendants in their personal capacity fails as a matter of state law. And any claims against the University or Defendants in their official capacity are barred by sovereign immunity. *Infra*, p. 17.

for the control and direction of all expenditures from the institutions' funds."); *id.*, Art. V, § 2 (excluding higher education entities from executive departments).

Regardless, the record is devoid of facts indicating that Defendants violated Eid's rights. *See By Lo Oil Co. v. Dep't of Treasury*, 703 N.W.2d 822, 837 (Mich. Ct. App. 2005) (Clause "protect[s] against the excesses and abuses of Cold War legislative or executive investigations or hearings."). As recounted above, Eid was treated fairly throughout the process and provided far more process than he was due under the School's policies and the Constitution. *Infra*, pp. 7–15.

## VII.    Eid's emotional distress claim is barred by governmental immunity and fails on the facts in any event.

Eid's final claim for intentional infliction of emotional distress is barred by governmental immunity. See *Mays v. Governor*, 916 N.W.2d 227 (Mich. Ct. App. 2018). The individual defendants, who acted in good faith and were exercising discretion within the scope of their authority, are also entitled to state-law immunity. *See infra*, pp. 7–15, 26–27. *Courser v. Michigan House of Representatives*, 831 F. App'x 161, 172 (6th Cir. 2020). The claim also fails because there is no evidence Defendants engaged in conduct that is "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community." *Linebaugh v. Sheraton Michigan Corp*, 497 N.W.2d 585, 588 (Mich. Ct. App. 1993).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court grant summary judgment in their favor.

Respectfully submitted,

KIENBAUM HARDY VIVIANO
  PELTON & FORREST, P.L.C.

By: */s/ Elizabeth Hardy*
    Elizabeth Hardy (P37426)
    David Porter (P76785)
Attorneys for Defendant
280 N. Old Woodward Ave., Suite 400
Birmingham, MI  48009
(248) 645-0000
ehardy@khvpf.com
Dated:  January 31, 2022    dporter@khvpf.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 31, 2022, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to all ECF participants.

/s/ *Elizabeth Hardy*      
Elizabeth Hardy
Kienbaum Hardy
 Viviano Pelton & Forrest, P.L.C.
280 N. Old Woodward Avenue
Suite 400
Birmingham, MI  48009
(248) 645-0000
E-mail: ehardy@khvpf.com
(P37426)

437403