EXHIBIT 25

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

ANTHONY EID,

Plaintiff,

Case No. 2:20-cv-GAD-DRG

-vs-

WAYNE STATE UNIVERSITY, WAYNE STATE UNIVERSITY SCHOOL OF MEDICINE, NIKOLINA CAMAJ, MARGIT CHADWELL, MATTHEW JACKSON, RICHARD S. BAKER, R. DARIN ELLIS, in their individual and official capacities, jointly and severally,

Defendants.
________________________________________/

ZOOM DEPOSITION OF MARGIT CHADWELL, M.D., F.A.A.F.P.

Taken remotely via video conference by the Plaintiff on Thursday, the 7th day of October, 2021 in Birmingham, Michigan at 10:00 a.m.

APPEARANCES:

For the Plaintiff: J. ROBERT FLORES (VA Bar No. 42080)
10410 Hampton Road
Fairfax Station, Virginia 22039
(703) 761-5021
Rfloreseq@me.com

For the Defendants: DAVID A. PORTER (P76785)
Kienbaum Hardy Viviano Pelton & Forrest
280 North Old Woodward Avenue, Suite 400
Birmingham, Michigan 48009
(248) 645-0000
dporter@khvpf.com

Job No. 16301

FORTZ Legal

Fortz Legal Support

www.FortzLegal.com

844.730.4066



Students are encouraged to meet with our staff or the Assistant Dean at any time, knowing that confidentiality is respected and upheld. Our office provides a variety of services, all central to your well-being and development.

Is that close or consistent with what you know to be the mission of your office?

**A Yes.**

Q At the schools that I have attended, the person at the top usually is, whether you're talking about a Principal, or a Superintendent, or a Dean, those are people who don't get nearly as many problems presented to them as the assistants underneath. So whether it's the Vice Principal, or an Associate Dean, or an Assistant Dean, or it seems like the assistants deal with a lot of the pain and anguish, and the Deans, and the Principals, and the Superintendents are there to make sure they're smiling, they're representing the school, and everybody likes them.

So I just wanted to get a sense, because sometimes websites, even though that's the stated mission, the reality is a little bit different. And so I wanted to ask you, when you think about yourself relative to the Dean of the Medical School, are you kind of the good cop or the bad cop, or is there any kinds of situation like that?

MR. PORTER: Objection, form and foundation.

Q (BY MR. FLORES) If you can answer that question, I'd appreciate it.



MR. PORTER: Go ahead.

**THE WITNESS: Can you repeat the question.**

Q (BY MR. FLORES) Are you -- do you view yourself, in terms of the mission of your office, in your particular role, would you see yourself as someone that the students would see as, I'm going to go to talk to Dean Chadwell, because she can help me or, I don't really want to talk to Dean Chadwell because she's like the disciplinarian within the Medical School?

**A It's definitely number one.**

Q All right. Good.

**A That's my life.**

Q Do you address both behavioral and academic issues for students, or does someone else, do you share that responsibility with someone else?

**A It's a shared responsibility with other offices. Student Affairs is not primarily academic, although, obviously, yes, we provide a lot of support for students with academic challenges, as well as behavioral aspects, too.**

Q So it's fair to say that students are encouraged to look at you and your office in a positive way, where they should go to get help if they're having a problem?

**A That's true.**

Q Do you know my client, Anthony Eid?



**A Excuse me?**

Q Do you know my client, Anthony Eid?

**A I know him as a student, former student, yes.**

Q And when he was a former student, did he hold any student government position?

**A He did. He was the President of his class.**

Q I want to direct your attention now -- I want to focus a little bit more on the actual case, so I want to direct your attention first to October 31, 2018. And on that date did you have a discussion with a woman by the name of, with the first name of Pamela?

**A I did.**

Q At the time that you had that conversation, had you ever met her previously?

**A I had not.**

Q And did you learn her last name?

**A Yes, I did.**

Q And the last name?

**A Excuse me.**

Q Last name?

**A Burton.**

Q And how did it -- how did you come to talk with her on that date?

**A My receptionist provided me with a, basically put forward a message, that this Pamela Burton wanted to speak with me. I had no idea what it was about. I called -- I returned the call from my desk phone that afternoon.**



Q And approximately how long did that telephone call last?

**A It was maybe 10, 15, about a 15-minute conversation, I would say.**

Q And could you, to the best of your recollection, please describe that telephone conversation in detail?

**A So she called me with a lot of seriousness in her demeanor, her voice over the phone, and basically let me know that she was encouraged to give me a call. She was encouraged by Dr. Friday, who was a colleague, and a strong faculty member in the School of Medicine for many, many years, and worked at Children's Hospital; she was the Pediatric Clerkship Director, and this Pam Burton was a nurse, she told me, at Children's Hospital.**

**So she had worked with Dr. Friday, and had recounted the same thing she was about to tell me to Dr. Friday, and Dr. Friday said, you know, you ought to give the School of Medicine a call, and let them know this and see, you know, you know, where this might go. And so that's -- so on that encouragement, she called me that day and recounted her story.**

Q So just to be clear, the doctor who you've just mentioned, that's Dr. Friday, as in the day of the week?

**A Yes, Dr. Friday. Uh-huh.**

Page 22

Q Children's Hospital?
**A Yes.**
Q That's in Detroit?
**A Right.**
Q And now, when she -- well, what did she tell you about the case she was calling you about; what did she say?
**A She told me about her daughter, who was a Wayne State undergraduate student, and her connection with one of our medical students, Mr. Eid, and that there had been ongoing issues in terms of communications that were troublesome. And that there had also been a posting of what seemed to be a fake Court case and, essentially, there were just these -- and that turned out to be something that wasn't real.**
**And because of all the troublesome communication between her daughter and Anthony Eid, and she also recounted her daughter felt unnerved by this, that she had already proceeded to go to the Wayne State Police on this, and she just wanted it to stop.**
**And she just, you know, didn't really know where else, what else to do with this, but she felt very strongly that, you know, once she found out Mr. Eid was a medical student, that that is not in holding with, you know, how a medical student or future physician should conduct themselves.**
**So that's what she basically recounted to me in terms of, yeah, there was definitely high seriousness and concern**

Page 23

**on her part and there was, yeah, the semblance of behavior that seemed to be very out of touch with what we would expect from a medical student.**
Q And let me just go back just a couple questions. So at one point during the conversation did she talk about the Wayne State Police Department?
**A She mentioned Wayne State Police, and I believe they had already -- they were in the process of filing a report with them at the time. I mean, they had -- it sounded like they had endured a couple of years, almost, of these inappropriate interactions, and it just had come to a point where they felt like they needed help from the University.**
Q When you say they, you're talking about the Burtons --
**A I am.**
Q -- making a complaint?
**A Right.**
Q And your recollection is that these allegations about troubling behavior lasted a couple of years; that's your recollection?
**A It seemed like they, they had been quite protracted. Yeah, it seems like they had been -- because her daughter was an undergraduate student, so Anthony was a year two student at the time, so that would have had to been a few years ongoing from what she was telling me.**
Q At the time that you spoke with Pamela Burton, was her

Page 24

daughter a current student at Wayne State?
**A I believe she had actually transferred, or decided to move out West, I believe it was Colorado, and I think that was just in process, or -- but, yeah. She was referring to what had happened when they were both students at Wayne.**
Q So do you remember whether or not, at the time you took the phone call in 2018, whether she was or was not a student at that time?
**A I don't know the exact dates of when her daughter, you know, left Wayne State, or if she had left at that very point. All I know is that what she was recounting happened while she was a student at Wayne, as was Anthony.**
Q Is there anything else that you remember from that phone call?
**A I remember that she just had this real urgency about it, and a real seriousness, as I said before, and maybe even a little, like, some, like, angst and fear. I mean, that's why the police issue, you know, that came up as them proceeding with that. And I think the Court case, the fictitious Court case, that was really troublesome to them, and really worrisome.**
**And so, yeah, they -- that's what I remember distinctly from that conversation, that this had been just really bothersome to the entire family, and really scary to the whole family. She was worried for her daughter, clearly.**

Page 25

MR. FLORES: Bailey, if you would publish Exhibit A so that Dr. Chadwell and the others can take a look at that document, please.
EXHIBIT TECH: One moment. And I'm going to drop it in the chat. We were having a little problem with Drop Box this morning, so I'm going to drop the pdf in there, so it will actually have to be downloaded to be viewed.
**THE WITNESS: So I should click on the chat?**
EXHIBIT TECH: Or you can look at the shared screen here, and Mr. Flores will direct me as to what we want to look at.
MR. FLORES: Go down to the first full page.
Q (BY MR. FLORES) Do you recognize what that is, Dr. Chadwell?
**A Yeah, this is the, it looks like the follow-up of her, that she wrote me after our conversation.**
Q So if I -- let me give you a moment for you to read that E-mail through in its entirety, and then let me know when you're done.
**A Okay. I'm going to have to minimize my gallery view here. Okay.**
Q First, let me ask if you could please tell me what suggestions after, or as a result of talking to Jane Doe's mother, what suggestions did you make that she's referring to here in the first sentence of that E-mail?
**A So the suggestions were, since she brought me the complaint,**

**I needed some more substantive, something substantive to go off of. I can't just -- you know, I wanted her to provide me with some substantive elements to this complaint before I would further that, and consider it, because she told me a lot in that conversation. And so I said, well, you know, whatever you have to provide me to substantiate what you told me, that would be helpful in considering what I ought to do with it. And so that was one of the suggestions.**

**Another suggestion was, because of the safety concerns and the angst that she had about the situation, that she -- I said, you know, you always have, since you're already involved with Wayne State Police, you have the option for a PPO; you could follow up on that, depending on where you're at with this. So those were the two suggestions that I remember.**

Q Okay. When you made those suggestions to what you described as a clearly distraught mother, what authority were you relying on to be able to provide that advice?

**A Well, my own authority in terms of it was just common sense to say, I'm not going to act on something without having some substantive, something to look, you know, to substantiate her complaint. So that was just my own authority, as an institutional official, that I was doing due diligence. And then, obviously, with Wayne State Police already being in the picture, I made that suggestion about, you could initiate a**



**PPO if that's where you feel like you need to go with this.**

Q And at the time that you made the recommendation for a PPO which, am I correct, it's my understanding that you're referring to a Personal Protective Order?

**A Well, I want to say I didn't make the recommendation; I said it was an option, since she had already been in contact with police. So it was not my personal recommendation, it was just an option that she had, that I pointed out to her.**

Q I just want to make sure, you've referred to it as a PPO several times. We're talking about a Personal --

**A Yes, a Personal Protection Order.**

Q At the time that you spoke with her earlier that day, do you know whether anyone had actually made a complaint to the Wayne State Police Department?

**A No, I was not aware of that.**

Q And do you know what other police departments cover Wayne State?

**A Well, Detroit Police Department, I think, works in tandem with Wayne State Police, but typically, Wayne State, it covers our square mile, if you will, of our campus, like pretty much, they are the go-to for anything that happens on the campus.**

Q But you were not told by Mrs. Burton that Anthony had been arrested, or that any other legal action had been taken at that time against my client?



**A No, she told me that this Police Report was in progress.**

Q And you thought -- is it fair to say that you thought it was appropriate, given the circumstances, to discuss a student at the Medical School with a third party, even though you didn't really know who you were talking about, you just knew how she was representing herself?

**A No, that's not fair to say, because I did not discuss him, I was taking in her complaint, because there was no reason for me to discuss him. I was simply the receptor receiving her complaint, and basically that was the point of the conversation. It came out of the blue on that afternoon, as you know.**

Q At any time in that conversation did you have any concerns that you might be violating FERPA, known by the Family Education Records Protection Act?

MR. PORTER: Objection, foundation.

Q (BY MR. FLORES) Are you familiar with the privacy rights of students, Dr. Chadwell?

**A Of course.**

Q Are you familiar with what I'm referring to as FERPA?

**A Yes.**

Q And were you -- did you have any concern whatsoever as to whether or not there might be a violation of FERPA in even having this telephone call with someone who you did not know, but was representing themselves as a victim?



**A There were no educational records shared, nothing that was specific to Mr. Eid. It was simply an intake, and that's why I asked her, for her to -- the burden was on her to provide me with additional substantive reports, which she did in this E-mail, to even see if this was valid, and something that would need to be advanced.**

Q And just to be clear, did you raise the issue of the PPO, or did she?

**A She -- it was in the course of the conversation, and her telling me about the Police Report, and just wanting, her daughter wanting to just be left alone, and so it was in that context. And so, again, it was more a discussion of options, you know, while you're talking with the police, you could explore that, but it was not a recommendation; it was simply that's something that you would talk to, you could talk to the police about.**

Q You simply raised it, you did not recommend it?

**A Right. No, there was -- right, it was just based on that initial conversation. I had no reason to recommend that.**

Q I'd like to direct your attention to the bottom, the last couple sentences of the E-mail. Do you still have it visible to yourself?

**A I do. Yep, I do.**

Q Is it fair to say that the parent did not, was very uncomfortable with the notion that Mr. Eid would become a

Page 30

doctor, and have the responsibility to care for patients?
A Well, it's just what she said here. She was very -- I am very concerned about someone with this character becoming a doctor. That's her words.
Q And did you share that concern?
A Share that concern, with --
Q Based on what the parent had just told you.
MR. PORTER: I'm sorry, Bob.
THE WITNESS: Share it with --
MR. PORTER: I didn't catch the first part of that.
Q (BY MR. FLORES) Based on the E-mail and the earlier conversation with Pam Burton, did you share her concern about Mr. Eid becoming a doctor?
A Well, it wasn't specific. I mean, this just -- she -- this happened with Mr. Eid, and what she was telling me, but anyone who would do, you know, what she claimed, would warrant some, you know, would be a concern in terms of honesty and, yes, would be concerning as far as our professional, if I hold it up to our professional Code of Conduct for our physicians in training.
It could be any student. If there was no name attached to this, and this was just sent to me just at random, then, yes, it's concerning at face value.
Q And while you were talking with Pam Burton earlier in the day, did you take any notes while you were having that

Page 31

conversation?
A Not that I remember. I mean, again, I put the onus -- it was kind of at the end of, I think the end of the afternoon; I was getting ready to wrap things up, and this phone call came in. And so that's why I said, you know, send me what you would like to substantiate, or like to, you know, substantiate this conversation as much as you want. And so the onus was really on her, but I don't remember taking any notes or -- all I had was, I think, the little piece of paper with her name and the phone number from the receptionist, that's about it.
Q Did you do anything related to this complaint after having that conversation with Pamela Burton?
A Yeah, so -- so, obviously, this has now reached me, elevated, or encouraged by a highly regarded and knowledgeable faculty member that this Pamela Burton worked with, namely, Dr. Friday. And now she sent me all this supplemental information, you know, materials in support of what she told me during the conversation.
So as an -- now it's institutional knowledge, because I'm the institutional person responsible for our student body at the Medical School. So, yes, so I definitely had to think through, what do I do with this information. And so two things, one is anything of this level of concern is not something I would look at on my own, and make a

Page 32

determination. It's something I would always share with my boss, the Vice Dean of Medical Education, to make him aware, and so that's what I did. I did share this with my boss, and we talk about all of these sorts of issues, student issues on a weekly basis.
And the second thing that came out of it is, basically, that, you know, whether or not it's true, I didn't know. I mean, I don't know how much credibility there is, where this was all going, but I had to share that with, also, Dr. Jackson, who was the Chair of the Professionalism Committee, to look into it, because that was not my job to verify this, to look into it.
But the complaints were definitely serious enough in terms of our professional expectations of our own students, that it needed to be at least funneled to the person who could do a deeper look at this, and determine if this is something that would rise to a professionalism, you know, hearing or charge, if you will. And so that's why I sent that to Dr. Jackson.
And one other person that would need to know this, that I shared it with, is the counselor for Mr. Eid, and that's Mrs. Robichaud, just as an awareness.
Q On that -- after you received the call from Pam Burton, did you reach out to Dr. Friday to confirm that the representation that was being made by Ms. Burton, was

Page 33

actually true?
A I don't think I -- I don't recall, like, reaching out to her. I may have seen her in the hallway, but I mean, it's -- I didn't -- I didn't think that was -- that was not, like, a priority in terms of, because I had so much that was sent to me and relayed to me here in terms of material from Ms. Burton, to substantiate what her initial complaint was, or to round out her complaint.
So I think I, you know, I would frequently see, you know, occasionally, I would say, see Dr. Friday coming through our office suite, and I may have, you know, said something to her about it then, but really, that wasn't something that I felt needed to be tracked down.
Q Okay. So prior to distributing this information that you received from an individual identifying herself as Pam Burton, and working at Children's with Dr. Friday, before you -- you went ahead and circulated this information before confirming any of the information that Ms. Burton provided you with Dr. Friday, is that correct?
A Well, circulating is not the right word. There's no circulation; these are very sensitive things that come to me, and like I said, they were pinpoint directed at three particular individuals who I felt needed to know. And so, again, that was Dr. Baker, my Vice Dean of Medical Education; Dr. Jackson, the Chair of the Professionalism Committee, and

Page 34

**the class counselor, as just an awareness, FYI.**
**So the onus wasn't on me at all to, in my capacity to, you know, verify the information before I sent it, or I shared that with what was in my context of my responsibility. So, no, I didn't go back and start the fact-finding and verifying and all that; it was simply for consultation, where do we go from here, and the individuals who could actually do that.**
Q Again, I just want to confirm, you viewed your responsibility as needing to provide this information that you received to Dr. Jackson, to Dr. Baker, and to Mrs. Robichaud, is that correct?
**A What was your question, if it was my responsibility?**
Q If it was your responsibility, after receiving the complaint, to send this information to Dr. Jackson, to Dr. Baker, and to provide it to Mrs. Robichaud?
**A I felt that that was my responsibility, to those select individuals, for very specific reasons.**
Q So, and this was done -- I'll withdraw it.
Okay. So at the time that you sent this, or received this E-mail, you had had three or four hours to kind of think about the complaint. Were you concerned; were you anxious about this, were you -- did you think this was a real emergency? What was your thinking about this complaint at that time, at the very beginning?

Page 35

**A It definitely gave me some pause for, cause for pause, in terms of really having to think through it, and it was troublesome, very troublesome to hear this. And it was very much a, if true, very much a significant issue that I knew was going to have to be addressed in the right, with the right individuals that I just mentioned, and in the process of the medical school to be looked into. I mean, I knew at least that, that this has to be looked into, because it really was a professionalism, and it looked like an honesty issue that she was recounting to me, an interpersonal relationship issues. Those are specific things within our Code of Professionalism for our physicians in training that really seemed out of kilter.**
**So it just seemed like a very bizarre, almost, story that, but she had this, you know, these attachments that were supporting her, her complaint to me. And they, for sure, needed to be looked into within the right process and that's -- yeah, so during those hours I definitely felt the, you know, I thought, well, this is very serious sounding, and I was awaiting her substantiation before I did anything with it.**
Q And you had been in your current position for about a year, a year and a half at the time that this complaint came to your attention, is that correct?
**A Correct.**

Page 36

Q Had you dealt with anything like this in that, you know, during those previous months?
**A Yes, I have -- I have dealt with many professionalism issues, severe, significant, some not so -- the whole spectrum, and also had served previously on the Professionalism Committee for many years as a faculty member, was invited to serve on that Professionalism Committee. And so I had seen quite a few, I would say the most egregious issues that bubble up in a medical school setting. And so I felt like a gauge, had a pretty good gauge about how serious this was, or could be.**
MR. FLORES: If we would -- if you would go ahead and -- let me just make sure it's the right document. Could you please publish Exhibit E.
EXHIBIT TECH: One moment.
MR. FLORES: And go down to the second page where the E-mail starts. Okay. Go down further to the bottom half of the page; one more. Is that the end of the document right there?
EXHIBIT TECH: Yeah. Yeah, that's just --
Q (BY MR. FLORES) Okay. So this -- do you recognize this, Dr. Chadwell?
**A Sure, uh-huh.**
Q And can you read the date on what's been marked as Exhibit E.
**A An E-mail from December 5, 2018.**

Page 37

Q And can you tell me what time?
**A 8:22 a.m.**
Q So on December 5th, early in the morning, you sent a copy of the -- do you remember what you sent to Dr. Baker, as attached to this E-mail?
**A It was Nikolina Camaj's report regarding her, yeah, her report of Anthony Eid.**
Q Give me just a moment. Okay. And do you remember sending the report, also, to Dr. Jackson?
**A I don't know if he received it separately, or if I sent it.**
Q All right.
MR. FLORES: Could you please publish Exhibit D.
EXHIBIT TECH: Was that B; B as in boy?
MR. FLORES: David.
EXHIBIT TECH: D, as in David.
MR. FLORES: And go down to the second page.
Q (BY MR. FLORES) Take a look at that E-mail, and see if that refreshes your recollection as to what, or whether you sent the report to Dr. Jackson?
**A Okay. Yeah, it looks like the same thing. He may have received it separately, I don't know, but I -- yeah, because -- yeah, I felt like he should have it.**
MR. FLORES: Okay. You can take that off the screen.
Q (BY MR. FLORES) Now, are you familiar with something called

Page 62

**with us very often, so --**
Q And as you progressed in school, and you applied for medical school, you got in, did you face any kind of discrimination, or any kind of harassment as a result of being a woman in a field that, even at that time, women were making great strides, but not everyone was happy about having women significantly increasing their presence in the profession?
MR. PORTER: Objection, foundation.
**THE WITNESS: Again, I never really -- maybe I was just an ignorant kid, a happy kid, but I never had that sense. Wayne State was the only school I applied to, and my dad said, hey, there's a great school down the street, you can be a doctor just like everybody else.**
**So I applied to Wayne, and I'm still there, so I definitely have a fit, but I never felt -- I always felt it was welcoming, and I never had that sense of male/female or, like, some kind of lightning rod because I was a female or -- I've been the only female in the board room many, many times over the years but, yeah, no, I don't look at it like that at all, or didn't feel that way.**
Q (BY MR. FLORES) In your role as Associate Dean, though, have you talked with students who have experienced discrimination, or experienced harassment, and had to deal with the issue from that perspective?
**A For sure, for sure. And I totally understand how that can**

Page 63

**easily be something that many students and many cultures face. I mean, my parents just happened to raise us with a very positive outlook, but definitely, because I was exposed to so much, and had traveled so much, I definitely saw all of that, it's just I didn't have a personal, sort of, sort of stumbling block with that but, yes, it's something I see routinely.**
MR. FLORES: It would help me, if we can go ahead and take down the exhibit, just so I can see everyone's features a little larger.
Q (BY MR. FLORES) So I want to just ask, as a woman in a high level, and very visible role at Wayne State, do you feel any obligation, or do you take it upon yourself to work, to make sure that women are being advanced in the Medical School at Wayne State?
**A There are -- there are committees to that, which I have not been a part of. I know there are, you know, definitely ways to get involved with that particular objective, but I have not been involved with that because, yeah, my focus is on the students, and all students. And about half of our students, actually, now we tipped over to more than half are women and so, yeah, it's changed a lot. The culture has changed a lot in the last, like you said, you know, years that I've been a student.**
**And so, yeah, I don't have a particular agenda, if you**

Page 64

**will, for advancing, but I'm very open door towards women, obviously, and all students, but I know that everybody has their own issues, you know. Women medical students having children during medical school, I mean, those are things they can definitely come and talk to me about, but there's no particular initiative or agenda I would have to advance the women students over anyone else.**
Q I just want to go back and revisit the report that you received from Ms. Camaj. When you reviewed it, did you do the review before you sent it along to Dr. Jackson and Dr. Baker, or did you send it first, and then when you had time later on, review the documents?
**A I usually don't forward things that I don't at least read, so I probably skimmed through it. I'm sure I skimmed through it. I think it was pretty early in the morning when I sent it, if I remember the time stamp. Yeah, so I'm sure I just, I read it, and then forwarded it, because Dr. Baker would have expected that.**
Q And did you have any responsibility to make sure that Ms. Camaj had done a full investigation before accepting it, and then turning around and sending it to Dr. Baker and Dr. Jackson?
MR. PORTER: Object to form.
**THE WITNESS: I have no control over that process, or authority over Nikolina, whatsoever. So it came to me, I**

Page 65

**read it, I passed it on. That's basically it.**
MR. FLORES: Okay. Give me a second. I think I can jump over quite a bit, so if you'd just bear with me for a moment.
**THE WITNESS: Sure.**
Q (BY MR. FLORES) Okay. During the time that you have been in your position, your current position, has the Medical School come under investigation by the Office for Civil Rights as part of --
**A During -- there has been -- I know of a complaint, yes.**
Q Okay. And did that involve a medical student by the name of Ms. Rubenstein?
**A That's correct.**
Q And do you know what the ultimate finding of the Office for Civil Rights was after they concluded their investigation?
**A I don't know.**
Q Would it be a surprise to you to find out that the Office for Civil Rights found that Wayne State had retaliated against her by expelling her?
MR. PORTER: Objection, form.
**THE WITNESS: Yeah, I don't -- I never got a report about that.**
Q (BY MR. FLORES) Did you -- were you aware that the University agreed, had an agreement with the Office for Civil Rights at the conclusion of their investigation?

A Was I -- can you repeat that.
Q Are you aware that the Medical School signed an agreement with the Office for Civil Rights at the conclusion of the Civil Rights investigation?
A No, I'm not aware of that.
Q And within the last year, or rather, I guess, within the last 12 months, have you received any training, vis-a-vis, retaliation and the Title 9 provided either by the General Counsel's office, or by another provider?
MR. PORTER: Objection, asked and answered.
THE WITNESS: I have not received anything in terms of training for retaliation, and I already referenced the Title 9 update presentation that was provided internally last summer sometime.
Q (BY MR. FLORES) Thank you. You testified just a few moments ago that you had no control over Nikolina Camaj, is that correct?
A Correct.
Q Do you know what Dean, or what University official she answers to?
A I believe it's Dean Strauss.
MR. FLORES: Okay. Could you publish Exhibit G for me.
EXHIBIT TECH: One moment.
MR. FLORES: David, I don't have a lot of



additional questions, so I think I can probably get through in about the next 20 to 30 minutes, so rather than taking a break for lunch, I'd like to do that, if that's okay with you.
MR. PORTER: Yeah, that works for us. Thank you.
MR. FLORES: All right. Can you go down to the bottom of that document, please. Okay. Stop right there. Go up a little more. Okay.
Q (BY MR. FLORES) Dr. Chadwell, will you do me a favor, and just read that to yourself, and let me know when you're done.
A Okay. Okay.
Q Can you tell me what that E-mail refers to?
A Dr. Jackson's E-mail here? It looks like he's trying to coordinate an actual hearing for the Professionalism Committee.
Q Do you know to whom that E-mail is addressed?
A Well, it looks like to Ms. Burton, and referencing charging, being the charging party.
Q So approximately -- well, let me ask you this question.
From that E-mail, can you determine the name of the person who will be the charging party at that hearing?
A Well, it looks like an inquiry from Dr. Jackson, because he was ready to move it forward, and the E-mail obviously went to Ms. Burton, but I don't know if she ultimately, I mean, it



doesn't say that definitively she was going to have that role.
Q So if she -- if the original complainant did not serve as the charging party at a Professionalism Hearing, who could substitute, if you know, for that party?
A It could be various individuals, but in this case, it was most appropriate for Ms. Burton to serve in that role.
Q But that's also a role that Dean Jackson could play if she was unavailable?
A No, typically, as the Chair, he would not be the charging party.
Q So your testimony is, based on this, it was only Ms. Burton, Amanda Burton?
MR. PORTER: Objection, misstates her prior testimony.
THE WITNESS: I'm not sure what you mean, it was only Ms. Burton. This looks like this was an initial inquiry to her, to see if this was something she could -- yeah, so it's -- yeah, that's what it looks like to me. It was just his initial inquiry of her, to serve in that role, which was most appropriate.
MR. FLORES: If you would scroll to the top of the page, what's been marked as page one in the other E-mail.
Q (BY MR. FLORES) Can you just read that to yourself, and let me know when you're done.



A All set.
Q And what does that E-mail refer to?
A That's the original E-mail, yeah, that you showed me in the beginning, from Ms. Burton.
Q Well, this E-mail is from you to Dr. Jackson on December 10th, isn't that correct?
A Right.
Q And in that E-mail, isn't it correct that you're asking Dr. Jackson to remove some information from the Professionalism packet that will be distributed to the members of the committee?
A I'm not asking him to do that; I said it would be a preference, and that's because that initial E-mail, in that initial E-mail she referenced a PPO. And when I spoke with Dr. Jackson, sorry, Dean Strauss about this way back when he, you know, he -- we were kind of going back and forth about what should be done next. And so he had, you know, he said, it may not be at that level or, you know, as far as a PPO, we don't know yet, and that.
So my point in sending this to Dr. Jackson to not include that was because I thought it could taint Anthony's perception, I guess, the perception of him to the Professional Committee, because there was no PPO, that I was aware of at that moment; it was just that, like, that was just an option that Ms. Burton had at her disposal.