```
         IN THE DISTRICT COURT OF THE UNITED STATES
            FOR THE EASTERN DISTRICT OF MICHIGAN

JOHN PLAINTIFF,
              Plaintiff,
     vs.                         Case No. 2:20-cv-11718-GAD-DRG

WAYNE STATE UNIVERSITY, WAYNE
STATE UNIVERSITY SCHOOL OF
MEDICINE, NICOLINA CAMAJ, MARGIT
CHADWELL, MATTHEW JACKSON,
RICHARD S. BAKER, R. DARIN ELLIS,
in their individual and official
capacities, jointly and severally,
              Defendants.
_____

     The Remote Zoom Videoconference Deposition of
     NICOLINA CAMAJ,
     Taken at 280 North Old Woodward Avenue,
     Birmingham, Michigan,
     Commencing at 10:04 a.m.,
     Wednesday, October 6, 2021,
     Before Leisa M. Pastor, CSR-3500, RPR, CRR.
```

Fortz Legal Support
www.FortzLegal.com
844.730.4066



Page 42

1 on what is marked in blue at the top, page 11 of 20,
2 and ask you or give you time to read that paragraph.
3 A. Is this the one that I'm looking at?
4 Q. Let's make sure it is.
5 A. It starts with "As noted above..."?
6     MR. FLORES: Bailey?
7     EXHIBIT TECHNICIAN: Yes.
8     THE WITNESS: Okay.
9     MR. FLORES: Yeah, so if you'll read that
10 last paragraph, and then it flips over to the next
11 page. Bailey, when she's ready, just move it to that
12 next page so she can read the remainder of that
13 paragraph.
14    EXHIBIT TECHNICIAN: Yes.
15    THE WITNESS: Okay, I'm ready.
16    Okay.
17 BY MR. FLORES:
18 Q. Okay. Does that refresh your recollection about the
19    required standard of evidence that the civil rights
20    office said was applicable in Title IX cases?
21 A. Yes.
22 Q. And your testimony earlier was that at Wayne State or,
23    rather, at Loyola, the standard of evidence was a
24    preponderance of the evidence; is that correct?
25 A. Yes.

Page 43

1 Q. What was the standard of evidence when you arrived at
2    Wayne State Title IX cases?
3    MR. PORTER: Objection, foundation.
4 BY MR. FLORES:
5 Q. Do you -- I'm sorry, let me rephrase it. When you
6    first arrived at Wayne State, did you take time to
7    familiarize yourself with the Title IX process as it
8    was carried out at Wayne State?
9 A. I will say that I was not a Title IX investigator my
10   first year at Wayne State, and of course, I
11   familiarized myself as a part of our training in being
12   a responsible employee, and it was a preponderance of
13   evidence.
14 Q. So from 2018 until sometime in 2019, you were not a
15   Title IX investigator?
16 A. Correct.
17 Q. What was your title?
18 A. Associate director and student conduct officer.
19 Q. And how did the responsibilities of that job differ
20   from a Title IX investigator?
21 A. Well, I'm not responsible to hear Title IX cases or
22   investigate them.
23 Q. One of the reasons that -- or, rather, are you aware
24   that when the -- that the Department of Civil -- the
25   Office of Civil Rights' Dear Colleague letter created

Page 44

1 a stir within the Title IX community? Are you
2 familiar with that?
3    MR. PORTER: Objection to form.
4 A. I'm not sure what you're referring to.
5 BY MR. FLORES:
6 Q. Well, let's just skip that. Let's go to page 17 of
7    this document, please, Bailey. And go down a little
8    farther. Stop right there. Can you please read that
9    paragraph to yourself, Ms. Camaj, the top paragraph?
10 A. The top?
11 Q. It starts with "When OCR finds...".
12 A. Okay.
13 Q. Do you understand who the letter is referring to when
14    it talks about "recipient"?
15 A. I'm going to assume it's the -- the university.
16 Q. That's correct. That's my understanding, as well.
17    So in your words, can you tell me based on
18    this paragraph what one of the major penalties the OCR
19    can impose on a university if they fail to properly
20    enforce Title IX?
21    MR. PORTER: Objection, form.
22 A. Well, it says it right there in the last sentence,
23    "funding."
24 BY MR. FLORES:
25 Q. Okay. Did you ever receive any training once you

Page 45

1 became a Title IX investigator as to the consequences
2 of not performing your job properly?
3    MR. PORTER: Objection, form.
4 A. Not specifically other than to say, you know, but we
5    are aware that we must follow proceedings because they
6    will take funding away, so that's something that we
7    were aware of, that I was aware of.
8 BY MR. FLORES:
9 Q. All right, thank you.
10    MR. FLORES: All right, you can take that
11    document down, Bailey.
12 BY MR. FLORES:
13 Q. Now, do you remember whether or not you disclosed to
14    Wayne State that you were sued in federal court, you
15    were a named defendant for a period of time while you
16    were at Loyola?
17    MR. PORTER: I'm sorry, can you repeat
18    the -- I didn't catch the first part of that question.
19 BY MR. FLORES:
20 Q. Did you disclose to Wayne State when you were being
21    interviewed that you had been sued in federal court
22    for violating Title IX?
23 A. No, because I was not a part -- I never participated
24    in the proceedings.
25 Q. But you knew that you were a named party to that

Page 46
1   lawsuit though?
2 A. To be honest, I don't recall being -- I really don't
3   remember.
4 Q. Okay. That's fine, thank you.
5 A. Yeah.
6 Q. During your first year at Wayne State, what were your
7   primary duties on a daily basis?
8 A. Okay. So I was serving as a student conduct officer.
9   I also supervised our office staff along with
10   Dr. Strauss. We also in our office received CARE
11   reports from the community about concerns they have
12   about students, so I served as what you would call a
13   CARE officer and respond and contact students and
14   offer resources, so I would serve in both of those
15   roles. I would also offer trainings about academic
16   misconduct process, and so that was the extent, and
17   meet with other departments to train their faculty
18   about the procedures and their responsibility in the
19   process.
20 Q. So you seem to be making a distinction between student
21   conduct offenses and Title IX offenses. Can you
22   explain what the difference is?
23 A. Well, Title IX, if you violate a Title IX pol -- it's
24   in the code. But what I'm making the distinction on
25   is the types of responses in terms of investigation

Page 47
1   because Title IX has specific procedures to follow
2   that differ with my day-to-day job. So when I meet
3   with students for concerns, it differs. I don't have
4   any of the same responsibilities that I would to
5   Title IX procedures.
6 Q. So is it fair to say that you might be investigating
7   the exact same type of case, but sometimes it is
8   covered by Title IX and sometimes it isn't?
9 A. No.
10   MR. PORTER: Objection, form.
11 A. No, that's not what I'm saying.
12 BY MR. FLORES:
13 Q. Okay. Give me an example of a typical student conduct
14   offense that you would investigate.
15 A. If there was a fight between students and somebody
16   filed charges alleging that one or the other violated
17   the code, and a typical charge in that code might be
18   under the section 4.3 or 4.6 of our student code, so
19   it could be physical or verbal threats or abuse, or
20   you could file a 4.6, which is disorderly behavior,
21   and so I could hear that case and make a
22   determination, and then the student, in turn, gets to
23   accept or deny my determination. So that's one
24   example.
25 Q. Okay. And is -- can you describe a Title IX case that

Page 48
1   you would during your first year not have authority to
2   investigate?
3 A. I wouldn't investigate anything Title IX because I'm
4   not an investigator at that time.
5 Q. So any --
6 A. If anything -- if I hear about a Title IX matter, I
7   would forward it on to the director because I didn't
8   serve in that capacity.
9 Q. Were there any significant differences in how student
10   conduct cases were handled at Loyola and Wayne State?
11   MR. PORTER: Objection, form.
12 A. In Loyola, I -- the students didn't have the
13   opportunity to accept or deny the addition of a
14   hearing officer, whereas with the Student Code of
15   Conduct, they have that opportunity, so that's one
16   difference.
17   And of course, language is different, but
18   you know, every code's language was a bit different.
19 Q. Did you receive any training when you first arrived at
20   Wayne State on the Wayne State Student Code of
21   Conduct?
22 A. I had meetings with the previous person in that
23   position.
24 Q. Did you receive materials or binders or any kind of
25   other documentation about what the responsibilities

Page 49
1   were for someone assuming your position from --
2 A. We had -- you have the student code of conduct that
3   tells you what is expected of you.
4 Q. Was there any -- I'm sorry.
5 A. Another --
6 Q. Was there any other material? Was there any other
7   material?
8 A. Sure, sure. Materials in terms of, you know, sample
9   letters that you would normally send out to students
10   or sample, what do you call it, outcome letters, like,
11   what I'm referring to, when a decision is made to make
12   sure you include all the information for the student
13   when they receive your letter about your outcome. So
14   I got to see what was sent out before.
15 Q. And I may have cut you off. Was there an additional
16   manual or policy manual that also was included in the
17   material that you were provided?
18 A. Everything is online, so everything there is to read
19   about our policies and procedures is all available
20   online.
21 Q. Have you had a chance to read the complaint filed in
22   this case?
23 A. No.
24 Q. I want to talk a little bit about kind of generic
25   investigation directives and policies that you may or

Page 50

1 may not have had at Wayne State just to get an idea as
2 to what parameters you were working within during that
3 first year.  Would you agree or disagree with the
4 statement that every investigation is unique?
5         MR. PORTER:  Objection, form.
6 **A.  Every investigation can be unique.**
7 BY MR. FLORES:
8 Q.  Okay.  You're making a distinction different from my
9 statement.  Can you explain that?
10 **A.  You may have similarities in investigations, so in a**
11 **lot of ways, they could be similar, and then in other**
12 **ways, it could be unique just on virtue of different**
13 **human beings participating.**
14 Q.  Okay.  Would you agree that it's important to have a
15 strategy when starting an investigation?
16 **A.  I would say yeah, you want to strategize, sure,**
17 **mm-hmm.**
18 Q.  And would you agree that an experienced and
19 well-trained investigator typically has a well
20 developed strategy that he or she uses to make sure
21 that all aspects of the case are covered?
22         MR. PORTER:  Objection, foundation.  Are
23 you asking her about her Title IX investigation
24 duties --
25         **THE WITNESS:  Yeah.**

Page 51

1         MR. PORTER:  -- or her role as Student Code
2 of Conduct --
3         MR. FLORES:  Let me rephrase.
4 BY MR. FLORES:
5 Q.  With respect to title -- to your responsibilities as a
6 Title IX investigator, which you assumed in your
7 second year, would you agree that a well developed
8 strategy is necessary in order to make sure all of the
9 bases are covered?
10 **A.  Yeah.**
11 Q.  So as a student conduct officer, you have different
12 responsibilities, but you're also conducting
13 investigations; is that correct?
14 **A.  Mm-hmm.**
15 Q.  Can you tell me just generically when you receive a
16 complaint, what was your -- typically your first
17 action after receiving the complaint?
18 **A.  It depends on how I received the complaint.  Is it via**
19 **email, is it via phone call, is it via the forms we**
20 **have online and which form is used?  There's a**
21 **complaint form, there's a nonacademic misconduct form,**
22 **and there's an academic misconduct form, so depending**
23 **on the form and what's written, I would respond by**
24 **writing to the reporter and ask them to specify what**
25 **their concerns are, and if it's a -- where -- if it's**

Page 52

1 **a nonacademic misconduct form that's submitted, that's**
2 **typically indicative of someone who wants to file**
3 **charges against a student because they believe they**
4 **violated the code of conduct, and even then, I clarify**
5 **the charges they selected because they're not all**
6 **experts in the code, and so sometimes they select a**
7 **charge that's not to relevant to what they're sharing**
8 **in terms of the information they're concerned about,**
9 **and then I would clarify that, and so it becomes a**
10 **code of conduct, that's how I would proceed.**
11         **I would just always reply to the person**
12 **filing the report to get a better understanding of the**
13 **complaint so I know, you know, which way to proceed.**
14 Q.  So once you've had a chance to talk to the reporter
15 and provide that reporter with some additional
16 information, what's the next step?
17 **A.  Well, if it's not a conduct charge, it depends on what**
18 **the desired outcome is.  Is it coming from a faculty**
19 **member?  Is it coming from a student?  Is it coming**
20 **from staff?  It could be anything that we -- we get**
21 **all kinds of reports, so we really have to assess what**
22 **are we following up with.  Are we following up with**
23 **the student's concerning behavior that needs to stop?**
24 **Are we following up with a simple question?  It just**
25 **really varies.**

Page 53

1 Q.  Let's take a complaint from one student against
2 another.  You had received a complaint, you've now
3 responded to the reporter to try and narrow and
4 clarify what they're complaining about, and after that
5 takes place, what's the next step for you?
6 **A.  Sure.  If it's a -- if it's a student who's -- let's**
7 **say it's a roommate or someone like that or they're**
8 **concerned about a friend's behavior and they would**
9 **like us to just have a conversation with the student**
10 **about their concerning behavior and then we will do**
11 **that, we'll follow up with that other student and have**
12 **a conversation.**
13         **If it's an issue where they would like to**
14 **file charges against the roommate because they have**
15 **been affected and they thought that the student**
16 **violated the policy, then I would proceed by inviting**
17 **the student to meet with me and deal with it in a**
18 **conduct matter.**
19 Q.  How would you reach out to the student that is accused
20 in a student conduct case?
21 **A.  Sending them a letter.**
22 Q.  And is that -- that's not snail mail, that's an
23 electronic letter; is that correct?
24 **A.  We transitioned to both.  When I first started at**
25 **Wayne State, we would send letters via mail, and then**

Page 54
1  we transitioned to electronically, and we use our
2  Maxient software system to send students letters to
3  invite them to meetings with us, both concerning
4  behavior meetings, complaint meetings, and also
5  conduct meetings.  They all get the letter from
6  Maxient software.
7  Q.  Are there any time limitations or time recommendations
8     in order to -- from the time that you get a complaint
9     until the time that you reach out to the accused
10    student?
11 A.  Not with concerning behavior or -- and if a
12    complaint -- if it's a conduct matter, we try to be --
13    we try to expedite matters.  The only time that we
14    cannot be, you know, timely is if we have taken
15    vacation days or typically in the beginning of the
16    school year when we have more cases, it takes up a lot
17    of our time, so it could be delayed by a week, but
18    it's always our intention to respond quickly.  So I
19    know myself personally, I never have the intention to
20    delay, and I can only be impacted if I've taken time
21    away or I have trainings to attend to that keep me out
22    of the office.
23 Q.  And is there typically a timeframe that you gave to
24    the accused in terms of when they need to respond back
25    with you?

Page 55
1  A.  I typically don't give a timeframe in terms of -- it
2     depends on is it my outcome letter that they need to
3     respond to or my -- to meet with me after I assign
4     them a meeting time?  I'm not sure what you're asking.
5  Q.  Yeah, I'm still at the requesting a meeting with that
6     student.
7  A.  Mm-hmm.
8  Q.  So --
9  A.  Yeah, I will -- I will select the date, and they're
10    told if they're not able to make that meeting time,
11    they need to contact me within 48 hours, and I will
12    reschedule our meeting.  And I'm very flexible with
13    that.
14 Q.  Now --
15 A.  Especially if a student has to go on vacation or
16    something, I can meet with them later on.
17 Q.  Okay.  So there's flexibility --
18 A.  Yes.
19 Q.  -- in the timing of --
20 A.  Right.
21 Q.  -- meeting with you?
22 A.  Right.
23 Q.  And where does the meeting with you typically take
24    place?
25 A.  Typically in my office, and then when we are remote,

Page 56
1  it will be, obviously, on Teams video or Zoom
2  depending on what the student has at their desktop.
3  Q.  So during the first year that you were at Wayne State,
4     you would meet in your office with any student that
5     was coming at your invitation?
6  A.  Right.
7  Q.  And what happens if a student declines your
8     invitation, says I don't want to meet with you?
9  A.  It depends on what I'm asking them to meet for.  You
10    know, when I reach out to students to offer them
11    resources and support as -- in my role as a care
12    officer, that's fine, they don't have to meet with me.
13        If it's a behavioral concern where I'm
14    requesting them to meet with me and it's something
15    that the dean of students is aware of, I will let him
16    know that, hey, this student hasn't met with me, and
17    then, and then he will make a determination if he will
18    meet with them and follow up.  And if a student
19    doesn't meet with me for conduct, it goes over to the
20    dean, and that's on 11 -- in section 11, it tells you
21    that if a student fails to show up, then the conduct
22    officer needs to refer the case to the dean of
23    students.  So anyone that doesn't meet with me, I
24    notify the dean of students to let him know in any
25    case.

Page 57
1  Q.  When you meet with a student, are you in a separate
2     room, or are you out in the open with the student?
3     What are the circumstances of that, the physical
4     circumstances of that meeting?
5  A.  Sure.  The dean of students has an office suite, and
6     inside that suite, I have my own office.  The students
7     are positioned by the door, and I'm positioned on the
8     far wall behind a desk, and I allow the student to
9     keep the door open or to close the door depending on
10    their comfortability.
11 Q.  And what's your -- how do you typically present
12    materials in a student conduct situation to the
13    student that's come in to -- for this meeting?
14 A.  Well, the student code tells the student, and I know a
15    lot of students don't read the code, it tells them
16    that if you wanted materials presented to you prior to
17    your meeting, you can contact the conduct officer, and
18    that will be supplied to you, obviously redacted if
19    there's any information that needs to be redacted, and
20    then during my meeting, I let the -- well, before
21    that, in the letter that's sent to them, they are
22    notified of the specific charge, so they will be told,
23    you know, this is the violation that's alleged to have
24    occurred, 4.6, 4.3, and we give them the specifics of
25    the account, about two or three sentences about what

Page 82
1  A.  Yeah, I'm the conduct officer, yep.  That would have
2      been me.
3  Q.  Do you know who attended on behalf of the director of
4      counseling and psychological services?
5  A.  Yeah, Jeff.
6  Q.  Do you know a last name?
7  A.  We can submit -- Jeff Kuentzel.
8  Q.  Okay.  Do you know who attended on behalf of the
9      director of student disability services?
10 A.  Randie Kruman.
11 Q.  Do you know who attended on behalf of the office of
12     general counsel?
13 A.  Would have been Linda Galante at that time.
14 Q.  Do you know who attended on behalf of the director of
15     the office of housing and residential life?
16 A.  I think -- I don't remember her last name, but Janine.
17     It may have been Janine.  Janine was leaving the
18     institution, so I don't remember the date she left,
19     and then they were hiring, so I -- it would have been
20     her if there was somebody.
21 Q.  And do you know who attended on behalf of the crime
22     prevention section of the police department?
23 A.  Yes, Lieutenant Scott.
24 Q.  Do you remember during that meeting any discussion of
25     information that had been provided by Dean Chadwell?

Page 83
1          MR. PORTER:  Objection.  Instruct the
2      witness not to answer if it requires you to divulge
3      communications that are protected by the
4      attorney-client privilege.  To the extent that it does
5      not, you are free to answer.
6          THE WITNESS:  I'm going reserve my -- not
7      answer.
8  BY MR. FLORES:
9  Q.  I'm sorry?
10 A.  I'm not going to answer.
11         MR. PORTER:  I think based on my
12     instruction, she's decided that she cannot answer that
13     question?
14         MR. FLORES:  And, obviously, I'm not
15     agreeing to that claim of privilege, David.  We'll
16     deal with it later.
17 BY MR. FLORES:
18 Q.  Do you know whether or not any discussion took place
19     involving information received from Loretta Robichaud?
20 A.  I -- I don't recall.
21 Q.  Did you make any record of having reviewed the
22     complaint involving my client at the BIT, any notes,
23     any other writings?
24 A.  Me personally, no.
25 Q.  And as a result of the BIT, did there come a time that

Page 84
1      they assigned the complaint to you for investigation?
2  A.  There was a time where I was informed that I should be
3      the person to speak to the complainant and to speak to
4      the respondent.
5  Q.  Was any other conduct officer or person in a similar
6      position to you assigned to work with you on this
7      case?
8  A.  No.
9  Q.  And was that standard operating procedure because of
10     the size or the nature of the complaint?
11 A.  I'm the only student conduct officer at the
12     university.
13 Q.  But there are other investigators that are part of
14     your office; is that correct?
15 A.  The dean of students office?  No.  There's nobody with
16     the title called "investigator."
17 Q.  So there are no other -- other than yourself, there
18     was nobody else, unless it was going to be referred to
19     the police department, who could do any kind of
20     investigation; is that correct?
21         MR. PORTER:  Objection.  Are you referring
22     to just this specific case?  Or any case.
23         MR. FLORES:  This specific case.
24 A.  As far as I know, the decision was that I should be
25     the person to deal with the case.

Page 85
1  BY MR. FLORES:
2  Q.  And who made that decision?
3          MR. PORTER:  I would object and instruct
4      the witness not to answer if it requires you to
5      divulge attorney-client privileged communications, but
6      to the extent that it doesn't, you are free to answer.
7  A.  I will just say it was determined that I should be the
8      one to meet with the students.
9  BY MR. FLORES:
10 Q.  Were you given a timetable in which to do that?
11 A.  No, I wasn't given any specifics of a timetable other
12     than to typically do what we normally do and do our
13     best to schedule meetings and contact the -- both
14     parties and do our best depending on our schedule.
15 Q.  Did you handle that matter in the same way that you
16     handle other investigations?
17         MR. PORTER:  Objection, form.
18 A.  I'm not sure I understand your question.
19 BY MR. FLORES:
20 Q.  Had you ever received direction to handle a particular
21     conduct investigation at a previous meeting of the
22     BIT?
23 A.  Well, at that time, I was new to Wayne State, so I
24     would not have been asked to because it was my first,
25     you know, because of the nature of me, you know,

Page 86

1 starting that semester for the first time.
2 Q. Okay. Were you given any guidance by the BIT in terms
3 of how you should handle this matter?
4         MR. PORTER: Objection. Based on
5 attorney-client privilege, I would instruct you not to
6 answer if it requires to you divulge attorney-client
7 privileged communications, but to the extent that it
8 doesn't, you are, obviously, free to answer.
9 BY MR. FLORES:
10 Q. Can you answer that question?
11 A. I'm not going to comment, no.
12         MR. FLORES: For the record, I'm taking an
13 exception to that claim of privilege.
14 BY MR. FLORES:
15 Q. After you received, read, and discussed the complaint
16 at the meeting, did you receive any other instructions
17 from anyone else after the meeting as to how to handle
18 the investigation?
19 A. No. I was just asked to meet with both students and
20 gather the statements and forward them onward and not
21 to make a determination in the case.
22 Q. Okay. I just want to make sure that I understand.
23 Your responsibility was to talk with both parties,
24 correct?
25 A. Mm-hmm.

Page 87

1 Q. Could you answer just "yes" or "no" for the record?
2 A. Oh, sorry, yes. Sorry, yes.
3 Q. And once you'd taken their statements to submit a
4 report?
5 A. Yeah. The -- not only the statements but also if
6 there's any evidence for them to share and to document
7 that and submit it forward.
8 Q. But you were told not to make a determination as to
9 who was right or wrong or --
10 A. Right.
11 Q. -- who was truthful or not truthful?
12 A. Right, I was not to make a determination; that was not
13 my role in this matter.
14 Q. Okay. And then who did you forward your report to?
15 A. So the final report was emailed to Margit Chadwell,
16 Linda Galante, and also the respondent.
17 Q. Ms. Galante was general counsel?
18 A. Yes.
19 Q. And the -- I'm sorry, so it was to Dean Chadwell, to
20 general counsel's office, and then who else?
21 A. The respondent.
22 Q. So that would have been my client?
23 A. Yes.
24 Q. Were you directed by anyone not to investigate the
25 case beyond taking statements?

Page 88

1 A. No.
2 Q. And after getting the -- after having the conversation
3 with the complainant and getting copies of text
4 messages, did you do anything to corroborate or
5 disprove any of the complainant's account?
6 A. Just confirming the student's status, you know, that,
7 you know, like what she was studying and confirming
8 she, obviously, that she was a student, but no.
9 Q. At the time that you spoke with her in October of
10 2018, was she still a student at WSU?
11 A. No --
12         MR. PORTER: Objection, foundation. Did
13 you say October or November?
14         MR. FLORES: I said October of 2018.
15 A. I believe she was not a student at the time.
16 BY MR. FLORES:
17 Q. Do you know how long -- did you come to learn how long
18 she attended Wayne State?
19 A. I don't recall off the top of my head, but I recall
20 possibly that she would have left Wayne State soon
21 after filing the complaint. I mean graduated.
22 Q. She started as a freshman in 2016.
23 A. Okay.
24 Q. I'm just giving you that information. Typically, she
25 would have graduated after four years, which would

Page 89

1 have placed it 2020.
2 A. I should correct myself, I moved on from the
3 university.
4 Q. Oh, so your departure?
5 A. No, no, I'm saying her departure from the university.
6 So she was not a student at the time.
7 Q. Okay. So at the time she made the complaint, she was
8 not a student?
9 A. Right.
10 Q. And you don't know, as you're sitting here today, when
11 she was -- when she left the school after starting in
12 2016?
13 A. I would have to look at my records that's -- to gather
14 that information.
15 Q. At the time that you spoke with the complainant, do
16 you know where she was located?
17 A. Yeah, she was out of state.
18 Q. Do you know what state she was in?
19 A. I believe, if I recall, I'd have to check, but I think
20 she said she may have been in Colorado.
21 Q. And --
22 A. But I would have to check.
23 Q. I'm sorry, could you repeat that answer for the
24 record?
25 A. Yeah, I would have to check because I don't remember,

Page 90

1  it was so long ago, I would just have to check, but I
2  know that she was out of state.
3  Q.  And at the time that you interviewed her by telephone,
4  did the school have access to a videoconference?
5  A.  It wasn't something we used, and so I didn't use
6  videoconferencing with her, with the complainant.
7  Q.  So you were not able to see any facial expressions or
8  who else might have been in the room with her while
9  she was talking to you; all of that information was
10  not available to you?
11 A.  Well, I didn't see her on video.  I just spoke to her
12  over the phone.
13 Q.  So you did not know if there was anyone in the room
14  with her while you were talking with her?
15 A.  Yeah, I wouldn't have been able to see.
16 Q.  And you didn't -- did you ask her whether or not there
17  was anyone there when she was talking to you?
18 A.  I don't recall asking her because the meeting was just
19  between me and her, but I don't remember her saying
20  that there was anybody else in the room.  I believe
21  she was the only one on the phone at the time, and I
22  didn't hear anyone else commenting or making noises
23  during our conversation.
24 Q.  Okay.  How -- let's go back and talk now about your
25  contact with my client.

Page 91

1 A.  Mm-hmm.
2 Q.  Normally, you said you would have an electronic
3  message sent to the student informing them that there
4  was a letter for them; is that correct?
5 A.  No.
6 Q.  How would you normally --
7 A.  I would send them a letter via Maxient software
8  inviting them to meet with me.
9 Q.  In this particular case, however, you sent to my
10  client a note from the dean of students informing him
11  that there was a letter waiting for him from the dean
12  of students; do you remember that?
13 A.  No.
14 Q.  Just give me a moment.
15 A.  I -- yeah.  That's probably electronic information
16  coming from Maxient letting the student know there's
17  an electronic letter from the dean of students office
18  that they have to sign into.  Once they sign in with
19  their banner ID, they can open the letter that I would
20  have sent electronically.  So I think that's what you
21  might be referring to is the automated message that
22  all students get from me via Maxient software.
23      MR. FLORES:  Okay.  Let me just -- Bailey,
24  if you would put on the screen Exhibit F, please.
25      EXHIBIT TECHNICIAN:  One moment.

Page 92

1      INTRODUCED FOR DISCUSSION:
2      EXHIBIT F
3      1:11 p.m.
4 BY MR. FLORES:
5 Q.  And if you would go to the second page.  Scroll down
6  to the bottom half.
7 A.  Yep, that's from Maxient.  That's automatic messaging
8  from Maxient.
9 Q.  And your letter to them triggers that because you send
10  it through the Maxient system?
11 A.  Correct, so anything coming out of the dean of
12  students office.  It lets the student know that it's
13  coming from the dean of students office.
14 Q.  Okay.  Why don't you just leave that up there for just
15  a second so I can ask some related questions.
16      Now that email from the -- via Maxient goes
17  to the student's student email address; is that
18  correct?
19 A.  Correct.
20 Q.  And does it come with a flag or some type of attention
21  grabbing symbol to let the student know that they've
22  got an important piece of correspondence from the
23  dean's office?
24 A.  It just comes to their email.  As far as I know, it
25  comes to their email.

Page 93

1 Q.  And it looks the same as any other email?
2 A.  It will say it's from Maxient software.  It will say
3  Maxient in the subject header.
4 Q.  But it's not flagged as "Attention" or flagged as
5  "Important" or "Immediate Request"?
6 A.  No, it's --
7 Q.  There's no --
8      (Attorney and witness speak over each
9  other.)
10 Q.  -- attached to it is my question.
11 A.  Yeah, Maxient doesn't give you the option to put an
12  alert on the email --
13 Q.  Okay.
14 A.  -- to, like, ping a student, or something like that,
15  that would alert them in the email, but it will say
16  the subject -- that's the subject header, "Official
17  Correspondence From the Dean of Students Office."
18      MR. FLORES:  Okay.  And if you would,
19  Bailey, put up Exhibit G.
20      EXHIBIT TECHNICIAN:  One moment.
21      INTRODUCED FOR DISCUSSION:
22      EXHIBIT G
23      1:14 p.m.
24      MR. FLORES:  Okay.  If you could just show
25  that, just scroll through that slowly.  Just stop

Page 94

1    at -- yeah, put the text in the middle.
2  BY MR. FLORES:
3  Q.  Ms. Camaj, that is the letter that you wrote to
4     Anthony?
5  A.  Mm-hmm.  Yes, sorry, I should say yes.
6  Q.  And what was the stated purpose for the meeting?
7  A.  To discuss concerns reported about alleged behavior on
8     Wayne State University's campus.
9  Q.  And at the time that you sent that, did you also
10    include a statement of the charges for the complaint?
11 A.  There were no charges filed in this case, so I
12    wouldn't have included charges because there was no
13    charges filed.
14 Q.  Did you provide my client with a statement of why he
15    was being -- the purpose for the fact-finding
16    conference?
17 A.  No, because I'm not required to, and -- and I just
18    included in there I wanted to discuss reported
19    concerns.
20 Q.  So you're telling me that under the Student Code of
21    Conduct, you had no responsibility to advise him of
22    what he was going to be meeting with you about?
23 A.  This is not a Student Code of Conduct case because no
24    charges were filed in the matter, in this matter, I
25    should say.

Page 95

1  Q.  Okay.  Even though that the letter says it's a -- the
2     matter involves a violation of the Student Code of
3     Conduct?
4  A.  It says it may, and the information that was in the
5     complaint could have resulted in such and that's the
6     reason I wanted to discuss this concerning behavior.
7     It didn't say it did, it said may have.
8  Q.  Well, this just seems to be an effort to make sure
9     that he had no idea why he was going to meet with you.
10         MR. PORTER:  Objection, form.
11 A.  That's not the intention.  It's to get the student in
12    my office to discuss concerning behaviors that have
13    been reported to our office, and that's typically what
14    I do.  I'll invite students to meet with me to discuss
15    concerning behaviors, and then I let them know the
16    information when they meet with me, and it's not a
17    conduct case, so I'm not required to share anything
18    further.
19 BY MR. FLORES:
20 Q.  Why wasn't this a conduct case?
21 A.  Because no charges were filed.
22 Q.  When you say "charge," can you define how you're using
23    that term?
24 A.  Sure.  In the Code of Conduct, it indicates that
25    charges can be filed against the student, and that's

Page 96

1     the Code of Conduct term, and so if I'm informed that
2     someone on campus -- or has alleged to have -- excuse
3     me.  If somebody on campus is alleged to have violated
4     the Code of Conduct, and somebody wants to file
5     charges, they can contact our office and file charges.
6     In this case, no charges were filed.
7  Q.  So your testimony is that Jane Doe's complaint was not
8     the filing of a charge against my client?
9  A.  Right.  If it was -- if it was, it would have been
10    indicated in the letter.
11 Q.  And what additional step would the complainant have to
12    have taken to turn her complaint into a charge?
13 A.  Notify me that she wanted to pursue a charge.  They
14    just -- anybody who wants to file a charge just needs
15    to let me know that that is what they intend -- that
16    that is what they want.
17         MR. FLORES:  Bailey, if you would please
18    publish Exhibit E.
19         EXHIBIT TECHNICIAN:  One moment.
20         INTRODUCED FOR DISCUSSION:
21         EXHIBIT E
22         1:19 p.m.
23 BY MR. FLORES:
24 Q.  And go to page 3.  Do you see that paragraph that
25    starts with "Complaint" --

Page 97

1  A.  Mm-hmm.
2  Q.  -- Ms. Camaj?
3  A.  Mm-hmm.
4  Q.  Okay.  And then goes to the next page and stop there.
5         Do you see what the -- there's a question
6     there that reads "What is the outcome you are
7     requesting?"
8  A.  Mm-hmm.
9  Q.  Could you read that to yourself and let me know when
10    you're done?
11 A.  Okay.
12 Q.  And so is it your testimony today that in spite of the
13    fact that she asked to have my client held accountable
14    and that he be reprimanded, that this is not a request
15    for him to be charged with having harassed her; is
16    that your testimony?
17 A.  My testimony is that charges were not filed with me.
18 Q.  Were they filed with anyone else?
19 A.  Not at the time, nope.  Nobody -- no one filed charges
20    against your client.
21 Q.  Did there come a time that charges were filed against
22    my client?
23 A.  No, and if charges were filed, your client would have
24    been notified.
25 Q.  So is it your testimony that the complainant did not

Page 106

1 selected was the internet charge, and then also --
2 misuse of internet, and then also disorderly behavior
3 could be one. And then if there were threats made in
4 messaging, because at the time of the complaint, I
5 didn't have the text messages, so if there were
6 threatening messages being shared, you could also
7 select section 4.3. So it really depends on what the
8 specifics of the charges are that would be brought
9 forward by the complainant.
10 Q. Thank you. Now in the criminal law, there are charges
11 which are very specific, and there are charges which
12 are general, so you could be charged with disorderly
13 conduct, which incorporates a wide variety of
14 material.
15         MR. FLORES: You can remove Exhibit F.
16 BY MR. FLORES:
17 Q. So you have one charge, disorderly conduct. It covers
18 a lot of different types of behaviors, but it's just
19 one charge. You could also charge somebody with grand
20 larceny auto, which is a fairly specific charge
21 because you have to steel a car, it's what you would
22 expect.
23         Charges that are listed in section 4 of the
24 Student Code of Conduct, those are set forth with some
25 specificity; are they not?

Page 107

1 A. Sure. They're set forth to, you know, to reflect what
2 could be possible campus violations.
3 Q. And they include a definition?
4 A. Right.
5 Q. In this case, you're telling me there was no charge
6 that was filed because this was a conduct, an
7 investigation into conduct, not an -- not an
8 investigation into a specific charge; is that right?
9         MR. PORTER: Objection, form. It misstates
10 her prior testimony.
11 BY MR. FLORES:
12 Q. And what was your --
13 A. In my letter, it specifies that I was going to be
14 meeting with the respondent about some concerning
15 behavior that was reported to our office. So it was
16 about --
17 Q. Concerning --
18 A. Concerning behavior, correct, that was reported to our
19 office that we needed to get more information on.
20 Q. Okay. Thank you for refreshing my recollection. That
21 was the phrase I was searching for, "concerning
22 behavior."
23         Is that defined anywhere in the Student
24 Code of Conduct?
25 A. No, because, again, it's not a charge.

Page 108

1 Q. Is it described, to your knowledge, in any policy
2 statement or regulation or rule that the university
3 has published?
4 A. Not that I'm aware of.
5 Q. So when you hear the term "concerning behavior," will
6 you give me your definition of that phrase?
7 A. Yeah. You might be doing something that's concerning
8 to the greater community, it could be concerning to
9 your person, like maybe you are hurting yourself
10 individually, you are hurting others on campus, or
11 somehow your behavior is impacting others, it could
12 be -- it's very broad, so just concerning behaviors
13 that could be an issue that we want to, you know,
14 figure out what's going on. So it's very broad.
15 Q. So did there come a time where my client finally had a
16 chance to meet with you?
17 A. Yes, he did meet with me.
18 Q. And do you remember what date that was?
19 A. It would have been in my report that I would have
20 indicated. I don't recall off the top of my head, but
21 it would be in the documents.
22 Q. If I told you it was November 30th, would that seem
23 right?
24 A. Possibly, yes, yes, that makes sense.
25 Q. So right near the end of the month?

Page 109

1 A. Mm-hmm.
2 Q. And you had received this complaint sometime between
3 November -- October 29th, when it was made, and
4 November 15th, when you talked to her, when you
5 attended the behavioral intervention team meeting, so
6 someplace between the 29th of October and November
7 15th?
8 A. Yeah.
9 Q. So somewhere two weeks later, two and a half weeks
10 later, you finally met with my client?
11 A. Right, yes.
12 Q. And you met with him alone?
13 A. Yes.
14 Q. And you met with him in your office?
15 A. Yes.
16 Q. Do you remember who started the conversation?
17 A. I did.
18 Q. And can you tell me what, if anything, you said to
19 him?
20 A. Yes, the nature of the beginning of my conversation
21 was to inform him that I will be speaking to him about
22 concerning behavior and that this was not a conduct
23 matter that I would be making a determination on and
24 that I would be taking a statement based on concerns I
25 have gotten from a complainant, the complainant, and

Page 110

1 that I would be forwarding the case to the medical
2 school, and the other piece that I said was I'm trying
3 to remember just going down the line.
4 So after I informed him of what was going
5 to happen, I never shut the door, so I always let the
6 student shut the door, and if the student definitely
7 needs a break, I let them know, but that was the
8 beginning of our conversation in terms of me asking
9 questions, and then we began by me asking him what --
10 does he know the respondent, and what's the nature of
11 their relationship?
12 Q. In a case where you're looking at concerning behavior
13 rather than a charge, even with respect to just
14 concerning behavior, did you have authority at that
15 time to simply address the matter just at your level,
16 or was this case different and you had to send it up
17 to Dean Chadwell?
18 A. It's not what I was asked to do. I was asked to --
19 Q. Okay --
20 (Attorney and witness speak over each
21 other.)
22 A. -- right, so I -- I would not have been able to exert
23 any authority over this matter.
24 Q. So in this particular case, you were simply an
25 information provider and an information collector, and

Page 111

1 then you were sending that forward to your boss who
2 was Dean Chadwell?
3 A. Dean Chadwell's not my boss.
4 Q. I'm sorry, Dean Strauss?
5 A. I was moving it forward to Dr. Chadwell and to Linda
6 Galante as requested.
7 Q. So you didn't send it to Dean Strauss?
8 A. No.
9 Q. Okay. That's a little bit out of the normal ordinary
10 course; is that right?
11 A. Well, I typically don't send my outcomes in conduct
12 cases to Dr. Strauss. The code says that I do not
13 have to send him my outcome cases. I only send Dean
14 Strauss the cases that -- my cases when I invite the
15 student to meet with them to make him aware of the
16 charges, but I don't share the outcome with him.
17 Q. Okay. So would you say this was unusual that you were
18 in this role and sending the information you collected
19 to Dean Chadwell?
20 MR. PORTER: Objection, form.
21 A. I don't know about unusual, but it was because of the
22 nature of the timing of my starting there, it would
23 have been one of the first cases I would have done
24 that with just by the pure nature of me being there at
25 that time.

Page 112

1 BY MR. FLORES:
2 Q. But was it because you just were inexperienced and
3 they didn't think you could handle that?
4 A. That was not my directive. It's not about my
5 experience being inexperienced in that -- that's not
6 for me to make a determination on. That was not what
7 I was asked to do.
8 Q. The head of the behavioral intervention team was the
9 person who gave you your assignment; is that right?
10 MR. PORTER: Objection based on
11 attorney-client privilege. If it requires you to
12 divulge attorney-client communications, I'd ask you
13 not to answer.
14 A. Okay. I will not answer.
15 BY MR. FLORES:
16 Q. I'm taking an exception to that.
17 Had you ever sent any of your work directly
18 to Dean Chadwell?
19 A. At that time, no.
20 Q. Had you ever sent any of your work to anyone other
21 than Dean Strauss as of that date?
22 A. As of that date, I don't -- I don't remember. But
23 I -- because it was so early on in my time at Wayne
24 State, I don't know that I had any other cases I would
25 have been assigning to anybody, I mean to forward to

Page 113

1 anybody else at the time.
2 Q. Okay. Are you familiar with the Office of the
3 Ombudsman?
4 A. Yes, I am.
5 Q. And what does the ombudsman's office -- what are they
6 responsible for?
7 A. So one of their main purposes, and we include the
8 ombud's letter in our correspondence to students, to
9 provide them information about the policies and
10 procedures at Wayne State University. So they are not
11 ones to make decisions on cases, like in a conduct
12 case, but they are ones to provide students
13 information about proceedings.
14 Q. And is this --
15 A. And policies.
16 Q. I'm sorry.
17 A. Go ahead.
18 Q. I didn't hear the last part of your answer.
19 A. Sorry. They -- I just repeated what I said that they
20 informed students about procedural matters and
21 policies.
22 Q. And in this case, did you refer my client to the
23 office of the ombudsman?
24 A. No, because I wasn't required to.
25 Q. And that was because it wasn't -- there were no

Page 114

1  charges --
2  A. Correct.
3  Q. -- it was just a concerning behavior matter?
4  A. Correct.
5  Q. Okay. Based on your training, is a matter of
6     concerning behavior more serious or less serious than
7     charges being leveled at a student?
8        MR. PORTER: Objection, form.
9  A. It depends on the situation. I've had it where the
10    concerning behavior could be worse based on the
11    students that respond -- excuse me, the student's
12    behavior in the classroom could have been a little
13    more dangerous versus conduct charges, where some
14    conduct charges could have been less. So I've seen
15    both.
16 BY MR. FLORES:
17 Q. Did Mr. -- did my client raise any questions with you
18    that you could not answer?
19 A. If there were any questions about medical school
20    stuff, I would not be able it answer, but I don't
21    recall him asking me that. But if he were to ask me
22    anything about conduct, I would have definitely
23    answered it for him, and especially if he asked me can
24    he -- he asked if he could include an apology letter.
25    I said absolutely you can include that. I informed

Page 115

1  him he can provide me a statement after our meeting,
2  and he said he would, and I answered questions about
3  how he could send that to me by email. So that's what
4  I can recall at that time.
5  Q. Did you share with him at any point in your meeting
6     that you believed this was a very serious case?
7  A. I don't recall using that word, no.
8  Q. Do you remember -- do you recall what word you might
9     have used to describe this case?
10 A. I don't think I would have described it. I would have
11    said "concerning behavior" because, again, it wasn't
12    for me to make a determination. So I don't know that
13    I would have made a value judgment on the type of case
14    or the seriousness of it.
15 Q. Do you remember having a conversation with him at the
16    beginning where he asked you why you had not answered
17    his emails?
18 A. Possibly. It was so long, I -- I may have told him
19    similar to what I told you where, again, it's not my
20    intention to ignore students.
21 Q. Do you remember telling him that you didn't provide
22    any information because that was your -- your typical
23    strategy, you waited until someone came to your office
24    and then you confronted them in person to see if you
25    could shake their story?

Page 116

1  A. I would never say that. I don't -- I don't ever
2     remember saying that. Typically, I ask the students
3     to come and meet with me, and then I discuss the
4     concerning behavior that was reported in front of
5     them.
6  Q. Between the time that you spoke with the complainant
7     and you spoke to my client, did you do any independent
8     investigation to either verify or contradict either
9     person's statement?
10       MR. PORTER: Objection, asked and answered.
11    You may answer.
12 A. Okay. So when the complainant stated that text
13    messages were sent, I noticed that I couldn't open
14    them, so I did request that they be sent to me again,
15    and also, when the complainant made her statements in
16    the complaint, itself, I verified that what was said,
17    there was text messages to corroborate as --
18    corroborate as she indicated to see that they matched
19    up.
20       And then waiting, then, I waited to speak
21    to the respondent to confirm that he was in a text
22    message situation with the complainant to confirm that
23    these were sent by him, as well. So that's -- that's
24    all I did is just to confirm that text messages were
25    sent between the two parties.

Page 117

1  Q. Did you do any work to confirm or disprove any of the
2     allegations pertaining to hacking of my client's
3     computers?
4  A. No, because that's not my expertise, and I recall the
5     respondent mentioning that and us talking about what
6     he did in terms of reporting it to other parties such
7     as C&IT or Apple, I think it was Apple at the time
8     that he was consulting with, and so I -- because
9     that's not my expertise. So I would ask them did they
10    do any work to see who may have hacked them? And then
11    also with the police.
12 Q. Okay. And do you know whether or not Wayne State
13    Police Department or Wayne State's Computer Science
14    Department have forensic specialists that could have
15    done that investigation?
16       MR. PORTER: Objection, form.
17 A. I don't know. I -- our C&IT office is always willing
18    to help students. So if someone has questions about
19    internet and technologies, they could answer basic
20    questions, and then if something's happening on
21    campus, they could look into it, but something
22    external, that would assume that the police would need
23    to be involved. It was, like, an outside source,
24    like, somebody else -- like a Snapchat, which was
25    mentioned, and someone's phones. I would assume that

Page 130
1  A.  That's not what I said.
2      MR. FLORES:  I'll withdraw it.
3  BY MR. FLORES:
4  Q.  Is there a reason that you waited so late to contact
5      my client and ask to meet with him?
6  A.  No, it would have just been my scheduling because I
7      have my calendar, and if I -- my calendar is booked,
8      then I would have delayed the meeting, but there was
9      no ill intent to delay the meeting at all.
10 Q.  And you submitted that report on December 4th, 2018;
11     is that correct?
12 A.  Yeah, that's the date on the report.
13 Q.  And do you remember what day of the week that was?
14 A.  I don't.  I would have to check the calendar; I don't
15     remember.
16 Q.  Do you remember if you worked the full month of
17     December?
18 A.  What do you mean?  Like was I in the office?
19 Q.  Were you in the office?  Did you take off for
20     Christmas break?
21 A.  I believe I was, I -- all of us have the same
22     Christmas break at Wayne State, so it would have
23     started on the 23rd or 22nd, because I usually take my
24     time off when most students take time off.  So that
25     would have been that week where we get off for Wayne

Page 131
1      State.
2  Q.  All right.  Now, how did you transmit your report to
3      Dean Chadwell?
4  A.  Maxient.
5  Q.  And he is not at the university but in the medical
6      school; is that correct?
7      MR. PORTER:  Objection, form.
8  BY MR. FLORES:
9  Q.  Do you know where Dr. Chadwell works?
10 A.  Yeah, if you look at her letterhead -- if you look at
11     the letter, it says that she's at the University
12     School of Medicine.
13 Q.  And so that system can send information from the Dean
14     of Students Office anywhere in the university; is that
15     correct?
16 A.  The Maxient software has email capabilities, and then
17     you can send emails to anybody that you choose to send
18     emails to.
19 Q.  And that's how you communicated, and that's how you
20     sent this particular report?
21 A.  Yes.
22 Q.  And did that report include the attachments, the text
23     messages?
24 A.  Yes, it should have included everything.  I believe it
25     did.  There should be about 11 to 12 pages of text

Page 132
1      messages that I should have included.  Some of it may
2      have been repeated, but all of them should have been
3      there.
4  Q.  After you sent the report to Dean Chadwell, did you
5      have any direct communication with her by telephone or
6      in person?
7  A.  No, because my role was done.
8  Q.  Did you ever talk with Dean Jackson at the medical
9      school?
10 A.  Not about this case, nope.
11 Q.  How about Dean Richard Baker?
12 A.  No.
13 Q.  Did you ever speak with Loretta Robichaud about this
14     case?
15 A.  No.
16 Q.  Did you ever talk to Jane Doe's mother?
17 A.  No, I did not.
18 Q.  Do you know whether or not Jane Doe provided
19     information to anyone at the university?
20 A.  I don't.  I just -- what I know is I got the -- we
21     reviewed the complaint, so I don't know what else
22     happened after that.  After I submitted my report, I'm
23     not involved in the case.
24 Q.  When you joined Wayne State your first year, you were
25     a student conduct officer, not a Title IX

Page 133
1      investigator; is that correct?
2  A.  Yes.
3  Q.  Nevertheless, did there come a time that you became
4      aware that there was an investigation by the
5      Department of Education's Office of Civil Rights of
6      the WSU Medical School for retaliation against a
7      female student?
8  A.  It may have been spoken about in front of me in the
9      meetings that I was, but I was never part of that
10     discussion and had no knowledge of the proceedings.
11 Q.  As a Title IX investigator, though, are you aware that
12     an investigation by the Office of Civil Rights is a
13     serious matter?
14     MR. PORTER:  Objection, form.
15 A.  Yes, I am aware.
16 BY MR. FLORES:
17 Q.  And during your time working for WSU in any capacity,
18     did you ever have an occasion to speak to an
19     investigator from the Office of Civil Rights from the
20     Department of Education?
21 A.  No.
22 Q.  Are you aware that at the conclusion of the Office For
23     Civil Rights' investigation, they found by a
24     preponderance of the evidence that the School of
25     Medicine had, in fact, retaliated against that female

Page 134
1 medical student by expelling her?
2     MR. PORTER: Objection, form.
3 A. No, I don't know the details of the case.
4 BY MR. FLORES:
5 Q. Did you ask -- did you ever ask the complainant for an
6    opportunity to speak to her mother or her father?
7 A. No.
8 Q. And even though she stated in her complaint that she
9    had recently talked to her parents about this matter,
10   you made no effort to speak to them?
11 A. No, I did not contact the parents.
12 Q. Because there was no charge in this case for you to
13    investigate, and my client was being -- the inquiry
14    focused on concerning behavior, did my client have an
15    obligation under the school conduct code to meet with
16    you?
17 A. Again, this was not a conduct matter so --
18 Q. So the answer would be no?
19 A. Right:
20 Q. Did you tell him that he had no obligation to meet
21    with you?
22 A. No, I don't typically say that to students, they have
23    no obligation. That's just not language that I use.
24 Q. Well, is there some language that you could use to
25    communicate that?

Page 135
1 A. It's just not something that I -- I do.
2 Q. Of course not.
3 A. Right.
4 Q. Because if you told them that, they didn't need to
5    come and talk with you, many of them would not; is
6    that right?
7     MR. PORTER: Objection, calls for
8 speculation.
9     MR. FLORES: Withdrawn.
10 BY MR. FLORES:
11 Q. And your testimony is that after you submitted that
12    report on December 4th, you had no further contact or
13    anything to do with this case, and you had no
14    conversations with anyone, including anyone in the
15    general counsel's office or counsel for the
16    university?
17 A. Yeah, I had no further involvement in the case. I
18    don't even know what was decided or the outcome. So
19    I, again, was only there to investigate.
20     MR. FLORES: Okay. All right, well,
21 Ms. Camaj, I -- this is a serious matter, and if I was
22 a little too aggressive, I apologize, I didn't mean to
23 do that; it's the nature of the process sometimes.
24     David, I want to thank you for your
25 cooperation here. We should probably have an

Page 136
1 off-camera discussion. I can't do that until Friday
2 since I'm going to apparently do -- I'm going to be
3 handling the deposition tomorrow. So I've got to get
4 preparing for that, but if we can set aside, if you
5 can let me know Friday what might work for you in
6 terms of a call or maybe with you and Ms. Hardy, that
7 would be good.
8     MR. PORTER: Yeah, that sounds good, we'll
9 set it up.
10     MR. FLORES: Thank you very much. Do you
11 need any other information from me, Leisa?
12     COURT REPORTER: Just your transcript
13 orders. Did you want to order the transcript?
14     MR. FLORES: Yes.
15     COURT REPORTER: And did you need this
16 expedited?
17     MR. FLORES: As quickly as you can get it.
18 I don't know what your schedule is, so...
19     COURT REPORTER: On Friday?
20     MR. FLORES: That's great.
21     COURT REPORTER: Did you want a copy,
22 Mr. Porter?
23     MR. PORTER: You know what, I need to
24 follow up with you on that. I'll be in touch.
25     (The deposition was concluded at 2:33 p.m.

Page 137
1 Signature of the witness was not requested
2 by counsel for the respective parties
3 hereto.)