```
              UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF MICHIGAN


JOHN PLAINTIFF,
          Plaintiff,


     vs.            Case No. 2:20-cv-11718-GAD-DRG


WAYNE STATE UNIVERSITY,
WAYNE STATE UNIVERSITY
SCHOOL OF MEDICINE,
NICOLINA CAMAJ, MARGIT CHADWELL,
MATTHEW JACKSON, RICHARD S. BAKER,
R. DARIN ELLIS, in their individual
and official capacities,
jointly and severally,
          Defendants.
_____

               VIDEOCONFERENCE DEPOSITION

DEPONENT:   MATTHEW JACKSON, Ph.D.
TIME:       9:59 a.m.
DATE:       Friday, November 19, 2021
REPORTER:   Denise M. Kizy, RPR, CRR, CSR-2466
```



Fortz Legal Support
www.FortzLegal.com
844.730.4066

Page 54

1 referring to a specific policy of the
2 Professionalism Committee?
3  MR. FLORES: I am. I am.
4  MR. PORTER: I think it would be
5 helpful if we show the witness the document so
6 that he can --
7  MR. FLORES: Okay. Please publish
8 Exhibit A.
9  MR. PORTER: Feel free to take your
10 time to read the document.
11  MR. FLORES: And if you would take a
12 look at page 9 of 12. If you would go down to
13 page 9 of 12, and if you would just show that to
14 Dr. Jackson, let him familiarize himself with
15 it.
16  **THE WITNESS: Okay.**
17 BY MR. FLORES:
18  Q. And if you would just go up to page 8
19 of 12 as well, take a look at that.
20  **A. Okay.**
21  Q. All right. So is it accurate to say
22 that the Dean of Students, the Dean of Basic
23 Sciences or the Assistant Dean of Clinical
24 Sciences, that those individuals can receive
25 complaints and undertake an investigation?

Page 55

1  MR. PORTER: Objection; form.
2  **THE WITNESS: Yes, that's correct.**
3 BY MR. FLORES:
4  Q. And one of the outcomes there is that
5 no further action is taken; is that right?
6  **A. Yes, that's possible, yes.**
7  Q. Now in this case at some point in
8 time did you receive a report from the Office of
9 the Dean of Students at the medical school
10 regarding my client, Anthony Eid?
11  **A. The report came to Dr. Chadwell, and**
12 **then Dr. Chadwell provided the material to me.**
13  MR. FLORES: All right. And would
14 you please publish Exhibit B for Dr. Jackson.
15 I'm sorry, that's not Exhibit B.
16 Exhibit C.
17  MARKED FOR IDENTIFICATION:
18  EXHIBIT C
19  11:23 a.m.
20  MR. FLORES: And if you would scroll
21 down to the next page.
22 BY MR. FLORES:
23  Q. Dr. Jackson, do you recognize that?
24  **A. Yes, that as my recollection is that**
25 **was with the material that Dr. Chadwell**

Page 56

1 forwarded to me.
2  MR. FLORES: Could you slowly scroll
3 for Dr. Jackson.
4  Dr. Jackson, if you need them to stop
5 at any point, just ask them to.
6  Just scroll through just to make sure
7 that we're talking about the same document.
8  MR. PORTER: Bob, I'm not seeing any
9 Bates numbers on this document. Was this in
10 your client's possession or was it produced?
11  MR. FLORES: I believe this was
12 produced. I'm not sure why there are no Bates
13 stamps on here.
14  MR. PORTER: Okay. But it's in your
15 client's possession?
16  MR. FLORES: Yeah, and it was listed
17 as the Professionalism Committee file.
18  MR. PORTER: Produced by you to us?
19  MR. FLORES: No, produced by you to
20 us, because we would have had Bates stamps on
21 it, too. I'm not sure why they're not on here.
22  MR. PORTER: Okay.
23 BY MR. FLORES:
24  Q. Does that look like the document that
25 you -- the document and materials that you

Page 57

1 received from Dr. Camaj?
2  **A. Yes, it looks like what she provided**
3 **to Margit Chadwell and then Margit Chadwell**
4 **provided it to me.**
5  Q. Okay. Yes. I apologize for that.
6 That's my mistake.
7  Now when you receive a document like
8 this as the chair of the Professionalism
9 Committee, what's your first responsibility with
10 respect to the information you receive?
11  **A. Well, first, it would be to schedule**
12 **a Professionalism Committee meeting with all the**
13 **different members. That would be the first**
14 **responsibility.**
15  Q. And do you have any responsibility
16 with respect to investigation?
17  MR. PORTER: Objection; form.
18  **THE WITNESS: Yes, if there would be**
19 **additional documentation that was needed then I**
20 **would have the responsibility of contacting**
21 **individuals who may be able to provide that.**
22 BY MR. FLORES:
23  Q. And do you remember if you read
24 through the material that you received from Dr.
25 Chadwell shortly after receiving it?

Page 62

1  Q. Did you investigate the complainant
2  to determine whether her claims to have felt
3  harassed were supported by the evidence?
4       MR. PORTER: Objection; form.
5       THE WITNESS: No, I did not.
6  BY MR. FLORES:
7  Q. Did there come a time that you
8  conducted an investigation with respect to where
9  my client lived?
10      MR. PORTER: Objection; form.
11      THE WITNESS: During the
12 Professionalism Committee, we have record of
13 where students' addresses, so during the
14 Professionalism Committee hearing we looked that
15 up on-line and found --
16 BY MR. FLORES:
17 Q. I'm sorry?
18 A. And we found his address at that
19 time.
20 Q. And was there a charge that related
21 to my client's address that you recall?
22      MR. PORTER: Objection; form.
23      THE WITNESS: The implication was
24 that Amanda had mapped the location of the
25 individual who had taken over her account,

Page 63

1  someone had spoofed her account and was
2  pretending to be her on-line, and she was able
3  to map that individual to a location in Detroit,
4  and that location corresponded to Mr. Eid's
5  address at that time.
6  BY MR. FLORES:
7  Q. Is it your testimony today that the
8  location that had been mapped was my client's
9  specific address?
10 A. As I recall from that, it was -- the
11 location was mapped to an intersection and his
12 address was adjacent. It was on the corner of
13 that intersection is what I recall.
14 Q. But you did not -- or let me -- I'll
15 withdraw that.
16      Did you interview any of the
17 complainants' friends who allegedly had
18 knowledge about the harassment?
19 A. No, I did not.
20 Q. Did you ask the Wayne State Police
21 Department to run a criminal background check on
22 the complainant?
23 A. No.
24 Q. Did you investigate whether my
25 client's banking or social media accounts were

Page 64

1  the subject of unauthorized access?
2       MR. PORTER: Objection; form.
3       THE WITNESS: No, I didn't
4  investigate that.
5  BY MR. FLORES:
6  Q. And did you ever learn whether
7  Nikolina Camaj ever conducted an actual
8  investigation regarding the complaint or --
9       MR. PORTER: Objection; form. Sorry.
10 BY MR. FLORES:
11 Q. Based on your recollection, what was
12 Ms. Camaj's responsibility or role in this case?
13 A. My understanding was that she
14 collected the initial documents and then that
15 she interviewed Amanda Burton and Anthony Eid
16 and collected -- I believe that he provided a
17 statement as part of that interview, and that
18 was part of the packet that she forwarded over
19 to Dr. Chadwell.
20 Q. Do you remember whether she actually
21 investigated whether the claims made by either
22 party were accurate?
23      MR. PORTER: Objection; form.
24      THE WITNESS: I'm not aware that she
25 did that, no.

Page 65

1  BY MR. FLORES:
2  Q. Was there ever a time that you asked
3  my client to surrender his computer and cell
4  phone for the purpose of submitting it for a
5  forensics analysis?
6  A. No.
7  Q. Are you aware of whether Nikolina
8  Camaj ever had a forensic examination of the
9  computer or phone done?
10 A. No.
11 Q. Did you ever learn that the events
12 complained of by her did not take place on Wayne
13 State University property?
14 A. My understanding -- I'm not clear on
15 your question.
16 Q. Are you aware now -- let me rephrase
17 that.
18      How did you determine -- let me
19 withdraw that.
20      Under the school's rules, the
21 university has a responsibility to investigate
22 conduct that occurs on school property; is that
23 correct?
24      MR. PORTER: Objection; lack of
25 foundation. Are we still talking about the

Page 78
1  met in a conference room. There was an area
2  outside where they could wait, but I told him to
3  come and wait after they were finished.
4       So I -- the answer is I don't know
5  where he was waiting when they were in the room.
6  He was not in the vicinity of the conference
7  room that we were meeting with them.
8       Q.   And was that intentional on your
9  part?
10      A.   Yes.
11      Q.   What was the reason for that?
12      A.   I didn't want them to have to
13 interact in person.
14      Q.   Were you aware that one of the goals
15 of Mrs. Burton's was to make sure that Anthony
16 did not become a doctor?
17           MR. PORTER: Objection; form and
18 foundation.
19           THE WITNESS: I was not aware of
20 that.
21 BY MR. FLORES:
22      Q.   If you had known that would you
23 have -- would that have affected your evaluation
24 of her testimony?
25           MR. PORTER: Objection; form.

Page 79
1            THE WITNESS: Well, I didn't evaluate
2  her testimony. That was up to the committee. I
3  didn't have any role in the decision-making. I
4  was just -- I chaired it, so it was a logistics
5  process. So, no, it wouldn't have affected my
6  actions, no.
7  BY MR. FLORES:
8       Q.   Do you think it might have affected
9  any of the Professionalism Committee members?
10           MR. PORTER: Objection; calls for
11 speculation.
12           THE WITNESS: I would have to
13 speculate to try and speculate what was in their
14 mind at the time. I don't know.
15 BY MR. FLORES:
16      Q.   Now when my client entered the room
17 that the hearing was being held in, was he
18 introduced by anybody?
19      A.   Me. I would have introduced him to
20 the committee.
21      Q.   And did you ask him any questions?
22      A.   I don't recall specifically. I
23 believe I may asked him to confirm his address.
24      Q.   And did any of the members of the
25 Professionalism Committee ask him any questions?

Page 80
1       A.   Yes, they did. They would have
2  asked -- they asked him a number of questions.
3       Q.   Do you remember any of the questions
4  that he was asked?
5       A.   I don't recall specific questions,
6  no.
7       Q.   Prior to his testimony that morning,
8  did you provide him with a summary of what
9  had -- what Amanda Burton or Pamela Burton had
10 testified to?
11           MR. PORTER: Objection; form.
12           THE WITNESS: No, I did not.
13 BY MR. FLORES:
14      Q.   So that all that he would have known
15 about the complaint against him was related to
16 the materials you had shown him during your
17 meeting?
18           MR. PORTER: Objection; form.
19           THE WITNESS: That was the
20 information that he had going to the committee,
21 correct. He had reviewed the documents that
22 they had.
23 BY MR. FLORES:
24      Q.   Now, Dr. Jackson, if I accused you of
25 a crime to a police officer, do you think it's

Page 81
1  important for the police officer to ascertain
2  what relationship you and I have?
3            MR. PORTER: Objection; calls for
4  speculation and form.
5  BY MR. FLORES:
6       Q.   If you can answer it.
7       A.   I wouldn't think that the police
8  officer would be responsible for finding out the
9  nature of our relationship. I think they
10 would -- you know, I would think they would just
11 have to respond to the complaint and deal with
12 it from there. I don't think it would be there
13 position to understand if there was some
14 history, for example, in your scenario between
15 us.
16      Q.   But in this case your job was to
17 investigate the charges against my client; is
18 that right?
19           MR. PORTER: Objection; form.
20           THE WITNESS: Investigation to the
21 point of gathering the information, the
22 documents, that were going to be provided to the
23 Professionalism Committee, but no, not
24 investigate beyond that point. Not to the
25 point, for example, a criminal investigation or

Page 90

1  after notifying was then I provided all the
2  documents to the chair of Promotions Committee
3  who then would have been responsible for
4  coordinating and organizing that committee
5  meeting and then communicating to Mr. Eid for
6  that meeting date.
7  BY MR. FLORES:
8      Q.   And did you have any further
9  involvement with the case after writing the
10 letter to my client informing him of the
11 decision?
12         MR. PORTER:  Objection; form.
13         THE WITNESS:  I forwarded all the
14 documentation to the Promotions Committee, and
15 that was my involvement.  I attended the
16 Promotions Committee meeting, but I wasn't on
17 that committee.
18 BY MR. FLORES:
19     Q.   Did you speak at the Promotions
20 Committee meeting?
21     A.   I don't recall if I -- my role in
22 that committee would have been to answer
23 questions from the actual committee, but I do
24 not recall if they had any questions of me.
25     Q.   Do you remember whether Dr. Chadwell

Page 91

1  was at that Promotions Committee meeting?
2      A.   I don't recall specifically.  I would
3  be presuming or assuming because she was in
4  attendance at all of those, but I would assume
5  yes.  I can't say for certain that she was
6  there.  I don't recall.
7      Q.   Dr. Jackson, looking back at the way
8  you conducted the Professionalism Committee
9  hearing for my client, what was the most
10 important goal that you had for that hearing?
11         MR. PORTER:  Objection; form,
12 foundation.
13         THE WITNESS:  The goal would be to
14 provide the student, in this case Anthony Eid,
15 an opportunity to tell his side of things to the
16 committee.
17 BY MR. FLORES:
18     Q.   It was not to fully investigate the
19 charges against him?
20         MR. PORTER:  Objection;
21 argumentative.
22         THE WITNESS:  My interpretation of
23 the word "investigate" was that committee would
24 have been responsible for digging deeper.  Some
25 of the questions you've asked me, did they go

Page 92

1  out and look at accounts and looks into other,
2  you know, other issues, and no, they could not
3  be in the role of investigating that.  I think
4  the goal was they were presented with the
5  material, reviewed it, and then they had the
6  opportunity to ask the student in this case what
7  happened, his own words.
8          So I would say, no, the goal was for
9  them to gain a better understanding of what was
10 going on, of his motivations and the outcomes.
11 BY MR. FLORES:
12     Q.   But my client testified that he had a
13 legitimate purpose for staying in contact with
14 Amanda Burton; is that right?
15         MR. PORTER:  Objection; assumes facts
16 not in evidence.
17         THE WITNESS:  I seem to recall that
18 that was his testimony with the Professionalism
19 Committee was yes, he argued he had a legitimate
20 reason staying in contact with her.
21 BY MR. FLORES:
22     Q.   And he denied sending any lawyer
23 letter, fraudulent or otherwise, to Amanda
24 Burton; is that right?
25     A.   I seem to recall he did deny that,

Page 93

1  yes.
2      Q.   So clearly there was a dispute
3  between the different -- in terms of the witness
4  testimony, what Ms. Burton testified to and what
5  Mr. Eid testified to were in conflict with one
6  another; is that right?
7          MR. PORTER:  Objection to the extent
8  that you are characterizing his prior testimony,
9  that's not accurate, but if you can answer the
10 question, feel free.
11         THE WITNESS:  I don't think there was
12 a discussion of the conflict between them.  It
13 was not a he said, she said.  There was so
14 much -- there was so much documentation with all
15 the text messages that did come from Anthony Eid
16 that I think my opinion was the committee saw
17 that as something that was very impactful, very
18 important, to their decision-making.
19 BY MR. FLORES:
20     Q.   But at the same time the allegation
21 was that all of that conduct back and -- all
22 that communication back and forth was
23 legitimate, it had a legitimate purpose.
24         Didn't that make a difference to the
25 committee?

Page 110

1  university -- well, as far as I know legally in
2  Michigan, it's prohibited.
3  BY MR. FLORES:
4     Q.   It's prohibited from recording a
5  Professionalism Committee hearing?
6     A.   Well, I was putting that in a
7  different context.  No, if everybody in
8  attendance is aware that it's being recorded
9  then it's permitted, yes.  I was thinking of
10 somebody --
11        MR. PORTER:  Objection.  Are we
12 talking about generally or this Professionalism
13 Committee that Mr. Eid attended?
14 BY MR. FLORES:
15    Q.   The Professionalism Committee that
16 you chaired, was there any rule that you were
17 aware of that prohibited you from recording the
18 hearing?
19    A.   No, I'm not aware of any rule that
20 would prohibit that.
21    Q.   Dr. Jackson, are you familiar with a
22 Dear Colleague letter that was sent by the
23 Department of Education's Office of Civil Rights
24 to schools, colleges and universities in 2011
25 dealing with Title 9?

Page 111

1     A.   No, I can't say that I'm familiar
2  with that.
3     Q.   Are you aware of what penalties the
4  Department of Education can impose on a school
5  that fails to properly address Title 9 concerns?
6     A.   No.  I'm not aware of those
7  penalties.
8     Q.   And after the close of the
9  Professionalism hearing on February 7th of 2019,
10 did you have any conversations with my client?
11    A.   No, other than the e-mail
12 communication I had to him with the letter
13 giving the decision of the Professionalism
14 Committee, but no conversations.
15    Q.   Did you talk to Dean Chadwell after
16 the Professionalism Committee reached its
17 decision?
18    A.   Specifically about the decision or
19 Mr. Eid?
20    Q.   Any aspect of the case.
21    A.   I don't recall any specific
22 conversations, but very possibly I did.
23    Q.   How about with Ms. Robichaud?
24    A.   If it would have been -- if it would
25 have been Dr. Chadwell it would have been

Page 112

1  Ms. Robichaud probably at the same time, but,
2  yes, I would have had conversations with them.
3     Q.   And do you remember what the nature
4  of that conversation was?
5     A.   No, no, other than -- it would be
6  speculation.  I'm trying to recall what
7  happened, but it would just be the nature of the
8  next step would be the Promotions Committee.
9     Q.   Do you recall whether or not Dr.
10 Chadwell or Ms. Robichaud was pleased with the
11 decision by the Professionalism Committee?
12        MR. PORTER:  Objection; calls for
13 speculation.
14        THE WITNESS:  I can't --
15 BY MR. FLORES:
16    Q.   Did either of them express an opinion
17 as to whether or not the Professionalism
18 Committee had reached the proper decision?
19    A.   Yeah, I don't recall them expressing
20 any opinion after the decision was made.
21    Q.   Do you know how many conversations
22 you had with them, do you remember?
23    A.   No, I don't.
24        MR. FLORES:  If you would publish
25 Exhibit B for Dr. Jackson.

Page 113

1        MARKED FOR IDENTIFICATION:
2        EXHIBIT B
3        1:17 p.m.
4  BY MR. FLORES:
5     Q.   Dr. Jackson, if you would, just read
6  that first portion and once you're done let me
7  know.
8     A.   All right.
9     Q.   And are you familiar with this
10 document prior to my showing it to you this
11 morning?
12    A.   No, I'm not.
13        MR. FLORES:  All right.  I have no
14 further questions for the witness.
15        Dr. Jackson, thank you very much for
16 your time today.  I appreciate it.
17        MR. PORTER:  I'm going to ask him a
18 few questions.
19        MR. FLORES:  Sure.
20            EXAMINATION
21 BY MR. PORTER:
22    Q.   Dr. Jackson, did you meet with
23 Anthony Eid on January 25, 2019?
24    A.   Yes, I believe that was the prep
25 session.

Page 114
1  Q. And was the purpose of that to
2  provide him the materials that would be later
3  provided to the Professionalism Committee?
4  A. Yes.
5  Q. Did he have an opportunity during
6  that meeting to review the materials?
7  A. Yes.
8  Q. Did he ask you any questions about
9  any of the materials?
10  A. I don't recall him asking specific
11  questions about the material, no.
12  Q. Were you present while he was
13  reviewing the materials?
14  A. Yes, I was.
15  Q. And did he deny the -- well, strike
16  that.
17  Included in those materials were text
18  messages that were provided by Amanda Burton
19  between her and Anthony Eid; is that correct?
20  A. Yes, that's correct.
21  Q. And those were included in the packet
22  of materials; is that correct?
23  A. Yes.
24  Q. And did he deny sending any of the
25  text messages as he was reviewing them there in

Page 115
1  your office?
2  A. No, he did not.
3  Q. That material was then later provided
4  to the Professionalism Committee; is that
5  correct?
6  A. Yes, that's correct.
7  Q. And was he asked questions about
8  those text messages during the Professionalism
9  Committee?
10  A. Yes.
11  Q. Did he deny sending any of the text
12  messages during the Professionalism Committee?
13  A. No, he did not.
14  Q. Did he take responsibility for
15  sending them?
16  A. Yes, he did.
17  Q. Mr. Flores asked you some questions
18  about disputes between Ms. Burton and Mr. Eid,
19  and as I heard you testify the primary emphasis
20  of inquiry by the Professionalism Committee was
21  on the statements that the student was subject
22  to the Professionalism Committee gave to the
23  Professionalism Committee; is that true?
24  A. Yes, that's the principal mission.
25  MR. FLORES: I'm sorry, David, I

Page 116
1  really -- I couldn't understand the question.
2  Can you repeat it?
3  BY MR. PORTER:
4  Q. Is it your testimony earlier today
5  that the primary focus of the Professionalism
6  Committee is on the student in question and
7  their conduct during the Professionalism
8  Committee?
9  A. Yes, that's correct.
10  Q. And was that true in Mr. Eid's case?
11  A. Yes.
12  Q. And so would it be fair to say that
13  any testimony by Ms. Burton that may have been,
14  in Mr. Flores' words, inconsistent was not
15  material to the purpose or the objective of the
16  Professionalism Committee?
17  A. That's correct.
18  Q. Earlier today you were asked
19  questions about, quote, charges that were filed
20  against Mr. Eid in front of the Professionalism
21  Committee; is that correct?
22  A. Yes.
23  Q. And is it your understanding that
24  there are multiple charges filed against the
25  particular student or just a charge?

Page 117
1  A. In this particular case, there were
2  multiple charges.
3  Q. Okay. And what was just the -- what
4  was the overall description or nature of the
5  charge against Mr. Eid?
6  A. I think it was the cyberstalking and
7  continued aggressive messages, unwanted
8  messages, that he sent to Amanda.
9  Q. Okay. And then earlier today you
10  were asked questions about the Student Code of
11  Conduct. Do you recall?
12  A. Yes.
13  Q. Does the Professionalism Committee
14  follow the guidelines that are set out in the
15  Student Code of Conduct?
16  A. No, it doesn't.
17  Q. Is the Professionalism Committee
18  bound by those guidelines?
19  A. No, it's not.
20  Q. Okay. That's all the questions I
21  have for you.
22  MR. PORTER: Bob, anything more?
23  MR. FLORES: No.
24  MR. PORTER: Denise, I assume Mr.
25  Flores ordered a copy of the transcript or