```
         IN THE DISTRICT COURT OF THE UNITED STATES
            FOR THE EASTERN DISTRICT OF MICHIGAN


JOHN PLAINTIFF,
              Plaintiff,
     vs.                        Case No. 2:20-cv-11718-GAD-DRG

WAYNE STATE UNIVERSITY, WAYNE
STATE UNIVERSITY SCHOOL OF
MEDICINE, NICOLINA CAMAJ, MARGIT
CHADWELL, MATTHEW JACKSON,
RICHARD S. BAKER, R. DARIN ELLIS,
in their individual and official
capacities, jointly and severally,
              Defendants.
_____


     The Remote Zoom Videoconference Deposition of
     RICHARD S. BAKER, Ph.D.,
     Taken at 280 North Old Woodward,
     Birmingham, Michigan,
     Commencing at 10:20 a.m.,
     Tuesday, October 26, 2021,
     Before Leisa M. Pastor, CSR-3500, RPR, CRR.
```

Fortz Legal Support

www.FortzLegal.com

844.730.4066



Page 18

1 A. Correct.
2 Q. And can you tell me what that system involves?
3 A. That systems involves an LCME mandated committee which
4    is the promotions committee, and a subcommittee of
5    that committee which is the professionalism committee.
6 Q. Now, you used some initials or an acronym at the
7    beginning of that sentence, LCME?
8 A. Yes.
9 Q. Can you please tell me what that stands for?
10 A. Yes, liaison committee of medical education. It's the
11    accrediting body for the MD program.
12 Q. And so that is outside the university?
13 A. Correct.
14 Q. Okay. And the promotions committee's responsibility
15    with respect -- what does it involve with respect to
16    misconduct?
17 A. It oversees and is responsible for exploring the
18    conduct of all medical students. It is the entity
19    that actually officially, how should I put this,
20    officially graduates students. It is that entity that
21    acts, officially says that students have fulfilled all
22    requirements for graduation, including professionals.
23 Q. And when a student fails to meet those standards or
24    engages in serious misconduct, is it the promotions
25    committee that determines whether or not they will

Page 19

1    either remain in school or can continue their
2    education?
3         MS. HARDY: Objection, form.
4 A. Correct.
5 BY MR. FLORES:
6 Q. How many people are on the promotions committee?
7 A. I believe -- I believe that there are four chair
8    positions. I believe that there are five faculty
9    positions, and these are -- these are voting members,
10    and I believe that there may be five or six student
11    members of the committee.
12 Q. How many nonvoting members of the committee are there?
13 A. Let me go back. The committee chair is a voting
14    member when there's a tie in the vote and only at that
15    time.
16         The other participants, the nonvoting
17    members, it's -- it changes. The number of people who
18    are actually participating changes.
19 Q. And that, in some ways, depends on how many people are
20    actually able to attend a particular meeting; is that
21    correct?
22         MS. HARDY: Objection, form.
23 A. Yes, who's available, who's germane to the discussion.
24 BY MR. FLORES:
25 Q. Okay. And do the students have a vote in that

Page 20

1    committee?
2 A. They do.
3 Q. Do all of the students have a vote?
4 A. All the students that are assigned to the committee
5    have a vote, yes.
6 Q. Okay. And can you tell me you were the chairman of
7    the promotions committee when my client's case was
8    considered; is that correct?
9 A. Correct.
10 Q. How did the promotions committee get my client's case
11    for consideration?
12 A. The professionalism committee made a recommendation
13    from their committee on me and recommended that the
14    case be sent to the promotions committee.
15 Q. When the professionalism committee -- and now I'm just
16    asking you a general question, when they generally
17    send a case to the promotions committee, does it
18    always come with a recommendation?
19 A. Usually, it does. It becomes the promotions committee
20    because -- promotions committee has -- has all
21    dispositions at its disposal and the -- and
22    professionalism committee does not.
23 Q. So what are the possible outcomes that the promotion
24    committee can decide on?
25 A. Full spectrum.

Page 21

1 Q. Just can you give me a list of those?
2 A. Yes. It could -- it could -- remediation, it could be
3    citation, it could be -- it could be recommendations
4    for dismissal, and again, the difference between the
5    professionalism committee and the promotions
6    committee, the promotions committee has the ability to
7    dismiss a student. They're the only committee that
8    has that ability.
9 Q. Can you tell me what you mean when you say -- or you
10    use the term "remediation"?
11 A. A plan for a remediation, an individual comes to the
12    promotions committee for many, many different reasons,
13    beyond professionalism and academic concerned. Once
14    they do come to promotions committee, they are --
15    their full academic record and everything that's been
16    done to date is actually at the disposal of that
17    committee.
18 Q. So am I correct in understanding that a student who
19    was performing poorly academically could be ordered by
20    the promotions committee to undertake, you know, an
21    extra year's medical education or repeating certain
22    courses or engaging in -- in some other type of action
23    to fix the problem that brought them in front of the
24    promotions committee?
25 A. Correct.

Page 30

1 referred it back to the professionalism committee?
2 A. Interesting. Not to my recollection. Not -- not that
3 sequence.
4 Q. Okay. Have you ever served on the professionalism
5 committee?
6 A. I have not.
7 Q. Have you ever attended any meetings of the
8 professionalism committee?
9 A. I have not.
10 Q. And have you ever observed a hearing of that
11 committee?
12 A. I have not.
13 Q. Have you ever served in any other capacity other than
14 chairman of the promotions committee?
15 A. I have not.
16 Q. Who selects members of the promotions committee?
17 A. I believe the members of the promotions committee are,
18 and again, I think it's outlined in the document, but
19 I believe they are nominated through the faculty
20 senate.
21 Q. Okay. And they're voted upon by the faculty senate?
22 A. I believe so.
23 Q. Okay. How about the students?
24 A. The students, the process by which -- good question.
25 I think it comes to their -- their body,

Page 31

1 their elect, their body, the student senate, I
2 believe, but --
3 Q. Okay.
4 A. -- as you mentioned, I'm not sure.
5 Q. Okay. That's fine.
6 Have you had -- first of all, are you
7 familiar with Title IX of the federal code?
8 A. Yes.
9 Q. Okay. And what do you understand Title IX to involve
10 itself with?
11 A. Again, I'm -- I'm not an expert, okay, so my
12 familiarity is not just that, but I think Title IX is
13 relative to gender based sexual harassment, a big part
14 of that.
15 Q. Okay. Have those kinds of cases come up before your
16 committee?
17 A. No, they have not, not promotions committee.
18 Q. Are title -- to your knowledge, is there a reason why
19 they don't come up to your committee?
20 A. I -- I don't think that that's the -- the process in
21 place. I don't think that that's the, you know, I
22 think there's a parallel or different process for
23 Title IX.
24 Q. Okay. In 2011, you were still working at -- was it
25 Drew University in California?

Page 32

1 A. Correct.
2 Q. Okay. And your position there, could you please tell
3 me what that was?
4 A. Yes. Provost and dean.
5 Q. Okay. Are you familiar with a "Dear Colleague" letter
6 sent in April of 2011 to all colleges and universities
7 that receive federal funds dealing with violence
8 against women on campus and sexual harassment?
9 MS. HARDY: Objection, form.
10 THE WITNESS: Yeah --
11 BY MR. FLORES:
12 Q. If you know.
13 A. No, no, 2011, no.
14 Q. Okay.
15 A. I don't recollect that.
16 Q. Dean Baker, in addition to the university's rules, are
17 there other rules that dictate or control what the
18 promotions committee can do?
19 A. No, again, there -- it's outlined in those documents,
20 and again, it's based on authority as derived from
21 the -- from the LCME and -- and the, I guess the
22 faculty center.
23 Q. Okay. In addition to those, are -- well, let me ask
24 it this way. Are you familiar with how the federal
25 court system works?

Page 33

1 MS. HARDY: Objection, form.
2 A. No.
3 BY MR. FLORES:
4 Q. Are you aware of a difference between the United
5 States District Courts and the United States Courts of
6 Appeal?
7 MS. HARDY: Objection, form.
8 A. No.
9 BY MR. FLORES:
10 Q. If you know.
11 A. No.
12 Q. Are you familiar with a case by the name of Doe versus
13 Baum that was -- the Court of Appeals for the Sixth
14 Circuit, which covers Michigan, issued that ruling on
15 August 1st, 2018; are you familiar with that case?
16 A. No, I'm not.
17 Q. Okay. Do you remember if you ever had a discussion
18 with the general counsel's office about that case?
19 A. I have not had a discussion, no.
20 Q. And do you remember if you've ever received any
21 materials from the office of the general counsel about
22 that case?
23 MS. HARDY: I'd object to the extent that
24 this seems to be bordering on calling for
25 attorney-client communications.

Page 38

1 I've just said, a written statement and the ability
2 to -- and then notify they have the ability to testify
3 at that meeting --
4 Q. Okay.
5 A. -- on their behalf.
6 Q. Let's talk about just the notice of the meeting. In
7 the event that you're talking about a nonacademic
8 misconduct situation, are -- is the student provided
9 with a list of the charges being considered by the
10 promotions committee?
11    MS. HARDY: Objection, form.
12 A. Yes, the -- the student gets the same materials, the
13 same charges or the same recommendation that the
14 committee gets.
15 BY MR. FLORES:
16 Q. Okay. And are those -- what kind of -- what form does
17 that take?
18 A. A written form, and again, it goes to -- speak to when
19 it goes from the professionalism committee to the --
20 to the promotions committee, there's a statement from
21 the professionalism committee as to what their
22 recommendation is, and that recommendation goes both
23 to the -- in cases where it's referred to the
24 promotions committee, it goes both to the student,
25 multiple administrators are cc'd on that

Page 39

1 communication, and it goes to the committee.
2 Q. Okay. When the student provides -- what's the purpose
3 of providing the student with the opportunity to
4 prepare a written statement?
5 A. So that the committee is assured that they get all
6 aspects of the case or at least the -- from the
7 viewpoint of the student. We want to assure that they
8 get the complete viewpoint of the student and any
9 supporting documentation.
10 Q. And is the student permitted to produce information
11 that's new and that was not provided to the
12 professionalism committee?
13 A. Yes.
14 Q. And is that statement provided prior to the date of
15 the scheduled promotions committee?
16 A. Yes.
17 Q. And whose responsibility is it to distribute that
18 among the members of the committee?
19 A. I believe what usually happens is the -- well, two
20 things, one, that the information from the -- from the
21 professionalism committee comes in a communication
22 from the chair. The -- what needs to be done relative
23 to the promotions committee is usually communicated
24 through counselors and student affairs.
25 Q. And in the case of my client, was his counselor

Page 40

1 Loretta Robichaud if you know?
2 A. I -- I think so.
3 Q. But you're not sure?
4 A. No, no. There are four counselors, so I couldn't --
5 Q. Okay. Once the student has turned in his written
6 statement and he shows up or she shows up for the
7 promotions committee meeting, does she -- is the
8 student given the opportunity to read the statement or
9 is it simply submitted in writing prior to the
10 meeting?
11 A. It's submitted in writing prior to the meeting, and
12 the student has the opportunity to make a statement
13 there.
14 Q. Okay. So that would be a statement in addition to the
15 letter because the letter's already been distributed
16 among the committee?
17 A. Correct.
18 Q. Okay. And what's the role of the -- what's the role
19 of the committee vis-à-vis the statement? Do they
20 conduct cross-examination? What's the interplay
21 between the committee and the student appearing before
22 it?
23    MS. HARDY: Objection, form.
24 A. Yes, they ask questions of the students to get
25 clarity.

Page 41

1 BY MR. FLORES:
2 Q. And do you recall the hearing involving my client back
3 in 2018?
4 A. Yes, just generally.
5 Q. Okay. Do you remember if there was any significant
6 questioning of my client during that hearing?
7 A. Yes.
8 Q. And do you remember what those questions focused on?
9 A. The questions in general focused on one, getting your
10 client's viewpoint on some of the things that were
11 submitted and focused on what was perceived as
12 inconsistencies just getting clarification.
13 Q. Was there a transcript made of that exchange between
14 the promotion committee members and my client?
15 A. No, none other than what was reflected in the final
16 notes, reflected in the recommendations of the -- of
17 the committee.
18 Q. And did the committee have an opportunity to question
19 the complainant in the case, Amanda Burton?
20 A. No.
21 Q. Did the committee have an opportunity to question her
22 mother, Pamela Burton?
23 A. No.
24 Q. Did the committee have the opportunity -- withdrawn.
25    Did the committee ask to have any other

Page 42

1 witnesses appear with respect to my client's case?
2 A. No.
3 Q. Is that -- does the committee have that authority?
4 A. They did not exercise that. The deliberations in the
5     committee were based upon what transpired in the
6     committee. The decisions made by the committee was
7     based upon what transpired in the committee.
8 Q. Okay. Do you know if Loretta Robichaud participated
9     in that promotions committee meeting?
10         MS. HARDY: Objection, form.
11 A. She was present.
12 BY MR. FLORES:
13 Q. Did she speak during the meeting?
14 A. Yes, when questions were asked of her.
15 Q. Who asked those questions?
16 A. I -- I can't remember.
17 Q. Do you know if my client was in the room when those
18     questions were asked of Ms. Robichaud?
19 A. I don't remember that. Usually when a student is in
20     the room, the questions are directed toward the
21     student versus anyone else.
22 Q. So questions were directed to Ms. Robichaud other
23     before or after my client appeared before the
24     committee?
25 A. Correct.

Page 43

1 Q. And would that have been during the course of
2     deliberation?
3 A. That was during the committee meeting.
4 Q. Okay. Do you remember Dr. Chadwell being present?
5 A. Yes.
6 Q. And was she asked questions by the committee?
7 A. I don't know specifically, but she might have been.
8 Q. Do you know if she made any statement in support of my
9     client?
10 A. Honestly, I cannot remember.
11 Q. Do you know if Ms. Robichaud made any statements in
12     support of my client?
13 A. Honestly, I can't remember the specific statements
14     that Ms. Robichaud made.
15 Q. Are you aware, Dr. Baker, that at the very beginning
16     when the complaint by Ms. Burton was first made that
17     Dr. Chadwell had a telephone call with Amanda Burton's
18     mother?
19         MS. HARDY: Objection, form.
20 A. Yes.
21 BY MR. FLORES:
22 Q. And do you know that Dr. Chadwell and Ms. Robichaud
23     had numerous conversations regarding my client and the
24     complaint?
25         MS. HARDY: Objection, form.

Page 44

1 A. I -- I am aware that there was a conversation. I
2     don't know the, you know, how many times, when, or any
3     of that.
4 BY MR. FLORES:
5 Q. Okay. And do you remember if either Dr. Chadwell or
6     Ms. Robichaud were asked questions about their direct
7     involvement with either the Burtons or with each
8     other?
9 A. Not to my recollection. Again, most of what
10     transpired in the room was based upon behavior in the
11     room, not the individuals outside of the room.
12 Q. Okay. During the deliberations of the promotions
13     committee, did the case of Larry Nassar come up?
14 A. No, not to my recollection, no.
15 Q. Was there any discussion about the mental health of my
16     client?
17 A. There's always concern about the -- for all of our
18     students. It's always concern about all of the mental
19     health of all of our students. These are -- this is
20     serious proceedings.
21 Q. Certainly. But do you remember if there was
22     discussion as to the mental health of my -- of my
23     client?
24 A. Just the general what the impact might be on any
25     student. There's concern particularly -- all students

Page 45

1     that go through the process, there's concern.
2 Q. Now, the -- the -- if you can, tell me what you
3     remember the nature of the complaints made by
4     Ms. Burton against my client.
5 A. They were similar to what your client has, at least in
6     my recollection, they were similar in terms of
7     accusations in terms of cyberstalking. They were
8     similar to -- to that. But again, I, you know,
9     in -- again, my recollection, my impression of the
10     decisions that were made by the committee were not
11     based upon that.
12         They were based upon what had transpired in
13     the room and the interaction with your client and the
14     members of the committee in that room that day.
15 Q. Okay. So is it your testimony then that the findings
16     and the charges that were considered by the
17     professionalism committee did not play a role in
18     dismissing my client?
19         MS. HARDY: Objection, form.
20 A. No, I think it did play a role, but it reinforced some
21     of the -- some of what was said by the professionalism
22     committee.
23 BY MR. FLORES:
24 Q. Okay. Can you tell me what conduct in the -- before
25     the promotions committee raised concerns about my

Page 46
1 client's ability to remain in school?
2 A. I believe what was stated by the professionalism
3 committee is concerns relative to veracity of
4 statements, to integrity in terms of issues relative
5 to a lack of awareness for what was perceived by that
6 committee as unprofessional behavior.
7 Q. Would it be fair to say that the committee was
8 concerned about efforts to minimize the misconduct?
9 MS. HARDY: Objection, form.
10 A. I -- I don't understand the question.
11 BY MR. FLORES:
12 Q. Sure. Are you familiar with the fact that there were
13 allegations that my client repeatedly texted the
14 complainant even after being told not to text anymore?
15 A. Yes.
16 Q. Are you familiar or do you recall that some of the
17 complaints dealt with an allegation that he had
18 impersonated an attorney?
19 A. Yes.
20 Q. Do you remember that some of the allegations involve
21 sexual harassment related to nude photographs?
22 MS. HARDY: Objection, form.
23 A. Not to my recollection.
24 BY MR. FLORES:
25 Q. Okay.

Page 47
1 A. Not --
2 Q. Let me see if I can refresh your recollection. Do you
3 remember whether the complaint alleged that someone
4 unknown to Ms. Burton had tried to access personal
5 photographs contained on her Snapchat account?
6 A. Yes.
7 Q. And do you remember her testimony before the
8 professionalism committee revolving around the fact
9 that some of those photographs involved nude
10 photographs of her?
11 MS. HARDY: Objection form.
12 A. No, that did not come to the promotions committee to
13 my knowledge.
14 MR. FLORES: Okay, it's 11:30. Why don't
15 we take a ten-minute break and be back here at 11:42?
16 MS. HARDY: Okay, fair enough.
17 (Recess taken at 11:32 a.m.)
18 (On the record at 11:54 a.m.)
19 MR. FLORES: Derek, you're our technology
20 person today, right?
21 VIDEO TECHNICIAN: Yes.
22 MR. FLORES: Could you please publish
23 Exhibit C for the witness?
24 VIDEO TECHNICIAN: Absolutely.
25 MARKED FOR IDENTIFICATION:

Page 48
1 EXHIBIT C
2 11:55 a.m.
3 BY MR. FLORES:
4 Q. And would you work with Dr. Baker to show it to him so
5 that he can kind of scroll through and read the
6 exhibit? It's five pages long.
7 A. Next page, please.
8 Next page, please.
9 Next page, please.
10 Okay, I'm finished.
11 Q. Okay. You can remove the exhibit. If at some point
12 during the questions, Dr. Baker, you need to refresh
13 your recollection about what you just read, just let
14 me know, and we'll have it republished.
15 Do you recognize what that document was,
16 Exhibit -- Exhibit C?
17 A. Yes.
18 Q. And what was that?
19 A. I believe that's the minutes of the professionalism
20 committee.
21 Q. And that would have been in the packet of information
22 you received from the professionalism committee; is
23 that correct?
24 A. I believe so. Yes.
25 Q. And in preparation for the promotion committee

Page 49
1 meeting, do you remember whether you reviewed that
2 material?
3 A. Probably reviewed that material, yes.
4 Q. So that would have been standard for you to review all
5 of the material that the professionalism committee
6 sent you?
7 A. Correct.
8 Q. And does that refresh your recollection as to the
9 nature of the complaint made by Ms. Burton?
10 MS. HARDY: Objection, form.
11 A. Yes, now that I've read it.
12 BY MR. FLORES:
13 Q. Okay. And in your own words, can you tell me what her
14 complaint boiled down to?
15 A. Well, what she's articulated was harassment.
16 Q. And that involved -- what, if any, were the sexual
17 aspects of that harassment?
18 MS. HARDY: Objection, form.
19 A. I guess it's, one, the procurement of pictures would
20 have been, you know, misrepresentation in the attempt
21 to procure pictures that were personal.
22 BY MR. FLORES:
23 Q. And do you recall what the complainant's testimony was
24 with respect to how it made her feel?
25 MS. HARDY: Objection, form.

Page 50

1  A. No, except for whatever she said in the document.
2  BY MR. FLORES:
3  Q. Okay. But you don't have any independent recollection
4     of what she said?
5  A. No.
6  Q. Is it fair to say that Ms. Burton and Mr. Eid had very
7     different perspectives on what had taken place between
8     them?
9        MS. HARDY: Objection, form.
10 A. Yes. Well, there was some agreement as to their
11    interaction, but there was some disagreement as to
12    what had taken place between them, yes.
13 BY MR. FLORES:
14 Q. Okay. And ultimately, who did the professionalism
15    committee believe was telling the truth?
16       MS. HARDY: Objection, form.
17 A. Well, one, I was not at the committee.
18 BY MR. FLORES:
19 Q. Okay. So did the committee -- let me ask it this way.
20    When you received the committee's recommendation, they
21    had reached a conclusion; is that correct?
22 A. Correct.
23 Q. And what was their conclusion?
24 A. Their conclusion was stated, I believe there were five
25    points that they -- in their letter, there are five

Page 51

1     points of concern, and again, I think it goes back to
2     concern relative to, one, I've always stated both the
3     habitual lying, right, the lack of veracity, and I
4     guess what I would term maybe lack of contrition
5     that -- the fact that, that, you know, Anthony did not
6     take any ownership for any of the actions.
7  Q. And in light of the fact that there was concern about
8     lying, is it fair to say that the professionalism
9     committee was adopting one of the two versions of the
10    account?
11       MS. HARDY: Objection, form.
12 A. No, again, not -- not having been at the committee, I
13    cannot say, but the focus was not at one versus
14    another. I think the focus was specifically on
15    Anthony, what he did.
16 BY MR. FLORES:
17 Q. Is it fair to say that the professionalism committee
18    did not believe Anthony Eid's statements?
19       MS. HARDY: Objection, form.
20 A. It appears from what they said in that document, the
21    minutes, that there are multiple statements that they
22    did not believe, yes.
23 BY MR. FLORES:
24 Q. Okay. And subsequent to that hearing, you also held a
25    hearing involving my client before the promotions

Page 52

1     committee, and did the promotions committee come to a
2     conclusion whether or not my client was telling the
3     truth?
4        MS. HARDY: Objection, form.
5  A. So there were -- there was similar concerns within the
6     promotions committee. There were many
7     inconsistencies, and the discussions actually
8     reflected that concern.
9  BY MR. FLORES:
10 Q. But the discussion did not have a -- the promotion
11    committee did not have an opportunity to hear directly
12    from Ms. Burton, did they?
13 A. No, nor did they request it, either.
14 Q. So there was no opportunity to ask her questions and
15    determine whether she was telling the truth?
16       MS. HARDY: Objection, form.
17 A. Correct, but the focus was on -- was on Anthony, not
18    on her, not on the -- it was not a trial. It was
19    really -- the focus was on his specific behavior.
20 BY MR. FLORES:
21 Q. Is it your testimony then that it would not have made
22    a difference if you had found out that Amanda Burton
23    had lied about the impersonation of the attorney and
24    had created those documents herself and provided them
25    to the professionalism committee? Are you telling me

Page 53

1     that wouldn't have made a difference?
2        MS. HARDY: Objection, form.
3  A. It was -- and again, it wasn't -- the focus was not in
4     the promotions committee on her testimony or -- at
5     all. The focus was on -- again -- when you look at
6     what was stated, I believe my impression is that the
7     meeting focused on the fact that it was unlikely,
8     unlikely that Anthony did not have something to do
9     with those statements including the letters sent by
10    the lawyer. It is highly unlikely, independent of
11    who -- who sent it.
12       So -- so again, I don't -- I don't believe
13    that the questioning was her statement versus his. It
14    was his behavior and his statements relative to some
15    of the questions.
16 Q. But Doctor, the whole reason Anthony was before your
17    committee was because of the allegations made by
18    Ms. Burton; is that right?
19 A. Correct.
20 Q. Okay. So if Ms. Burton had not made those allegations
21    and the professionalism committee didn't believe them,
22    would there have been a presentation before the
23    promotions committee?
24       MS. HARDY: Objection, form.
25 BY MR. FLORES:

Page 54
1  Q. Let me simplify it for you.
2  A. Yes.
3  Q. If the promotions committee thought Amanda Burton was
4     lying through her teeth, what would have happened
5     during that stage if they believed Anthony was telling
6     the truth, Amanda was lying? Do you have a -- based
7     on your experience, do you have an opinion based on
8     what the professionalism committee would have done?
9          MS. HARDY: Objection form.
10 A. So I can't speak for other people.
11 BY MR. FLORES:
12 Q. I understand.
13 A. I can't speak for other people. Her -- her testimony,
14    her allegations were not germane to much of the
15    deliberation in that room. The focus was on Anthony's
16    behavior and his statements. It didn't matter if
17    somebody else did something else, didn't matter,
18    they're two people. The focus was really, and the
19    concern really was on Anthony's behavior, some -- some
20    very big inconsistencies, and the fact that at least
21    during the committee hearing, it appeared and the
22    impression was from -- from the members of the
23    committee that he was taking no responsibility for any
24    of his decisions or behaviors.
25 Q. Dr. Baker, is it fair to say that Anthony's

Page 55
1     explanation for why he made contact with Amanda Burton
2     was that his accounts, both bank accounts and computer
3     accounts were being accessed without authorization?
4  A. Yes.
5  Q. And would you agree that he had a right to try to fix
6     that problem?
7  A. Yes.
8  Q. And the complainant in this case challenged that
9     notion; is that correct?
10 A. When you say challenge, what do you mean?
11         MS. HARDY: Objection.
12 BY MR. FLORES:
13 Q. Well, the complainant's position was that she did not
14    believe that Anthony was telling the truth and that
15    that's the reason why he was contacting her?
16 A. Yes.
17         MS. HARDY: Objection.
18         MR. FLORES: Okay.
19         MS. HARDY: Form.
20         MR. FLORES: All right, let's move on. If
21    you would, please publish Exhibit D for Dr. Baker.
22         MARKED FOR IDENTIFICATION:
23         EXHIBIT D
24         12:14 p.m.
25 BY MR. FLORES:

Page 56
1  Q. And if you would go down to the first page. If you
2     would read that portion that's currently displayed to
3     yourself and let me know when you're done, thanks.
4  A. Next page, please.
5  Q. Doctor, if I may, could I direct you to page 3 and
6     section 6?
7  A. Yes.
8  Q. And then if you would show him the very last page and
9     just take a look at the very end, the last sentence.
10         Okay, you can -- are you done?
11 A. Yes.
12 Q. Okay. You can remove the exhibit.
13         Do you recognize that document, Dr. Baker?
14 A. I believe I read it's the Student Code of Conduct.
15 Q. But do you recognize the changes that that document
16    contains from the standard Student Code of Conduct due
17    process rules?
18 A. Not particularly, no.
19 Q. Okay. Did you observe at the beginning of the
20    document that the purpose of the document was to
21    respond to the case and the decision by the Court of
22    Appeals in Doe versus Baum?
23 A. Yes.
24 Q. And is it fair to say that section 6 lays out how
25    cross-examination would be done under these interim

Page 57
1     rules?
2          MS. HARDY: Objection, form, the document
3     speaks for itself. It's not...
4  BY MR. FLORES:
5  Q. Did you see that? Did you read that? Did you
6     understand that as far as section 6?
7          MS. HARDY: Objection, form.
8  BY MR. FLORES:
9  Q. You still need to answer the question, Doctor.
10 A. Yeah, so I read it. I've read it. Like I said, I've
11    read it.
12 Q. Okay.
13 A. My understanding, yeah.
14 Q. And the document says that the interim guidelines are
15    effective as of December 7th, 2018. Was that before
16    or after the professionalism committee met in the --
17    to discuss my client's case?
18 A. I believe it was -- and again, I don't know the exact
19    date; it's probably before.
20 Q. Okay. Was it before the promotions committee met?
21 A. Yes, it was.
22 Q. Okay. Do you remember seeing any information in the
23    professionalism packet or file that was sent to the
24    promotions committee that set out information based on
25    the cross-examination of Amanda Burton?