EXHIBIT 28

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE EASTERN DISTRICT OF MICHIGAN

JOHN PLAINTIFF,
Plaintiff,
vs. Case No. 2:20-cv-11718-GAD-DRG

WAYNE STATE UNIVERSITY, WAYNE STATE UNIVERSITY SCHOOL OF MEDICINE, NICOLINA CAMAJ, MARGIT CHADWELL, MATTHEW JACKSON, RICHARD S. BAKER, R. DARIN ELLIS, in their individual and official capacities, jointly and severally,
Defendants.

_____________________________________

The Remote Zoom Videoconference Deposition of
RICHARD S. BAKER, Ph.D.,
Taken at 280 North Old Woodward,
Birmingham, Michigan,
Commencing at 10:20 a.m.,
Tuesday, October 26, 2021,
Before Leisa M. Pastor, CSR-3500, RPR, CRR.

FORTZ Legal

Fortz Legal Support
www.FortzLegal.com
844.730.4066



Page 18

**A. Correct.**
Q. And can you tell me what that system involves?
**A. That systems involves an LCME mandated committee which is the promotions committee, and a subcommittee of that committee which is the professionalism committee.**
Q. Now, you used some initials or an acronym at the beginning of that sentence, LCME?
**A. Yes.**
Q. Can you please tell me what that stands for?
**A. Yes, liaison committee of medical education. It's the accrediting body for the MD program.**
Q. And so that is outside the university?
**A. Correct.**
Q. Okay. And the promotions committee's responsibility with respect -- what does it involve with respect to misconduct?
**A. It oversees and is responsible for exploring the conduct of all medical students. It is the entity that actually officially, how should I put this, officially graduates students. It is that entity that acts, officially says that students have fulfilled all requirements for graduation, including professionals.**
Q. And when a student fails to meet those standards or engages in serious misconduct, is it the promotions committee that determines whether or not they will

Page 19

either remain in school or can continue their education?
MS. HARDY: Objection, form.
**A. Correct.**
BY MR. FLORES:
Q. How many people are on the promotions committee?
**A. I believe -- I believe that there are four chair positions. I believe that there are five faculty positions, and these are -- these are voting members, and I believe that there may be five or six student members of the committee.**
Q. How many nonvoting members of the committee are there?
**A. Let me go back. The committee chair is a voting member when there's a tie in the vote and only at that time.**
**The other participants, the nonvoting members, it's -- it changes. The number of people who are actually participating changes.**
Q. And that, in some ways, depends on how many people are actually able to attend a particular meeting; is that correct?
MS. HARDY: Objection, form.
**A. Yes, who's available, who's germane to the discussion.**
BY MR. FLORES:
Q. Okay. And do the students have a vote in that

Page 20

committee?
**A. They do.**
Q. Do all of the students have a vote?
**A. All the students that are assigned to the committee have a vote, yes.**
Q. Okay. And can you tell me you were the chairman of the promotions committee when my client's case was considered; is that correct?
**A. Correct.**
Q. How did the promotions committee get my client's case for consideration?
**A. The professionalism committee made a recommendation from their committee on me and recommended that the case be sent to the promotions committee.**
Q. When the professionalism committee -- and now I'm just asking you a general question, when they generally send a case to the promotions committee, does it always come with a recommendation?
**A. Usually, it does. It becomes the promotions committee because -- promotions committee has -- has all dispositions at its disposal and the -- and professionalism committee does not.**
Q. So what are the possible outcomes that the promotion committee can decide on?
**A. Full spectrum.**

Page 21

Q. Just can you give me a list of those?
**A. Yes. It could -- it could -- remediation, it could be citation, it could be -- it could be recommendations for dismissal, and again, the difference between the professionalism committee and the promotions committee, the promotions committee has the ability to dismiss a student. They're the only committee that has that ability.**
Q. Can you tell me what you mean when you say -- or you use the term "remediation"?
**A. A plan for a remediation, an individual comes to the promotions committee for many, many different reasons, beyond professionalism and academic concerned. Once they do come to promotions committee, they are -- their full academic record and everything that's been done to date is actually at the disposal of that committee.**
Q. So am I correct in understanding that a student who was performing poorly academically could be ordered by the promotions committee to undertake, you know, an extra year's medical education or repeating certain courses or engaging in -- in some other type of action to fix the problem that brought them in front of the promotions committee?
**A. Correct.**

Page 30

referred it back to the professionalism committee?
**A. Interesting. Not to my recollection. Not -- not that sequence.**
Q. Okay. Have you ever served on the professionalism committee?
**A. I have not.**
Q. Have you ever attended any meetings of the professionalism committee?
**A. I have not.**
Q. And have you ever observed a hearing of that committee?
**A. I have not.**
Q. Have you ever served in any other capacity other than chairman of the promotions committee?
**A. I have not.**
Q. Who selects members of the promotions committee?
**A. I believe the members of the promotions committee are, and again, I think it's outlined in the document, but I believe they are nominated through the faculty senate.**
Q. Okay. And they're voted upon by the faculty senate?
**A. I believe so.**
Q. Okay. How about the students?
**A. The students, the process by which -- good question.**
**I think it comes to their -- their body,**

Page 31

**their elect, their body, the student senate, I believe, but --**
Q. Okay.
**A. -- as you mentioned, I'm not sure.**
Q. Okay. That's fine.
Have you had -- first of all, are you familiar with Title IX of the federal code?
**A. Yes.**
Q. Okay. And what do you understand Title IX to involve itself with?
**A. Again, I'm -- I'm not an expert, okay, so my familiarity is not just that, but I think Title IX is relative to gender based sexual harassment, a big part of that.**
Q. Okay. Have those kinds of cases come up before your committee?
**A. No, they have not, not promotions committee.**
Q. Are title -- to your knowledge, is there a reason why they don't come up to your committee?
**A. I -- I don't think that that's the -- the process in place. I don't think that that's the, you know, I think there's a parallel or different process for Title IX.**
Q. Okay. In 2011, you were still working at -- was it Drew University in California?

Page 32

**A. Correct.**
Q. Okay. And your position there, could you please tell me what that was?
**A. Yes. Provost and dean.**
Q. Okay. Are you familiar with a "Dear Colleague" letter sent in April of 2011 to all colleges and universities that receive federal funds dealing with violence against women on campus and sexual harassment?
MS. HARDY: Objection, form.
**THE WITNESS: Yeah --**
BY MR. FLORES:
Q. If you know.
**A. No, no, 2011, no.**
Q. Okay.
**A. I don't recollect that.**
Q. Dean Baker, in addition to the university's rules, are there other rules that dictate or control what the promotions committee can do?
**A. No, again, there -- it's outlined in those documents, and again, it's based on authority as derived from the -- from the LCME and -- and the, I guess the faculty center.**
Q. Okay. In addition to those, are -- well, let me ask it this way. Are you familiar with how the federal court system works?

Page 33

MS. HARDY: Objection, form.
**A. No.**
BY MR. FLORES:
Q. Are you aware of a difference between the United States District Courts and the United States Courts of Appeal?
MS. HARDY: Objection, form.
**A. No.**
BY MR. FLORES:
Q. If you know.
**A. No.**
Q. Are you familiar with a case by the name of Doe versus Baum that was -- the Court of Appeals for the Sixth Circuit, which covers Michigan, issued that ruling on August 1st, 2018; are you familiar with that case?
**A. No, I'm not.**
Q. Okay. Do you remember if you ever had a discussion with the general counsel's office about that case?
**A. I have not had a discussion, no.**
Q. And do you remember if you've ever received any materials from the office of the general counsel about that case?
MS. HARDY: I'd object to the extent that this seems to be bordering on calling for attorney-client communications.

Page 38

**I've just said, a written statement and the ability to -- and then notify they have the ability to testify at that meeting --**
Q. Okay.
**A. -- on their behalf.**
Q. Let's talk about just the notice of the meeting. In the event that you're talking about a nonacademic misconduct situation, are -- is the student provided with a list of the charges being considered by the promotions committee?
MS. HARDY: Objection, form.
**A. Yes, the -- the student gets the same materials, the same charges or the same recommendation that the committee gets.**
BY MR. FLORES:
Q. Okay. And are those -- what kind of -- what form does that take?
**A. A written form, and again, it goes to -- speak to when it goes from the professionalism committee to the -- to the promotions committee, there's a statement from the professionalism committee as to what their recommendation is, and that recommendation goes both to the -- in cases where it's referred to the promotions committee, it goes both to the student, multiple administrators are cc'd on that**

Page 39

**communication, and it goes to the committee.**
Q. Okay. When the student provides -- what's the purpose of providing the student with the opportunity to prepare a written statement?
**A. So that the committee is assured that they get all aspects of the case or at least the -- from the viewpoint of the student. We want to assure that they get the complete viewpoint of the student and any supporting documentation.**
Q. And is the student permitted to produce information that's new and that was not provided to the professionalism committee?
**A. Yes.**
Q. And is that statement provided prior to the date of the scheduled promotions committee?
**A. Yes.**
Q. And whose responsibility is it to distribute that among the members of the committee?
**A. I believe what usually happens is the -- well, two things, one, that the information from the -- from the professionalism committee comes in a communication from the chair. The -- what needs to be done relative to the promotions committee is usually communicated through counselors and student affairs.**
Q. And in the case of my client, was his counselor

Page 40

Loretta Robichaud if you know?
**A. I -- I think so.**
Q. But you're not sure?
**A. No, no. There are four counselors, so I couldn't --**
Q. Okay. Once the student has turned in his written statement and he shows up or she shows up for the promotions committee meeting, does she -- is the student given the opportunity to read the statement or is it simply submitted in writing prior to the meeting?
**A. It's submitted in writing prior to the meeting, and the student has the opportunity to make a statement there.**
Q. Okay. So that would be a statement in addition to the letter because the letter's already been distributed among the committee?
**A. Correct.**
Q. Okay. And what's the role of the -- what's the role of the committee vis-à-vis the statement? Do they conduct cross-examination? What's the interplay between the committee and the student appearing before it?
MS. HARDY: Objection, form.
**A. Yes, they ask questions of the students to get clarity.**

Page 41

BY MR. FLORES:
Q. And do you recall the hearing involving my client back in 2018?
**A. Yes, just generally.**
Q. Okay. Do you remember if there was any significant questioning of my client during that hearing?
**A. Yes.**
Q. And do you remember what those questions focused on?
**A. The questions in general focused on one, getting your client's viewpoint on some of the things that were submitted and focused on what was perceived as inconsistencies just getting clarification.**
Q. Was there a transcript made of that exchange between the promotion committee members and my client?
**A. No, none other than what was reflected in the final notes, reflected in the recommendations of the -- of the committee.**
Q. And did the committee have an opportunity to question the complainant in the case, Amanda Burton?
**A. No.**
Q. Did the committee have an opportunity to question her mother, Pamela Burton?
**A. No.**
Q. Did the committee have the opportunity -- withdrawn.
Did the committee ask to have any other

Page 42

witnesses appear with respect to my client's case?
**A. No.**
Q. Is that -- does the committee have that authority?
**A. They did not exercise that. The deliberations in the committee were based upon what transpired in the committee. The decisions made by the committee was based upon what transpired in the committee.**
Q. Okay. Do you know if Loretta Robichaud participated in that promotions committee meeting?
MS. HARDY: Objection, form.
**A. She was present.**
BY MR. FLORES:
Q. Did she speak during the meeting?
**A. Yes, when questions were asked of her.**
Q. Who asked those questions?
**A. I -- I can't remember.**
Q. Do you know if my client was in the room when those questions were asked of Ms. Robichaud?
**A. I don't remember that. Usually when a student is in the room, the questions are directed toward the student versus anyone else.**
Q. So questions were directed to Ms. Robichaud other before or after my client appeared before the committee?
**A. Correct.**

Page 43

Q. And would that have been during the course of deliberation?
**A. That was during the committee meeting.**
Q. Okay. Do you remember Dr. Chadwell being present?
**A. Yes.**
Q. And was she asked questions by the committee?
**A. I don't know specifically, but she might have been.**
Q. Do you know if she made any statement in support of my client?
**A. Honestly, I cannot remember.**
Q. Do you know if Ms. Robichaud made any statements in support of my client?
**A. Honestly, I can't remember the specific statements that Ms. Robichaud made.**
Q. Are you aware, Dr. Baker, that at the very beginning when the complaint by Ms. Burton was first made that Dr. Chadwell had a telephone call with Amanda Burton's mother?
MS. HARDY: Objection, form.
**A. Yes.**
BY MR. FLORES:
Q. And do you know that Dr. Chadwell and Ms. Robichaud had numerous conversations regarding my client and the complaint?
MS. HARDY: Objection, form.

Page 44

**A. I -- I am aware that there was a conversation. I don't know the, you know, how many times, when, or any of that.**
BY MR. FLORES:
Q. Okay. And do you remember if either Dr. Chadwell or Ms. Robichaud were asked questions about their direct involvement with either the Burtons or with each other?
**A. Not to my recollection. Again, most of what transpired in the room was based upon behavior in the room, not the individuals outside of the room.**
Q. Okay. During the deliberations of the promotions committee, did the case of Larry Nassar come up?
**A. No, not to my recollection, no.**
Q. Was there any discussion about the mental health of my client?
**A. There's always concern about the -- for all of our students. It's always concern about all of the mental health of all of our students. These are -- this is serious proceedings.**
Q. Certainly. But do you remember if there was discussion as to the mental health of my -- of my client?
**A. Just the general what the impact might be on any student. There's concern particularly -- all students that go through the process, there's concern.**

Page 45

Q. Now, the -- the -- if you can, tell me what you remember the nature of the complaints made by Ms. Burton against my client.
**A. They were similar to what your client has, at least in my recollection, they were similar in terms of accusations in terms of cyberstalking. They were similar to -- to that. But again, I, you know, in -- again, my recollection, my impression of the decisions that were made by the committee were not based upon that.**
**They were based upon what had transpired in the room and the interaction with your client and the members of the committee in that room that day.**
Q. Okay. So is it your testimony then that the findings and the charges that were considered by the professionalism committee did not play a role in dismissing my client?
MS. HARDY: Objection, form.
**A. No, I think it did play a role, but it reinforced some of the -- some of what was said by the professionalism committee.**
BY MR. FLORES:
Q. Okay. Can you tell me what conduct in the -- before the promotions committee raised concerns about my

Page 46

client's ability to remain in school?
**A. I believe what was stated by the professionalism committee is concerns relative to veracity of statements, to integrity in terms of issues relative to a lack of awareness for what was perceived by that committee as unprofessional behavior.**
Q. Would it be fair to say that the committee was concerned about efforts to minimize the misconduct?
MS. HARDY: Objection, form.
**A. I -- I don't understand the question.**
BY MR. FLORES:
Q. Sure. Are you familiar with the fact that there were allegations that my client repeatedly texted the complainant even after being told not to text anymore?
**A. Yes.**
Q. Are you familiar or do you recall that some of the complaints dealt with an allegation that he had impersonated an attorney?
**A. Yes.**
Q. Do you remember that some of the allegations involve sexual harassment related to nude photographs?
MS. HARDY: Objection, form.
**A. Not to my recollection.**
BY MR. FLORES:
Q. Okay.

Page 47

**A. Not --**
Q. Let me see if I can refresh your recollection. Do you remember whether the complaint alleged that someone unknown to Ms. Burton had tried to access personal photographs contained on her Snapchat account?
**A. Yes.**
Q. And do you remember her testimony before the professionalism committee revolving around the fact that some of those photographs involved nude photographs of her?
MS. HARDY: Objection form.
**A. No, that did not come to the promotions committee to my knowledge.**
MR. FLORES: Okay, it's 11:30. Why don't we take a ten-minute break and be back here at 11:42?
MS. HARDY: Okay, fair enough.
(Recess taken at 11:32 a.m.)
(On the record at 11:54 a.m.)
MR. FLORES: Derek, you're our technology person today, right?
VIDEO TECHNICIAN: Yes.
MR. FLORES: Could you please publish Exhibit C for the witness?
VIDEO TECHNICIAN: Absolutely.
MARKED FOR IDENTIFICATION:

Page 48

EXHIBIT C
11:55 a.m.
BY MR. FLORES:
Q. And would you work with Dr. Baker to show it to him so that he can kind of scroll through and read the exhibit? It's five pages long.
**A. Next page, please.**
**Next page, please.**
**Next page, please.**
**Okay, I'm finished.**
Q. Okay. You can remove the exhibit. If at some point during the questions, Dr. Baker, you need to refresh your recollection about what you just read, just let me know, and we'll have it republished.
Do you recognize what that document was, Exhibit -- Exhibit C?
**A. Yes.**
Q. And what was that?
**A. I believe that's the minutes of the professionalism committee.**
Q. And that would have been in the packet of information you received from the professionalism committee; is that correct?
**A. I believe so. Yes.**
Q. And in preparation for the promotion committee meeting, do you remember whether you reviewed that material?

Page 49

**A. Probably reviewed that material, yes.**
Q. So that would have been standard for you to review all of the material that the professionalism committee sent you?
**A. Correct.**
Q. And does that refresh your recollection as to the nature of the complaint made by Ms. Burton?
MS. HARDY: Objection, form.
**A. Yes, now that I've read it.**
BY MR. FLORES:
Q. Okay. And in your own words, can you tell me what her complaint boiled down to?
**A. Well, what she's articulated was harassment.**
Q. And that involved -- what, if any, were the sexual aspects of that harassment?
MS. HARDY: Objection, form.
**A. I guess it's, one, the procurement of pictures would have been, you know, misrepresentation in the attempt to procure pictures that were personal.**
BY MR. FLORES:
Q. And do you recall what the complainant's testimony was with respect to how it made her feel?
MS. HARDY: Objection, form.

Page 50

**A. No, except for whatever she said in the document.**
BY MR. FLORES:
Q. Okay. But you don't have any independent recollection of what she said?
**A. No.**
Q. Is it fair to say that Ms. Burton and Mr. Eid had very different perspectives on what had taken place between them?
MS. HARDY: Objection, form.
**A. Yes. Well, there was some agreement as to their interaction, but there was some disagreement as to what had taken place between them, yes.**
BY MR. FLORES:
Q. Okay. And ultimately, who did the professionalism committee believe was telling the truth?
MS. HARDY: Objection, form.
**A. Well, one, I was not at the committee.**
BY MR. FLORES:
Q. Okay. So did the committee -- let me ask it this way. When you received the committee's recommendation, they had reached a conclusion; is that correct?
**A. Correct.**
Q. And what was their conclusion?
**A. Their conclusion was stated, I believe there were five points that they -- in their letter, there are five**

Page 51

**points of concern, and again, I think it goes back to concern relative to, one, I've always stated both the habitual lying, right, the lack of veracity, and I guess what I would term maybe lack of contrition that -- the fact that, that, you know, Anthony did not take any ownership for any of the actions.**
Q. And in light of the fact that there was concern about lying, is it fair to say that the professionalism committee was adopting one of the two versions of the account?
MS. HARDY: Objection, form.
**A. No, again, not -- not having been at the committee, I cannot say, but the focus was not at one versus another. I think the focus was specifically on Anthony, what he did.**
BY MR. FLORES:
Q. Is it fair to say that the professionalism committee did not believe Anthony Eid's statements?
MS. HARDY: Objection, form.
**A. It appears from what they said in that document, the minutes, that there are multiple statements that they did not believe, yes.**
BY MR. FLORES:
Q. Okay. And subsequent to that hearing, you also held a hearing involving my client before the promotions

Page 52

committee, and did the promotions committee come to a conclusion whether or not my client was telling the truth?
MS. HARDY: Objection, form.
**A. So there were -- there was similar concerns within the promotions committee. There were many inconsistencies, and the discussions actually reflected that concern.**
BY MR. FLORES:
Q. But the discussion did not have a -- the promotion committee did not have an opportunity to hear directly from Ms. Burton, did they?
**A. No, nor did they request it, either.**
Q. So there was no opportunity to ask her questions and determine whether she was telling the truth?
MS. HARDY: Objection, form.
**A. Correct, but the focus was on -- was on Anthony, not on her, not on the -- it was not a trial. It was really -- the focus was on his specific behavior.**
BY MR. FLORES:
Q. Is it your testimony then that it would not have made a difference if you had found out that Amanda Burton had lied about the impersonation of the attorney and had created those documents herself and provided them to the professionalism committee? Are you telling me

Page 53

that wouldn't have made a difference?
MS. HARDY: Objection, form.
**A. It was -- and again, it wasn't -- the focus was not in the promotions committee on her testimony or -- at all. The focus was on -- again -- when you look at what was stated, I believe my impression is that the meeting focused on the fact that it was unlikely, unlikely that Anthony did not have something to do with those statements including the letters sent by the lawyer. It is highly unlikely, independent of who -- who sent it.**
**So -- so again, I don't -- I don't believe that the questioning was her statement versus his. It was his behavior and his statements relative to some of the questions.**
Q. But Doctor, the whole reason Anthony was before your committee was because of the allegations made by Ms. Burton; is that right?
**A. Correct.**
Q. Okay. So if Ms. Burton had not made those allegations and the professionalism committee didn't believe them, would there have been a presentation before the promotions committee?
MS. HARDY: Objection, form.
BY MR. FLORES:

Page 54

Q. Let me simplify it for you.
**A. Yes.**
Q. If the promotions committee thought Amanda Burton was lying through her teeth, what would have happened during that stage if they believed Anthony was telling the truth, Amanda was lying? Do you have a -- based on your experience, do you have an opinion based on what the professionalism committee would have done?
MS. HARDY: Objection form.
**A. So I can't speak for other people.**
BY MR. FLORES:
Q. I understand.
**A. I can't speak for other people. Her -- her testimony, her allegations were not germane to much of the deliberation in that room. The focus was on Anthony's behavior and his statements. It didn't matter if somebody else did something else, didn't matter, they're two people. The focus was really, and the concern really was on Anthony's behavior, some -- some very big inconsistencies, and the fact that at least during the committee hearing, it appeared and the impression was from -- from the members of the committee that he was taking no responsibility for any of his decisions or behaviors.**
Q. Dr. Baker, is it fair to say that Anthony's explanation for why he made contact with Amanda Burton was that his accounts, both bank accounts and computer accounts were being accessed without authorization?

Page 55

**A. Yes.**
Q. And would you agree that he had a right to try to fix that problem?
**A. Yes.**
Q. And the complainant in this case challenged that notion; is that correct?
**A. When you say challenge, what do you mean?**
MS. HARDY: Objection.
BY MR. FLORES:
Q. Well, the complainant's position was that she did not believe that Anthony was telling the truth and that that's the reason why he was contacting her?
**A. Yes.**
MS. HARDY: Objection.
MR. FLORES: Okay.
MS. HARDY: Form.
MR. FLORES: All right, let's move on. If you would, please publish Exhibit D for Dr. Baker.
MARKED FOR IDENTIFICATION:
EXHIBIT D
12:14 p.m.
BY MR. FLORES:

Page 56

Q. And if you would go down to the first page. If you would read that portion that's currently displayed to yourself and let me know when you're done, thanks.
**A. Next page, please.**
Q. Doctor, if I may, could I direct you to page 3 and section 6?
**A. Yes.**
Q. And then if you would show him the very last page and just take a look at the very end, the last sentence.
Okay, you can -- are you done?
**A. Yes.**
Q. Okay. You can remove the exhibit.
Do you recognize that document, Dr. Baker?
**A. I believe I read it's the Student Code of Conduct.**
Q. But do you recognize the changes that that document contains from the standard Student Code of Conduct due process rules?
**A. Not particularly, no.**
Q. Okay. Did you observe at the beginning of the document that the purpose of the document was to respond to the case and the decision by the Court of Appeals in Doe versus Baum?
**A. Yes.**
Q. And is it fair to say that section 6 lays out how cross-examination would be done under these interim rules?

Page 57

MS. HARDY: Objection, form, the document speaks for itself. It's not...
BY MR. FLORES:
Q. Did you see that? Did you read that? Did you understand that as far as section 6?
MS. HARDY: Objection, form.
BY MR. FLORES:
Q. You still need to answer the question, Doctor.
**A. Yeah, so I read it. I've read it. Like I said, I've read it.**
Q. Okay.
**A. My understanding, yeah.**
Q. And the document says that the interim guidelines are effective as of December 7th, 2018. Was that before or after the professionalism committee met in the -- to discuss my client's case?
**A. I believe it was -- and again, I don't know the exact date; it's probably before.**
Q. Okay. Was it before the promotions committee met?
**A. Yes, it was.**
Q. Okay. Do you remember seeing any information in the professionalism packet or file that was sent to the promotions committee that set out information based on the cross-examination of Amanda Burton?