UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

ANTHONY EID, an individual,

        Plaintiff,

   vs.                               Case No. 20-cv-11718

                                          Hon. Gershwin A. Drain

WAYNE STATE UNIVERSITY, et al,    Mag. Judge David R. Grand

        Defendants.

_____

    The Continued Deposition of ANTHONY EID, VOLUME II,

    Taken at 280 North Old Woodward Avenue,

    Suite 400, Birmingham, Michigan,

    Commencing at 9:56 a.m.,

    Tuesday, September 28, 2021,

    Before Lezlie A. Setchell, CSR-2404, RPR, CRR.

Anthony Eid
September 28, 2021

Page 258

1  Snap?
2  A. I'm not sure what I meant at that time except that my
3     Snapchat account had been hacked at the time that I
4     sent that message to her.
5  Q. What did you do to rescue all of your accounts?
6  A. I'm not sure what rescuing all of my accounts meant in
7     that exchange.  Generally to rescue my accounts, I
8     would do things like change my password.  At that
9     point in time, security, account security got a little
10    better where you could do things like put on two-step
11    verification and measures like that which is what I
12    had done to my accounts except for Snapchat.
13 Q. Why hadn't you done it to Snapchat?
14 A. Because that is the first time my Snapchat had been
15    hacked.
16 Q. Well, if all of your other accounts had been hacked,
17    allegedly at least, why wouldn't you take that
18    precaution with your other ones to prevent having the
19    same experience again?
20 A. There are a lot of accounts, you know, and I guess
21    Snapchat just made it through without being changed.
22 Q. So the next sentence in this box on page 45 reads:
23    They somehow logged in through your phone number to
24    get to me, so, those accounts are linked.
25        Where did you get that information?

Page 259

1  A. I thought that Roe was the one that was accessing my
2     Snapchat account, and normally to access a Snapchat
3     account, you either need a user name or a phone
4     number, and I did not believe that Roe had my user
5     name, so, but I know she had my phone number, so, it
6     had to be through my phone number.
7  Q. What information did you have in 2017 that led you to
8     believe that her phone number was being used to hack
9     your Snapchat?
10 A. I didn't have anything specific to make me think that
11    it was her phone number, but I thought it was Roe
12    based on the circumstances of all my accounts being
13    hacked, like the iCloud account, like the Gmail
14    account, like the Capital One accounts.
15 Q. And so without any concrete evidence, you're asking
16    her to change her password so that you can, quote,
17    unlink it and get my account back?
18 A. Yes.
19 Q. And she's saying, Stop, leave me alone?
20 A. Yes.  She said:  No.  Please stop contacting me.
21 Q. Alright.  If the records were established that this
22    exchange occurred in 2018, would you have any basis
23    for disputing that?
24 A. My first meeting with the Promotions Committee was in
25    February of 2018, correct?

Page 260

1  Q. No.  It was in '19.
2  A. Well then, I have my dates wrong.  Well then, this
3     would be around October of 2018, not 2017.
4  Q. Let's go to the last page, 46, of Exhibit Number 30.
5     Again, it's Anthony Eid at the top, and there's a box
6     in which the message reads:  I understand.  I deleted
7     your number until I got it in this investigation
8     report.  I'm going to have to file a lawsuit with the
9     36th District Court for damages.  I will not contact
10    you again, but you may hear from my lawyer if this is
11    not resolved.
12        That message was sent by you to Roe in
13    response to her message, No, please stop contacting
14    me, correct?
15 A. Yes, and that was the last message I had sent to Roe.
16 Q. It's not quite the last because the next one you also
17    sent, correct?
18 A. No.
19 Q. It reads:  Hi.  My lawyer told me he emailed you
20    yesterday.  Take a look and let me know what you wanna
21    do.  I'm open to a better resolution.  Thanks.
22 A. No.  As I stated, that last message that starts with
23    "I understand" is the last message I sent to her.
24 Q. Alright.  So let's focus on the message right below
25    the "I understand" message which refers to threatening

Page 261

1     her with a 36th District Court action and moving for
2     damages and the lawyer, you may hear from my lawyer.
3     Are you denying under oath that you sent the message
4     that follows immediately after the one referring to
5     the 36th District Court, quote:  Hi.  My lawyer told
6     me he emailed you yesterday.  Take a look and let me
7     know what you wanna do.  I'm open to a better
8     resolution.  Thanks.
9  A. Yes.  I did not send that message.
10 Q. So do you have any theory or idea how such a message
11    exists?
12 A. Well, I'm not sure if its exists because it says text
13    message there, and these messages were sent through
14    iMessage.  The fact that it says text message there in
15    that message, looks like they are two duplicate
16    messages there, right, one that says Friday, 6:26 p.m.
17    and one that says text message but they're the same
18    message.
19 Q. They could have been sent through iMessage and through
20    text message, correct?
21 A. I do not believe that's how iMessage works, no.  All
22    of the other messages were sent through iMessage.
23 Q. So that's the only theory you can offer as to how this
24    message is not one that you sent?
25 A. Well, all I know is I didn't send it.  I don't really

Page 270

1  damages and made a reference to your lawyer?
2  A. Well, no, I did not say that in here.
3  Q. Why did you leave that out?
4  A. I didn't think it was relevant to this, and at that
5     time, I also didn't have those messages anymore, so, I
6     was going off the best of my recollection, which is
7     what it says.
8  Q. Those are more recent than the 2016 and '17 messages.
9     In fact, they're almost immediately prior to the time
10    you draft and submit this statement, correct?
11 A. Yes.
12 Q. You couldn't remember them?
13 A. Everything I put in this statement was true.  If there
14    was communication between these times, it was
15    infrequent with months between them, which it was, and
16    then in the next paragraph, I said that I did have
17    communication on October 27th.
18 Q. Let's proceed on.  You acknowledge in your statement
19    that you had considered going to the police and the
20    university but you did not, correct, to complain about
21    Roe?
22 A. Yes.
23 Q. Okay.  So let's go to 216, second full paragraph.  So
24    you write in the first line of the second full
25    paragraph, I take full responsibility for the text

Page 271

1  messages/Facebook messages that were sent to blank,
2  and that's Roe, right, where the redacted black mark
3  is?
4  A. Yes.
5  Q. Alright.  I deeply regret how this incident has taken
6     place.  I understand that I lied to this person about
7     many things, and I'm very sorry about that.  I never
8     had a lawyer like I stated.  I did not -- I did in the
9     messages, and while I did consider suing for damages
10    in civil court regarding this issue, I never did go to
11    file in court for any such damages.
12         So let's stop there before we proceed.
13    Alright.  So you'd clearly read the text and Facebook
14    messages that were in dispute because you were taking
15    full responsibility for them, correct?
16 A. I only saw the ones that Camaj showed to me during our
17    meeting.
18 Q. Okay.  And so that alone was enough to cause you to
19    say, I take full responsibility for them, and I deeply
20    regret how this incident has taken place?
21 A. Well, I believe in taking responsibility for your
22    actions, and the Student Code of Conduct for the
23    university states that students who take
24    responsibility for their actions and show a sign of
25    remorse, it's in the Code of Conduct that that is what

Page 272

1  they prefer of students.
2  Q. Okay.  So that's what you thought would make you look
3     good to say that?
4  A. No.  I think it's true.  I do take responsibility for
5     the ones that I saw from Camaj.
6  Q. And you deeply regret those text messages and Facebook
7     messages?
8  A. Yes.  In retrospect, I wish I would have gone to the
9     police from the beginning and let them figure it out
10    instead of trying to figure it out myself.
11 Q. Alright.  And you regret the fact that you lied to
12    Roe, correct?
13 A. Yes.  Again, I wish I would have gone about this
14    differently in retrospect and went to the police from
15    the beginning.
16 Q. And you recognized that the conduct that you displayed
17    with Roe during your dialogue with her represents a
18    major character flaw, correct?
19 A. No, I wouldn't say it's a major character flaw.  I
20    would say I was trying to protect myself from being
21    hacked, having my identity stolen.  I was really
22    scared for, you know, my personal information at the
23    time.  I thought that this person might have my
24    address, so, I was scared.
25 Q. Let's look at your own writing, second full paragraph,

Page 273

1  page 216.  You write in the middle of the page, quote:
2  This represents a major character flaw that I know I
3  feel terribly about.  I promise that I'll be working
4  on myself to fix this flaw through deep personal self
5  reflection and perhaps professional help if deemed
6  necessary.
7         You wrote those words, correct?
8  A. I did.
9  Q. And you acknowledge that your conduct constituted a
10    major character flaw?
11 A. No, I don't think it did.  That's what I wrote, I
12    understand, but I don't think it actually was a major
13    character flaw.  It was wrong and I wish I would have
14    went about it differently in retrospect, like I said,
15    but a deep character flaw, no.
16 Q. Why did you write those words?  It's actually major,
17    not deep.
18 A. Major character flaw.  I think the Student Code of
19    Conduct makes accommodations for students who take
20    responsibility for their actions.  I didn't know
21    exactly what I was being accused of at the time, so, I
22    thought this would be the best way to take
23    responsibility for my actions and be able to move on
24    with my medical school studies.
25 Q. So those were insincere words?

Anthony Eid
September 28, 2021

Page 274

1  A.  No, I wouldn't say they were insincere, but I don't
2      think my actions represent a major character flaw.
3  Q.  Well, would you agree that the Student Code of Conduct
4      wants people to truly take and genuinely take
5      responsibility for their actions, not just to use
6      words that they later disassociate themselves from;
7      they expect actions, not just words?
8  A.  I think in all of my statements, I have a plethora of
9      actions that I would have taken to solve this issue,
10     and if you read the other statements that I submitted
11     to the Promotions or the Professionalism Committee,
12     those actions are listed.
13 Q.  Alright.  So let's go to the third full paragraph of
14     Exhibit Number 6, page 216.  Another regret you
15     express is that you should have taken the matter up
16     with proper authorities such as the police, Apple, and
17     IT.  So you didn't go to the police as we've
18     established, correct?
19 A.  Yeah, at that point I had not.
20 Q.  Okay.  And you had not gone to Apple as of that point,
21     correct?
22 A.  Correct.
23 Q.  Even though you'd represented to Roe that you had?
24 A.  Correct.
25 Q.  Okay.  So in terms of the lies that you had told Roe,

Page 275

1      you misrepresented having gone to the police, you
2      misrepresented having a lawyer, you misrepresented
3      having gone to Apple and gotten the information you
4      were then sending her to convince her to give up her
5      password and allow you into her computer?
6  A.  No, I never tried to get into her computer or
7      attempted to get into her computer.
8  Q.  How were you going to, quote, unlink your two accounts
9      if you did not get access to her computer once she
10     gave up her ID and password?
11 A.  In any of those messages, there was never any attempt
12     or want to get into her computer.
13 Q.  Well, you would have had to have gotten -- the reason
14     you wanted the password and user ID was to get on her
15     computer and from your perspective do something to
16     unlink the two?
17 A.  No, that is completely incorrect.
18 Q.  So what would you have done with her iCloud password
19     and ID if she had given it to you?
20 A.  I would have logged in and logged out.
21 Q.  Logged in to her account, right?
22 A.  Yes, the iCloud account.
23 Q.  Let me make a correction.  You're not going to
24     physically be on her computer but you're going to be
25     on her account?

Page 276

1  A.  Yes, that would be correct.
2  Q.  Alright.  So you made misrepresentations to her about
3      what Apple had told you you needed because you hadn't
4      talked to them to be able to unlink the accounts?
5  A.  Yes, because I thought that would fix the hacking
6      issue at the time.
7  Q.  Alright.  And you were trying to get her to give up
8      her ID and password to iCloud so that you could get
9      into the account and telling her that Apple had
10     suggested that that was the resolution to your
11     problem?
12 A.  I think it should be noted that I asked for a
13     temporary password, not the real password, and I also
14     think it should be noted that I offered to meet in
15     person so she could do it as well.
16 Q.  Alright.  Let's go to the next page, 217, second full
17     paragraph.  You write, quote:  In my eyes while these
18     actions do represent a character flaw that I deeply
19     regret --
20         Let's stop right there.  Again, you're
21     admitting to a character flaw, correct?
22 A.  Yes.
23 Q.  Why were you admitting to a character flaw at that
24     point; if you're in the dark with what was at issue,
25     why were you admitting to a character flaw?

Page 277

1  A.  Because the Student Code of Conduct makes
2      accommodations for students who take accountability
3      for their actions and want to fix those actions.  In
4      retrospect, I wanted to fix those, and I would have
5      gone about it a different way by going to the police
6      at the beginning.
7  Q.  Why didn't you say in your statement if this was truly
8      the case, I don't understand what the issue is here,
9      tell me what the concerns are about my conduct, rather
10     than just saying, I have a major character flaw and
11     then on the next page saying I have a character flaw,
12     I deeply regret everything, I deeply regret the
13     textbook and Facebook messages; if you truly had no
14     idea what was being talked about, why didn't you say
15     that in your statement?
16 A.  I wish I would have said that to be honest with you.
17     I think that's the problem of drafting a letter like
18     this after you go into a meeting without knowing why
19     you're going in there while being in a very rigorous
20     medical program, but yeah, I wish I would have done it
21     like that.  I'm not a lawyer, and I didn't know to do
22     that because I was never advised to do something like
23     that.  All I was reading was the Student Code of
24     Conduct at the time and trying to make a statement
25     that was both truthful and that would, you know,

Page 286

1  decision?
2  A.  Well, they did not let me know what was a factor in
3      their decision, which is why I asked for the
4      deliberations before my dismissal so I could know what
5      I was being accused of.
6  Q.  Are you aware of anything that has ever been said by
7      any of the decision-makers in the whole process that
8      would suggest that gender or issues of a sexual nature
9      were a factor in their decision?
10 A.  I think the testimony that was given against me was a
11     major factor in their decision against me.
12 Q.  Can you answer my question?
13 A.  I am answering your question.
14 Q.  So your answer then keeps going back to because there
15     was a reference made to Snapchat and photos on
16     Snapchat, that the decision-makers must have been
17     influenced and relied upon that in making their
18     decision?
19 A.  Do you not think that the decision-makers weren't
20     influenced by the testimony of the witness?
21 Q.  I'm not here to answer your questions first.
22 A.  Hypothetically.
23 Q.  That is a rule of this proceeding.  Secondly, I do not
24     just conclude and I don't think any reasonable person
25     would that everything a witness has to say is going to

Page 287

1      become a factor in a decision.
2          So do you know anything about what the
3      decision-makers said either in writing or verbally
4      that would indicate that gender or issues of a sexual
5      concern were a driver in their decision?
6          MR. ROSSMAN:  Excuse me.  I know you've
7      given me a standing objection, but things are getting
8      quite argumentative right now.  You're making long
9      speeches.  I just ask that you ask questions, and I'm
10     letting you ask and answer this a lot.  So, please,
11     accept his answer and move on.
12 BY MS. HARDY:
13 Q.  I want specifically to know if you have heard anything
14     attributed to one of the decision-makers that supports
15     your conclusion that gender or something of a sexual
16     nature influenced their decision?
17 A.  The decision-makers, I wasn't present for their
18     deliberations.
19 Q.  So the answer is no?
20         MR. ROSSMAN:  Asked and answered.
21         THE WITNESS:  No, the answer is not no.
22 BY MS. HARDY:
23 Q.  Well, what is the answer to my question about the
24     decision-makers?
25 A.  Like I said, I think it's obvious what the

Page 288

1      decision-makers had in mind when making their
2      decisions, and I think it was based on the testimony
3      that was given against me, which I didn't have an
4      opportunity to be asked about or defend myself
5      against.
6  Q.  Alright.  Let's go back to Exhibit 6, 2017 -- strike
7      that.
8          Let's go back to Exhibit 6, page 217 and to
9      the second full paragraph on that page.  We started
10     with the first sentence in which you again acknowledge
11     that your actions constitute a character flaw, but
12     then you proceed and you say, quote:  It is not
13     against the Student Code of Conduct of the medical
14     school to mislead a third-party individual who is not
15     a student at the time the alleged incident took place
16     about a private matter that has nothing to do with the
17     university, medicine, me or my studies.
18         So are you suggesting there that dishonesty
19     if it doesn't involve a student is not an issue of
20     concern for the medical school about someone who seeks
21     to become a future physician with one of their
22     degrees?
23 A.  That's not what the -- that's not what the email sent
24     to me by Ms. Camaj said.  It said that my actions were
25     because of an incident that took place on campus, and

Page 289

1      none of this took place on campus, and that's what I'm
2      referring to here and, you know, I think that if every
3      person who, you know, says a white lie for a good
4      reason were dismissed from medical school, we'd have
5      very few doctors.
6  Q.  What was the white lie that you told?
7  A.  The white lies were that I went to the police or that
8      I had contacted Apple about this issue, but the
9      reasonings were all true.  It was because I thought
10     that this person had unauthorized access to my
11     accounts, and I was sick of having all of my accounts
12     hacked very frequently only after I met her and she
13     had access to the accounts.
14 Q.  Representing you had a lawyer was also a white lie?
15 A.  I never represented I had a lawyer.
16 Q.  Let's go back to the question, though.  I'm trying to
17     understand what you're saying in this sentence.  Do
18     you believe that it's no business of the medical
19     school to be concerned about dishonesty so long as, of
20     one of its medical students, so long as that
21     dishonesty does not involve a student?
22 A.  No.  I think if it involves a student, a faculty
23     member, a patient, someone that, you know, someone
24     that has something regarding the school but this
25     didn't have anything regarding the school.

Page 290

1  Q.  So dishonesty outside the realm of something having to
2      do with the school is in your view none of the
3      business of the medical school when it's making
4      decisions about professionalism?
5  A.  Well, I think it could have something to do with it,
6      but I don't think it did in this case based on the
7      facts of what was going on in this case.
8  Q.  Alright.  Well, just to go back to what you said
9      earlier, Roe was actually a student during the time in
10     which you were dealing with her, at least for a
11     portion of it, correct?
12 A.  For the beginning portion, the 2016 portion.
13 Q.  And '17?
14 A.  I'm not sure when she stopped being a student, but at
15     the time the complaint was filed, at the time when,
16     you know, the text messages in 2018 took place and
17     also that time, 2016, 2017, I wasn't a medical student
18     at that time which I think is another important
19     factor.  I was younger.  Like I said, I do regret it.
20     I wish I would have went about it differently, and I
21     think if I had been mature to the point where I was in
22     medical school and this whole thing had started, I
23     would have gone about it differently which is why I
24     submitted that plan to the committee, but no, I think
25     this was a private matter that really didn't have

Page 291

1      anything to do with the school.
2  Q.  And, therefore, the fact that you were dishonest in
3      connection with Roe, your communications and how
4      you're dealing with her is none of the business of the
5      medical school?
6  A.  It wasn't any of the business of the medical school.
7              MARKED FOR IDENTIFICATION:
8              EXHIBIT 31
9              Text messages with
10             Investigation Report attached
11             11:47 a.m.
12 BY MS. HARDY:
13 Q.  Let's look at Exhibit Number 31.  I'll provide you
14     with a copy.  In your first deposition, you testified
15     on pages 174 and 175 that Camaj showed you most of the
16     text messages, Facebook messages that were a part of
17     the Camaj report which is Exhibit 11 to your first
18     deposition.  You then said that you didn't see
19     everything that was part of the Bates range labeled
20     231 to 241, and you couldn't recall which ones you'd
21     seen and which ones you hadn't.  You didn't have any
22     recollection at that time.
23          So I have isolated in Exhibit 31 the Bates
24     ranges of 231 through 241 which are all part of the
25     Camaj report.  I'd like you to look through them and

Page 292

1      tell me which, if any, of these text messages you did
2      not see, if you have a recall at the time of your
3      dealings with Ms. Camaj.
4  A.  And what you have in front of me, Deposition 31, these
5      are what exactly?
6  Q.  So Exhibit Number 11 to the first deposition is the
7      Camaj report with all the attachments.  You
8      acknowledged under oath that you had seen the Camaj
9      report with most of the attachments but not all of
10     them.  You then testified that you had not seen some
11     portion of the exhibits to that report which are Bates
12     Stamped 231 to 241.  That is what you now have in
13     front of you as Exhibit Number 31.
14 A.  I testified that I had seen the Camaj report when
15     Dr. Jackson showed it to me during our meeting.
16 Q.  Okay.
17 A.  Because I don't think Camaj had written it yet when I
18     first met with her.
19 Q.  That was your January 25 meeting, correct?
20 A.  With Dr. Jackson, yes, it sounds about right.  So when
21     I met with Camaj, she showed me some of these
22     messages, but it certainly wasn't all of them.  I
23     don't think we met for a long enough time for her to
24     show me all of them, but I do not know which ones in
25     particular.  Let me just read through them to make

Page 293

1  sure if I recall anything.
2          MR. ROSSMAN:  For the record, what does
3  Exhibit 11 represent?
4          MS. HARDY:  It's the Camaj report.
5          MR. ROSSMAN:  Why are the Bates Numbers not
6  sequential?  They seem to be missing pages.
7          MS. HARDY:  They're not missing.  They were
8  Bates Stamped out of order, and they're just put in
9  chronological order so that it makes more sense when
10 you're reading through it.
11         MR. ROSSMAN:  So this is the Camaj report?
12         MS. HARDY:  Yes.
13         MR. ROSSMAN:  But the exhibit was created
14 for purposes of becoming an exhibit, and that's why
15 the Bates Numbers are out of order?
16         MS. HARDY:  Well, slightly incorrect but
17 close.  The pages of the Camaj report are all the
18 pages of the actual report.  Nothing's been added or
19 deleted.  There has been some reorganization of the
20 attachments just so that they read in chronological
21 order.
22         MR. ROSSMAN:  Okay.  But if we put these
23 all in order, it would be in chronological Bates
24 Numbering, like this is actually his report produced
25 with his attachments?

Page 298

1  A.   I would not have said I didn't send those.  I did send
2       those messages.  But I would have clarified that, you
3       know, I think once you start putting Snapchat into
4       this, it starts to get a little, you know, starts to
5       get a little different because Snapchat can be
6       suggestive of other actions.  So I would have
7       clarified that this had nothing to do with Snapchat.
8       It was simply a matter of me trying to fix my accounts
9       that had been hacked, and that included the Snapchat
10      account.
11 Q.   What else, if anything, would you have added to your
12      statement or to your comments to Camaj had you looked
13      at 226 and 227 prior to concluding your dealings with
14      her as of December 4, 2018?
15 A.   I think if I would have saw those, I would have done
16      things differently.  I probably would have hired a
17      lawyer at that point to help defend me, for example.
18      I probably would have offered my phone and my laptop
19      to the school at an earlier point than I did if I had
20      known that this was part of the issues at play, and I
21      probably would have been a lot more defensive in my
22      statement to her instead of, you know, what the
23      statement says currently.
24 Q.   Simply because there is a reference to Snapchat that
25      had been brought into the picture?

Page 299

1  A.   I think that changes things.  Not only Snapchat but
2       also about the address thing on 226.
3  Q.   And what would you have said about that; what's the
4       significance of that?
5  A.   I think it is significant.  I don't know exactly what
6       I would have said about it at the time, but like I
7       said, I think it would have caused me to see these
8       actions a little differently, especially when taking
9       into account the type of questioning I was getting
10      from Ms. Camaj.
11 Q.   Alright.  You mentioned just a moment ago that you
12      would have given the university access to your phone
13      and laptop at an earlier point in time?
14 A.   Uh-huh.
15 Q.   When did you give them access to your phone and
16      laptop?
17 A.   I offered to give them access.
18 Q.   Who did you offer and when?
19 A.   It was included in the addendum to the Promotions
20      Committee.
21 Q.   The one that was addressing photos?
22 A.   What was that?
23 Q.   The one in which you were addressing photos in
24      Snapchat?
25 A.   Yes, because that's after I had spoken to Ms. Camaj

Page 300

1       where she told me to address that, and that's what I'm
2       saying, I didn't know about that -- I'm sorry -- I
3       misspoke there, not Ms. Camaj, Ms. Robichaud, my
4       medical school counselor, because I didn't know about
5       that until that late in the process.
6  Q.   Alright.  So up until now we've been talking about
7       what you knew from Ms. Camaj during the investigation?
8  A.   Yes.
9  Q.   But after December 4 when she completes her report and
10      she submits that report to the School of Medicine, you
11      then meet with Dr. Jackson on January 25?
12 A.   That's correct.
13 Q.   In advance of the February 7th Professionalism
14      Committee hearing?
15 A.   Yes.
16 Q.   And you looked through the entire Camaj report at that
17      point, correct?
18 A.   I don't know if it was the entire Camaj report.  I
19      looked through what he had at the time.
20 Q.   Well, you've seen Exhibit 11.  You previously
21      identified this is the document that Dr. Jackson
22      showed you?
23 A.   Well, again, I don't recall 226 or 227 being in that
24      report that Dr. Jackson showed me.
25 Q.   But you knew at that point in time and you did

Page 301

1       address, even if you don't recall 226 or 227, that
2       there had been a concern raised by Roe that you had
3       hacked her Snapchat account?
4  A.   I don't think I had addressed that concern at that
5       point yet.
6  Q.   You addressed that during the Promotions Committee,
7       didn't you?
8  A.   No.
9  Q.   You wrote an addendum to your statement in which you
10      addressed that, that's 19, correct?
11 A.   Yes, but that came much after the Professionalism
12      Committee meeting that you're speaking of now.
13 Q.   What is the date of Exhibit 19?  You don't date it.
14      Do you know when it was drafted?
15 A.   Exhibit 19 is the addendum?
16 Q.   Yes.
17 A.   It was drafted a couple of days before my appeal to
18      the Promotions Committee that would have been either
19      in March or April of 2019.
20 Q.   You certainly knew at this point in time that there
21      was a concern at least raised by Roe or Roe's mother
22      that you had accessed her Snapchat account?
23 A.   No.  The only thing I knew was that Ms. Robichaud in
24      one of our prior meetings prior to that appeal where
25      she was reviewing my appeal which originally did not

Page 302

1  include any reference as you were just suggesting.
2  Ms. Robichaud said I should include a reference to
3  that.
4  Q.  When was that conversation?
5  A.  With Ms. Robichaud?
6  Q.  Yes.
7  A.  It would have been in probably the week preceding the
8     appeal to the Promotions Committee.  This is the
9     appeal after the Professionalism Committee made their
10    decision, and I was appealing their decision.
11 Q.  And that's when you claim you first learned that there
12    had been a concern expressed by Roe about you hacking
13    her Snapchat account?
14 A.  That's correct.
15 Q.  Alright.  Let's go back.
16         Do you know when the university first
17    learned that Roe had a concern about you potentially
18    having hacked her Snapchat account?
19 A.  No.
20 Q.  So you don't know whether or not Ms. Camaj was aware
21    of that before she drafted her report, do you?
22 A.  I don't know if it was then or after the fact.  I know
23    that it wasn't shown to me at that time.
24 Q.  Let's talk for a moment about Loretta Robichaud.  She
25    was a student counselor, correct?

Page 303

1  A.  Yes.
2  Q.  And she was your counselor before the incidents that
3     related to the investigation took place?
4  A.  Yes, she was the counselor for my whole class, the
5     class of 2021.
6  Q.  Okay.  So you understood she wasn't a decision-maker
7     in anything related to what would happen in connection
8     with the complaint filed by Ms. Roe; that wasn't her
9     role and you understood that?
10 A.  She wasn't on the committee.
11 Q.  She wasn't on the committee, and she wasn't anybody
12    who had a say in the outcome?
13 A.  I didn't know if she'd have a say or not.  She was
14    present in the room, so, she might have had a say.
15 Q.  But you don't have any reason to assert that she had
16    any decision-making authority or was in any way part
17    of the decision-making group?
18 A.  No.  I do think she could have been part of the
19    decision-making group or a dialogue that maybe took
20    place.
21 Q.  You're speculating, correct?
22 A.  Well, you asked me if I know, and I'm saying I do not
23    know.
24 Q.  Okay.  Thank you.  So how was your relationship,
25    describe it, with Ms. Robichaud; was it professional?

Page 304

1  A.  Yeah, she was my class counselor.  I thought that
2     she -- you know, I had met with her a couple times
3     prior during my M1 and M2 year.  I always got positive
4     feedback from her regarding school matters.
5  Q.  Did you bring to her attention the situation that you
6     learned about in November, 2018, concerning the Roe
7     complaint, or did she approach you about it?
8  A.  Are you speaking of after the complaint was filed or
9     --
10 Q.  The fact that there was a complaint, the fact that --
11 A.  I didn't talk to her about that.  The first time I
12    heard about the complaint was from Ms. Camaj, not from
13    Ms. Robichaud.
14 Q.  Alright.  So let's focus on Ms. Robichaud.
15 A.  Okay.
16 Q.  What discussions did you have with her about issues
17    related to the Roe complaint; what did they consist
18    of?
19 A.  We met a couple times.  One of those times was with
20    Dr. Chadwell.  Most of the discussion was about
21    process, not about the actual complaint, itself.
22 Q.  Did you have discussions about something other than
23    process that related to the Roe complaint at any point
24    in time with Loretta Robichaud?
25 A.  Well, yes, she told me -- well, yeah, I mean she had

Page 305

1     read my statements that I was getting ready to submit
2     to the committee, both committees, both the
3     Professionalism Committee, the Promotions Committee
4     and the addendum to the Promotions Committee.  She
5     reviewed those documents and gave me advice on what to
6     include or not include, and she also gave me advice on
7     what she thought my chances of success were, and we
8     also talked about the ability to withdraw that I
9     mentioned during my last deposition, and then towards
10    the end, like I stated earlier, she alerted me of the
11    Snapchat photos issue.
12 Q.  Do you have any notes concerning your conversations
13    with Loretta Robichaud?
14 A.  No, I don't.  At one point during one of our meetings,
15    I believe it was the meeting with Dr. Chadwell, I had
16    pulled my phone out to check a message, and she asked
17    me to put my phone away because she didn't want me to
18    record our conversation.
19 Q.  And you did not, correct?
20 A.  I did not record the conversation.
21 Q.  And you didn't record any conversations with Loretta
22    Robichaud, correct?
23 A.  That's correct.
24 Q.  Alright.  So let's go back to She read my statements
25    and provided advice.  Let's start with your

Page 306

1  December 4, 2018 statement that you submitted to
2  Nikolina Camaj.
3  A.  Okay.
4  Q.  What advice did Ms. Robichaud provide on that
5      statement?
6  A.  She did not because I had not spoken with her about it
7      at that point.  I don't believe even the School of
8      Medicine was aware of it at that point because Camaj
9      had not sent it to the School of Medicine yet.
10 Q.  So you didn't first start talking about the Roe
11     complaint with Robichaud until the issue was referred
12     by Nikolina Camaj to Margit Chadwell, correct?
13 A.  That is correct.
14 Q.  Okay.
15 A.  And you guys know, I'm sure you know the meeting times
16     that I had with Ms. Robichaud.  They're all in the
17     university system or in her emails, so, you should be
18     able to find that out pretty easily.
19 Q.  When you met with her, was there anyone else present,
20     or was it just one-on-one?
21 A.  It was just her and I either in her office or in the
22     Student Affairs office, which I believe was -- there
23     was some construction going on, so, it would have been
24     various rooms around that area.
25 Q.  What advice did Ms. Robichaud provide you about

Page 307

1   working through the process in connection with the Roe
2   complaint?
3  A.  She told me to be honest.  She told me honesty was the
4      best way to get this put behind me.  She read my
5      statements and she said she thought they were strong,
6      honest statements.  She said specifically she thought
7      my chances of success was about 50/50.  She told me
8      after Dr. Baker had let me continue on with taking my
9      exams and completing my year two course work, she said
10     that was a very good sign because other people that
11     are before these committees are usually not allowed to
12     do that, depending on the severity of the accusations
13     and yeah, you know, she kind of made it seem like this
14     was something I was going to get past and be able to
15     continue on with my education.
16 Q.  Did she provide any particular input on the content of
17     your statements before the Professionalism or
18     Promotions Committee?
19 A.  Yes, she had read the statements and provided inputs.
20     Specifically I recall with the statements to the
21     Promotions Committee which included, you know, all of
22     my messages, not messages, all of my documents showing
23     that I was hacked, she told me to include those at
24     that time, and she also told me to include the
25     conversations I had had which you brought up with my

Page 308

1   mother previously to that document as well.
2  Q.  Did she make any suggestions about changing the
3      substantive content of your written statement?
4  A.  She said that whenever she would read it, she would
5      give me positive feedback saying it was good.  So she
6      didn't tell me to change anything.  She just said on
7      multiple occasions that she thought the testimony was
8      honest and true.
9  Q.  Okay.  So she didn't at any point in time say write
10     this or change this part of your writing; she just
11     gave you kind of general overall feedback about
12     whether she thought it was good or not good?
13 A.  There were small things she told me to change.  I
14     don't recall what those were off the top of my head at
15     this moment.
16 Q.  Anything of significance?
17 A.  Yeah, she told me to make that addendum, that's pretty
18     significant, and include the explanation for the
19     Snapchat accusation.
20 Q.  When did she tell you to do that?
21 A.  That was in the weeks leading up to my appeal to the
22     Promotions Committee.
23 Q.  So did she specifically read the addendum, which is
24     Exhibit 19 to your first deposition, prior to you
25     submitting it?

Page 309

1  A.  I'm not sure if she read it or not.
2  Q.  Alright.  But she told you to write that to deal with
3      the Snapchat issue?
4  A.  Yes.
5  Q.  Okay.  And to deal with the suggestion that you may
6      have used the Snapchat to access photos of Roe?
7  A.  I don't know if she used that phrase exactly, but she
8      told me about this accusation of photos and Snapchat,
9      and she said I had to address it.
10 Q.  So tell me as best you can recall, since you don't
11     have a writing to memorialize what she said or a
12     recording, what did Loretta Robichaud tell you about
13     the Snapchat allegation and the possibility that you
14     may have been trying to access photos; what were her
15     words?
16 A.  We were sitting in her office, and she said, Anthony,
17     what is this stuff about Snapchat and photos?
18          And then I told her:  I don't know what
19     you're talking about.  What do you mean Snapchat or
20     photos?
21          And she told me that there is an accusation
22     that I tried to get into Roe's Snapchat to obtain
23     photos, and I told her that's the first I'm
24     hearing of it, and I didn't see any evidence to back
25     that suggestion at that time, and she told me, Well,

Page 390

1  Q.  Are there any other facts?
2          MR. ROSSMAN: Asked and answered.
3          THE WITNESS: I think we went over all of
4      the things I would have told the committee already,
5      which are factual things.
6  BY MS. HARDY:
7  Q.  Alright. Let's go to page 21, the paragraph
8      concerning Ms. Blank said that she felt horrified
9      during the two-year period of harassment. Had you
10     heard her testimony on that issue, what would you have
11     wanted the committee to know in your defense?
12 A.  Well, I would have wanted them to know I think she's
13     misrepresenting her own feelings there, and saying
14     that suggests to make it look worse for me.
15 Q.  Is there anything else you would have wanted them to
16     know?
17 A.  That she never communicated feeling horrified to me.
18     The paragraph goes onto say she regularly experienced
19     anxiety due to potentially running into Mr. Eid on
20     campus. I'd like to know why she said that. I'd like
21     to know why she thought her anxiety was due to me and
22     not her own anxiety. You know, I would wonder if she
23     had a doctor tell her that her anxiety was due to me
24     or not. I would go into asking or trying to figure
25     out why she moved to Colorado, if it actually was

Page 391

1      because of me or because of perhaps an opportunity
2      over there.
3          There's, yeah, all of that and much more.
4      I would ask why was she scared, did I say anything to
5      scare her or did I attempt to meet with her after that
6      first initial meeting? I don't think so.
7  Q.  Why did you propose your five-step plan for self
8      improvement?
9  A.  Because Ms. Robichaud instructed me to make a plan to
10     the committee.
11 Q.  You came up with the terms of the plan yourself?
12 A.  Well, Ms. Robichaud had suggested that I should start
13     seeing somebody about this professionally, which I
14     acquiesced to. That's about the psychiatrist. She
15     also offered to meet with me for check-ins on a
16     monthly basis. She also suggested that I write the
17     apology letter, even though I had previously been told
18     not to do that, and as far as number 5 goes, the
19     School of Medicine is very big on reflections as a
20     positive outlook for students. So I thought that
21     would help, too.
22 Q.  So you say you acquiesced to treatment. You didn't
23     think you needed treatment?
24 A.  At that time, no, I didn't think I needed treatment.
25 Q.  Okay. Did you conclude later on that, yes, I do need

Page 392

1      treatment?
2  A.  After I was dismissed and I became mentally ill due to
3      the dismissal, yes.
4  Q.  So prior to the dismissal, you did not feel you were
5      in need of any kind of mental health treatment?
6  A.  The only type of mental health treatment that I would
7      have required was due to the stress and anguish of
8      going through this process.
9  Q.  Apart from that, you felt you were a healthy, whole
10     person?
11 A.  Yes.
12 Q.  Okay. So any statements to the effect that you needed
13     treatment were all false just to appear like you were
14     making concessions to get beyond the pickle you were
15     in?
16 A.  That's not what I said. I didn't say they were false.
17     I already said that at that time when I wrote that, I
18     was experiencing anguish and anxiety due to being
19     accused of something that I didn't do and had no
20     understanding of what I was being accused of.
21 Q.  Okay. The five steps that you committed to take in
22     your self improvement plan, did you think you needed
23     to take any of those, or were those also just because
24     it sounded good?
25 A.  I never said it was because it sounded good. I said

Page 393

1      it's what Ms. Robichaud had told me to include.
2  Q.  Well, but you're the person whose future is at stake?
3  A.  Yes.
4  Q.  And you're writing to explain hopefully in an honest
5      way what you see as having done wrong or being
6      misunderstood, whatever the case may be. Don't you
7      feel you need to be honest about that report?
8  A.  I was honest in the report. There is not one lie here
9      in this report at all. I would have done all of those
10     things if the school had thought I should or even if
11     they didn't think I should after I submitted this, I
12     would have gone on with my medical school education.
13     I would have done all five of them. That's very
14     truthful.
15 Q.  But you didn't acknowledge that those are really
16     necessary things that you needed to do to be a better
17     person; you were just committing to do it if that was
18     going to get you beyond the issue?
19 A.  I put these in here, again -- I mean, I already
20     answered that literally like twice now, two or three
21     times.
22 Q.  But it's still not clear whether or not you felt that
23     those were things you really needed to do for yourself
24     to be a better person as opposed to just telling the
25     School of Medicine what you thought they wanted to

Page 394
1  hear?
2  A.  I don't think I -- I don't think I'm --
3           Can you repeat that question.
4           MS. HARDY:  Can you read it back, please.
5           (The requested portion of the record was
6           read by the reporter at 2:34 p.m. as
7           follows:
8           "Question:  But it's still not clear
9           whether or not you felt that those were
10          things you really needed to do for yourself
11          to be a better person as opposed to just
12          telling the School of Medicine what you
13          thought they wanted to hear?")
14          THE WITNESS:  It's not what I thought they
15      wanted to hear.  It was what they told me to include
16      in the letter.
17 BY MS. HARDY:
18 Q.  But that's the same issue.  Is it genuine that you
19     really recognized the need for self improvement, or is
20     it just saying it because that's going to sound good?
21 A.  I think everybody can use some self improvement.  I'm
22     sitting here today and trying to improve myself every
23     single day, and these steps would help me improve as a
24     person just how they'd help anybody improve as a
25     person.

Page 395
1  Q.  Okay.  Let's turn to the Promotions Committee meeting
2      that was on February 27, 2019.
3  A.  Is that in this binder somewhere?
4  Q.  No.  I'm asking if you recall the date of the meeting.
5  A.  No, I don't recall.
6  Q.  You have no reason to disagree that it was
7      February 27, 2019?
8  A.  The original Promotions Committee meeting?
9  Q.  Yes.
10 A.  I think it was later than that.
11 Q.  You only had one hearing in front of the Promotions
12     Committee, correct?
13 A.  Yes, I had one hearing and an appeal which was not in
14     person.
15 Q.  So the records reflect that the committee meeting was
16     on February 27.  I'll show you Exhibit 5.
17          Do you see the date at the top?
18 A.  Yes, that looks to be correct.
19 Q.  Does that refresh your memory?
20 A.  That doesn't refresh my memory, but it looks to be the
21     date of the hearing.
22 Q.  So let's talk for a moment about your recall of the
23     Promotions Committee hearing.  Do you know who was in
24     attendance?
25 A.  All I remember specifically was Dr. Baker being there

Page 396
1      as well as Ms. Robichaud and Dr. Chadwell.
2  Q.  Okay.
3  A.  In fact, there's one more.  I remember Dr. Waineo
4      being there as well, but most of the other people I
5      had never met before.
6  Q.  Okay.  What do you recall about the meeting in terms
7      of what you had to say, what was asked of you, what
8      other people had to say?
9  A.  I recall trying to make a statement again and
10     Dr. Baker sitting to my left asking me to stop reading
11     the statement saying that the committee already had
12     it.  I remember once again offering copies of my
13     professionalism record, which was an excellent
14     professionalism record, an objective professionalism
15     record that the school administers, offering that to
16     the committee members, which they didn't take.
17          The one question I remember being asked
18     during that meeting was why did -- the question was
19     why did I lie to the Professionalism Committee in
20     which I said I did not lie to the Professionalism
21     Committee and I don't have anything in front of me
22     that says I lied to them, and I asked if they'd be
23     willing to provide me with the notes from the
24     professionalism hearing so I could more adequately
25     address that question.

Page 397
1  Q.  Who asked that question?
2  A.  I believe it was one of the student members.
3  Q.  Was that Brian Sullivan?
4  A.  I have no clue.
5  Q.  Okay.  A person you'd never met before?
6  A.  Yes.
7  Q.  And so you didn't know anything about the person?
8  A.  No.
9  Q.  Alright.  Did they --
10 A.  I may have met them before in my capacity as President
11     of my class, but I did not know the person.  They were
12     not an acquaintance or someone that I had known.
13 Q.  Do you have any other recall of what happened in the
14     Promotions Committee hearing on February 27?
15 A.  It was a very short meeting.  It started late.  There
16     was a lot of snow that day and I had arrived on time,
17     but some of the members had arrived late.  We didn't
18     get started until much later.
19          I remember feeling like they had already
20     made their decision before I had entered the room.
21 Q.  What made you feel that way?
22 A.  The general vibe of when I got in there, you know,
23     people's body language, the expressions on people's
24     faces, which I didn't understand at the time, but now
25     after reading these professionalism hearing minutes

Page 442

```
 1     drive, that she was more than three years later
 2     hacking your bank accounts?
 3  A. She had more information than just at this point.  She
 4     had my approximate address.  She had the information
 5     that was located on my iCloud which included other
 6     personal information such as my driver's license
 7     number, my Social Security card, all of which could be
 8     used to access my Flagstar account.
 9  Q. But you have no basis for contending, any basis in
10     fact that she, in fact, looked at your Social Security
11     Number, looked at your driver's license, looked at any
12     of that stuff or ever used it?
13  A. That's a suspicion and that's what the police are for.
14  Q. And a suspicion over three years after that one
15     contact you had with her and you go to the police?
16  A. Yeah.  I should have gone to the police from the
17     beginning.  I regret that I didn't until late in the
18     process but I only did this on this day because of the
19     new charge that was there on 2-9-19.
20  Q. Let's look at quickly your apology letter, Exhibit 18.
21     You wrote this at the time of the appeal to the
22     Promotions Committee?
23  A. Yes, I was recommended to do this by Ms. Robichaud.
24  Q. It's your words, though, correct; she didn't choose
25     your words for you?
```

Page 443

```
 1  A. She didn't choose my words, but she advised me to take
 2     this course of action.
 3  Q. To apologize for your actions?
 4  A. To apologize, yes.
 5  Q. She didn't tell you what to say, did she?
 6  A. She didn't tell me specifically what to say, but she
 7     said make sure it's a sincere apology, make sure that
 8     you address all the things that the committee might be
 9     suspecting you of doing.
10  Q. Alright.  So was it indeed sincere, or was it only
11     attempting to sound sincere?
12  A. If I was not recommended by Ms. Robichaud to write
13     this letter, I don't think I would have written it.
14     Knowing what I do now, if Burton really did feel that
15     way, well, then I would apologize because I didn't
16     mean to make her feel that way.  At this time I didn't
17     know that, and I wouldn't have written this letter
18     before being recommended to.
19  Q. Did anyone assist you with your appeal to the Provost
20     in writing it?
21  A. No.
22           MS. HARDY:  I need to take a break for a
23     few minutes, and then I will not be too much longer.
24           (Recess taken at 3:57 p.m.)
25           (Back on the record at 4:10 p.m.)
```

Page 444

```
 1           MS. HARDY:  I'd like to go on a
 2     confidential record regarding some issues related to
 3     the medical history.
 4           MR. ROSSMAN:  Yeah, that's fine.
 5           (Confidential record made at 4:10 p.m.)
 6           (End of Confidential record at 4:27 p.m.)
 7                      EXAMINATION
 8  BY MR. ROSSMAN:
 9  Q. This Exhibit Number 34, where is Tolan Park?
10  A. That's right next to the School of Medicine.  It's
11     part of the Wayne Physician Group.
12  Q. The Wayne State University School of Medicine?
13  A. Yes.
14  Q. How did you know to go there?
15  A. Ms. Robichaud had told me to go there and set up the
16     appointment first with Dr. Milan who is their head
17     guy, and then after I saw him, he thought it would be
18     better if I see Amanda who is who I was seeing.
19  Q. Who did you say set up the appointment?
20  A. Ms. Robichaud.
21  Q. That's your counselor?
22  A. Yes.
23  Q. The one who you testified was an advocate?
24  A. Well, that's what I presumed her role to be.
25  Q. And you presumed she was advocating for you when she
```

Page 445

```
 1     sent you to these psychiatrists?
 2  A. That's what I presumed.
 3  Q. Thank you.  Were you at the Tolan Park Outpatient for
 4     any other reason other than the situation at Wayne
 5     State and Ms. Robichaud's recommendation?
 6  A. No.
 7  Q. Did you feel that you could be candid with these
 8     people and it wouldn't be used against you in the
 9     process?
10  A. Well, I expected, you know, normal doctor/patient
11     confidentiality, so yes.
12  Q. That was on April 1, 2019, correct?
13  A. I was there from I believe about February of 2019
14     until my insurance ran out, which was later in the
15     year.
16  Q. And so were you being treated in May of 2019?
17  A. Yes.
18  Q. And May of 2019 is when you sent Exhibit 28, correct,
19     or the email to Jack Sobel according to the date
20     there?
21  A. Yes.
22  Q. There was a document that was attached to that, and
23     you indicated that it wasn't real.  Can you explain
24     that, please?
25  A. Well, not only is it not real but it's not the
```

Anthony Eid
September 28, 2021

Page 478

1  Q. Okay. Before I get to what he said in response to
2     your question, he talked about a hearing?
3  A. Yes.
4  Q. What did he tell you about the hearing?
5  A. He told me that I had to appear before the committee
6     and explain myself in regards to the complaints.
7  Q. Okay. And the complaint which he was going to show
8     you, correct?
9  A. Yes.
10 Q. Okay. And did he tell you anything else in terms of
11    perhaps what you were entitled to, what your rights
12    were, anything of that nature?
13 A. No.
14 Q. Okay. It was simply you're going to show up at this
15    hearing based on this complaint?
16 A. Yes.
17 Q. Okay. So you said a great many things were discussed?
18 A. Uh-huh.
19 Q. And the first thing was procedure. What was the next
20    subject matter that you went into?
21 A. Well, the next matter was the Camaj report.
22 Q. And did he give you a copy of it?
23 A. He let me look at a copy that he had.
24 Q. And this is why I asked earlier, so how were you
25    situated when he gave you the report; where were you

Page 479

1     sitting?
2  A. I was sitting across from his desk at a little like
3     table thing off to the side.
4  Q. You mean a little table disconnected from his desk?
5  A. Yes, disconnected from his desk.
6  Q. So he handed you the report?
7  A. He put it on his desk, and I came up and grabbed it.
8  Q. And you sat down and read it?
9  A. Yeah, I sat down and read, you know, I skimmed over
10    what was in it.
11 Q. Were you given privacy to review this document?
12 A. No.
13 Q. Who else was in the room?
14 A. No one, just myself and Dr. Jackson.
15 Q. And he watched you reading it?
16 A. Yes.
17 Q. What was he doing while you were reading it?
18 A. He was just looking at me.
19 Q. Was he writing any notes or talking?
20 A. Yeah, we, you know, we had small talk back and forth
21    as I was reading it.
22 Q. Who was initiating the small talk?
23 A. Dr. Jackson.
24 Q. Do you remember what he was small talking to you
25    about?

Page 480

1  A. Not exactly. I think it was some unrelated School of
2     Medicine thing.
3  Q. And this is the first you saw this document?
4  A. Yes.
5  Q. And I know we've gone through the document ad nauseam,
6     but when you first saw that document and you started
7     reading it and Dr. Jackson is small talking in your
8     ear, what was going through your mind?
9  A. You know, the main thing going through my mind was,
10    okay, how do I defend myself and how do I put this
11    behind me so it won't affect my school.
12 Q. So you started thinking that then. Did you arrive at
13    a conclusion on the spot?
14 A. Well, I asked him, I asked him what -- I asked him a
15    few things. I asked him if he thought I needed a
16    lawyer or not, and he was very specific that I did not
17    need a lawyer.
18 Q. Talk to me about that. Do you remember the exact
19    words you used when you asked him that question?
20 A. I said: Dr. Jackson, I feel like I'm going to need a
21    lawyer for this.
22 Q. Was this before or after you were done looking at the
23    document?
24 A. This was after.
25 Q. So you took the time to read the whole document as

Page 481

1     much as you could concentrate on the spot, and the
2     first question you asked him was whether you should
3     get a lawyer?
4  A. Yes.
5  Q. And why did you ask that?
6  A. Well, because I thought that having a lawyer might be
7     better for defending myself against false claims.
8  Q. I'm presuming he encouraged that?
9  A. No. He specifically told me not to get a lawyer and
10    said even if I did get a lawyer, they would not be
11    permitted to speak.
12         MS. HARDY: Counsel, I have a question.
13 I've never encountered an exam like this. It's the
14 first in 40 years.
15         MR. ROSSMAN: Like what? Are my questions
16 bad? Is there a problem?
17         MS. HARDY: I don't know what the purpose
18 is of this other than trying to use our dime to create
19 a record so you don't have to write a Declaration.
20         MR. ROSSMAN: We must be working off a
21 different set of Court Rules because the last time I
22 checked, the parties are free to have their lawyers
23 examine them, and it probably should say it in the Dep
24 Notice, too.
25         MS. HARDY: What kind of exam is this; what