**EXHIBIT 30**

831 Fed.Appx. 161
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007.
See also U.S.Ct. of App. 6th Cir. Rule 32.1.
United States Court of Appeals, Sixth Circuit.

Todd COURSER, Plaintiff-Appellant,

v.

MICHIGAN HOUSE OF REPRESENTATIVES;
Kevin Cotter; Tim Bowlin; Brock Swartzle;
Norm Saari; Edward McBroom; Hassan
Beydoun, in their official and individual
capacities, Defendants-Appellees.

Case No. 19-1840
|
FILED October 06, 2020

**Synopsis**
**Background:** Former member of Michigan House of
Representatives brought action against House and several of
its members and officers, alleging numerous state and federal
claims, including violation of the Federal Wiretapping Act
and § 1983 claims for violation of procedural and substantive
due process under the Fourteenth Amendment, arising from
alleged political conspiracy to remove him from office
due to his extramarital affair with another representative.
The United States District Court for the Western District
of Michigan, Gordon J. Quist, Senior District Judge, 404
F.Supp.3d 1125, granted House Defendants' motions to
dismiss, and denied former member's motion for sanctions.
Former member appealed.

**Holdings:** The Court of Appeals, Nalbandian, Circuit Judge,
held that:

former member failed to state claim for fraudulent
misrepresentation against House's general counsel;

former member failed to state claims under § 1983 for
violation of Equal Protection Clause, violation of procedural
due process, violation of substantive due process, or violation
of Fourth Amendment privilege against unreasonable search
and seizure;

former member could not prevail on his claim that House
members and officers violated Michigan's eavesdropping law
by having employee record him;

former member failed to state claim under Computer Fraud
and Abuse Act (CFAA);

former member failed to state claims under Michigan law
for stalking and related conspiracy, tortious interference with
a business relationship, intentional infliction of emotional
distress (IIED), or negligent infliction of emotional distress
(NIED);

former member failed to state a claim for indemnity as a
government employee under Michigan law;

former member failed to state a claim for violation of
Racketeer Influenced and Corrupt Organizations Act (RICO)
or related conspiracy; and

former member failed to state a claim for spoliation of
evidence and thus was not entitled to award of sanctions.


Affirmed.

See also 969 F.3d 604, 822 Fed.Appx. 331.

**Procedural Posture(s):** On Appeal; Motion to Dismiss;
Motion for Summary Judgment; Motion for Sanctions.

**\*167** ON APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE WESTERN DISTRICT OF
MICHIGAN

**Attorneys and Law Firms**

Matthew S. DePerno, DePerno Law Office, Portage, MI, for
Plaintiff-Appellant

Gary P. Gordon, Jason T. Hanselman, Dykema, Lansing, MI,
for Defendant-Appellee

BEFORE: GIBBONS, LARSEN, and NALBANDIAN,
Circuit Judges.


**OPINION**

RICO Bus.Disp.Guide 13,404

**NALBANDIAN**, Circuit Judge.

Parties often raise a large number of claims on appeal. But that does not mean that they should. Especially when, as here, Plaintiff, Todd Courser, spends more time enumerating claims than developing arguments. Despite filing an eighteen-count complaint and moving for sanctions, Courser has still failed to state any claim on which relief can be granted. We **AFFIRM**. [1]

[1]  We note for clarification that nearly every one of Courser's claims fails for multiple reasons. The fact that we may only mention one or two reasons does not mean that additional reasons for dismissal would not be warranted.

**I.**

This court has twice already outlined the relevant facts giving rise to this case in *Courser v. Allard,* 969 F.3d 604 (6th Cir. 2020) and *Gamrat v. McBroom*, 822 Fed.Appx. 331 (6th Cir. 2020). We briefly explain for a third time the facts prompting this lawsuit, since Defendants here are different from the other cases. Given the posture of this appeal, we recite the facts as they are stated in the complaint, without evaluating their truth. *Solo v. United Parcel Serv. Co.*, 819 F.3d 788, 793 (6th Cir. 2016).

Courser is a lawyer and former member of the Michigan House of Representatives. Keith Allard, Josh Cline, and Benjamin Graham all helped with Courser's successful 2014 campaign. The House then hired these three men in January 2015 and assigned them to work jointly for Courser and Representative Cindy Gamrat. Courser and Gamrat had chosen to follow a jointstaffing arrangement. The two were also engaged in an extramarital, sexual relationship when their roles as representatives began in 2015.

At that time, the Speaker of the House was Defendant Kevin Cotter. He made Republican members sign a Caucus Pledge. This pledge, which Cotter asked Courser to sign the day after Courser's swearing in, required signers to pledge to "[s]tand together with [the] caucus on difficult votes and issues" and if unable to do so, the signer should "inform the [House] Whip personally." (R. 33-9, PageID 1385.) Courser refused to sign the pledge. His complaint seems to imply that the alleged conspiracy to get him out of office resulted, at least in part, because of this refusal.

Around the same time, Allard, Cline, and Graham met with Defendants Norm Saari (Cotter's Chief of Staff) and Brock Swartzle (Cotter's Chief of Staff/House General Counsel) [2] about Courser. Saari and Swartzle wanted the three men to gather information on Courser. So the trio began surveilling Courser and giving Saari **\*168** and Swartzle reports. Courser says this was "to injure and erode [his] credibility and effectiveness as a State Representative, and to force his vote according to COTTER's wishes." (R.33, PID405.)

[2]  Courser calls Swartzle Cotter's General Counsel, but his exhibits note that Swartzle was the House's General Counsel.

Dozens of pages in the complaint detail the collected recordings and surveillance information that the three men gathered. The surveillants bugged rooms, listened to Courser and Gamrat's intimate encounters, and followed them while driving, to list a few examples. They gained access to Courser's passwords and looked at his private emails. Graham also recorded at least one conversation he had with Courser. The men worked with Joe Gamrat, Cindy Gamrat's now ex-husband, and two others whom Courser only identifies by name (without description) in the complaint: David Horr and Vincent Krell.

But the most relevant activity occurred on May 19, 2015. Courser had been receiving extortive texts on his phone, insisting that he step down as a representative, or else the sender would release "specific information" about his "private life" to the public. (*Id.* at 439.) On the evening of May 19, Courser asked Graham to send a coverup email that would act as a "controlled burn" to "inoculate the herd." *Allard*, 969 F.3d at 613. By sending such an email, Courser seemed to hope that the real story about his and Gamrat's affair would get lost in the shuffle. *Id.* Graham recorded this conversation, and he and Allard sent it to *The Detroit News*, which published a story about the recording on August 7, 2015.

Right after the article came out, Cotter directed Defendant Tim Bowlin, the Business Director and Chief Financial Officer for the House, to investigate and prepare a report about Courser and Gamrat's alleged misuse of taxpayer funds. Courser says that at the end of August, Cotter, Bowlin, Swartzle, Saari, and Defendant Hassan Beydoun, the House Majority Legal Counsel, issued a "Report on the Investigation of Alleged Misconduct by Representative Todd Courser and Representative Cindy Gamrat." (R. 33, PID 451.) Soon after,

the House adopted a resolution to form a Select Committee to look into Courser and Gamrat's fitness for office. Cotter picked six committee members: four Republicans and two Democrats. Defendant and Representative Edward McBroom chaired the committee.

Before the committee meeting, Courser met with Swartzle and Beydoun who told him that he would only be censured, and not expelled, if he participated in the committee hearing. On September 8, 2015, the Select Committee hearings began. Courser says Cotter's Caucus Pledge bound the Republican members of the committee to vote as Cotter wanted. He also claims that the House should have let him present evidence or thoroughly defend his case, allow him enough time to look at exhibits, and so on. The committee heard the May 19 recording during this hearing. On September 11, Courser resigned, because it was clear by that point that the House planned to vote to expel him.

Courser first sued the House, Bowlin, Beydoun, Cotter, McBroom, Saari, Swartzle, Cline, Allard, Graham, and others in 2016. He voluntarily dismissed his complaint a few months later. He later split up his lawsuits, suing only the House, Bowlin, Beydoun, Cotter, McBroom, Saari, and Swartzle in this case on August 7, 2018. Then he sued Allard, Cline, Graham, and others in several separate lawsuits. He amended his complaint in this case in December 2018, and it now includes eighteen total counts.

The House, Beydoun, Bowlin, Cotter, McBroom, and Swartzle moved to dismiss all claims, and Saari filed a separate motion to dismiss all claims. Courser opposed **\*169** the motions and filed a motion for Rule 37 sanctions based on spoliation of evidence. He alleged that Defendants deleted and modified files and programs on his computer after they seized it.

The district court granted Defendants' motions on all claims and denied Courser's motion for sanctions. This appeal followed.

## II.

Courser claims that the district court should have converted Defendants' motions to dismiss into motions for summary judgment. So we analyze that question first. Second, we look at various immunities raised by Defendants. Third, we assess whether Courser has plausibly alleged any claims against the

Defendants. And fourth, we examine Courser's motion for sanctions.

### A. Conversion to a Rule 56 Motion

Courser argues that the district court should have converted Defendants' Rule 12(b)(6) motions into motions for summary judgment because Defendants attached exhibits and referenced materials outside his complaint. Under Rule 12 of the Federal Rules of Civil Procedure:

> If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

Fed. R. Civ. P. 12(d). But when reviewing a 12(b)(6) motion, a district court "may consider"—without converting the motion to a Rule 56 motion—"the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case[,] and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001))

This court has interpreted the text of Rule 12(d) to mean that a district court must either (1) expressly reject evidence outside the complaint that is attached to a 12(b)(6) motion or an opposition to such motion, or (2) treat the motion to dismiss as a motion for summary judgment. *See Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 484 (6th Cir. 2020) (citing *Max Arnold & Sons, LLC v. W.L. Hailey & Co.*, 452 F.3d 494, 502–04 (6th Cir. 2006)) (discussing these two options in the context of materials attached to an opposition to a 12(b)(6) motion). If a district court fails to expressly reject such exhibits and materials, though, "we have held that the failure to convert the motion to a motion for summary judgment is not reversible error if the court's 'rationale' in no way 'hinged on the additional information provided there.' " *Id.* (quoting *Yeary v. Goodwill Indus.-Knoxville, Inc.*, 107 F.3d

Case 2:20-cv-11718-GAD-DRG ECF No. 47, PageID.1189 Filed 01/31/22 Page 4 of 87
Courser v. Michigan House of Representatives, 831 Fed.Appx. 161 (2020)
RICO Bus.Disp.Guide 13,404

443, 445 (6th Cir. 1997); *Song v. City of Elyria*, 985 F.2d 840, 842 (6th Cir. 1993)). "That is, this 'error will be treated as harmless if the dismissal can be justified without reference to any extraneous matters.' " *Id.* (citing 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1364 (3d ed. Supp. 2019)).

Defendants attached several exhibits to their motions to dismiss. [3] At least some of these exhibits were neither referenced in the complaint nor "central to the claims contained therein." **170** *Bassett*, 528 F.3d at 430. But in its rationale for dismissing all the counts in Courser's complaint, the district court did not rely on any of the allegedly prohibited exhibits that Defendants attached. So under *Bates*, even if the district court should have expressly rejected these exhibits (or else converted the motions to Rule 56 motions), the error was harmless because none of these exhibits factored into the district court's rationale.

[3]    In the House, Beydoun, Bowlin, Cotter, McBroom, and Swartzle's motion, they also moved to dismiss for lack of jurisdiction under Rule 12(b)(1).

On the other hand, the district court did rely on other materials that the House, Beydoun, Bowlin, Cotter, McBroom, and Swartzle mentioned or pointed the district court to in their motion to dismiss. But all of those outside materials appear to be public records, and, at the very least, Courser does not dispute that they are public records. [4] Plus, Courser *himself* referenced and attached snippets of some of these records that the district court cited. So under *Bassett*, which permits reliance on public records without conversion of the motion, the district court permissibly relied on these records without conversion.

[4]    We hesitate in concluding that the police report is a public record that the district court could use. But we note that the panel in *Allard* referred to the police report when discussing the civil stalking claim in that case. 969 F.3d at 620. Under that reasoning, we find the district court's use of the police report permissible in this case.

For these reasons, the district court did not err by treating Defendants' 12(b)(6) motions as motions to dismiss.

**B. Immunities**

### 1. Sovereign Immunity

The states' sovereign immunity protects them from suit in federal court unless they consent, the federal Constitution specifically overrides that immunity, or Congress abrogates the states' immunity under a limited number of its enumerated powers. *See Ladd v. Marchbanks*, 971 F.3d 574, 577–78 (6th Cir. 2020). And that immunity extends to arms of the state, including the states' officers. *Hall v. Med. Coll. of Ohio at Toledo*, 742 F.2d 299, 301 (6th Cir. 1984) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

But sovereign immunity does not bar plaintiffs from suing state officials in federal court for prospective injunctive relief. *Ernst v. Rising*, 427 F.3d 351, 365 (6th Cir. 2005) (citing *Edelman v. Jordan*, 415 U.S. 651, 667, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)). That said, plaintiffs must sue the proper state officials—those who would enforce the challenged law. *Doe v. DeWine*, 910 F.3d 842, 848 (6th Cir. 2018) (emphasizing that "a state official must possess 'some connection with the enforcement of the [challenged law]' " (quoting *Ex parte Young*, 209 U.S. 123, 157, 28 S.Ct. 441, 52 L.Ed. 714 (1908)) (alteration in original)).

Plaintiffs can also sue officials in their individual capacities. *See, e.g.*, *Foulks v. Ohio Dep't of Rehab. & Corr.*, 713 F.2d 1229, 1233 (6th Cir. 1983) (allowing a suit for damages against an official in his individual capacity); *Williams v. Kentucky*, 24 F.3d 1526, 1543 (6th Cir. 1994) (allowing a suit over pendent state-law claims against an official in his individual capacity, even though the Eleventh Amendment bars suits for pendent state-law claims against officials in their official capacity (*see Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984))). That said, it is well established that sovereign immunity protects state officers from official capacity suits for retrospective damages if the money would come from the state treasury. *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255, 131 S.Ct. 1632, 179 L.Ed.2d 675 (2011) (*Ex parte Young*'s exception "does not apply **171** when the state is the real, substantial party in interest, as when the judgment sought would expend itself on the public treasury" (internal quotation marks and citations omitted)) (quoting *Pennhurst*, 465 U.S. at 101 n.11, 104 S.Ct. 900); *Quern v. Jordan*, 440 U.S. 332, 337–38, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979).

Here, all claims against the House of Representatives are barred by sovereign immunity because the House of Representatives is an arm of the State. That's because Article IV, Section 1 of the Michigan Constitution says so. Mich. Const. art. IV, § 1 ("Except to the extent limited or abrogated by article IV, section 6 or article V, section 2, the legislative power of the State of Michigan is vested in a senate and a house of representatives."). And "[i]f the [state] Legislature did not qualify as the state or its 'alter ego' or 'arm,' " it is difficult "to comprehend what would so qualify." *Reavis v. Legislature of La.*, No. 14-2543, 2015 WL 631456, at \*4 (E.D. La. Feb. 13, 2015).

As for the six others—Beydoun, Bowlin, Cotter, McBroom, Saari, and Swartzle ("the individual Defendants")—Courser sued them almost exclusively for retrospective damages. So under sovereign immunity principles, at best the claims here may only be viable against the individual Defendants in their individual capacities, not their official capacities.

We recognize three caveats to these conclusions. First, Saari did not raise this defense. But to the extent Courser sues him in his official capacity for money coming from the State treasury, the suit against him in any official capacity is effectively a suit against the State. *See Stewart*, 563 U.S. at 255, 131 S.Ct. 1632. And the House asserts its sovereign immunity here, so Saari's failure to raise the immunity issue on appeal cannot bind the State (as the true party in interest). Thus, the claims against him (or his successor) in his official capacity fail.

Second, we cannot reasonably understand Count 13 (Indemnification) to be against the individual Defendants in their individual capacities, so that claim is completely barred against any Defendant in any capacity.

Third, for Count 3 (relating to Article IV, Section 16 of the Michigan Constitution), Courser also requests prospective, equitable relief on top of damages. Cotter and McBroom, as the Speaker and a member of the House respectively, are the only Defendants who may have a possible connection to the enforcement of this provision of the Michigan Constitution. We assume, without deciding, that Count 3 properly exists against these two in their *official* capacities as well as against the individual Defendants (for damages) in their individual capacities.

In sum, sovereign immunity bars every count against the House. And Courser has not requested injunctive relief against the individual Defendants in their official capacities, except Count 3 against Cotter and McBroom. All counts, except Count 13, remain against the six individual Defendants in their individual capacities, as far as Courser seeks damages.

## 2. Legislative Immunity

Legislative immunity protects state legislators from suits related to the actions that they took in their legislative capacities. *Bogan v. Scott-Harris*, 523 U.S. 44, 54, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998). The proper inquiry for the application of legislative immunity is whether the legislator is acting in:

> [A]n integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the **\*172** consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House.

*Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975) (quoting *Gravel v. United States*, 408 U.S. 606, 625, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972)). And legislative aides share in legislative immunity to a degree. *Id.* at 507, 95 S.Ct. 1813.

To the extent that any of the claims here relate to the allegedly improper actions at the Select Committee hearing (including using the May 19 recording), legislative immunity bars those claims. But since many claims also implicate alleged actions taken outside the legislative capacity, those claims remain to the degree that they relate to those non-legislative actions.

## 3. Governmental Immunity

In their appellate brief, Swartzle and Saari point out governmental immunity for Count 7 (Defamation), Count 9 (Intrusion Upon Seclusion), Count 10 (Tortious Interference), Count 11 (Intentional Infliction of Emotional Distress), Count 12 (Negligent Infliction of Emotional Distress), and Count 14

(Fraudulent Misrepresentation), which Courser only brought against Swartzle and Beydoun. Beydoun, Bowlin, Cotter, and McBroom mention governmental immunity for those same counts, except Count 14. So we analyze potential governmental immunity for those six counts.

In Michigan, a government employee can raise governmental immunity as an affirmative defense. The court analyzes governmental immunity using the following framework, outlined in *Odom* by the Michigan Supreme Court:

(1) Determine whether the individual is a judge, a legislator, or the highest-ranking appointed executive official at any level of government who is entitled to absolute immunity under [Mich. Comp. Laws §] 691.1407(5).

(2) If the individual is a lower-ranking governmental employee or official, determine whether the plaintiff pleaded an intentional or a negligent tort.

(3) If the plaintiff pleaded a negligent tort, proceed under [Mich. Comp. Laws §] 691.1407(2) and determine if the individual caused an injury or damage while acting in the course of employment or service or on behalf of his governmental employer and whether:

(a) the individual was acting or reasonably believed that he was acting within the scope of his authority,

(b) the governmental agency was engaged in the exercise or discharge of a governmental function, and

(c) the individual's conduct amounted to gross negligence that was the proximate cause of the injury or damage.

(4) If the plaintiff pleaded an intentional tort, determine whether the defendant established that he is entitled to individual governmental immunity ... by showing the following:

(a) The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority,

(b) the acts were undertaken in good faith, or were not undertaken with malice, and

(c) the acts were discretionary, as opposed to ministerial.

*Odom v. Wayne Cnty.*, 482 Mich. 459, 760 N.W.2d 217, 228 (2008). A legislator is only **\*173** entitled to absolute immunity under Mich. Comp. Laws § 691.1407(5) if he or she was "acting within the scope of his or her ... legislative ... authority." "Michigan courts define the 'scope of authority' as '[t]he reasonable power that an agent has been delegated or might foreseeably be delegated in carrying out the principal's business.' " *Brent v. Wayne Cnty. Dep't of Hum. Servs.*, 901 F.3d 656, 689 (6th Cir. 2018) (alteration in original) (quoting *Backus v. Kauffman*, 238 Mich.App. 402, 605 N.W.2d 690, 694 (1999)). The governmental employee must "raise and prove his entitlement to immunity as an affirmative defense." *Odom*, 760 N.W.2d at 227–28.

Courser alleges facts suggesting that some actions relevant to Counts 7, 9, 10, 11, and 12 fell outside the scope of the actors' authorities, and the individual Defendants have not demonstrated otherwise (or that they reasonably believed otherwise). For example, for IIED (Count 11), we can only reasonably conclude that the individual Defendants' alleged actions of wiretapping, surveilling, publishing, and distributing the information they obtained are actions that fall outside the scope of the individual Defendants' authorities as legislators and lower-ranking legislative employees. So governmental immunity fails for those claims.

For Count 14 (Fraudulent Misrepresentation), governmental immunity is a closer call. For this claim, Courser says that Defendants Swartzle and Beydoun, "acting as his attorney[s,]" falsely assured him that if he appeared at the committee meeting and met with Defendant Bowlin, the House would only censure him, not expel him. (R. 33, PID 516.) Since the two are lower-ranking governmental employees and fraudulent misrepresentation is an intentional tort, the fourth provision of the *Odom* framework mentioned above applies to this analysis.

The conversation with Courser seems to consist of an action within Swartzle and Beydoun's course of employment as the House General Counsel and House Majority Legal Counsel, respectively. And the comments were discretionary, not ministerial. The next question is whether Swartzle and Beydoun made these comments in good faith or without malice. Courser says the duo "knew the representations and assurances ... were false" and "intended that the representations and assurances ... would be relied upon." (*Id.* at 517.) But he "ha[s] not averred facts allowing the inference that defendants had acted with malice." *Brent*, 901 F.3d at 699 (analyzing governmental immunity under the fourth prong

of *Odom* for an intentional infliction of emotional distress claim); *see also Stoll v. Luce Mackinac Alger Schoolcraft Dist. Health Dep't Bd. of Health*, No. 316287, 2014 WL 5364085, at *3 (Mich. Ct. App. Oct. 21, 2014) (applying governmental immunity when the plaintiff "offered no facts to support his conclusions" that the defendant acted with malice). So governmental immunity applies for Count 14 against Swartzle. (Beydoun failed to raise the defense on appeal.)

Overall, Counts 7, 9, 10, 11, and 12 fail for reasons besides governmental immunity. But governmental immunity applies for Swartzle regarding Count 14.

### C. Failure to State a Claim

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows for the dismissal of a claim if the complaint fails to "state a claim upon which relief can be granted[.]" Since this appeal is from a motion to dismiss, we take as true all factual allegations in Courser's complaint and make all reasonable inferences in his favor. *Doe v. Baum,* 903 F.3d 575, 581 (6th Cir. 2018). We review de novo the district court's **\*174** dismissal of Courser's complaint. *Id.* at 580.

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' "

*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal citations omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–57, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The factual allegations must "raise a right to relief above the speculative level[.]" *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955.

We need not accept a "legal conclusion couched as a factual allegation." *Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 246 (6th Cir. 2012) (quoting *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). "[A] plaintiff's obligation to provide the 'grounds'

of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 246–47 (alteration in original) (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. The complaint "must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." *LULAC v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007).

Aside from the basic requirements for stating a claim, waiver and forfeiture principles apply to many counts Courser brings in his complaint. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (alterations in original) (quoting *Citizens Awareness Network, Inc. v. U.S. Nuclear Regul. Comm'n*, 59 F.3d 284, 293–94 (1st Cir. 1995)). And "it is not our function to craft an appellant's arguments[.]" *United States v. Phibbs*, 999 F.2d 1053, 1080 n.12 (6th Cir. 1993).

In *Estate of Barnwell v. Grigsby*, this court recently found that the appellant waived an argument given its perfunctory and skeletal character. 801 F. App'x 354, 372 (6th Cir. 2020). Making a § 1983 excessive-force claim and related state-law battery claim, the *Grigsby* appellant only argued that "[t]here was excessive force and battery in the administration of a paralytic drug to" the defendant. *Id.* (alteration in original). The court found this statement insufficient because it "failed to 'provide even a modicum of legal argument as to why the district court erred[.]' " *Id.* (quoting *Cooper v. Com. Sav. Bank*, 591 F. App'x 508, 509 (6th Cir. 2015)).

Additionally, when "a plaintiff fails to address the district court's reasoning or motion to dismiss, we ... deem[ ] the **\*175** claim forfeited." *Scott v. First S. Nat'l Bank*, 936 F.3d 509, 522 (6th Cir. 2019) (quoting *Rees v. W.M. Barr & Co.*, 736 F. App'x 119, 124–25 (6th Cir. 2018)). In *Scott*, the plaintiffs failed to address the district court's actual reason for dismissing their fraudulent misrepresentation claim—the statute of frauds. *Id.* Instead, they only addressed the merits of their claim, which

the district court did not even address. *Id.* Again, this court found that the plaintiffs "forfeited any challenge to the district court's disposition of this claim" because they didn't address the actual reasoning of the district court. *Id.* at 522–23.

Similarly in *Grosswiler*, the plaintiffs only contested the district court's finding about whether they showed a genuine issue of material fact over whether they worked more than forty hours a week. *Grosswiler v. Freudenberg-Nok Sealing Techs.*, 642 F. App'x 596, 598 (6th Cir. 2018). They did not contest the district court's "alternative holding" that they failed to show the company knew or should have known about unpaid overtime. *Id.* "Because [the] [p]laintiffs ... failed to address the district court's alternate basis for its decision," this court found that the plaintiffs abandoned the issue. *Id.* at 599.

### 1. 42 U.S.C. § 1983 (Count 1)

The individual Defendants raise qualified immunity for the § 1983 claims against them. "Qualified immunity shields government officials from standing trial for civil liability in their performance of discretionary functions, unless their actions violate clearly established rights." *Kollaritsch v. Mich. State Univ. Bd. of Trs.*, 944 F.3d 613, 626 (6th Cir. 2019). Generally, qualified immunity is better left for the summary judgment stage, rather than the 12(b)(6) stage. *Wesley v. Campbell*, 779 F.3d 421, 433–34 (6th Cir. 2015); *In re Flint Water Cases*, 960 F.3d 303, 325 (6th Cir. 2020). This is "because, at this point in the case, 'the precise factual basis for the plaintiff's claim or claims may be hard to identify,' meaning 'the court's task can be difficult.' " *Siefert v. Hamilton Cnty.*, 951 F.3d 753, 761 (6th Cir. 2020) (quoting *Kaminski v. Coulter*, 865 F.3d 339, 344 (6th Cir. 2019)). But dismissal based on qualified immunity is appropriate if a plaintiff fails to plausibly allege facts that, taken as true, "show the violation of a right so clearly established that a reasonable official would necessarily have recognized the violation." *Kollaritsch*, 944 F.3d at 626. "[T]he fundamental question presented in this case is whether plaintiff['s] complaint alleges sufficient facts to make out [a] valid ... claim." *Rondigo, LLC v. Twp. of Richmond*, 641 F.3d 673, 681 (6th Cir. 2011).

So we ask (1) whether Courser has plausibly alleged "that [an] official violated a statutory or constitutional right, and (2) [whether] that ... right was clearly established at the time of the challenged conduct." *In re Flint Water Cases*, 960 F.3d at 323 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011)). We can address these questions in either order. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). In Count 1, Courser alleges that the individual Defendants violated four provisions of the federal Constitution. We discuss each in turn.

### a. Equal Protection

In *Courser v. Allard*, this court found that the district court properly ruled "that Courser failed to state a constitutional violation and rightly dismissed [his equal protection] claim." 969 F.3d at 617. Bound by that decision's reasoning, we likewise find that Courser failed to plausibly allege a violation of the Equal Protection Clause here. So the individual Defendants **\*176** are entitled to qualified immunity for this claim. Alternatively, legislative immunity fully bars this claim.

### b. Procedural Due Process

The Fourteenth Amendment provides, in part, that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. For a procedural due process claim "a plaintiff must show that (1) he or she had a life, liberty, or property interest protected by the Due Process Clause; (2) he or she was deprived of this protected interest; and (3) the state did not afford adequate procedural rights." *Schmitt v. LaRose*, 933 F.3d 628, 642 (6th Cir. 2019) (citing *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 904 (6th Cir. 2014)).

On appeal, Courser emphasizes that he is *not* alleging the State provided inadequate process for a deprivation of a *property* interest. (*See* Appellant Br. at 30 ("The district court glossed over the primary argument made at oral argument: Courser was deprived of a 'liberty' interest. Instead, the district court focused primarily on a 'property' interest. Prior to and during the select committee hearings, Courser was deprived of a liberty interest and not afforded a full public process.").) Instead, he asserts that the Defendants deprived him of a liberty interest.

Courser's asserted liberty interest in his complaint is difficult to comprehend, and he provides us little to no guidance on appeal to clarify his assertions. In his brief, Courser cursorily argues that "[p]rior to and during the select committee

Case 2:20-cv-11718-GAD-DRG ECF No. 47, PageID.1194 Filed 01/31/22 Page 9 of 87
Courser v. Michigan House of Representatives, 831 Fed.Appx. 161 (2020)
RICO Bus.Disp.Guide 13,404

hearings, Courser was deprived of a liberty interest[.]" (*Id.*) He also cites general propositions about liberty interests from unrelated cases about bodily injuries. His brief fails to clarify his purported liberty interest. What's more, Courser's complaint only attempts to explain how the House failed to give him due process during the Select Committee hearing and the whole expulsion process. But nowhere does he explain what *liberty* interest he had that the individual Defendants could not deprive him of without process.

As in *Allard*, Courser's procedural due process claim fails for failure to identify a liberty interest protected by the Fourteenth Amendment. *See Allard*, 969 F.3d at 616 ("Courser has not stated a liberty interest or cited any cases to back up his claim of an alleged deprivation of liberty."). Because Courser failed to plausibly allege a violation of a constitutional right, the individual Defendants are entitled to qualified immunity. Alternatively, legislative immunity fully bars this claim.

### c. Substantive Due Process

Courser's complaint in *Allard* was essentially the same as his complaint in the instant case. *See id.* at 614 ("The operative complaints filed in each case are virtually identical."). This court in *Allard* found that Courser's substantive due process claim failed because he did not specify a liberty interest in that complaint. *Id.* at 616. Bound by that decision, which hinged on essentially the same complaint, we hold that Courser failed to plausibly allege a substantive due process claim here. So the individual Defendants are entitled to qualified immunity on this claim.

### d. Fourth Amendment

Although Courser's complaint discusses multiple alleged recordings, he argues on appeal only that Graham's recording of the "inoculate the herd" conversation on May 19, 2015 violated Courser's Fourth Amendment rights. So for this claim, we focus on that recording only.

**\*177** In *United States v. White*, a plurality of the Supreme Court reiterated its prior decisions that suggested that "however strongly a defendant may trust an apparent colleague, his expectations in this respect are not protected by the Fourth Amendment when it turns out that the colleague is a government agent regularly communicating with the authorities." 401 U.S. 745, 749, 91 S.Ct. 1122, 28 L.Ed.2d

453 (1971). "No warrant to search and seize is required in such circumstances ... when the same agent, unbeknown to the defendant, carries electronic equipment to record the defendant's words and evidence so gathered is later offered in evidence." *Id.* (internal quotations omitted) (citing *Lopez v. United States*, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963)). In *White*, a defendant spoke with a government informant, who carried a radio transmitter on his person. *Id.* at 746–47, 91 S.Ct. 1122. Other agents listened in on the conversation by "monitoring the frequency of [the] radio transmitter." *Id.* The Court explained its prior reasoning: If an agent can write down the contents of a conversation with a defendant after their conversation and then testify about that conversation in court, this is effectively no different from the agent recording the conversation to better relay the contents of the conversation. *Id.* at 751, 91 S.Ct. 1122. The Court said:

> If the conduct and revelations of an agent operating without electronic equipment do not invade the defendant's constitutionally justifiable expectations of privacy, neither does a simultaneous recording of the same conversations made by the agent or by others from transmissions received from the agent to whom the defendant is talking and whose trustworthiness the defendant necessarily risks.

*Id.* And a majority of the Court reiterated this reasoning a few years later when it said:

> [T]here is a substantial distinction between "revelation[s] to the Government by a party to conversations with the defendant" and eavesdropping on conversations without the knowledge or consent of either party to it. A homeowner takes the risk that his guest will cooperate with the Government but not the risk that a trustworthy friend has been bugged by the Government without his knowledge or consent.

*United States v. Karo*, 468 U.S. 705, 716 n.4, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984) (second alteration in original) (quoting *White*, 401 U.S. at 749, 91 S.Ct. 1122); *see also United States v. Caceres*, 440 U.S. 741, 750–51, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979) (citing favorably these principles from *White*).

Case 2:20-cv-11718-GAD-DRG   ECF No. 47, PageID.1195   Filed 01/31/22   Page 10 of 87
Courser v. Michigan House of Representatives, 831 Fed.Appx. 161 (2020)
RICO Bus.Disp.Guide 13,404

Under these premises from *White* and *Karo*, no Fourth Amendment violation resulted from Graham recording the May 19 conversation. Courser took the risk that his colleague might relay the contents of that conversation to others or, similarly, record that conversation and have other House employees listen to it later. Unlike a situation when neither party knew about the recording, Graham, a House employee, of course knew that he was recording the conversation.

For these reasons, Courser has failed to plausibly allege a violation of a constitutional right. Thus, the individual Defendants are entitled to qualified immunity.

### 2. 42 U.S.C. § 1985 (Count 2)

While Courser mentions 42 U.S.C. § 1985 in his appellate brief's Issue Three argument heading, he fails to make any arguments about § 1985 in that section. So he has abandoned his § 1985 claim on **\*178** appeal. *See McPherson*, 125 F.3d at 995–96.

Even if he had not abandoned the claim, it would have failed anyway. The three sections under § 1985 require the following:

> Section 1985(1) ... prohibits conspiracies to interfere with federal officers in the performance of their duties, and the first clause of § 1985(2) ... prohibits conspiracies to influence parties, witness, or jurors in federal court proceedings.... Under both the second clause of § 1985(2), which prohibits conspiracies to interfere with due process in state courts with the intent to deprive persons of their equal protection rights, and § 1985(3), which prohibits conspiracies to deprive persons of their equal protection rights, a plaintiff must allege that there was "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action."

*Fox v. Mich. State Police Dep't*, 173 F. App'x 372, 376 (6th Cir. 2006) (quoting *Kush v. Rutledge*, 460 U.S. 719, 726, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983)).

Courser was a state official, not a federal one, so § 1985(1) does not apply. And Courser has alleged no conspiracy to influence anyone involved in a federal court proceeding or any conspiracy to interfere with the due process of his state court criminal proceedings, so § 1985(2) does not apply. Finally, Courser's complaint does not allege racial or class-based discriminatory animus. The closest he gets is asserting that the House treated him differently than other representatives who have had expulsion hearings, but that does not implicate "class-based, invidiously discriminatory animus." So § 1985(3) does not apply. For these reasons, Courser has failed to state a plausible § 1985 claim.

### 3. Mich. Const. art. IV, § 16 (Count 3)

Courser claims that Article 4, Section 16 of the Michigan Constitution is unconstitutionally vague and overbroad. As outlined above, this claim, if sustainable at all, could only possibly be against (1) Cotter and McBroom in their official capacities (to the extent that it requests prospective, injunctive relief), though we don't decide for certain, and (2) against all individual Defendants in their individual capacities (since it also requests damages). But Courser fails to make any specific arguments about Count 3 on appeal. So he has waived this claim.

### 4. Mich. Const. art. I § 17 – Fair and Just Treatment Clause (Count 4)

Courser sought only damages for the individual Defendants' alleged violation in Count 4. When dismissing this claim, the district court cited *Smith v. Dep't of Pub. Health*, 428 Mich. 540, 410 N.W.2d 749 (Mich. 1987), for the proposition "that a plaintiff seeking damages under Michigan's Constitution— as Courser does here—may only sue the State and its officials in their official capacities." Under this principle, the district court found that the claim could only remain against the State and its officials in their official capacities, not the officials in their individual capacities. And with the claim remaining only against the House and the officials in their official capacities, the district court then threw it out as barred by sovereign immunity. So the district court found that the principle from *Smith* barred this count against the individual Defendants in their individual capacities, and sovereign immunity barred this count against the Michigan House of Representatives and the individual Defendants in their official capacities.

Now, on appeal, Courser argues against sovereign immunity. And he contends **\*179** that the district court should not have dismissed Count 4. But he fails to provide any argument refuting the district court's reasoning based on *Smith*. Instead, he argues that the district court's opinion about a similar count in another case does not apply here. So under the principles outlined by *Scott* and *Grosswiler*, because Courser failed to

Case 2:20-cv-11718-GAD-DRG ECF No. 47, PageID.1196 Filed 01/31/22 Page 11 of 87
Courser v. Michigan House of Representatives, 831 Fed.Appx. 161 (2020)
RICO Bus.Disp.Guide 13,404

address the district court's reasoning for throwing out the claim against the individual Defendants in their individual capacities, he has forfeited any challenge to that conclusion. And we already outlined above why sovereign immunity bars the claim against the Michigan House of Representatives and the individual Defendants in their official capacities. So we affirm the district court's decision to dismiss the entire count, without addressing the merits.

### 5. Federal Wiretapping (Count 5)

The district court dismissed Courser's federal wiretapping claim for several reasons, one being that the statute of limitations barred the claim. Yet on appeal, Courser fails to address the statute of limitations. So under the principles outlined by *Scott* and *Grosswiler*, he has forfeited any challenge to the district court's statute of limitations reasoning.

On top of that, the district court correctly concluded that the statute of limitations bars this claim. Although a 12(b)(6) motion "is generally an inappropriate vehicle for dismissing a claim based upon the statute of limitations ... sometimes the allegations in the complaint affirmatively show that the claim is time-barred." *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012). In such a case, dismissal is appropriate. *Id.*

The statute of limitations for federal wiretapping is "two years after the date upon which the claimant first has a reasonable opportunity to discover the violation." 18 U.S.C. § 2520(e). Courser filed his initial complaint in this case on August 7, 2018. This would mean the cause of action would have had to accrue on or after August 7, 2016. But all the recordings and disclosures that Courser alleges in his complaint occurred before he left office in September 2015.

The district court points out that tolling may apply because Courser had first sued the parties in 2016 and then voluntarily dismissed his complaint ninety-five days later. Even if tolling applied, this would only set the accrual date to sometime in May 2016 instead of August 2016. But still—Courser has alleged no facts after May 2016, let alone after September 2015, that relate to a federal wiretapping claim.

So on top of forfeiting the federal wiretapping claim, Courser did not file within the statute of limitations timeframe.

### 6. Michigan Eavesdropping (Count 5)

Courser claims that the individual Defendants violated Michigan's eavesdropping law, *see* Mich. Comp. Laws §§ 750.539, by recording Courser. In his brief, Courser only contests the May 19 recording, not any of the other alleged bugs that Allard, Cline, and Graham placed or any of their other recordings. So we focus only on that recording.

The eavesdropping statute does not apply to participants in the conversation. *Sullivan v. Gray*, 117 Mich.App. 476, 324 N.W.2d 58, 59–61 (1982) (per curiam). In other words, a person is not liable under the statute if he recorded a conversation in which he participated. Courser says Graham recorded the May 19 conversation. And Graham participated in that conversation. So Courser has failed to state a plausible claim against Graham.

Courser argues that Graham picking up Gamrat in the recording made the recording **\*180** illegal. Whether Gamrat had a claim against Graham is not at issue here, and the panel that addressed that question already found that Gamrat had no plausible claim against Graham. *See Gamrat*, 822 Fed.Appx. at 334-35.

Because Graham did not act illegally by recording Courser, the individual Defendants could not be liable for Graham's actions, even assuming Courser plausibly alleged a conspiracy between Graham and the individual Defendants here. Courser's claim against the individual Defendants fails.

### 7. Computer Fraud and Abuse Act (Count 6)

For Count 6, Courser relies on factual allegations that the individual Defendants accessed his passwords and private computer information and altered files on his computer once they retained it after *The Detroit News* article came out.

The district court dismissed Courser's CFAA claim under 18 U.S.C. § 1030 for two reasons. First, the statute of limitations barred the claim. Second, Courser failed to state a claim because he failed to properly allege damages. But on appeal, Courser only addresses the statute of limitations argument. And he never addresses the district court's finding that he failed to properly allege damages or a loss. So under the principles of *Scott* and *Grosswiler* mentioned above, Courser

Case 2:20-cv-11718-GAD-DRG   ECF No. 47, PageID.1197   Filed 01/31/22   Page 12 of 87
Courser v. Michigan House of Representatives, 831 Fed.Appx. 161 (2020)
RICO Bus.Disp.Guide 13,404

has forfeited any challenge to the district court's damages holding.

But even on the merits, Courser fails to state a claim on which relief could be granted for this count. To state a claim, he had to allege facts showing a plausible "loss to 1 or more persons during any 1-year period ... aggregating at least $5,000 in value." 18 U.S.C. § 1030(c)(4)(A)(i)(I). All he alleges is that he "suffered damages and loss," that the Defendants "caused damage," and that the "Defendants['] conduct involved a loss to COURSER during any 1-year period aggregating at least $5,000 in value [so] COURSER also suffered a loss through Defendants' attempt to commit an offense punishable under 18 U.S.C. § 1030." (R. 33, PID 497–98.) These are merely conclusory legal statements posing as factual allegations, which cannot state a claim under Rule 12(b)(6). *See Republic Bank & Tr. Co.*, 683 F.3d at 246 (finding that we need not accept a "legal conclusion couched as a factual allegation"). Courser has alleged no facts to show a loss fitting the statute. Thus, he has failed to state a claim upon which relief can be granted.

Given these two independent reasons for disposing of the claim, we do not need to address whether Courser filed within the statute of limitations timeframe.

### 8. Michigan Fraudulent Access to Computers, Computer Systems, and Computer Networks Act (Count 6)

Courser provides no argument about this state law claim at all in his brief. He only mentions the Michigan statute in the subheading for Count 6. So he has forfeited this claim altogether.

### 9. Defamation (Count 7)

For his defamation claim, Courser says that someone edited the May 19, 2015 recording and "fabricated" it before giving it to *The Detroit News*. A plaintiff must bring a defamation claim within one year after the claim accrues. Mich. Comp. Laws § 600.5805(11).

To show that he timely filed his defamation claim, Courser argues that the statute of limitations was tolled under Michigan's common-law discovery rule. But Michigan law does not recognize a common-law discovery rule. Instead, as the Michigan Supreme **\*181** Court has stated, the

Michigan legislature displaced the common law by adopting a comprehensive statutory limitations and tolling scheme:

> Since the Legislature has exercised its power to establish tolling based on discovery under particular circumstances, but has not provided for a general discovery rule that tolls or delays the time of accrual if a plaintiff fails to discover the elements of a cause of action during the limitations period, no such tolling is allowed. Therefore, we conclude that courts may not employ an extrastatutory discovery rule to toll accrual in avoidance of the plain language of [Mich. Comp. Laws §] 600.5827.

*Trentadue v. Buckler Lawn Sprinkler*, 479 Mich. 378, 738 N.W.2d 664, 672 (Mich. 2007). Courser does not point to any statutory discovery rule to toll the accrual of his defamation claim. *See McCormick v. Richard*, No. 315811, 2014 WL 4628847, at \*2 (Mich. Ct. App. Sept. 16, 2014) (citing *Trentadue* and refusing to rely on an "extrastatutory discovery rule" to toll the accrual of a defamation claim). A defamation claim under Michigan law accrues at the time of "the wrong upon which the claim is based was done regardless of the time when damage results." *See Mitan v. Campbell*, 474 Mich. 21, 706 N.W.2d 420, 422 (Mich. 2005) (quoting Mich. Comp. Laws § 600.5827).

The wrongful dissemination and fabrication would have occurred before or during August 2015, because *The Detroit News* published the article about the May 19 recording on August 7, 2015. And Courser alleges harm based on that article's August 2015 release, so his argument that the claim accrued later is meritless.

Moreover, this court in *Allard* already held that the statute of limitations barred a substantively identical defamation claim against Allard, Cline, and Graham. 969 F.3d at 619–20. Since Courser filed the initial and amended complaints in that case on almost exactly the same dates as the complaints in this case, we are bound by *Allard*'s logic. This claim is untimely.

Thus, the district court properly dismissed his claim as barred by the statute of limitations.

Courser v. Michigan House of Representatives, 831 Fed.Appx. 161 (2020)

RICO Bus.Disp.Guide 13,404

#### 10. Michigan Civil Stalking (Count 8)

In *Allard*, this court disposed of claims against Allard, Cline, and Graham because "Courser failed plausibly to allege that Defendants here sent the extortion texts." 969 F.3d at 620. The panel in *Allard* concluded that Joe Gamrat and David Horr sent the texts. *Id.* The *Gamrat* panel similarly found that "none of the House Defendants or staff members sent those texts." 822 Fed.Appx. at 335. And the *Allard* panel determined that Courser could not "mount a civil stalking claim based on his conspiracy claim because the civil stalking claim is necessary for him to prove his conspiracy claim." 969 F.3d at 620. Bound by these reasonings, Courser failed to allege a civil stalking claim against the individual Defendants here too.

#### 11. Intrusion Upon Seclusion (Count 9)

Courser's appellate brief only cursorily touches on intrusion by seclusion. He presents the elements for intrusion upon seclusion, and then merely cites his complaint to argue that "[t]he allegations in the complaint support these elements." (Appellant Br. at 43.) Saying he "need only 'state a claim to relief that is plausible on its face,' " and that he "has done [s]o here" does not provide sufficient argument. (*Id.*) This bare assertion of meeting the required standard provides no "developed argumentation" and impermissibly requires "the court to ... put flesh on [the **\*182** argument's] bones." *McPherson*, 125 F.3d at 995–96 (quoting *Citizens Awareness Network, Inc.*, 59 F.3d at 293–94). So Courser has waived this issue.

#### 12. Tortious Interference (Count 10)

Courser is an attorney and alleges that the individual Defendants tortiously interfered with his business relationships with his clients. For this claim too, Courser merely states the elements of tortious interference with a business relationship, then cites some paragraphs of his complaint to argue that "[t]hese elements are all set forth and satisfied in the First Amended Complaint[.]" (Appellant Br. at 43–44.) This bare recitation is not enough to preserve a claim. *McPherson*, 125 F.3d at 995–96.

But even on the merits, the claim still fails. To show tortious interference with a business relationship or expectancy, the plaintiff must prove:

> (1) the existence of a valid business relationship or expectancy that is not necessarily predicated on an enforceable contract, (2) knowledge of the relationship or expectancy on the part of the defendant interferer, (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and (4) resulting damage to the party whose relationship or expectancy was disrupted.

*Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.*, 268 Mich.App. 83, 706 N.W.2d 843, 849 (2005). Courser does not sufficiently allege facts to state a plausible claim. His allegations are merely legal conclusions tracing the language of the elements that he frames as factual allegations. For example, for the first element he asserts: "COURSER has valid business relationship [sic] or expectancy with his clients.... [A]ctual relationships existed." (R. 33, PID 508.) And he doesn't allege any facts in support. We are left to speculate, which is improper under *Iqbal* and *Twombly*. This allegation is a mere legal conclusion tracing the language of the first element in *Health Call of Detroit*.

For the third element he again merely traces the legal standard. He asserts: "Defendants' act of publishing ... was an intentional interference ... causing a breach of termination of the relationship[.]" (*Id.*) And most conclusory of all he says: "COURSER has suffered damages, which continue," tracking the fourth element. (*Id.*) He concludes with a standard damages request. None of these statements are factual allegations; they are mere legal conclusions. Courser does not present any facts to move these allegations beyond speculation to plausibility. So on top of waiving the issue, Courser's claim has no merit.

#### 13. Intentional Infliction of Emotional Distress (Count 11)

Courser alleges that the individual Defendants are liable for intentional infliction of emotional distress (IIED). For a prima facie IIED claim in Michigan:

> [T]he plaintiff must present evidence of (1) the defendant's extreme and outrageous conduct, (2) the defendant's intent or recklessness, (3) causation, and (4) the severe emotional distress of the plaintiff. [5]

**\*183** *Lucas v. Awaad*, 299 Mich.App. 345, 830 N.W.2d 141, 150 (2013) (quoting *Dalley v. Dykema Gossett PLLC*, 287 Mich.App. 296, 788 N.W.2d 679, 694 (2010)). For the causation and damages elements, Courser only says: "As the result of wiretapping and surveillance and then publishing information, COURSER has suffered severe emotional distress." (R. 33, PID 510.) Courser presents this statement as a factual allegation, when it is really a disguised legal conclusion. All he does is state the causation and distress elements by almost quoting them verbatim. He says "[a]s a result" of Defendants' conduct he "suffered severe emotional distress." Such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. Courser has failed to allege factual allegations for all material elements. *See Bredesen*, 500 F.3d at 527.

[5]     Although the Michigan Court of Appeals has recognized the tort of IIED, the Michigan Supreme Court has not. *See Melson ex rel. Melson v. Botas*, 497 Mich. 1037, 863 N.W.2d 674, 674 (2015) (mem.) (Markman, J., dissenting) ("Michigan is one of only two states whose highest court has not dispositively address the establishment, and the contours, of the tort of intentional infliction of emotional distress (IIED).").

### 14. Negligent Infliction of Emotional Distress (Count 12)

While Courser mentions negligent infliction of emotional distress (NIED) in one of his subheadings, he makes no arguments about NIED in that section. He only focuses on his IIED claim in that section. So he has waived the NIED

issue. *See McPherson*, 125 F.3d at 995–96; *see also Phibbs*, 999 F.2d at 1080 n.12.

Even so, he also fails to state a claim. In Michigan, an NIED claim requires that:

> (1) the injury threatened or inflicted on the third person must be a serious one, of a nature to cause severe mental disturbance to the plaintiff; (2) the shock must result in actual physical harm; (3) the plaintiff must be a member of the immediate family, or at least a parent, child, husband or wife; and (4) the plaintiff must actually be present at the time of the accident or at least suffer shock fairly contemporaneous with the accident. [6]

*Tschirhart v. Pamar Enters., Inc.*, No. 327125, 2016 WL 3541827, at \*3 (Mich. Ct. App. June 28, 2016) (citing *Wargelin v. Sisters of Mercy Health Corp.*, 149 Mich.App. 75, 385 N.W.2d 732, 734–35 (1986)). Courser alleges no facts satisfying these elements. For instance, he provides no facts about harm to a family member. So on top of waiving his NIED claim, he failed to state that claim.

[6]     The Michigan Supreme Court also has not recognized the tort of NIED. *See Hesse v. Ashland Oil, Inc.*, 466 Mich. 21, 642 N.W.2d 330, 331 n.6 (2002) (per curium) ("This Court has never recognized the existence of such a cause of action, and we decline to discuss the validity of plaintiffs' claim at this time because of a discussion of the merits of the claim is unnecessary to our determination.").

### 15. Indemnification (Count 13)

Courser also claims that the Michigan House of Representatives failed to "provide him with a defense and pay his legal costs and other expenses" when Allard and Graham sued him in state court and when the state criminally

Case 2:20-cv-11718-GAD-DRG   ECF No. 47, PageID.1200   Filed 01/31/22   Page 15 of 87
Courser v. Michigan House of Representatives, 831 Fed.Appx. 161 (2020)
RICO Bus.Disp.Guide 13,404

prosecuted him "for actions stemming from his employment as a Representative." (R. 33, PID 514.) Under Michigan law:

> Whenever a claim is made or a civil action is commenced against an officer, employee, or volunteer of a governmental agency for injuries to persons or property caused by negligence of the officer, employee, or volunteer while in the course of employment with or actions on behalf of the governmental agency and while acting within the scope of his or her authority, *the governmental agency* may pay for, engage, or furnish **\*184** the services of an attorney to advise the officer, employee, or volunteer as to the claim and to appear for and represent the officer, employee, or volunteer in the action. *The governmental agency* may compromise, settle, and pay the claim before or after the commencement of a civil action. Whenever a judgment for damages is awarded against an officer, employee, or volunteer of a governmental agency as a result of a civil action for personal injuries or property damage caused by the officer, employee, or volunteer while in the course of employment and while acting within the scope of his or her authority, *the governmental agency* may indemnify the officer, employee, or volunteer or pay, settle, or compromise the judgment.

Mich. Comp. Laws § 691.1408(1) (emphases added). And:

> When a criminal action is commenced against an officer or employee of a governmental agency based upon the conduct of the officer or employee in the course of employment, if the employee or officer had a reasonable basis for believing that he or she

> was acting within the scope of his or her authority at the time of the alleged conduct, *the governmental agency* may pay for, engage, or furnish the services of an attorney to advise the officer or employee as to the action, and to appear for and represent the officer or employee in the action. An officer or employee who has incurred legal expenses after December 31, 1975 for conduct prescribed in this subsection may obtain reimbursement for those expenses under this subsection.

*Id.* § 691.1408(2) (emphasis added). Courser also seems to allege constitutional arguments under this count as well. He says the "Defendants' decision not to indemnify COURSER is unconstitutional" and "violates the equal protection and due process of law and freedom of speech." (R. 33, PID 515.)

Courser's claims under these statutory provisions fail because he does not explain why he has a right to sue for payment under these provisions. By their plain terms ("may"), Mich. Comp. Laws § 691.1408(1) and (2) give governmental agencies discretion to provide attorneys and legal expenses. They do not give individuals the right to such benefits. Courser has not shown that he has a cause of action under these discretionary provisions.

Moreover, the language of § 691.1408 points to the governmental agency itself paying legal expenses—not the individual officers. So Courser cannot possibly maintain that the individual Defendants in their *individual* capacities had to indemnify him. Plus, Courser only appears to ask for damages for this count, not any form of injunctive relief, so sovereign immunity bars this claim even if it is against the individual Defendants in their official capacities. [7] Finally, sovereign immunity bars the claim against the House of Representatives. Thus, this count fails against all Defendants.

[7]   This is assuming all the individual Defendants could even enforce the provisions, which, of course, at least some cannot.

### 16. Fraudulent Misrepresentation (Count 14)

Courser v. Michigan House of Representatives, 831 Fed.Appx. 161 (2020)

RICO Bus.Disp.Guide 13,404

The basis of Courser's fraudulent misrepresentation claim [8] is that Swartzle **\*185** (the House General Counsel) and Beydoun (the House Majority Legal Counsel) told him that the House would only censure, and not expel, him if he met with Bowlin and partook in the Select Committee hearing. The district court rejected Courser's fraudulent misrepresentation claim because no reasonable person could believe that Courser's reliance on these reassurances was reasonable. Yet Courser fails to address the district court's reasoning in his argument for this issue. So under the principles outlined by *Scott* and *Grosswiler*, he has forfeited any challenge to the district court's reasonableness reasoning.

[8]      We note that this claim is subject to the heightened pleading requirement from Rule 9(b) of the Federal Rule of Civil Procedure. *See Derbabian v. Bank of Am., N.A.*, 587 F. App'x 949, 952–53 (6th Cir. 2014) (applying Rule 9(b) in the context of a Michigan fraudulent misrepresentation claim). But we opt to not analyze whether Courser has met this heightened requirement, instead disposing of it for other reasons.

We also explained above how governmental immunity bars this claim against Swartzle.

But even on the merits, Courser's claim fails. In *MacDonald*, this court acknowledged Michigan's six elements for proving fraudulent misrepresentation. *MacDonald v. Thomas M. Cooley L. Sch.*, 724 F.3d 654, 662 (6th Cir. 2013). Element five specifically requires that "the plaintiff acted in reliance on the representation" and that the reliance was reasonable. *Id.* at 662–63.

We agree with the district court's conclusion that no reasonable person could find Courser's reliance on Swartzle and Beydoun's assurances to be reasonable. Although in his complaint he alleges that Swartzle and Beydoun were acting as his attorneys at the time, he ignores this allegation on appeal. Even if they were acting as his counsel, it is not reasonable for Courser to think that they could guarantee the House would merely censure him. Courser has not alleged why it was reasonable for him to rely on the House General Counsel and House Majority Legal Counsel's guarantee of the full committee's final outcome or the full House's final outcome. Along with forfeiting this claim and the application of governmental immunity, Courser fails to state a claim upon which relief could be granted.

## 17. Racketeer Influenced and Corrupt Organizations Act (Count 15)

Courser cites numerous statutes in his complaint that he claims establish predicate acts for his Racketeer Influenced and Corrupt Organizations Act (RICO) claim. But the district court threw out these claims because Courser failed to show a pattern of racketeering. He fails to address this ruling in his brief. Rather, he emphasizes that co-conspirators are responsible for the actions of their other co-conspirators. And he claims that he properly alleged "predicate acts." (Appellant Br. at 47–48.) Thus, based on the premises of *Scott* and *Grosswiler*, Courser has forfeited any challenge to the district court's reasoning.

We also note that in his complaint, Courser cites 18 U.S.C. § 1962 and Mich. Comp. Laws § 750.159i for his RICO count. The district court only addressed the federal statute, not the state one. But Courser does not point this out, so we find that he forfeited his state-law claim.

Yet even on the merits, Courser loses. Although 18 U.S.C. § 1962 (RICO) is a criminal statute, an injured party can bring a civil RICO claim against parties who violate any subsection of § 1962. *See* 18 U.S.C. § 1964(c); *Rotella v. Wood*, 528 U.S. 549, 552, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000). Under 18 U.S.C. § 1962(a), a person cannot receive income from a pattern of racketeering activity. Under 18 U.S.C. § 1962(b), a person, based on a pattern of racketeering activity, cannot "acquire or maintain ... interest in or control of" an enterprise involved in interstate or foreign commerce. These two provisions have nothing to do with what Courser alleged in his complaint. He never **\*186** alleged that any of the Defendants received income or had interest or control in an enterprise.

Under 18 U.S.C. § 1962(c), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." The district court's reasoning on this provision is sound.

As the district court explained, Courser failed to allege a "pattern." To show a pattern, a plaintiff has to establish that (1) the racketeering predicate acts were related and (2) those acts "amount to or pose a threat of continued criminal activity."

Courser v. Michigan House of Representatives, 831 Fed.Appx. 161 (2020)

RICO Bus.Disp.Guide 13,404

*Aces High Coal Sales, Inc. v. Cmty. Bank & Tr. of W. Ga.*, 768 F. App'x 446, 454 (6th Cir. 2019) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989)). That second continuity requirement "is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 455 (quoting *H.J. Inc.*, 492 U.S. at 241, 109 S.Ct. 2893).

Open-ended means "the criminal activity is interrupted by the filing of a RICO action." *Id.* at 456. "A threat of continuity may also be established 'by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business.' " *Id.* (quoting *H.J. Inc.*, 492 U.S. at 242, 109 S.Ct. 2893.) "The threat of continuing racketeering activity need not be established ... exclusively by reference to the predicate acts alone; rather, a court should consider the totality of the circumstances surrounding the commission of those acts." *Id.* (quoting *Heinrich v. Waiting Angels Adoption Servs.*, 668 F.3d 393, 410 (6th Cir. 2012)).

The criminal activities that Courser alleged ended in September 2015 once Courser left the House. This action interrupted no criminal activity, and no threat of continuity remained, because the House Defendants achieved their alleged goal: getting Courser out. Courser thus failed to sufficiently plead open-ended continuity.

On the other hand, a plaintiff can plead closed-ended continuity by alleging "a series of related predicates extending over a substantial period of time." *Aces High Coal Sales, Inc.*, 768 F. App'x at 457 (quoting *H.J. Inc.*, 492 U.S. at 242, 109 S.Ct. 2893). "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." *Id.* (quoting *H.J. Inc.*, 492 U.S. at 242, 109 S.Ct. 2893). Acts "over a substantial period of time" are required. *H.J. Inc.*, 492 U.S. at 242, 109 S.Ct. 2893.

Courser's allegations fail under *H.J. Inc.* They only span a few months (from January 2015 to September 2015). Nine months is not "a substantial period of time." *Id.* Plus, Courser has not alleged a future threat of more criminal conduct. All the allegedly inappropriate acts ran their course and ended once Courser left office.

For these reasons, Courser has failed to allege a pattern of racketeering. Besides forfeiting his claim, it would have failed on the merits anyway.

**18. RICO Conspiracy (Count 16)**

The district court threw out the RICO conspiracy claim because a conspiracy claim cannot remain when the district court dismisses the other RICO counts. Courser fails to address this point, so he has forfeited any challenge to this reasoning of the district court.

**\*187** Either way, the district court was correct. Because Courser's RICO claim fails, the RICO conspiracy claim fails too. *See Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 495 (6th Cir. 1990) (finding that the "[p]laintiffs' conspiracy claim cannot stand in light of the dismissal of their other RICO counts"). So we affirm the dismissal of Count 16.

**19. Civil Conspiracy (Count 18)**

A party must establish a predicate, unlawful act to allege a conspiracy. *See Advoc. Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 257 Mich.App. 365, 670 N.W.2d 569, 580 (2003); *Urbain v. Beierling*, 301 Mich.App. 114, 835 N.W.2d 455, 463–64 (2013). Since all counts fail, Courser has established no predicate, unlawful acts. Thus, he fails to allege a conspiracy claim.[9]

[9] And the argument section of his brief does not discuss concert of action.

**D. Spoliation (Count 17) and Sanctions**

Based on Courser's brief heading for this section, he is not appealing the dismissal of his spoliation claim, but only appeals the denial of his Rule 37 motion for sanctions based on spoliation. So Courser has abandoned his spoliation claim.

But even if he were appealing the dismissal of his spoliation claim, it would fail, because Michigan does not recognize a separate cause of action for spoliation, absent a legal duty to maintain the evidence:

> There is no alleged statutory duty, no alleged promise by [the defendant] to maintain [the evidence], and no special relationship existing that would warrant the imposition of a duty on [the defendant] to preserve

evidence. Absent an articulable, legally recognized duty, there can be no cause of action for the alleged tort of spoliation of evidence.

*Teel v. Meredith*, 284 Mich.App. 660, 774 N.W.2d 527, 533 (2009). Courser has not alleged an articulable, legally recognized duty to maintain this evidence. So no separate cause of action stands.

As for Courser's motion argument, we review the district court's decision for an abuse of discretion. *Beaven v. U.S. Dep't of Just.*, 622 F.3d 540, 553 (6th Cir. 2010) (citing *Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009) (en banc)). If "a party destroys evidence in anticipation of litigation, the trial court may impose sanctions for spoliation." *Applebaum v. Target Corp.*, 831 F.3d 740, 744 (6th Cir. 2016) (citing *Adkins*, 554 F.3d at 651). To succeed on a Rule 37 motion based on spoliation:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

>> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

>> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

>>> (A) presume that the lost information was unfavorable to the party;

>>> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or

>>> (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e). As to subsection (e)(1), "[a]n evaluation of prejudice from **\*188** the loss of information necessarily

includes an evaluation of the information's importance in the litigation." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.

Courser alleges that someone or something did the following to his computer when the House implemented a "litigation hold" before the Select Committee hearing: (1) modified files, (2) deleted a messaging program, (3) overwrote files and "bleached" the computer, and (4) locked the computer with BitLocker. (R. 61, PID 2621–22.) But even though the district court emphasized that Courser "does not even attempt to explain what information was deleted that may have been useful to him," (R. 67, PID 2804), he still has not even tried on appeal to explain how the deleted messages or modified/deleted/inaccessible files would have helped him here. Nor does he refer to what messages or files he needed from his computer. This leads us to assume that the information was unimportant. Courser has failed to prove prejudice, so the district court did not abuse its discretion in denying the Rule 37 motion.

As for (e)(2), after the 2015 amendment, Courser had to show that the Defendants "had 'intent' to deprive [him] of the information's use. A showing of negligence or even gross negligence will not do the trick." *Applebaum*, 831 F.3d at 745. The district court concluded that "[n]othing in the record indicates that the House Defendants intended to deprive Courser of information relating to this litigation." On appeal, Courser still fails to explain to us why the district court was wrong to conclude that and how he has established that the individual Defendants intended to deprive him of any of this information. So we find that the district court did not abuse its discretion in denying the Rule 37 motion.

### III.

For these many reasons, we largely agree with the district court's conclusions and **AFFIRM**.

### All Citations

831 Fed.Appx. 161, RICO Bus.Disp.Guide 13,404

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

809 Fed.Appx. 276
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007.
See also U.S.Ct. of App. 6th Cir. Rule 32.1.
United States Court of Appeals, Sixth Circuit.

John DOE, Plaintiff-Appellant,

v.

CASE WESTERN RESERVE UNIVERSITY;
Barbara R. Snyder; Lou Stark; G. Dean
Patterson, Jr.; George O'Connell; Shannon
J. Greybar Milliken, Defendants-Appellees.

No. 19-3520
|
FILED April 06, 2020

**Synopsis**
**Background:** Former student filed suit against private
university, claiming violation of Title IX and breach of
contract after investigation and administrative disciplinary
hearing in which adjudicator concluded that student was
responsible for non-consensual sexual intercourse under
university sexual misconduct policy and was ordered
suspended for two years, was deemed persona non grata so
was not permitted on campus during his suspension, and was
barred from residing in university housing upon his return,
and appeals board then increased his suspension and persona
non grata status for three years. The United States District
Court for the Northern District of Ohio, Donald C. Nugent,
Senior District Judge, 2019 WL 1982266, granted university
summary judgment. Student appealed.

**Holdings:** The Court of Appeals, Readler, Circuit Judge, held
that:

disciplinary hearing did not violate Title IX;

student waived any right to cross-examination; and

university did not breach contract with student.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary
Judgment.

**\*277** ON APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE NORTHERN DISTRICT OF
OHIO

**Attorneys and Law Firms**

Matthew A. Dooley, O'Toole, McLaughlin, Dooley &
Pecora, Sheffield Village, OH, for Plaintiff - Appellant

John Gerak, Amanda Tiffany Quan, Ogletree Deakins,
Cleveland, OH, for Defendants - Appellees Case Western
Reserve University, Barbara R. Snyder, Lou Stark, G.
Dean Patterson, Jr., George O'Connell, Shannon J. Greybar
Milliken

John Gerak, Amanda Tiffany Quan, Cleveland, OH, for
Defendant - Appellee Case Western Reserve University
Board of Trustees

BEFORE: SILER, GIBBONS, and READLER, Circuit
Judges.

**Opinion**

CHAD A. READLER, Circuit Judge.

While a student at Case Western Reserve University, John
Doe was accused of **\*278** violating the University's sexual
misconduct policy. Early in the ensuing investigation, John
admitted to engaging in at least one form of non-consensual
sexual intercourse with a fellow student. With the goal of
resolving the matter without involving other students, John
selected a streamlined hearing process, one that did not afford
him the opportunity to question witnesses.

That forthrightness and candor nonetheless undermines
John's challenge to the resolution of his disciplinary
proceeding. While John now believes a more robust
proceeding was necessary, we see no reason not to hold him
to his earlier choices. Nor do we see blatant errors in the
University's handling of the investigatory and adjudicatory
process. Accordingly, we **AFFIRM** the district court's
decision rejecting John's claims.

## I. BACKGROUND

During their sophomore and freshman years, respectively, Case Western Reserve University students John Doe and Jane Roe began a casual sexual relationship. The relationship included kissing and, on at least one occasion, digital penetration and oral sex. But it did not include sexual intercourse—Jane told John she did not want that type of relationship with anyone to whom she was not in a committed relationship. And when John later expressed stronger feelings towards Jane, Jane thought it better for the two to separate, rather than advance their relationship.

*Night of the Incident.* A few days after their separation, John and Jane separately went out drinking with their respective friends. Around one in the morning, John received a text from a friend stating that Jane appeared intoxicated, with the suggestion that John check on her. John went to find Jane. When he found her, John convinced her to return with him to his fraternity house.

What unfolded next is disputed. According to Jane, as she started to fall asleep, John began to kiss her. John proceeded to undress her, digitally penetrate her, and perform oral sex on her. John then inserted his penis into Jane's vagina. She stopped him. Suggesting that Jane instead perform oral sex on him, John, in Jane's words, "put it in [her] face." Jane began performing oral sex before stating that she did not want to do that either. She began to cry, at which point John drove Jane back to her dorm.

For John's part, he admits that he digitally penetrated Jane and performed oral sex on her. But he denies that he inserted his penis into her vagina, or that she performed oral sex on him.

*Initial Inquiry.* Roughly two months after the incident, Jane emailed Dr. Shannon Milliken, Case Western's Deputy Title IX Misconduct Investigator. An initial inquiry into the incident ensued. Milliken interviewed Jane. Milliken's assistant then emailed John to set up a time for Milliken to interview him. When John sought out Jane to discuss the situation, Jane let Milliken know that John had contacted her. The next day, Milliken emailed John with a no-contact order.

Not long thereafter, Milliken interviewed John. John made several incriminating comments. Chief among them was his admission that "[w]hat happened in the basement, I know I didn't physical [sic] force her or abuse her, but it was without her consent. She was not, by definition, capable of giving consent. What happened was my fault."

*Sexual Misconduct Investigation.* Milliken determined that the incident implicated the University's sexual misconduct policy. As a result, Milliken, as directed by **\*279** the policy, undertook a more formal, broad-based investigation. As a part of this investigation, Milliken and the University's outside counsel interviewed 15 students. Milliken also met again separately with Jane and John. Following the investigation, Milliken created a report wherein she summarized the incident and the findings of her investigation.

Following Milliken's investigation, the University had to decide the appropriate adjudicatory process for resolving the matter. Within the "formal" adjudicatory process, the University policy provided two options: an administrative hearing and a board hearing. An administrative hearing is the more informal process of the two. Indeed, there is no "hearing" in the traditional sense. Instead, a single adjudicator meets individually with the parties, as she deems necessary. Based on these meetings and a review of the underlying investigatory materials, the adjudicator determines culpability and punishment. The parties do not present evidence or conduct cross-examination. A board hearing, by comparison, takes place before a three-member panel. During the hearing, witnesses may testify, and a modified form of cross-examination is permitted. The accuser and the accused are invited to ask questions of the witnesses, and they can also submit to the panel questions they wish to ask each other. The panel then determines culpability and, when appropriate, administers punishment.

In signed statements, John and Jane each indicated they preferred an administrative hearing as opposed to a board hearing. In accordance with those expressed preferences, the University referred the matter to an administrative hearing.

*John's Administrative Hearing.* George O'Connell, the Director of the University Office of Student Conduct & Community Standards at Case Western, conducted the administrative hearing. O'Connell met with both John and Jane and reviewed materials provided to him from the investigation. "Based on [his] review of all provided information," O'Connell concluded that John was "responsible for non-consensual sexual intercourse under the university sexual misconduct policy." As a result, O'Connell ordered John to be suspended for two years, deemed *persona non grata* (meaning he was not permitted on campus during the suspension), and barred from residing in University housing upon his return.

Challenging the severity of his punishment on appeal, John requested either a three-month or one-year suspension. Alternatively, he sought a three-year suspension—to allow Jane to graduate before he returned to campus and so he could "have a clearer vision on how to proceed with [his] life." The appeals board rejected the first two requests, but granted the third, increasing John's suspension and *persona non grata* status to three years.

Almost two years later, John sued in district court, alleging that Case Western violated Title IX and breached its contract with him. Following dismissal of those claims at summary judgment, John brought this appeal.

## II. ANALYSIS

### A. Title IX

Title IX prohibits universities that receive federal funds from discriminating against students because of their sex. 20 U.S.C. § 1681(a); *Doe v. Baum*, 903 F.3d 575, 585 (6th Cir. 2018). As evidence of a Title IX violation, John claims that Case Western's disciplinary process resulted in an "erroneous outcome." *See Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018). To prevail under Title IX, the plaintiff must **\*280** "show that the 'outcome of [Case Western's] disciplinary proceeding was erroneous because of sex bias.' " *Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016) (quoting *Mallory v. Ohio Univ.*, 76 F. App'x 634, 639 (6th Cir. 2003)). Doing so requires two showings: first, that the outcome of the proceeding was tainted by some "articulable doubt," and second, that gender bias caused the articulable doubt. *Baum*, 903 F.3d at 585 (quoting *Miami Univ.*, 882 F.3d at 592).

*John's Admission of Misconduct.* We can resolve John's claim on the basis of the first prong, as he fails to show articulable doubt as to the outcome of his proceeding. Case Western's sexual misconduct policy defines non-consensual sexual intercourse as "intercourse that involves all of the following: a) any sexual intercourse (anal, oral or vaginal); b) with any object or body part; c) by a person upon a person; and d) without consent." As part of the University's investigation, John acknowledged that he digitally penetrated Jane without her consent. As John described the pair's interaction: "[w]hat happened in the basement, I know I didn't physical [sic] force her or abuse her, but it was without her consent. She was not, by definition, capable of giving consent. What happened was my fault." When Milliken provided John the opportunity to walk-back or clarify this statement during a subsequent interview, he did not do so. By John's own word, then, he engaged in a) vaginal intercourse; b) with his finger; c) by himself upon Jane; and d) without Jane's consent. This conduct, under the policy, constitutes non-consensual sexual intercourse.

True, there is some dispute over the extent of the non-consensual sexual activity that occurred. But that dispute, at most, goes to the *degree* to which John violated the policy, not *whether* he violated the policy in the first instance. Any discrepancies in John's and Jane's stories thus do not alter the investigation's ultimate conclusion that John violated University policy. Absent some unique circumstance, John's concession is enough to dispel the notion that his hearing resulted in an "erroneous outcome." *Cf. United States v. Oufnac*, 449 F. App'x 472, 476 (6th Cir. 2011) (finding that, in the criminal context, "admission of guilt is sufficient evidence to sustain the conviction[ ]" (citing *United States v. Mellies*, 329 F. App'x 592, 607 (6th Cir. 2009))).

While Case Western thus arrived at the correct outcome, we note that its decision finding John guilty of a violation and punishing him with a two-year suspension lacked precision. While there is no doubt John violated the policy by digitally penetrating Jane without her consent, she made other allegations against him as well, allegations that were also mentioned in the decision. Yet the hearing officer failed to make express findings as to what exact conduct occurred between the two. O'Connell's decision states only that Jane did not consent to any kind of sexual intercourse. The degree of the violation (i.e., the exact type(s) of non-consensual sexual activity that occurred) is potentially relevant to the punishment John received. While John did not argue in his briefing that his punishment was harsher due to the degree of the violation, and while there is no evidence suggesting that O'Connell's finding hinged on the precise sexual activity that occurred, it may behoove the University, going forward, to articulate the precise basis for finding a violation and the precise basis for the punishment administered.

*John Waived Any Right He May Have Had To Cross-Examination.* As grounds for challenging the reliability of his disciplinary proceeding's outcome, John cites his inability to cross-examine **\*281** witnesses. According to John, the disciplinary proceeding turned on whether the University believed John's or Jane's version of events—making each one's credibility a central issue. And, John adds, cross-examination would have resolved this credibility dispute, and thus enhanced the accuracy of the proceedings.

John is correct that, as a general matter, procedural flaws can undermine the veracity of a disciplinary proceeding's outcome. *See Baum*, 903 F.3d at 585–86 (citing *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)). And he is likewise correct to note that, at least in the context of due process considerations applicable to Title IX proceedings conducted by public institutions, cross-examination is required when "the university's determination turns on the credibility of the accuser, the accused, or witnesses." *Id.* at 581. We have yet to decide expressly how those considerations apply in the context of Title IX proceedings conducted by a private university, where constitutional due process principles lack the same force. *See id.* at 585–86 (noting that a plaintiff's *allegation* of a procedural flaw is enough to plead articulable doubt, but making no statement as to whether all Title IX claims require cross-examination as a matter of right). And we need not do so today. For even if John was entitled to some manner of cross-examination, he waived that right.

Individuals subject to administrative proceedings are free to waive rights they may otherwise be entitled to in that forum. *See, e.g.*, *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 510 (2d Cir. 2009) (finding that a plaintiff waived her statutory right to counsel in a social security hearing); *Covucci v. Apfel*, 31 F. App'x 909, 912 (6th Cir. 2002) (mem.) (finding that plaintiff waived his right to counsel at an administrative hearing); *Butler v. Comm'r of Soc. Sec.*, No. 96-1211, 1997 WL 259374, at *4 (6th Cir. May 15, 1997) (per curiam) (table decision) (finding that the due process right to cross-examination in an administrative hearing is waived when an attorney is silent during the opportunity for cross-examination); *Worthams v. Bd. of Educ. of Memphis City Sch.*, No. 90-5936, 1991 WL 119266, at *2 (6th Cir. July 1, 1991) (per curiam) (table decision) (finding that a dismissed teacher waived his right to a board hearing when he opted to have an arbitrator review his dismissal) (citing *Malone v. U.S. Postal Serv.*, 526 F.2d 1099, 1105 (6th Cir. 1975)). To be sure, disciplinary cases in which waiver principles are enforced often arise in the due process context. *See Leary v. Daeschner*, 228 F.3d 729, 744 (6th Cir. 2000) (finding that plaintiffs waived their due process right to a pre-deprivation hearing when they failed to attend the hearing). But those principles would seem to apply with equal force in the Title IX context. At least one court has expressly said as much. In *Pacheco v. St. Mary's University*, the district court, like here, addressed claims that a Title IX proceeding produced an erroneous outcome. No. 15-cv-1131 (RCL), 2017 WL 2670758, at *15 (W.D. Tex. June 20, 2017). And like here, the plaintiff complained that

he did not get to cross-examine and confront his accusers. *Id.* at *17. But that alleged shortcoming was of the plaintiff's own making: he failed to "participate meaningfully in the investigatory hearing—he did not attend, and chose not to examine *any* witnesses at all." *Id.* With the plaintiff having failed to avail himself of those opportunities, among other reasons, there was no process-related flaw casting doubt over the outcome. *Id.*

So too here. John affirmatively waived any right to cross-examination when he stated: "I don't want any witnesses. I would like the sole administrator hearing." In fact, John's waiver was twice-over. In addition to expressly disclaiming an interest **\*282** in calling witnesses, he also selected a form of hearing that did not allow for the presentation of evidence or cross-examination of witnesses (unlike a board hearing, which afforded him more robust rights). Not only that, but in his briefing, he now likewise acknowledges that "the *Pacheco* court correctly found that there was no procedural flaw casting doubt on the accuracy of the proceeding." We see no difference between a plaintiff who chooses not to attend his witness-based hearing and a plaintiff who essentially forgoes that type of hearing altogether. Put differently, it is difficult to accept John's claim of procedural deficiency when he received exactly the procedure he requested.

## B. Breach of Contract

In addition to his Title IX claim, John also alleges that Case Western breached contractual duties owed to him. John bases his claim on the rules and procedures articulated in the University's sexual misconduct policy applicable to all admitted students. As a matter of Ohio law, "[w]hen a student enrolls in a college or university, pays his or her tuition and fees, and attends such school, the resulting relationship may reasonably be construed as being contractual in nature." *Savoy v. Univ. of Akron*, 15 N.E.3d 430, 436 (Ohio Ct. App. 2014). This contractual relationship is governed by the "college or university catalog, handbook, and/or other guidelines supplied to the students." *Id.* But universities need not strictly adhere to those policies. *See Tate v. Owens State Cmty. Coll.*, No. 10AP-1201, 2011 WL 2685664, at *3 (Ohio Ct. App. July 12, 2011) ("[T]he court is to defer to the decisions of the school unless it can find 'such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.' " (quoting *Bleicher v. Univ. of Cincinnati Coll. of Med.*, 78 Ohio App.3d 302, 604 N.E.2d 783, 788 (1992))). When a university's adherence to a particular disciplinary policy is questioned, we generally ask

378 Ed. Law Rep. 68

only whether the university abused its discretion during the disciplinary process. *Faparusi v. Case W. Res. Univ.*, 711 F. App'x 269, 277 (6th Cir. 2017). Asked another way, did the university apply the rules in a reasonable manner? *Id.* None of the policy violations alleged by John clear that high hurdle.

*(1) Presence of a Support Person.* John first finds error in the fact that a "support person" was not provided to him during Milliken's initial inquiry. True, students have a right under the University's policy to a "support person" present with them at all stages of the process—including the initial inquiry. But as we read the policy, it does not *require* a support person attend the initial inquiry; it simply allows the student to have one. While John could have chosen to bring a support person, he did not. And when meeting with John, Milliken asked him if there were any accommodations John would like to request; he requested none.

*(2) Notification of Jane's Complaint and the Ability to Remain Silent.* John next claims that Case Western failed timely to inform him both of the complaint against him as well as of his policy-based right to remain silent while a subject of investigation. As to the former, however, before his initial interview with Milliken, and after a conversation with Jane about the complaint she filed, John received a no-contact order from Milliken, which stated: "[t]he University Office of Student Conduct and Community Standards (UOSC&CS) is currently in the process of investigating allegations made regarding the sexual-misconduct policy. This letter is to serve as official notice that you are to have no contact with Jane Roe for the **\*283** duration of this investigation." Nor, in any event, does the policy explicitly state that John must be notified of the *specific* charges; it only requires that, as was the case for John, he be notified of a complaint.

As to the latter, when John met with Milliken for his initial interview, John did make statements that amounted to a concession of a violation of the University's sexual misconduct policy. But John could have chosen to refrain from making any statements at that time. Nothing in the University's policy required the University to assert this right on John's behalf, or otherwise notify him that he did not need to answer questions posed.

*(3) Wrong Procedure.* Nor do we accept John's assertion that he was contractually guaranteed the board hearing, with witness testimony and cross-examination. According to University policy, an administrative hearing "may" be used in certain situations, while "a board hearing *is used* when ... [t]he

respondent does not admit that the alleged sexual misconduct has occurred and/or does not admit that the alleged conduct is or could be construed as sexual misconduct under this policy." (Emphasis added). Contrary to John's contention, the policy does take into account the accused's preference of forum—it considers "[t]he wishes of the complainant and the respondent"—and John requested an administrative (not a board) hearing. What is more, while some facts were in dispute, it was undisputed that John *admitted* to the conduct of which he was accused: non-consensual sexual intercourse. For these reasons, the University was well within its rights to utilize the administrative hearing.

*(4) Non-Neutral Administrator.* Equally unavailing is John's claim that Milliken failed to act in a neutral manner. Milliken's questions, even if leading, are not indicators of bias; they are tools to employ at the investigator's discretion to uncover the truth. *See Doe v. Tr. of Boston Coll.*, 892 F.3d 67, 84 (1st Cir. 2018) (citing *United States v. DeCologero*, 530 F.3d 36, 56 (1st Cir. 2008)) (finding that the chairperson overseeing the questioning of witnesses did not exhibit gender bias when the plaintiff alleged that they received cross-examination like questions); *see also Liteky v. United States*, 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994) (finding that, in the criminal context, "remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their case, ordinarily do not support a bias or partiality challenge"). And in any event, John was under no obligation to answer them in an incriminating manner.

*(5) Delivery of Policy.* Finally, John argues that he was not provided a copy of the sexual-misconduct policy in a timely fashion. Once a sexual misconduct investigation begins, the policy itself provides that the university will "consider interim" actions "as appropriate," including "[p]rovid[ing] a copy of the university sexual misconduct policy to both parties," which should be done "as promptly as possible." That permissive standard to "consider" providing the misconduct policy is far from an iron-clad, mandatory requirement. This optional step would typically be taken, as stated in the policy, to "protect the safety and well-being of the individuals involved in a complaint of sexual misconduct." Yet whether John was provided a copy of the policy seemingly had little impact on his "safety or well-being." We thus do not see how the University's actions lacked professional judgment or constituted a clear abuse of discretion, especially when one considers that the policy was available online, and that Milliken provided John a printed copy of the policy **\*284** prior to his administrative hearing. *See Tate,* 2011 WL

378 Ed. Law Rep. 68

2685664, at *3; *Valente v. Univ. of Dayton*, 438 F. App'x 381, 384–85 (6th Cir. 2011).

<strong>CONCLUSION</strong>

For these reasons, we **AFFIRM** the judgment of the district court.

**All Citations**

809 Fed.Appx. 276, 378 Ed. Law Rep. 68

---

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.

766 Fed.Appx. 275
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007.
See also U.S.Ct. of App. 6th Cir. Rule 32.1.
United States Court of Appeals, Sixth Circuit.

John DOE, Plaintiff-Appellant,

v.

UNIVERSITY OF DAYTON; Jane Roe; National
Center for Higher Education Risk Management;
and Daniel C. Swinton, Defendants-Appellees.

No. 18-3339
|
Filed March 15, 2019

**Synopsis**

**Background:** Suspended student brought action against
private university, alleged victim of student's sexual assault,
and outside investigator, for violation of Title IX, breach
of contract, promissory estoppel, negligence, defamation,
intentional infliction of emotional distress, and declaratory
judgment. The United States District Court for the Southern
District of Ohio, Thomas M. Rose, J., 2018 WL 1393894,
granted university's, victim's, and investigator's motions to
dismiss for failure to state a claim. Student appealed.

**Holdings:** The Court of Appeals, Jane B. Stranch, Circuit
Judge, held that:

student did not allege facts required to state claim for Title IX
violation under four different theories;

university did not breach contract with student;

investigator did not breach contractual obligation to student,
if any;

victim's statements were subject to qualified privilege, and
thus did not support defamation claim; and

student did not allege outrageous and extreme conduct, as
required to state claim for intentional infliction of emotional
distress.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss for
Failure to State a Claim.

**\*278** ON APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
OHIO

**Attorneys and Law Firms**

Eric John Rosenberg, Rosenberg & Ball, Granville, OH, for
Plaintiff-Appellant

R. Doreen Canton, Cincinnati, OH, Evan T. Priestle, Taft,
Stettinius & Hollister, Cincinnati, OH, for Defendant-
Appellee University of Dayton

Eric Lawrence Dauber, Law Offices, Dayton, OH, Matthew
Raymond Skinner, Law Offices, Fairfield, OH, for
Defendant-Appellee Jane Roe

Julie Lynn Juergens, Richard C.O. Rezie, Gallagher Sharp,
Cleveland, OH, for Defendants-Appellees National Center
for Higher Education Risk Management, Daniel C. Swinton

BEFORE: KEITH, STRANCH, and DONALD, Circuit
Judges.

OPINION

JANE B. STRANCH, Circuit Judge.

Plaintiff John Doe alleges that he was wrongfully suspended
from the University of Dayton after Defendant Jane Roe
accused him of sexual assault. He filed Title IX, breach of
contract, and tort claims against the University, Roe, and the
investigator the University hired. The district court dismissed
all claims. For the reasons explained below, we **AFFIRM**.

**I. BACKGROUND**

On September 4, 2016, Doe and Roe had a sexual encounter.
That night, Roe reported to University police that she had
been sexually assaulted.

The University's Sexual Harassment Code of Conduct strictly
prohibits all forms of sexual harassment, defined to include

sexual assault and any other sexual conduct without "effective consent." According to the Student Handbook, "[e]ffective consent is granted when a person freely, actively and knowingly agrees at the time to participate in a particular sexual act with a particular person." Standard punishments for a violation "range from educational interventions to expulsion."

Just over a week after the incident, the University sent Doe a Notice of Investigation, attaching a copy of Roe's complaint and explaining the process and Doe's rights, as laid out in the Student Handbook. The notice stated that the matter had been referred to an external investigator, Defendant Daniel Swinton, an employee of Defendant National Center for Higher Education Risk Management (NCHERM). According to the Handbook, Swinton's role was to compile an investigatory report and determine whether, when "all of the evidence is viewed in a light most favorable to [the complainant,] ... there is probable cause to believe that the respondent might have violated" University policy.

Swinton interviewed Doe, Roe, seven other Dayton students, and one of the University officers who responded to Roe's initial call. He then drafted a report containing interview notes, written statements from Doe and Roe, police incident reports, *279 text messages between Doe and Roe, pictures of the locations, and the results of a polygraph exam provided by Doe. Based on that evidence, Swinton first determined that there was no probable cause to believe Doe used force to obtain consent or that Roe was incapacitated and so unable to consent. He then performed a consent analysis and concluded that, "when viewing the facts in a light most favorable to the complainant, ... probable cause exists to believe that 1) non-consensual sexual intercourse, 2) non-consensual sexual contact, and 3) sexual harassment may have occurred in violation of University of Dayton policies."

The matter was then referred for a hearing before the University Hearing Board. The Board reviewed Swinton's report and heard testimony from Roe, Doe, and other witnesses. Based on that evidence, the Board concluded that Doe had violated the Code of Conduct by committing sexual harassment, reasoning as follows:

The University Hearing Board voted that they believed it was more likely than not that [Roe's] version of events in the bedroom occurred specific to non-consensual sexual intercourse. They referenced the agreement of both parties that the complainant indicated she did not think she wanted to do this and indicated that they believed by

preponderance of the evidence that [Roe's] version of when and how many times it was said more likely than not occurred.

With regards to non-consensual sexual contact, the board determined that the kissing was consistently described by both parties and was inconsequential compared to the non-consensual sexual intercourse. The board made a finding of not responsible on this matter given they fell at 50/50 on the scale of preponderance.

(R. 23-37, Hr'g Bd. Notice of Action, PageID 1516) Doe was suspended for a year and a half, until the end of the following school year.

Doe appealed the decision to the University's Judicial Review Committee. The Committee identified one error that had occurred at the hearing: neither Doe nor Roe had been given the opportunity to submit to the Board questions relating to live testimony given at the hearing. The Student Handbook provides that "[d]uring the course of the hearing, the board will allow both parties to submit questions they would like to have asked of the other or to key witnesses." Parties are to be given 10 to 15 minutes to prepare "questions addressing information that occurred during the hearing," and then the "[t]he board determines the questions they will ask by considering the relevance of the content to their purpose, their need for the information in order to make a decision and the appropriateness of the question." To remedy the error, the Committee gave both Doe and Roe the opportunity to listen to a recording of the hearing, after which they had an hour to draft questions for the Board to pose to the witnesses. Doe did so, providing two and a half pages of questions. The Board reconvened the following day. According to a letter the Associate Dean of Students sent to Doe, they "carefully reviewed all questions submitted and determined that none of those questions would provide additional information that could alter the determinations already made with regards to a code violation of sexual harassment." That determination was in turn presented to the Judicial Review Committee, which "indicated that the original decision by the University Hearing Board in this case stands." The previously imposed suspension became effective that day.

*280 Doe then filed the instant suit, bringing claims against the University, Roe, NCHERM, and Swinton for violation of Title IX, breach of contract, promissory estoppel, negligence, defamation, intentional infliction of emotional distress, and declaratory judgment. He alleges that the sexual encounter was consensual and that Roe fabricated the assault claim

"to avoid discipline related to her work." As an employee of Dayton's athletic department, Roe was not permitted to engage in sexual conduct with Doe, a student athlete. Doe also argues that the campus environment was hostile to men and that the investigatory and Board proceedings were biased and procedurally deficient. He avers that as a result, he suffers from post-traumatic stress disorder, anxiety, and depression; was denied admission to another university; and lost an opportunity to be recruited by a coach at another school. The district court dismissed all claims. Doe appeals as to all claims and all Defendants.

## II. ANALYSIS

We review a district court order granting a motion to dismiss de novo. *See Hill v. Snyder*, 878 F.3d 193, 203 (6th Cir. 2017). In doing so, we construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Our review of factual allegations encompasses exhibits attached to the complaint, which may be considered without converting the "motion to dismiss into one for summary judgment." *Matthew N. Fulton, D.D.S., P.C. v. Enclarity, Inc.*, 907 F.3d 948, 953 (6th Cir. 2018).

As a preliminary matter, we note that Doe concedes that Dayton, a private university, is not a state actor. Dayton is therefore not subject to suit under 42 U.S.C. § 1983, *see Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295, 305, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001), and whether the procedures employed in Doe's hearing would constitute due process of law is not before us. We ask only whether Defendants' behavior violated Title IX, breached applicable contracts, or gave rise to tort liability.

### A. Title IX Claims

Title IX provides that, subject to certain exceptions not relevant here, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any

education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "Title IX is enforceable through a judicially implied private right of action, through which monetary damages are available." *Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018) (quoting *Klemencic v. Ohio State Univ.*, 263 F.3d 504, 510 (6th Cir. 2001) ).

We have recognized at least four theories of Title IX liability in cases alleging gender bias in university disciplinary proceedings: (1) erroneous outcome, (2) selective enforcement, (3) deliberate indifference, and (4) archaic assumptions. *Id.* We have also recognized the viability of a fifth theory, hostile environment, in other contexts, though not in the context of a suit related to disciplinary proceedings. *Id.* (citing *Doe v. Claiborne County*, 103 F.3d 495, 515 (6th Cir. 1996) ). Doe pursues four of these five theories—all but archaic assumptions.

### *281 1. Erroneous Outcome

To present a viable claim under the erroneous outcome theory, a plaintiff must allege "facts sufficient to (1) 'cast some articulable doubt' on the accuracy of the disciplinary proceeding's outcome, and (2) demonstrate a 'particularized causal connection between the flawed outcome and gender bias.' " *Doe v. Baum*, 903 F.3d 575, 585 (6th Cir. 2018) (ellipsis omitted) (quoting *Miami Univ.*, 882 F.3d at 592). Because Doe's core argument is that he was subject to unfair procedures that were biased against men, this is the Title IX theory that most naturally fits his allegations.

We assume for purposes of argument that Doe has satisfied the first requirement and proceed immediately to the second prong. To allege a particularized causal connection, we have generally required plaintiffs to point to some hint of gender bias in their own disciplinary proceedings. Thus, for example, it is not enough to allege that in all of one university's sexual assault investigations during the relevant period, "the accused was male and was ultimately found responsible." *Doe v. Cummins*, 662 F. App'x 437, 453 (6th Cir. 2016). This prong is satisfied, however, when that same claim is combined with other troubling allegations, including both an affidavit that "describes a pattern of the University pursuing investigations concerning male students, but not female students" and a showing that in the plaintiff's own case, the university "initiated an investigation into him but not" his female accuser. *Miami Univ.*, 882 F.3d at 593. (In that case, there was an allegation that the accuser herself violated the University's

policies by kissing the plaintiff when he was "inebriated to the extent that he could not consent." *Id.* at 591.) Similarly, alleging that a university adopted certain procedures due to pressure from the federal government is not enough on its own, *see Cummins*, 662 F. App'x at 452–53, but suffices when combined with an allegation that the plaintiff's hearing body disagreed with the findings of the initial investigator based on "exclusively female testimony," even though the reason given for discrediting the men (membership in the accused's fraternity) applied equally to the women (all members of the accuser's sorority), *Baum*, 903 F.3d at 586.

In this case, Doe contends that three of his allegations, when considered in their entirety, demonstrate a comparable causal connection to gender bias. [1] First, in 2014, Dayton entered into a resolution agreement with the Department of Education's Office of Civil Rights, agreeing to modify its policies for handling complaints. Doe alleges that his discipline was motivated in part by a desire to avoid further federal scrutiny and negative publicity. The helpfulness of this 2014 agreement to Doe's case is questionable. According to the news article Doe attached to his complaint describing the resolution agreement, "none of the Title IX complaints [spurring the resolution agreement] involved sexual assault." The policy changes mandated by the resolution agreement—about the role of the Title IX coordinator, the use of informal resolution processes, the right to counsel, and the conduct of a hearing when the complainant and respondent cannot be in the same room—are not the same policies that Doe alleges were indicative of gender bias in his hearing. But even if we assume the agreement is both relevant and **\*282** indicative of bias, Doe fails to draw any connection between that agreement and his hearing two years later. He does not allege, for example, that the University or the individuals involved in his hearing were facing substantial public pressure or outcry in the weeks leading up to his hearing—facts the Second Circuit found persuasive in *Doe v. Columbia University*, 831 F.3d 46, 57–58 (2d Cir. 2016). The 2014 agreement therefore does not provide the necessary "particularized" evidence of a causal connection between gender bias and the outcome of Doe's hearing. *See Cummins*, 662 F. App'x at 452–53.

Next, Doe argues that one member of the Hearing Board revealed gender bias by supporting the film *The Hunting Ground*, which Doe alleges portrays campus sexual assault inaccurately. Just over a year before Doe's hearing, the Board member posted on Facebook that the film was a "[m]ust see," indicated it was unacceptable for a fraternity to be known as the "roofie frat," and agreed with a response implying that men should masturbate instead of "hav[ing] sex with unconscious women." A single comment made at a substantial temporal remove from Doe's hearing is of limited value in discerning discrimination—especially when, as here, the discriminatory aspect of the statement is difficult or impossible to discern. It is not problematic for a Board member to express distaste for sex with unconscious partners or for using drugs to obtain consent—both clear violations of Dayton's "effective consent" policy. And while Doe has alleged that the film is based on inaccurate statistics and discredited accounts, those flaws do not plausibly suggest gender bias in a supporter of the film who was not necessarily aware of the criticisms.

Finally, Doe highlights his allegations that, "[u]pon information and belief, in virtually all cases of campus sexual misconduct by Dayton [sic], the accused student is male and the accusing student is female," and "[u]pon information and belief, Dayton possesses additional documentation evidencing their refusal to discipline female students who were alleged to have sexually assaulted male students." As previously explained, the fact that sexual assault proceedings have been brought only against male students is not in and of itself sufficient to infer gender bias. *Cummins*, 662 F. App'x at 453–54. And, more fundamentally, these generalized, conclusory statements, devoid of underlying factual support, do not suffice to allege a *particularized* causal connection between gender bias and Doe's suspension. *See Baum*, 903 F.3d at 585.

In sum, Doe references events that are temporally removed from his hearing and raise little or no inference of discrimination; he then augments those allegations with speculation about evidence he might uncover later in the proceedings. Even considering all Doe's allegations in combination, they do not show that gender bias had some causal connection to the outcome of his disciplinary hearing. The erroneous outcome theory fails.

[1] In Doe's opening brief, he raised a fourth allegation, related to statistics cited by another Board member in her doctoral thesis. In his reply brief, he acknowledges that the individual mentioned did not serve on Doe's Hearing Board and so withdraws the argument.

2. Hostile Environment

We next consider whether Doe has made out a Title IX claim under the hostile environment theory. Such a claim "is analogous to a Title VII hostile-environment claim." *Miami Univ.*, 882 F.3d at 590. To succeed, Doe must allege "that his educational experience was 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive so as to alter the conditions of [his]' educational environment." *Id.* (brackets omitted) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) ).

**\*283** Doe points to a series of film screenings and on-campus events that he argues amounted to a "campaign of intimidation and insult which altered the educational environment of males like Doe by portraying them as sexual deviants." We are dubious that programming highlighting sexual violence, even when focused on sexual violence committed by men, could create a hostile environment absent unusual circumstances. After all, though Doe vigorously disputes how often sexual violence on college campuses occurs, he concedes that some women are sexually assaulted on college campuses. One instance of sexual assault is too many, and it is logical and appropriate for universities to host events confronting an acknowledged problem. Indeed, such actions appear to be mandated by federal regulation. *See* 34 C.F.R. § 668.46(j) (requiring each covered university to "include in its annual security report a statement of policy that addresses the institution's programs to prevent dating violence, domestic violence, sexual assault, and stalking").

The aspects of the events that Doe takes issue with do not rise to the level necessary for a hostile environment claim. Making available or distributing allegedly inaccurate information does not equate to intimidation or insult. Using male pronouns when highlighting problematic statements such as "he said if I really loved him, I would have sex with him," is not equivalent to accusing all male students of committing or condoning sexual assault. Nor does highlighting sexual assault of women by men negate the possibilities that women can commit sexual assault or that men can be sexually assaulted. Indeed, the first line of the description of sexual harassment in Dayton's Handbook states that the offense "[c]an be committed by a man or woman against a person of the same or opposite sex." Doe therefore does not plausibly allege that the events hosted at Dayton crossed the line into "intimidation, ridicule, and insult." *Miami Univ.*, 882 F.3d at 590 (quoting *Harris*, 510 U.S. at 21, 114 S.Ct. 367).

Moreover, Doe fails to allege that he was even aware that these events took place while he was a student at Dayton, much less that they meaningfully changed the conditions of his educational environment. We hesitate to deem an environment hostile to a plaintiff when "there is no evidence that plaintiff was aware" of what occurred. *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 249 n.4 (6th Cir. 1998). Though Doe was not required to allege that he personally attended the events or even that he knew about them at the time they occurred, *see Jackson v. Quanex Corp.*, 191 F.3d 647, 661 (6th Cir. 1999), he had to connect those events to his personal educational environment. The conclusory allegation that these events "interfere[ ] with males' ability to participate in or benefit from various activities including learning on campus" is insufficient.

Doe also appears to argue that his hearing and ultimate suspension interfered with his ability to participate in campus life. But we have already explained that "allegations of gender bias in the University's sexual-assault disciplinary process" do not constitute the sort of intimidation, ridicule, or insult that can sustain a hostile environment claim. *Miami Univ.*, 882 F.3d at 590. Doe's criticisms of that process have already been analyzed in their proper place, under the erroneous outcome rubric.

### 3. Deliberate Indifference

Doe next advances the deliberate indifference theory. Here, he must allege that the school "acts with deliberate indifference to known acts of harassment in its programs or activities" and that the **\*284** harassment "is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 633, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). "[W]e have held that to plead a Title IX deliberate-indifference claim, 'the misconduct alleged must be sexual harassment,' not just a biased disciplinary process." *Baum*, 903 F.3d at 588 (quoting *Miami Univ.*, 882 F.3d at 591). Thus, to the extent this claim is premised on procedural flaws in the proceedings themselves, it fails.

Doe argues that his deliberate indifference claim is also based on the programming about sexual violence that formed the basis for his hostile environment claim. He does not, however, allege that the University "had actual knowledge" about any sexual harassment that occurred at those events. *Tumminello v. Father Ryan High Sch., Inc.*, 678 F. App'x 281, 284 (6th

Case 2:20-cv-11718-GAD-DRG ECF No. 47, PageID.1215 Filed 01/31/22 Page 30 of 87
Doe v. University of Dayton, 766 Fed.Appx. 275 (2019)
366 Ed. Law Rep. 69

Cir. 2017). And, for the same reasons described above in the hostile environment context, permitting campus events discussing sexual assault—even with some inaccuracies —is not "severe, pervasive, and objectively offensive" harassment. *Davis*, 526 U.S. at 633, 119 S.Ct. 1661.

#### 4. Selective Enforcement

Doe's final Title IX theory is selective enforcement. "To prevail on a 'selective enforcement' claim, the plaintiff must show that a similarly-situated member of the opposite sex was treated more favorably than the plaintiff due to his or her gender." *Cummins*, 662 F. App'x at 452. Doe has not identified any woman accused of sexual assault at Dayton University who was not referred to disciplinary proceedings. Instead, he returns to his allegation that, "[u]pon information and belief, Dayton possesses additional documentation evidencing their refusal to discipline female students who were alleged to have sexually assaulted male students." Doe provides no factual content to underpin this allegation. The bare allegation, unsupported by facts, does not suffice to state a claim. *See 16630 Southfield L.P. v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 506 (6th Cir. 2013) ("[T]he plaintiffs have not identified any similarly situated individuals whom [the defendant] treated better. They have merely alleged their 'belief' that such people exist. These 'naked assertions devoid of further factual enhancement' contribute nothing to the sufficiency of the complaint." (quoting *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937) ).

In sum, Doe has not stated a claim for a violation of Title IX under any of these four theories. The district court properly dismissed Doe's Title IX claims.

### B. Contract Claims

Doe next alleges that Dayton, Swinton, and NCHERM breached applicable contracts and the implied covenant of good faith and fair dealing. The parties do not dispute that these state law claims are analyzed under Ohio law.

#### 1. Breach of Contract Against Dayton

"A cause of action for breach of contract requires the claimant to establish the existence of a contract, the failure without legal excuse of the other party to perform when performance is due, and damages or loss resulting from the breach." *Lucarell v. Nationwide Mut. Ins. Co.*, 152 Ohio St.3d 453, 97 N.E.3d 458, 469 (2018). The parties agree that the relationship between Doe and Dayton is contractual and that the Student Handbook lays out the contract terms. *See Behrend v. State*, 55 Ohio App.2d 135, 379 N.E.2d 617, 620 (1977) ("[W]hen a student enrolls in a college or university, pays his or her tuition and fees, and attends such school, the resulting relationship may reasonably be **\*285** construed as being contractual in nature."). We therefore ask whether Dayton failed to perform on the contract.

Our review of Dayton's actions is limited, recognizing that "contracts for private education have unique qualities and must be construed to allow the institution's governing body to meet its educational and doctrinal responsibilities." *Valente v. Univ. of Dayton*, 438 F. App'x 381, 384 (6th Cir. 2011) (brackets omitted) (quoting *Ray v. Wilmington Coll.*, 106 Ohio App.3d 707, 667 N.E.2d 39, 42 (1995) ). We "will not interfere in these matters in the absence of a clear abuse of discretion." *Schopplerei v. Franklin Univ.*, 11 Ohio App.2d 60, 228 N.E.2d 334, 336 (1967). "In confronting challenges to private school disciplinary proceedings, the appropriate question is thus 'whether the proceedings fell within the range of reasonable expectations of one reading the relevant rules, an objective reasonableness standard.' " *Faparusi v. Case W. Reserve Univ.*, 711 F. App'x 269, 277 (6th Cir. 2017) (quoting *Pierre v. Univ. of Dayton*, 143 F.Supp.3d 703, 713 (S.D. Ohio 2015) ).

Doe's broad argument is that his proceedings were unfair and so the University breached general Handbook guarantees such as "ensur[ing] that respondents ... are treated fairly in the University's processes." In light of the governing objective standard, we may not accept as sufficient Doe's subjective claim of an unfair proceeding that reached the wrong conclusion. Nor may we derive an ideal of fairness by analogy to the procedural protections applicable in courts of law. *See Doe v. Univ. of Cincinnati*, 872 F.3d 393, 400 (6th Cir. 2017) ("[The University] is not required to 'transform its classrooms into courtrooms' in pursuit of a more reliable disciplinary outcome." (quoting *Jaksa v. Regents of Univ. of Mich.*, 597 F.Supp. 1245, 1250 (E.D. Mich. 1984) ) ). Rather, because our inquiry asks "whether the proceedings fell within the range of reasonable expectations of one reading the relevant rules," *Faparusi*, 711 F. App'x at 277 (citation omitted), we consider each instance of allegedly unfair conduct by the University and compare it to the governing Handbook provisions.

Doe first raises two allegations centering on the Board's failure to ask witnesses questions that he proposed. Before his hearing, Doe submitted a list of questions to be asked of each witness. He alleges that the Board asked none of them, thereby breaching the Handbook's promise that "[q]uestions deemed relevant and appropriate by the [Board] will be addressed to the individual [witness] by the [Board] chair." He similarly faults the Board's decision after the Judiciary Review Committee gave him an opportunity to review the taped proceedings and propose another set of questions. At that point, the Board declined to reconvene the witnesses and pose the proposed questions because "none of those questions would provide additional information that could alter the determinations already made with regards to a code violation of sexual harassment." Doe argues this was also error because the Board failed to apply the Handbook's "relevant and appropriate" standard.

The Handbook is divided into sections that lay out expectations for particular topics and types of proceedings. The section describing Board procedures in sexual harassment cases states that "the University Hearing Board process and procedure differs for cases that do not involve sexual harassment and harassment" and provides a cross reference to another section that lays out "the process for other Codes of Conduct." The "relevant and appropriate" provision Doe cites is found in the cross-referenced section governing other conduct violations, not in the harassment-specific **\*286** procedures. The harassment procedures do not mention the "relevant and appropriate" standard. Instead, in harassment cases, "[t]he board determines the questions they will ask by considering the relevance of the content to their purpose, their need for the information in order to make a decision and the appropriateness of the question." The Board's "approval process is closed to both parties," and the Board "is not required to provide rationale for the acceptance or denial of any question." The Handbook therefore did not oblige the Board to ask the questions Doe proposed before the hearing or to explain to Doe why his questions were not asked, and the Board properly considered its "need for the information in order to make a decision" when it rejected proposed questions that would not "alter the determinations already made."

Next Doe states that Dayton imposed "arbitrary and capricious time limitations on Doe that were not contained in Dayton's policies." He appears to reference the requirement imposed after the Judiciary Review Committee's remand that he view the taped proceeding between January 12 and

17 and submit questions within one hour of the viewing. The one-hour limit was more generous than the Handbook, which allows parties only 10 to 15 minutes to generate questions from live testimony. As to the selection of dates, the Handbook is silent about how to navigate the unusual circumstance mandated by the Committee's remand. The University may therefore have been obliged to pick a date in good faith. *See Shimrak v. Goodsir*, 2014-Ohio-3716, ¶ 25 (Ohio Ct. App. Aug. 28, 2014) ("[I]f a contract is silent on a point, '[t]he parties to a contract are required to use good faith to fill the gap.' " (quoting *Burlington Res. Oil & Gas Co. v. Cox*, 133 Ohio App.3d 543, 729 N.E.2d 398, 401 (1999) ) ). *But see Lucarell*, 97 N.E.3d at 469 ("[T]here is no violation of the implied duty [of good faith] unless there is a breach of a specific obligation imposed by the contract...."). The University gave Doe three business days to review the hearing and indicated that it would "allow for an extension if there was good reason." Doe does not allege that he provided such a reason and was ignored, so even assuming the University was obliged to act in good faith, we see no basis to conclude that it failed to do so.

Doe also argues that the University breached Handbook provisions by not allowing him to submit exhibits, call a witness, or access a medical record that Roe referenced during her live testimony. These arguments turn in part on the Board's process for receiving evidence. Participants are not "permitted to submit information to the Student Conduct System outside of the investigation." Doe concedes that he suggested witnesses and provided evidence to Swinton during the investigation. Pursuant to the Handbook, then, he could call a new witness or introduce new evidence only under "extraordinary circumstances," and "[t]he University reserves the right to determine what is considered an extraordinary circumstance." Doe does not allege that the University deemed his circumstances extraordinary, nor (assuming such a challenge would be permissible) does he explain why the University should have made such a determination. Barring him from submitting further exhibits or calling new witnesses thus comported with the Handbook. To the extent Doe wished to call a witness who had already testified to the investigator, the Board was bound by the Handbook provision that "witnesses are not compelled to participate in the University Hearing Board process."

The argument about Roe's medical record fails for a similar reason. Because that record was not included in the investigatory **\*287** report, it could not be provided to the Board—and so to Doe—at the hearing. Doe points to no

Handbook provisions requiring production of documents that are referenced during the hearing but were not included in the report, and the University was not required to have such a process in place. *See Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 635 (6th Cir. 2005) (noting "unanimous" agreement that "neither rules of evidence nor rules of civil or criminal procedure need be applied" at disciplinary hearings).

In sum, having compared the language of the Handbook to the procedures described in the complaint, we see no "clear abuse of discretion," *Schoppelrei*, 228 N.E.2d at 336, in the University's interpretation and implementation of its hearing procedures.

## 2. Breach of Contract Against Swinton and NCHERM

We next consider Doe's breach of contract claims against Swinton and NCHERM arising from the investigation. Doe alleges that, because Dayton hired NCHERM and its employee Swinton to perform the Title IX investigation, there must have been a contract between them, the contract must have incorporated the terms of the Handbook and applicable federal law, and Doe must have been an intended third-party beneficiary of the contract.

We hesitate to accept the proposition that a plaintiff may plead upon information and belief not only that a contract exists but also what its terms would be and that it would confer upon him the rights of a third-party beneficiary. But even if such pleading is permissible, Doe must allege some action by NCHERM or Swinton that breached the alleged contract terms. The one action Doe identified in his opening brief is Swinton's treatment of Doe's proposed polygraph evidence. The portion of Swinton's report discussing the polygraph states:

Before briefly reviewing the results of the polygraph examination, it may be helpful to provide some context as to its reliability and efficacy. Polygraph examinations typically consist[ ] of a series of control questions (in this case, seven) to establish a baseline, with a smaller number of key questions (in this case, three) pertinent to the issue posed for comparison. The American Psychological Association encourages people to view them skeptically. Additionally, most courts do not allow their use in proceedings given their lack of reliability and efficacy. Polygraph examinations often are only able to test whether a person *believes* they are telling the truth, not whether they

are actually telling the truth. As such, using polygraphs for probative purposes is problematic.

[Doe] privately arranged for a polygraph examination and presented the results to the investigators. The examiner asked three issue-specific questions, which the examiner opines were answered by [Doe] in a manner "indicative of truthfulness":

Q: Did [Roe] take off her own pants for sex[?]

A: Yes

Q: Did you [in] any way force [Roe] to have sex of any kind?

A: No

Q: Did [Roe] in any way object to engaging in sex act[s] with you?

A: No

[Doe] seems to have selected a well-respected professional to perform the polygraph exam and it seems to have been performed in accordance with professional standards. The exam is a piece of evidence that could, at the discretion **\*288** of the decision-maker, serve to assist with [Doe]'s credibility, but the exam should not be viewed as proof of [Doe]'s truthfulness or of the veracity of [Doe]'s statements.

(R. 23-34, Investigation Report, PageID 1442–43) Swinton's duty under the Handbook was to "compile all of the evidence." He presented Doe's polygraph evidence to the Board in a manner that described both its potential usefulness and its limitations—and, in so doing, was more generous to Doe than a federal court would have been. *See United States v. Sherlin*, 67 F.3d 1208, 1216 (6th Cir. 1995) ("[U]nilaterally obtained polygraph evidence is almost never admissible under Evidence Rule 403." (quoting *Conti v. Comm'r*, 39 F.3d 658, 663 (6th Cir. 1994) ) ). Doe has not alleged that Swinton made any factual errors in his presentation of the polygraph evidence. To the extent Doe takes issue with Swinton's conclusion that the polygraph was not conclusive, Swinton was required to view the evidence "in a light most favorable to [Roe]." He did not breach a contractual obligation to Doe by doing so.

In Doe's reply brief, he raises a new argument about the omission of facts favorable to Doe from Swinton's report. Doe has likely forfeited this argument by failing to raise it

in his opening brief and then referencing it only briefly on reply. *See Tyson v. Sterling Rental, Inc.*, 836 F.3d 571, 580 (6th Cir. 2016). But even if the argument is properly before us, it suffers from the same infirmity as the polygraph argument. Swinton included the facts favorable to Doe—about Roe's intoxication and flirtatiousness, the timeline, and Doe's lack of familiarity with Roe's apartment—in his report. Swinton was not required to draw Doe's preferred conclusions from that evidence; to the contrary, as already explained, he was required to view the evidence in the light most favorable to Roe.

We therefore find no basis to conclude that Swinton or his employer committed a breach of contract.

### 3. Breach of Covenant of Good Faith and Fair Dealing

Doe next claims that Dayton, NCHERM, and Swinton breached the implied covenant of good faith and fair dealing. This claim invokes the rule, recognized in Ohio law, that "[i]n addition to a contract's express terms, every contract imposes an implied duty of good faith and fair dealing in its performance and enforcement." *Lucarell*, 97 N.E.3d at 469. But as the Ohio Supreme Court held just last year, "there is no independent cause of action for breach of the implied duty of good faith and fair dealing apart from a breach of the underlying contract." *Id.*; *see also Ne. Ohio Coll. of Massotherapy v. Burek*, 144 Ohio App.3d 196, 759 N.E.2d 869, 875 (2001) (same). Because the Defendants did not breach contract terms or otherwise act in bad faith, there is no independent basis to maintain this cause of action for breach of the implied covenant.

In sum, the University, Swinton, and NCHERM adhered to the procedures laid out in the Handbook. Doe argues that those procedures are themselves flawed, but his dissatisfaction does not give rise to a claim for breach of contract. The district court properly dismissed all Doe's contract claims.

### C. Tort Claims

We turn next to Doe's tort claims. As with the claims for breach of contract, these claims are creatures of state law analyzed pursuant to the decisions of Ohio courts.

### 1. Promissory Estoppel and Negligence

Doe argues the district court should not have dismissed his promissory **\*289** estoppel and negligence claims against Dayton, NCHERM, and Swinton.

Though these two claims have distinct elements, Doe's allegations as to each suffer from the same flaw. The first element of a promissory estoppel claim is a "clear and unambiguous" promise. *Cohen & Co. v. Messina*, 24 Ohio App.3d 22, 492 N.E.2d 867, 872 (1985). The first element of a negligence claim is "the existence of a duty." *Armstrong v. Best Buy Co.*, 99 Ohio St.3d 79, 788 N.E.2d 1088, 1090 (2003). In this case, the promises made and duties owed are found in the terms of the Handbook and in Title IX itself.

Claimed violations of Handbook terms have already been analyzed in their proper place, as potential breaches of contract. *See O'Neill v. Kemper Ins. Cos.*, 497 F.3d 578, 583 (6th Cir. 2007) ("In Ohio, 'where the parties have an enforceable contract and merely dispute its terms, scope, or effect, one party cannot recover for promissory estoppel.' " (alterations omitted) (quoting *Terry Barr Sales Agency, Inc. v. All-Lock Co.*, 96 F.3d 174, 181 (6th Cir. 1996) ) ); *Bowman v. Goldsmith Bros. Co.*, 109 N.E.2d 556, 557 (Ohio Ct. App. 1952) ("[A]n action of tort for negligence cannot be maintained unless the defendant's conduct constituted the breach of a duty imposed by law, apart from it being a breach of an obligation created by agreement of the parties, either express or implied."). There is no dispute that the Handbook is a contract, so Doe's response that these claims are pled in the alternative to his contract claims does not rescue them.

Claimed violations of Title IX have likewise been analyzed in their proper place, under recognized Title IX rubrics—not as freestanding tort claims. *See Horner ex rel. Horner v. Ky. High Sch. Athletic Ass'n*, 206 F.3d 685, 691 (6th Cir. 2000) ("The Supreme Court rejected the use of agency or negligence principles to render the school district liable for monetary damages under Title IX." (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 285, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998) ) ); *see also Stiles v. Grainger County*, 819 F.3d 834, 849 (6th Cir. 2016) ("Title IX authorizes suit only against the school itself and not individual administrators....").

The promissory estoppel and negligence claims were therefore properly dismissed.

## 2. Defamation

Doe also brings defamation claims against Roe. [2] Under Ohio law, a plaintiff alleging defamation must show: "(1) that a false statement of fact was made, (2) that the statement was defamatory, (3) that the statement was published, (4) that the plaintiff suffered injury as a proximate result of the publication, and (5) that the defendant acted with the requisite degree of fault in publishing the statement." *Am. Chem. Soc'y v. Leadscope, Inc.*, 133 Ohio St.3d 366, 978 N.E.2d 832, 852 (2012). Absolute and qualified privilege are recognized defenses to defamation, *see M.J. DiCorpo, Inc. v. Sweeney*, 69 Ohio St.3d 497, 634 N.E.2d 203, 209 (1994), and truth is an absolute defense, *see McPeek v. Leetonia Italian-Am. Club*, 174 Ohio App.3d 380, 882 N.E.2d 450, 454–55 (2007).

[2]     The district court stated in a footnote, citing *Caci v. Laborers International Union*, No. 97-CV-0033A, 2000 WL 424199, at *1–2 (W.D.N.Y. Mar. 31, 2000), *aff'd sub nom. Panczykowski v. Laborers' Int'l Union*, 2 F. App'x 157 (2d Cir. 2001), that "[i]t is entirely conceivable that Plaintiff[']s state-law claims against Roe are pre-empted, given that they contradict the findings of the process Doe contracted for, under the umbrella of Title IX, and resolution of their truthfulness requires re-opening the Title IX process." Roe does not advance this argument on appeal, so we do not decide the issue here.

**\*290** Doe does not dispute that Roe's statements made in preparation for and during the disciplinary hearing are entitled to absolute immunity. *See Savoy v. Univ. of Akron*, 15 N.E.3d 430, 435–36 & n.3 (Ohio Ct. App. 2014) (affording absolute privilege to statements made in the context of university disciplinary proceedings). Instead, he focuses on Roe's alleged statements to six friends and roommates that Doe sexually assaulted her. Private statements to friends are not the type of utterances commonly thought of as giving rise to defamation claims. *See, e.g.*, *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 47, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) (parody in a national magazine); *Garrison v. Louisiana*, 379 U.S. 64, 65, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) (statement at a press conference); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 256, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (full-page advertisement in a national newspaper). We do not lightly apply a framework commonly applied to public statements about third parties in this most personal of contexts: a conversation with intimates about your own possible sexual assault. Nor do we disregard the risk that victims of sexual assault could be dissuaded from sharing their experiences —and so from seeking support, justice, and treatment—by looming defamation suits.

Ohio law is capable of this task. Because these statements to friends do not bear a "reasonable relation" to the disciplinary proceedings, *Surace v. Wuliger*, 25 Ohio St.3d 229, 495 N.E.2d 939, 943 (1986), we apply Ohio's test for qualified privilege. The elements of qualified privilege "are fully satisfied by showing that the relationship of the parties to the communication is 'such as to afford a reasonable ground for supposing an innocent motive for giving information and to deprive the act of an appearance of officious intermeddling in the affairs of others.' " *McCartney v. Oblates of St. Francis de Sales*, 80 Ohio App.3d 345, 609 N.E.2d 216, 224 (1992) (emphasis omitted) (quoting *Hahn v. Kotten*, 43 Ohio St.2d 237, 331 N.E.2d 713, 720 (1975) ). Roe described (albeit, according to the complaint, incorrectly) an incident that personally involved her to a small number of friends and roommates who shared an interest in her health and well-being. Doe does not allege that she shared that description widely. Roe's version of the events, moreover, bears many similarities to Doe's—Doe agrees the sexual encounter occurred, and he told the interviewer that Roe said, "I don't think I want to do this," as the encounter was ending. At the hearing, the Board determined that Roe's description of events was more likely than not to be true. *See McPeek*, 882 N.E.2d at 454–55. Doe must therefore allege actual malice. *See McCartney*, 609 N.E.2d at 224. To do so, he relies on a legal conclusion in his complaint, that "Roe made her false and non-privileged statements negligently, with knowledge of their falsity, or with reckless disregard for their truth or falsity." "[W]e 'are not bound to accept as true a legal conclusion couched as a factual allegation.' " *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955).

Under these circumstances, the district court properly dismissed the defamation claims.

## 3. Intentional Infliction of Emotional Distress

Doe next argues that the district court should not have dismissed his claim against all Defendants for intentional infliction of emotional distress. To state such a claim under Ohio law, Doe must allege that:

(1) the defendant intended to cause, or knew or should have known that his **\*291** actions would result in serious emotional distress; (2) the defendant's conduct was so extreme and outrageous that it went beyond all possible bounds of decency and can be considered completely intolerable in a civilized community; (3) the defendant's actions proximately caused psychological injury to the plaintiff; and (4) the plaintiff suffered serious mental anguish of a nature no reasonable person could be expected to endure.

*Morrow v. Reminger & Reminger Co.*, 183 Ohio App.3d 40, 915 N.E.2d 696, 712–13 (2009).

This test is not satisfied merely by showing "that the defendant has acted with an intent which is tortious or even criminal"; rather, Ohio courts find liability "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 713–14 (quoting *Yeager v. Local Union 20, Teamsters*, 6 Ohio St.3d 369, 453 N.E.2d 666, 671 (1983) ). As described above, Swinton, the University, and NCHERM complied with the requirements of Title IX and the Student Handbook. Even assuming the procedures were flawed, their conduct is neither outrageous nor atrocious. *See Miami Univ.*, 882 F.3d at 599 (6th Cir. 2018) (concluding that even though the plaintiff had plausibly alleged an erroneous outcome under Title IX, the conduct did not "shock the conscience" for purposes of a due process claim). Roe instigated sexual harassment proceedings after discussing the incident within her immediate circle of friends; the Board then found her description of the events more credible than Doe's. Neither discussing a sexual encounter with friends— even inaccurately—nor filing a complaint that is ultimately accepted as more likely than not to be true exceeds the bounds of decency. *See Hanly v. Riverside Methodist Hosp.*, 78 Ohio App.3d 73, 603 N.E.2d 1126, 1132 (1991) (publishing that the plaintiff was discharged for sexual harassment, even if it exceeded the bounds of qualified privilege, "was not so extreme and outrageous to support a claim for intentional infliction of emotional distress"). The district court properly dismissed this claim.

### D. Declaratory Judgment

Last of all, Doe argues that his declaratory judgment claim against Dayton for violation of the Handbook and Title IX should not have been dismissed. The Declaratory Judgment Act is procedural in nature and "does not create an independent cause of action" that can be invoked absent some showing of an articulated legal wrong. *Davis v. United States*, 499 F.3d 590, 594 (6th Cir. 2007). Because Doe's other claims have been dismissed, his declaratory judgment claim likewise fails.

### III. CONCLUSION

For the foregoing reasons, the district court's decision dismissing all claims is **AFFIRMED**.

### All Citations

766 Fed.Appx. 275, 366 Ed. Law Rep. 69

End of Document          © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 764632
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

Latausha SIMMONS, Plaintiff,
v.
WAYNE COUNTY COMMUNITY
COLLEGE DISTRICT, et al., Defendants.

Civil Action No. 11–CV–14936.
|
Feb. 25, 2014.

**Attorneys and Law Firms**

Benjamin Whitfield, Jr., Benjamin Whitfield, Jr. &
Associates, PC, Detroit, MI, for Plaintiff.

George D. Mesritz, Floyd E. Allen & Associates, P.C.,
Detroit, MI, for Defendants.

***ORDER ACCEPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION***

BERNARD A. FRIEDMAN, Senior District Judge.

**\*1** This matter is presently before the Court on defendants'
motion to dismiss [docket entry 54]. Plaintiff has filed a
response brief and defendants have filed a reply. Magistrate
Judge Paul J. Komives has submitted a Report and
Recommendation ("R & R") in which he recommends that
defendants' motion be granted. No objections to the R &
R have been filed, and the objection period has expired.
The Court has reviewed the amended complaint, the motion
papers and the R & R. The Court is satisfied that the
magistrate judge's analysis and recommendation are correct.
Accordingly,

IT IS ORDERED that Magistrate Judge Komives' R & R is
hereby accepted and adopted as the findings and conclusions
of the Court.

IT IS FURTHER ORDERED that defendants' motion to
dismiss is granted.

***REPORT AND RECOMMENDATION ON
DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S
SECOND AMENDED COMPLAINT (docket # 54)***

PAUL J. KOMIVES, United States Magistrate Judge.

I. *RECOMMENDATION:* The Court should grant defendant's
motion to dismiss.

II. *REPORT:*

A. *Procedural Background*

Plaintiff Latausha Simmons commenced this action on
October 26, 2011, in Wayne County Circuit Court, against
defendant Wayne County Community College District
(WCCCD). Defendant removed the case to this Court
on November 9, 2011. Plaintiff's claims arise from her
participation in, and termination from, defendant's Nursing
Program. On March 13, 2013, after extensive proceedings on
various aspects of the case, including a grant of defendant's
motion for judgment on the pleadings, I granted in part and
denied in part plaintiff's motion to amend the complaint.
Specifically, I denied plaintiff's motion with respect to her
asserted claims of: (1) false imprisonment against both
defendant and newly proposed individual defendants; (2)
First Amendment retaliation; (3) violation of substantive
due process by depriving her of her interest in the credit
hours she had accumulated; and (4) breach of contract.
I granted plaintiff's motion with respect to her purported
procedural due process claim, reasoning that her proposed
First Amended Complaint arguably stated a procedural
due process claim. Following my Order, plaintiff's counsel
withdrew, and new counsel filed an appearance on plaintiff's
behalf. Plaintiff, through new counsel, filed her Second
Amended Complaint on June 11, 2013. Plaintiff's amended
complaint adds as defendants Dean of Nursing Clarissa
Shavers, Chief Academic Officer Andrea Juarez, Assistant
Dean of Nursing Doressa Lewis, and Clinical Instructor Willa
Wofford. Plaintiff alleges that defendant violated her right
to due process of law by removing her from the Nursing
Program, converting her disciplinary action to an academic
failure, and denying her enrollment into the mentoring
program arbitrarily and capriciously, and in bad faith.

The matter is currently before the Court on defendant
WCCCD's motion to dismiss the Second Amended
Complaint, filed on June 20, 2013. Defendant argues that
plaintiff's amended complaint fails to assert a plausible claim
that she was deprived of her property interest in continued

enrollment in violation of her procedural due process rights. Alternatively, defendant argues that plaintiff's failure to comply with my order that her she set forth her procedural due process claim "as articulated in her proposed amended complaint." Plaintiff filed a response to the motion on August 5, 2013, and defendant filed a reply on August 20, 2013.

## B. *Legal Standard*

**\*2** A motion to dismiss for failure to state a claim upon which relief can be granted is provided for in FED. R. CIV. P. 12(b)(6). In order for a court to dismiss a complaint for failure to state a claim, it must appear beyond doubt that the party asserting the claim can prove no set of facts supporting his claim that would entitle him to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The party asserting the claim is not required to specifically set out the facts upon which he or she bases his claim. *Id.* at 47. Rather, "a short and plain statement of the claim" pursuant to FED. R. CIV. P. 8(a)(2) gives the opposing party fair notice of the claim and the grounds upon which it rests. *See Conley,* 355 U.S. at 47. However, as the Supreme Court has recently explained, bare legal conclusions need not be accepted by the Court, and a pleading must contain sufficient factual allegations to show that the allegations are plausible:

> Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in *[Bell Atlantic Corp. v.] Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 [ ( 2007) ], the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. *Id.,* at 555 (citing *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550 U.S., at 555. Nor does a complaint suffice if it tenders "naked assertion[s] devoid of "further factual enhancement." *Id.,* at 557.

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.,* at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.,* at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility

that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.,* at 557 (brackets omitted).

Two working principles underlie our decision in *Twombly.* First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.,* at 555 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)). Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id.,* at 556. Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not "show[n]"-"that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

**\*3** In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Ashcroft v. Iqbal,* 556 U.S. 662, 677–79, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (parallel citations omitted). "[B]are assertions ... amount[ing] to nothing more than a 'formulaic recitation of the elements' of a constitutional ... claim," are "not entitled to be assumed true" and are therefore insufficient to survive a motion to dismiss. *Id.* at 680–81 (quoting *Twombly,* 550 U.S. at 555).

A court can only decide a Rule 12(b)(6) motion on the basis of the pleadings; if the court considers matters outside the

pleadings, the court must convert the motion into one for summary judgment under Rule 56. *See Kostrzewa v. City of Troy,* 247 F.3d 633, 643–44 (6th Cir.2001); *Weiner v. Klais & Co.,* 108 F.3d 86, 88 (6th Cir.1997).

## C. *Analysis*

Plaintiff's only remaining claim before this Court is her claim that she was denied her procedural due process rights by her termination from the Nursing Program. As the Supreme Court has recognized, the Due Process Clause protects "both substantive and procedural rights." *Albright v. Oliver,* 510 U.S. 266, 277, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (plurality op.). "So called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' or interferes with rights 'implicit in the concept of ordered liberty.' When government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner. This requirement has traditionally been referred to as 'procedural' due process." *United States v. Salerno,* 481 U.S. 739, 746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (citations omitted). In asserting a procedural due process claim, as with a substantive due process claim, a plaintiff must first show that the defendant's actions deprived her of a liberty or property right protected by the Due Process Clause. *See Board of Regents v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) ( "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property."); *Sullivan v. Brown,* 544 F.2d 279, 282 (6th Cir.1976) (citing *Bishop v. Wood,* 426 U.S. 341, 349 n. 1, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976)) ("Without a 'property' or 'liberty' interest protected by the due process clause, plaintiff would have no federally protected right[.]"). For purposes of its motion, defendant assumes that plaintiff has sufficiently allegedly a property interest in her continued enrollment, based on the Supreme Court's similar assumption in *Regents of the Univ. of Mich. v. Ewing,* 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985).

**\*4** If the plaintiff shows that she was deprived of a protected liberty or property interest, the Court proceeds to the second step of the due process analysis, asking "whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke,* —— U.S. ——, ——, 131 S.Ct. 859, 861, 178 L.Ed.2d 732 (2011) (per curiam). What process is "due" with respect to a particular deprivation depends upon the circumstances of the case. " '[D]ue process' is a flexible concept—... the processes required by the Clause

with respect to the termination of a protected interest will vary depending upon the importance attached to the interest and the particular circumstances under which the deprivation may occur." *Walters v. National Ass'n of Radiation Survivors,* 473 U.S. 305, 320, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1973); *accord Moyer v. Peabody,* 212 U.S. 78, 84–85, 29 S.Ct. 235, 53 L.Ed. 410 (1909) ("[I]t is familiar that what is due process of law depends on circumstances. It varies with the subject-matter and the necessities of the situation."); *Seal v. Morgan,* 229 F.3d 567, 574 (6th Cir.2000) (noting that "[t]he answer to the question of what process is due depends on appropriate accommodation of the competing interests involved") (internal quotation marks and citation omitted). In cases of academic dismissal from a state institution of higher education, only minimal procedures are required. As the Sixth Circuit has explained:

> [W]hen the student has been fully informed of the faculty's dissatisfaction with the student's academic progress and when the decision to dismiss was careful and deliberate, the Fourteenth Amendment's procedural due process requirement has been met. No formal hearing is required for academic decisions because such academic decisions "require[ ] an expert evaluation of cumulative information and [are] not readily adapted to the procedural tools of judicial or administrative decisionmaking."

*Ku v. Tennessee,* 322 F.3d 431, 436 (6th Cir.2003) (quoting *Board of Curators of Univ. of Mo. v. Horowitz,* 435 U.S. 78, 90, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978)) (citation omitted); *see also, Rogers v. Tennessee Bd. of Regents,* 273 Fed. Appx. 458, 462 (6th Cir.2008); *Amaechi v. University of Ky.,* 118 Fed. Appx. 32, 33 (6th Cir.2004) (per curiam) ("[D]ismissal of a student for academic reasons comports with the requirement of due process if the school has fully informed the student of the faculty's dissatisfaction with his or her performance and of the risk that the deficiencies pose to continued enrollment, and if the ultimate decision to dismiss is made carefully and with deliberation."). Under this standard, therefore, the question is whether plaintiff's complaint alleges sufficient facts which, if true, plausibly show that either she was not fully informed of defendant's dissatisfaction with her performance or that her removal from the Nursing Program was not made carefully and with deliberation.

After applying this standard, the Court should conclude that plaintiff's Second Amended Complaint fails to state a claim that her procedural due process rights were violated. Plaintiff alleges that she was notified by Wofford on September 16,

2011, that she was being placed on clinical probation. At that time, she was given a letter listing six reasons for this decision. *See* 2d Amended Compl., ¶ 10 & Ex. 1. [1] Plaintiff further alleges that she was brought before the Mediation Committee, which determined that plaintiff had breached the code of conduct and that removal from the Nursing Program was warranted. *See id.,* ¶ 18–19, 30–31 & Ex. 2. Plaintiff appealed her removal on October 1, 2011. *See id.,* ¶ 33 & Ex. 3. As a result of that appeal, Juarez informed plaintiff on October 10 that it had been decided that she could continue in the Nursing Program, but that she would receive a failing grade in the clinical course. In order to continue with the Nursing Program, Juarez informed plaintiff, she would be placed on probation and be required to complete a mentoring program. *See id .,* ¶¶ 34–36 & Ex. 4. Plaintiff further appealed the grade determination. *See id.* ¶ 37 & Exs. 5–6. These allegations establish that plaintiff was fully informed of the individual defendants' dissatisfaction with her work, and that the decision made by them was careful and deliberate. By plaintiff's own admission, the decision to terminate her was the culmination of several meetings and appeals not themselves required as a matter of due process. This process shows defendants' decision to have been careful and deliberate. *See Yoder v. University of Louisville,* 526 Fed. Appx. 537, 550–51 (6th Cir.2013); *Rogers,* 273 Fed. Appx. at 463. Plaintiff's "pleaded facts do not support an allegation that the dismissal process was neither careful nor deliberate." *Hlavacek v. Boyle,* No. 10–87–GPM, 2010 WL 5093935, at * (S.D.Ill.Dec.7, 2010).

[1] As noted above, ordinarily in resolving a motion to dismiss the Court is limited to the allegations of the complaint. However, Rule 10 provides that "[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes." FED. R. CIV. P. 10(c). Thus, the Court may consider the exhibits attached to plaintiff's complaint in deciding whether the complaint states a claim upon which relief may be granted. *See Lum v. Bank of Am.,* 361 F.3d 217, 221 n. 3 (3d Cir.2004) (in deciding a motion to dismiss, the court may consider "the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim."); *Realtek Indus., Inc. v. Nomura Secs.,* 939 F.Supp. 572, 575 n. 1 (N.D.Ohio 1996). Further, "[a] court may consider a document that is not formally incorporated by reference or attached to a complaint if the document is referred to in the complaint and is central to the plaintiff's claim" without converting the motion to dismiss into one for summary judgment. *Welch v. Decision One,* No. 12–10045, 2012 WL 4008730, at *2 (June 25, 2012) (Randon, M.J.) (citing *Greenberg v. Life Ins. Co. of Va.,* 177 F.3d 507, 514 (6th Cir.1999)), *magistrate judge's report adopted,* 2012 WL 4020976 (E.D.Mich. Sept.12, 2012) (Rosen, J.); *see also, Nixon v. Wilmington Trust Co.,* 543 F.3d 354, 357 n. 2 (6th Cir.2008). Here, plaintiff attached various exhibits to her initial Complaint, and explicitly incorporates them in her Second Amended Complaint by citing to them in support of her allegations. Thus, they may be relied upon in ruling on defendant's motion to dismiss.

**\*5** Plaintiff attempts to overcome this conclusion by arguing that the initial decision to remove her from the Nursing Program was a disciplinary decision, and was converted to an academic decision by Juarez after the fact. Plaintiff argues that because the Due Process Clause requires more procedural protections in the disciplinary context than in the academic context, *see Flaim v. Medical College of Ohio,* 418 F.3d 629, 634 (6th Cir.2005), her dismissal from the program for disciplinary reasons was done without affording her due process of law. This argument is without merit, because plaintiff's allegations fail to state a plausible claim that her removal from the program was anything other than an academic decision. The initial letter from Wofford informed plaintiff that there were several issues that needed to be addressed by plaintiff "to successfully meet the objectives of the Medical Surgical II (NUR 116) Course." Compl., Ex. 1. These included "[i]nability to properly assess and manage the total care of the assigned patient;" "[d]emonstrating disruptive behavior in the clinical setting;" "[a]pplying critical thinking skills when providing care;" and "applying knowledge from nursing and general education courses when planning patient care." They also included two more general concerns of "[i]nappropriate communication skills with faculty ... and peers" and "[n]ot [being] properly prepared and organized for clinical." *Id.* While the Mediation Committee made findings of what appear to be disciplinary infractions, the Committee's findings also noted that "[t]he Clinical Probation was a result of several documented faculty and student concerns related to the lack of clinical skill, lack of critical thinking, inappropriate communication, disruptive behavior and overall lack of preparedness for the clinical setting." *Id.,* Ex. 2. Defendant Juarez did not "convert" a disciplinary decision into an academic one, but rather informed plaintiff that instead of being dismissed from the

program she would merely receive a failing grade in the course because she "failed to meet all the objectives in the clinical portion of NUR 116." *Id.,* Ex. 4. These determinations all focus on the academic requirements of the clinical course.

Further, as defendants rightly point out, given the clinical nature of the Nursing Program and the course at issue, there is not a clear demarcation between "academic" and "disciplinary" actions. The mere fact that faculty base their decision on a student's conduct rather than test results is insufficient to establish that the decision was disciplinary rather than academic. Rather, the cases that have addressed this issue coalesce into the general rule that "[a]n academic dismissal is where a student's scholarship *or conduct* reflects on the personal qualities necessary to succeed in the field in which he or she is studying, and can be based on an at least partially subjective appraisal of those qualities." *Allahverdi v. Regents of the Univ. of N.M.,* No. Civ 05–277, 2006 WL 1313807, at *20 (D.N.M. Apr. 25, 2006) (emphasis added) (citing *Horowitz,* 435 U.S. at 91 n. 6; *Fenje v. Feld,* 398 F.3d 620, 625 (7th Cir.2005); *Hennessy v. City of Melrose,* 194 F.3d 237, 242–43, 251 (1st Cir.1999); *Firester v. Board of Governors of Wayne State Univ.,* No. 89–1772, 1990 WL 99493, at *2–*3 (6th Cir. July 18, 1990)), *discussed with approval by Fuller v. Schoolcraft College,* 909 F.Supp.2d 862, 875 (E.D.Mich.2012) (Murphy, J., adopting report of Michelson, M.J.); *see also, Yoder,* 526 Fed. Appx. at 550 ("Courts have frequently held that an academic dismissal may be properly based on more than simply grades, particularly in the medical-professional context."); *Ku,* 322 F.3d at 436 ("Academic evaluations are not limited to considerations of raw grades or other objective criteria."). Thus, solely in the context of medical education such as medical school, nursing programs, and psychology programs, the courts have found dismissals on the following grounds to be academic rather than disciplinary:

**\*6** • personal hygiene and timeliness, *see Horowitz,* 435 U.S. at 91 n. 6;

• proper attitudes toward patients, *see Firester,* 1990 WL 99493, at *3;

• failure to disclose on application for residency program previous dismissal from another program, *see Fenje,* 398 F.3d at 625;

• lack of attendance, *see Harris v. Blake,* 798 F.2d 419, 423 (10th Cir.1986);

• tardiness and missed appointments with patients, *see Davis v. Mann,* 882 F.2d 967, 969 (5th Cir.1989);

• failure of the student to address her mental health issues, *see Shaboon v. Duncan,* 252 F.3d 722, 731 (5th Cir.2001);

• "inappropriate behavior during class, lack of preparation, tardiness and absenteeism, and inappropriate interaction with instructors," *Richmond v. Fowlkes,* 228 F.3d 854, 858 (8th Cir.2000); *see also, Halverson v. University of Utah Sch. of Medicine,* No. 2:06CV228, 2007 WL 2892633, at *12 (D.Utah Sept. 28, 2007);

• "unprofessional conduct" and "inability to interact with others in a basic professional manner," *Ku,* 322 F.3d at 435–36;

• lack of candor about criminal history, *see Fuller,* 909 F.Supp.2d at 876;

• failure to abide by drug treatment program, *see Mathai v. Board of Supervisors of La. State Univ. & Agricultural & Mechanical College,* No. 12–2778, 2013 WL 3776580, at *7 (E.D.La. July 17, 2013); and

• failure to comply with confidentiality agreement, *see Yoder,* 526 Fed. Appx. at 550–51; *Stevenson v. Owen State Community College,* 562 F.Supp.2d 965, 971 (N.D.Ohio 2008).

In light of these cases, plaintiff's Second Amended Complaint fails to allege a plausible claim that her dismissal was not academic.

Finally, plaintiff contends that she was denied due process when she was denied re-admittance into the Nursing Program pending completion of the mentoring program. However, plaintiff cites no authority, and I have found none, suggesting that a student is entitled to any reinstatement procedures as a matter of procedural due process. Because defendants' initial decision provided plaintiff all the procedure she was due, she has no claim based on defendants' failure to allow her to participate in the mentoring program or be readmitted to the Nursing Program.

### D. *Conclusion*

In view of the foregoing, the Court should conclude that plaintiff's complaint fails to state a claim that her procedural due process rights were violated. Accordingly, the Court should grant defendant WCCCD's motion to dismiss.

### III. *NOTICE TO PARTIES REGARDING OBJECTIONS:*

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of Health & Human Servs.,* 932 F.2d 505 (6th Cir.1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of Health & Human Servs.,* 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit*

*Federation of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

**\*7** Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

### All Citations

Not Reported in F.Supp.3d, 2014 WL 764632

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 699347
Only the Westlaw citation is currently available.
United States District Court,
S.D. Ohio, Western Division.

Ahmad SAQR, et al., Plaintiff,
v.
The UNIVERSITY OF
CINCINNATI, et al., Defendants.

Case No: 1:18-cv-542
|
Filed 02/20/2019

**Attorneys and Law Firms**

Brian Paul Gillan, Freking Myers & Reul LLC, Matthew
Miller-Novak, Godbey Law, Cincinnati, OH, for Plaintiff.

Reid T. Caryer, Elizabeth Howell, Ohio Attorney General's
Office Education Section, Columbus, OH, for Defendants.

**REPORT AND RECOMMENDATION**

Stephanie K. Bowman, United States Magistrate Judge

 **\*1** On August 3, 2018, two brothers, Ahmad Saqr and Omar
Saqr, filed suit against the University of Cincinnati and the
University of Cincinnati College of Medicine (collectively
"UC"). [1] Plaintiffs allege that Defendants violated the
Americans with Disabilities Act, the Rehabilitation Act,
and Title VI as well as related state laws, when UC's
Performance and Advancement Committee recommended
Plaintiffs' respective dismissals from UC's medical school
program and those recommendations were upheld by an
appeal panel.

[1]    Despite being identified as separate Defendants,
       UC states that the University of Cincinnati College
       of Medicine is not a separate legal entity from the
       University of Cincinnati. Plaintiffs' complaint and
       memorandum in opposition inconsistently refer to
       UC as both a single "Defendant" and "Defendants."

In lieu of an answer, Defendants filed a motion to dismiss
based upon a lack of federal jurisdiction and for failure to state
a claim. (Doc. 6). Plaintiffs filed a response in opposition to
that motion, (Doc. 9), to which Defendants filed a reply. (Doc.

10). For the reasons that follow I now recommend that UC's
motion be GRANTED IN PART and DENIED IN PART.

**I. Standard of Review**

Unlike a motion for summary judgment, a motion to dismiss
is directed to the sufficiency of the pleadings, with the Court's
review limited accordingly. Thus, in evaluating the pending
motion under Rule 12(b)(6), the Court is required to "accept
all well-pleaded factual allegations of the complaint as true
and construe the complaint in the light most favorable to the
plaintiff." *Dubay v. Wells,* 506 F.3d 422, 426 (6th Cir. 2007)
(internal quotation marks and additional citation omitted). A
complaint must contain more than "labels and conclusions"
under the standards established in *Bell Atl. Corp. v. Twombly,*
550 U.S. 544, 127 S. Ct. 1955 (2007) and *Ashcroft v. Iqbal,*
556 U.S. 662, 129 S.Ct. 1937 (2009). At the same time, Rule
8(a) of the Federal Rules of Civil Procedure sets forth only
a "notice pleading" standard and does not require detailed
factual allegations. For that reason, all reasonable inferences
are to be construed in favor of the plaintiffs, and a complaint
generally will survive under Rule 12(b)(6) standards if it
contains sufficient factual content "that allows the court to
draw the reasonable inference that the defendant is liable for
the misconduct alleged." *Hensley Mfg. v. ProPride, Inc.,* 579
F.3d 603, 609 (6th Cir. 2009) (quoting *Iqbal,* 129 S.Ct. at
1949).

**II. Plaintiffs' Claims**

**A. Count I – Title II ADA Claim**

**1. Whether the Allegations State a Title II Claim**

Many of Plaintiffs' allegations and several claims focus on
alleged discrimination related to Plaintiffs' status as Egyptian
Muslim males. (*See, e.g.* Doc. 1 at ¶ 18, alleging that "100% of
the students who were dismissed from Defendant's program
in recent years were minority students."). However, three of
the articulated claims focus on Plaintiffs' alleged learning
disabilities. In Count I of the Complaint, Plaintiffs allege that
UC denied them accommodations and discriminated against
them in violation of the Americans with Disabilities Act
of 1990 ("ADA"). Although Plaintiffs fail to identify the
precise provision of the ADA under which they proceed, the
parties agree that the claims arise under Title II of the ADA.
That provision provides that "no qualified individual with
a disability shall, by reason of such disability, be excluded

from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

**\*2** In its motion, UC argues that Plaintiffs' allegations are so conclusory as to be insufficient to state any claim under Title II and/or that Plaintiffs' ADA claims should be dismissed on the basis of UC's Eleventh Amendment immunity. The undersigned begins with an examination of whether – apart from the immunity issue – Plaintiffs' allegations are otherwise sufficient to state any claim under Title II.

Plaintiffs allege that prior to their respective dismissals from the medical school, UC's Performance and Advancement Committee ("PAC") learned that each Plaintiff had one or more disabilities and needed accommodations. Plaintiffs have alleged that they sought but were refused "proper accommodations" by UC. [2] (Doc. 1, Complaint at ¶¶ 36, 49, 64). Plaintiff Ahmad more specifically alleges that he has ADHD and a general anxiety disorder, (*Id.* at ¶ 34), while Plaintiff Omar alleges that he suffers from anxiety, depression, and ADHD. (*Id.* at ¶¶ 46-49). Plaintiff Ahmad alleges that "[i]t was circulated that Ahmad passed his classes when he received support, but when [he] did not receive the same level [of] support as his classmates, it [led] to failure." (*Id.* at ¶ 30). Plaintiffs jointly assert that they "could have performed in the program had Defendant provided reasonable accommodations," and that they "would not have been dismissed if they did not have a disability." (*Id.* at ¶ 67). Thus, as a result of their disabilities, Plaintiffs assert they were denied access to a program of education at the University of Cincinnati, College of Medicine and ultimately were dismissed from that program. (*See id.* at ¶¶ 34-40, 46-54, 59-68).

[2]     Plaintiffs allege that the PAC is comprised of a group of faculty. Within the limited scope of review applicable to the present motion, the undersigned finds it reasonable to construe Plaintiffs' allegations concerning the PAC and/or the appeal panel as attributable to UC.

While conceding that Plaintiffs have sufficiently alleged that they suffer from disabilities, UC argues that Plaintiffs have failed to "establish" the remaining elements of a Title II claim, such as demonstrating they were otherwise qualified to continue in medical school with or without reasonable accommodations, that they conveyed to UC officials their formal diagnoses, that they requested accommodations in a

legally sufficient manner, and that the school failed to provide accommodations. *See generally Kaltenberger v. Ohio College of Podiatric Medicine*, 162 F.3d 432, 437 (6th Cir. 1998). It is true that Plaintiffs' allegations are relatively conclusory, insofar as the allegations fail to identify specific individuals other than the "Defendant," UC's PAC, or UC's "Appeal Panel." At the same time, however, UC relies upon cases that were decided on summary judgment, not on a motion to dismiss. In so doing, UC misconstrues the notice pleading standard, which requires only allegations that give rise to reasonable inferences to support Plaintiffs' Title II claims.

The issue is undoubtedly close given the paucity of factual detail. However, in the context of the present motion, it is appropriate to give the Plaintiffs the benefit of the doubt. Thus, reviewing the allegations as a whole, the undersigned concludes that the allegations are not so deficient that dismissal is warranted but reasonably construes the allegations as stating claims by each Plaintiff under Title II of the ADA. *Contrast Cooley v. Western Michigan University Cooley Law School*, 2017 WL 4324944 (E.D. Mich. Sept. 29, 2017) (holding that plaintiff's allegation that state had failed to conduct an impartial investigation of discrimination complaint against law school did not state a claim under Title II).

**\*3** UC urges this Court to consider further whether it is entitled to at least partial dismissal based upon a further parsing of Plaintiffs' claims. Title II case law reflects a variety of more specific legal theories beyond the intentional discrimination proscribed by the statutory language, including disparate treatment, disparate impact, and a failure to accommodate. Distinguishing among those legal theories, UC argues in its motion that Plaintiffs' Title II claim should be dismissed based upon a failure to state a "failure to accommodate" claim. In its reply brief, [3] UC additionally argues that Plaintiffs have failed to sufficiently identify similarly situated individuals in a manner that would support a "disparate treatment" claim under the ADA. (Doc. 10 at 9). *Contrast generally James v. Hampton*, 592 Fed. Appx. 449, 461 (6th Cir. Jan. 7, 2015) (permitting disparate treatment claim of race discrimination by an African-American state court judge to proceed where she went beyond "conclusory allegations" to identify "specific individuals and ... instances of their misconduct.").

[3]     Although UC initially argued against the viability of a disparate treatment theory under the Rehabilitation Act, (*see* Doc. 6 at 12-15), UC's

Case 2:20-cv-11718-GAD-DRG ECF No. 47, PageID.1229 Filed 01/31/22 Page 44 of 87

Saqr v. University of Cincinnati, Not Reported in Fed. Supp. (2019)

opposition to a construed "disparate treatment" claim under Title II of the ADA was first presented in its reply memorandum. As a rule, the Court will not consider new arguments presented for the first time in a reply.

Plaintiff's complaint contains only one ADA "discrimination" claim, and Sixth Circuit case law does not wholly support the presumption that each legal theory of liability can or should be viewed as a separate claim under Title II. Indeed, the Sixth Circuit has not defined whether, or to what extent, a plaintiff is required to further identify the legal theories under which he proceeds, once he has included sufficient allegations to state a claim of intentional discrimination under Title II. The parameters of the theories of liability arguably overlap one another, and the distinctions between theories are often poorly defined. Nevertheless, some ADA cases have "distinguished intentional discrimination claims from disparate-impact and reasonable-accommodation claims." *United States Society for Augmentative v. Lyon*, 2016 WL 6563422, at \*2 (E.D. Mich., Nov. 4, 2016) (citing *Everson v. Leis*, 412 Fed. Appx. 771, 784 n.6 (6th Cir. 2011) (Moore, J., dissenting) ). In light of the undersigned's conclusion that Plaintiffs have adequately stated the essential elements of a Title II claim, and the lack of controlling case law requiring further delineation of the legal theories upon which that claim is based, the undersigned declines UC's invitation to dismiss based on a "failure to accommodate" claim and/or theory of recovery under Title II. *See generally Anderson v. City of Blue Ash*, 798 F.3d 338, 357 (6th Cir. 2015) (setting forth three elements of prima facie case of intentional discrimination under Title II of ADA).

## 2. Whether Sovereign Immunity Bars Plaintiffs' Title II Claim

Having determined that Plaintiffs have adequately pleaded Title II claims against UC, the Court must next determine whether UC is immune from suit for those claims. States are entitled to sovereign immunity from suit under the Eleventh Amendment of the Constitution. *See Johnson v. University of Cincinnati*, 215 F.3d 561, 571 (6th Cir. 2000). While not contesting UC's assertion that it is an arm of the state, Plaintiffs point out that Congress has expressed an unequivocal desire to abrogate Eleventh Amendment immunity for violations of the ADA. *See* 42 U.S.C. § 12202. However, "the Supreme Court has held that Congress's attempted abrogation is only valid in limited circumstances, depending upon the nature of the ADA claim." *Babcock v. Michigan*, 812 F.3d 531, 534 (6th Cir. 2016).

In *United States v. Georgia*, 546 U.S. 151 (2006), the Supreme Court resolved a Circuit split concerning whether, and to what extent, the abrogation of Eleventh Amendment immunity was a valid exercise of Congress's authority for claims filed by a plaintiff under Title II of the ADA. [4] In *Georgia*, the Supreme Court held that Congress had validly abrogated a state's immunity for the Title II claims filed by a paraplegic prisoner plaintiff, and provided guidance for lower courts to resolve similar immunity issues on a claim-by-claim basis in future cases. To assess whether any particular Title II claim may proceed, the Supreme Court directed courts to determine:

> \*4 (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.

*Id.*, 546 U.S. at 159. Here, the undersigned has resolved the first portion of *Georgia* in Plaintiffs' favor, concluding that Plaintiffs' allegations are sufficient to state a claim that UC's failure to provide accommodations to each of the two Plaintiffs, and subsequent dismissal from the medical school program, constituted intentional discrimination in violation of Title II. *See Haas v. Quest Recovery Servs., Inc.* ("*Haas II*"), 247 Fed. Appx. 670, 672 (6th Cir. 2007) (holding that the Eleventh Amendment immunity issue should be addressed "only after finding a viable claim under Title II").

4      Previously, the Sixth Circuit had held that the State of Ohio was immune from suit under the Eleventh Amendment and that Congress had not effectively abrogated Ohio's immunity under the ADA, although the court also held that the plaintiff had failed to state any Title II claim. *Haas v. Quest Recovery Servs.*, Inc., 174 Fed. Appx. 265 (6th Cir. 2006). Following *Georgia*, the Supreme Court granted the Haases' petition for certiorari, vacated, and remanded for reconsideration. *Haas v. Quest Recovery Servs., Inc.*, 127 S. Ct. 1121 (2007). In

*Haas II*, the Sixth Circuit affirmed based upon its conclusion, as re-affirmed, that the plaintiff had failed to state a Title II claim and therefore failed to satisfy the first prong of the *Georgia* inquiry.

Under the second portion of the *Georgia* inquiry, the undersigned must determine whether Plaintiffs' allegations are reasonably construed as violating the Fourteenth Amendment. In *Georgia*, it was undisputed that plaintiff's allegations stated a plausible claim that prison officials had violated the Eighth Amendment.

> Goodman urges, and the State does not dispute, that this same conduct that violated the Eighth Amendment also violated Title II of the ADA.... In fact, it is quite plausible that the alleged deliberate refusal of prison officials to accommodate Goodman's disability-related needs in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs constituted "exclu[sion] from participation in or ... deni[al of] the benefits of" the prison's "services, programs, or activities." 42 U.S.C. § 12132.

*Id.*, 546 U.S. at 157 (additional citations omitted). Because the Due Process Clause of the Fourteenth Amendment incorporates the Eighth Amendment's fundamental guarantee against cruel and unusual punishment, the Supreme Court found the plaintiff's allegations to simultaneously state claims under both Title II and the Fourteenth Amendment. Because the plaintiff had alleged a Fourteenth Amendment violation that was entirely co-extensive with his Title II claim, the Supreme Court concluded that the state's Eleventh Amendment immunity was effectively abrogated under the Fourteenth Amendment for that claim.

Unlike in *Georgia*, Plaintiffs here have not identified *any* constitutional violation by UC, much less a violation of the Fourteenth Amendment. Plaintiffs concede as much, [5] glossing over the second part of the *Georgia* inquiry in order to focus on the third (alternative) inquiry – the determination of whether, for Title II claims that do not violate the Fourteenth Amendment, Congress's abrogation of sovereign immunity is "nevertheless valid." *See Georgia*, 546 U.S. at 159; *accord Toledo v. Sanchez*, 454 F.3d 24, 33-34 (1st Cir. 2006) (moving on to third inquiry after determining that plaintiff had failed to allege Fourteenth Amendment violation).

[5]     Plaintiffs argue in a cursory fashion that that their Title II claims are not barred by

sovereign immunity because the same allegations "support an inference that Plaintiffs were treated differently because of their disability compared to other students who requested accommodations ... specifically other non-minority students." (Doc. 9 at 5, emphasis added). However, Plaintiffs' one-sentence argument does not point to specific allegations or provide any explanation for construing the allegations as stating a Fourteenth Amendment claim. While "reasonable" inferences must be drawn in favor of the non-moving party, the undersigned cannot find "reasonable" a construction that is wholly unsupported. *See generally Babcock v. Michigan*, 812 F.3d at 534 (clarifying that "an alleged violation of the Equal Protection Clause based on heightened scrutiny as a member of a suspect class, as opposed to an alleged Due Process Clause violation, cannot serve as a basis for Title II liability," internal citations omitted). Plaintiffs' complaint is devoid of "rational basis" allegations or any other clearly stated constitutional claim. *Compare Mingus v. Butler*, 591 F.3d 474, 482-483 (6th Cir. 2010) (In case where state had conceded that facts would show a violation of Title II, plaintiff had alleged misconduct that "*actually* violated the Fourteenth Amendment" when he alleged under the Equal Protection Clause there was "*no rational basis* for the classification allowing able bodied prisoners, and those with medical problems less serious than Plaintiff's, as qualifying for a single-occupancy room.") (emphasis added).

**\*5**  To determine whether the abrogation of sovereign immunity is valid for a Title II claim that does *not* implicate the Fourteenth Amendment, the third portion of the *Georgia* inquiry incorporates the "congruence and proportionality" test set forth in *City of Boerne*, 521 U.S. 507, 520-521 (1997).

> Congress does not enforce a constitutional right by changing what the right is. It has been given the power "to enforce," not the power to determine what constitutes a constitutional violation. Were it not so, what Congress would be enforcing would no longer be, in any meaningful sense, the "provisions of [the Fourteenth Amendment]."

> While the line between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law is not easy to discern, and Congress must have wide latitude in

Case 2:20-cv-11718-GAD-DRG ECF No. 47, PageID.1231 Filed 01/31/22 Page 46 of 87

Saqr v. University of Cincinnati, Not Reported in Fed. Supp. (2019)

determining where it lies, the distinction exists and must be observed. There must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end. Lacking such a connection, legislation may become substantive in operation and effect. History and our case law support drawing the distinction, one apparent from the text of the Amendment.

*City of Boerne v. Flores*, 117 S.Ct. at 2164, 521 U.S. at 519–20.

In conducting the "congruence and proportionality" inquiry, a court must determine: (1) the fundamental right that Congress sought to enforce; (2) whether there is a history of unconstitutional discrimination that supports Congressional determination that prophylactic legislation was necessary; and (3) whether Title II is an appropriate response. *See Tennessee v. Lane*, 541 U.S. 509, 520-23 (2004); *Bourne*, 521 U.S. at 519 (holding that Congressional power "extends only to 'enforcing the provisions of the Fourteenth Amendment,' " additional internal citation omitted). In both *Lane* and *Georgia*, the Supreme Court resisted any temptation to conclude that Congress's abrogation of immunity would be valid for *any* claim filed under Title II, reminding lower courts that context matters. *See Lane,* 541 U.S. at 530 (declining to consider Title II as "an undifferentiated whole," and explaining "Whatever might be said about Title II's other applications, the question presented in this case is not whether Congress can validly subject the States to private suits for money damages for failing to provide reasonable access to hockey rinks, or even to voting booths, but whether Congress had the power ... to enforce the *constitutional* right of access to the courts.") (emphasis added). In their memorandum in opposition to UC's motion, Plaintiffs maintain that just as *Lane* established the valid abrogation of immunity under Title II for cases involving the constitutional right of access to the courts and *Georgia* established the valid abrogation of immunity for Title II claims that violate the Eighth and Fourteenth Amendments, most Circuits have concluded that the abrogation of immunity for Title II claims is valid for *any* claims involving a program of "public education" even when *no* constitutional right is at issue. Thus, Plaintiffs propose that Congress has validly abrogated immunity for all Title II claims based on alleged discriminatory animus in the broad category of programs of "public education," regardless of the type of educational program.

**\*6** The breadth of the waiver of sovereign immunity proposed by Plaintiffs cannot be harmonized with the language of *Lane* and *Georgia*, which strongly suggests that

the waiver of immunity for at least some programs or services (i.e., access to state owned hockey rinks) might not be valid. The undersigned agrees with UC that *Lane* and *Georgia* emphasize that context controls, particularly when the Title II claim is not based on any constitutional right.

UC does not contest that Congress has validly abrogated immunity for some claims based upon educational programs, but argues that *Georgia* requires a sharp focus on the precise type of educational "program" on which the Title II claim is based. Applying this nuance, UC argues that the abrogation of immunity for a claim of discrimination in the professional school context is overbroad and constitutes an invalid and unconstitutional expansion of Congress's power. After all, unlike the right to access the courts at issue in *Lane* or the prohibition against cruel and unusual punishment at issue in *Georgia*, the right to public education is not a "fundamental" right. [6] *See Carten v. Kent State University*, 282 F.3d 391, 395 (6th Cir. 2002) (pre-*Georgia* case holding that Title II claims by graduate student sounding in equal protection rather than due process were barred by sovereign immunity, in part because claim sought access to education – a lesser right than participation in judicial proceedings). Additionally, "[p]ersons with disabilities 'are not a suspect class for purposes of an equal protection challenge.' " *Crochan Through Shields v. Columbus City Schools*, 278 F. Supp.3d 1013, 1020 (S.D. Ohio 2017) (quoting *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 457 (6th Cir. 2008) (additional citation omitted) ). Still, the right to education has been recognized as "vital" and in Title II, Congress expressed a clear intent to protect that right for persons with disabilities. *See generally Ass'n for Disabled Americans, Inc. v. Fla. Int'l Univ.*, 405 F.3d 954, 958 (11th Cir. 2005) ("the constitutional right to equality in education, though not fundamental, is vital to the future success of our society," citing *Brown v. Board of Education*, 347 U.S. 483, 493 (1954) ).

6
    Courts generally limit the definition of "fundamental" rights to those based upon specific constitutional provisions. *See, e.g., Doe v. Bd. of Trustees of U. of Illinois*, 429 F. Supp.2d at 939 (holding that "education, despite its undoubted importance, is not considered by the Supreme Court to be a fundamental constitutional right," citing *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35-37 (1973) ); *accord Cunningham v. U of N.M. Bd. of Regents*, 779 F. Supp. at 1279 (acknowledging that education is not a fundamental right but holding that Congressional abrogation of

immunity for "higher education" is still valid based upon published case law in First, Third, Fourth and Eleventh Circuits, without drawing distinctions between undergraduate education and professional school).

In support of its position that immunity has been validly abrogated for discrimination at the professional school level, Plaintiffs rely on two pre-*Georgia* and two post-*Georgia* cases from the First, Third, Fourth, and Eleventh Circuits, as well as a handful of published and unpublished district court cases. *See e.g., Bowers v. Nat'l Collegiate Athletic Ass'n,* 475 F.3d 524, 555 (3d Cir. 2007); *Toledo v. Sanchez,* 454 F.3d 24; *Constantine v. Rectors & Visitors of George Mason Univ.,* 411 F.3d 474 (4th Cir. 2005); *Ass'n for Disabled Americans,* 405 F.3d 954; *see also McCollum v. Owensboro Community & Tech. College,* 2010 WL 5393852 at n.1 (W.D. Ky. Dec. 22, 2010) (stating that "Title II of the ADA validly abrogates sovereign immunity with respect to public education."). While all four Circuit cases broadly upheld the abrogation of immunity for claims involving "public education," it is worth noting that three concerned claims at the undergraduate level. The only case involving a claim in post-graduate education (law school) was the pre-*Georgia* claim presented in *Constantine.* However, Constantine did not consider whether professional or graduate school programs deserve special consideration, and the Fourth Circuit's overarching analysis included sweeping language about the validity of abrogation for all Title II claims that is arguably incompatible with *Georgia. Accord Guttman v. Khalsa,* 669 F.3d 1101, 1117 (10th Cir. 2012) (distinguishing *Constantine* as inappropriately reading *Lane* as holding that Title II survives the first two prongs of the *City of Bourne* inquiry in all cases); *see also Constantine,* 411 F.3d at 487, 489 (interpreting *Lane* as holding that Title II was validly enacted as a response to a history and pattern of disability discrimination in *all* areas of public services or programs, reasoning that Title II "presents fewer congruence-and-proportionality concerns than does Title I").

**\*7** Examining the two post-*Georgia* Circuit court cases, the clearest rationale for an expansive view of the abrogation of immunity for "public education" at all levels is set forth in *Toledo v. Sanchez.* There, the First Circuit concluded that the abrogation of immunity for claims against a public university by an allegedly disabled undergraduate student was validly applied to "*all levels* of public education," expressly rejecting the contention that the court should narrow its focus to evaluate "the validity of Title II [immunity only] as it applies to the conduct of public *universities.*" *Id.* at

36 (emphasis added). Citing *Tennessee v. Lane,* the First Circuit reasoned that "[t]he Supreme Court's broad treatment of judicial services suggests that we should consider Title II as it applies to public education in general." *Id.*

In contrast to the reasoning of *Toledo,* however, *Lane* involved a "fundamental" and clearly constitutional right of access to the courts. Nevertheless, in *Bowers,* the Third Circuit reached a similar conclusion. There, an athlete who suffered from a learning disability had filed suit against the NCAA and several universities, alleging in part that the denial of academic eligibility based upon his failure to take required core courses in high school violated the ADA when they ceased recruiting him as a high school senior and/or as a college freshman. Among the multiple issues resolved in a complex consolidated appeal was whether the University of Iowa was entitled to sovereign immunity for the plaintiff's Title II claim. Answering that query in the negative, the *Bowers* court upheld the abrogation of sovereign immunity for any student seeking entrance to a college or university based upon a denial of access to "public education," relying heavily on the pre-*Georgia* decisions by the Fourth and Eleventh Circuits as well as the First Circuit's post-*Georgia* decision in *Toledo*:

As the Fourth Circuit observed in *Constantine,* Congress limited the scope of Title II in several respects. First, the statute only protects "qualified individuals with a disability." Second, Title II permits States to limit participation in their programs and activities for all other lawful reasons. Third, Title II only requires States to make "reasonable modifications" to accommodate the disabled, thus protecting the States from having to compromise essential eligibility criteria for public programs. Finally, States are able to make available other accommodations if structural modifications of physical structures are too burdensome. 411 F.3d at 488–89. For those reasons, and against the backdrop of discrimination against disabled students, the *Constantine* court concluded that Title II was valid legislation as applied to public education. *Id.* at 490. *See also Toledo,* 454 F.3d at 40 ("Title II's prophylactic measures are justified by the persistent pattern of exclusion and irrational treatment of disabled students in public education, coupled with the gravity of the harm worked by such discrimination."); *Assoc. for Disabled Americans, Inc.,* 405 F.3d at 959 ("Discrimination against disabled students in education affects disabled persons' future ability to exercise and participate in the most basic rights and responsibilities of citizenship, such as voting and participation in public programs and services. The

relief available under Title II of the ADA is congruent and proportional to the injury and the means adopted to remedy the injury.").

*Bowers*, 475 F.3d at 555–56. While the above reasoning *could* be used to conclude that Title II validly waives state immunity for the claims presented, other courts have been more circumspect about sweeping away Eleventh Amendment immunity for any and all claims related to "public education." *See e.g.,* *W.H. by and through M.H.D.R. v. Tenn. Dept. of Ed.*, 2016 WL 236996 at 9 (M.D. Tenn. Jan. 20, 2016) (holding that "[i]n the absence of express guidance from the Sixth Circuit, the court is swayed by ... other circuits' holdings ... with respect to the right to public *primary* education" despite the fact that education is not a constitutional right) (emphasis original).

 **\*8** The undersigned is persuaded by the reasoning of courts that have squarely confronted the same issue that the distinction between other educational programs and professional school education is an important one. In *McCulley v. Univ. of Kansas School of Medicine*, 2013 WL 1501994 at *3 (D. Kan. Apr. 10, 2013), the court dismissed a medical student's Title II claim for monetary damages after finding no showing of "historical discrimination in medical schools," thereby refuting any conclusion under the *City of Bourne* test that Title II is "proportional, congruent, or responsive to historical unconstitutional behavior" by medical schools. *McCulley* reasoned that a medical school degree differs substantially from other educational programs, because it is a professional degree that leads to a specific occupation. *Accord Guttman v. Khalsa*, 669 F.3d 1101, 1125 (10th Cir. 2012) (upholding immunity against claim by disabled doctor relating to revocation of medical license because the right to practice a chosen profession is not a "fundamental right" and Title II cannot be viewed as proportional to any identified pattern of historic discrimination in professional licensing).

Other courts, like *McCulley*, draw the abrogation-of-immunity line at Title II claims alleging discrimination at the post-graduate level. *See Shaikh v. Texas A&M University College of Medicine*, 739 Fed. Appx. 213, 225 (5th Cir. 2018) (*per curiam*, holding that medical student failed to state Fourteenth Amendment claim, and affirming grant of immunity by trial court against Title II claim despite lower court's incomplete analysis, because medical student failed to provide any "meaningful argument that Congress's purported abrogation is 'nevertheless valid' in this case"); *Doe v. Board of Trustees of University of Illinois*, 429 F.

Supp.2d 930, 939 (N.D. Ill. 2006) (granting immunity against claim by former student with learning disabilities dismissed from medical and doctoral programs, disagreeing with Fourth and Eleventh Circuits and holding that Title II "as applied to the postgraduate state university program at issue in this case, exceeds Congress's power" to abrogate Eleventh Amendment immunity); *Rittenhouse v. Bd. of Trustees of So. Illinois University*, 628 F. Supp.2d 887 (S.D. Ill. 2008) (citing reasoning of *Doe* as "compelling" and finding immunity against Title II claim filed by law school student).

Neither the Sixth Circuit nor any district court within this circuit has directly considered or provided reasoned analysis of this precise issue. *But see Frank v. University of Toledo*, 621 F. Supp.2d 475 (N.D. Ohio 2007) (citing *Bowers* and *Toledo* and holding that abrogation of state sovereign immunity validly applies to all "public higher education" for claim by student in Ph.D. program, without discussion of post-graduate nature of program). The only published Sixth Circuit case involving graduate student education is *Carten v. Kent State University*, 282 F.3d 391, a pre-*Georgia* case that held that sovereign immunity barred the plaintiff's claims, without considering the import of differences between undergraduate and professional school educational programs.

Plaintiffs cite two cases from other courts involving medical students. However, one of those cases chose not to reach the issue, while the other did not address whether access to professional school warrants different treatment. [7] *See, e.g., Dean v. University at Buffalo School of Medicine and Biomedical Sciences*, 804 F.3d 178, 193-195 and n.9 (2d Cir. 2015) (noting a "growing fracture among the district courts in this Circuit" but declining to reach issue of whether immunity was validly abrogated for Title II for "discrimination in access to public higher education"); *Cunningham v. Univ. of N.M.*, 779 F. Supp.2d 1273 (D.N.M. 2011) (holding that Congressional abrogation of immunity for higher education is valid based upon Circuit cases, but without further discussion). [8]

[7]

The undersigned has located other cases involving medical students that reveal a similar lack of analysis of the issue. *See generally, Duncan v. University of Texas Health Science Center at Houston*, 469 Fed. Appx. 364 (5th Cir. 2012) (holding without elaboration that trial court erred in granting immunity on Title II claim by medical student, but alternatively holding that claim would

Case 2:20-cv-11718-GAD-DRG ECF No. 47, PageID.1234 Filed 01/31/22 Page 49 of 87

Saqr v. University of Cincinnati, Not Reported in Fed. Supp. (2019)

not have survived summary judgment); *Shurb v. University of Texas Health Science Center at Houston – School of Medicine*, 2013 WL 4096826 at n. 8 (S.D. Texas Aug. 13, 2013) (dismissing claim of immunity via footnote as "unpersuasive").

8 Plaintiffs also cite *Sarkissian v. W. Va. Univ. Bd. of Governors*, 2007 WL 1308978 (N.D.W.V. May 3, 2007), in which a doctor who presumably had completed medical school prior to beginning a residency program alleged he had been dismissed because of his ADHD. Like the two cases involving medical students, the court in *Sarkissian* failed to discuss any distinctions and simply equated the professional *residency program* with "public higher education." *See id.,* at *8 (relying on *Constantine*, holding that Fourth Circuit had settled issue on valid abrogation of immunity for any Title II claim based upon access to "public higher education").

**\*9** In one of the few cases cited by Plaintiffs that addresses a post-graduate claim, the district court briefly noted that the claim challenged access to a PhD program, but held that Title II abrogated immunity even for claims at the post-graduate education level. *See Novak v. Bd of Trustees of So. Ill. University*, 2012 WL 5077649 (S.D. Ill. Oct. 18, 2012). However, *Novak* is unpersuasive because that court mistakenly reasoned that "[t]he First, Third, Fourth, and Eleventh Circuits have extended *Lane* to post-graduate state universities, finding Title II of the ADA to be a congruent and proportional response." *Id.* at *5 (emphasis added). As stated, only the Fourth Circuit's opinion in *Constantine* involved a claim by a law student rather than an undergraduate student. Since *Georgia* was decided in 2006, no Circuit court has squarely addressed the issue of whether a claim brought in the professional graduate school context might result in a different outcome. Consistent with the claim-by-claim approach required by both *Lane* and *Georgia*, and the analysis of several district courts that have addressed the issue, I conclude that the abrogation of immunity is not valid for Plaintiffs' Title II ADA claims of denial of access to medical school. Therefore, UC is entitled to dismissal of Plaintiffs' Title II claims for monetary damages.

### 3. Whether the Statute of Limitations Bars Ahmad's Claim

UC's motion also seeks dismissal of Plaintiff Ahmad's Title VI discrimination, ADA, and Rehabilitation Act claims based upon a statute of limitations defense. The parties agree that all of Plaintiffs' claims are subject to a two-year statute of limitations defense. *See McCormick v. Miami Univ.*, 693 F.3d 654, 662 (6th Cir. 2012) (ADA and Rehabilitation Act); *Brooks v. Skinner*, 139 F. Supp.3d 869, 880-881 (S.D. Ohio 2015) (Title VI). This suit was filed on August 3, 2018; therefore, any claims that arose more than two years prior to that date are time-barred.

Plaintiffs' complaint includes several dates concerning Plaintiff Ahmad's claims: August 2010, June 29, 2016, August 2, 2016, and August 4, 2016. (Doc. 1 at ¶¶ 26, 27, 28, 30). Typically, a statute of limitations defense is raised in a motion to dismiss only where the failure to comply with the limitations period is apparent from the face of the pleadings. Multiple cases suggest that Plaintiff Ahmad's claims may well be time-barred. *See generally Delaware State College v. Ricks*, 449 U.S. 250 (1980) (tenure decision); *Morse v. University of Vermont,* 973 F.2d 122 (2d Cir. 1992) (where disabled student was terminated from master's program, internal administrative review of University's decision had no effect on when the statute of limitations for Rehabilitation Act claim period began to run); *cf. Babiker v. Ross Univ. Sch. of Med.,* 2000 WL 666342 at *9 n. 15 (S.D.N.Y. May 19, 2000) (section 1981 claim against medical school dismissed as beyond the statutory time period, even though plaintiff's internal appeal of his discharge occurred within the statutory time period); *Rapp v. Oregon Health Sciences University*, 972 F. Supp. 546 (D. Or. 1997) (same).

Despite this case law, the undersigned is reluctant to grant UC's motion to dismiss prior to any discovery on the issue. Plaintiff does not contest UC's argument that any claims relating to events in 2010 are time-barred. However, Plaintiff maintains that he was not finally dismissed until August 4, 2016, a date that falls just within the limitations period. (*See* Doc. 9 at 9, arguing that the "decision to recommend Ahmad for dismissal made on June 29, 2016 was not a final decision as the Complaint makes clear that students have a right to appeal a PAC's initial recommendation for dismissal....").

Courts ordinarily will not grant a motion to dismiss on limitations grounds where "the pleadings do not conclusively show that the plaintiffs' claims are barred." *Basile v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 551 F. Supp. 580, 582 (S.D. Ohio 1982); *see also Hensley Mfg. v. ProPride, Inc.*, 579 F.3d at 613. In the absence of this Court's ability to review

the precise language of the June 29, 2016 communication from the PAC or any other exhibits attached to the pleadings that shed light on the matter, the undersigned declines to dismiss Plaintiff's claims as time-barred at this juncture. *Compare Datto v. Harrison*, 664 F. Supp.2d 472 (E.D. Penn. 2009) (holding based on explicit language in letter to doctoral student that possibility that decision could have been reversed on appeal did not change when the cause of action accrued); *accord Endres v. Ne. Ohio Med. Univ.*, 2018 WL 4002613 (N.D. Ohio Aug. 22, 2018) (dismissing similar claims based on exhibits attached to the complaint, holding that the disability discrimination claim accrued when the "decision to dismiss him was formally communicated" prior to the rejection of his appeal of that decision).

**\*10** Plaintiffs have filed no formal motion seeking leave to amend. However, in a footnote, Plaintiff Ahmad "respectfully ask[s] the Court for leave to amend his complaint to add a claim for violation of his Due Process right as this [statute of limitations] argument by Defendants supports the conclusion that Ahmad's dismissal was a for[e]gone conclusion, notwithstanding his right to appeal and therefore a sham proceeding giving rise to claims for procedural due process violations." (Doc. 9 at 9 n.1). Plaintiffs' footnoted leap of logic makes no sense. Nothing in UC's legal argument supports a new claim. Certainly, the fact that a litigant loses an appeal proceeding does not ordinarily provide grounds for concluding that the ruling authority violated the litigant's procedural due process rights, or that the appeal result was somehow "fixed." Otherwise, virtually every litigant who loses any type of appeal could raise such a claim, with no more factual or legal support for the claim than "I lost, therefore my constitutional due process rights must have been violated." In short, this Court cannot agree that UC's legal argument provides any support for a new constitutional claim not previously asserted, even if Plaintiffs had filed an appropriate motion to amend.

### B. Count II - Title V Retaliation Claim Under the ADA

#### 1. Sovereign Immunity

The parties agree that the same result obtained by this Court concerning the applicability of sovereign immunity to Plaintiffs' Title II claim should apply to Plaintiffs' Title V retaliation claim. *See generally McCollum*, 2010 WL 5393852 at *3 ("Where the underlying claim is predicated on alleged violations of Title II of the ADA, then the Title

II abrogation of immunity is extended to ADA Title V retaliation claims."). Because the undersigned has concluded that UC retains its sovereign immunity for the *specific* Title II claims at issue in this case, sovereign immunity also bars any Title V claims based on that same conduct. *See Demshki v. Monteih*, 255 F.3d 986 (9th Cir. 2001) (because state was immune from suit under Title I of ADA, it was immune from suit for Title V retaliation claim predicated on Title I violation).

#### 2. Plaintiffs' Allegations Fail to State a Title V Claim

In the alternative,[9] UC argues that Plaintiffs' allegations are insufficient to state a plausible retaliation claim under Title V, even assuming that Plaintiffs' dismissals from the College of Medicine are adverse actions and that they engaged in protected activity. UC maintains that the allegations fail to show UC had "actual knowledge" that Plaintiffs engaged in protected activity, including knowledge by the decision-maker(s). UC points out that neither Plaintiff identifies which UC official(s) he complained to or the dates of those complaints. Based upon the lack of identification of any specific individual, UC maintains that the allegations "do not support an inference that Defendants or any actual decision-makers harbored any retaliatory motive." *See EEOC v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (affirming grant of summary judgment based on record presented). In turn, UC contends there is no "causal connection" between the dismissals and Plaintiffs' alleged protected activity.

[9] The undersigned addresses alternative issues for reasons of judicial economy, should any reviewing court disagree with the undersigned's sovereign immunity analysis.

The undersigned agrees that, unlike Plaintiffs' Title II allegations, the allegations supporting Plaintiffs' retaliation claim are simply too threadbare to make out such a claim under the ADA. In reaching this conclusion, the undersigned is guided by the analysis set forth in *Rhodes v. R & L Carriers, Inc.*, 491 Fed. Appx. 579, 583-584 (6th Cir. 2012), in which the Sixth Circuit reversed the dismissal of an age discrimination retaliation claim on grounds that the trial court had inappropriately required overly specific factual allegations at the pleading stage. *Rhodes* does not aid Plaintiffs here, however, because neither Plaintiff identifies any specific individual or, for that matter, any facts at all to support their claims. While both Plaintiffs

Case 2:20-cv-11718-GAD-DRG ECF No. 47, PageID.1236 Filed 01/31/22 Page 51 of 87

Saqr v. University of Cincinnati, Not Reported in Fed. Supp. (2019)

allege in conclusory fashion that they "confronted Defendant for refusing to provide them accommodations for their conditions," (Doc. 1 at ¶ 71), neither identifies the timing or nature of the "confrontation" or provides any supporting detail that would allow this Court to draw a reasonable inference that Plaintiffs were subjected to dismissal from the College of Medicine in retaliation for their complaints of disability discrimination.

**\*11** The most that Plaintiff Ahmad alleges is that "[b]efore and after his dismissal, [he] did complain that he was not receiving accommodations and was different treatment [sic] than non-minority students" and that *after* dismissal, he "did file a complaint with Defendant putting it on notice for his disparate treatment in the Program." (*Id.* at ¶¶ 42-43). Obviously, a complaint of discrimination that did not occur until after dismissal could not support a claim that UC dismissed Plaintiff Ahmad in retaliation for his complaint. That leaves only the conclusory allegation by Plaintiff Ahmad that he "did complain" about his treatment to an unknown person or persons, in an undetermined fashion, prior to his dismissal. Plaintiff Omar offers only slightly more detail, alleging only that his brother Ahmad "filed a Complaint with Defendant after his [Ahmad's] dismissal," and that "Defendant further retaliated against Omar relating to his brother's Complaint against the Program." (*Id.* at ¶¶ 72 73). Plaintiff Omar also alleges that during his appeal process, he "confronted Defendant for failing to provide him accommodations and treating him differently" and that "Defendant's agents reacted with hostility to his comments during the appeal." (Doc. 1 at ¶¶ 56-57).

Plaintiffs protest that to require greater detail prior to discovery would be manifestly unfair. They suggest that requiring them to identify "the University officials to whom they complained ... would require a discrimination plaintiff to state factual details that are rightfully subject to the discovery process." (Doc. 9 at 12). The undersigned disagrees. No discovery from UC should be required for Plaintiffs to identify some minimal level of detail within Plaintiffs' knowledge, such as the name or title of the person(s) to whom they allegedly complained, whether the complaints were oral or in writing, and/or a rough time frame of when they expressed those complaints. Plaintiffs' minimalistic and conclusory pleading would require this Court to draw inferences that are not plausible based on the face of the complaint, and do not surpass the relatively low bar of "notice pleading" required to state a retaliation claim. *Accord, Rhodes, supra.*

### C. Count III - Rehabilitation Act ("RA")

"Because claims brought under Title II of the ADA and § 504 of the RA require proof of substantially similar elements, courts often treat the two in the same manner and analyze ADA and RA claims together." *Gohl v. Livonia Public Schools*, 134 F. Supp.3d 1066, 1074 (E.D. Mich. 2015) (citing *S.S. v. E. Ky. Univ.*, 532 F.3d at 452-453) (analyzing claims together but recognizing that the Rehabilitation Act only covers federally funded entities and is limited to discrimination "solely" based upon disability). Based upon the similarity of these two laws, UC first argues that Plaintiffs fail to state any plausible Rehabilitation Act claim for the same reason that Plaintiffs' allegations fail to make out a Title II claim under the ADA. The undersigned rejects that argument for the reasons stated above.

However, UC additionally and more persuasively argues that even if this Court finds that Plaintiffs have stated a Title II claim, the Court still should conclude that Plaintiffs have not stated a Rehabilitation Act claim under that statute's stricter causation standard. *See, e.g.*, 29 U.S.C. § 794 and *Lewis v. Humbold Acquisition Corp., Inc.*, 681 F.3d 312, 315 (6th Cir. 2012) (holding that the two laws have "two distinct causation standards" with the Rehabilitation Act barring only discrimination that is based "solely by reason of" an individual's disability; *Anderson*, 798 F.3d at 357 n. 1 (holding that sole-causation standard does not apply to Title II ADA claims). As UC points out, Plaintiffs allege that UC "ousted Plaintiffs from the medical program because of their disability," (Doc. 1 at ¶ 82) but fail to allege discrimination based *solely* on disability, instead alleging that UC discriminated against them based on a combination of their alleged disabilities, national origin and race. (Complaint at ¶ 92). Plaintiffs do not plead their claims in the alternative, but instead rely upon the same set of allegations for all claims. (*See generally* Doc. 1 at ¶¶ 1, 17-22, 24, 29-31, 41-42, 44, 58; *see also* Doc. 9 at 5, arguing that "Plaintiffs were treated differently because of their disability compared to other students who requested accommodations, and specifically other non-minority students."). Because Plaintiffs clearly allege more than one cause of discrimination in a manner that is incompatible with relief under the Rehabilitation Act, they fail to state claims under that Act. Therefore, the undersigned recommends dismissal of that claim. *Accord Yates-Matttingly v. Univ. of Cincinnati*, Case No. 1:11-cv-753, 2012 WL 3779934 (S.D. Ohio Aug. 31,

2012) (dismissing Rehabilitation Act claim, holding that amendment of complaint to allege receipt of federal funds by UC would be futile because Plaintiff also failed to allege that her disability was the sole reason for her termination from UC as required to state a claim); *Doe v. BlueCross BlueShield of Tennessee, Inc.*, 2018 WL 3625012 at *4 (W.D. Tenn. July 30, 2018) (holding that amended complaint did not satisfy Rehabilitation Act's "solely because of" language).

**\*12** Finally, unlike the distinct "discrimination" and "retaliation" ADA claims set forth in Plaintiffs' complaint, the complaint contains only a single count of "discrimination" under the RA. To the extent that Plaintiffs' complaint may be construed as containing an additional retaliation claim under the RA, the undersigned recommends dismissal of any such claim for the same reasons I have recommended dismissal of the ADA retaliation claim.

### D. Count V - Title VI of the Civil Rights Act

In Count V of their Complaint, both Plaintiffs allege that UC violated Title VI of the Civil Rights Act, 42 U.S.C. § 2000d. [10] Title VI provides in relevant part that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." *Id.* UC construes Plaintiffs' allegations under Title VI as alleging distinct claims: (1) disparate treatment and/or direct discrimination through dismissal "because of [Plaintiffs'] national origin and race," (2) disparate impact discrimination through policies "designed to intentionally discriminate against similarly-situated non-white students," and (3) a "pattern and practice" claim of "systemic discrimination regarding students with different national origins during the support, dismissal and appeals processes." (Doc. 1 at ¶¶ 92-94).

[10]    The complaint identifies the relevant statute only by its abbreviated title, "Title VI."

In support of their Title VI claims, Plaintiffs allege that they were qualified to continue in medical school, but were discriminated against and ultimately dismissed from the College of Medicine "because of their national origin and race," insofar as they identify as Egyptian, Muslim male students. [11] (*Id.* at ¶¶ 90-92). Both allege that UC's "policies regarding the PAC review process are designed

to intentionally discriminate against similarly-situated non-white students," and that UC "dismisses ... minority-students at a rate surpassing its regional comparators." (*Id.* at ¶¶ 93, 95). Plaintiff Ahmad more specifically alleges that he was not provided the same level of counseling as "non-minority students," that he was forced to take 1.5 years off "which was disproportionate to [the PAC's] treatment of members outside [his] protected class," and that the PAC did not contact his advisor during the PAC process. (Doc. 1 at ¶¶ 30-33). In addition, Plaintiff Ahmad alleges he was "forced ... to endure an overly burdensome exam schedule" in comparison to other students, and that UC denied his appeal of the dismissal in contrast to an unidentified "non-minority student [who] was able to successfully appeal his dismissal." (*Id.* at ¶¶ 36, 37, 41).

[11]    Title VI does not expressly prohibit religious discrimination, notwithstanding Plaintiffs' repeated reference to their religious affiliation. *See Rosario de Leon v. Nat'l College of Business & Technology*, 663 F.Supp.2d 25, 34 (D.P.R. 2009). In a footnote in their response, Plaintiffs state that the complaint's use of the caption "National Origin and Race Discrimination" is a "scrivener's error insofar as the claim should more properly be labelled 'National Origin, Ethnicity, and Religious Discrimination.' " (Doc. 9 at 12-13, n. 2). Plaintiffs assert that the alleged error "does not change the substantive analysis but recognizes that 'Egyptian Muslim' refers to national origin, ethnicity and religious affiliation, not 'race.' " (*Id.*)

**\*13** Both Plaintiffs combine their allegations of race and/or national origin discrimination and disability discrimination. Thus, in support of his Title VI claim, Plaintiff Omar alleges that prior to his dismissal from medical school, UC "recommended Omar seek Islamic support," but otherwise denied him [disability-related] accommodations. In the only other allegations that specifically address his national origin, Plaintiff Omar alleges that his PAC "Appeal Panel ... lacked any foreign nationals," and that he "confronted [UC] for.... treating him differently." (*Id.* at ¶¶ 55-56). Without elaboration, he alleges that UC treated him "differently than similarly-situated students who were not minorities." (*Id.* at ¶ 58). On the whole, UC argues that these allegations are too conclusory to state *any* type of claim on behalf of either Plaintiff under Title VI, whether characterized as a "disparate treatment," "disparate impact" or a "pattern or practice" claim.

Case 2:20-cv-11718-GAD-DRG ECF No. 47, PageID.1238 Filed 01/31/22 Page 53 of 87

*Saqr v. University of Cincinnati*, Not Reported in Fed. Supp. (2019)

Plaintiffs have conceded that they are not seeking to recover under a theory of disparate impact. (Doc. 9 at 13). *See also Alexander v. Sandoval*, 532 U.S. 275, 280 (2001) (holding there is no private right of action for disparate impact claim under Title VI, and that Title VI prohibits only intentional discrimination).[12] As to UC's arguments that the allegations are insufficiently specific to support either a "disparate treatment" or a "pattern and practice" theory of liability, the undersigned again concludes that disparate treatment and pattern and practice are better viewed as theories of liability than as separate Title VI claims. Contrary to the assumptions in UC's argument, the undersigned has not located any controlling Sixth Circuit case law that requires a plaintiff who has otherwise stated an intentional discrimination claim under Title VI to identify a more specific theory of liability.[13]

[12]    The Sixth Circuit also has rejected consideration of disparate impact evidence in support of an intentional discrimination claim under the ADA. "Acts and omissions which have a disparate impact on disabled persons in general are not specific acts of intentional discrimination against the plaintiff in particular." *Anderson v. City of Blue Ash*, 798 F.3d at 359-360 (additional internal quotation marks and citation omitted); *see also Lyon*, 2016 WL 6563422 at * *2-3 (discussing disparate impact case law pertinent to ADA claims and citing *Crocker v. Runyon*, 207 F.3d 314, 320 (6th Cir. 2000) for the proposition that it remains unclear whether disparate-impact is cognizable under the Rehabilitation Act in the Sixth Circuit).

[13]    UC's arguments that Title VI does not support either a "disparate impact" type of claim along with its suggestion that Title VI does not expressly include a "pattern or practice" claim lend further support to the conclusion that stating a claim for intentional discrimination under Title VI is all that is required to survive a motion to dismiss. With that said, "pattern and practice" evidence is commonly used to prove disparate impact claims, for which no private action is recognized under Title VI.

At the same time, both Plaintiffs' allegations under Title VI are long on conclusions and short on factual detail. Giving the benefit of the doubt to both Plaintiffs, and construing all *reasonable* inferences in their favor, the undersigned finds Plaintiff Ahmad's allegations to be (barely) sufficient to state a claim that UC intentionally discriminated against

him in violation of Title VI.[14] In contrast, however, Plaintiff Omar's conclusory assertion of national origin discrimination contains *no* supporting facts from which the undersigned can draw an inference sufficient to state a Title VI claim.

[14]    This finding is independent of the Court's analysis of potential statute of limitations issues concerning Plaintiff Ahmad's claims.

The undersigned writes briefly to address UC's argument that dismissal is also required because Plaintiffs have failed to sufficiently identify similarly-situated students under the *McDonnell Douglas* framework. It is unclear whether that framework would apply to Title VI claims that do not rely solely upon a disparate treatment theory of recovery. *See Johnson v. City of Clarksville*, 186 Fed. Appx. 592, 595 (6th Cir. 2006) (Assuming without deciding on summary judgment that *McDonnell Douglas* burden shifting applies to Title VI claims, affirming because plaintiffs failed to show that similarly situated members of the non-protected class received more favorable treatment than plaintiff received); *compare Heike v. Central Mich. University Bd. of Trustees*, 2011 WL 2602004 at *22 (E.D. Mich. July 1, 2011) (holding that collateral estoppel did not bar subsequent Title VI claim by plaintiff despite prior litigation of equal protection claim under 42 U.S.C. § 1983, based upon different standards of liability). Because a claim of intentional discrimination under Title VI may be proven by either direct or indirect evidence, and therefore does not necessarily require a plaintiff to identify similarly situated individuals, the undersigned declines to recommend dismissal of Plaintiff Ahmad's Title VI claim on this basis. *See, generally, Keys v. Humana, Inc.*, 684 F. 3d 605 (6th Cir. 2012) (holding that African-American employee's allegations were sufficient to state claims of discrimination under Title VII and § 1981, because a plaintiff is not required to plead facts to establish a prima facie case under the *McDonnell Douglas* framework at pleading stage).[15]

[15]    UC attempts to distinguish *Keys* on grounds that in that case, the plaintiff had more specifically identified supervisors and other relevant persons by race and either name or company title. *Id.*, 684 F.3d at 610. As discussed *infra*, Plaintiffs' identity of the PAC is sufficient identification of the decision-makers at the pleading stage.

### E. Count VI – Retaliation Under
### Title VI of the Civil Rights Act

**\*14** Count VI is Plaintiffs' retaliation claim under Title VI. In that claim, Plaintiff Ahmad alleges that he complained of "different treatment than non-minority students" both "[b]efore and after his dismissal." (*Id.* at ¶ 42). Both Plaintiffs further allege that they "confronted and reported to Defendant that it did not accommodate their faith and/or treated them differently based upon their national origin and race," and that UC "denied Plaintiffs' appeals in retaliation for reported discrimination and unequal treatment in its program." (*Id.* at ¶¶ 100-101). UC argues that these allegations are legally insufficient to state a retaliation claim under Title VI of the Civil Rights Act.

The Sixth Circuit has not addressed whether Title VI would support a private right of action for retaliation. *Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 593-95 (1983); *Johnson v. Galen Health Institutes, Inc.*, 267 F. Supp.2d 679, 690 n. 12 (W.D. Ky. 2003) (describing circuit split as to whether a plaintiff can sue for retaliation under Title IX and/or Title VI). Even assuming that a private cause of action for retaliation is permissible under Title VI, however, the undersigned agrees that Plaintiffs' failure to provide any factual detail to support their claim leaves both retaliation claims well short of the threshold of plausibility. [16] Consistent with the analysis of Plaintiffs' ADA retaliation claim, the undersigned concludes that a plaintiff is required to provide *some* factual detail concerning when and/or how he complained of discrimination based on race or national origin, and to whom, in order to state a claim.

[16] Plaintiff Omar's retaliation claim also fails because he has failed to state an underlying claim of Title VI discrimination sufficient to support a retaliation claim.

### F. Counts VIII and IX – declaratory and injunctive relief

In Counts VIII and IX, Plaintiffs seek injunctive relief "enjoining [UC] from continuing to conduct itself in a manner that discriminates against its students on the basis of race and/or disability," and "a declaration that [UC's] policies and practices are unlawful." (Doc. 1 at ¶¶ 112, 114). Plaintiffs include a specific request for reinstatement into the College of Medicine. (Doc. 1 at 12).

UC argues that Plaintiffs' requests for relief cannot survive because they rest on allegations that fail to state any ADA, Rehabilitation Act, or Title VI claims. As Plaintiffs point out, (*see* Doc. 9 at 14), UC's arguments are premised on the conclusion that the entirety of Plaintiffs' ADA, Rehabilitation Act and Title VI claims will be dismissed. However, the undersigned has determined that Plaintiffs' allegations are sufficient to state Title II ADA claims, and that Plaintiff Ahmad has pleaded a claim of race and/or national origin discrimination under Title VI in a manner sufficient to survive UC's motion. Although sovereign immunity bars Plaintiffs' claims for monetary damages under the ADA, that same immunity does not bar Plaintiffs' claim for injunctive relief in the form of reinstatement to UC's College of Medicine. *See generally Ex parte Young*, 209 U.S. 123 (1908); *McCulley*, 2013 WL 1501994 at \*4-5 (holding under *Ex parte Young* that immunity did not bar medical student's claim for injunctive relief). Accordingly, the undersigned recommends that UC's motion to dismiss claims for declaratory and injunctive relief be denied.

### G. Counts IV and VII – State Law Claims

In Count IV, Plaintiffs allege disability discrimination in violation of Ohio Revised Code § 4112. In Claim VII, Plaintiffs allege a "breach of contract" claim under state law based upon a "handbook" in which UC "agreed not to discriminate ... based upon ... race and national origin." (Doc. 1 at ¶ 105). Plaintiffs further allege that UC breached a contractual agreement "to accommodate Plaintiffs and not discriminate against them regarding their disabilities." (*Id.* at ¶ 106).

**\*15** UC generally advocates dismissal of the state law claims on the basis of a lack of federal subject matter jurisdiction – an argument that appears premised on UC's arguments in favor of dismissal of *all* federal claims. Because the undersigned does not recommend dismissal of all federal claims at this time, supplemental jurisdiction over any related state law claims remains appropriate.

Unfortunately for Plaintiffs, they have not set forth any related state claims over which this Court has jurisdiction. Only the Ohio Court of Claims has jurisdiction over Plaintiffs' asserted breach of contract or disability discrimination claim under state law, *see* Ohio Rev. Code § 2743.02(A)(1), and Plaintiffs remain barred from attempting to prosecute their

Case 2:20-cv-11718-GAD-DRG ECF No. 47, PageID.1240 Filed 01/31/22 Page 55 of 87

Saqr v. University of Cincinnati, Not Reported in Fed. Supp. (2019)

state claims in any other forum by the doctrine of sovereign immunity.[17] *See also Stein v. Kent State University Bd. of Trustees*, 994 F. Supp. 898, 903 (N.D. Ohio 1998) (holding that a state anti-discrimination statute did not explicitly abrogate the state's Eleventh Amendment immunity from suit in federal court, but merely authorized suit in the Ohio Court of Claims); *Harris v. Dept. of Adm. Serv.*, 63 Ohio App. 3d 115, 119, 577 N.E.2d 1180 (Ohio Ct. App. 1989) (Ohio has waived its sovereign immunity for age discrimination claims only if filed in Court of Claims, which has exclusive jurisdiction); *Al-Maqablh v. University of Cincinnati College of Medicine*, 2012 WL 6675761 at *2 (S.D. Ohio Dec. 21, 2012) (holding that sovereign immunity bars consideration of any state law employment discrimination claims, citing *Dendinger v. Ohio*, 207 Fed. Appx. 521, 528-29 (6th Cir. 2006) ). Because UC remains immune from federal suit under either the breach of contract theory or state antidiscrimination laws, Plaintiffs' state law claims should be dismissed. *Cf. generally, Min Li v. Qi Jiang*, 38 F.Supp.3d 870 (N.D. Ohio 2014) (Eleventh Amendment immunity bars suit in federal court for alleged state law claims based on race or national origin); *Williams v. Ohio Dep't of Mental Health*, 960 F. Supp. 1276 (S.D. Ohio 1997) (Eleventh Amendment bars suit against state for violations of Ohio statutes prohibiting disability discrimination); *Hall v. Medical College of Ohio at Toledo*, 742 F.2d 299 (6th Cir. 1984) (Eleventh Amendment bars suit by student dismissed from medical school).

[17] In its reply memorandum, UC asserts that Plaintiffs procedurally have abandoned their state law claims by failing to address this discrete portion of UC's motion to dismiss. Considering Plaintiffs' stated opposition to dismissal of their state claims on other grounds, (Doc. 9 at 14), and the cursory (two sentence) nature of UC's initial argument, the undersigned does not agree that Plaintiffs have abandoned their state law claims. Nevertheless, UC's substantive arguments prevail.

**III. Conclusion and Recommendations**
**\*16** For the reasons explained above, **IT IS RECOMMENDED THAT** UC's motion to dismiss Plaintiffs' claims in their entirety (Doc. 6) be **GRANTED ONLY IN PART**, with judgment to be entered in favor of Defendant(s) UC on Counts I and II (ADA claims except for the portion of Count I that seeks injunctive relief), Count III (Rehabilitation Act claims), Count IV (state discrimination claim), Count VI (Title VI retaliation claim); and Count VII (state breach of contract claim). **IT IS FURTHER RECOMMENDED THAT** judgment be granted to UC and that the motion be **GRANTED** as to the portion of Count V in which Plaintiff Omar asserts a Title VI discrimination claim but **DENIED** as to the portion of Count V that sets forth Plaintiff Ahmad's claim. Thus, proceedings should continue at present for Plaintiff Ahmad's Title VI discrimination claim and for both Plaintiffs' claims for injunctive and declaratory relief under the ADA.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 699347

---

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

 © 2022 Thomson Reuters. No claim to original U.S. Government Works. 14

145 Fed.Appx. 122
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also
Sixth Circuit Rule 28. (Find CTA6 Rule 28)
United States Court of Appeals,
Sixth Circuit.

Erica VREDEVELT, Plaintiff–Appellant,

v.

The GEO GROUP, INC., f/k/a Wackenhut
Corrections Corp., Defendant–Appellee.

No. 04–1435.
|
Aug. 5, 2005.

**Synopsis**

**Background:** Former employee of privately operated
correctional facility brought action against employer,
alleging gender discrimination and sexual harassment under
Michigan's Elliot-Larsen Civil Rights Act. The United
States District Court for the Western District of Michigan
granted summary judgment in favor of employer, and former
employee appealed.

**Holdings:** The Court of Appeals, Reeves, District Judge,
sitting by designation, held that:

allegedly less desirable work assignments did not constitute
adverse employment action;

employee failed to establish prima facie case of disparate-
treatment gender discrimination based on denial of
promotion;

employee failed to establish prima facie case of disparate-
treatment gender discrimination based on removal from
facility's emergency response team;

employee was not constructively discharged; and

employer was not liable for sexual harassment.

Affirmed.

Clay, Circuit Judge, concurred in part and dissented in part
and filed opinion.

**Procedural Posture(s):** On Appeal; Motion for Summary
Judgment.

**\*124** On Appeal from the United States District Court for
the Western District of Michigan.

**Attorneys and Law Firms**

Brent W. Boncher, Schenk, Boncher & Rypma, Grand Rapids,
MI, for Plaintiff–Appellant.

Regan S. Dahle, Butzel Long, Detroit, MI, Kenneth
H. Adamczyk, Butzel Long, Bloomfield Hills, MI, for
Defendant–Appellee.

Before CLAY and SUTTON, Circuit Judges; REEVES,
District Judge. [*]

[*]     The Honorable Danny C. Reeves, United States
         District Judge for the Eastern District of Kentucky,
         sitting by designation.


**OPINION**

REEVES, District Judge.

**\*\*1** Plaintiff–Appellant Erica Vredevelt appeals the
decision of the district court granting summary judgment to
Defendant–Appellee The GEO Group, Inc. on her gender
discrimination and sexual harassment claims pursuant to
Michigan's Elliott–Larsen Civil Rights Act, M.C.L. § 37.2101
et seq., and intentional infliction of emotional distress claim
under Michigan common law. For the reasons that follow, we
affirm the district court's judgment.


**BACKGROUND**

The GEO Group, Inc., formerly known as Wackenhut
Corrections Corp. ("GEO"), operates the Michigan Youth
Correctional Facility (the "Facility") in Baldwin, Michigan,
under a contract with the Michigan Department of

Corrections. The Facility is a maximum security youth detention prison housing inmates ranging in age from 13 to 16 years. GEO hired Vredevelt as a Corrections Officer ("CO") out of its first training academy in 1999. She worked at the Facility until April 2002 when she left to take a new job. Shortly after beginning her employment, Vredevelt became a member of the Facility's Corrections Emergency Response Team ("CERT")—a small unit of COs that responds to critical incidents at the Facility involving inmates.

As a CERT team member, Vredevelt received additional compensation of $20 to $30 per month. At the Facility, COs are required to work at various posts, including the Medical Department, Visitation, Recreation, ARV (emergency response vehicle), Control Center, Housing Pods (inmate residence areas), Utility (a rotating post that helps where needed), Tower (gun towers surrounding the Facility's perimeter), Checkpoint, and Segregation (a housing unit reserved for violent and disruptive *125 inmates). GEO has the authority to assign a CO to any post. Specifically, the Collective Bargaining Agreement between GEO and the CO's Union provides that "the direction of the working force ... shall be vested exclusively with the employer." It further provides that GEO "shall have the right ... to determine work schedules and type of work."

For the first six months of her employment, Vredevelt worked in Segregation. Following that assignment, she worked Utility for over a year. She also worked without objection or incident in the Medical Department, Recreation, the Towers and the Housing Pods as those duties were assigned to her.

As a CERT member, Vredevelt was required to respond quickly to critical incidents involving inmates. GEO stored all of the CERT equipment in a locker room adjacent to the men's bathroom. Upon notification of an incident, team members would gather their gear (leg pads, elbow pads, a helmet, gas mask and shoulder pads) from the locker room and change clothing and equipment prior to addressing the incident. GEO contends that, as a matter of personal preference, Vredevelt would change her clothing and equipment in the men's locker room rather than carry the equipment to the women's restroom located approximately 20 to 30 feet away. Vredevelt claims that, because the equipment was too heavy and because it was difficult to maneuver past the men, she was forced to change in the men's locker room so that she could respond to emergencies in a timely manner.

**2 In 2001, Vredevelt applied for a promotion to sergeant. In applying for this position, she was required to submit a letter of interest and participate in a Promotion Board interview. Vredevelt was also required to deliver an oral presentation and complete a written exercise. Although Vredevelt was not selected, she acknowledges that the person who received the position, Thomas DeWolf, was a qualified candidate.

At the end of 2001, Vredevelt took a second job outside the Facility. However, she was permitted by the Warden to work three days a week at the Facility to accommodate her work schedule.[1] Subsequently, in February or March 2002, Vredevelt was removed from the CERT team by Deputy Warden Daniel Bosse. According to Bosse, Vredevelt was removed from the team because she could only work three days a week and GEO could not afford to have one of its limited number of CERT members unavailable on other work days. Vredevelt never sought reversal of this decision from Warden Frank Elo. Instead, approximately one week after her removal from the CERT team, she left her job at the Facility and started working as a full-time deputy with the Ottawa County Sheriff's Department. Vredevelt testified that she made more money at this job than she did at the Facility.

[1]    Vredevelt still worked forty hours a week at the Facility but did so over a three-day period.

Before resigning, Vredevelt wrote to GEO to announce her intentions and reasoning:

This is a letter regarding my resignation from Wackenhut Corporation/Michigan Juvenile Prison. I Erica R. Vredevelt will be leaving WCC after 2 weeks of service to further my career elsewhere. I am grateful and thankful of the time and effort Wackenhut has given me, my thanks goes to all those officers above and below me in rank who have taken time to train and educate me in the field of corrections. The knowledge and skills I have learned here will help me in [my] future career.

*126 I leave WCC with a great respect for the staff and corrections officers. They put forth a good effort in teamwork and keeping company standards and mission statements. There is no reason I would not come back to work for WCC in the future. Once again I thank all those who helped me become the corrections officer I am today.

On October 1, 2003, Vredevelt and nine other plaintiffs filed a Joint Amended Complaint against GEO alleging

gender discrimination, sexual harassment and retaliation claims under Michigan's Elliott–Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq.* ("MCRA"). In addition, the group asserted claims for defamation, false imprisonment and intentional infliction of emotional distress under Michigan common law. In her Joint Amended Complaint, Vredevelt asserted five claims against the Defendant: (1) disparate treatment gender discrimination (Count 1); (2) hostile work environment (Count II); (3) retaliation (Count III); (4) intentional infliction of emotional distress (Count IV); and (5) false imprisonment (Count V). Subsequently, Vredevelt abandoned her false imprisonment and retaliation claims. Two of the ten plaintiffs voluntarily dismissed their claims and six of the ten settled their claims for nominal amounts. The district court dismissed the claims of the remaining two plaintiffs (including Vredevelt) on summary judgment. That dismissal is the subject of the present appeal.

**3** Vredevelt's gender discrimination claim is based on the contention that she and other women were never assigned to the best post positions and that she was improperly removed from the CERT team. She also contends that she was passed over for the sergeant job despite being more qualified than the male CO who received the promotion. In addition, Vredevelt claims that she and the other female CERT members were not provided with a separate changing facility and, therefore, were forced to change in front of male CERT officers.

In support of her sexual harassment claim, Vredevelt alleged that GEO employees—primarily Deputy Warden Bosse —made comments that were offensive. These comments included:

1. Bosse allegedly told Vredevelt that she should be home "barefoot and pregnant."

2. Bosse allegedly told Vredevelt that she was incapable of performing utility or transport after she went part time.

3. Someone told Vredevelt that Bosse said that he would never promote a female.

4. New corrections officers allegedly made comments to Vredevelt such as "who do you think you are?" or "your s —— does not stink" in reference to the fact that she wore fatigues instead of a uniform.

5. Bosse made a comment that Vredevelt "was a female and [she] couldn't handle [herself] around inmates."

6. Officer Griffin allegedly made a comment to Vredevelt about her "camel toe" when she wore her fatigues.

7. Vredevelt's fellow CERT members allegedly made bets about the color of her underwear and asked to see her tattoos.

8. A fellow corrections officer made comments to the effect of "let's go for a quick f—k" and "give me a b—w job."

9. After a male officer commented that she was not performing "pat downs" properly, Vredevelt states that she **127** was required to pat down the complaining officer.

Vredevelt alleges that these comments support her sexual harassment and hostile work environment claims. In addition, Vredevelt has asserted a claim of intentional infliction of emotional distress.

## STANDARD OF REVIEW

A district court's grant of summary judgment is reviewed *de novo. Holloway v. Brush,* 220 F.3d 767, 772 (6th Cir.2000). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering such a motion, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The central issue is "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## DISCUSSION

### I. Disparate Treatment

Section 202 of the MCRA prohibits an employer from discriminating "against an individual with respect to employment ... because of religion, race, color, national origin, age, sex, height, weight, or marital status." M.C.L. § 37.2202(1)(a). Courts have recognized two broad categories of claims under this section: disparate treatment and disparate impact claims. *See Dep't of Civil Rights ex rel. Peterson*

*v. Brighton Area Schools,* 171 Mich.App. 428, 431 N.W.2d 65 (1988) (citing *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)). In this case, Vredevelt has alleged a disparate treatment gender discrimination claim.

**\*\*4** Disparate treatment claims may be established under ordinary principles of proof by the use of indirect or direct evidence. *Town v. Michigan Bell Tel. Co.,* 455 Mich. 688, 568 N.W.2d 64 (1997). When a plaintiff uses indirect evidence, she must establish a "rebuttable prima facie case on the basis of proofs from which a factfinder could infer that [she] was the victim of unlawful discrimination." *Sniecinski v. Blue Cross and Blue Shield of Mich.,* 469 Mich. 124, 666 N.W.2d 186, 193 (2003); *see McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[2] Under this test, as applied by the state of Michigan, a plaintiff may establish a prima facie case of prohibited discrimination by demonstrating that: (1) she was a member of a protected class; (2) adverse employment action was taken against her; (3) she was qualified for the position; and (4) she was treated differently than similarly-situated male employees. *Town,* 568 N.W.2d at 68. If a prima facie case is established, the employer has the **\*128** burden of coming forward with a legitimate, nondiscriminatory reason for the adverse employment action. If the employer offers such evidence, the plaintiff has the burden of proving that the stated reason is merely a pretext for discrimination. This burden merges with the plaintiff's overall burden of proving the claim. *Id.*

[2]    In examining discrimination claims under Michigan's Civil Rights Act, Michigan courts have adopted the analysis used in evaluating discrimination claims brought under Title VII of the Civil Rights Act of 1964 ("Title VII"). *See Sniecinski,* 666 N.W.2d at 193 (for purposes of Michigan's Civil Rights Act, the elements of a prima facie case of unlawful employment discrimination under the *McDonnell Douglas* approach should be tailored to the facts and circumstances of each case); *Sharp v. City of Lansing,* 238 Mich.App. 515, 606 N.W.2d 424 (1999) (an employer is liable under the Michigan Civil Rights Act whenever it would be liable under Title VII); *Jackson v. Quanex Corp.,* 191 F.3d 647 (6th Cir.1999); *Alexander v. Local 496, Laborers'*

*Int'l Union of N. Am.,* 177 F.3d 394, 418 (6th Cir.1999).

A plaintiff alleging discrimination *via* direct evidence is not subject to the *McDonnell Douglas* burden-shifting framework, *Harrison v. Olde Fin. Corp.,* 225 Mich.App. 601, 572 N.W.2d 679, 683 (1997), though she still must establish that she suffered an adverse employment action in order to state a claim, *see Sniecinski,* 666 N.W.2d at 193. "Direct evidence is evidence which, if believed, would prove the existence of a fact (i.e. unlawful discrimination) without any inferences or presumptions." *Herendeen v. Mich. St. Police,* 39 F.Supp.2d 899, (W.D.Mich.1999); *see also Johnson v. Kroger Co.,* 319 F.3d 858, 865 (6th Cir.2003) (direct evidence of discrimination "does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by" discriminatory animus).

Vredevelt contends that she suffered discrimination at her employment because she is female. Thus, the initial issue in dispute, under either an indirect or a direct evidence approach, is whether she suffered an adverse employment action because of her sex. An "adverse employment action" for purposes of proving unlawful discrimination must be materially adverse in that it is more than a "mere inconvenience or an alteration of job responsibilities," and "must have an objective basis for demonstrating that the change is adverse, rather than the mere subjective impressions of the plaintiff." *Meyer v. City of Center Line,* 242 Mich.App. 560, 619 N.W.2d 182, 188 (2002) (citing *Wilcoxon v. Minnesota Mining & Mfg. Co.,* 235 Mich.App. 347, 597 N.W.2d 250, 258 (1999)). According to the Michigan courts, a "materially adverse" employment action includes: termination of employment; demotion evidenced by a decrease in wage or salary; a less distinguished title; a material loss of benefits; significantly diminished material responsibilities; or other indices that might be unique to a particular situation. *Wilcoxon,* 597 N.W.2d at 258.

**\*\*5** Here, Vredevelt contends that she met this burden because she: (1) received poor post assignments; (2) was removed from the CERT team; (3) was not provided with comparable facility in which to change into her CERT gear; (4) failed to receive a promotion to sergeant; and (5) was constructively discharged. Vredevelt contends that the actions by GEO were based on her gender. Thus, she alleges that the district court erred in granting summary judgment on this claim.

### A. The Post Assignments

 Vredevelt alleges that she and the other female employees working at the Facility were never assigned to the best post assignments. During her deposition, however, Vredevelt admitted that the desirability of the post positions was subjective. Specifically, she indicated that she particularly liked to work segregation but others did not because "it was the toughest to work." Further, although Vredevelt claimed that the pod position was undesirable, one of her former co-plaintiffs testified that she like working "a couple of the pods."

Vredevelt failed to demonstrate that her assignment to work certain post positions constituted an adverse employment action. As noted in *Wilcoxon,* in order for an employment action to be adverse for purposes of a discrimination claim, "a plaintiff's subjective impressions as to the desirability **\*129** of one position over another [are] not controlling." *Wilcoxon,* 597 N.W.2d at 258 (citing *Kocsis v. Multi–Care Mgmt., Inc.,* 97 F.3d 876, 886 (6th Cir.1996)). The Collective Bargaining Agreement between GEO and the CO's Union provides that GEO "shall have the right ... to determine work schedules and type of work ..." Moreover, as a CO, GEO could assign Vredevelt to any post. Certainly, GEO was not required to accommodate the post preferences of its employees. Thus, GEO's assignment of Vredevelt to one post position instead of another cannot be deemed an adverse employment action.

### B. Removal From The CERT Team

 Vredevelt also contends that she suffered an adverse employment action when she was removed from the CERT team. As a CERT team member, Vredevelt was on a special unit of COs that was required to respond to critical situations involving inmates at the Facility. Vredevelt notes that when she was removed from the CERT team, she lost a monthly stipend of $20 to $30 per month. Moreover, Vredevelt claims that the CERT team members were considered the "cream of the crop" within the Facility. Therefore, according to Vredevelt, the alteration in pay—in addition to the fact that she was removed from a prestigious position—constituted an adverse employment action by GEO.

Even if all of this amounted to an adverse employment action, a point we need not decide, Vredevelt's gender-discrimination claim on this score comes up short. To the extent she means

to establish indirect evidence of discrimination in connection with this claim, she has not proved one of the elements of a prima facie case—that she was treated differently from a similarly situated male employee. Not only has she failed to show that the defendant offered anyone else (male or female) a comparable *benefit*—the opportunity to maintain a full-time, full-benefits, forty-hours-per-week schedule—she also has failed to show that a male employee was spared the alleged *hardship* she faced. In other words, she has not identified a single CERT member who was allowed to remain in the unit while working at the prison just three days a week.

 **\*\*6** To the extent Vredevelt means to show direct evidence of discrimination in connection with this claim and in connection with Bosse's statements about the job, she faces other shortcomings. For one, she was a member of the team shortly after commencing work with GEO in 1999 and she has acknowledged that Bosse never had a problem with her working on the CERT team until after she adopted her three-day-a-week work schedule. For another, the allegedly discriminatory statement made in connection with her removal from the CERT team does not appear to be "direct evidence" of discrimination, which is to say a statement that requires no inference that the challenged action was substantially motivated by discriminatory animus. *Johnson,* 319 F.3d at 865 ("[D]irect evidence of discrimination does not require a factfinder to *draw any inferences* in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group.") (emphasis added); *Sniecinski,* 666 N.W.2d at 193 (noting that a plaintiff must "present *direct* proof that the discriminatory animus was causally related to the adverse decision" and that direct evidence requires proof that "discriminatory animus was ... a substantial or motivating factor in the decision"). As Vredevelt herself says in her affidavit, "When affiant questioned Deputy Warden Bosse why she was not being renewed for her CCW permit [concealed weapons permit], Bosse replied that **\*130** if she didn't like his authority, then she should be home barefoot and pregnant." J.A. 808. But these statements require us to draw the inference that the controversy surrounding her CCW permit was motivated by, and was in preparation for, her removal from the CERT team. Proving that there is a distinction between the two, Vredevelt says later in the same affidavit that Bosse denied her permission to work on the CERT team not because her CCW permit had expired but because "she was only a part-time employee." *Id.*

For still another reason, GEO has presented evidence—unrebutted by Vredevelt—showing that she would have been removed from the team regardless of any impermissible gender-based motive. *See Sniecinski,* 666 N.W.2d at 193 (rejecting a direct evidence claim as a matter of law because the plaintiff failed to establish a causal link between the animus and the adverse decision); *Hein v. All America Plywood Co.,* 232 F.3d 482, 488–89 (6th Cir.2000) (rejecting direct evidence claim that failed to establish both "that the plaintiff's employer was predisposed to discriminate [and] ... that the employer acted on that predisposition"). Warden Elo testified that it was important for a CERT member to be available five days a week so that the Facility could maximize the number of CERT members available on each of the three daily shifts. And Vredevelt did not present any evidence to rebut GEO's proof that the dismissal from the team was based on this eminently non-discriminatory reason.

### C. Failure To Provide A Comparable CERT Facility

**\*\*7**  Vredevelt also alleges that she suffered an adverse employment action when GEO "forced" her to change into her CERT gear in the men's locker room. Specifically, Vredevelt contends that no separate changing facilities were provided to women CERT members. GEO, however, presented evidence that there was a women's restroom near the locker room where the CERT gear was stored. In addition, GEO noted that there were stalls in the men's restroom where at least one other female CERT member changed clothes. Thus, as GEO contends, there were other options available to Vredevelt but she opted not to take advantage of these alternatives. In addressing this issue, the district court acknowledged that this situation was not ideal but determined that women CERT members, including Vredevelt, had other options and were not "forced to undress in front of the men." At most, Vredevelt would have been "inconvenienced" by having to gather her CERT gear, carry it to the women's restroom, and change in a different location from the male members of the CERT team. And as previously noted, a mere inconvenience does not constitute a materially adverse employment action. *Meyer,* 619 N.W.2d at 188.

### D. Failure To Receive Promotion To Sergeant

Vredevelt also argues that she suffered an adverse employment action when GEO selected a male CO for promotion to sergeant instead of her. A failure to promote

may constitute an adverse employment action. *Allen v. Mich. Dept. of Corrections,* 165 F.3d 405 (6th Cir.1999) (construing adverse employment action under Title VII). But even if she suffered an adverse employment action when she was not promoted, Vredevelt's claim nonetheless fails under either an indirect or direct evidence approach.

In the context of a failure-to-promote claim, a plaintiff seeking to use indirect evidence must demonstrate that: "(1) she belongs to a protected class, (2) she suffered **\*131** an adverse employment action, (3) she was qualified for the position, and (4) the job was given to another person under circumstances giving rise to an inference of unlawful discrimination." *Hazle v. Ford Motor Co.,* 464 Mich. 456, 628 N.W.2d 515, 523 (2001). Although Vredevelt is able to satisfy the first two elements of this test, she cannot establish the remaining two elements by simply showing that she was qualified for the position and yet a male candidate was chosen. *See id.* at 525. Rather, she must present evidence that the employer's actions, "if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Id.* In short, an inference of unlawful discrimination does not arise, as a matter of law, merely because an employer has chosen between two qualified candidates. *Id.*

GEO offered several permissible explanations for promoting DeWolf over Vredevelt. Among them were DeWolf's military background (which it thought was well-suited to the correctional setting), the fact that he had been a CERT team leader, and the fact that he possessed "natural leadership ability." In contrast, GEO explained, Vredevelt lacked military experience, had only been a CERT team member and "lacked leadership." In addition, GEO noted that DeWolf scored higher than Vredevelt on the promotion board exam. According to GEO, DeWolf in the end was simply more qualified than Vredevelt.

**\*\*8**  In response, Vredevelt contends that she was the more qualified candidate for the sergeant's position. Specifically, she asserts that she had taken college criminal justice classes, while DeWolf had not, and that she had more seniority than DeWolf. Given GEO's recitation of DeWolf's qualifications, Vredevelt's allegation that she was more qualified for the position than DeWolf is unpersuasive. At best, the comparison in this case is between two qualified employees.

Even if Vredevelt's claims had sufficed to establish a prima facie case, she still could not prevail. Under the burden-shifting framework used in indirect evidence cases, GEO's

legitimate, nondiscriminatory reasons for hiring DeWolf instead of Vredevelt shift the burden once again to Vredevelt, requiring her to produce evidence that would permit a reasonable jury to conclude that GEO's explanations are a pretext for gender discrimination. The district court, however, correctly concluded that she did not meet this burden. Other than her subjective claim that she was more qualified than DeWolf, she has failed to present evidence to support her claim that GEO's stated reasons for hiring DeWolf are a pretext. *See Hazle,* 628 N.W.2d at 521–22; *Town,* 568 N.W.2d at 72.

In *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the Supreme Court held that, when the objective qualifications of a protected class member are equal to an employee who was not a member of the protected class, the employer has the discretion to choose among these employees, provided that the decision is not based on unlawful criteria. Even though a court may conclude that the employer misjudged the qualifications, that fact in and of itself does not expose the employer to liability. *Id.* at 259, 101 S.Ct. 1089. In summary, Vredevelt's evidence merely raises a question about GEO's business judgment, but such questions are insufficient to overcome summary judgment.

Vredevelt's claims are likewise unsuccessful under a direct evidence theory of discrimination. As an initial matter, Vredevelt is less than clear in explaining which statements she means to use to establish **\*132** direct evidence of discrimination. But even if we address each of the potential candidates for this theory, none of them presents "credible, direct evidence of wrongful discrimination" with respect to her non-promotion claim. *See Hein,* 232 F.3d at 488. For instance, Bosse's "barefoot and pregnant" comment is not direct evidence of discrimination because it was neither made by a decisionmaker nor conceivably made in connection with the promotion decision. Most notably, the comment was made almost a year after DeWolf's promotion. *See Sniecinski,* 666 N.W.2d at 193 (noting that a plaintiff must "present direct proof that the discriminatory animus was causally related to the adverse decision"). Nor does Vredevelt's recollection of a comment by Officer Stuart Morin amount to direct evidence of discrimination. Vredevelt refers to this statement in her brief in the following way: "Officer Morin ... recalled that a captain who *apparently* had input on the promotion decision or scoring stated that...." Br. for App't at 9 (emphasis added). By its terms, this statement speculates about the decision-making capacity of this captain; it does not provide direct, credible evidence of discriminatory animus by a

decisionmaker. Finally, Jill Sable's statements about the manner and tone of questioning in Vredevelt's interview are, at best, indirect evidence of animus. *Johnson,* 319 F.3d at 865 ("[D]irect evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group.").

**\*\*9** That leaves the alleged statement by Bosse, overheard by Lt. McDaniel, repeated to Vredevelt and repeated once more in Vredevelt's affidavit, to the effect that Bosse would never promote a woman as long as he was a Deputy Warden. But, critically, this statement was not made by a decisionmaker. All agree, including Vredevelt, that Warden Elo made the decision to hire DeWolf, and no one has argued that Elo had any discriminatory animus either in general or with respect to this decision. In suggesting that Bosse ought to be treated as a decisionmaker with respect to this decision, Vredevelt has done so in the most fainthearted of ways. In her opening brief on appeal, she argued (1) that Bosse was a "decisionmaker" with respect to the CERT team decision, not with respect to the promotion decision, App't Br. at 20 n. 11 and (2) that Bosse at most "influence[d] her non-promotion," *id.* at 18, a statement that would apply to anyone with any input in the decisionmaking process. While she attempts to make the necessary "decisionmaking" argument in her reply brief, she does so at a time when the point had already been waived and at any rate she does so without citing a single case in support of this less than self-evident proposition. But even if we were to address the issue in the interest of completeness, as the dissent does, the cases identified by the dissent do not establish that Bosse was a decisionmaker, much less the decisionmaker with respect to *this* decision. Bosse was one of three members of a committee tasked with interviewing the candidates; he did not tabulate the interview scores; and although he met with Warden Elo to discuss the scores, Vredevelt offers no evidence that Warden Elo adopted Bosse's assessment rather than forming his own conclusion (or even adopting another interviewer's assessment). The cited cases all are at least one step removed from this situation. *See DiCarlo v. Potter,* 358 F.3d 408, 413 (6th Cir.2004) (holding that a supervisor's memo to the decisionmaker recommending discharge of an employee justified imputation of the supervisor's animus to the decisionmaker **\*133** after the decisionmaker "agreed with the assessment and approved" the recommended discharge); *Wells v. New Cherokee Corp.,* 58 F.3d 233, 238 (6th Cir.1995) (holding that a subordinate's animus could be imputed to the decisionmaker, but involving a situation where the two

worked so closely together that they acted jointly with respect to personnel decisions); *Hussain v. Highgate Hotels, Inc.,* 126 Fed. Appx. 256, 262 (6th Cir.2005) (unpublished opinion) (holding that the animus of a single individual, not a committee, who made a recommendation to those in authority, then "awaited their approval," could be imputed to the decisionmaker).

### E. Constructive Discharge

Vredevelt also argues that she suffered an adverse employment action by being constructively discharged from her employment at the Facility. To establish a prima facie case of constructive discharge, an employee must present evidence that her employer deliberately made working conditions so intolerable that a reasonable person would feel compelled to quit the job. *Champion v. Nationwide Sec., Inc.,* 450 Mich. 702, 545 N.W.2d 596, 600 (1996). In short, Vredevelt has not presented evidence to support this claim.

**\*\*10** When Vredevelt took a second job, GEO accommodated her request to work part-time. However, when she realized that she would not receive full benefits, GEO again agreed to allow her to work forty hours over the course of three days. Certainly, these accommodations were a substantial benefit to Vredevelt and were beyond what GEO was required to do. Moreover, Vredevelt indicated in her resignation letter to the company that she "was grateful and thankful of the time and effort [GEO] ha[d] given [to her]." She further stated that "there [was] no reason [she] would not come back to work for WCC in the future." These concessions are contradictory to Vredevelt's claim that working conditions at the Facility were so intolerable that a reasonable person would *feel* compelled to quit. Rather, the evidence of record supports an opposite conclusion: Vredevelt left to take a job for more money. Accordingly, Vredevelt did not present sufficient evidence to support a constructive discharge claim.

### II. Hostile Work Environment Claim

The MCRA prohibits an employer from discriminating because of sex, which includes sexual harassment. M.C.L § 37.2202(1); M.C.L. § 37.2103(I); *Chambers v. Trettco, Inc.,* 463 Mich. 297, 614 N.W.2d 910 (2000). Specifically, M.C.L. § 37.2103(I) provides that:

Discrimination because of sex includes sexual harassment. Sexual harassment means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature under the following conditions:

(i) Submission to the conduct or communication is made a term or condition either explicitly or implicitly to obtain employment....

(ii) Submission to or rejection of the conduct or communication by an individual is used as a factor in decisions affecting the individual's employment....

(iii) The conduct or communication has the purpose or effect of substantially interfering with an individual's employment ... or creating an intimidating, hostile, or offensive employment ... environment.

Sexual harassment under one of the first two subsections is commonly referred to as quid pro quo harassment. Sexual harassment under the third subsection is commonly labeled hostile work environment **\*134** harassment. *Chambers,* 614 N.W.2d at 915. To establish a claim of hostile work environment harassment, an employee must prove the following by a preponderance of the evidence:

(1) the employee belonged to a protected group;

(2) the employee was subjected to communication or conduct on the basis of sex;

(3) the employee was subjected to unwelcome sexual conduct or communication;

(4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and

(5) respondeat superior

*Elezovic v. Ford Motor Co.,* 259 Mich.App. 187, 673 N.W.2d 776 (2003). With regard to the respondeat superior element [3] of a claim of hostile work environment harassment, an employer may avoid liability "if it adequately investigated and took prompt and appropriate remedial action upon notice of the alleged hostile work environment." Prompt and appropriate remedial action will permit an employer to avoid liability if the plaintiff accuses either a co-worker or a supervisor of sexual harassment. An employer, of course, must have notice of the alleged harassment before being held liable for not implementing corrective action. *Chambers,* 614 N.W.2d at 916.

3    The Supreme Court of Michigan has specifically held that the federal principles of vicarious liability related to sexual harassment claims brought under Title VII do not apply to claims brought under Michigan's Civil Rights Act. *See Chambers,* 614 N.W.2d 910. Therefore, with respect to this issue, the Title VII cases are inapplicable.

**11** Thus, an employer may avoid liability for a claim of sexual harassment if it does not have actual or constructive notice of the alleged harassment. *Radtke v. Everett,* 442 Mich. 368, 501 N.W.2d 155 (1993). The employee gives the employer actual notice if she complains about the harassment to higher management. *McCarthy v. State Farm Ins. Co.,* 170 Mich.App. 451, 428 N.W.2d 692, 695 (1988). If the employee never complained to higher management, she can prove the employer had constructive notice "by showing the pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive knowledge." *Id.* Notice is considered adequate if, under the totality of the circumstances and viewing the circumstances objectively, a reasonable employer would have known that there was a substantial probability that an employee was being sexually harassed. *Sheridan v. Forest Hills Pub. School,* 247 Mich.App. 611, 637 N.W.2d 536 (2001).

In this case, the Facility had a sexual harassment policy in place. The policy provided employees with two sexual harassment coordinators to which they were directed to report any complaints of harassment. However, the policy further provided that, if an employee does not feel comfortable reporting a complaint to the coordinators, the employee should report the incident to someone within supervision. Vredevelt has conceded that she did not report many of the alleged instances of sexual harassment. Thus, GEO did not have the opportunity to investigate and take remedial action due to complaints from Vredevelt. Specifically, during her deposition Vredevelt admitted that she did not report the following incidents: (1) Deputy Warden Bosse's comment that she should be home "barefoot and pregnant"; (2) Officer Griffin's comment to her about her "camel toe" when she wore her fatigues; **135** (3) the CERT members' bets about what color underwear she wore and their requests to see her tattoos; and (4) a fellow corrections officer's comments of "let's go for a quick f—k" and "give me a b—w job."

Notwithstanding this lack of actual notice, Vredevelt contends that GEO had constructive knowledge of the hostile environment at the Facility due to other women's complaints. In addition, she argues that there was a general pervasiveness of sexual harassment toward females at the Facility. Specifically, Vredevelt asserts that women were commonly called "pod bitches" and "control bitches" and that they were never assigned to the good post positions. Thus, Vredevelt asserts that GEO was constructively aware of the sexual harassment due to an overall negative attitude toward, and poor treatment of, females throughout the Facility. Again, however, the record does not support Vredevelt's contention.

Vredevelt admitted that she remained silent about most of the alleged incidents and complained about only two incidents over a three year period. Further, she testified during her deposition that much of the alleged conduct was "not so apparent." Moreover, in her resignation letter to the company, Vredevelt expressed how much she enjoyed working at the Facility, noting that "[t]here [was] no reason [she] would not come back to work for WCC in the future." Again, Vredevelt failed to put GEO on notice of the alleged sexual harassment. Although she claims that the sexual harassment complaints of other female employees were sufficient to put GEO on constructive notice of the hostile environment at the Facility, we cannot conclude based on the totality of the circumstances that this evidence establishes that the alleged sexual harassment was such that GEO had constructive notice. *See e.g., Sheridan,* 637 N.W.2d at 545–46; *Elezovic,* 673 N.W.2d at 783 (complaint of alleged sexual harassment of plaintiff's co-worker cannot be said to establish notice with respect to plaintiff's claim of harassment).

**12** Because Vredevelt failed to show that she provided actual or constructive notice to GEO concerning the existence of a sexually hostile working environment, it cannot be liable for her hostile environment claim. *Chambers,* 614 N.W.2d at 916; *Radtke,* 501 N.W.2d at 168. Thus, the district court did not err in granting summary judgment to GEO regarding this claim.

### III. Intentional Infliction of Emotional Distress Claim

The district court was also correct in concluding that Vredevelt failed to present a genuine issue of material fact in support of her claim for intentional infliction of emotional distress. Intentional infliction of emotional distress is proved by the following elements: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress. *Roberts v. Auto–Owners Ins. Co.,* 422 Mich. 594, 374 N.W.2d 905, 908 (1985). The district court determined that Vredevelt failed to present evidence demonstrating extreme and outrageous conduct. To

be extreme and outrageous, Michigan courts have stated that the conduct must be so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community. *Id.* at 908–09. We agree that Vredevelt's allegations do not state a claim for intentional infliction of emotional distress. Because Vredevelt cannot establish a prima facie case, the district court properly granted summary judgment.

### *136 CONCLUSION

We **AFFIRM** the judgment of the district court.

CLAY, Circuit Judge, concurring in part and dissenting in part.

I join Parts I–A, C and E, as well as Parts II and III of the majority's opinion. I write separately because the majority ignores or discounts Vredevelt's direct evidence of discrimination in connection with her removal from the CERT team and failure to be promoted to sergeant. I therefore respectfully dissent from Parts I–B and D of the majority opinion.

## I.

### A. Removal From the CERT Team

The majority concludes that Vredevelt was removed from the CERT team because of modifications in her work schedule. While this is ostensibly a legitimate nondiscriminatory reason, the majority inappropriately discounts the fact that when Vredevelt questioned Deputy Warden Bosse about her dismissal, Bosse responded that "if she didn't like his authority, then she should be home barefoot and pregnant." (Joint Appendix, "J.A.," at 808.) This type of sexist comment constitutes direct evidence of gender discrimination because it suggests that Vredevelt's sex played a role in Warden Bosse's decision to remove her from the CERT team. *See Harrison v. Olde Fin. Corp.,* 225 Mich.App. 601, 572 N.W.2d 679, 683 (1997) ("For example, racial slurs by a decisionmaker constitute direct evidence of racial discrimination that is sufficient to get the plaintiff's case to the jury.") (quotation and citation omitted); *see also Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.,* 176 F.3d 921, 926 (6th Cir.1999) ("[D]irect evidence is that evidence which, if believed, requires the conclusion that

unlawful discrimination was at least a motivating factor in the employer's actions.").

**\*\*13** In a case such as this, involving direct evidence of discrimination and mixed motives, *"i.e.,* where the adverse employment decision could have been based both legitimate and legally impermissible reasons, a plaintiff must prove that the defendant's discriminatory animus was more likely than not a 'substantial' or 'motivating' factor in the decision." *Sniecinski v. Blue Cross and Blue Shield of Mich.,* 469 Mich. 124, 666 N.W.2d 186, 192–93 (2003) (quoting *Price Waterhouse v. Hopkins,* 490 U.S. 228, 244, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (Plurality Opinion)). Thus, the proper inquiry at summary judgment is whether, viewing the evidence in the light most favorable to Vredevelt as the non-moving party, a reasonable trier of fact could find that Vredevelt's sex was a substantial or motivating factor in Warden Bosse's decision to remove her from the CERT team. Instead of according proper weight to the "barefoot and pregnan" comment, the majority dismisses it out of hand, giving conclusive weight to Defendant's proffered reason for removing Vredevelt from the CERT team. The majority's analysis is inappropriate because at the summary judgment stage, it is not this Court's role to weigh the evidence. *Sterling China Co. v. Glass, Molders, Pottery, Plastics & Allied Workers Local No. 24,* 357 F.3d 546, 551 (6th Cir.2004) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)) ("The judge is not to weigh the evidence and determine the truth of the matter, but rather determine whether there is a genuine issue for trial."). In my opinion, the direct evidence proffered by Vredevelt creates a genuine issue of material fact on the question of whether discriminatory animus was a substantial or motivating factor in Warden Bosse's decision to remove her from the CERT team, **\*137** such that a reasonable jury could find in her favor. Therefore, I would reverse the district court's grant of summary judgment to Defendant on the CERT team removal issue.[4]

[4]   Although it is unnecessary for the majority to address the issue given its conclusion that summary judgment was properly granted, I would also find that removal from the CERT team constituted a materially adverse employment action. Materially adverse employment actions include " 'termination of employment, a demotion evidence by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might

be unique to a particular situation.' " *Wilcoxon v. Minn. Mining & Mfg. Co.,* 235 Mich.App. 347, 597 N.W.2d 250, 257 (1999) (quoting *Kocsis v. Multi–Care Mgmt., Inc.,* 97 F.3d 876, 886 (6th Cir.1996) (citations omitted)). It is undisputed that CERT team members received a small amount of additional monetary compensation. Perhaps more importantly, however, Defendant's own arguments support the notion that CERT team membership was prestigious and an important element in receiving a promotion. One of the reasons offered by Defendant in support of the decision to promote DeWolf over Vredevelt was DeWolf's position as CERT team leader. If this is true, then Vredevelt's removal from the CERT team, and by extension, the elimination of her ability to become a CERT team leader, would materially reduce her chances of receiving a promotion in the future. In this sense, an employee who is not a CERT team member has "a less distinguished title" or position for promotion purposes than a CERT team member. Therefore, Vredevelt's dismissal from the CERT team arguably constituted an adverse employment action.

### B. Failure to Receive Promotion

I would also reverse the district court's grant of summary judgment to Defendant on the promotion issue. I do not think that the evidence supports Vredevelt's claim that she was more qualified than DeWolf for the sergeant's position, and I agree with the majority's position that "[a]t best, the comparison in this case is between two qualified employees." (Majority Op. at ——.) Once again, however, the majority discounts Vredevelt's direct evidence of discriminatory animus by individuals who were involved in deciding whether to promote her, thereby inappropriately weighing the evidence and usurping the role of the trier of fact. *Id.; see also Cline v. Catholic Diocese of Toledo,* 206 F.3d 651, 657–58 (6th Cir.2000) ("No doubt, [defendant] may have sharp retorts to many of [plaintiff's] factual claims ... [which] could well convince a trier of fact of its case. But at this stage in the trial, the district court's and our role is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. To do so, the court must look at the evidence and make all reasonable inferences in the light most favorable to [plaintiff].") (internal citations and quotation marks omitted). Officer Stuart Morin testified that he was present when a

captain who had been on the review board for Vredevelt's promotion stated that "women don't belong in the prison and shouldn't be in that position, they are not capable of doing it." (J.A. at 852.) Vredevelt also swore in an affidavit and testified at her deposition that Lieutenant Kevin McDaniels informed her that Deputy Warden Bosse specifically told him Vredevelt was not promoted because Bosse "would not promote any females while he was deputy warden." *Id.* at 450, 807. Additionally, Jill Sable, the Personnel Director who participated in Vredevelt's promotion review, testified that Deputy Warden Bosse was tougher in his questioning of Vredevelt than of DeWolf and Kevin Cox, another male candidate for the promotion, and further, that the questions Bosse asked Vredevelt were "in a different tone and in a different way" and "were more detailed." *Id.* at 846. Finally, there is the "barefoot and pregnant" **\*138** comment made by Deputy Warden Bosse in connection with Vredevelt's removal from the CERT team, which suggests that discriminatory animus colors Bosse's employment decisions.

 **\*\*14** The majority concludes that Warden Elo made the decision of whom to promote, and therefore, Vredevelt's direct evidence of discriminatory animus by Deputy Warden Bosse and others is irrelevant. However, the record reflects that although Warden Elo was technically the final decisionmaker, the manner in which the promotion decision was made left a great deal of influence to individuals other than Elo. Contrary to the majority's claims, we have previously held that "courts must consider as probative evidence any statements made by those individuals who are in fact *meaningfully involved in the decision* to terminate [or promote] an employee." *Wells v. New Cherokee Corp.,* 58 F.3d 233, 238 (6th Cir.1995) (emphasis added); *see also Hussain v. Highgate Hotels, Inc.,* 126 Fed. Appx. 256, 262 (6th Cir.2005) (unpublished decision) (stating that in employment discrimination context, direct evidence "shows that the person who made the challenged decision, *or was otherwise meaningfully involved in that decision,* had a bias or that bias affected the challenged decision") (emphasis added). Warden Elo selected a three-member promotion board, which was chaired by Deputy Warden Bosse as the Deputy Warden of Security. Each of these board members interviewed and evaluated the candidates for promotion, and provided a scored review. The scores were then tabulated by Sable, as Personnel Director, and given to Warden Elo, who reviewed the scores and discussed them with Deputy Warden Bosse. There is no evidence that Warden Elo interviewed the candidates or otherwise independently interacted with them; to the contrary, the evidence demonstrates that the materials that

formed the basis for Warden Elo's decision were provided and compiled by other individuals, most notably Deputy Warden Bosse. Therefore, the three-member board, and Deputy Warden Bosse, while not the ultimate decisionmakers, had a significant amount of influence in deciding which candidate would be promoted, and their discriminatory comments are clearly relevant evidence in assessing Vredevelt's claim. *Cf. DiCarlo v. Potter,* 358 F.3d 408, 416–17 (6th Cir.2004) (holding that derogatory comments by supervisor constituted direct evidence of discriminatory animus, because although manager made ultimate decision to terminate the plaintiff, supervisor made recommendation to manager and was therefore meaningfully involved in the decision to fire the plaintiff).

Additionally, because Vredevelt has produced direct evidence of discriminatory animus by individuals involved in the promotion decision, the majority errs in suggesting that the *McDonnell Douglas* burden-shifting framework is appropriate. *See Harrison,* 572 N.W.2d at 683; *DiCarlo,* 358 F.3d at 415. Defendant claims that DeWolf was promoted due to his military background and higher test scores, which could be legitimate reasons for the decision to promote him over Vredevelt.[5] *See Sniecinski,* 666 N.W.2d at 193 (citing *Price Waterhouse,* 490 U.S. at 244–45, 109 S.Ct. 1775) (stating that a mixed motive case is one in which "the adverse employment decision could have been based on both legitimate and legally impermissible reasons," and "a defendant may avoid **\*139** liability by proving that it would have made the same decision even if the impermissible consideration had not played a role in the decision."). Thus, the relevant question for this Court is whether, viewing the evidence in the light most favorable to Vredevelt, there is a genuine issue of material fact on the issue of whether her sex was a substantial or motivating factor in the decision not to promote her. *See id.* at 192–93.

Despite Defendant's proffered reasons for promoting DeWolf, given the direct evidence of discriminatory animus by Deputy Warden Bosse and another member of the promotion review board, a reasonable trier of fact could find that discrimination was a substantial or motivating factor in the decision not to promote Vredevelt. Therefore, I would reverse the district court's grant of summary judgment to Defendant on the promotion issue.

5      I question whether the test score issue is significant given that only 1.5 percentage points separated Vredevelt and DeWolf's scores, and both scored highly on the test, *i.e.,* 97% for Vredevelt versus 98.5% for DeWolf.

## II.

**\*\*15** I join the majority in upholding the grant of summary judgment to Defendant on Vredevelt's hostile work environment and intentional infliction of emotional distress claims, as well as her disparate treatment claims involving post assignments, changing facilities, and constructive discharge. However, because Vredevelt has presented direct evidence of discriminatory animus in connection with her removal from the CERT team and her failure to be promoted to sergeant, summary judgment is inappropriate on these issues. I therefore respectfully dissent from Parts I–B and D of the majority opinion.

## All Citations

145 Fed.Appx. 122, 2005 WL 1869607, 2005 Fed.App. 0667N

---

**End of Document**            © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:20-cv-11718-GAD-DRG   ECF No. 47, PageID.1253   Filed 01/31/22   Page 68 of 87
Yoder v. University of Louisville, 526 Fed.Appx. 537 (2013)
297 Ed. Law Rep. 741

526 Fed.Appx. 537 (Table)
Unpublished Disposition
NOTICE: THIS IS AN UNPUBLISHED OPINION.
(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA6 Rule 28 and FI CTA6 IOP 206 for rules regarding the citation of unpublished opinions.)
United States Court of Appeals,
Sixth Circuit.

Nina YODER, Plaintiff–Appellant,

v.

UNIVERSITY OF LOUISVILLE; Ermalynn Kiehl, in her official and individual capacity; Marcia Hern, in her official and individual capacity, Defendants–Appellees.

No. 12–5354.
|
May 15, 2013.

**Synopsis**

**Background:** Former student at Kentucky university's school of nursing (SON) filed § 1983 action against university, Dean of SON, and Associate Dean of Undergraduate Programs in their official and individual capacities, alleging they violated her First Amendment right to free speech and Fourteenth Amendment right to due process by dismissing her from SON for blog post on social networking site about patient's birthing experience. Student moved for summary judgment. The United States District Court for the Western District of Kentucky, 2009 WL 2406235, granted motion. Defendants appealed. The Court of Appeals, Cook, Circuit Judge, 417 Fed.Appx. 529, vacated and remanded. On remand, parties cross-moved for summary judgment. The District Court, 2012 WL 1078819, granted summary judgment for defendants. Student appealed.

**Holdings:** The Court of Appeals, Helene N. White, Circuit Judge, held that:

student did not waive her claim for money damages;

student's claim for injunctive and declaratory relief against university and individuals in their official capacities was moot;

defendants were entitled to qualified immunity from liability based on First Amendment violation, as any such right allegedly violated was not clearly established;

policies that student signed as part of SON program were not unconstitutionally vague or overbroad; and

defendants were entitled to qualified immunity from liability for alleged violation of Fourteenth Amendment procedural due process.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

**\*538** On Appeal from the United States District Court for the Western District of Kentucky.

Before: WHITE and DONALD, Circuit Judges; and VARLAN, Chief District Judge.[*]

[*]     The Honorable Thomas A. Varlan, Chief United States District Judge for the Eastern District of Tennessee, sitting by designation.

**Opinion**

HELENE N. WHITE, Circuit Judge.

**\*\*1** Plaintiff–Appellant Nina Yoder, a former student at the University of Louisville's School of Nursing ("the SON"), appeals the district court's grant of summary judgment in favor of Defendants–Appellees University of Louisville (the "University") and University employees Ermalynn Kiehl and Marcia Hern (collectively, "Defendants") in this 42 U.S.C. § 1983 action **\*539** alleging that Defendants violated Yoder's First Amendment right to free speech and Fourteenth Amendment right to due process by dismissing her from the SON for a blog post on her MySpace.com page (the "Blog") that discussed various aspects of a birth she witnessed as part of the SON's childbearing clinical program. Because we conclude that Defendants are entitled to qualified immunity and that the SON's policies are neither overbroad nor vague, we AFFIRM the district court's grant of summary judgment.

Case 2:20-cv-11718-GAD-DRG   ECF No. 47, PageID.1254   Filed 01/31/22   Page 69 of 87
Yoder v. University of Louisville, 526 Fed.Appx. 537 (2013)
297 Ed. Law Rep. 741

## I.

In January 2007, Yoder enrolled in an undergraduate nursing program at the SON. In September 2008, as part of her transition to the upper-division courses, Yoder signed an Honor Code pledge ("Honor Code") that stated:

I join my fellow students today to pledge my commitment to the highest ideal and academic standards of my education at the University of Louisville School of Nursing.

I recognize I am entering a profession in which I have responsibility for the lives of others. With that responsibility comes accountability for my actions.

Therefore, as a representative of the School of Nursing, I pledge to adhere to the highest standards of honesty, integrity, accountability, confidentiality, and professionalism, in all my written work, spoken words, actions and interactions with patients, families, peers and faculty.

I pledge to work together with my peers and to support one another in the pursuit of excellence in our nursing education and to report unethical behavior.

I will work to safeguard the health and welfare of clients who have placed their trust in me and will advocate for the client's best interest.

I recognize that these responsibilities do not end with graduation, but are a lifelong endeavor.

As part of her studies at the SON, Yoder took a childbearing clinical course, which required that she follow a pregnant patient through the birthing process. In January 2009, in conjunction with the course, Yoder signed a Confidentiality Agreement ("Confidentiality Agreement"):

I _____ do hereby agree to consider confidential any and all information entrusted to me throughout my clinical rotations while a student at the University of Louisville School of Nursing. This includes medical, financial, personal, and employment related information. I realize that information shared with others could

bring harm to clients. Further I understand that a proven violation of confidentiality may be cause for immediate termination of access to further data and is grounds for immediate dismissal from the School of Nursing.

When Yoder identified a pregnant patient (the "Patient") to follow, both Yoder and the Patient signed a Consent Form ("Consent Form"), which provided in pertinent part:

**2** Any information shared with the named nursing student will be used by that student only for written/oral assignments. My name and my family's name will not be used in any written or oral presentation by the named student. I understand that information regarding my pregnancy and my health care will be presented in written or oral form to the student's instructor only.

On February 2, 2009, Yoder posted a blog entry on her personal MySpace.com [1] **540** webpage entitled, "How I witnessed the Miracle of Life." The Blog stated in full:

[1] "MySpace is a popular social-networking website that allows its members to create online 'profiles,' which are individual web pages on which members post photographs, videos, and information about their lives and interests." *Layshock ex rel. Layshock v. Hermitage Sch. Dist.,* 650 F.3d 205, 208 (3d Cir.2011) (citation and internal quotation marks omitted).

As part of my mother-baby clinical (99% of the time clinicals are a waste of my time) I was assigned to find a pregnant mother and follow her around. I didn't look far. If you have ever worked a 12–hour shift in the hospital, you'd know that 50% of females there are at various stages of pregnancy. People say that there's something in the water. I say it's the shift—basically, she works 3 days and has 4 days to do everything else, including getting knocked up. That's

Case 2:20-cv-11718-GAD-DRG  ECF No. 47, PageID.1255  Filed 01/31/22  Page 70 of 87
Yoder v. University of Louisville, 526 Fed.Appx. 537 (2013)
297 Ed. Law Rep. 741

how I got surprised with my own Creep—I was working nights in the ER. Never thought I'd have one, but there ya go. If your wife is infertile, send her to work at the hospital, she'll come back with triplets.

Anyway, I found my mom fairly easy—I just came to work and confronted one of the ladies. Good thing that it was her third pregnancy—and she had no problem with me being stuck to her like a tick to an ass, so I cordially invited myself to observe the glorious moment of The Popping.

Now, let's bust some myths.

**1. "Pregnant women are beautiful"**

No. Hell—no.

*Beautiful* pregnant women are beautiful, or more like, only slightly distorted with the belly (as was the case with my "mom"). Otherwise, pregnancy makes an ok-looking woman ugly, and an ugly woman—fucking horrifying.

**2. "You're all glowing"**

Oh really? Is that all the sweat from having to lug 35 extra lbs?

**3. "Babies are God's little miracles"**

I gotta admit, there is something freakishly fascinating with the fact that one bunch of coiled protein grows a tail, forms an army, and attacks another bunch of coiled protein (which gets released by signals from a whole lot of proteins and waits patiently in a soft bed of all sorts of other proteins), then 23 + 23 becomes 46, immediately gets determined whether it's an XX or XY, or XXY or XYY, or some retarded XXXY ... anyway, it's an amazing process. But IMHO [in my humble opinion] these 'miracles' are demons sent to us from hell to torture us for the whole eternity.

**4. "Children are such joy!"**

Someone referred to having kids as like being pecked to death by chickens. I'll say that it's more like being ripped apart by rabid monkeys.

\* \* \* \* \* \*

Last Friday I armed myself with a camera, and journeyed to the assigned hospital, where I met my wonderful lady,

getting ready to pop. Since it was her third kid, everyone expected her to shoot it out within 30 minutes. She was already getting induced by elephantine dose of Oxytocin (Mmmm, Oxytocin!) I took my camera, put it on "Rec" and assumed the position.

**\*\*3**  45 minutes later, no baby.

1 hour 30 minutes later, no baby.

The anesthesiologist comes in and sets up my girl with an epidural. Having it done is one thing; watching someone else getting it done is another. The doc took out this teeny needle first and numbed her up. Then she took out this huge-ass 10 inch needle and jammed it into her spine!

**\*541**  I was watching the whole thing, with my face changing expressions like Louis De Funès'. But I guess everything went fine, because my 'mom' was back into position in no time, waiting for the Creep to show up.

3 hours later, no baby.

I'm looking at the mother with sheer disdain, she looks at me with sheer anger, but still—no baby.

I've got to go to work this evening, and I'm starting to cuss. I haven't slept in 36 hours, so I went to my car, got my blanket, kicked the nervous spouse out of the recliner, and went to sleep.

4 hours later she starts to throw up. I jump up, and turn my camera on again, assuming the position of a greyhound, right in between her legs.

... no baby.

5 hours.

6 hours.

7 hours.

My eyes are starting to feel like they're filled with sand, and my heart is starting to palpitate. The momma is throwing up, the daddy's stomach is growling and he's starting to bitch like a 14–year–old school girl in the mall.

8 hours later, the nurse comes in, checks the momma, and says, "ok, we're ready to push".

FINALLY!!! I turn my camera on again. Two more nurses, and a woman doctor come in. They put my momma into a position of American Eagle, prop her up with pillows, and shine bright light at the cooch.

The momma's family is sitting in the corner, shaking all over, with the two younger brothers of the baby, the in-laws, and the bitching spouse. At last my girl gave one big push, and immediately out came a wrinkly bluish creature, all Picasso-like and weird, ugly as hell, covered in god knows what, screeching and waving its tentacles in the air.

15 minutes later it turned into a cute pink itty bitty little baby girl. Mom was forgotten, the whole squacking family surrounded the new Creep; she was crowned with a pink cap, wrapped into a blanket and finally shut up with a teat.

I came to work, overwhelmed with emotions and new knowledge and experience. I sat down, looked around and once again proved that women are FREAKING STUPID and don't learn from their past mistakes.

I said: **"I want another baby!!"**

The End.

In late February 2009, Glenda Adams, the childbearing clinical course instructor learned about Yoder's Blog from another SON student, and informed Kiehl, the Associate Dean of the Undergraduate Programs at the University. Kiehl met with Hern, the Dean of the SON, to discuss the Blog, and they agreed that Yoder should be dismissed from the SON for violating "the [H]onor [C]ode and the standards of the profession and a [C]onfidentiality [A]greement."

Kiehl asked Adams to contact Yoder and request that they meet the following morning, February 27, 2009. When Yoder arrived at what she thought would be a meeting with Adams, she instead found Kiehl, a physician who provides psychological support to students, and two law enforcement officers. Kiehl showed Yoder copies of the Blog, stated that the Blog violated patient confidentiality and the Honor Code, and informed Yoder that she was being dismissed from the SON. Several days later, Yoder received a formal letter of dismissal from Hern that stated, in relevant part:

> **\*\*4** It has been determined that your internet postings regarding patient

activities **\*542** and identification as a University of Louisville School of Nursing student violates the nursing honor code which you pledged to uphold on September 7, 2008. Upon evaluation of your demonstrated fitness to continue in the program in accordance with promulgated professional standards established by the School of Nursing, you are receiving an academic dismissal from the School of Nursing and the three nursing classes in which you are currently enrolled this Spring 2009 semester.

Pursuant to the SON's policy, Yoder submitted a written petition with the Undergraduate Academic Affairs Committee requesting reinstatement in the SON program. Yoder was not permitted to participate in the Committee's deliberations, and on March 9, 2009, in a letter signed by Kiehl, the Committee denied Yoder's petition for reinstatement. Yoder did not pursue any additional internal grievance procedures.

## II.

On March 12, 2009, Yoder filed a complaint pursuant to 42 U.S.C. § 1983 claiming that her dismissal from the SON violated her right to free speech and due process under the First and Fourteenth Amendments of the United States Constitution. The complaint named the University, Hern, and Kiehl as defendants,[2] and asked that: (1) Yoder be reinstated as a nursing student, (2) she be granted full credit for all academic work missed, (3) her disciplinary and academic record be cleared, and (4) University employees be enjoined from disclosing information regarding the incident. Yoder also sought compensatory damages, punitive damages, and attorney fees.

[2] The complaint named Hern and Kiehl in both their official and individual capacities.

After discovery, the parties filed cross-motions for summary judgment. On August 3, 2009, the district court granted Yoder's motion for summary judgment. *See Yoder v. Univ. of Louisville,* No. 3:09–CV–205–S, 2009 WL 2406235 (W.D.Ky., Aug. 3, 2009) (unpublished). However, the court

did not resolve Yoder's § 1983 claims on free speech and due process grounds, instead deciding the case on a contract theory. *Id.* at \*6. The court entered a permanent injunction compelling the University to reinstate Yoder as a nursing student, but noted that, "[b]ecause Yoder succeeds on her motion for summary judgment on nonconstitutional grounds, we need not address liability for damages under 42 U.S.C. § 1983." *Id.* at \*7.

Defendants filed an appeal of the district court's order with this court, and on April 8, 2011, we vacated the district court's grant of summary judgment and remanded. *See Yoder v. Univ. of Louisville,* 417 Fed.Appx. 529 (6th Cir.2011) (unpublished). This court noted that Yoder had not alleged breach of contract, and found that the district court's decision was impermissible under Federal Rule of Civil Procedure 54(c). *Id.* at 530. We declined to affirm the grant of summary judgment on free speech and due process grounds because "the district court's judgment includes no consideration of these claims or their factual grounding." *Id.* (citations omitted).

 **\*\*5** On remand, both parties again filed cross-motions for summary judgment. On March 30, 2012, the district court granted Defendants' motion for summary judgment. The district court found that Yoder's claims against the University and Hern and Kiehl in their official capacities were barred by sovereign immunity, and further found that Kiehl and Hern were entitled to qualified immunity in their individual capacities. This appeal ensued.

### \*543 III.

As a preliminary matter, Defendants contend that this court no longer has Article III jurisdiction because Yoder failed to preserve her claim for money damages by cross-appealing the district court's first grant of summary judgment in her favor, which declined to rule on her § 1983 claims. Defendants further assert that, in the absence of a claim for monetary relief, Yoder's claims for injunctive and declaratory relief are moot because she was reinstated as a student and has since completed her nursing degree.

### A.

 The district court did not expressly reach the issue of damages under 42 U.S.C. § 1983 and thus Yoder's claim for money damages is properly before this court. The district court stated in its first grant of summary judgment that its decision did not address liability for damages under § 1983: "This is not ultimately a free speech case. Nor is it fundamentally a matter of due process. There is no need, therefore, for the court to discuss the constitutional questions raised by Yoder's claim." Indeed, this court declined to affirm the district court's grant of summary judgment on constitutional grounds because "the district court's judgment includes no consideration of these claims or their factual grounding." *Yoder,* 417 Fed.Appx. at 530. And, after this court remanded the case and Defendants raised the issue of waiver below, the district court held that, "[l]iability for damages under § 1983 was not addressed by this court," and found that there was "no failure to preserve a claim that was never addressed by the court below." Thus, Defendants' claim that Yoder waived her claim for monetary damages is mistaken. And, because Yoder's claim for monetary damages "ensures that this dispute is a live one and one over which Article III gives us continuing authority," *Blau v. Fort Thomas Pub. Sch. Dist.,* 401 F.3d 381, 387 (6th Cir.2005) (citations omitted), the case is properly before this court.

### B.

 We agree, however, with the district court's conclusion that Yoder's claim for injunctive and declaratory relief against the University or Hern and Kiehl in their official capacities fails. It is not clear from Yoder's briefs what, if any, future action by Defendants Yoder hopes to preserve the right to enjoin. Yoder's injunctive claim for reinstatement is moot as a result of her graduation from the SON program. *See DeFunis v. Odegaard,* 416 U.S. 312, 319–20 & n. 2, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974) (per curiam) (holding a student's claim for injunctive relief against a law school moot when he registered for his last quarter, and the school said he would "be awarded his J.D. degree ... regardless of the outcome of this appeal"); *Fialka–Feldman v. Oakland Univ. Bd. of Trustees,* 639 F.3d 711, 714 (6th Cir.2011) (holding a student's claim for injunctive relief moot upon his graduation because university programs "tend to last longer than the time it takes to obtain a trial court ruling and an appeal, and accordingly the courts generally have not applied the capable-of-repetition exception to them"); *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.,* 119 F.3d 453, 458 (6th Cir.1997) (en banc) (dispute over high school basketball player's eligibility for upcoming season was not "capable of repetition" when player graduated and there was "no reasonable expectation of another controversy over

his eligibility"). Accordingly, we affirm the district court's grant of summary judgment as to the University and Hern and Kiehl in their official capacities.

#### *544  IV.

**\*\*6** We review a grant of summary judgment de novo. *Chen v. Dow Chem. Co.,* 580 F.3d 394, 400 (6th Cir.2009). "Summary judgment is appropriate where the evidence shows 'that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " *Singfield v. Akron Metro. Hous. Auth.,* 389 F.3d 555, 560 (6th Cir.2004) (quoting Fed.R.Civ.P. 56(c)). We must review the evidence in the "light most favorable to the party opposing the motion, giving that party the benefit of all reasonable inferences." *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.,* 477 F.3d 854, 861 (6th Cir.2007) (citation omitted). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original).

Hern and Kiehl argue that they are entitled to qualified immunity. The qualified-immunity doctrine shields government officials performing discretionary functions from civil liability unless their conduct violates clearly established rights. *Barker v. Goodrich,* 649 F.3d 428, 433 (6th Cir.2011) (citation and internal quotation marks omitted). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). "The doctrine focuses on 'the objective reasonableness of an official's conduct, as measured by reference to clearly established law' to 'avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment.' " *Andrews v. Hickman Cnty., Tenn.,* 700 F.3d 845, 853 (2012) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

In order to determine whether qualified immunity applies, this court must engage in a two-step inquiry, addressing (1) whether, considering the allegations in a light most favorable to the injured party, a constitutional right has been violated and (2) whether that right was clearly established. *Saucier*

*v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Campbell v. City of Springboro, Ohio,* 700 F.3d 779, 786 (6th Cir.2012). We may exercise our discretion in determining the order in which to conduct this inquiry. *See Pearson,* 555 U.S. at 236–37, 129 S.Ct. 808.

#### A. First Amendment Claim

We begin with Yoder's claim that Defendants violated her rights under the First Amendment by dismissing her for the views expressed in the Blog. We exercise our discretion to focus on the second prong of the qualified immunity inquiry—whether, assuming Yoder had a First Amendment right to post the Blog that was violated by her dismissal from the SON, this right was clearly established. Yoder has the burden of demonstrating that the law was clearly established at the time of Defendants' challenged conduct. *Andrews,* 700 F.3d at 853 (citation omitted). For a right to be clearly established, it "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). If school administrators "of reasonable competence could disagree" on the lawfulness of the action, Defendants are entitled to immunity. **\*545** *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). Thus, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151. The unlawfulness of the school administrator's action "can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." *Feathers v. Aey,* 319 F.3d 843, 848 (6th Cir.2003) (citing *Hope v. Pelzer,* 536 U.S. 730, 740–41, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)). "When determining whether a constitutional right is clearly established, we look first to decisions of the Supreme Court, then to our own decisions and those of other courts within the circuit, and then to decisions of other Courts of Appeal." *Andrews,* 700 F.3d at 853.

**\*\*7** We find dispositive the absence of controlling authority that specifically prohibits Defendants' conduct. Because neither the Supreme Court nor a panel of our circuit has considered whether schools can regulate off-campus, online speech by students, Yoder relies on *Layshock ex rel. Layshock v. Hermitage School District,* where the Third Circuit held that "the First Amendment prohibits the school from reaching

beyond the schoolyard to impose what might otherwise be appropriate discipline." 650 F.3d 205, 207 (3d Cir.2011) (en banc). We first observe that *Layshock* was not decided until June 2011—over two years after Yoder's dismissal—and thus cannot stand as clearly established law at the time of the incident. *See Mitchell v. Forsyth,* 472 U.S. 511, 528, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (assessing whether the law was "clearly established" at the time the challenged actions occurred). More important, other circuits have come to conflicting conclusions and permitted schools to regulate off-campus, online student speech where such speech could foreseeably cause a material disruption to the administration of the school. *See Kowalski v. Berkeley Cnty. Schs.,* 652 F.3d 565, 572 (4th Cir.2011) (upholding summary judgment in favor of a school that punished a student for creating a MySpace page mocking a fellow student); *Doninger v. Niehoff,* 642 F.3d 334, 347 (2d Cir.2011) (holding that it is not "clearly established that off-campus speech-related conduct may never be the basis for discipline by school officials"). Indeed, Yoder herself acknowledges that student internet communications present an "enigmatic issue, since these are communications available on campus, off campus, or anywhere else."

In addition, both parties rely heavily on Supreme Court cases that govern student speech standards,[3] none of which considers the unique circumstances posed here. Yoder has not identified any case—nor are we aware of any—that undermines a university's ability to take action against a nursing (or medical) student for making comments off campus that implicate patient privacy concerns. Defendants have legal and ethical obligations to ensure that patient confidentiality is protected, and that nursing students are trained with regard to their ethical obligations. *See, e.g.,* Ky.Rev.Stat. § 314.031(4)(d), (k); *id.* § 314.111. Yoder gained access to the Patient through the SON's clinical program, and patients allow SON students to observe their medical treatment in reliance on the students' agreement not to share information about their medical treatment **\*546** and personal background. Under such circumstances, Defendants could not "fairly be said to 'know' that the law forb[ids] [discharging a student under these circumstances]." *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727.

[3]     Yoder also contends that because the Supreme Court has not applied student-speech standards to "adult college students," such standards are inapplicable here. However, a recent panel of this court expressly held that school-speech standards

may be applicable to university students. *See Ward v. Polite,* 667 F.3d 727, 733–34 (6th Cir.2012).

Further, assuming Yoder had a First Amendment right to post the Blog online, it was not objectively unreasonable for Defendants to believe that Yoder affirmatively waived that right. The Confidentiality Agreement states that Yoder "agree[d] to consider confidential *any and all information* entrusted to [her] throughout [her] clinical rotations while a student at the University of Louisville School of Nursing. This includes *medical, financial, personal,* and *employment related information.*" The Confidentiality Agreement further notes that Yoder "understand[s] that a proven violation of confidentiality of any such information may be cause for immediate termination of access to further data and is grounds for immediate dismissal from the School of Nursing." The Blog discussed several medical, personal, and employment-related pieces of information related to the Patient, including:

> **\*\*8**  • the date the Patient was in labor;
>
> • the Patient was an employee of the hospital;
>
> • the child born was the Patient's third child;
>
> • the Patient was induced by oxytocin;
>
> • the Patient received an epidural;
>
> • the Patient vomited during labor;
>
> • the Patient was in labor for 15 hours;
>
> • the baby born to the Patient was a girl; and
>
> • the Patient was married.

The Consent Form goes further than the Confidentiality Agreement by stating that information regarding a patient's "pregnancy and healthcare will be presented in written or oral form to the student's instructor only." Although Yoder contends that this agreement was for the Patient's benefit, Yoder was also required to sign the Consent Form, indicating that she was both aware of and constrained by its limitations. The district court correctly noted that nothing about the language of the Consent Form suggests that the information that Yoder agreed not to disseminate was limited to confidential information. The patient-specific information in the Blog falls under the rubric of personal, professional, and medical information and discusses the Patient's "pregnancy and healthcare." Yoder cannot show that Defendants' reliance on the documents as a waiver of Yoder's

First Amendment rights was objectively unreasonable in light of clearly established law.

Yoder also contends that for her waiver to be valid, it must be in the form of a "binding contract between the parties." Although a majority of cases considering constitutional waivers concern contractual obligations, *see, e.g., Snepp v. United States,* 444 U.S. 507, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980) (per curiam) (considering a contract between the CIA and its former employee regarding publication rights); *D.H. Overmyer Co. v. Frick Co.,* 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972) (outlining the considerations relevant to determination of a contractual waiver of due process rights); *Fuentes v. Shevin,* 407 U.S. 67, 95, 92 S.Ct. 1983, 32 L.Ed.2d 556 (finding no waiver of due process rights where the waiver was a contract that was "no bargaining over contractual terms between the parties who, in any event, were far from equal in bargaining power"), it is not clearly established that a waiver *must* come in contractual form. For example, in *Cohen v. Cowles Media Co.,* 501 U.S. 663, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991), the Supreme Court addressed whether the First Amendment **\*547** prohibits a plaintiff from recovering damages, under state promissory-estoppel law, for a newspaper's breach of a promise of confidentiality given to the plaintiff in exchange for information. *Id.* at 665, 111 S.Ct. 2513. The Court allowed the claim to advance, despite the "absence of a contract, [which] creates obligations never explicitly assumed by the parties." *Id.* at 668, 111 S.Ct. 2513. With this determination, the Court implicitly held that a party's voluntary promise to keep information confidential constituted a valid waiver of First Amendment rights, even in the absence of an enforceable contract.

Accordingly, we hold that any First Amendment right allegedly violated by Defendants was not clearly established such that it would have been clear to Defendants that their actions were unlawful.

### B. Vagueness and Overbreadth

**\*\*9**  Yoder also asserts that the Honor Statement, Confidentiality Agreement, and Consent Form are unconstitutionally overbroad, and that the Consent Form is unconstitutionally vague. [4] As the Supreme Court recently observed, vagueness and overbreadth are distinct concerns: vagueness implicates the Due Process Clause, while overbreadth implicates the First Amendment. *See*

*Holder v. Humanitarian Law Project,* 561 U.S. 1, 130 S.Ct. 2705, 2719, 177 L.Ed.2d 355 (2010).

[4]  Defendants argue that concepts of overbreadth and vagueness generally apply to *laws* that create a chilling effect on constitutionally-protected speech, not school policies. However, this court has previously considered vagueness and overbreadth challenges to school policies, including state university policies. *See, e.g., Savage v. Gee,* 665 F.3d 732 (6th Cir.2012).

Yoder challenges three SON policies—the Honor Code, the Confidentiality Agreement, and the Consent Form— as overbroad. [5]  Under the traditional test for assessing restrictions on expressive conduct, a regulation (or in this case, a university policy) will be upheld if: "(1) it is unrelated to the suppression of expression, (2) it furthers an important or substantial government interest, and (3) it does not burden substantially more speech than necessary to further the interest." *Blau,* 401 F.3d at 391 (internal citations, quotation marks and brackets omitted). In attacking the SON's policies, Yoder bears the burden of demonstrating that the policies reach "a 'substantial' amount of protected free speech, 'judged in relation to the [policies'] plainly legitimate sweep.' " *Virginia v. Hicks,* 539 U.S. 113, 118–19, 123 S.Ct. 2191, 156 L.Ed.2d 148 (2003) (quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)). This high burden is in place because

[5]  The overbreadth doctrine provides an exception to the traditional rules of standing allowing Yoder to bring an action under the First Amendment based on a belief that the SON's policies are so broad or unclear that they will have a chilling effect. *See Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) ( "Litigants [ ] are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression."); *Blau,* 401 F.3d at 390 ("In the context of First Amendment challenges, unlike most other areas of constitutional litigation, a claimant may seek protection not only on her own behalf but on behalf of others.").

there comes a point at which the chilling effect of an overbroad law, significant though it may be, cannot justify prohibiting all enforcement of that law— particularly a law that reflects "legitimate state interests in maintaining comprehensive **\*548** controls over harmful, constitutionally unprotected conduct." For there are substantial costs *created* by the overbreadth doctrine when it blocks application of a law to constitutionally unprotected speech, or especially to constitutionally unprotected conduct. To ensure that these costs do not swallow the social benefits of declaring a law "overbroad," we have insisted that a law's application to protected speech be "substantial," not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications, before applying the "strong medicine" of overbreadth invalidation.

*Id.* at 119–20, 123 S.Ct. 2191 (internal citations omitted). For this reason, "the mere fact that one can conceive of some impermissible applications of a [policy] is not sufficient to render it susceptible to an overbreadth challenge." *Mems. of the City Council of the City of L.A. v. Taxpayers for Vincent,* 466 U.S. 789, 800, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984). "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum,* 408 U.S. 1, 13–14, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972).

The policies challenged by Yoder do not reach a substantial amount of protected speech, and Defendants have a compelling interest in ensuring that students observe patient confidentiality. The SON's decision to restrict the dissemination of patient information for purposes of teaching students about their confidentiality responsibilities, ensuring that patient information is not improperly released, and encouraging patients to participate in the teaching of the students are important and valid interests. Yoder has not established that the policies burden substantially more speech than necessary. Students are still permitted to discuss childbirth, pregnancy, or any other topic they wish; they are simply not permitted to do so in the context of a *specific* patient observed in conjunction with their clinical coursework.

**\*\*10** Yoder also challenges the Consent Form as unconstitutionally vague. [6] However, this court has rejected vagueness challenges "when [a party's] conduct clearly falls within a statutory or regulatory prohibition." *Fowler v. Bd. of Educ. of Lincoln Cnty., Ky.,* 819 F.2d 657, 665 (6th

Cir.1987); *see also Humanitarian Law Project,* 130 S.Ct. at 2719 ("[A] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.") (citation omitted). As discussed above, the Blog clearly violates the Consent Form.

[6] Yoder does not challenge the Honor Code or Confidentiality Agreement as unconstitutionally vague.

Assuming that Yoder is permitted to pursue a vagueness challenge to the Consent Form, her arguments are unavailing. Yoder must establish that "[the Consent Form's] prohibitive terms are not clearly defined such that a person of ordinary intelligence can readily identify the applicable standard for inclusion and exclusion." *United Food & Comm. Workers Union Local 1099 v. Sw. Ohio Reg. Transit Auth.,* 163 F.3d 341, 358–59 (6th Cir.1998) (citing *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)).

The Consent Form is not unconstitutionally vague; it obligates students to refrain from sharing information about their clinical patients' pregnancy and health care with any person other than the instructor of the course. A person of ordinary intelligence **\*549** would understand that posting information about a patient on MySpace.com, including a discussion of the patient's birthing process and medical procedures, would violate this policy. Indeed, that person would understand that the Consent Form requires that he or she not discuss patients' pregnancy or health care with any person besides the course instructor.

We therefore reject Yoder's claim that the policies she signed as part of the SON program are unconstitutionally overbroad or vague.

## C. Procedural Due Process Claim [7]

[7] Although Yoder states that Defendants violated her substantive due process rights, she fails to make any arguments in support of her claim. Moreover, as the district court correctly noted, this court has rejected the notion that substantive due process protects a medical or nursing student's interest in his or her continued enrollment. *See Rogers v. Tenn. Bd. of Regents,* 273 Fed.Appx. 458, 463 (6th

Cir.2008); *Bell v. Ohio State Univ.,* 351 F.3d 240, 249–51 (6th Cir.2003).

We next consider Yoder's assertion that Defendants violated her rights under the Fourteenth Amendment by failing to provide her adequate due process.[8] At the heart of Yoder's argument is the assertion that her dismissal from the SON was disciplinary, not academic. The Supreme Court recognizes a significant distinction between "the failure of a student to meet academic standards and the violation by a student of valid rules of conduct." *Bd. of Curators of Univ. of Mo. v. Horowitz,* 435 U.S. 78, 86, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978) (holding that students are entitled to "far less stringent procedural requirements" for an academic, rather than a disciplinary, action). When a school takes action against a student for academic reasons, the due process afforded is minimal: a student is entitled only to notice that his or her academic performance was not satisfactory and a "careful and deliberate" decision regarding their punishment. *Id.* at 85, 98 S.Ct. 948; *Ku v. Tennessee,* 322 F.3d 431, 436 (6th Cir.2003). In contrast, courts reviewing a disciplinary action must conduct a "more searching inquiry," *Flaim v. Med. Coll. of Ohio,* 418 F.3d 629, 634 (6th Cir.2005) (citing *Horowitz,* 435 U.S. at 86, 98 S.Ct. 948), and the student must be afforded both notice and a hearing, although the formality of the hearing will vary depending on the circumstances. *See Goss v. Lopez,* 419 U.S. 565, 581–84, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). This distinction is rooted in the Court's recognition that "[a]cademic evaluations of a student, in contrast to disciplinary determinations, bear little resemblance to the judicial and administrative fact-finding proceedings to which we have traditionally attached a full hearing requirement." *Horowitz,* 435 U.S. at 89, 98 S.Ct. 948. For this reason, "[w]hen judges are asked to review the substance of a genuinely academic decision ... they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Regents of the Univ. of Mich. v. Ewing,* 474 U.S. 214, 225, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985) (citations and footnotes omitted).

[8]    To be entitled to the procedural protections of the Fourteenth Amendment, Yoder must demonstrate that her dismissal from the school deprived her of either a "liberty" or a "property" interest. *Bd. of Curators of Univ. of Mo. v. Horowitz,* 435 U.S. 78, 82, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978). Defendants do not dispute that Yoder's enrollment

in the SON was a valid property interest, and we assume the same on appeal.

**11    We again focus on the second prong of the qualified immunity assessment— *550 whether, assuming that Yoder had a right to the due process procedures of a disciplinary dismissal instead of an academic dismissal, that right was clearly established. *Cf. Pearson,* 129 S.Ct. at 818–19. It was not. The term "academic" in this context is somewhat misleading. "Courts have frequently held that an academic dismissal may be properly based on more than simply grades, particularly in a medical-professional context. For example, in *Horowitz,* "the school warned [the plaintiff] that significant improvement was needed not only in the area of clinical performance but also in her personal hygiene and in keeping to her clinical schedules." 435 U.S. at 91 n. 6, 98 S.Ct. 948. In concluding that the plaintiff was dismissed for purely academic reasons, the Court noted that "[p]ersonal hygiene and timeliness may be as important factors in a school's determination of whether a student will make a good medical doctor as the student's ability to take a case history or diagnose an illness." *Id.* This court reaffirmed that idea in *Ku,* noting "in the context of medical school, academic evaluations are not limited to consideration of raw grades or other objective criteria." 322 F.3d at 436; *see also Fenje v. Feld,* 398 F.3d 620, 625 (7th Cir.2005) ("The nexus between [the plaintiff's] lack of candor in the application process and his capacity to be trusted with patient care clearly pushes this decision into the realm of an academic dismissal.").

Here, Yoder's compliance with the Honor Code, Confidentiality Agreement, and Consent Form was mandated as a condition of her enrollment in the upper division and participation in the clinical portions of the SON program. This indicates that the required conduct was a component of Yoder's coursework, not part of a general student code of conduct. Defendants reasonably concluded that Yoder's apparent inability to keep patient information confidential was an important consideration in determining Yoder's suitability as a future nurse. Under such circumstances, Yoder cannot show that clearly established law required Defendants to treat her dismissal for violating patient confidentiality as disciplinary instead of academic.

We further find that Defendants were not objectively unreasonable in concluding that the processes used in Yoder's dismissal afforded Yoder adequate due process. As discussed above, the Supreme Court held that in cases of academic dismissal from a state educational institution, the requirements of due process are met when the student is

fully informed of faculty dissatisfaction with his or her performance and the decision to dismiss the student is "careful and deliberate." *Horowitz,* 435 U.S. at 85, 98 S.Ct. 948; *Ku,* 322 F.3d at 436 ("[W]hen the student has been fully informed of the faculty's dissatisfaction with the student's academic progress and when the decision to dismiss was careful and deliberate, the Fourteenth Amendment's procedural due process requirement has been met. No formal hearing is required...."); *see also Hlavacek v. Boyle,* 665 F.3d 823, 826 (7th Cir.2011) ("Dismissals for poor academic performance 'require no hearing at all.' ") (citation omitted). Here, by her own admission, Yoder received an explanation of why she was being dismissed. When she arrived at the meeting where she was dismissed, Kiehl expressed concern about the Blog, stated that she believed the Blog violated the Honor Code and patient confidentiality, and explained Yoder's punishment.[9] It **551** was also not objectively unreasonable for Defendants to believe that their decision was "careful and deliberate." It is uncontested that Defendants reviewed the Blog, conferred with each other and the clinical instructor about the Blog's contents and implications, and jointly determined that the Blog violated the Honor Code, the standards of the profession, and the Confidentiality Agreement. Although a post-dismissal appeal hearing was not constitutionally required, Yoder availed herself of the University appeal process, where her dismissal was affirmed

by the Committee. *See Rogers v. Tenn. Bd. of Regents,* 273 Fed.Appx. 458, 463 (6th Cir.2008) (a university's decision to dismiss a nursing student was "careful and deliberate" when it allowed her to engage in an appeal process); *Fenje,* 398 F.3d at 627 (decision was "careful and deliberate" with use of a post-termination hearing). Under such circumstances, it was not objectively unreasonable for Defendants to have believed that they provided Yoder with adequate due process procedures for an academic dismissal, and accordingly they are entitled to qualified immunity.

[9]     Indeed, Yoder also had prior notice from the Confidentiality Agreement that a violation of patient confidentiality "is grounds for immediate dismissal from the School of Nursing."

**V.**

**\*\*12** For the reasons discussed above, we affirm the district court's grant of summary judgment.

**All Citations**

526 Fed.Appx. 537 (Table), 2013 WL 1976515, 297 Ed. Law Rep. 741

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 1902031
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

Alissa ZWICK, Plaintiff,
v.
REGENTS OF the UNIVERSITY OF MICHIGAN,
Marilyn Lantz, Wilhelm A. Piskorowski, Mark
D. Snyder, and Fred Burgett, Defendants.

Civil Case No. 06-12639.
|
April 28, 2008.

**Attorneys and Law Firms**

Deborah L. Gordon, Deborah L. Gordon Assoc., Bloomfield Hills, MI, for Plaintiff.

Ryan K. Mulally, Timothy H. Howlett, Dickinson Wright, Detroit, MI, for Defendants.

*OPINION GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT*

MARIANNE O. BATTANI, District Judge.

### I. INTRODUCTION

 *1 Before the Court is a Motion for Summary Judgment brought by Defendants Regents of the University of Michigan, Dr. Marilyn Lantz, Dr. Wilhelm A. Piskorowski, Dr. Mark D. Snyder, and Dr. Fred Burgett ("Defendants") pursuant to Fed.R.Civ.P. 56(c). Defendants claim that summary judgment is appropriate with respect to Plaintiff's claims for (1) violation of the First Amendment (retaliation); (2) violation of the Fourteenth Amendment's Due Process Clause; (3) violation of the Fourteenth Amendment's Equal Protection Clause; (4) violation of Michigan's constitutional right to free speech; (5) violation of Michigan's constitutional right to due process; (6) violation of Michigan's constitutional right to equal protection; (7) breach of contract; (8) defamation (as to Defendants Piskorowski, Snyder and Burgett); (9) tortious interference with a contract (as to Defendants Lantz, Piskorowski, Snyder and Burgett); (10) intentional inflection of emotional distress; and (11) violation

of the Michigan Civil Rights Act. Because Plaintiff has presented enough evidence to potentially prevail on the due process claim, Defendants' Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part.

### II. STATEMENT OF FACTS

Plaintiff Alissa Zwick enrolled in the University of Michigan Dental School in the Fall of 2002. Her first year at Dental School was largely uneventful, save for a grade of "D" in one course, which was subsequently remediated. Plaintiff began having trouble in Fall 2003, her first semester of her second year, when she began losing concentration in class and doing poorly on the practical exams in her Clinical Foundations 621 class, run by Drs. Stoffer and Jaarda. Plaintiff went to see Defendant Dr. Lantz, the associate dean of student affairs at this time, and confessed that she was having trouble concentrating. Defendant Lantz recommended that she see a psychiatrist and be tested for Attention Deficit Disorder. Plaintiff saw two psychiatrists, the second of which diagnosed her with ADD in October of 2003, and she reported her disability to the school. Subsequently, Drs. Stoffer and Jaarda allowed her to take her tests by the window, as she requested, or in a room by herself. Despite these accommodations, Plaintiff failed 621. She was placed on probation and offered an opportunity to remediate the class by passing Clinical Foundations 631 in the following semester, also run by Drs. Stoffer and Jaarda.

Plaintiff contacted Drs. Stoffer and Jaarda before the beginning of the semester in January 2004 and requested that she take exams in a separate room. Drs. Stoffer and Jaarda resisted this accommodation, as they felt that it would give Plaintiff an unfair advantage and would not accurately represent the practice of dentistry. They arranged with Plaintiff to have her take the exam with the class and retake it in a separate room if she failed.

However, when informed of this arrangement Defendant Lantz falsely told the Dean of the Dental School, Dr. Polverini, that Drs. Stoffer and Jaarda were failing to accommodate Plaintiff and that litigation was likely to result. Defendant Lantz drew up a list of accommodations and told Drs. Stoffer and Jaarda to either sign the list or step down. As a result of this maneuvering, Drs. Stoffer and Jaarda resigned from their positions in February 2004. This move caused a great deal of controversy at the dental school, and, according to Plaintiff, a number of the students began to blame her for the resignations. Defendant Lantz counseled Plaintiff not to talk to her fellow students and to take a week off to let the

situation die down. She also warned Plaintiff against talking to Drs. Stoffer and Jaarda, and according to Plaintiff, warned Plaintiff's father that Plaintiff might not be invited back if she tried to talk to either students or faculty about the controversy (Defendant Lantz denies this).

**\*2**  Plaintiff eventually talked to Drs. Stoffer and Jaarda and explained that she never considered litigation and that she was happy with their accommodations. Plaintiff then brought this information to Dean Polverini, who reinstated Drs. Stoffer and Jaarda in their positions in May 10, 2004. In the midst of this turmoil, Plaintiff failed 631, which meant that she failed to remediate 621 as well. On May 11, 2004, Defendant Lantz and the Academic Review Board met and the board voted to dismiss Plaintiff based on her failing grades.

Plaintiff was given the opportunity to appeal the dismissal, and-based largely on the events surrounding the resignations of Drs. Stoffer and Jaarda-won her appeal. She was reinstated at the Dental School and allowed to remediate her failing grades in 621 and 631 in the Summer of 2004. Plaintiff successfully remediated these courses and was removed from probation.

In Fall 2004, Plaintiff received mostly passing grades, but failed Pediatric Clinic 743A. In Comprehensive Care Clinic 720, Plaintiff received an overall grade of B, but received two incomplete grades (a D and a C-) in various parts of the class. While Plaintiff contends that these grades were only for the student's edification-and indeed they do not count towards Plaintiff's GPA-Plaintiff acknowledges that she was required to repeat the parts that she failed. Plaintiff was placed on the warned list for the "D" grade in 720 and was allowed to remediate the failing grade in 743A the following semester, which Plaintiff did.

Written complaints from this time composed by various faculty members in the two clinics (Drs. Heys, Johnson and Benham in 720, and Drs. Pink, Fontes and Alaki in 743A) indicate faculty concerns with her patient management, preparation and practical ability.

In Winter 2005, Plaintiff failed Pediatric Clinic 743B and received two incomplete grades (two C-) for various parts of Comprehensive Care Clinic 720. On May 10, 2005, Plaintiff was placed on probation. On May 12, 2005, the Academic Review Board (Drs. Heys, Richards, Brooks and Defendant Lantz) met and discussed Plaintiff's case. According to the minutes, the board reviewed various faculty concerns with

Plaintiff's performance, discussed possibly allowing her to use the summer as a "testing ground" and finally resolved to have Defendant Lantz send Plaintiff a letter stating the faculty's concerns about her judgment and ability. No such letter was ever sent to Plaintiff.

Defendant Lantz and Dr. Heys then asked several faculty members to draft letters of evaluation based on their experiences with Plaintiff. Defendants Snyder, Burgett and Piskorowski submitted letters, which were negative about Plaintiff's skills and professional future. Aside from having experience with Plaintiff in a clinical setting, it is unclear why these particular faculty members were selected, but the uniformly negative tone of their evaluations suggests that they were not chosen at random. The letters are similar thematically-each declares that Plaintiff lacks requisite dental skills, has behavioral issues ("emotionally unstable", etc.) and would be unfit for the independent practice of dentistry. Defendants Snyder and Burgett wrote their letters independently. Defendant Piskorowski initially composed his thoughts in an email to Dr. Heys, who forwarded the message to Defendant Lantz. Defendant Lantz asked Defendant Piskorowski for a more formal letter, and when he complained that he lacked the computer skills to write such a letter she-shockingly, given the events that transpired between Defendant Lantz and Plaintiff-went to his office and typed his letter for him.

**\*3**  Defendant Lantz then called an unscheduled meeting of the Academic Review Board (Drs. Heys, Richards, Brooks, Upton and Defendant Lantz) on June 16, 2005. Presented with the faculty evaluations, the board voted to dismiss Plaintiff. Plaintiff was notified on June 20th. Plaintiff appealed the decision and argued her appeal before the Academic Review Board with counsel present on December 8, 2005. The board denied the appeal and again recommended dismissal. Plaintiff appealed that decision to the Executive Committee of the Dental School and argued her appeal before the committee on January 11, 2006. The committee denied the appeal and Plaintiff was dismissed.

Plaintiff brought this action in Michigan state court, and Defendants removed it to this Court. After extensive discovery, Defendants filed this motion for summary judgment on August 3, 2007.

### III. STANDARD OF REVIEW
Federal Rule of Civil Procedure 56(c) authorizes the Court to grant summary judgment "if the pleadings, depositions,

answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." There is no genuine issue of material fact if there is no factual dispute that could affect the legal outcome on the issue. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In other words, the movant must show he would prevail on the issue even if all factual disputes are conceded to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp. .,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Accordingly, in the instant case, this Court evaluates the motions with the rule that it should defer to the Plaintiff's factual account whenever that account clashes with the Defendants'. The Court should keep in mind, however, that the Plaintiff "may not rest upon the mere allegations or denials of [her] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial" *Anderson,* 477 U.S. at 248 (internal quotations and citation omitted).

## IV. ANALYSIS

### A. Due Process

Plaintiff claims that her dismissal was a violation of due process under both the United States and Michigan constitutions. [1] As a threshold matter, Plaintiff must show that her place at the Dental School was a property or liberty interest recognized by Michigan state law to assert a denial of due process claim under the Fourteenth Amendment. *Board of Curators of the Univ. of Missouri v. Horowitz,* 435 U.S. 78, 82, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978) (finding that to receive the procedural protections of the Fourteenth Amendment, the plaintiff must "demonstrate that her dismissal from the school deprived her of either a "liberty" or a "property" interest").

[1] Under *Gazette v. City of Pontiac,* 212 Mich.App. 162, 536 N.W.2d 854, Michigan's due process protections are "construed no more broadly than the federal guarantees" and thus the claims are analyzed together.

### 1. Property Interest

Property interests are secured by "existing rules and understandings" and it is Plaintiff's burden to show that her seat at the Dental School was a "property" interest. *Perry v. Sindermann,* 408 U.S. 593, 599-603 (1972). Though the

arrangement between student and school does not rise to the level of a contractual relationship, the Court determines that a student has enough of a property interest in continued enrollment to require the basic protections of due process. [2]

[2] Plaintiff also argues that the continued enrollment is a liberty interest. Though the Court is skeptical of this claim, it is unnecessary to reach a conclusion on this issue in this case, and the Court does not address it.

**\*4** In *Regents of Univ. of Mich. v. Ewing,* 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985), the Supreme Court held that the existence of a property right was unnecessary to determine, as the Court simply assumed the existence of a right for the purposes of dismissing the defendant's due process claim. *Id.* at 223. In the other major case on this issue, *Board of Curators, Univ. of Mo. v. Horowitz,* 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978), the Supreme Court similarly assumed both a liberty and a property interest for the purpose of dismissing the defendant's due process claim. *Id.* at 91-92. The Sixth Circuit has issued contradictory rulings on this point. *Compare McGee v. Schoolcraft Community College,* 167 Fed.Appx. 429, 437 (6th Cir.2006) ("The issue of whether a student's interest in continued enrollment at a post-secondary institution is protected by procedural due process has not been resolved") *with Flaim v. Medical College of Ohio,* 418 F.3d 629, 633 (6th Cir.2005) ("In this Circuit, we have held that the Due Process Clause is implicated by higher education disciplinary decisions").

This has left a great deal of ambiguity. "The Sixth Circuit, in two cases claiming a violation of procedural due process, simply 'assumed without deciding' that the plaintiffs had constitutionally protected property interests in continuing their medical studies." *Rogers v. Tennessee Bd. of Regents,* 2007 WL 738146 (E.D.Tenn.2007) (*citing to Stevens v. Hunt,* 646 F.2d 1168, 1170 (6th Cir.1981) and *Ku v. State of Tennessee,* 322 F.3d 431, 435 (6th Cir.2003)). Lacking any kind of specific guidance, courts generally follow *Ewing'* s lead and assume an interest to reach the due process questions. *See, e.g., Bell v. Ohio State University,* 351 F.3d 240, 249 (6th Cir.2003).

Many federal courts, including the Eastern District of Michigan, have found a property interest in continuing education. *Picozzi v. Sandalow,* 623 F.Supp. 1571, 1576 (E.D.Mich.1986) (finding that "[a] public university student has a protected interest in continuing his studies"); *Dixon v.*

*Alabama State Bd. of Educ.,* 294 F.2d 150, 157 (5th Cir.1961) ("the right to remain at the college in which the plaintiffs were students in good standing is an interest of extremely great value"); *Stoller v. College of Medicine,* 562 F.Supp. 403, 412 (M.D.Pa.1983) (concluding that "a graduate student has a 'property' interest in continuing his studies."); *Hall v. Univ. of Minnesota,* 530 F.Supp. 104, 107 (D.Minn.1982) (holding that "[a] student's interest in attending a university is a property right protected by due process"); *Woodis v. Westark Community College,* 160 F.3d 435, 440 (8th Cir.1999) (finding that procedural due process applied to nursing student in disciplinary action by community college); *Gorman v. Univ. of Rhode Island,* 837 F.2d 7, 12 (1st Cir.1988) (holding that "a student facing expulsion or suspension from a public educational institution is entitled to the protections of due process"); *Hart v. Ferris State College,* 557 F.Supp. 1379, 1382 (W.D.Mich.1983) (concluding that "the threat of suspension or expulsion implicates ... property and liberty interests in public education and reputation, and that such interests are within the purview of the due process clause of the Fourteenth Amendment"). Other courts have found no property interest. *See Lee v. Univ. of Michigan-Dearborn,* 2007 WL 2827828 (W.D.Mich.2007) (finding the question unresolved); *Osteen v. Henley,* 13 F.3d 221, 223 (7th Cir.1993) ("it is an open question in this circuit whether a college student as distinct from an elementary or high school student has a property right in continued attendance"); *Tigrett v. Rector and Visitors of Univ. of Virginia,* 290 F.3d 620, 627 (4th Cir.2002) (assuming a property interest without deciding whether one exists).

 **\*5** Michigan state courts have only rarely addressed the issue directly, but they have consistently found a property interest in continued education. The Michigan Supreme Court in *Booker v. Grand Rapids Medical College,* 156 Mich. 95, 120 N.W. 589 (1909) declared that "when one is admitted to a college, there is an implied understanding that he shall not be arbitrarily dismissed therefrom." *Id.* at 590. In *Booker,* the Michigan Supreme Court found an implied contractual relationship between student and university to prevent the arbitrary dismissal of black students. *Id.* The decision-though characterized by the Supreme Court as "antiquated", *Ewing,* 474 U.S. at 222, fn. 7-nonetheless established that there is a property right in continuing education. More recently, the Michigan Court of Appeals found that "a student who has been accepted to a university has an implied contractual right to continued enrollment in that university." *Carlton v. Trustees of University of Detroit Mercy,* 2002 WL 533885, \*3 (Mich.Ct.App.2002). The court found that the "implied

contractual right" amounted to "the right to continued enrollment free from arbitrary dismissal," which is the Due Process protection laid out in *Horowitz* and *Ewing. Carlton,* at \*3. Finally, the Michigan Court of Appeals has directly stated that there exists a due process interest in continuing education. *See also Imtiaz v. Board of Regents of University of Michigan,* 2006 WL 510057, \*4 (Mich.App.2006) ("The right to an education has been recognized a legitimate property or liberty interest protected from arbitrary short term suspensions"). Taken together, these cases demonstrate that Michigan state courts recognize a property right in continued enrollment in a university. [3]

[3]  Michigan courts, however, do not extend this recognition to construe a contractual relationship between a student and a university. *See* Part IV-B, *infra.*

After careful analysis, the Court finds the arguments in favor of a property interest to be persuasive on this point. While admission into a college or university is not at all a guaranteed right, the value of continuing one's education after one has been admitted is plain. [4] As the Fifth Circuit eloquently phrased it in *Dixon:*

[4]  To use but one example, if a student were prevented from continuing their university education by the action of some third party, a court could not reasonably state that the student was deprived of *nothing* at all.

"The precise nature of the private interest involved in this case is the right to remain at a public institution of higher learning in which the plaintiffs were students in good standing. It requires no argument to demonstrate that education is vital and, indeed, basic to civilized society. Without sufficient education the plaintiffs would not be able to earn an adequate livelihood, to enjoy life to the fullest, or to fulfill as completely as possible the duties and responsibilities of good citizens ... Surely no one can question that the right to remain at the college in which the plaintiffs were students in good standing is an interest of extremely great value."
*Dixon,* 294 F.2d. at 157.

Therefore, relying on the relevant Michigan state court decisions and persuaded by the logic of fellow federal courts, this Court finds that continued enrollment in a public university amounts to a property interest and a student is thus

afforded protection from arbitrary dismissal under the Due Process clause.

### 2. Due Process Violation

**\*6** With regard to student dismissals, procedural due process requires (1) that a student be informed of their academic situation and (2) that the decision must be careful and deliberate. *Horowitz,* 435 U.S. at 85. "In the case of an academic dismissal or suspension from a state educational institution, when the student has been *fully informed* of the faculty's dissatisfaction with the student's academic progress and when the decision to dismiss was *careful and deliberate,* the Fourteenth Amendment's procedural due process requirement has been met." *Ku,* 322 F.3d at 436 (emphasis added). [5]

[5]    The analysis of substantive due process is much narrower than procedural due process in the academic setting. To find a violation of substantive due process, Plaintff is required to prove a "substantial departure from accepted academic norms so as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Ewing,* 474 U.S. at 225. As Plaintiff has met the evidentiary burden for summary judgment on her procedural due process claim, this analysis is not necessary.

Here, Plaintiff has presented sufficient evidence to show a material issue over the requirement that the student be "fully informed ... of the faculty's dissatisfaction with her clinical progress and the danger that this posed to timely graduation and continued enrollment," *Horowitz,* 435 U.S. at 89-90. Plaintiff has offered evidence indicating that though she was informed of the failing grades she received and her placement on probation, Plaintiff was never sent the letter that the board resolved to send in May 2005 indicating their dissatisfaction with her progress and outlining the consequences to Plaintiff. Thus, it would be reasonable to conclude from Plaintiff's evidence that the Academic Review Board's decision to recommend dismissal, emanating from an unscheduled and apparently informal meeting, came without adequate notice to Plaintiff.

Plaintiff's evidence similarly creates a question of fact as to whether the Academic Review Board's decision was the result of "careful deliberation" and "focused professional judgment." *Ku,* 322 F.3d at 438. Plaintiff has presented facts and testimony that could establish bias (if not animus) on

the part of Defendant Lantz. Plaintiff has further provided evidence of Defendant Lantz's prominent role in Plaintiff's dismissal and Defendant Lantz's activities on behalf of the Academic Review Board (e.g., that Defendant Lantz was tasked with sending Plaintiff the letter stating the faculty's concerns, and the letter was never sent to Plaintiff). Additionally, Plaintiff has offered testimony that Defendant Lantz solicited negative letters from faculty members-going so far as to edit Defendant Burgett's and physically type Defendant Piskorowski's-and that Defendant Lantz called the impromptu June 16, 2005 meeting at which Plaintiff was dismissed. Finally, Plaintiff's has submitted other evidence-such as the discrepancy between Plaintiff's grades and Plaintiff's post hoc written evaluations-which supports Plaintiff's theory that dismissal was made in bad faith.

Plaintiff's cumulative evidence surrounding Defendant Lantz is sufficient to create a genuine issue of material fact as to both the information provided to Plaintiff and the careful deliberation of the Academic Review Board with regard to Plaintiff's dismissal. Plaintiff's due process claim therefore survives summary judgment, and Defendants' motion will be denied as to Counts II and V.

### B. Breach of Contract

**\*7** Even though the Court accepts that Plaintiff's ongoing education constitutes a property interest, it has never been clearly established under Michigan law that the relationship between a student and a university is explicitly contractual in nature. *See Carlton v. The Trustees of the University of Detroit Mercy,* No. 225926, 2002 WL 533885 at \*3 (Mich.App.2002) (unpublished opinion) (only implied contract exists); *Tapp v. Western Michigan University,* No. 211725, 1999 WL 33326770 at \*3 (Mich.App.1999) (unpublished opinion) ("[c]ourts have rejected a rigid application of contract law in the area of student-university relationships"); *Amaya v. Mott Community College,* No. 186755, 1997 WL 33353479 at \*1 (Mich.App.1997) (unpublished opinion) (no contractual relationship); *Cuddihy v. Wayne State University Board of Governors,* 163 Mich.App. 153, 413 N.W.2d 692, 695 (Mich.App.1987) (a student had no cause of action against the university under a theory of promissory estoppel). *See also Lee,* 2007 WL 2827828 at \*10 (finding no clear law on point and remanding the contract claim to state court to determine its validity).

Contrary to Plaintiff's argument, the Supreme Court in *Ewing* did not establish a clear contractual relationship with regard to continued enrollment. *Ewing,* 474 U.S. at 223 (accepting Defendant University's invitation to "assume the existence" of such a property right). The district court in *Ewing* had rejected the plaintiff's contract claims, finding "no sufficient evidence to conclude that the defendants bound themselves either expressly or by a course of conduct to give Ewing a second chance [to take the NMBE, a qualifying examination]." *Ewing v. Regents of Univ. of Mich.,* 559 F.Supp. 791, 800 (E.D.Mich., 1983) (ruling cited with approval, 474 U.S. at 223-24 fns. 9 and 10). Though the university had provided Ewing with a pamphlet that stated that a qualified student would be given a second chance to take the qualifying exam, the Court held that "[e]ven if he had learned of the pamphlet's contents before he took the examination ... I would not conclude that this amounted either to an unqualified promise to him or gave him a contract right to retake the examination." *Id.*

Furthermore, it is entirely unclear what such a relationship would require of the Defendants. Plaintiff suggests that the rights associated with such a contract extend to being "free from arbitrary dismissal" (Pl. Brief at 40), which is functionally the same as the claim for procedural due process as discussed in Part IV-A, *supra.* Because (1) there is no established law creating a contractual relationship between student and university, and (2) Plaintiff does not articulate a theory for breach of contract separate from the due process claim, Defendant's motion for summary judgment is granted as to Count VII, and this claim is dismissed.

### C. Equal Protection

Plaintiff claims that she was intentionally treated differently from other similarly situated without a rational basis-a "class of one" equal protection violation. *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000). The states cannot make distinctions which either burden a fundamental right, target a suspect class, or intentionally treat one differently from others similarly situated without any rational basis for the difference. *Radvansky v. City of Olmsted* Falls, 395 F.3d 291, 312 (6th Cir.2005) (citing *Vacco v. Quill,* 521 U.S. 793, 799, 117 S.Ct. 2293, 138 L.Ed.2d 834 (1997)). [6]

6 "Michigan's equal protection provision [is] coextensive with the Equal Protection Clause of the federal constitution," and therefore the claims are analyzed together. *Crego v. Coleman,* 463 Mich. 248, 615 N.W.2d 218 (Mich.2000).

**\*8** The broad discretion afforded universities in their evaluations of students is an important factor here, as the only way in which the "similarly situated" students are similar to Plaintiff is in their academic record. However, "academic evaluations are not limited to consideration of raw grades or other objective criteria." *See Horowitz,* 435 U.S. at 89-90. The Plaintiff fails to present any evidence that the "similarly situated" students triggered the same concerns from faculty members, or that the students were considered deficient in clinical work the way that Plaintiff was judged to be. Plaintiff's failure to identify a similarly situated student-e.g., a student who generated concern among the faculty about their practical ability-means that her equal protection argument fails.

Plaintiff would also need to show that the dismissal lacks rational basis. "A 'class of one' plaintiff may demonstrate that a government action lacks a rational basis in one of two ways: either by negating 'every conceivable basis which might support' the government action or by demonstrating that the challenged government action was motivated by animus or ill-will." *Warren v. City of Athens, Ohio,* 411 F.3d 697, 711 (6th Cir.2005). Rational basis is a highly deferential standard of judicial review, and despite Plaintiff's best efforts, the evidence she presents cannot negate every conceivable basis which supports the dismissal, because so much of the dismissal involves academic judgment to which the Court defers absent actions outside accepted academic norms. Plaintiff's argument relies primarily on the existence of personal animus on the part of Defendant Lantz. "To demonstrate animus or ill will under *Olech,* a plaintiff must prove that the challenged government actions were motivated by personal malice unrelated to the defendant's official duties." *Klimik v. Kent County Sheriff's Department,* 91 Fed. Appx. 396, 401 (6th Cir.2004). While Plaintiff has presented evidence demonstrating Defendant Lantz' potential bias, Plaintiff has submitted no evidence that any of the members of either the Academic Review Board or the Executive Committee had any ill will, malice, animus or bad faith towards Plaintiff.

Though Plaintiff has submitted sufficient evidence to create an issue of material fact on whether the decision to dismiss was deliberate and considered in the Due

Process context, Plaintiff cannot meet the greater burden of showing that the decision lacked a rational basis in the Equal Protection context. For these reasons, Plaintiff's equal protection argument fails, and Defendants' motion for summary judgment is granted as to Counts III and VI, the Equal Protection claims.

### D. First Amendment Retaliation

To prevail on her federal and state free speech claims [7], Plaintiff must prove that her speech was constitutionally protected, that her injury would chill speech, and that she was dismissed in retaliation for her speech; Plaintiff can prove the first two elements, but fails to prove the third.

[7]     The "rights of free speech under the Michigan and federal constitutions are coterminous." *In re Contempt of Dudzinki,* 257 Mich.App. 96, 667 N.W.2d 68 (Mich.Ct.App.2003). The federal and state freedom of speech claims are therefore treated as one and the same.

**\*9** "In the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views." *Tinker v. Des Moines Indep. Community Sch. Dist.,* 393 U.S. 503, 511, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). To establish a retaliation claim, a plaintiff must show "(1) that [she] was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused [her] to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of [her] constitutional rights." *Cockrel v. Shelby County School Dist.,* 270 F.3d 1036, 1048 (6th Cir.2001).

As a threshold matter, Plaintiff's speech is protected speech. "It would be incredulous to think that the university has carte blanche to retaliate against any student as long as the speech was of a private concern or was made to vindicate the student's private interest." *Qyjit v. Lin,* 932 F.Supp. 1100, 1109 (N.D.Ill.1996) (finding that a student's speech was protected where he lodged allegations of misconduct against his advisor). While students' rights are not necessarily co-extensive with the rights of adults in other settings, their expressions will generally be protected as long as they do not "materially and substantially interfere with the requirements of appropriate discipline" or collide with the rights of others.

*Tinker,* 393 U.S. at 513. Defendants attempt to draw a distinction between public concerns and private matters in the speech context, but as this distinction originates from cases on employee speech, it is inapplicable here. *See, e.g., Pinard v. Clatskanie School Dist. 6J,* 467 F.3d 755 (9th Cir.2006) ("Although [the] personal matter/public concern distinction is the appropriate mechanism for determining the parameters of a public employer's need to regulate the workplace, neither we, the Supreme Court nor any other federal court of appeals has held such a distinction applicable in student speech cases, and we decline to do so here"). As Plaintiff's speech was not obscene or necessarily disruptive and was actually quite important-she accused the dean of a publicly funded university of misconduct and supported it with evidence-it is constitutionally protected speech.

The second element of a retaliation claim-chilling speech-is also found here. Plaintiff must show "that the defendant[s'] adverse action caused [her] to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity." *Leary v. Daeschner,* 228 F.3d 729, 737 (6th Cir.2000). The dismissal of Plaintiff-if it is seen to be motivated by Plaintiff's speech-would clearly have the effect of chilling speech at the dental school.

Plaintiff, however, fails to prove the final element-that the adverse action was motivated at least in part as a response to the exercise-as "the nonmoving party may not rely on the mere fact that an adverse [action] followed speech that the [moving party] would have liked to prevent." *Cockrel,* 270 F.3d at 1055. Plaintiff must provide evidence linking the speech in question to the Defendants' decision to dismiss her. However, the long span of time between Plaintiff's speech and Plaintiff's dismissal, while not dispositive, is relevant and it weighs in Defendants' favor. *Mulazim v. Corrigan,* 7 Fed. Appx. 427 (6th Cir.2001) (listing a "temporal nexus" as a factor in determining a causal connection in a First Amendment retaliation claim). While Plaintiff's first dismissal came almost directly after her conversations with Drs. Jaarda and Stoffers and Dean Polverini, the second dismissal-the subject of this suit-occurred well after the Jaarda/Stoffers controversy. It is thus difficult to tie the dismissal directly to the protected speech based on Plaintiff's circumstantial evidence, and Plaintiff provides no other evidence linking the 2004 speech and the 2005 dismissal.

**\*10** Additionally, there is no evidence that Plaintiff's protected speech bothered any member of either the Academic Review Board or the Executive Committee aside

from Defendant Lantz, or served as a motivation in anyone's decision to dismiss.

The long delay between Plaintiff's speech and the contested dismissal, combined with the fact that the parties most responsible for dismissing Plaintiff did not have a strong motive to retaliate, dooms Plaintiff's attempt to prove the third element of retaliation. Thus, Plaintiff's First Amendment retaliation claim fails and summary judgment is granted as to Counts I and IV of her complaint.

### E. Michigan's Elliot-Larsen Civil Rights Act

The Elliot-Larsen Civil Rights Act (the "Civil Rights Act") demands that "[a]n educational institution shall not ... discriminate against an individual in the full utilization of or benefit from the institution, or the services, activities, or programs provided by the institution because of religion, race, color, national origin, or sex." MICH. COMP. LAWS § 37.2402.

"Under the Civil Rights Act ... a prima facie case of race discrimination can be made by showing either intentional discrimination or disparate treatment." *Singal v. General Motors Corp.,* 179 Mich.App. 497, 447 N.W.2d 152, 155 (Mich.Ct.App.1989). To prove intentional discrimination, the plaintiff must show that he was a member of the affected class, that he was discharged, and that the person who discharged him was predisposed to discriminate against persons in the affected class and actually acted on that disposition in discharging him." *Id.* at 155-56. To prove disparate treatment, the plaintiff must show (1) that the plaintiff was a member of the class entitled to protection under the act and (2) that he was treated differently than persons of a different class (3) for the same or similar conduct." *Reisman v. Regents of Wayne State Univ.,* 188 Mich.App. 526, 470 N.W.2d 678, 685 (Mich.Ct.App.1991) (numbers added). Once a plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to articulate some nondiscriminatory reasons for the decision. *Sisson v. Univ. of Mich. Bd. of Regents,* 174 Mich.App. 742, 436 N.W.2d 747 (Mich.Ct.App.1989). If defendants present such reasons, plaintiff must then show that the reasons are actually pretexts for discrimination. *Id.*

Plaintiff does not present any evidence of intentional discrimination, so her claim under the Civil Rights Act is one of disparate treatment. Plaintiff, who is white, claims

that beneficial treatment was given to non-white students and denied her. Her allegations might satisfy the first two elements of disparate treatment, but Plaintiff clearly fails to establish the third element and Plaintiff fails to rebut Defendants' non-discriminatory reasons for dismissal.

Plaintiff presents evidence to suggest that minority students with similar or worse GPAs have not been dismissed. However, this does not necessarily prove that the non-white students had "the same or similar conduct", as "academic evaluations are not limited to consideration of raw grades or other objective criteria." *See Horowitz,* 435 U.S. at 89-90. The official grounds for Plaintiff's dismissal were the faculty concerns about her ability to practice dentistry and not solely her academic performance.

**\*11** Furthermore, even if Plaintiff successfully alleged a prima facie case, her argument still fails. Defendants here offer several nondiscriminatory reasons for dismissal: the faculty concerns, letters of evaluation and Plaintiff's various academic problems. Thus, the burden shifts to Plaintiff to not only show that the reasons given were pretextual, but also to "present sufficient evidence to establish that race was a determining factor in the decision." *Reisman,* 470 N.W.2d at 685. Plaintiff here has offered only suggestions of a pro-minority bias in grading at the dental school, and in every other part of her case she argues that the determining factor (indeed, the only factor) in her dismissal was personal animus on behalf of Defendant Lantz. Though Plaintiff argues persuasively that the decision was "pretextual", she fails to show that the decision was a pretext for *discrimination,* and as such summary judgment is granted for the Defendants on Count XI and this claim is dismissed.

### F. Tortious Interference With Contract

Plaintiff's claim for tortious interference is inadequate for the simple reason that there was no third-party interference. Under Michigan law "corporate agents are not liable for tortious interference with the corporation's contracts unless they acted solely for their own benefit with no benefit to the corporation." *Reed v. Michigan Metro Girl Scout Council,* 201 Mich.App. 10, 506 N.W.2d 231, 233 (Mich.Ct.App.1993).

Plaintiff has presented no evidence as to how Defendants Snyder, Piskorowski or Burgett benefited from her dismissal. Plaintiff's alternate theory-that Defendant Lantz wanted her dismissed because of a "personality conflict"-is awkwardly

imported from the employment context and is somewhat implausible considering that Plaintiff and Defendant Lantz didn't work together, or even interact all that much after the second year (and, in any event, Plaintiff's stay at the school was transitory and Defendant Lantz's was permanent). For these reasons, summary judgment is granted for Defendants on this claim and Count IX is dismissed.

## G. Defamation

Plaintiff's allegations of defamation fail, as Plaintiff presents no evidence proving that the statements are demonstrably false. The elements of a cause of action for defamation are: (1) a false and defamatory statement; (2) an unprivileged communication to a third party; (3) fault amounting to at least negligence on the part of the publisher; and (4) actionability of the statement. *Hodgins Kennels, Inc. v. Durbin,* 170 Mich.App. 474, 429 N.W.2d 189, 192-93 (Mich.Ct.App.1988). "The elements of a qualified privilege are (1) good faith, (2) an interest to be upheld, (3) a statement limited in its scope to this purpose, (4) a proper occasion, and (5) publication in a proper manner and to proper parties only." *Prysak v. R.L. Polk Co.,* 193 Mich.App. 1, 483 N.W.2d 629, 636 (Mich.Ct.App.1992). A plaintiff may overcome a qualified privilege only by showing that the statement was made with actual malice. *Id.*

**\*12** While the statements are almost certainly damaging to Plaintiff's reputation ("unfit", "emotionally unstable"), it is impossible to prove them false. Plaintiff argues that because her classroom evaluations didn't express any of the sentiments in the letters, the letters are false, while Defendants argue that the statements are professional opinions and not provably false; Defendants have the better argument here. Plaintiff's case for the falsehood of these letters seems to rest entirely on the conflict between the generally neutral daily classroom evaluations-the "bubble sheets"-and the fairly harsh tone taken in the letters. However, just because someone expressed (or, more accurately, failed to express) an opinion in the past

does not prove that a different or contradictory opinion in the future is "false". Plaintiff can complain that she was blind-sided by these letters, or that they are unnecessarily harsh, but they are expressions of professional judgment and are not provably false. Thus, the claim for defamation is dismissed and Defendants' motion for summary judgment is granted as to Count VIII.

## H. Intentional Infliction of Emotional Distress

To succeed in a claim for intentional inflection of emotion distress, a plaintiff must show "(1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation and (4) severe emotional distress." *Roberts v. Auto-Owners Insurance,* 422 Mich. 594, 374 N.W.2d 905, 908 (Mich.1985). To satisfy the first claim, the conduct must be so outrageous and extreme as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized society. *Id.* at 909. This is a high standard to meet, and the set of facts here are clearly insufficient to meet it. The most that Plaintiff alleges against any of the Defendants is "bad faith", which under *Roberts* is not enough to constitute an affront to decency and meet the first element of this tort. As such, summary judgment is appropriate as to Count X of Plaintiff's complaint and this claim is dismissed.

## V. CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that Defendants Motion for Summary Judgment is **DENIED** as to Count II and V of Plaintiff's complaint and **GRANTED** as to all other Counts.

**IT IS SO ORDERED.**

## All Citations

Not Reported in F.Supp.2d, 2008 WL 1902031

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.