EXHIBIT 1

EXPERT REPORT & DECLARATION OF PAUL FINKELMAN, Ph.D.

I, Paul Finkelman, declare that, if called upon, I could and would competently testify to the following:

1.  I am currently the Chancellor and Distinguished Professor of History at Gratz College, in Melrose Park, Pennsylvania. From the fall of 2017 to the fall of 2021, I was the President of Gratz College. Before coming to Gratz, I held positions in a number of law schools, where I primarily taught Constitutional Law, American legal history, courses on race relations and civil rights, and courses on civil liberties. My law school positions included:  Albany Law School, President William McKinley Distinguished Professor of Law and Public Policy (Endowed Chair), 2006-14; University of Tulsa College of Law, Chapman Distinguished Professor of Law (Endowed Chair), 1999-2006; University of Ottawa School of Law, Fulbright Research Chair in Human Rights and Social Justice, Fall, 2017; University of Pittsburgh, John E. Murray Visiting Professor of Law, Spring and Fall, 2017; University of Saskatchewan School of Law, Ariel F. Sallows Visiting Professor of Human Rights Law (Endowed Chair), Spring and Fall, 2016; Paul M. Hebert Law Center, Louisiana State University, Justice Pike Hall, Jr., Visiting Professor of Law (Endowed Chair), Spring and Summer, 2014; Duke Law School, John Hope Franklin Visiting Professor of American Legal History (Endowed Chair), Fall, 2012; University of Akron School of Law, John F. Seiberling Professor (Endowed Chair), 1998-99;  Cleveland-Marshall College of Law, Baker & Hostetler Visiting Professor (Endowed Chair), 1997-98. I have also taught in history and political science departments at a number of universities, including the University of Pennsylvania, University of Miami, University of Texas at Austin, and Washington

University in St. Louis. A full vita, attached to this affidavit, lists all my academic positions.

2.  I have a Bachelor of Arts in American Studies from Syracuse University (1971) and an M.A. and Ph.D. in history from the University of Chicago (1972 and 1976).  My two mentors were the legal historian Stanley Katz, who was also Associate Dean of Chicago Law School, and the leading historian of African American history, John Hope Franklin, who had done research for the NAACP Legal Defense Fund for the litigation in *Brown* v. *Board of Education*. In 1979, I held the J. Franklin Jamison Fellowship at the Library of Congress. I was a Fellow in Law and Humanities at Harvard Law School in 1982-83. While I have taught at law schools for about twenty years and held both tenured and visiting positions as a Distinguished Professor and a Chaired Professor at law schools, I am not an attorney and not a member of any bar.

3.  A true and correct copy of my curriculum vita is attached to this Declaration as Exhibit A.

4.  I have authored, co-authored, edited, or co-edited more than fifty books.  My most recent major book, *Supreme Injustice: Slavery in the Nation's Highest Court* was published by Harvard University Press (2018). I have subsequently published two articles based on this book in the online version of *University of Chicago Law Review*:

https://lawreviewblog.uchicago.edu/2020/08/31/marshall-slavery-pt1/  and

https://lawreviewblog.uchicago.edu/2020/08/31/marshall-slavery-pt2/, and a third article in *The Atlantic*, https://www.theatlantic.com/ideas/archive/2021/06/chief-justice-john-marshall-slaves/619160/. My co-edited book, *A History of Michigan Law* (2006) received the Annual Book Award from the Michigan Historical Society in 2007 and was designated a Michigan Notable Book for 2007 by the Library of Michigan. I am the co-author of *A March of Liberty:  A Constitutional History of the United States* (3rd ed., 2 vols. Oxford University Press, 2011), co-

2

author of *American Legal History:  Cases and Materials* (5th ed., Oxford University Press, 2017), and co-author of *Landmark Decisions of the Supreme Court* (2nd ed, Congressional Quarterly Press, 2008). I am one of five co-authors of the law school casebook, *Constitutional Law in Context* (4th ed., Carolina Academic Press, 2018).

5.  I am the author of about one hundred law review articles and approximately one hundred other scholarly articles and book chapters. My law review articles have appeared in many different journals including, *Michigan Law Review*, *Michigan State Law Review*, *Harvard Law Review*, *Stanford Law Review*, *University of Chicago Law Review*, *Yale Journal of Law and Humanities, University of Pennsylvania Law Review, Northwestern University Law Review, University of Southern California Law Review, Cornell Law Review*, *University of Texas Law Review*, and *Supreme Court Review* (published by the University of Chicago School of Law). One of my more recent articles, on the meaning of the Fourteenth Amendment, appeared in *University of California at Davis Law Review* in 2021.  My curriculum vita, attached to this affidavit, includes a list of most of the publications I have authored, co-authored, edited, and co-edited during my academic career.

6.  The United States Supreme Court has cited me in five cases. Most recently, and most relevant to this case, Justice Ruth Bader Ginsburg quoted me on the meaning of the Fourteenth Amendment and Bill of Rights protections in her opinion for a unanimous Supreme Court in *Timbs* v. *Indiana*, 586 U.S. ___ (2019), 139 S. Ct. 682; 203 L. Ed. 2d 11. I have also been cited by many other federal and state courts.

7.  I have given hundreds of public and academic lectures in 48 different states, six Canadian provinces, and in Austria, China, Colombia, France, Germany, Ireland, Israel, Italy, Japan, Poland, Switzerland, and throughout the United Kingdom (England, Scotland, and

Northern Ireland). The United States Information Agency and the United States Department of State sponsored some of these lectures. I have served as a consultant or an advisor to the Library of Congress, the National Parks Service, the Abraham Lincoln Bicentennial Commission, the New York Unified Court System, and the U.S. Department of Education. I have been an advisor and been filmed for many productions for PBS, C-SPAN, and the History Channel. I have appeared on other television networks, in a few movies, and on many radio programs.

8. I have been an invited speaker and/or a presenter (and sometimes as consultant) at many museums and similar institutions including: the National Archives, Smithsonian Institution, Library of Congress, The Henry Ford Museum of American Innovation, Charles H. Wright Museum of African American History in Detroit, Gerald R. Ford Presidential Library, National Freedom Center and Underground Railroad Museum in Cincinnati, John Hope Franklin Center for Reconciliation in Tulsa, the Newseum in Washington, D.C., Massachusetts Historical Society, Minnesota Historical Society, New York Historical Society, Virginia Historical Society, Monticello, Montpelier (James Madison's Home), James Monroe Museum and Memorial Library, the John Marshall House in Richmond, and the National Baseball Hall of Fame in Cooperstown, NY.

9. I have spoken at many colleges and universities across the United States, including the following Michigan institutions: Wayne State University, University of Michigan, Michigan State University, Grand Valley State University, Central Michigan University, Michigan Tech, Albion College, Alma College, and Thomas M. Cooley Law School. I have spoken at many academic conferences in law, criminal justice, history, political science, and other fields. I have spoken at programs, or given CLEs sponsored by, among others, the United States Second Circuit Court of Appeals, a number of U.S. District Courts, the New York Court of Appeals, the

supreme courts of Florida, Ohio, and Pennsylvania, the courts of the District of Columbia, and

the New Jersey Bar Association. I have received grants and fellowships from, among other

institutions and agencies, the American Bar Foundation, American Council of Learned Societies,

American Historical Association, American Philosophical Society, Gilder Lehrman Institute,

Harvard Law School, Japan Society for the Promotion of Science, Library of Congress, National

Constitution Center, National Endowment for the Humanities, William L. Clements Library at

the University of Michigan, and Yale University.

10.  I am an elected member of three honorary societies:  Phi Beta Kappa, Phi Alpha Phi,

and Phi Alpha Theta and an elected member of the American Antiquarian Society (one of the

oldest historical societies and libraries in the United States).  I am a life member of the American

Society for Legal History, the Organization of American Historians (OAH), and the Southern

Historical Association. Since 2001, I have been designated as a speaker as part of the

"Distinguished Lecture Series" sponsored by the OAH.

11.  I was an expert witness in *Glassroth v. Moore*, 229 F. Supp. 2d 1290 (M.D. Ala.

2002), a case involving a Ten Commandments monument in the rotunda of the Alabama

Supreme Court building. I was also a member of an "experts panel" in *Popov* v. *Hayashi*, No.

400545, 2002 WL 31833731 (Cal. Superior 2002), a lawsuit over the ownership of the 73rd home

run ball hit by San Francisco Giants baseball player Barry Bonds in the 2001. I have prepared

expert reports and affidavits in a number of other matters, but these cases have either settled

without trial or were resolved on summary judgment, without my testimony.  I have been an

amicus (sometimes the lead named amicus) on a number of amicus briefs to the U.S. Supreme

Court and other federal and state courts.

**DUE PROCESS IN US CONSTITUTIONAL HISTORY**

12.  I have been asked to express opinions on the history and meaning of "Due Process" in the Fourteenth Amendment (and collaterally in the Fifth Amendment) as it relates to Mr. Eid's case. I will draw on my many years as a scholar of the Constitution, especially the Fourteenth Amendment and the Bill of Rights. This also leads to the internal Wayne State University procedures used in investigating the charges against Mr. Eid and the final determination of the Wayne State University Medical School, as an agency of the State of Michigan, to expel Mr. Eid from the Medical School. Here I will consider the university's own procedures against the requirements of the law that I am familiar with as a constitutional scholar, professor, and college president. In both of these issues I will rely entirely on the fillings, documentation, and transcripts of depositions in this matter, as provided to me by Mr. Eid's counsel.

13.  It is not my place, as an expert, to determine or even suggest how the court should decide this case. My goal is to illuminate the constitutional history surrounding the case. Given the complexities of due process as it has developed in the courts it is no longer a concept that is well understood by a majority of the public and can be confusing to laymen. I base the interpretations, analyses, and conclusions in this Report on my education, research, writing, and experience as a professional historian and legal scholar and my more than forty years as a professor and college president.

14.  The U.S. Constitution requires that "No State shall … deprive any person of life, liberty, or property without due process of law; not deny to any person within its jurisdiction the equal protect of the laws." (U.S. Constitution, Amend. XIV, Sec. 1). Starting with *Gitlow* v. *New York*, 268 U.S. 652 (1925) the Supreme Court has gradually incorporated almost all of the provisions of the Bill of Rights into this clause and applied them to the states. Thus, as an entity of the State of Michigan, Wayne State University must protect the due process rights and

guarantee the equal protection of the laws to all individuals within the scope of its jurisdiction as well as their liberties set out in the Bill of Rights of the United States Constitution, as incorporated to the states through the Fourteenth Amendment.

15.  In 1866, following the Civil War, Congress passed the Fourteenth Amendment, which the states ratified in 1868. The immediate impetus for the Amendment was to protect fundamental rights and liberties of former slaves at the state level and to prevent the imposition of laws and procedures designed to "replicate, as much as possible, a system of involuntary servitude."[1]  The clause was also adopted to protect all Americans from arbitrary government action that denies them due process and "the equal protection of the laws."  Those who framed and ratified the Fourteenth Amendment were fully aware that before 1861 many states – especially the slave states that seceded to form the Confederacy – had denied due process and many fundamental rights and liberties to white people and free African Americans, as well as virtually all rights to enslaved persons.  To use a simple example, there was virtually no freedom of speech or the press in most of the fifteen southern slave states for whites or free African Americans (as well of course enslaved persons), who criticized slavery before the Civil War or challenged the Confederate government's policies after the War stated.[2]  After the War southern

---

[1] Timbs v. Indiana, 586 U.S. ___ (2019), 139 S. Ct. 682; 203 L. Ed. 2d 11, Slip opinion at p. 6 https://www.supremecourt.gov/opinions/18pdf/17-1091_5536.pdf , quoting Paul Finkelman, *John Bingham and the Background to the Fourteenth Amendment*, 36 AKRON L. REV 671, 681 (2003).

[2] See RUSSELL NYE,  FETTERED FREEDOM:  CIVIL LIBERTIES AND THE SLAVERY CONTROVERSY, 1830-1860 (1963); MICHAEL KENT CURTIS, FREE SPEECH, "THE PEOPLE'S DARLING PRIVILEGE:"  STRUGGLES FOR FREEDOM OF EXPRESSION IN AMERICAN HISTORY 271-99 (2000).  There was some suppression of speech in the North during the War, but far less than in the South. Paul Finkelman, *Civil Liberties and the Civil War:  The Great Emancipator as Civil Libertarian*, 91 MICH. L. REV. 1353 (1993) and MARK E. NEELY, JR., SOUTHERN RIGHTS: POLITICAL PRISONERS AND THE MYTH OF CONFEDERATE CONSTITUTIONALISM (1999).

states oppressed former slaves, African Americans who had been free before the War, white

southern unionists, and northerners (white and African American) who came to the South to

teach former slaves and work in other fields. The Fourteenth Amendment was designed to

prevent these depravations of liberties and rights by guaranteeing to all Americans due process of

law and the equal protection of the laws. [3]

16.  To understand how this Amendment is relevant to the case at hand, we must look at

evolution of the concept of due process in England and the American colonies before 1775 and

in the United States from the Revolution to the present.  While this case is a civil matter, the

standards of due process which have emerged over time in the United States arose mostly from

criminal law as well as equity law, and are now, in many ways similar. The notion of due process

in American law emerges out of nearly eight centuries of Anglo-American legal traditions,

starting with Magna Carta.  To put this in the context of modern Constitutional law, the

Fourteenth Amendment prohibits the state from denying anyone "due process of law" or the

"equal protection of the laws" in civil as well as criminal matters.[4]

---

[3] U.S. Constitution, Amend. XIV, Sec. 1; Paul Finkelman, *The Long Road to Dignity: The Wrong of Segregation and What the Civil Rights Act of 1964 Had to Change*, 74 LOUISIANA L. REV. 1039-1094 (2014). See also, Paul Finkelman, *John Bingham and the Background to the Fourteenth Amendment*, 36 AKRON L. REV 671.  For the Congressional hearings and documents that led to the Amendment, see REPORT OF THE JOINT COMMITTEE ON RECONSTRUCTION, H.R. Rep. No. 30-39 (1866).

[4] For obvious examples of the application of these principles in the non-criminal context, see Brown v. Board of Education of Topeka, Kansas, 347 U.S. 483 (1954) (holding that segregated schools violated the Fourteenth Amendment; Goldberg v. Kelly, 397 U.S. 254 (1970) (holding that welfare recipients were denied "due process of law" when they lost their benefits without a hearing, and an opportunity to dispute the reasoning of the city officials; Lucas v. South Carolina Coastal Council, 505 U.S. 1003 (1992) (holding that the denial of a permit to build on property owned by the plaintiff constituted an unconstitutional taking in violation of the due process clause of the Fourteenth Amendment); Lawrence v. Texas, 539 U.S. 358 (2003)

17.  The Magna Carta of 1215 is considered by legal historians to be a seminal source of modern English, and later American, law. Indeed it is arguably the single most important document for the development of American law before the American Revolution.[5]  The Magna Carta addressed various legal subjects, including inheritance; the legal obligations of guardians and the rights of underage heirs; land ownership and sale; marriage; the rights of widows; satisfaction of debts; taxation; feudal dues and services; dispensation of justice by the courts; jury trials and trial procedure; proportionality in punishment; the credibility of evidence in courts; taking of property without compensation; honesty and fairness in courts; and travel by merchants into and out of England.

18.  Magna Carta contains principles that are central to our legal culture today, including assertions that no person can be "seized or imprisoned, or stripped of his rights or possessions . . . except by the lawful judgment of his equals or by the law of the land" and that "[t]o no one will we sell, to no one deny or delay right or justice."  As the legal scholar A.E. Dick Howard observed, "The story of Magna Carta is the story of a number of concepts central to Anglo-American jurisprudence, most notably due process of law."[6]

19.  The concessions granted by King John I in the Magna Carta were largely limited to the baronial families at the top of the rigidly structured feudal system. In the early seventeenth century, the great English lawyer Sir Edward Coke began to use Magna Carta to argue for an

---

(holding that law prohibiting private intimate relations between consenting adults violated violated the due process clause of the Fourteenth Amendment).

[5]A.E. DICK HOWARD, THE ROAD FROM RUNNEYMEDE:  MAGNA CARTA AND CONSTITUTIONALISM IN AMERICA (1968).

[6]Id., at 1.

expansion of rights and liberties to all people in Britain.  Coke had served as Attorney General for Queen Elizabeth and under King James I (1594-1606), Chief Justice of Common Pleas (1606-1613) and Chief Justice of King's Bench (1613-1616) under King James I. In 1628, as an elected member of Parliament, he asserted on the floor of the House of Commons that the Magna Carta "will have no sovereign."[7]  Most of the early colonial charters contained a clause asserting that the colonists would have the rights of natural born English citizens. As a result of Coke's influence, by 1630 – the year of the founding of the Massachusetts Bay colony – these "rights" had begun to include the rights, privileges, and protections found in the Magna Carta. When American colonists spoke of their "rights as Englishmen," whether in the early colonial period or later at the time of the Revolution, they had in mind, among other things, the rights and privileges found in the Magna Carta; indeed, the colonists, and later the people of the new independent American nation, incorporated many of the provisions and concepts of the Magna Carta, such as trial by jury and a guarantee of due process of law, into their own political and legal systems.

20.  Another important aspect of the evolution of due process came from the use and misuse of court procedures from the late sixteenth century to the late seventeenth century, and especially the development of arbitrary justice in the Court of Star Chamber in England in the Seventeenth Century. A key source for this history of this issue is the Pulitzer Prize winning book by Professor Leonard W. Levy, *Origins of the Fifth Amendment*.[8] The quotations in this

---

[7]Debate in House of Commons of May 17, 1628, as quoted in J.R. TANNER, ENGLISH CONSTITUTIONAL CONFLICTS OF THE SEVENTEENTH CENTURY, 1603-1689 (1928, reprint 1960) 63 (citing to JOHN RUSHWORTH, 1 HISTORICAL COLLECTIONS (1682) 562).

[8]LEONARD W. LEVY, ORIGINS OF THE FIFTH AMENDMENT:  THE RIGHT AGAINST SELF-INCRIMINATION (New York:  Oxford University Press, 1968).

paragraph and the next one come from that work, with appropriate page numbers noted. By the end of the sixteenth century common law courts in England had begun to resemble the inquisitorial courts of continental Europe. "The suspect was closely and strictly interrogated in private; his accusers and witnesses against him were interrogated out of his presence and the evidence was withheld from him until the trial. The purpose of examining the suspect was to trap him into a confession." (35) Eventually English common law courts would abandon most of these procedures. In any event, even when such procedures were in place, at trial a defendant could repudiate his pretrial statements, and juries, could, and did, accept the repudiation, and find for the defendant. [9] Unlike common law courts, Star Chamber operated without a grand jury indictment or a petit jury to weigh evidence. This court was also free to coerce suspects (and threaten them with torture after conviction) to force confessions. After conviction (as well as before in some cases) the Star Chamber "could torture, imprison, fine, and punish any way it pleased" short of execution or dismemberment. Permissible Star Chamber punishments including whipping, branding, nose-slitting, cropping ears, and other cruel punishments, as well long prison sentences and outrageously high fines. (100)

21. The memory of such procedures and punishments was one reason for the adoption of the due process and other protections in the Fifth, Sixth, Seventh, and Eighth Amendments. The normal procedure in Star Chamber was arbitrary and gave few protections to someone under investigation. "With no advance notice of the interrogatories and without counsel, the defendant

---

[9]In the sixteenth and seventeenth centuries the Crown would sometimes try to punish jurors for such behavior. This arbitrary power ended with Bushell's Case, 124 Eng. Rep.1006 (1670). A discussion of juries and similar issues is well beyond the scope of my declaration, but again serves to remind us that the Founding generation took seriously "due process" when the state confronted individuals, with the potential to deprive them or property or liberty without due process.

was privately examined under oath, on a series of questions to which his answers were taken in writing and subscribed by him." (183-84) But "Star Chamber might scrap all procedural regularity and just do as it pleased." (184)  Many cases "were tried by a summary oral procedure" and "the suspect was simply 'grilled' or put to a 'third degree' type of examination whose only purpose was to trap him into a confession and conviction."  (184)  In the Star Chamber "the accused's refusal to answer incriminating interrogatories was taken as a confession of guilt."  (256-57) In Star Chamber cases, witness were also examined privately, "separately, under oath, without benefit of counsel." Star Chamber examinations were in secret and the court was free to use "any procedure it wished" to gain a confession or trap a suspect. (101)  A defendant in Star Chamber was not necessarily informed of the charges he or she faced (or why the person was even brought before the Court), and simply subjected to questions designed to either elicit a confession or lead to a plausible charge of perjury. Parliament abolished the Court of Star Chamber with the Habeas Corpus Act (16 Car I, c. 10) in 1641. Due Process, as understood in America precluded such arbitrary behavior. Indeed, central to due process is the right to know why you are being questioned, the charge or accusation you are facing, and what the potential punishment might be.  This also includes the right to have an attorney present. This would be true in non-criminal matters brought by the state or a state agency, including of course a state university.

22.  In the period following the Glorious Revolution of 1689 in Great Britain, American colonists expanded the notion of the "rights of Englishmen."  Americans now argued that their rights included the protections set out in the English Bill of Rights, which Americans of the Revolutionary period often called "the second Magna Carta."  The English Parliament passed the Bill of Rights in 1689 and required that the incoming monarchs, King William III and Queen

Mary II, assent to it. Parliament invited William and Mary to take the English throne in 1689 in the wake of the "Glorious Revolution," which overthrew King James II and brought an end in Britain to the concept of divine right of kings and the arbitrary prosecutions and procedures of the Tudor and Stuart monarchs.  The English Bill of Rights was designed to make the King and Queen subject to the laws of Parliament and to control their power in relation to their subjects.  It addressed various issues, including the passage of laws; taxation; the keeping of a standing army; the right to petition the Monarch for grievances; the election of legislators; and freedom of speech for members of Parliament. The Bill of Rights prohibited excessive bail and fines and cruel and unusual punishment while guaranteeing the right to a jury trial to all criminal defendants. Like the Magna Carta, the 1689 English Bill of Rights was highly influential in the colonies; many of the colonies, and the states and the national government during and after the Revolution, incorporated liberties guaranteed by the Magna Carta and later the 1689 English Bill of Rights directly into their statutes and constitutions.

23.  In the American colonies and newly independent nation, the Founding generation had a strong memory of the arbitrary procedure and the lack of due process in Star Chamber and other English courts.  The Founders sought to prevent similar behavior though the Fifth Amendment with its requirement of a grand jury indictment and the prohibition against requiring someone "to be a witness against himself."[10]   Other Amendments also responded to this history. The Sixth Amendment required that a defendant "be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses, and to have the Assistance of Counsel for his defense."  The Seventh

---

[10]See generally, LEVY, ORIGINS OF THE FIFTH AMENDMENT.

Amendment protected the civil jury and common law rules, including due process, because the Founders understood that arbitrary government could deny people their rights and liberties through civil actions that might impoverish victims of arbitrary government. The Eighth Amendment not only prohibited "cruel and unusual" punishments, but also "excessive" fines that could bankrupt a citizen in a criminal case, a civil action, or even and administrative hearing.

24.  A central element of "due process" in the United States has been based on idea that a government interrogation must be fair, and those being investigated have a right to know what the accusations and charges against them, to face (confront) their accusers, and have a right to counsel.  In our broad history of due process, it is important to recognize that when an individual is facing a harm from the state – whether in the context of criminal liability, civil forfeiture, or a termination of a benefit provided by the state – that individual has a right to be represented by counsel. The evolution of this right in the criminal context is clear, and includes two classic cases, *Powell* v. *Alabama,* 287 U.S. 45 (1932) (reversing a capital conviction in the famous Scottsboro case, because defendant Powell did not have adequate counsel) and *Gideon* v. *Wainwright*, 372 U.S. 335 (1963) (reversing a conviction in which the trial court denied the request of the indigent defendant, Gideon, for a court appointed attorney). As Justice Black said in *Gideon* (quoting Justice Cardozo) "'immunities that are valid as against the federal government by force of the specific pledges of particular amendments have been found to be implicit in the concept of ordered liberty, and thus, through the Fourteenth Amendment, become valid as against the states.'" (*Gideon* at 342, quoting *Palko* v. *Connecticut,* 302 U. **S.** 319 (1937) at 324-25, 326.)

25.  These protections in the Fifth and Sixth Amendments were of course written in the context of criminal prosecutions. The Supreme Court made this crystal clear in the criminal

context in a series of cases, including *Malloy* v. *Hogan*, 378 U.S. 1 (1964), *Massiah* v. *United States*, 377 U.S. 201 (1964), *Escobedo v. Illinois*, 378 U.S. 478 (1964) and most famously, *Miranda* v. *Arizona*, 384 U.S. 436 (1966).

26.  But this notion of due process of law has also become part of the general understanding of rights in civil matters involving government actions. In the now classic case of *Goldberg* v. *Kelly*, 397 U.S. 254 (1970), the Supreme Court held that a state must provide an evidentiary hearing for the termination of public assistance benefits provided by the state. What was true for welfare benefits would, presumably, be true for educational opportunity and the right to continue studying in a state university.

27.  The recent decision in *Timbs* v. *Indiana*, 586 U.S. ___ (2019), 139 S. Ct. 682; 203 L. Ed. 2d 11, is instructive in this context. The state of Indiana took the property of Mr. Timbs through civil forfeiture, but the U.S. Supreme Court held that this forfeiture violated the excessive fines clause of the Eighth Amendment, even though the seizure was not technically a fine imposed by a court as a punishment for a criminal conviction.

28.  From the perspective and development of American legal history, these fundamental due process rights are central to our constitutional world – what Justices Cardozo and Black called "ordered liberty" – when government investigates an individual for an infraction against the rules of government entity.

29.  As we know, states and state agencies, are obligated to provide due process whether in criminal matter, or like here, in a civil context. As I have just noted, as recently as the *Timbs* case in 2019, the U.S. Supreme Court held that the "excessive fines" clause of the Eighth Amendment ("Excessive bail shall not be required, nor excessive fines imposed …" U.S. Constitution, Amend, VIII) is incorporated to the states through the Fourteenth Amendment and

that this clause applies to civil forfeitures as well as criminal fines.

30.  Thus, when a Court considers the decision to expel Mr. Eid from Wayne State University – which is an agency of the State of Michigan – the Court should consider whether the procedures Wayne State University used against Mr. Eid met even minimal standards of due process, or whether it looked more like a Star Chamber proceeding, in which the University's "purpose of examining the suspect was to trap him into a confession."  (Levy, *Origins of the Fifth Amendment*, 35)

## THE CASE AT HAND INVOLVOLVING MR. EID

31.  The due process requirements of American law come into sharp contrast with the lack of due process in the case involving Mr. Eid at Wayne State University. Quite frankly, the system at Wayne State University for investigating, and dealing with this issue unfortunately reminds us of the denial of due process and the unfair administration of adjudication and justice in the inquisitorial courts of Early Modern Europe, rather than the robust protection of liberty and due process found in the American legal system. In an inquisitorial Court, like the English Star Chamber, the judges are heavily involved in the actual prosecution of a case. The goal of the court was to obtain a guilty verdict or a confession, not to determine guilt or innocence. [11]  In many ways the investigation of Mr. Eid by Wayne State University (and indeed the entire Wayne State investigative process) resembles these ancient and long discredited practices.

---

[11]It is important to understand that in modern democracies, the modern version of inquisitorial justice, and opposed to the American accusatorial system, works relatively well, because no one is brought to trial unless the evidence is overwhelming and in effect, pre-trial investigations focus on a careful evaluation of potential guilt, in which judges take part.  This is not the place to evaluate or compare the common law to the civil, but I do not want to be misunderstood as saying that there is no justice in non-common law jurisdictions.
.

32.  When a university investigates an accusation against a member of its community, whether it be a student, staff member, faculty member, or administrator, the goal should be to discover the basis of the accusation, thoroughly investigate the issue, and then bring the evidence to an appropriate internal review process or turn it over to an appropriate external review process (including a district attorney) for adjudication. The investigation must be careful, thoughtful, and intentionally designed to afford due process for all concerned, and to protect the rights of all. This is especially true where students are concerned since they are in a precarious position.  They are part of the university community, but as students they are subject to rules, regulations, and forms of observation and evaluation, that do not apply to other members of the community. Their careers and their future can be impacted in ways that are far more serious than in a traditional employment relationship. Any investigation or disciplinary actions can affect a student's grades, scholarships and other financial aid, university jobs and teaching assistantships, recommendations for internal and external fellowships and honors, post-graduate opportunities, such as residencies and fellowships for medical students, clerkships for law students, or post-doctoral fellowships and grants for PhD students. So too, in very rare cases, can the opportunity to continue in a graduate program. The financial implications can be huge as well.  Most students have the burden of student loans, which would be difficult (or impossible) to pay back if a student was dismissed from a graduate or professional program.

33.  In Mr. Eid's case, he has spent a considerable amount of money, time, and effort, and of course incurred opportunity costs, to obtain a medical degree. Being prevented from continuing in a degree program, with little opportunity to transfer to a different institution is an

extraordinary punishment. [12]  Such a severe outcome should only be implemented after significant investigations, careful due process, and the gathering of all relevant evidence by trained investigators who are seeking facts and information, and not tasked with "building a case" against the accused student. This would include the right of the student to counsel, full, transparent, and timely notification of all charges, the opportunity to present all exculpatory evidence, and the right to live confrontation of witnesses (either in person or on something like zoom). The adjudication must be by a neutral party or parties (usually a committee) who have not prejudged the outcome of the investigation. Usually, some or all of the adjudicators would be parties who are not directly involved in the student's education. Furthermore, if an institution seeks such an outcome, the standards for that outcome should be based on clear rules and regulations and the nature of the infractions leading such an outcome should be clearly set out in existing rules and regulations, which would include procedures that are transparent and afford due process to the student under investigation.  The alleged infractions must rise to levels of harm such that no other outcome – such as an apology by the student, suspension for as specific time, probation, or a determination that a student seek counselling – could possibly cure or rectify the harm. There should also be a meaningful appeals process.  In academic terms, an expulsion is the equivalent of a death sentence, and should be treated as such by university administrators, the State of Michigan, and the courts.

34.  Even where universities have the discretion or legal right to expel a student, especially one who has spent a great deal of time in money in a program, the institutions

---

[12]As I note below, at paragraph 34, Medical School administrators have made it clear that Mr. Eid cannot reapply to their school, and it is extremely unlikely that he will be able to transfer to another school.

.

typically avoid such an outcome unless the harm is extremely severe. An example of this can be seen in the U.S. Supreme Court case of *De Funis* v. Odegaard, 416 U.S. 312 (1974). After the University of Washington denied De Funis admission to its law school, he sued, arguing that the school's admissions policies favored African Americans over him, and but for his race he would have been admitted. The trial court ordered the school to admit him, and he started law school. The Washington Supreme Court reversed but allowed him to remain in the school, pending an appeal to the United States Supreme Court.  By the time the U.S. Supreme Court heard the case he was registered for his last term of law school. Before the U.S. Supreme Court, the University of Washington conceded that even if the school won the case, it would not expel him from the school, but would allow him to finish his degree.[13]   The University might have contended that because it was opposed to his admission in the first place, it would not allow him to continue, if it won the case. This case illustrates the responsibility of a school to allow a student to finish a degree, except in the most dire circumstances.  In my own experience, I have seen law schools allow students to amend their applications to fix errors (such as failure to report old legal infractions on their applications) after they have been admitted and started taking classes. In these cases, the school would have been within its rights to expel the students, but it did not.  In other instances, I have seen universities ask students to take a leave, to seek counseling, or to resign from the school and then reapply because of a serious rule violation. Significantly, Wayne State University Medical School does not allow a student such an option. In his deposition, the Vice Dean for Medical Education, Dr. Baker, had the following conversation (Baker Dep, 24 L. 16-24):

---

[13]"In light of DeFunis' recent registration for the last quarter of his final law school year, and the Law School's assurance that his registration is fully effective," De Funis at 316.

Q.   So once a person is dismissed from the medical school, there isn't an opportunity to

reapply or to request reconsideration?

A.   Yes, they can reapply, request reconsideration at other institutions. . . .

Q.   But not at Wayne State?

A.   Not at Wayne State, but there's nothing that – that prohibits the student from

applying to another institution.

Dr. Baker then affirmed that "It is very difficult" but possible to be admitted into another

medical school after a dismissal and that he also stated that he knew of no instance in which a

student dismissed from Wayne State University Medical School was able to continue her or his

medical education anywhere else (Baker Dep., 25, L. 4-11).  In effect, dismissal from the

medical school was a "death penalty" for an aspiring physician's career.  When Mr. Eid asked

Dr. Baker what he should do with his career, after he had been expelled, this Vice Dean of the

Medical School, and an educator replied that Mr. Eid "could run for Governor." (Eid Dep., 195,

L 23.)

35.  In all such cases I have known in my academic career, there have been careful

evaluations of the evidence, and students were able to bring counsel (or even a parent) to

hearings or to appeals over discipline or even grades. In such cases there has always been a

presumption of innocence and an investigation involving committees that included faculty and

administration to evaluate the situation. Students were informed of their rights and

responsibilities and any allegations against them. The goal of the committee, or the dean, or any

fact finder, was to first establish the facts.

36. At Wayne State University the process seems to be different. In her deposition, Ms.

Nicolina Camaj asserted that when there is complaint that comes to her, she is the sole

investigator, and her goal is to resolve the issue with a "determination," and that most students accept her determination. (Camaj Dep., 63, L. 22-25). If the student accepts the "determination" then the case ends. As I will note below,[14] Ms. Camaj departed from this procedure, apparently on orders from one of her superiors or perhaps university counsel.

37.   In the process described by Ms. Camaj, the student is contacted, not by Ms. Camaj, but through what appears to be a robot email from Maxient software. The email summons the student to come to a meeting, and according to the student code, is supposed to have a brief statement about the investigation.[15] The email is not highlighted as "urgent" and does not contain any "significant, flag or some type of attention grabbing symbol to let the student know that they've got an important piece of correspondence from the dean's office."  Ms. Camaj declared the email "will say Maxient in the subject header."  It says nothing else "other than that it came from Maxient." (Camaj Dep., 92, L. 21-25; 93 L 1-4).  It is "not flagged" as "Attention" or flagged as "Important" or "Immediate Request." (Camaj Dep., 93, L. 2-12)   However, in the same conversation Ms. Camaj also asserted "it will say the subject -- that's the subject header, Official Correspondence From the Dean of Students Office." (Camaj Dep., 93, L. 15-17)

38.   Needless to say, Ms. Camaj's inconsistent testimony here makes it impossible to determine if a student receiving this email would know, without opening it, the actual "subject" of the email.  The documents provided in conjunction with Ms. Camaj's deposition show the contents of the email sent to Mr. Eid, but do not show the actual email as it was sent to him, so we cannot know if the subject line clearly stated it came from the Dean's office, or just said it

---

[14] See Paragraphs 58, 60 and 66, below.
[15] As I will discuss below, in the case of Mr. Eid (and as I note below in violation of the Wayne State University student code) the email said nothing about the purpose of the meeting or the alleged infraction.  See Paragraph 50 below.

came from Maxient.  This of course would matter in a world where students are often inundated with emails and may only immediately look at those with a clear subject line.  We do not, for example, know how many other emails from Maxient a student might regularly, or irregularly, receive from the University. What is clear, however, is that this email required immediate attention, and had to be answered within 48 hours of receiving it (Camaj Dep., Ex. G, letter of Nov. 27), if the student could not appear at the time the student was summoned to her office.

39.  We also do not know what the process is for determining the time and day that a student is summoned to appear at the Dean's office. We do not know if Ms. Camaj looks at the student's class schedule to know when it would be convenient for a student to appear in her office, or at least to know when the student cannot appear without missing class.   Ms. Camaj set summoned him to a meeting at 12:00 noon (Camaj Dep., Ex. G, letter of Nov. 27).  For a busy medical student, this might have been the only time of the day that Mr. Eid would be able to eat lunch.  It is hard to understand why Ms. Camaj would summon Mr. Eid to a meeting when he was probably hungry but had not had time to eat.  As we all know, someone distracted by hunger at mid-day might not be in the best frame of mind to face an accusation and an investigation that threatened his entire career as a medical student and future physician.  We also do not know if her decision on the day and time factored the distance between a classroom where a student is either leaving class or going back to another class, to determine if the time she has allocated was sufficient or possible.  Again, if Mr. Eid was anxious to get to his next class, it would have hampered his ability to concentrate on the issues raised by Ms. Camaj.  According to Google Maps and the Wayne State University Campus map, it is about 1.2 miles from the Medical School at 540 East Canfield Street to the Office of the Dean of Students, at 5221 Gullen Mall.

https://www.google.com/search?q=distance+540+East+Canfield+Street+to+5221+Gullen+Mall

%2C+Detroit+Michigna&rlz=1C1EJFA_enUS761US761&oq=distance+540+East+Canfield+Str
eet+to+5221+Gullen+Mall%2C+Detroit+Michigna&aqs=chrome..69i57.44264j0j7&sourceid=c
hrome&ie=UTF-8 Google tells us this is a 24 minute walk, but that does not include time for

leaving and entering buildings, waiting for elevators, or any kind of traffic or construction.

When we consider the due process issues, it would be useful to know how Ms. Camaj decided on

a particular day and time for the meeting, taking into account class schedules, distance, and the

normal lunch hour.  Because an email summoning a student to Ms. Camaj's office would likely

produce some anxiety in the student, it is not unreasonable to think that a summons which tells a

student to miss class, or lunch, to meet with her would produce even more anxiety.

40.  The email does not tell students they may ask for a copy of the complaint. The

student code allows students to receive the complaint in advance of a meeting but, Ms. Camaj

noted "the student code tells the student, and I know a lot of students don't read the code, it tells

them that if you wanted materials presented to you prior to your meeting, you can contact the

conduct officer, and that will be supplied to you." (Camaj Dep., 57, L. 14-18) In my experience

as an undergraduate, graduate student, and visiting post-doctoral student for ten years, and my

experience in dealing with students for more than four decades, I must agree with her.  Very few

students ever read the student code, and many do not know it exists.

41. As a matter of due process, it is insufficient that the letter sent to Mr. Eid (Camaj

Dep., Ex. G, letter of Nov. 27, 2018), does not have a URL or weblink to the student code, or any

suggestion that the student receiving the letter look at the code. To provide proper notice a

summons letter such as this one should in fact have directed Mr. Eid (and all other students who

receive such letters) to the student code and the specific sections that might be relevant to the

investigation, the charges being made against the student, and procedure or process at the meeting.

42.  The letter also does not urge the student (in this case Mr. Eid) to bring any material with him about the matter under investigation. But as is quite clear, this letter tells Mr. Eid nothing about the investigation, charges against him, or evidence. It is just a summons to appear. So even if he had wanted to bring materials, he would not have known what to bring.

43.  In the case before us, Mr. Eid received a vague letter, from a robot email server, summoning him to a meeting (during his lunch break) with someone he had probably never heard of, on an undisclosed matter.  He could have had the complaint sent to him, but Ms. Camaj neither offered to do so or told him he could ask for it.  The letter simply summoned him to appear in Ms. Camaj's office in three days. (Camaj Dep., Ex. G, letter of Nov. 27). This summoning violated Mr. Eid's due process rights in many ways.  As I note below, the letter in fact violated a number of the requirements in the student code, including timely notice.[16]

44.  By not offering the student information in advance – and not telling the student that the information was available – Wayne State University and the State of Michigan began its investigation without due process. This was the way the Star Chamber operated. You were summoned to appear, often with no indication of why you were being summoned or investigated. You were then questioned.

45.  Wayne State University's process is eerily similar to Star Chamber procedures at this point in an investigation.

---

[16]As I will discuss below (Paragraphs 48 and 50), this summons to appear in 3 days violated the Student Code, which required a notice of at least 5 school days. See Paragraph 50 below.

46. Mr. Eid faced the same circumstances. He was not told he could bring counsel with him or informed of his "rights." But as Ms. Camaj noted, she often reached a determination on the spot and asked students to agree to it. This process puts the students in the uncomfortable, and unconstitutional, position of being pressured to agree to a finding or determination without any opportunity to have any due process or consult an attorney, a parent, or anyone else. Quite frankly, a simple parking ticket summoning someone to come to the local court (or pay a fine) gives more due process to a driver than Wayne State University does to its students.

47. Wayne State University tasks Ms. Camaj with the job of chief investigator, prosecutor, and chief magistrate. She proceeds in a summary manner to adjudicate a dispute and render a judgment.

48. This case, however, was different. On November 27, 2018, Ms. Camaj had a robot letter sent to Mr. Eid, summoning him to a "fact finding conference" to be held in three days (Nov. 30) and that he had to reply to this email within two days (48 hours) if he could, or could not, attend the meeting. The email said the conference was about his "alleged behavior on Wayne State University's campus." (Camaj Dep., Ex. G, letter of Nov. 27) The letter gave no indication of what this was about. This is in contrast to Ms. Camaj's statement in her deposition that when summoned to her office a student would be told what the charge was. In her deposition she declared: "in the letter that's sent to them, they are notified of the specific charge, so they will be told, you know, this is the violation that's alleged to have occurred,  4.6, 4.3, and we give them the specifics of the account, about two or three sentences about what we're talking about because that's what's requested by the Student Code of Conduct, so I'm required to put that in a letter when I send that to students whenever there's a conduct matter that charges have been filed." (Camaj Dep., 57-58 L. 20-25, 1-4) The letter and Ms. Camaj's deposition are clearly in

conflict. She states what the policy is, what the "process" is, what she was "required to put in the letter," but the letter she sent Mr. Eid did not conform to these requirements. Her letter flagrantly violated the process she was "required" to follow. Thus, Ms. Camaj denied Mr. Eid any due process notice and denied him specific rights *required* by the student code.

49. When a government agency – in this case Wayne State University as an agency of the State of Michigan – seeks to discipline someone, a minimal aspect of due process is that the agency must follow its own stated rules. Ms. Camaj, apparently acting under orders from her superiors, intentionally violated these due process rules and University requirements.[17]

50. On Nov. 29, 2018, Mr. Eid specifically asked Ms. Camaj about her failure to follow stated university policy. (Camaj Dep., Exhibit F). (Camaj Dep., 134, L. 12-18) In an email he asked what the charges were against him. Eid noted that according to the student code:

"A notice shall be sent to the student(s) or to representative(s) of the student organization, with a copy to the Dean of Students or the Academic Dean, within ten school days of the Student Conduct Officer's receipt of the charges, and at least five school days prior to the conference. The notice shall contain the following information:

a) The alleged infraction;

b) The nature of the evidence submitted;

c) The time and place of the conference;

---

[17]From her deposition it is impossible to know if Ms. Camaj intentionally violated the rules she was "required" to follow, but it is not unreasonable to believe that as a skilled and seasoned administrator, this is not the sort of human error that would happen. And if it was a mere error, then we can only wonder why she did not immediately rectify it when she discovered her error.

d) A copy of this code, with a statement that it is the governing policy and that the

student should retain it for use throughout the proceeding."

It is worth noting that Ms. Camaj had violated the Student Code in failing to give Mr. Eid "five

school days" notice of the conference, and failed to provide any documentation for parts a, b, and

d. The robot letter Ms. Camaj sent only indicated the time and place (c) and as I have noted, the

"time" was clearly in violation of the Wayne State University rules.

51.  There is no indication that Ms. Camaj replied to Mr. Eid's email of November 29 or

that she provided him with any of the information he was entitled to, that he had requested, and

that as she noted in her deposition, she was "required" to send him.  Significantly, in her

deposition Ms. Camaj said that students were entitled to significantly more information, if they

asked for it, but that most did not because "a lot of students don't read the code." (Camaj Dep.

57, L. 14-18).  But here Mr. Eid had read the code and yet, the University ignored his requests.

Here once again, are clear violations of the due process Mr. Eid was entitled to have.

52.  Because Mr. Eid had no notice of the charges against him, or the nature of the

alleged misbehavior, he had no opportunity to prepare for his meeting. How could he prepare for

this meeting when he had no knowledge of the complaint?  As Ms. Camaj later noted in her

deposition, Mr. Eid actually had no obligation to meet with Ms. Camaj, but she did not inform

him of this right either.  (Camaj Dep., 134, L. 20-23).

53.  Ms. Camaj claims in her deposition that she had no obligation to tell him of the

"charges" against him, because she said no formal charges had been made.  The deposition is

worth quoting:

Q.   And at the time that you sent that, did you also include a statement of the charges

for the complaint?

27

A.   There were no charges filed in this case, so I wouldn't have included charges because there was no charges filed.

Q.   Did you provide my client with a statement of why he was being -- the purpose for the fact-finding conference?

A.   No, because I'm not required to, and -- and I just included in there I wanted to discuss reported concerns.

Q.   So you're telling me that under the Student Code of Conduct, you had no responsibility to advise him of what he was going to be meeting with you about?

A.   This is not a Student Code of Conduct case because no charges were filed in the matter, in this matter, I should say. (Camaj Dep., 94, L. 9-19)

Q.   Okay. Even though that the letter says it's a – the matter involves a violation of the Student Code of  Conduct?

A.   It says it may, and the information that was in the complaint could have resulted in such and that's the reason I wanted to discuss this concerning behavior.  It didn't say it did, it said may have.  (Camaj Dep., 95, L. 1-7)

Ms. Camaj's argument and assertions seem to have been lifted from either Star Chamber procedures or were guided by the main theme of Joseph Heller's classic book *Catch-22*.  Ms. Camaj is saying that because Mr. Eid isn't charged with anything he has no right to know why he is being summoned before Ms. Camaj, and because he has not been charged, he is *not* protected by the rules of the Student Code.

54.  But in fact, according to the code, she had a legal obligation to inform him of why he was there in advance of the meeting.  This was a clear violation of due process. Under the code she was "required" to tell him: "a) The alleged infraction; and b) The nature of the evidence

28

submitted."  The code, significantly, does not use the term "charge," so her explanation or

excuse for not doing following the code, suggests that she intentionally decided (or was ordered)

to not do what she was required to do, and intentionally decided (or was ordered) to not give him

the information he was entitled to have.  Her failure to do so, whether of her own accord or under

direction from her superiors (including possibly legal counsel for the University)[18] simply

underscores the lack of due process and the "star chamber" nature of the proceeding.

55.  This lack of due process is also made clear by questions of Ms. Elizabeth Hardy

while deposing Mr. Eid.  She asserted that "on November 27, you received electronic

communication from Nikolina Camaj indicating that there had been a complaint filed and that

she wanted to speak with you on November 30th at 12 p.m. in the dean's office?"  Mr. Eid

responded that this was not correct because the letter said nothing about a "complaint." Ms.

Hardy again insisted that there was a "complaint" filed against him and asserted he should have

known this because the document had a "case number." (Eid, Dep., 143, L. 16-25).  She then

insisted to Mr. Eid that the letter said there was "going to be a fact-finding conference

concerning a case, correct?" (Eid, Dep., 144, L. 2-7).  Again, Mr. Eid and also his attorney

responded that there was no case filed.  That counsel for Wayne State University did not realize

that in fact this letter said nothing about a "case" or a "complaint" suggests an extraordinary

cavalier attitude to due process and proper procedures.  Alternatively, if Ms. Hardy is correct,

that this letter asserted there was a "case" filed against him, then Ms. Camaj was consciously

---

[18]See Camaj deposition, at page 75, where Mr. Porter, the attorney for Wayne State
University asserts that counsel for the University was present at a meeting prior to Ms. Camaj
summoning Mr. Eid to a meeting with her, and at that meeting she possibly received advice, or
directions that were protected from discovery by lawyer-client privilege.  Here it appears that the
University discussed a plan to deny a student due process, instructed a subordinate official (Ms.
Camaj) to implement that denial and then tried to prevent discovery of that denial by claiming

violating University rules and procedures, and not being candid (to say the least) when she claimed in her deposition that she did not have to inform Mr. Eid of the "charges" against him, because she said no formal charges had been made.  Either Ms. Camaj or Ms. Hardy is being disingenuous, misleading, or worse, and whichever theory of this event is correct, the University did not afford Mr. Eid any due process or procedural protections.  He was not informed of the "charges" or "allegations" or "complaints" against him.

56.  Ms. Camaj further denied Mr. Eid due process protections by not informing him that anything he said to Ms. Camaj might be used against him, to his detriment. This would have been the 'civil' version of a *Miranda* warning, which again is fundamental to due process. Nor was he informed that he might be expelled from medical school on the basis of her conversations with him.

57.  It is important to recall that Ms. Camaj said in her deposition that her job is to make a "determination" in cases, and hopefully to get the students to accept it. "I could hear that case and make a determination, and then the student, in turn, gets to accept or deny my determination." (Camaj Dep., 47, L. 21-23).  Under this procedure – it cannot be called "due process" – Mr. Eid (or any other student) would be in the position of trying to defend himself (or herself) against unknown and secret charges at a one-shot meeting, with no opportunity to present evidence, have advice of counsel, or even fully know what the evidence was against him. With all due respect, in the context of American popular culture, this smacks of the "double secret probation" meted out to troublesome students in the now classic comedy movie *Animal House*. As a movie this was great entertainment. In real life, such proceedings violate due process, fundamental justice, and the Constitution of the United States.

---

lawyer-client privilege.

58.  In the end Ms. Camaj did not follow her own procedures of trying to reach a determination in this case. Rather, on the direction of some unnamed superior or superiors, she said in her deposition, "I was just asked to meet with both students and gather the statements and forward them onward and not to make a determination in the case."  She repeated "I was not to make a determination; that was not my role in this matter."  (Camaj Dep., 86, L. 19-12; 87 L. 12-13) After interviewing the complainant and Mr. Eid, she was to report on the "statements" they made, and "also if there's any evidence for them to share and to document that and submit it forward."  She was then told to forward her "report" without any recommendations to the Associate Dean of the Medical School, Dr. Margit Chadwell, and the University counsel, Linda Galante.  (Camaj Dep., 87, L 5-7, 15-16).

59. Nor did she share with Mr. Eid the full nature of the complaint against him or the information she had from Ms. Burton.  Asked "what did you learn about the substance of the complaint" he replied, "Not much."  He learned that Ms. Burton "filed a complaint against [him]" based on text messages he had sent her, and she showed him some of these text messages. When asked "Is that all you learned during that meeting?" he replied, "That's all I recall." (Eid Dep., 147, 2-11)

60.  Compounding her multiple denials of due process, Ms. Camaj did not inform Mr. Eid that she actually had no power or authority to settle this matter, because she was under orders not to settle it.  Instead, according to his deposition, she asked Mr. Eid to write a "statement" which Mr. Eid agreed to do. Ms. Camaj then offered "input" into this letter.  He submitted that statement to Ms. Camaj a few days later.  He also offered to write a letter of apology to Ms. Burton, but it appears Ms. Camaj did not want that to happen. (Eid Dep.  148, L 20-25; 149 L. 2-25)

31

61.   These events create two due process issues.  First, Ms. Camaj essentially asked Mr. Eid to "confess" he had done something wrong in his "statement" but Ms. Camaj had not given him a full picture of the complaint, not told him that she was not in a position to accept his explanation and end the matter, and not told him that she would be forwarding his "statement" to various disciplinary bodies in the Medical School, and not informed him that this statement could (and would) be used against him.

62.   Second, as I note later in this report, one of the reasons that Dr. Baker gave for expelling Mr. Eid from the Medical School was his failure to show remorse.  Dr. Baker testified: "I guess what I would term maybe lack of contrition that -- the fact that, that, you know, Anthony did not take any ownership for any of the actions." (Baker Dep., 51, L.4-6) But it is clear from the beginning of this process Mr. Eid was prepared to do that and wanted to do that. The University did not want him to do that, because as will be clear later in this report, some leaders of the Medical School had already determined that Mr. Eid was "guilty" of something and should be expelled from the medical school.  Almost a month before he appeared before Ms. Camaj, Associate Dean Margit Chadwell and Ms. Loretta Robichaud, and counselor at the Medical School, had reached this conclusion (Chadwell Dep., Ex. B, Loretta Robichaud email of Nov. 4, 2018).   This may explain why Ms. Camaj had been ordered not to perform her normal duties, but instead misled Mr. Eid, failing to give him the information he was entitled to under the University's own code, and setting him up to confess to something, based on the limited information he had.

63.   In preparing her report to others in the University, Ms. Camaj was not directed to interview anyone else (nor did she) about the interactions between Mr. Eid and the complainant, Ms. Burton, to make any further investigations, or apparently seek any other evidence, other than

32

that provided by Ms. Burton. (Camaj Dep., 87, L 5-7, 15-16). When asked "did you do anything to corroborate or disprove any of the complainant's account" she replied that she had not done so. Rather she said that all she did was "Just confirming the student's status, you know, that, you know, like what she was studying and confirming she, obviously, that she was a student." She then admitted that in fact Ms. Burton was not in fact a student at Wayne State University at the time she made the complaint (Camaj Dep., 88, L 2-15).

64.  It is not clear if the lack of Ms. Burton's student status is relevant here. In her deposition Ms. Camaj stated that her office and Wayne State University would only have jurisdiction over an infraction that took place "on campus." Ms. Camaj stated: "sometimes when a complaint comes in, they will let you know the person making the complaint where it occurred, and then, you know, when you go forward, you discover that it may have been off campus or on campus, you're not sure, and so if it's on campus, we have jurisdiction. If it's off campus, we don't have jurisdiction." (Camaj Dep., 65, L 2-8). She then stated, "If they are not on the property of Wayne State or are not on something affiliated with Wayne State's educational program, then it's off campus." (Camaj Dep., 65, L 14-16).

65.  The evidence in this case, presented from the documents provided in depositions, strongly suggests that the actions of Mr. Eid that led to the complaint did not take place "on campus" and that many of them took place when Ms. Burton was not even a student at the University. Mr. Eid clearly met her on campus once, and never met her in person again.  In his deposition counsel for the University asked, "Is it accurate that you only met Roe one time in person?" He answered: "That is accurate."   (Eid Dep., 93, L 9-11).   But that first meeting was not the basis of the complaint. The basis of complaint seems to be text messages (and perhaps phone calls), that took place off campus and not in the context of any Wayne State University

function or activity. And, as Ms. Camaj admitted, for much of the timeline of these events, the complainant (Ms. Burton) was not a student and not living in Michigan. ((Camaj Dep., 89, L 5-20).

66.  Once again, due process and fair procedures were ignored. We can only wonder how Ms. Camaj's report could be accurate, comprehensive, or fair, if she did not investigate the veracity of the complainant's evidence and did not provide Mr. Eid with a reasonable amount of time to respond to it.  Similarly, her failure to investigate if any of the events that might have been concerning to the University actually took place on campus or even took place between two students illustrates the lack of due process here. If the events did not take place on campus, then Ms. Camaj had an obligation to note that in her report and raise to her supervisors the lack of her jurisdiction (and the University's) to investigate any further. As noted above, Mr. Eid's was summoned to this hearing without any knowledge of what it was about, and therefore had no opportunity to bring any documentation or evidence that might have illuminated his side of the story. Quite frankly, this meeting with Mr. Eid was like a Star Chamber proceeding, in which the accused was led to incriminate himself through questions, not given the opportunity to provide evidence of his own, and never informed of the charges against him, or the potential of an outcome that was fatal to his medical school education and his plan to become a physician.

67.  It is also not clear why the University directed Ms. Camaj to depart from its normal procedures – why it turned the investigation of Mr. Eid into some sort of special case, in which the University deliberately refused to follow the procedural rules of the student code and directed Ms. Camaj to *not* perform her job as she did in all other cases.

68.  It should be obvious to anyone, that there is a fundamental lack of due process when the government simply ignores its own rules, directs its staff to purposely depart from general

practices, and gives no notice of any charges or complaints to someone it is investigating.  This lack of due process is especially flagrant here because Wayne State University was intentionally violating its own rules as set out in the student code.  This lack of due process is underscored and made more apparent when the government agency, in this case Wayne State University, secretly creates a special procedure to investigate a specific individual and does not inform that individual about what is going on.  It is hard to imagine a more obvious plan "to get" Mr. Eid, to harm him, and set him up for expulsion.

69.  The Medical School's investigation of this case did not even remotely resemble a procedure to discover the truth of any allegations against Mr. Eid, and throughout denied him any due process protections or rights.  The Medical School did not conduct any investigation on its own into the assertions of Mr. Eid that his computer systems had been hacked. (Jackson Dep., 60 L 24-25; 61, L. 1-2).  Nor did either Ms. Camaj or the Medical School investigate the veracity of Ms. Burton's claims. Wayne State University made no attempt made to verify any of the claims of Ms. Burton, except that there was an attempt to hack into her email from a location close to where Mr. Eid lived. (Jackson Dep., 60 L 18, 62-64)

70.  Dr. Matthew Jackson, the chair of the Medical School's professionalism committee, noted that his committee interviewed Ms. Burton and her mother but kept no transcripts of these conversations or even records of any questions the committee asked them (Jackson Dep., 74 L 8-14). The committee did not cross examine either witness or in any other way question or examine their statements.  The members of the committee "did not challenge her [Ms. Burton's] testimony" (Jackson Dep., 74 L 24-25) or that of her mother.  The committee allowed both witnesses to sit together and hear each other's statements and testimony. (Jackson Dep., 75 L 1-16).  Thus, they were in a position to intentionally, or inadvertently, corroborate each other's

story.  It seems unlikely that a mother or daughter would contradict the other when testifying together, in person.  But of course, if they had been examined separately, the committee might have heard different sets of facts and statements.  That both the mother and the daughter were present for each other's testimony clearly undermines the utility of their testimony.

71.  While Ms. Burton and her mother were present to hear, and support, each other's testimony, Mr. Eid was not present for this testimony and had no opportunity to ask questions, challenge their statements, or even later refute what they said.  He was denied the constitutional right to confront the witnesses whose testimony would lead to his dismissal from medical school, preventing him from ever practicing his chosen profession. Thus, as it had throughout this investigation, Wayne State University and the State of Michigan denied Mr. Eid any semblance of due process.

72.  Members of the Medical School committees asked Mr. Eid many questions, but the committee did not keep any record of these questions, or his answers. This is surprising, given that the Committee was preparing a report on Mr. Eid's future, and some or all members were contemplating his expulsion from the school.   When the case came to the Promotions Committee, chaired by Dr. Baker, the issue of expulsion was clearly on the table. It is somewhat shocking that for such an important matter the committee kept no minutes or records of its proceedings.  While this was clearly a hearing – analogous to a legal investigation – the medical faculty seem to be resistant to that notion and kept no record of its proceeding.

73.  The lack of a written record, or a video or audio recording of this hearing, underscores the Medical School's denial of due process.  We are unable to judge whether the forum was neutral and fair, or hostile from the beginning.  Mr. Eid wanted to read a statement to the Committee on Promotions – the committee which would ultimately decide to expel him from

the Medical School.  However, he was not allowed to do this.  He started to read one document

but "was interrupted while reading these documents during the committee hearing." (Eid Dep.,

187 L. 8-9).  He later said, in reference to a second document, "I was shut down from being able

to speak." (Eid Dep., 188 L. 19). Committee members said they already had these documents,

and thus they did not need to hear him read them.  But, as we all know, commissions, legislative

committees, and fact finders almost always allow (or even ask for) an opening statement from a

witness, *especially* if that witness is the subject of the investigation.  We know that a verbal

statement can have a much greater impact than words on paper.  In addition, an oral statement, in

front of the entire committee, might have led to further discussion, questions, and clarifications.

Hearing a statement in the presence of other members of the committee is quite different than

reading it alone, at your desk, or perhaps reading it at home while there are distractions from

family, pets, and technology.  We also know that there is no proof that all (or any) of the

members of this committee actually took the time to read Mr. Eid's statement.  A historic right of

due process, dating back to the Medieval period, is the right of a defendant to speak at a trial.

The Medical School, Wayne State University, and the State of Michigan trampled on this ancient

right in this case.

74.  Dr. Richard S. Baker, the Vice Dean of Medical Education, asserted that he did not

see the investigation and procedures used in Mr. Eid's case as "judicial."  He stated in his

deposition when discussing the investigation of Mr. Eid, "I don't see it as a judicial process"

(Baker Dep., 17, L. 14-15.)  When asked if the Medical School has "formal rules for either the

professionalism or the promotions committee that lay out the rules of evidence for those

committees" he answered that the school had no such rules.  (Baker Dep., 28, L. 15-24) Dr.

Baker asserted this was permissible because the committee he chaired, and others that considered

Mr. Eid's case "are not necessarily disciplinary in function." (Baker Dep., 28, L. 23-24)  It is hard to comprehend how a professor and M.D.  could claim that one committee (professionalism) which recommended expulsion, and another (promotions) which ordered expulsion was "not . . .disciplinary in function." Dr. Baker did not need a legal education to understand that expelling someone from school was indeed "disciplinary."

75.  The disconnect between plain language and Dr. Baker's claims about the functions of his committee is confirmed by his other parts of his own testimony. Shortly before saying that his committee was not "disciplinary in function" he had said that one of the functions of his committee was to put into a student's record "disciplinary actions."  (Baker Dep., 22, L. 11.) Thus, his committee was in the business of confirming and reporting "disciplinary actions," which would seem to mean the committee was involved "disciplinary actions," unless he is asserting that one of the most important committees in the Medical School, chaired by a Vice Dean and a senior faculty member, is merely a "ministerial" rubber stamp that puts things in files without examining them or considering them.  However, he later said that the committees, including his, "can play a disciplinary role, but that is not necessarily their role." (Baker Dep., 29, L. 2-3.)  This strikes me as double talk, worthy of the Star Chamber.  Dr. Baker asserts the professionalism committee and the promotions committee have no rules of evidence because they are "not necessarily disciplinary in function" and then admits that they in fact have a "disciplinary role."

76.  The distinctions here boggle the mind.  Some analogies might be helpful.  A bankruptcy court might say that its main role is not "disciplinary."  The same might be true for a probate court.  But both have the power to issues sanctions, contempt citations, and other forms of discipline.  When they do, they follow rules that have been set out in advance.  But Dr.

Baker's committee holds investigations and hearings, pretending it is not "disciplinary" and so it has no rules of procedure or evidence.  Having finished its hearing work, it suddenly – almost magically – transforms itself into a disciplinary body, for the sole purpose of expelling a student.  But since at this point it is not taking testimony or examining new evidence, it does not have to have procedures or rules of evidence.

77.  Asked if there "is a document at the university that lays out how evidence will be treated or considered by the committee" when the committee "does consider a disciplinary matter," Dr. Baker responded, "No. And again, it's not a judicial process." (Baker Dep., 29, L. 4-8) Illustrative of the Committee's insistence that it was not "judicial" – or for that matter administrative – the committee kept no written record of its procedures or hearing. When asked "Was there a transcript made of that exchange between the promotion committee members and" Mr. Eid, Dr. Baker said "No, none." (Baker Dep., 41, L. 13-15) Dr. Baker then said that the committee did not interview the complainant, Amanda Burton, or ask her any questions.  Nor did the committee interview Ms. Burton's mother, who first brought this matter to the Associate Dean of the Medical School, Dr. Chadwell (Baker Dep., 41, L. 18-23; 43, L. 15-20).  Although the Medical School's promotion committee was aware of the many disagreements between Mr. Eid and Ms. Burton on the various allegations of both of them, Dr. Baker noted that the Committee did not interview Ms. Burton (Baker Dep., 52, L. 10-13). Dr. Baker insisted that this "was not a trial. It was really -- the focus was on his specific behavior" (Baker Dep., 52, L. 17-19) even thought the issue of his behavior was based entirely on Ms. Burton's complaint. Not only was Mr. Eid unable to confront the witness against him, but the committee did not seem to believe that due process required that the committee investigate the veracity of Ms. Burton's statements.

78.  While Mr. Eid was allowed to answer questions from the committee (but not present his own side of the story in an oral statement), he was not able to witness the questioning of others involved in the case and thus had no opportunity to offer any rebuttal or explanations. (Baker Dep., 42, L. 8-25) Thus in a hearing – that has all the elements of a trial – Mr. Eid was denied one of the most fundamental aspects of due process in the American constitutional law, the right to confront witnesses that testified against him.

79. In response to a subsequent question Dr. Baker asserted that "when a student appears before the promotions committee . . . to determine whether the student deserves to stay in school in a case concerning dismissal," is it "the responsibility of the promotions committee to determine which students should progress in the program." (Baker Dep., 69-70, L. 21-25, 1, 5-7). Weirdly, however, Dr. Baker denies that this is "disciplinary" process or a "judicial process."

80. Dr. Baker's insistence that this was not a "judicial process" reminds one of the logic of George Orwell's classic book *Nineteen Eighty-Four: A Novel* (1949).  Dr. Baker seems to have absorbed the Orwellian concepts of "doublethink" and "newspeak." Why isn't an investigation, which can cost a student a huge amount of money and prevent the student from ever become a physician not "a judicial process"?  The answer is apparently because Dr. Baker, Wayne State University, and the State of Michigan say it is "not a judicial process."  Why doesn't the committee have rules of evidence, because the committee's job is not essentially "disciplinary." But of course, it can discipline students, even expel them from school, but only after it has conducted its investigation in what it pretends is a non-disciplinary function without any rules or procedures.

81.  Dr. Baker insists that his committee was not conducting a judicial process, because in his 21st century version of George Orwell's "Newspeak" he says it was not judicial.  In political

and popular culture most Americans (and many people in other parts of the world) fully understand that the antidote to the Medical School's "newspeak" and "doublethink" is the classic Duck Test: "If it looks like a duck, swims like a duck, and quacks like a duck, then it probably *is* a duck."[19] Whatever Dr. Baker might want to call the process, it was judicial, conducted by a committee with enormous disciplinary powers.

82.   Thus, with no formal rules of evidence, no opportunity for Mr. Eid to state his case to the committee or to confront the witnesses against him, and no requirement that the committee members evaluate or interrogate any of the evidence before it, the committee, an entity of the State of Michigan, essentially imposed a medical school "death penalty" against Mr. Eid, even though the committee was not "disciplinary."  This, I would argue, is a clear violation of the right to "due process of law" protected by the Fourteenth Amendment of the United States Constitution.

83.   One fundamental aspect of due process is the right to appeal a decision. After being told of the outcome in his case, Dr. Baker urged Mr. Eid to withdraw from the Medical School. Dr. Baker said that Mr. Eid could still appeal the decision after he withdrew.[20]  (Eid Dep. 195-96). However, Dr. Baker said he could do this "as long as I didn't take it one further step and appeal to the Provost office." (Eid Dep. 196, L. 11-13).  This is a remarkable statement.  In a large University, like Wayne State, the provost is usually the chief academic officer, second only to the president, in the administrative hierarchy, and supervises most academic deans.  Dr. Baker

---

[19]This phrase so common that it hardly needs attribution, but once source suggests it comes from great Midwest Poet James Whitcomb Riley once wrote: When I see a bird that walks like a duck and swims like a duck and quacks like a duck, I call that bird a duck." https://www.amazon.com/James-Whitcomb-Riley-Sketches-quacks/dp/1785430114

[20] This was where Dr. Baker also suggested that instead of pursuing a medical career, Mr. Eid "could run for governor."  (Eid Dep., 195, L. 23).

was essentially trying to prevent his superiors within the university from finding out how the Medical School had treated Mr. Eid. Thus Mr. Eid was told he could only appeal the decision to the very committee that had decided against him.

84.  At this meeting Mr. Eid also asked Dr. Baker what was the reason for his expulsion. Certainly knowing why you have been punished – why in this setting you have been given the academic equivalent of a death sentence – fundamental due process requires an answer to that question.  How, after all, could Mr. Eid appeal the outcome of these proceedings – appeal his sentence – if he did not know why he had received this outcome.  Astoundingly, Dr. Baker "said he could not get into what the Promotions Committee thought that I did." (Eid Dep. 196, L. 20-22).  Thus, while Mr. Eid was allowed to appeal to the committee that voted to expel him (and not to the Provost or some university committee outside of the Medical School), he had to appeal without even knowing what he act he was "guilty" of doing.   The lack of due process here is astounding.

85.  Precluded from appealing to the provost, which would have been the proper avenue in most universities, Mr. Eid investigated appealing to the president of the university.  At his deposition Ms. Hardy seemed to attack him for this. "Why did you think it would be appropriate for the President of the entire university to become an advocate for you in the course of your appeal?"  (Eid Dep. 211, L. 16-18) This set of questions astounded me.  Even someone sentenced by the Court of Star Chamber could appeal to the King.  But apparently the counsel for Wayne State University does not think the president of the University should have to power to consider an unfair process brought against a student.

86. Wayne State University, the Medical School, and by extension the State of Michigan, have managed to channel not only the fictitious world of George Orwell, but the real world of the Seventeenth Century Star Chamber. They do so by ignoring the Constitution of the United States and the legal history of the United States.

THE STAR CHAMBER IN THE CITY OF DETROIT

87. This Court may find my comparison of Wayne State University's process to Star Chamber proceedings as "over the top," and an exaggeration. Wayne State University, after all, has not physically tortured Mr. Eid. He has not been whipped or had his ears cropped. But, in other ways there are frightening parallels.

88. Star Chamber interrogated people without telling them what the charge was or the potential outcome of the case. Ms. Camaj did that to Mr. Eid when she failed to provide any details of her investigation in her initial letter and then refused to provide this material, as she was "required" to do, when he asked for it. These were rights he had under the student code. She flagrantly and intentionally denied him these rights and did not even have the courtesy to reply to his email. This was a clear violation of the University's own policies and practices and a denial of basic due process from the very beginning of her interaction with him.

89. Star Chamber imposed psychological punishment by endless investigations, that would in the end, have a bad outcome. This resembles Mr. Eid's ordeal. Star Chamber proceeded from an assumption of guilt and gathered evidence "to prove" that guilt. Wayne State University departed from its standard investigative process, directing Ms. Camaj not to issue a "determination," because it seems clear from email traffic, that Wayne State University personnel has already determined that Mr. Eid was "guilty" before there was any investigation or any discussion with him. Loretta Robichaud, a nurse working in the Medical School as a

University Counselor asserted unequivocally that Mr. Eid was guilty of "threats, harassment, and cyberbullying … etc."  (Chadwell Dep., Ex. B, Loretta Robichaud email of Nov. 4, 2018.) This was certainly alleged by the complainant, but it had not yet been investigated or proved. She had already reached a series of conclusions about Mr. Eid and speculated that he "preyed on other students." (Chadwell Dep., Ex. B, Loretta Robichaud email of Nov. 4, 2018.) There was no evidence beyond the complaint, and no evidence that Mr. Eid had any problems with any other students. In response to Ms. Robichaud's email, setting out her emphatic conclusions about Mr. Eid's guild, Dr. Chadwell, who is the Associate Dean for Student Affairs of the medical school said "agree," implying that she agreed with Ms. Robichaud's analysis and conclusions.  She indicated she was going to be at meeting this issue that afternoon.  Thus, we find that before there any been any investigation of Mr. Eid, any meetings about him, or any attempt to hear his side of the story, Associate Dean Chadwell, who would be a key figure in determining Mr. Eid's fate, had already concluded he was "guilty."  (Chadwell Dep., Ex. B, Loretta Robichaud email of Nov. 4, 2018.)  This was not due process, but the opposite of due process. Without investigation or evidence or even a hearing, the key player in the outcome of this case had already decided what the outcome should be.

90.  In her deposition Dr. Chadwell concluded that Ms. Robichaud was concerned that Mr. Eid's behavior would lead to a scandal similar to the one involving Dr. Larry Nasser, who was ultimately convicted of numerous offenses involve the sexual abuse of female athletes, especially those connected to U. S. Olympic teams.  (Chadwell Dep., 47, L 23-25; 48, L 1-25; 49, L 1-4).  Thus, from the very beginning of this investigation, two key players in the medical school were asserting that Mr. Eid was a danger because he would, at some time in the future, conduct himself like a notorious figure at another medical school in Michigan.

91.  This concern of key decision makers, like the Associate Dean, over Mr. Eid's non-existent future conduct, from the very beginning of the case, shows a lack of due process and fundamental fairness. Like the Court of Star Chamber which persecuted people for religious beliefs that they might or might not have held, the Associate Dean of the Medical School and the Senior Counselor for Mr. Eid's medical school class, had effectively determined that he was a threat to their institution.  Not surprisingly, such a conclusion would ultimately lead to expulsion.

92.   George Orwell would appreciate this email exchange, because it is an example of the word he invented, "crimethink."  Ms. Robichaud and Dr. Chadwell, without any testimony or evidence, on the basis of a complaint from a non-student that no one knew or had ever interviewed, had concluded that Mr. Eid was a threat to Wayne State University and the reputation of the medical school.  They were certain he held unacceptable beliefs and ideas, and he was essentially a ticking timebomb waiting to explode to the detriment of the school.  In their minds he must be stopped so his "crimethink" could not harm Wayne State University, the medical school, and the State of Michigan.  This was more like the jurisprudence of Salem, Massachusetts in 1691, than the jurisprudence of the United State of America in the twenty-first century.  The text message evidence and accusations were the 21st century equivalent of the spectral evidence used to send people to their death in Salem.  And like the spectral evidence in Salem, no one at Wayne State University chose to interrogate the value or veracity of the evidence presented against Mr. Eid.  Like those who hanged witches in Salem, Dr. Chadwell and Ms. Robichaud *knew* what kind of person Mr. Eid was, and was going to become, without the need for evidence, careful investigation, or due process.  Dr. Jackson and Dr. Baker collaborated in this.

93.   Star Chamber proceedings sought to have defendants confess to their alleged "crimes" and if confessions did not occur, Star Chamber used intricate and persistent questioning to trap defendants into admitting their alleged offences, or to trap them into inconsistent testimony which would lead to a charge of perjury.  We see this throughout this process, starting with Ms. Camaj urging Mr. Eid to write a statement.

94.   The Medical school "Promotions Committee" stressed the importance of Mr. Eid failing to express remorse or contrition for his actions.  The committee either did not know, or did not care to know, that at the very beginning of this process, Mr. Eid expressed remorse for anything he said that made Ms. Burton uncomfortable and offered to apologize to her.  Dr. Baker testified that one of the reasons why the committee on professionalism recommended that the Committee on Promotion expel Mr. Eid from the medical school – to impose the medical school's equivalent of a death penalty on his desire to become a physician – was due to his lack of "contrition."  Dr. Baker testified: "I guess what I would term maybe lack of contrition that -- the fact that, that, you know, Anthony did not take any ownership for any of the actions." (Baker Dep., 51, L.4-6)

95.   Dr. Baker testified that his committee did not interview Ms. Burton, or interrogate her statements, because what she accused him of did not matter.  Mr. Eid's attorney asked: "If the promotions committee thought Amanda Burton was lying through her teeth, what would have happened during that stage if they believed Anthony was telling the truth, Amanda was lying?" Dr. Baker responded by saying it would not matter because:

> Her -- her testimony, her allegations were not germane to much of the
>
> deliberation in that room.  The focus was on Anthony's behavior and his
>
> statements.  It didn't matter if somebody else did something else, didn't matter,

they're two people. The focus was really, and the concern really was on

Anthony's behavior, some – some very big inconsistencies, and the fact that at

least during the committee hearing, it appeared and the impression was from --

from the members of the committee that he was taking no responsibility for any of

his decisions or behaviors. (Baker Dep., 54, L.13-24)

Dr. Baker is essentially arguing that Mr. Eid was "guilty" because he would not accept

responsibility for accusations of conduct, even if, as Dr. Baker admits, the conduct might not

have happened, might not have happened the way Ms. Burton claimed it happened, or that Ms.

Burton might not have been wholly truthful (or truthful at all) in her accusatory claims of what

Mr. Eid did.

96. In effect, Dr. Baker is asserting that because Mr. Eid would not accede to "self-

incrimination," that showed that he was "guilty" of whatever the Medical School thought he was

guilty of, the State of Michigan had the right to expel him from the Medical School, deprive him

of the opportunity to become a physician, and saddle him with great debts that he could not

easily repay because he was not a physician. This was all because he may have exercised his

constitutional rights under the Fifth Amendment and the Fourteenth Amendment, not to testify

against himself. It is, quite frankly, hard to imagine a more egregious violation of the

constitutionally protected rights of due process than these actions by the State of Michigan and

its agents, Wayne State University, and the administration of the Medical School.

97. Despite what Dr. Baker asserts, this case is fundamentally about "truth" and

evidence. If Mr. Eid did not do the things Ms. Burton accused him of doing, then he had nothing

to be remorseful about. And even if he sent the texts to Ms. Burton that upset her, are these

really grounds for expulsion? This strikes me as an issue of proportionality in punishment (and

because of the financial implications of being expelled, an excessive fine), raising issues of due process and fundamental fairness under the Eighth Amendment. This is very similar to the issues raised in *Timbs* v. *Indiana*, which I have already discussed.

98. Since truth is at the heart of this case, is it troubling that the University chose not to investigate Mr. Eid's assertion that he received a racist and threatening phone call from a Colorado phone number. He testified "I received a phone call from a Colorado number who I presumed to be Roe or someone affiliated with Roe that contained a racial slur that threatened to get me deported." While as a natural born American citizen Mr. Eid was not fearful of being deported, he was very upset by this racial slur and testified "having something like that said to you is scary. (Edi Dep, 84, L. 16-19; 92, L 12-13)

99. The University, as an agency of the State of Michigan, might easily have asked for investigative help to determine where the call came from, since Mr. Eid provided the phone number as it showed up on his cell phone. In an age of hate crimes and violent attacks on minorities, we can only wonder why the University and the Medical School did not think this information deserved some of its attention. We might think the University would take seriously physical threats to its students based on their ancestry. This aspect of the case suggests that the Medical School did not think Mr. Eid was entitled to the "equal protection of the laws," which is also a guarantee of the Fourteenth Amendment.

100. If this case were about strictly academic issues, we would not be here today. Universities deserve great deference in making academic decisions. [21] A court, except in the most unusual circumstances, should never question academic standards and the considered opinion of academic professionals that someone had not learned the material or passed the

48

course. As a professor I have never enjoyed giving a student a failing grade, but students should get the grades they earn, even when the outcome is unpleasant or even tragic. Mr. Eid had a great desire to be physician, but if he had failed most of his exams and was dismissed for that reason, and that reason alone, it is unlikely he would be before this court, and I certainly would not be serving as an expert witness for his cause. But that is not the case. No one has questioned his academic record.

101. On the other hand, if dismissal involves discrimination, harassment, bribery, retaliation, or coercion by a faculty member or staff, the Courts may indeed become involved, even if the school claims the dismissal is due to poor grades. This also includes the failure of the University to accord due process to its students in administrative hearings.

102. There are instances where dismissal is tied to external adjudications, such as convictions for serious crimes or crimes of moral turpitude. If a student were convicted of such crimes, the university might expel the student (but does not have to) with a fairly summary process, based on the external criminal conviction.

103. This standard is relevant here. The Wayne State University police department and a police department in Colorado were aware of Ms. Burton's allegations against Mr. Eid. Both law enforcement agencies declined to take any action or bring any charges against Mr. Eid. The University ought to have taken these facts into account. The Medical School paints Mr. Eid as a danger to the medical profession and society. Someone guilty of the Orwellian notion of "crimethink." But trained investigators and law enforcement officers on the Wayne States campus and in Ms. Burton's current state of residence found no reason to take any actions in this matter.

---

[21]See Gruter v. Bollinger, 539 U.S. 306 (2003).

104.  Star Chamber imposed outrageous fines. For example, the Court fined William Prynne the enormous sum of ten thousand pounds, because the Court did not like his religious diatribes against dancing, the performance of plays, and other common activities. Later he was fined another five thousand pounds.[22] Such fines were in the minds of the members of Congress who wrote and passed the Eighth Amendment and the state legislators who ratified it.  Mr. Eid has expended an enormous sum of money at Wayne State University to earn his medical degree, and all that is now wasted, because without any due process he has been prevented from finishing his degree. This is the modern equivalent of a constitutionally impermissible excessive fine. Star Chamber also prohibited William Prynne from continuing to practice law, because the Court objected to his writings,[23] and Wayne State University has done the same to Mr. Eid, even before he is able to complete his degree.

105.  Finally, Star Chamber could brand someone. It ordered that William Prynne be branded with the letters S.L. – for seditious libel – that is, for his audacity in criticizing the regime of King Charles I.[24]  Wayne State University has effectively branded Mr. Eid as unfit for his chosen profession based on an investigative process that was flawed from the beginning. Mr. Eid's "branding" is not with a hot iron. It is electronic and in paper records. But the result is the same. He cannot finish his medical degree at Wayne State University, and he will be unable transfer to another school.

106.  This branding and expulsion, the academic death penalty, took place after a long investigation that lacked any semblance of due process of fairness. It violated many or the rules

---

[22]LEVY, ORIGINS OF THE FIFTH AMENDMENT, 271. The Court also ordered the Prynne's ears be cropped.

[23]Id.

of Wayne State University.  More importantly, it trampled on the norms and guarantees of the United States Constitution.

I declare under penalty of perjury that the foregoing is true and correct and that this Declaration was executed on December 13, 2021, in Slingerlands, New York.

Dr. Paul Finkelman

---

[24]Id.