PAUL  FINKELMAN, PH.D.
December 17, 2021

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN


ANTHONY EID, an individual,

            Plaintiff,

    vs.                Case No. 2:20-cv-11718
                        Hon. Gershwin A. Drain
                        Mag. Judge David R. Grand

WAYNE STATE UNIVERSITY, WAYNE

STATE UNIVERSITY SCHOOL OF MEDICINE,

NIKOLINA CAMAJ, MARGIT CHADWELL,

MATT JACKSON, RICHARD S. BAKER, and

R. DARIN ELLIS, in their individual and

official capacities, jointly and severally,

            Defendants.

_____/


DEPOSITION OF PAUL FINKELMAN, Ph.D.

APPEARING REMOTELY


Friday, December 17, 2021

10:19 a.m.


REPORTED BY:

Cheri L. Poplin, CSR-5132, RPR, CRR

APPEARING REMOTELY FROM WAYNE COUNTY, MICHIGAN

PAUL   FINKELMAN, PH.D.
December 17, 2021

Page 6

1   was in Tulsa, Oklahoma.  In the end I was not called
2   as a witness because I moved out of Oklahoma, and when
3   the case took place, you know, they had seen no reason
4   to bring me back, so I actually cannot -- the
5   defendant was the Miller Museum of Jewish History in
6   Tulsa, Oklahoma, and I literally -- I mean, this is
7   more than -- this is about 20 years ago or 15 years
8   ago and I just don't remember the name.  If it's
9   absolutely necessary, I will dig that out somewhere.
10   Again --
11 Q.  Yeah.  So these were all preludes to -- just wanted to
12   get an understanding of what kind of experience you've
13   had in a setting like this, because one of the things
14   I don't want you to do is to speculate or to guess in
15   answering any of my questions this morning, so if you
16   don't remember or don't know, it is okay and
17   acceptable to give that answer, and if we need any
18   additional follow-up or anything like that, Mr. Flores
19   and I can discuss that, but it won't be necessary for
20   today.
21 A.  Okay.  I understand.
22 Q.  If you don't understand any questions that I've asked,
23   if they're poorly formulated, this can be a pretty
24   dense subject matter, so just ask me to rephrase or
25   tell me that you don't understand the question and

Page 7

1   I'll do my best to reformulate it.
2 A.  All right.
3 Q.  And if you don't do that, I will assume that it at
4   least makes sense enough to you that you're able to
5   give me an answer.
6 A.  Okay.
7 Q.  And as with all remote depositions, there are some
8   possibilities of some cross-talk, overlap, things like
9   that.  We'll try to do our best not to talk over each
10   other, but if that happens, please just let me know
11   and I will, you know, try to pause and let you finish
12   and then hopefully you will do the same.
13 A.  Thank you.
14 Q.  Okay.  So please, Dr. Finkelman, if you could,
15   identify for me all the expert opinions that you have
16   reached in this matter.
17 A.  All of them?
18 Q.  Correct.
19 A.  Okay.  I sent you a 51-page expert report and so I
20   have covered a lot of ground.  The -- my general view
21   is, and, again, I would have to go through the 51-page
22   document paragraph by paragraph in case I missed
23   something, but generally I believe that the plaintiff
24   in this case, Mr. Eid, was not granted due process
25   protections by the State of Michigan through its

Page 8

1   agency, Wayne State University at Wayne State medical
2   school, that he was denied any right of confrontation,
3   that he was denied notice of what he was charged with,
4   that at one point one of the people who were deposed,
5   a Ms. Camaj, said that there wasn't a complaint here
6   and so she didn't have to give him notice according to
7   the student rules, but, in fact, according to the
8   rules of the university, the university did not follow
9   a number of its own due process rules and protections
10   for people like Mr. Eid, starting with the fact they
11   did not give him enough notice to come to a meeting to
12   which he was summoned, they did not give him the
13   material he was promised according to the student
14   rules in being summoned to that meeting, and when he
15   specifically asked for information, as best I can
16   tell, unless there's something in the record I -- that
17   I didn't see, Ms. Camaj did not, in fact, even reply
18   to his email asking for the information that he
19   wanted.  She then in her deposition said that she
20   didn't need to do that because there was no charge
21   against him, but three days later or four days later
22   she referred to this as a case when she submitted her
23   report to somebody -- to one of her superiors, so in
24   that sense there seems to be -- my conclusion is
25   there's a tremendous amount of double-talk coming out

Page 9

1   of Ms. Camaj and other people involved.
2        Next --
3 Q.  Well --
4 A.  You asked me for all of it.  You have to let me
5   finish.
6 Q.  I will let you finish.  I just wanted to cut in here
7   and just say we will certainly go over everything
8   that's in your report.  So I don't want you to
9   think -- and I accept that you are reserving your
10   right to rely on everything that's in your report, and
11   so it wasn't my intention to ask for you to give me an
12   exhaustive recitation of your report.  Just your -- if
13   you could, just summarize your baseline opinion or
14   opinions, and if there are subsidiary points --
15 A.  That's fine.
16 Q.  If there are subsidiary points subsumed within those,
17   I acknowledge that you have -- you think that, and we
18   will cover all of those subsidiary points.  I promise
19   you.  I just was hoping -- I was asking for maybe just
20   a thesis statement of your opinion or opinions without
21   waiving your right to expand on those later on, and I
22   assure you we will --
23 A.  That's fine.  I thought I was answering your question
24   where you asked me to cover it all.  Okay.  So my --
25   my summary opinion is that the university has denied

PAUL   FINKELMAN, PH.D.
December 17, 2021

Page 10

1    Mr. Eid a full plethora range of due process
2    protections, right to know what he's being charging
3    with, right to see evidence, due process right to
4    confront witnesses, right to have an attorney, and
5    that the university has, in fact, failed to follow
6    many, many of its own rules in this process and that
7    the university did not give him an adequate right to
8    appeal, including refusing to tell him what he was
9    actually charged with and why he was being expelled
10   from medical school, and when asked about this, he was
11   told that the -- by the chair of the promotions
12   committee that they could not tell him what, in fact,
13   was the reason for why he was being expelled from
14   school.  So it is all about due process and that the
15   right to due process is about as ancient a right in
16   Anglo-American law as we can find going back to at
17   least Magna Carta, and I have given some history of
18   this, and that this right to due process is a
19   fundamental requirement of the State of Michigan under
20   the 14th Amendment which says that no state may deny
21   anyone due process of law.  Okay?  Does that help you?
22 Q.   It does.  Outside of the due process clause of the
23   14th Amendment, have you reached any other expert
24   opinions in this case?
25 A.   Yeah.  I believe that, although I have not developed

Page 11

1    it, that he may also have been denied full protection
2    of the law, which is also a requirement of the 14th
3    Amendment, and I did not go into that in as great of
4    detail, but it seems to me that and in my expert
5    report I -- I make some suggestions about the due process
6    issues.  I also -- again, I am not an attorney, so I'm
7    not making a legal argument, but as a person who
8    taught in law schools for about 20 years and who has
9    been cited by many, many courts and written an awful
10   lot on constitutional law and legal history, it
11   strikes me that there is even a fundamental question
12   of jurisdiction in this case because, again,
13   Ms. Camaj, and I don't want to go into this in great
14   detail, Ms. Camaj said that the university only has
15   jurisdiction over events which took place on campus or
16   at university events, and as far as I can tell from
17   the record, any of the events that may have led to
18   this issue did -- none of them took place on campus
19   and many of them did not involve -- involve someone
20   who was no longer a student.  So yeah, I've reached
21   conclusions.  But these are -- these are secondary
22   conclusions to the main issue, which is about due
23   process.
24 Q.   Have you in your report reached your conclusion
25   regarding the equal protection clause with any

Page 12

1    reasonable degree of certainty?
2 A.   No, I have not because I don't have evidence.  Again,
3    I don't have -- you know, we're not working from a
4    trial record.  We're working from depositions.  So I
5    can only respond to the issues that have been raised
6    in deposition and raised in documents and look at
7    those documents, but it does seem clear to me that
8    the -- that there is a prima facie case that he has
9    been denied equal protection by the university.
10 Q.   And, Doctor, when you refer to jurisdiction, are you
11   referring to the Wayne State University's
12   jurisdiction --
13 A.   Yes.
14 Q.   -- over -- let me just -- let me finish.  Let me
15   finish my question first.  Sorry.
16 A.   I'm sorry.  I'm sorry.
17 Q.   When you refer to the word "jurisdiction," are you
18   referring to the Wayne State University's jurisdiction
19   over Mr. Eid or over the Court's jurisdiction over
20   this case?
21 A.   The Wayne State's jurisdiction over Mr. Eid.
22 Q.   Is that a question of interpretation of the school's
23   handbook and bylaws?
24 A.   It is based mostly on the statement of Ms. Camaj that
25   the -- that when asked what she did to investigate

Page 13

1    this case she said one of the things she determines is
2    whether when a complaint is made the university has,
3    quote, jurisdiction.  That's I believe the term she
4    used.  We can check her deposition.  And then she went
5    on to give the example that something might have
6    happened off campus and therefore the university did
7    not have any jurisdiction, and so if the university
8    has no jurisdiction to investigate this matter because
9    it did not take place on campus and for much of the
10   matter did not even involve two students, then I would
11   think as a fundamental matter of due process this is
12   not something the university should be handling.  The
13   university could have turned it over to the local
14   district attorney, could have turned it over to the
15   police department in Detroit or the Wayne State
16   University Police Department and, in fact, did turn it
17   over.  There was a complaint or some action with the
18   Wayne State University Police Department, which
19   declined to investigate.  So it strikes me that if
20   there is an issue here in terms of jurisdiction, it
21   may not involve Wayne State University.
22 Q.   Thank you.  Do I understand you correctly or is it
23   fair to say that your concern with jurisdiction is a
24   subsidiary component of your due process opinion?
25 A.   It's -- you can't pull all these apart.  I mean,

PAUL  FINKELMAN, PH.D.
December 17, 2021

Page 62

1  bonus.  I'm paid 510 an hour for this work.  So if I
2  work -- to make a joke, which I am not, I would say
3  let's continue this a lot longer because I'm getting
4  paid more, but we don't want to do that.  I'm joking,
5  and I hope that's clear for the record.  So that would
6  be the information you want.
7           In terms of my hours, I have put in
8  60 hours of reading and writing and conversations with
9  attorneys, and I now have two hours of deposition
10  time, including the five or seven or eight minutes it
11  took me to gather all this information, so I've just
12  rounded that up to two hours from ten to 12, although
13  I probably went a little bit over in getting this
14  information.  Is that sufficient?
15 Q.  Thank you, Doctor.  Did I understand you correctly
16  that Ms. Vincent contacted you on October 19th and
17  provided you the Complaint on that date?
18 A.  Yes.  And I said to her that I could not -- I could
19  not be her expert until I -- until I read the
20  Complaint.
21 Q.  Okay.  So just in reviewing the transcript that we've
22  got so far and in response to that question that I
23  just asked, I've noticed a few times during our
24  deposition I will ask you a straightforward question
25  and I will get a -- what I consider to be a

Page 63

1  non-responsive answer.  Now, of course I can't --
2  excuse me.  I cannot tell you how to answer your
3  questions.  However, if this continues, we can do one
4  of two things.  I can allow you to provide the
5  extended responses that you've been giving and I will
6  then ask my follow-up and I will continue to ask the
7  question that I want an answer to until you finally
8  give it, and if we do that, we may be here longer than
9  seven hours.  We will have to go to a court and bring
10  you back.  Or you can answer the question that I'm
11  asking you directly and we can streamline this
12  process.  Okay?
13 A.  Thank you.
14 Q.  So you received the Complaint for the first time on
15  October 19th and it was after that date that you
16  agreed to become Mr. Eid's expert; is that correct?
17 A.  Yes.
18 Q.  Dr. Finkelman, you are not a lawyer; correct?
19 A.  Yes.  That is correct.
20 Q.  You are not a medical doctor; is that correct?
21 A.  That is correct.
22 Q.  You have previously taught at law schools; is that
23  correct?
24 A.  That is correct.
25 Q.  What is the most recent law school that you've taught

Page 64

1  at?
2 A.  I taught at the University of Pittsburgh Law School in
3  the fall of 2017.
4 Q.  And what classes did you teach at the University of
5  Pittsburgh Law School?
6 A.  I taught -- in the spring of 2017 I taught -- in the
7  spring of 2017 I taught first year constitutional law,
8  and in the fall of 2017 I taught a seminar on -- on
9  civil rights and the constitution.  I also taught a
10  course in legal history in the spring of 2017.  It may
11  have been a course on the law of slavery or it may
12  have been a general course.  I don't remember.
13       MR. FLORES:  Excuse me, David.
14       Dr. Finkelman, I'm having trouble hearing
15  you.  If you could try and --
16       THE WITNESS:  I'm sorry.  Can you hear me
17  better now?
18       MR. FLORES:  Yes.  If you can stay closer
19  to your microphone.
20       THE WITNESS:  I will stay closer to my
21  microphone.  Sorry.
22       MR. FLORES:  Sorry, David.
23       MR. PORTER:  That's okay.  I should tell
24  you I have the benefit of having a live transcription
25  here, so if it looks like I'm looking off to the

Page 65

1  side --
2       MR. FLORES:  I caught that from this
3  morning.  Yeah.
4       MR. PORTER:  -- I'm trying to read.
5 BY MR. PORTER:
6 Q.  Okay.  Have you ever taught a class devoted to
7  procedural due process?
8 A.  No, I have not.
9 Q.  Have you ever taught a class on procedural due process
10  in the medical setting?
11 A.  I have never taught in any medical setting.
12 Q.  As a professor at a variety of law schools, have you
13  ever sat on a committee in charge of handling
14  complaints of academic misconduct?
15 A.  Yes.
16 Q.  At what institutions?
17 A.  Pardon?  I didn't hear your question.
18 Q.  At what law schools?
19 A.  I taught -- I was on a committee at Hamline Law
20  School.  I was involved in these issues, I'm not sure
21  it was actually a committee, at the University of
22  Tulsa Law School.  I was involved in issues of this
23  nature at Albany Law School.
24       MR. FLORES:  What was the last one, Doctor?
25 A.  Albany Law School, Tulsa Law School, and Hamline Law

PAUL   FINKELMAN, PH.D.
December 17, 2021

1 like the writing of a law student, a second year law
2 student, and it didn't seem consistent with the rest
3 of the writing, but while they had searched, and what
4 they did was did a Google search, they had searched
5 and done a Google search and only found this one
6 sentence that was plagiarized.
7     And I said, "Well, how did you do the
8 Google search?"
9     And they said, "We simply put in these
10 whole sentences into Google."
11     I said, "That's not the way to do it."  The
12 way to do it is to take the key words of the sentences
13 and say, you know, Smith within five words of Jones,
14 you know, using key words, not those names, and search
15 in a Lexis or Westlaw or HeinOnline or any database,
16 and when they did that, it turned out that a massive
17 amount of the section was plagiarized, and so I
18 unfortunately had to bring this to the dean, and she
19 was brought before the academic --
20 Q.  Thank you.  Thank you, Doctor.  Any other institutions
21 that you have been a faculty member on have you sat on
22 an academic integrity committee?
23 A.  As I said, at Albany Law School I was involved in some
24 academic integrity cases.  I was --
25 Q.  Were you involved as a voting member on the committee?

1 A.  I do not believe I was on those committees.  But,
2 again, I was the faculty advisor to the law review
3 committee while these things came up quite frequently.
4 Q.  So is it fair to say that you have never been a member
5 of a committee in charge of resolving allegations of
6 academic misconduct?
7 A.  I've never been a voting member.  I would say at
8 Hamline I was an ex officio member, a conscripted
9 member for that one.
10 Q.  For just that one incident; correct?
11 A.  That one incident of plagiarism, yes.
12     I must add one thing, though.  No.  Because
13 this is relevant.
14 Q.  Well, here's how this works, Dr. Finkelman.  If you --
15 A.  Okay.  I won't add it.  I won't add it.  Never mind.
16 Q.  If you think that there is an important piece of
17 information that has been left off, Mr. Flores will
18 have an opportunity to ask you questions and then you
19 can add that information you want at the end.  Now is
20 my opportunity to ask you questions and for you to
21 provide what you believe is a responsive answer.
22 A.  Mr. Porter, I was trying to give you a responsive
23 answer.  I remembered one thing that I did not tell
24 you.
25 Q.  And what is that?

1 A.  Well, do you want me to tell you or not?
2 Q.  What is it?
3 A.  It is that as a faculty member in both Albany and
4 Tulsa, we are required to vote on issues involving
5 whether students are eligible to graduate and whether
6 when they submitted their application for law school
7 they were -- they divulged all criminal activity
8 before they came to law school, and so there were
9 many -- as a voting faculty member, there were many
10 faculty meetings where these issues were discussed
11 where what would happen is a student is applying for
12 the bar and the bar comes back and says, well, you
13 didn't disclose on your application that you had these
14 speeding tickets or this fine or this -- this legal
15 action in your life, and we as a law faculty had to
16 debate and consider whether we would have admitted
17 that student had we known this information, and so
18 that is a -- very much a disciplinary proceeding,
19 although not an academic disciplinary proceeding.
20 Q.  Have you written any law review articles on the
21 subject of procedural due process?
22 A.  I -- not specifically on that subject, but I've
23 certainly written about it.
24 Q.  Have you written any law review articles on the
25 subject of procedural due process in the higher

1 education setting?
2 A.  No, I have not.
3 Q.  Have you written any other types of scholarly articles
4 on the procedural due process -- on the subject of
5 procedural due process?
6 A.  I've written about the incorporation of due process in
7 the Fourteenth Amendment.  I've written about due
8 process in the Fifth Amendment.  I've written about
9 the debates over the Bill of Rights and the
10 ratification of the Constitution which functioned to a
11 great -- focused to a great extent on the lack of due
12 process protections in the Bill of Rights.  I have
13 written a fairly large book called "Landmark Cases of
14 the Supreme Court" which is entirely written by me and
15 a coauthor, and in that book I had to write about
16 many, many due process cases before the Supreme Court
17 summarizing them, and of course I am the coauthor of
18 a -- of a two-volume history of the Constitution
19 called "A March of Liberty" in which we have
20 significant chapters that deal with issues of due
21 process in American constitutional history.  There are
22 probably other things I've written that aren't coming
23 to mind at the moment.
24 Q.  Okay.  I'm asking a slightly different question.
25 Would you like me to repeat it?

PAUL  FINKELMAN, PH.D.
December 17, 2021

Page 74

1 A.   Feel free, because I thought I was answering your
2      question you asked.
3 Q.   Have you written any other types of scholarly articles
4      on the subject of procedural due process?
5 A.   If you're looking -- if you're asking about
6      specifically an article, I have not written an article
7      only on procedural due process.  I have written about
8      procedural due process in many articles.
9 Q.   Can you explain to me -- strike that.
10          Are the journals and reviews that you
11     submit your law review and other scholarly articles to
12     peer-reviewed?
13 A.  I don't know if you were on law review when you went
14     to law school, but if you were, you would know that
15     law review articles are reviewed usually, although not
16     always, by the law review editors.  My other journals
17     and books are peer-reviewed in other scholarly
18     journals and scholarly books and peer-reviewed.
19 Q.  What does peer review mean to you?
20 A.  Peer review means that an article is sent to a
21     scholar, an expert in the field, an article or book
22     chapter or book manuscript is sent to a scholar in the
23     field who reads it and comments on it and says does
24     this look like good scholarship, yes or no.
25 Q.  And does that person who the manuscript is sent to

Page 75

1      have a say over whether or not the work gets
2      published?
3 A.   No.  By the way, some of the law review journals like
4      Supreme Court Review are, in fact, faculty edited, so
5      they are peer-reviewed by other faculty members.  Same
6      for the Yale Journal of Law and Humanities.
7 Q.   So your definition of peer review is simply that
8      somebody else in the field reads it and provides
9      comments but does not have any say over whether or not
10     the work actually gets published?
11 A.  No.  You have input.  You don't have say.
12 Q.  Are you an expert in procedural due process?
13 A.  I am an expert in the history of the Fourteenth
14     Amendment and the Fifth Amendment and --
15 Q.  Are you an expert -- are you an expert -- excuse me.
16     Excuse me, Dr. Finkelman.  Are you an expert in
17     procedural due process?  Yes or no?
18 A.  To the extent that due process is included in the
19     history of the Fifth and Fourteenth Amendment, to that
20     extent I am an expert of due process.  And
21     furthermore -- and furthermore, to the extent that due
22     process is part of the general constitutional history
23     of the United States and the Supreme Court decisions,
24     then I am an expert on the constitutional history of
25     the United States and so I would be an expert on

Page 76

1      aspects of that.
2 Q.   Can you name for me two or three other experts in that
3      field of study?
4 A.   None come to mind at the moment.
5 Q.   What about John Nowak and Ronald Rotunda, the authors
6      of the Treatise --
7 A.   I know who they are.  Yes.
8 Q.   Would you consider them --
9 A.   Due process constitutional law experts.
10 Q.  Would you consider them to be constitutional law
11     experts?
12 A.  Yes, I would.  Absolutely.  I mean, I -- go ahead.
13     I'm sorry.
14 Q.  Do you understand the difference between procedural
15     due process and substantive due process?
16 A.  Yes.
17 Q.  What is it?
18 A.  One deals with whether the procedures are fair, such
19     as a fair trial, and substantive due process comes out
20     of the mid 19th century, the most famous example would
21     be Dred Scott v. Sandford, in which the courts have
22     said that even if a law is passed, that law could deny
23     somebody their due process substantively, that is, in
24     the essence and the reality of what they're getting,
25     without -- even though the procedure itself on the

Page 77

1      face of it seems to be fair.  The classic substantive
2      cases would be, at least in historical terms, Dred
3      Scott and Lochner, but there are many others.
4 Q.   Would you agree with the following proposition?  That
5      there are three components to the protection provided
6      by the Fourteenth Amendment.  The first is procedural
7      protections, such as notice and hearing.  That's
8      procedural due process.  The recognition of
9      unenumerated rights, such as the ones that you just
10     referenced, and right to privacy, things like that.
11     That would be substantive due process.  And the third
12     component, recognition of individual rights listed in
13     the Bill of Rights against the state.  That would be
14     the doctrine of incorporation.
15 A.  Could you repeat the first part of that?  And are you
16     able to tell me what you are quoting or is this
17     something you wrote?
18 Q.  I'm just asking if you agree with the following
19     proposition, and I'll repeat it more slowly.  There
20     are three components to the protections provided by
21     the Fourteenth Amendment.  Procedural protections,
22     such as notice and an opportunity to be heard.
23 A.  Okay.  I can now answer the question because I needed
24     to hear the first part.  I would say that that is a
25     very incomplete statement about the Fourteenth

PAUL  FINKELMAN, PH.D.
December 17, 2021

Page 78

1  Amendment.  So, no, I would not agree with that as a
2  statement of the protections in the Fourteenth
3  Amendment.
4 Q.  Is there a fourth or fifth or sixth component to the
5  protections provided by the Fourteenth Amendment that
6  are not listed there?
7 A.  May I refer to the Constitution of the United States?
8  Because I think -- I think that's -- that's what
9  you're asking me and --
10 Q.  Actually I understand what -- we're going to go back.
11  No.  Stop right there.  I'm going to ask the question
12  again.  I'm going to ask the question again slightly
13  differently because I can tell that it was an
14  improperly phrased question.  Thank you for bringing
15  that to my attention.
16      Would you agree with the following
17  proposition?  There are three components to the
18  protections provided by the due process clause of the
19  Fourteenth Amendment.  The first, procedural
20  protections, such as notice and opportunity to be
21  heard.  That's procedural due process.  Second, the
22  recognition of unenumerated rights.  That's
23  substantive due process.  And, third, the recognition
24  of individual rights listed in the Bill of Rights
25  against the states.  That's the doctrine of

Page 79

1  incorporation.  Do you agree with that?
2 A.  I agree with that, although, again, with something
3  that complicated, it's a yes, but I would want to
4  think about it for a long time to see whether there's
5  something else that should be added.
6 Q.  So would you agree with me that these components are
7  analytically distinct, although they may blur together
8  at the margins?
9 A.  They blur together at more than the margins.  For
10  example, procedural due process in the Fourteenth
11  Amendment would also include the procedural due
12  process of the Fifth Amendment which is incorporated
13  through the Fourteenth Amendment.  So it's -- and,
14  again, the area between substantive and procedural due
15  process has always been constitutionally blurred.
16 Q.  So, for example, the right to a jury, that is in a
17  very real sense an important procedural right;
18  correct?
19 A.  Yes.
20 Q.  But when we're talking about incorporating the Sixth
21  Amendment against the states through the Fourteenth
22  Amendment, we're not talking about procedural
23  process, we're talking about the doctrine of
24  incorporation and the substance of the due process
25  clause?  Would you agree with that?

Page 80

1 A.  I think we're talking about both.  Because -- because
2  the -- the -- the Sixth Amendment guarantees you a
3  jury trial.  Incorporation says that you have a Sixth
4  Amendment right to a jury trial.  The general due
5  process would also say you have a right to a jury
6  trial.
7 Q.  Right.
8 A.  That's -- they blur.
9 Q.  So are you referring, then, to -- are you referring to
10  the doctrine of incorporation?  These cases that talk
11  about the importance -- the fundamental nature of this
12  what we call a procedural right to a trial by jury,
13  you're referring to case law that's applying the
14  doctrine of incorporation; correct?
15 A.  I'm -- I think both.  This is not -- this is not
16  simple yes or no questions.
17 Q.  Would you agree with me, though, that procedural due
18  process at its core is an analytically distinct issue
19  from the doctrine of incorporation and substantive due
20  process?
21 A.  I'm not sure I agree with that, because I think you
22  can't -- you can't talk about the procedural due
23  process without talking about the Bill of Rights, and
24  that gets you to incorporation.
25 Q.  Right.  Yeah.  So in what -- okay.  So when you refer

Page 81

1  to procedural due process, are you referring to the
2  incorporation of the Bill of Rights against the
3  states?
4 A.  In part.
5 Q.  And what have I left out?
6 A.  I am also incorporating the procedural due process
7  that -- that you keep coming back to as being I
8  suppose independently in the Fourteenth Amendment.
9 Q.  So you recognize that those could be two -- at least
10  two separate core concepts, although they may overlap
11  in certain respects?
12 A.  Yes.  And courts have done that as well.
13 Q.  So can we agree at least for the remainder of this
14  afternoon that when we refer to procedural due process
15  we're talking about the core procedural protection of
16  the Fourteenth Amendment's due process clause to
17  notice and an opportunity to be heard?
18 A.  No.
19      (Marked EXHIBIT C for identification)
20 BY MR. PORTER:
21 Q.  I've placed in the chat Exhibit, we'll call it C I
22  think at this point.
23 A.  If I can't open this, can you email it to me again?
24  Because I'm getting the same weird stuff trying to
25  open it.

PAUL   FINKELMAN, PH.D.
December 17, 2021

Page 82

1 Q.   I'll email it to you right now.

2 A.   Okay.  I just got an email from you which I'm opening.

3 Q.   So what Dr. Finkelman is reviewing at the moment, I

4        believe, and you can correct me if I'm wrong, is an

5        excerpt of Nowak and Rotunda's Constitutional Law

6        treatise, Seventh Edition, and it's just excerpted

7        pages from that treatise.  Is that correct,

8        Dr. Finkelman?

9 A.   Yes.

10 Q.   All right.  Please flip to the last page of the PDF.

11       It's Page 593 of the text.

12 A.   Okay.

13 Q.   This is written by Mr. Nowak and Mr. Rotunda, who

14       you've previously agreed are experts in this field.

15 A.   Yes.

16 Q.   Please take a look and read the first two paragraphs

17       of this page.

18 A.   Do you want me to read them out loud?

19 Q.   You can read them quietly to yourself at this

20       moment -- at this time.

21             MR. FLORES:  David, a point of

22       clarification.  This is your Exhibit C so far?

23             MR. PORTER:  Yes.

24 A.   Okay.  I've read this.

25 BY MR. PORTER:

Page 83

1 Q.   Do you agree that the due process clause has several

2        quite distinct meanings?

3 A.   Yes.

4 Q.   Do you agree with the statement that "This

5        'substantive' due process may protect certain

6        fundamental rights or void arbitrary limitations of

7        individual freedom of action.  Part of the substantive

8        impact of the due process clause of the Fourteenth

9        Amendment is the 'incorporation' of certain guarantees

10       in the Bill of Rights."

11             Do you agree with that?

12 A.   Yes.

13 Q.   Do you agree that, as they state in the next

14       paragraph, "The due process clauses also have a

15       procedural aspect in that they guarantee that each

16       person shall be accorded a certain 'process' . . ."?

17 A.   Yes.

18 Q.   So can we agree that there are three analytically

19       quite distinct components of the Fourteenth Amendment

20       due process clause as stated here by the experts in

21       constitutional law, Mr. Nowak and Mr. Rotunda?

22 A.   Well, I wouldn't -- I wouldn't parse them that way.  I

23       think that -- that in some ways, while they are

24       parsing them that way, they -- they clearly lose track

25       of the ways in which they deeply interact, and, again,

Page 84

1        I would simply say that the -- the procedural due

2        process has to refer back to the Bill of Right so that

3        they, you know -- for example, the right to confront

4        witnesses against you is a -- is a procedural right as

5        well, and, you know, maybe somebody would say it's

6        also a substantive right.  I mean, you know, there's a

7        gigantic field of constitutional law that debates

8        these issues all the time and --

9 Q.   Is the same test that's used to determine whether or

10       not an individual has been deprived of procedural due

11       process the same test that's used to determine whether

12       or not a provision of the Bill of Rights should be

13       incorporated against the states?

14 A.   No.  The courts have used different tests.

15 Q.   Okay.

16 A.   But having --

17 Q.   Thank you.

18 A.   Having -- okay.

19       We discussed earlier your prior service as an expert

20       witness.  Do you recall that?

21 A.   Yes.

22 Q.   Do you recall how many cases in which you've served as

23       an expert witness?

24 A.   We did discuss that, yes.

25 Q.   And you cited two cases; is that correct?

Page 85

1 A.   I cited two cases in which I spoke, yes.

2 Q.   That's Glassroth versus Moore and Popov versus

3        Hayashi; is that correct?

4 A.   That's right.

5 Q.   Were you challenged as an expert in either one of

6        those cases?

7 A.   No.

8 Q.   Did the case go to trial?

9 A.   Both of those cases went to trial.

10 Q.   How did your report in Glassroth differ from any of

11       the other work that you've done as an Amicus on that

12       subject?

13 A.   I don't think that it does.

14 Q.   How did your report in Popov differ from your previous

15       work on the subject that was at issue in Popov?

16 A.   Again, I don't think it does.

17 Q.   Have you been offered as an expert in any other case?

18 A.   Yes.

19 Q.   Okay.  How about Greenville County Republican Party

20       Executive Committee versus the State of South

21       Carolina?

22 A.   Yes.

23 Q.   Does that name ring a bell?  Is that the case that you

24       referenced earlier involving voting rights?

25 A.   Yes.

PAUL   FINKELMAN, PH.D.
December 17, 2021

Page 86

1 Q.   Okay.  Were you challenged as an expert in that case?
2 A.   No.  Because I was never deposed, and I don't believe
3       I was challenged because I believe it was settled on
4       summary -- decided on summary judgment before I could
5       be deposed.  If I was challenged, I don't know I was
6       challenged.
7 Q.   Were you offered as an expert in the case Fields
8       versus Speaker of the House, State of Pennsylvania?
9 A.   I was.
10 Q.   Were you challenged as an expert in that case?
11 A.   That case was decided on summary judgment, and the
12       chief judge of the district court who wrote the
13       opinion cited and quoted me a number of -- quoted my
14       expert report a number of times.
15 Q.   I'm going to ask the question one more time.  The
16       question was, were you challenged as an expert in that
17       case?
18 A.   As far as I know, no.
19 Q.   How did your report in that case differ from any of
20       the other work that you had done on the topic on which
21       you were giving your expert opinion?
22 A.   I don't believe it did.
23 Q.   Were you offered as an expert in the case
24       Mogervich (ph) versus Allegheny County?
25 A.   Yes.

Page 87

1 Q.   Were you challenged as an expert in that case?
2 A.   Not as far as I know.
3 Q.   Did your report in that case differ from any of the
4       other work you had previously done on the subject on
5       which you were offering your expert opinion?
6 A.   No.
7 Q.   Are there any other cases in which you have been
8       offered as an expert witness?
9 A.   I was offered as an expert witness in a case which I
10       listed in the very first document you gave involving
11       a -- something in Haskell County, Oklahoma.
12 Q.   Is that the Green and ACLU of Oklahoma versus Board of
13       County Commissioners of the County of Haskell?
14 A.   Yes.
15 Q.   We've previously gone over this answer here that you
16       agreed was complete and accurate.  You wrote, "On a
17       motion of the Defendants, the Court excluded both
18       experts because the experts were disclosed well past
19       the deadline to testify and would significantly
20       prejudice the Defendants."  Is that true?
21 A.   Yes.
22 Q.   Is there any other reason why you were excluded as an
23       expert?
24 A.   The judge said that my testimony was unnecessary or
25       perhaps irrelevant, and I am not sure whether that's

Page 88

1       dicta or not.
2 Q.   Can you please repeat that?
3 A.   Pardon?
4 Q.   Can you please repeat your answer?
5 A.   I said the -- after the judge excluded me and the
6       other expert on the grounds of timeliness, he said
7       that our -- our -- that our expert report had
8       nothing to add to the case.  He referred to both of us
9       in this way.
10 Q.   You agree with me that information is not listed
11       here in the answer to our question to -- directed to
12       you about whether or not you had ever been excluded as
13       an expert witness?
14 A.   That information is not there.  I gave that
15       information to Ms. Vincent, and you can take that up
16       with her if she didn't include this, because, as I
17       say, I never saw the document that you showed me.  I
18       only sent her a -- I sent her information and I had
19       that quotation from the -- from the judge's opinion as
20       well.  However, I -- as I said, I think that was
21       dicta.
22 Q.   Does that complete your answer?
23 A.   Um-hmm.
24                   (Marked EXHIBIT D for identification)
25 BY MR. PORTER:

Page 89

1 Q.   I am providing you what we will call Exhibit D to this
2       deposition.  I've put it in the chat.
3 A.   And I assume you'll email it to me since I'm having
4       trouble getting these otherwise?
5 Q.   Yes.  From now on as a matter of protocol I will email
6       you all the exhibits.  Please let me know when you've
7       had an opportunity to review that document.
8 A.   I'm waiting -- I'm waiting for it to show up.  Here it
9       is.
10       Yeah.  Okay.  So I've reviewed it.
11 Q.   Do you agree with me that the Court denied -- or
12       excuse me, granted the motion to exclude your expert
13       report and expert opinion because "The Court finds
14       that the testimony proffered by Plaintiffs' experts
15       would not be helpful and is not properly the subject
16       of expert testimony?"
17 A.   No.  I would not agree with you.  I would say that the
18       Court excluded it because of the failure to timely
19       disclose, and that is the -- in citing the Federal
20       Rules of Civil Procedure, and once he concluded that,
21       I think whatever else he's saying is -- may or may not
22       be his reasoning, but, again, I'm not an attorney and
23       I'm not an expert on civil procedure, but I would
24       imagine if he excluded it entirely on that, that he
25       would have -- that the other side, the people who

PAUL  FINKELMAN, PH.D.
December 17, 2021

Page 90

1  hired me as an expert, would have been entitled to
2  have some kind of argument, which it's not clear that
3  they did.  But, in any event, you know, he chose two
4  reasons to exclude it and, you know -- and then when
5  he was reversed by the Court of Appeals and ordered
6  to --
7 Q.  All right.  Dr. Finkelman, Dr. Finkelman, I am going
8  to again instruct you to just answer the question that
9  I'm asking.
10 A.  Okay.  I've answered it.  I --
11 Q.  All right.  If you're done answering, then you can
12  stop and wait for the next question.  Do you
13  understand?
14 A.  Yeah.
15 Q.  Do you agree with me that in the following sentence
16  the Court then states "While these experts' reports
17  include some scholarship, neither," including your
18  report, "represents an objective balance of views, but
19  rather the zealous views of an advocate"?
20 A.  I agree that the order says that.
21 Q.  Okay.  And the order is referring to your expert
22  report; correct?
23 A.  Mine and someone else's.
24 Q.  Is referring to also -- but it is also referring to
25  your expert report; correct?

Page 91

1 A.  I just said mine and someone else's.  That would be
2  both of us.  Yes.
3 Q.  And as you have admitted, you are not an attorney;
4  correct?
5 A.  I am not an attorney.
6 Q.  So you do not have the expertise to determine whether
7  or not this portion of the order is, quote unquote,
8  dicta; correct?
9 A.  That's not necessarily the case.  As a historian, I --
10  and a constitutional law professor, I certainly have
11  the expertise to opine and to make an argument on why
12  something would be dicta if it is -- if it is part of
13  an opinion.
14 Q.  You agree with me nonetheless that a federal district
15  court judge having reviewed your expert report stated
16  that it does not represent an objective balance of
17  views but instead a zealous view of an advocate?
18 A.  I agree that that is what the federal district judge
19  said, yes.
20 Q.  You agree also that the federal district court judge,
21  describing your expert report, found that it would not
22  be helpful and is not properly the subject of expert
23  testimony?
24 A.  I agree that that is what he said.
25 Q.  And it's your testimony here today that you've

Page 92

1  provided that information to plaintiff's counsel?
2 A.  Yes.
3 Q.  And you agree with me that that information is not
4  contained here in response to Interrogatory 1(c)?
5 A.  Yes.
6     MR. PORTER:  Okay.  We're going to take a
7  quick five-minute break.  I need to use the restroom.
8  So if we can go off the record.
9     (Recess taken at 1:08 p.m.)
10     (Back on the record at 1:14 p.m.)
11     MR. PORTER:  Back on the record.
12 BY MR. PORTER:
13 Q.  Dr. Finkelman, do you have the report that you've
14  prepared in this case in front of you?
15 A.  I do.
16 Q.  We will put it in the chat and we will mark this as
17  Exhibit E.
18 A.  You do not need to send this to me.  I have it.
19     (Marked EXHIBIT E for identification)
20 BY MR. PORTER:
21 Q.  Are all the expert opinions that you formed in this
22  case contained in this report?
23 A.  Yes.
24 Q.  Are all the reasons for your opinions contained in
25  this report?

Page 93

1 A.  Yes.
2 Q.  And is this the testimony that you intend to give if
3  you're qualified as an expert?
4 A.  Yes.  I should -- however, I should add to that yes,
5  that I may find new things learned, new things -- I
6  think I mentioned, for example, Doe v. Baum, which I
7  did not know about when I wrote the report, so that if
8  I'm called as an expert, I might say something about
9  the substance of that case and the arguments of the
10  Sixth Circuit, so . . .  You know, I have absolutely
11  no idea when I might testify.  I don't stop reading
12  and learning.
13 Q.  So you agree with me that there is no reference in
14  your expert report to Doe versus Baum or Title IX;
15  correct?
16 A.  I did not -- yes.  That's correct.
17 Q.  Did you review the plaintiff's Amended Complaint
18  before preparing your expert report in this case?
19 A.  I read the plaintiff's Amended Complaint.  I did not
20  go back to it when I was writing my report.
21 Q.  And you know, then, that the plaintiff has alleged a
22  violation of Title IX; correct?
23 A.  Yes.
24 Q.  You understand that he has also alleged a violation of
25  the Equal Protection Clause; correct?

PAUL  FINKELMAN, PH.D.
December 17, 2021

Page 94

1 A.   Yes.  And I have stated that in my -- I have made some
2      references to equal protection in this report.
3 Q.   You know that he has also alleged a violation of a
4      state constitutional provision; is that correct?
5 A.   I actually had forgotten that.
6 Q.   Did you form an opinion on the -- well, strike that.
7           Are all the documents that you've
8      considered in forming your expert opinion in this case
9      referenced in your report?
10 A.  I believe so.  Although I should say I don't believe I
11     referenced the Amended Complaint, but that obviously
12     influenced me, so if I'm called to testify, I will
13     reread the Amended Complaint if someone wants to ask
14     me about it.
15 Q.  What is your method of approach in forming opinions in
16     these types of cases?
17 A.  Well, in this case, as I said, I read all of the
18     depositions because my main -- the request of counsel
19     was to talk about due process and the Fourteenth
20     Amendment, and so I read all of the depositions within
21     the context of due process and the history of -- and
22     my understanding of the history of due process and
23     development of due process, and I use due process in a
24     very broad range to include essentially the Fifth
25     through the Eighth Amendments and possibly even the

Page 95

1      Fourth Amendment because a search could violate due
2      process as well.  So I read all these and then I
3      proceeded to think about where the process as it was
4      told to me in a sense by the people who were being
5      deposed from the university, from the medical school,
6      I read what they said about the due process -- their
7      process.  I read their rules and then I proceeded to
8      write my report.
9 Q.   What kind of sources or authorities do you typically
10     rely on in forming an opinion like the one you reached
11     in this case?
12 A.  Could you -- could you be more specific?
13 Q.  For example, is it important to consult the document
14     or a set of documents establishing the applicable
15     process when it comes to questions of due process in
16     the context of higher learning?
17 A.  Yes.
18 Q.  Is it important as a historian to review all source
19     materials before making assertions of fact regarding
20     those materials?
21 A.  As much source material as there is time to review and
22     you have available.
23 Q.  So just to use an example that you might know, before
24     making assertion that as a matter of historical fact
25     Chief Justice John Marshall did not in his writings

Page 96

1      express support for slavery, it's important to review
2      all of his personal correspondence before making an
3      assertion of fact like that; correct?
4 A.   I think so.
5 Q.   So --
6 A.   And more than correspondence.  His public speeches.
7 Q.   Right.  I'm just using that as an example.  I don't
8      mean to be --
9 A.   His financial records.  Yes.
10 Q.  Things like that.  And so did you apply the same
11     approach in this case?
12 A.  To the extent that I basically had two weeks to write
13     this and do the research and then rewrite it and think
14     about it, and then I was not in the state of Michigan
15     and I was relying on material that I could only access
16     that was sent to me or I could access on the internet.
17 Q.  Did you have any difficulty accessing the documents
18     that were provided to you by plaintiff's counsel?
19 A.  No.  Not at all.
20 Q.  What additional information or materials would you
21     have accessed were you in the state of Michigan?
22 A.  Well, if I were writing say a history of this case
23     rather than -- you know, and I was taking five years
24     as I did for my book, which has only two chapters on
25     John Marshall, I might have gone to the Wayne State

Page 97

1      Police Department, for example, and seen if I could
2      look at the Complaint and the -- and see if I had
3      access -- could have access to their investigation
4      where they chose not to actually do anything about
5      this.  I might want to interview myself as an
6      historian all the people involved.  I mean, there are
7      lots of things I would do if I were writing a book.
8      You know, this is a --
9 Q.   Okay.  Dr. Finkelman, do you know whether or not that
10     information was requested by plaintiff in this case?
11 A.  I do not.
12 Q.  So --
13 A.  Actually I take that back.  To the best of my
14     knowledge, I do not believe that the -- that Wayne
15     State University -- from all of the information I have
16     seen, Wayne State University did not request police
17     reports.  So I do not know for a fact.  I only know
18     from what I've read.
19 Q.  Dr. Finkelman, I'm asking you a different question.
20 A.  Okay.
21 Q.  You just said a moment ago that you would go to the
22     police department to look for records regarding any
23     report that Ms. Roe had made regarding Mr. Eid.  Is
24     that right?
25 A.  I would.

PAUL   FINKELMAN, PH.D.
December 17, 2021

Page 98

1 Q. Do you know whether or not the plaintiff in this case
2     requested those very documents?
3 A. I do not know if the plaintiff requested them.
4 Q. What databases did you use in your research in
5     formulating your expert opinion in this case?
6 A. Mostly I used HeinOnline to look at cases.
7 Q. Any others?
8 A. I do not believe so.
9 Q. Did you consult any contemporary legal precedent?
10 A. Any contemporary what?
11 Q. Legal precedent.
12 A. Well, I mean, I cited, for example, Timbs v. Indiana,
13     which is 2019.  That's pretty contemporary.  I
14     cited -- if contemporary is in my lifetime, then
15     Goldberg versus Kelly or Gideon versus Wainwright.
16 Q. I suppose it's in the eye of the beholder as far as
17     contemporary goes.
18 A. Yes.
19 Q. In reviewing documents and arriving at your expert
20     opinion in this case, did you consider alternative
21     explanations than the ones that you've provided in
22     your report?
23 A. Yeah.  Yes.  I looked -- I looked at the evidence and
24     evaluated it.  Of course there have to be alternative
25     explanations be at least considered when you look

Page 99

1     at evidence.
2 Q. And how did you go about ruling out those alternative
3     explanations?
4 A. Well, I was limited to the documentary evidence I had,
5     which is the -- which is the depositions and the
6     statements and the conclusions of two university
7     committees.  So I basically balanced, you know, what I
8     did -- I, by the way, approached this as a historian.
9     I'm looking at a body of material.  I'm trying to
10     understand the history of how this played out.
11 Q. So let me ask it again.  How did you go about ruling
12     out alternative explanations for opinions or
13     conclusions that you reached in your report?
14 A. I -- I don't think I can give you an answer to that.
15     I'm not sure what you mean by how I went about it.  I
16     read the evidence.  I thought about the evidence.  I
17     went back sometimes to the evidence.  I, for example,
18     went back a number of times to some of the depositions
19     when I would read in another deposition something, and
20     then I would go back to the other deposition to see
21     whether the evidence matched and what the evidence
22     was.  I looked at one email and then I might look at
23     another email.  Then I might go back to the first
24     email.  You know, I'm balancing the information.
25 Q. Did you make credibility determinations?

Page 100

1 A. Pardon?
2 Q. Would you make credibility determinations in ruling
3     out alternative explanations?
4 A. Well, I did to some extent, but the -- you know, my --
5     I think the credibility that was offered is based in
6     the depositions.  That is, if someone is inconsistent
7     in a deposition, if someone says something and -- and
8     then later says something else, I might -- I might --
9     I might say, well, there's -- there is a credibility
10     issue here that -- that needs to be -- that needs to
11     be addressed.
12         And, in fact, you know, you asked me a
13     minute ago, and this is to amend my answer to one of
14     your questions a minute ago if I may, you asked me if
15     this is all I would testify to, and I gave the example
16     that I might mention Roe v. Dowd (ph).  The other
17     thing that I might mention which I did not is -- and
18     I'm looking for her name, the school counselor.  Is it
19     Chattabaugh (ph)?  The medical school's counselor, the
20     nurse.  What is her name?
21 Q. Again, I'm not here to answer your questions.  Are you
22     trying to --
23 A. Okay.  Fine.  Fine.  You don't have to answer my
24     question.  I just need a minute to go through my
25     deposition to find her name, which you probably know

Page 101

1     but you don't want to tell me, and that's fine.  I
2     will go through my deposition until I can find it.
3     You know, you're talking about taking up too much
4     time, but . . .
5 Q. All right.  We're going to move on, Dr. Finkelman.  If
6     you can find it --
7 A. Robichaud.  No.  What I was going to say is if I were
8     to testify, I might use Ms. Robichaud's deposition,
9     which I did not use in writing this report.
10 Q. Did you have access to her deposition at the time that
11     you drafted your report?
12 A. It came late and the report was virtually finished.
13     In fact, I think it came after I finished the report,
14     so I did not have access to it.  Yes.  That's correct.
15 Q. Does that finish your answer?
16 A. Um-hm.
17 Q. Okay.  Would you please turn to Paragraph 13 of your
18     report?
19 A. Sure.
20 Q. In this paragraph you discuss the basis for your
21     interpretation, analyses, and conclusions and you
22     state that you base them on your "education, research,
23     writing, and experience as a professional historian
24     and legal scholar and my more than forty years as a
25     professor and college president."

PAUL   FINKELMAN, PH.D.
December 17, 2021

Page 102

1 A.   Yes.
2 Q.   Do you see that?
3 A.   I do.
4 Q.   As far as your education is concerned, you're not a
5      lawyer; correct?
6 A.   That is correct.
7 Q.   Not a medical doctor; correct?
8 A.   That is correct.
9 Q.   As a legal scholar, is that a reference to the
10     scholarship that's in your curriculum vitae?
11 A.  It is.  And also the fact that I took the first year
12     of Harvard Law School as a postdoctoral fellow of the
13     law school and I took approximately six or seven law
14     school courses while I did my Ph.D. at the University
15     of Chicago and that I have taught at law schools for
16     about 20 years and been involved in the legal world in
17     many, many ways.
18 Q.  And you agreed with me earlier that you have never
19     taught a procedural due process class; is that
20     correct?
21 A.  That is correct.
22 Q.  And you have never written a law review article
23     devoted to procedural due process; is that correct?
24 A.  Devoted solely to procedural due process, no.
25 Q.  You've never had a voting membership on any academic

Page 103

1      misconduct or promotions type committee at an
2      institution of higher learning; is that correct?
3 A.   Well, it depends what you mean by promotions because I
4      certainly was a voting member to determine whether or
5      not people got degrees.
6 Q.   And is that in reference to the criminal background
7      committee that you referenced earlier?
8 A.   It's -- it's the whole thing.  You know, anything can
9      come up when you're -- when you're voting on the
10     degree and various cases come up, yes.
11 Q.  Okay.  Was that a reference to your stint at I believe
12     it was Tulsa Law School which all faculty members had
13     a voting interest in determining whether --
14 A.  And also Albany Law School.  Same thing.  The faculty
15     has to vote on degrees.
16 Q.  You've never taught at a medical school; correct?
17 A.  Correct.
18 Q.  So you're not familiar with the Association of
19     American Medical Colleges?
20 A.  Not in any meaningful way.  I know it exists.
21 Q.  Are you familiar with its accreditation committee, the
22     liaison committee on medical education?
23 A.  I am not.
24 Q.  Are you familiar with the LCME as its acronym of its
25     standards for student achievement?

Page 104

1 A.   No, I am not.
2 Q.   You've previously served as a president of an
3      institution of higher learning; is that correct?
4 A.   For just under four years, yes.
5 Q.   And in that role did you ever adjudicate a student
6      code of conduct case?
7 A.   No.  But as president I wouldn't have adjudicated.  It
8      would come to me after it was adjudicated.
9 Q.   The paragraph above in Paragraph 12 you state that "I
10     will consider the university's own procedures against
11     the requirements of the law that I am familiar with as
12     a constitutional scholar, professor, and college
13     president."  Do you see that?
14 A.  This is in Paragraph 12?  Which paragraph are you in?
15 Q.  Paragraph 12, yes.  About midway through.
16 A.  Yes.  I see that.
17 Q.  I just want to make sure I understand this.  So you
18     intend to take the facts, the Wayne State's procedures
19     as applied to Mr. Eid in this case and apply them to
20     the law as you understand it as a constitutional
21     scholar?
22 A.  And through history of due process, yes.
23 Q.  What university procedures are you referring to there?
24 A.  Everything from the first -- well, starting with the
25     student code of conduct or the student code.  I'm not

Page 105

1      sure -- I don't remember --
2 Q.   I'm asking you what document are you referring to?
3      Not -- I don't want to know what literally happened to
4      Mr. Eid in this case.  But what procedures are you
5      referring to --
6 A.   Start with the student code.
7 Q.   Okay.  Anything else?
8 A.   Which sets out the procedures.
9 Q.   Anything else?
10 A.  I looked at procedures as explained in the
11     depositions.
12 Q.  And what were those?  Strike that.  I'll withdraw the
13     question.
14         Are you referring to how the procedures
15     played out in Mr. Eid's case?
16 A.  Yes.
17 Q.  Are all the opinions that you express here in this
18     report expressed to a reasonable degree of certainty?
19 A.  A reasonable degree of certainty, yes.
20 Q.  What do you mean by reasonable degree of certainty?
21 A.  That I have read all of these depositions.  I have
22     read the exhibits.  I have read much -- I have read
23     the email correspondence.  I have thought about due
24     process and the rights of people and taught about it
25     in con law and other places my whole life -- for much

PAUL   FINKELMAN, PH.D.
December 17, 2021

### Page 114

1  example.  Let's see.  The right to counsel.
2 A.  Yeah.
3 Q.  Is it your understanding that the Sixth Amendment
4  right to counsel applies only in the criminal setting?
5 A.  I am not a hundred percent sure that would be the case
6  today.  Again, and here's my thinking.  Okay?  If the
7  excessive fines clause applies in a civil setting,
8  then I would imagine that the right to counsel in a --
9  say a state proceeding against an individual in a
10  civil matter would also be the case.  I can't imagine,
11  for example, that if the State of Michigan told
12  someone, well, you don't have a right to counsel in a
13  tax -- Michigan State tax court that that would get
14  very far.  So I would think you would have a -- you
15  would clearly have a right to counsel in a civil case
16  and the state could not deny you that right to
17  counsel.
18 Q.  Are you aware of any case in which a Federal Court has
19  applied the Sixth Amendment right to counsel to
20  outside the criminal setting in a federal case?
21 A.  I would have to go back and read Goldberg versus Kelly
22  because certainly the right to the due process hearing
23  certainly implied the right to counsel.  One would not
24  imagine in that case that welfare recipients would
25  have been expected to appear pro se.

### Page 115

1 Q.  Would it surprise you that the Supreme Court held just
2  the opposite in Goldberg versus Kelly?
3 A.  What do you mean?
4 Q.  Would it surprise you that the Supreme Court expressly
5  declined to find a right to counsel in the setting
6  that was at issue in Goldberg versus Kelly?
7 A.  You know, if it did, I -- I had forgotten that, and
8  that does surprise me, but I don't think it -- I still
9  think given the recent case on excessive fines -- and
10  when you say denied the right to counsel or denied the
11  right of the state to have to provide counsel?
12 Q.  So we'll get to that.  What do you think the right to
13  counsel means under the Sixth Amendment?
14 A.  Well, it certainly means at a -- at the most basic
15  minimum before say Powell versus Alabama and before
16  Gideon, the right to counsel meant that you cannot be
17  denied the right to provide counsel for yourself in a
18  hearing, and I do not believe that Goldberg versus
19  Kelly holds the state can deny Kelly the right to
20  counsel when -- when appealing what's going on.
21  Whether the state has to provide counsel is a whole
22  different matter.
23 Q.  Okay.  That's a misunderstanding I had there.  Okay.
24  I thought you were referring to the appointment of
25  counsel, not just the ability to have the presence of

### Page 116

1  counsel.
2 A.  Yes.
3 Q.  That you've privately retained.
4 A.  There -- there are two separate rights.  They've
5  merged in the criminal context.  They probably haven't
6  fully merged in the civil context yet.
7 Q.  And so then let me -- then let me ask the question
8  again.  Would it surprise you that Goldberg versus
9  Kelly expressly declined to find the right to the
10  appointment of counsel in the setting --
11 A.  Yes.
12 Q.  It would not surprise you or it would?
13 A.  It's -- I believe -- as you say, it's what the court
14  did.
15 Q.  All right.  I want to jump to Paragraph 97 of your
16  report, which is at Page 47.
17 A.  Thank you.
18 Q.  And you ask what I think is a very interesting and
19  insightful question.  You say, ". . . even if he sent
20  the texts to Ms." -- I'm going to call her Ms. Roe,
21  "that upset her, are these really grounds for
22  expulsion?"
23       And you ask the question, but I do not see
24  an answer to it, and I'm just curious.  Why didn't you
25  answer that question?

### Page 117

1 A.  In part because the record of this case is such a
2  sparse factual record.  There is no cross-examination
3  of -- of the complainant.  There is no
4  cross-examination of the mother, who brought the
5  complaint.  There is no development of other evidence.
6  There -- there are all kinds of weird hints of things,
7  but there's no actual development of evidence.
8  There's allegations, for instance, of sexual
9  misconduct in some of the depositions, but since
10  everybody admits that Mr. Eid only met Ms. Burton
11  once, and, by the way, she is referred to this in the
12  depositions so I don't think we need to pretend that
13  we don't know her name.
14 Q.  Doctor, we've tried studiously to avoid using her last
15  name just for her own personal privacy.  We have
16  made --
17 A.  Then I will -- then I will refer to her as -- should I
18  refer to her as Ms. Doe, Ms. Roe?  How would --
19 Q.  We've been using Ms. Roe or Roe.
20 A.  All right.  So since there's no -- there's no -- since
21  it's very clear that Mr. Eid only met Ms. Roe for
22  approximately ten minutes face to face once in their
23  lives, if there is a -- if there is something in this
24  record or if there's something in this case that leads
25  to the expulsion of Mr. Eid, I don't see it.  You

Page 126

```
 1   why they're plagiarism, I don't think the court
 2   reviews the conclusion that they're plagiarism, again,
 3   unless under certain circumstances the student says,
 4   look, they're not plagiarism.
 5 Q. So let me make sure I understand.  You said appeal
 6   your right to bring evidence or provide an explanation
 7   for your conduct and the right to confront witnesses?
 8 A. Right to speak.  Right to speak at your own hearing.
 9   Right to -- and, by the way, right to counsel.  I --
10   the -- one of the instances I told you about is a
11   student showed up with counsel.
12 Q. Okay.  So are you -- I want to make sure I understand.
13   You're saying that the due process clause requires in
14   the academic decision-making setting, so we're not
15   talking about disciplinary, we're just talking about
16   academic, is it your testimony here as an expert that
17   the due process clause requires the availability of an
18   appeal, your -- the right to bring evidence or present
19   your case, the right to confront witnesses, and the
20   right to have the presence of counsel?
21 A. And notice.
22 Q. And notice.
23 A. And probably other things that I haven't thought
24   about, because I didn't spend a lot of time thinking
25   about this because this is not the case before us, and
```

Page 127

```
 1   I have conceded to you in my report and we have
 2   conceded here that in general there is no external
 3   review of an academic decision.
 4 Q. So I guess --
 5 A. For extraordinary instances, in other words.
 6 Q. So I want to make sure I understand this.  If this
 7   were a case of academic decision-making, not
 8   disciplinary but academic, you would -- your expert
 9   opinion is this just wouldn't apply?
10 A. Again, unless --
11           MR. FLORES:  Objection to the form.  That's
12   not this case.  Now you're asking him to speculate on
13   what he might do in a completely different case.
14           MR. PORTER:  Okay.  So I'm asking him a
15   hypothetical question, which I'm allowed to do during
16   an expert deposition, and I'm asking him about the
17   scope of his expert opinion.
18 BY MR. PORTER:
19 Q. I'll take an answer.
20 A. My expert opinion would be that if the question is has
21   the student -- and let me -- actually let's move it
22   out of the academic honesty question because that --
23 Q. No, no, no.  I want an answer to the question that I
24   have asked you and we are going to repeat it so I can
25   get an answer.
```

Page 128

```
 1 A. Okay.  Repeat the question.
 2 Q. If this were a case of academic decision-making, not
 3   disciplinary, but academic, would your expert opinion
 4   that you've issued in this report apply?
 5 A. Okay.  If this were a case of academic
 6   decision-making, my expert report would apply not to
 7   the substance of a grade but to the process and the
 8   procedure and possibly the evidence if it were -- if
 9   the evidence were in question.  And, again, if you'll
10   bear with me for one second.  If the student takes an
11   exam and writes a categorically wrong answer and the
12   faculty member says this is a wrong answer, you fail
13   the exam, that's different than if there's an
14   allegation of academic dishonesty because that's a
15   question -- that's a factual question that requires
16   some kind of evidentiary hearing, not merely an
17   assertion.
18 Q. So is it your expert opinion that the same procedural
19   safeguards that apply in a disciplinary setting also
20   apply in an academic setting?
21 A. Only in some.  I'm making a distinction between
22   allegations of academic dishonesty and, say, grading.
23 Q. Okay.  Subject to that caveat, is that a true
24   statement?
25 A. Yes.  And, again, since I have not thought this
```

Page 129

```
 1   through and you're asking me hypothetically, I would
 2   reserve the right to spend the next couple weeks
 3   thinking about it and seeing if I changed my mind.
 4 Q. Well, no.  You're the expert, you know.
 5 A. I have been asked to be an expert in this particular
 6   case and not an expert on the hypothetical that you're
 7   giving me, and so I am giving you a hypothetical
 8   answer based on what you've given me.
 9 Q. So let me just follow up on a distinction that you
10   just made between an erroneous grade and academic
11   dishonesty.  What is your definition of academic
12   standards?
13 A. I'm -- I'm not sure I know what you're asking.  That's
14   a very --
15 Q. You state in Paragraph -- you state in Paragraph 100,
16   ". . . except in the most unusual circumstances,
17   [courts] should never question academic standards and
18   the considered opinion of academic
19   professionals . . ."  What is?
20 A. Yes.
21 Q. What is your definition of academic standards?
22 A. So the academic standards in that context would be the
23   standard of what constitutes a passing effort on the
24   part of the student on an exam or on a paper or on a
25   thesis or dissertation, and those standards -- those
```

PAUL   FINKELMAN, PH.D.
December 17, 2021

Page 138

1   cases.  The right to a due process hearing before
2   being denied a -- before having a government benefit
3   taken away from you is -- is -- is now part of the
4   civil law.  I think that the right to confront a
5   witness, the right to testify are all accepted in
6   civil matters.  Again, if there's a civil proceeding
7   in tax court, you have a right to present your own
8   evidence and testify.
9 Q.   What's your authority for the proposition that
10   individuals have a constitutional right to confront
11   witnesses in a civil case?
12 A.   I can't give you that right now.
13 Q.   Okay.  You agreed with me earlier, though, that the
14   test for determining whether or not due process has
15   been -- excuse me, an individual's rights under the
16   procedural due process clause have been violated is
17   different than the test for determining whether or not
18   a particular Bill of Rights should be incorporated
19   against the states.
20 A.   Wait.  Could you repeat that?  I'm not sure I followed
21   it.
22 Q.   Did I understand you earlier correctly when you agreed
23   that the test for determining whether or not
24   somebody's procedural due process rights have been
25   violated is different than the test that is used for

Page 139

1   determining whether or not a provision of the Bill of
2   Rights should be incorporated against the states
3   through the Fourteenth Amendment?
4 A.   I don't think I said that.  What I said was that,
5   generally speaking, while the federal right within the
6   Bill of Rights has been incorporated against the
7   states, there have been some specific I suppose
8   substantive content to a federal right, and, again,
9   what comes up is the anomaly of jury trial, that have
10   not been incorporated against the states.  I think by
11   and large everything other than that probably is one
12   test.
13 Q.   As an expert in due process, what is the test that's
14   used to determine whether or not somebody's procedural
15   due process rights have been violated in a particular
16   case?
17 A.   The test is to look at the facts and to balance them
18   against precedent, against rules that have developed
19   over -- against -- against what Justice Cardozo and
20   Justice Black hold, the notions of ordered liberty.
21 Q.   That's the incorporation standard, not the right --
22   not the standard for procedural due process.  I
23   thought we just went over that earlier when we got out
24   the constitutional law treatise.
25 A.   I guess I -- I guess I don't understand what you're

Page 140

1   asking me.
2 Q.   Can you state for me here what is the standard or the
3   test for determining whether or not somebody's been
4   deprived of their rights under the procedural due
5   process?
6 A.   The standard is to look at the facts of the case and
7   to look at the traditions and precedent so that, for
8   example, in Powell versus Alabama, which is a -- which
9   is in part an incorporation case, the ruling of the
10   Court was that even though the state had authorized
11   lawyers to represent Powell, he had not gotten
12   procedural due process because of the factual
13   situation of the way the lawyers had represented him
14   and therefore he had been denied his Sixth Amendment
15   rights.  So, again, the incorporation is tied to the
16   due process.
17 Q.   Okay.  Is the test for determining whether or not
18   somebody's procedural due process rights have been
19   violated the same in the civil setting as it is in the
20   criminal setting?
21 A.   I'm not -- I'm not sure I -- I -- I know that -- I
22   know the answer to that fully.
23 Q.   You know, I've got to say that for an expert that's
24   being presented in a case in federal court on a claim
25   involving procedural due process I am shocked at the

Page 141

1   fundamental lack of knowledge of just the basics of
2   procedural due process that you are exhibiting here.
3   Are you qualified to give an expert opinion on
4   procedural --
5        MR. FLORES:  Objection.  Objection.  This
6   is clearly an outrageous effort to try to now bait the
7   witness here, David.  If you have a question, ask it.
8   And you can make your arguments when you have your
9   motion.
10 BY MR. PORTER:
11 Q.   Dr. Finkelman, do you believe that you are qualified
12   to provide an expert opinion on procedural due
13   process?
14 A.   Yes.
15 Q.   Okay.  Then, again, answer the question of whether or
16   not there's a different standard for determining
17   whether or not the state has violated procedural due
18   process in the civil setting versus the criminal
19   setting.
20 A.   Whether there is a different standard or whether there
21   should be a different standard?
22 Q.   Whether there is.
23 A.   And, again, I -- you know, before I come before a
24   court to testify on this, I will do lots of research
25   to answer that question.

PAUL   FINKELMAN, PH.D.
December 17, 2021

Page 142

1 Q.  But you have not done it as you sit here today?
2 A.  I have not done it as I sit here today because, quite
3      frankly, the depositions and the facts in evidence in
4      this case so egregiously violate the most minimal
5      standards of due process, starting with the failure of
6      the university, and in multiple ways to follow its own
7      rules and its own procedure, its failure to allow
8      Mr. Eid to testify in his own behalf, the failure to
9      allow confrontation of witnesses that --
10 Q.  Dr. Finkelman, we'll get into --
11 A.  No.  Wait a minute.  No.  No.  I'm sorry, Mr. Porter.
12     You asked me a question and I have a right to answer
13     it.
14 Q.  Okay.  Thank you for your answer.  You've answered it.
15 A.  My answer is not finished, Mr. Porter.
16 Q.  You'll have ample opportunity to provide that
17     information when we discuss the process that was
18     afforded to Mr. Eid.  Okay?  I'm just asking you if
19     you had done that research and the answer is no.
20     Okay?  You state here in your expert report that while
21     a case -- this case is a civil matter, the standards
22     for due process in the criminal realm are in many ways
23     similar.  So that was the basis for my question.  It's
24     in your report.  Why the -- if the standards are the
25     same or different, and as I understand it, you are not

Page 143

1      able to answer that question; is that correct?
2 A.  Let me give you -- let me give you a somewhat
3      different answer.  Mr. Eid was not, for example,
4      entitled to a jury trial in the internal proceedings
5      of Wayne State University.  So in that sense, the
6      standard for due process in the civil context within
7      the university would not be the same as if it were a
8      trial in a court.  So in that -- to that extent, yes,
9      there would be some differences between what would
10     constitute due process within the university
11     administrative hearings and within a court.
12 Q.  Can you tell me what is the most important, in your
13     opinion, the most important or influential Supreme
14     Court opinion on procedural due process?
15 A.  I -- there -- there are many.
16 Q.  Name one.
17 A.  We've talked about a number of them and there are many
18     others.
19 Q.  Name one.  Name one.
20 A.  We've talked, for example, about the procedural due
21     process in a number of criminal cases, such as Gideon,
22     such as Miranda, which I haven't mentioned yet.
23     These -- we've talked about it in -- so there's a few,
24     you know.
25 Q.  Okay.  So your answer is criminal cases like Gideon,

Page 144

1      Miranda, those are the Supreme Court's most
2      influential or more important cases --
3 A.  They're among them.
4 Q.  -- of procedural due process?
5 A.  To say what is the most important, I mean, come on.
6 Q.  I'm just making sure that that was -- the record was
7      clear that that was your answer.
8            Please turn to Paragraph 37 of your report.
9      In this paragraph you discuss the lack of information
10     that is in the subject line of Ms. Camaj's email to
11     Mr. Eid inviting him to a fact-finding conference.  Do
12     you see that?
13 A.  Yeah.  Um-hmm.
14 Q.  Do you know whether Mr. Eid failed to open the email
15     from Ms. Camaj?
16 A.  I do not.
17 Q.  Do you know --
18 A.  I actually assumed that he did since he showed up.
19 Q.  Do you know whether or not he failed to timely respond
20     to the email that Ms. Camaj sent?
21 A.  It appears that he responded in a timely manner.
22 Q.  So this criticism or deficiency that you address here
23     in Paragraph 37 doesn't really fit the facts of this
24     case?
25 A.  Wait.  On Page 37 or Paragraph 37?

Page 145

1 Q.  Excuse me.  Paragraph 37.
2 A.  I'm sorry.  Because you had directed me to Page 37, I
3      believe, unless I misheard you.  Hold on.  Hold on one
4      second.  Yeah.  Okay.  I'm here now.  Yeah.
5 Q.  In this paragraph you discuss the purported lack of
6      information that is in the subject line of Ms. Camaj's
7      email to Mr. Eid inviting him to a fact-finding
8      conference.  Do you see that?
9 A.  Yes.
10 Q.  Do you know whether Mr. Eid failed to open the email
11     from Ms. Camaj?
12 A.  I believe he opened it.
13 Q.  Part of the problem that you note here in Paragraph 37
14     through 38 is if it is not flagged, then a student may
15     not open it up in a timely manner; is that correct?
16 A.  Yes.  Um-hmm.
17 Q.  Do you know whether Mr. Eid failed to open this up in
18     a timely manner?
19 A.  I believe he opened it up in a timely manner.
20 Q.  Okay.  So this deficiency that you point out doesn't
21     really fit the facts of this case, does it?
22 A.  It points to the procedural problems of Wayne State's
23     process and to the -- to the extent that Wayne State's
24     process begins by not giving students appropriate
25     information and --

PAUL  FINKELMAN, PH.D.
December 17, 2021

Page 154

1  as a question.

2  Q.  Okay.  So in the Answers to Interrogatories that you

3  just reviewed earlier and declared that were true and

4  accurate states that you reviewed all documents

5  exchanged by the parties in discovery; is that

6  correct?

7  A.  I -- I reviewed the documents that we mentioned.  I

8  don't know if I -- I don't know if other documents

9  were exchanged.  I cannot testify to what documents I

10  did not see that way or may not have been exchanged.

11          MR. PORTER:  I think it might be helpful at

12  this point to go off the record.  Bob, are you okay

13  with that?

14          MR. FLORES:  Okay.

15          (Recess taken at 2:50 p.m.)

16          (Back on the record at 3:12 p.m.)

17          MR. FLORES:  Mr. Porter had requested that

18  I talk with my colleague about the plaintiff's

19  response to defendants' second interrogatories, which

20  is I think Exhibit A for purposes of this deposition.

21  I have done that, and I've informed Mr. Porter that

22  the plaintiff did provide Dr. Finkelman with access to

23  a Dropbox link in which discovery from both sides was

24  available as well as the Complaint and exhibits that

25  were part of that, but as with any witness, the case

Page 155

1  file is voluminous and they -- it's my understanding

2  that Dr. Finkelman looked at those documents he

3  believed were necessary to allow him to provide his

4  report.  In addition to those, for the record, I did

5  provide him with a number of additional copies of

6  certain exhibits that were part of the depositions

7  that I took of the defendants in this case,

8  Drs. Jackson, Baker, Chadwell, and then Nikolina Camaj

9  and Loretta Robichaud.  So I want -- so that's the --

10  that's our position with respect to I think it is

11  Subsection g on Page 9 of our plaintiff's response,

12  which is, as I noted, Exhibit A.

13          MR. PORTER:  Okay.  Thank you for that

14  clarification and for clearing that up.

15  BY MR. PORTER:

16  Q.  Dr. Finkelman, do you agree that you were provided

17  with all of the documents that Mr. Flores just

18  referenced as being exchanged between the parties in

19  this case?

20  A.  I agree that I was -- yes.  The documents that he says

21  I got I was provided with.

22  Q.  Did you have any difficulty accessing those -- the

23  tranche of documents?

24  A.  No, I did not.  But -- yeah.  I'm sorry.  Go ahead.

25  Q.  You had full opportunity to review all the documents

Page 156

1  that were provided to you; is that correct?

2  A.  I had opportunity to review them, and I would say that

3  I reviewed -- looked at most of them.  I did not

4  look at all of them in the same level of detail simply

5  because there was not time.

6  Q.  Did plaintiff's counsel instruct you on what documents

7  to review?

8  A.  Plaintiff's counsel suggested that I read the

9  depositions, which is what I read, and the -- and

10  the -- all of the documents connected with the

11  depositions and also various -- the papers coming out

12  of the Promotions Committee and the -- it's been a

13  long day.  I'm sorry.  The Promotions Committee and

14  the Professionalism Committee.

15  Q.  Did plaintiff's counsel tell you there was not a need

16  to review the other documents that you just -- other

17  than what you've just referenced?

18  A.  It wasn't a question of need.  It was a question of

19  time.  I mean, you know, if I -- if I had been

20  contacted a month earlier than I had, there would have

21  been -- I probably would have looked at everything --

22  I like to be very thorough in what I look at.  I like

23  to look at all documentation that's available.

24  Q.  So is it true -- so are you saying that you did not do

25  a thorough review of all the documents in this case?

Page 157

1  A.  I'm saying that I looked at all of the documents.  I

2  read some of them very thoroughly, some of them more

3  than once, and --

4  Q.  So you've looked at -- I want to make sure I

5  understand.  You've looked at every document that has

6  been provided to you?

7  A.  I believe so.  But I, again -- you know, it's possible

8  that I missed one.  I have a -- I have a bunch of

9  files of documents and I looked at most of them.  What

10  I --

11  Q.  Dr. Finkelman, just --

12  A.  I can go -- I can go through the list of documents

13  that I looked at if you'd like.

14  Q.  Please do.  Please do.

15  A.  Okay.  So I'm looking -- I am looking right now at

16  depositions, and I read two depositions by Eid, one by

17  Chadwell, Jackson, Camaj, Baker, and Robichaud.  If

18  there was another deposition, I'm not remembering

19  reading it and I don't know that I had it.  Okay?  I

20  looked at Ms. Camaj's report to her supervisor,

21  Mr. Eid's report to the provost, the Promotion

22  Committee.  I looked at -- I looked at the Promotion

23  Committee file, which is -- which is one of the

24  exhibits in -- in one of the depositions.  I looked at

25  the Professionalism Committee file, which is I believe

Page 166

1   that he could be dismissed.  Does that affect your
2   opinion about whether or not Ms. Camaj committed a
3   constitutional violation by failing to give him notice
4   that he could be dismissed?
5 A.   Well, I think it probably does in the context that she
6   is the one who's interviewing him and she is the one
7   who is urging him to essentially confess to something
8   without telling him exactly what it is he's confessing
9   to, and if -- if he -- and -- and given what I would
10   argue is a sort of byzantine process of various people
11   and various committees, I don't think it's due process
12   for -- for him to be interrogated in this way and told
13   to make a statement without knowledge of what the
14   consequences might be.
15 Q.   Dr. Finkelman, you are now conflating a bunch of
16   different due process components.  I am just talking
17   about this one sentence about him not being given
18   notice that he could be dismissed from medical school.
19   So let's limit ourselves to that component of the due
20   process analysis.  Can we agree on that for just this
21   moment?
22 A.   Sure.
23 Q.   Okay.  Assume in my hypothetical Mr. Eid already has
24   notice that he could be dismissed from medical school.
25   Are you testifying here right now that the due process

Page 167

1   clause requires him be given notice again prior to
2   meeting with Ms. Camaj?
3 A.   May I ask you to clarify what you mean by notice?
4 Q.   He is told that if he -- he could be dismissed from
5   medical school.
6 A.   Okay.  So you're not talking about something that
7   might be in some handbook or some medical school
8   rules.  You are talking about somebody in authority
9   has told him that you might be dismissed and that
10   person is in an authoritative position in part of the
11   process rather than say a professor who might say, you
12   know, you could be dismissed?
13 Q.   You are making a distinction between something being
14   in a handbook or medical school rules and somebody in
15   authority telling him that.  Why do you make that
16   distinction?
17 A.   Well, because -- because you are saying if he has been
18   told.  I interpret being told as a formal -- a formal
19   conveyance of information from someone in authority.
20   So, for example, if Mr. Eid got this and went to his
21   favorite med school professor and said, you know, how
22   do I deal with this and the professor said, well, you
23   know, you could be expelled for this, you've gotta be
24   careful, that's quite different from Vice -- Vice Dean
25   Baker telling him or Dr. Jackson telling him or -- or

Page 168

1   somebody who is actually in authority in the process.
2   So I would say unless the information is conveyed in a
3   formal authoritative way by somebody who is in the
4   system of investigating and -- and adjudicating this,
5   that he hasn't actually been given notice.
6 Q.   So it's irrelevant to your opinion as an expert that
7   the medical school handbook notifies students that
8   they could be dismissed from medical school for
9   breaches of the standards of professionalism?
10 A.   I think that is not notice in this case.
11 Q.   Is it notice in any case?
12 A.   It's -- it's notice in a very, very vague way.
13   Mr. Eid is being asked to essentially write a
14   confession, and that's -- and he doesn't actually know
15   what he has been -- he's being investigated for, but
16   he's asking -- he's being asked to confess to
17   something he hasn't been asked to -- where he doesn't
18   have the information, and the fact that in the
19   handbook it says professionalism, I don't know, maybe
20   you know, maybe you can send me how professionalism is
21   defined and how the medical school has interpreted
22   professionalism and applied it in this way.  As
23   Ms. Camaj notes, students don't read every piece of
24   the handbook.  I think that's pretty well-known.
25 Q.   Do you know whether or not Mr. Eid read the medical

Page 169

1   school handbook in this case?
2 A.   I have no idea.
3 Q.   Do you know whether or not he read any of the
4   committee bylaws?
5 A.   I have no idea.
6 Q.   Do you know whether or not he read the student code of
7   conduct?
8 A.   He seems to have because he emailed Ms. Camaj and
9   asked for specific information that he said he was
10   entitled to in the student code of conduct, and she
11   did not, as best I can tell from the record, even
12   respond to that email, much less give him the
13   information, and if you would look on my -- on my
14   expert report, I think it was in Paragraph --
15 Q.   I'm familiar with that aspect of your report.  Thank
16   you.
17 A.   We point that out.
18 Q.   Thank you.  You state in Paragraph 57 that
19   Ms. Camaj --
20 A.   Is that five seven or six seven?
21 Q.   Five seven.
22 A.   Five seven.  Okay.
23 Q.   You state in Paragraph 57 that Camaj often made a
24   determination on the spot and asked students to agree,
25   putting the student in an unconstitutional spot.

PAUL   FINKELMAN, PH.D.
December 17, 2021

| Page 190 | Page 192 |
|---|---|
| 1   case. In this particular numbered paragraph. | 1   maybe this would move a little smoother. Okay? But |
| 2 Q.  Okay. You state in Paragraph 60 of your report that | 2   let me -- |
| 3   Mr. Eid offered to write an apology "but it appears | 3 Q.  Well, go ahead and move this a little bit smoother. |
| 4   [she] did not want that to happen." | 4   Why don't you open up -- |
| 5 A.  Yes. | 5 A.  Let me rephrase my answer if I may. I am concluding |
| 6 Q.  You cite Mr. Eid's deposition at 148, 149. We've | 6   from the fact that Mr. Eid offered to write the |
| 7   already been over that. Correct? | 7   apology letter and Ms. Camaj did not accept that |
| 8 A.  Un-hmm. | 8   offer, say anything about that offer, try to convey |
| 9 Q.  Nowhere in those two pages that you just read did it | 9   the apology letter to the complainant, that this is |
| 10   ever suggest for Mr. Eid that Ms. Camaj did not want | 10   because Ms. Camaj did not, in fact, want him to write |
| 11   him to write an apology; correct? | 11   an apology letter, and this is based on the fact that |
| 12 A.  I would have to go and reread them again. | 12   in the other discussions of his statement Ms. Camaj |
| 13 Q.  Feel free to do so. | 13   said when he asked her should I include this in the |
| 14 A.  Pardon? | 14   statement, she said affirmatively yes, but when he |
| 15 Q.  Feel free to do so. | 15   says should I write an apology letter, there is no |
| 16 A.  And, you know, again, those two pages -- all I can say | 16   response, and that is because she does not want him to |
| 17   is that she also doesn't say in these two pages | 17   write an apology letter. Yes. |
| 18   that -- | 18 Q.  Did you take the same approach to drawing the other |
| 19 Q.  You're referring to the Eid deposition? | 19   conclusions that you reached in your report as the one |
| 20 A.  You're talking about Page 109 and 110 in Camaj; right? | 20   you just described right there? |
| 21 Q.  No. I'm referring to Mr. Eid's deposition at Page 148 | 21 A.  I don't know what the same approach would be to the |
| 22   and 149. It's the citation that you provide in your | 22   other conclusions. My report has many conclusions and |
| 23   expert report for this assertion of fact. Point to me | 23   many approaches. If you've got a specific -- if |
| 24   where in there it suggests that Camaj did not want | 24   you've got a specific issue, please ask me the |
| 25   that to happen. | 25   specific issue so I can answer it. |

| Page 191 | Page 193 |
|---|---|
| 1 A.  "Did you submit a" -- well, the question is, "You | 1 Q.  I'm asking you if this is -- if you approached all the |
| 2   wanted to submit one, though, because what you had | 2   assertions and conclusions that you make in this |
| 3   done did not sit well with your conscience; correct?" | 3   report. I'm wondering if you followed the same |
| 4        "I offered to write an apology letter." | 4   approach and methodology in forming each one. |
| 5        Again, my assumption from this, my | 5   General -- |
| 6   conclusion from the evidence that is here that Mr. Eid | 6        MR. FLORES: Objection. Objection. The |
| 7   offered to write an apology letter and Ms. Camaj did | 7   witness has already said that he did not. |
| 8   not say absolutely write an apology letter, just as | 8 BY MR. PORTER: |
| 9   she said at another point put this particular | 9 Q.  Okay. Please open up Ms. Camaj's deposition at |
| 10   information in the statement. She didn't say yes, I | 10   Page 114. It's the bottom two lines. |
| 11   want to take you up on that offer to write an apology | 11 A.  114. Okay. |
| 12   letter, that would be a good idea, that would be | 12 Q.  Please read those two lines. |
| 13   useful, and so I am saying that it appears that | 13 A.  ". . . he asked if he could include an apology letter. |
| 14   Ms. Camaj did not want him to write the apology | 14   I said absolutely you can include that. I informed |
| 15   letter. It doesn't say that I know for a fact | 15   him he can provide" -- |
| 16   because, again, this is only an appearance. | 16 Q.  You can stop right there. |
| 17 Q.  Okay. So you're speculating? You're assuming? | 17 A.  All right. In that case, thank you for correcting me. |
| 18 A.  I'm not assuming. I'm making an assumption that is | 18   I am wrong. Okay? I made a mistake. I missed it. I |
| 19   not assuming on -- if you'll excuse me, I like that | 19   missed a sentence that Ms. Camaj said. I will say, |
| 20   look. It's a very wonderful look. Right? | 20   however, that it still strikes me as odd that she did |
| 21 Q.  Well, you say you're not assuming and then you said | 21   not pursue the apology letter the way she pursued the |
| 22   you're making an assumption. Those are the same word, | 22   statement, but I -- |
| 23   Doctor. Excuse me for being shocked. | 23 Q.  Let's take a look at -- |
| 24 A.  Okay. But you know something? If you'd let me finish | 24 A.  I concede your point, Mr. Porter. |
| 25   my answer instead of, you know, doing your acting, | 25 Q.  You find that odd. All right. So then let's open up |

Page 194

1   the Eid/Camaj correspondence which we've already
2   been -- I've already sent you.
3 A.   Which -- which --
4 Q.   It's the last page of the PDF. It's Bates 219.
5 A.   Wait. I'm sorry. I have a ton of PDFs here.
6 Q.   Let me resend it to you to make it easy.
7 A.   I just want to know which one it is.
8 Q.   The very first page is the letter from Ms. Camaj to
9       Mr. --
10 A.   What is the title of the PDF?
11 Q.   Eid - Camaj Correspondence.
12 A.   Eid - Camaj Correspondence. And you sent that to me
13       earlier? Then let me open it up because I am not
14       seeing that right on my screen. So let me -- oh, wait
15       a minute. Here it is right here. Hold on a second.
16       I think I found the email you sent to me. Eid - Camaj
17       PDF.
18 Q.   You just testified just a moment ago that you, quote,
19       you find that odd that she didn't pursue the apology
20       letter.
21 A.   Yes.
22 Q.   Take a look at the last page of that PDF.
23 A.   The very last page. Okay. I will.
24 Q.   It's an email from Ms. Camaj to Mr. Eid; is that
25       right?

Page 195

1 A.   Yeah.
2 Q.   What is the second sentence of that email?
3 A.   "In the last paragraph of the letter, I welcome the
4       opportunity to write an apology, as what took place
5       does not sit well with my conscience."
6 Q.   No, no. That's Mr. Eid's email. If you go up to the
7       top, Ms. Camaj's email, this is the final
8       correspondence between them. What does she say?
9 A.   All right. She says that she will notify the
10      committee. And so I can only say that in this piece
11      of my expert report I overlooked evidence and I am
12      incorrect. That happens. It happens when you're
13      writing something in a hurry and you haven't had a
14      chance to fact check every -- you know, go back and do
15      multiple checkings of everything. And so it's clear
16      that she does not seem to be opposed to him writing
17      it.
18 Q.   Does that influence in any way your opinion that -- of
19      Ms. Camaj's role in this case?
20 A.   It might, yeah. It -- I'll leave it at that unless
21      you want to ask a follow-up question.
22 Q.   No. That's fine. I will ask a follow-up if I feel
23      it's necessary.
24          Do you know whether Mr. Eid was ever
25      informed of the nature of the allegations concerning

Page 196

1   his behavior?
2 A.   Well, we talked about the "nature of" language a while
3       ago, and, as I said, I do not believe he was informed
4       of the accusation. He probably was informed in a
5       general sense of the nature.
6 Q.   Okay. So let's distinguish between those two because
7       I feel like you are. You are making a distinction
8       between the nature of the allegations and the actual
9       complaint that Ms. Roe made; correct?
10 A.   And so I wrote in Paragraph 59 that he did not have
11       the full nature of the complaint, and, as I said,
12       perhaps the word "nature" is misleading here. He did
13       not have the full content of the complaint.
14 Q.   And I'm asking you a direct question. Are you
15       referring to Ms. Roe's complaint, the document that
16       she submitted raising concerns about his behavior?
17 A.   Yeah.
18 Q.   Do you know whether or not he ever received that
19       document?
20 A.   I do not know if he received it. I suspect he has it
21       now in this litigation.
22 Q.   Do you know whether or not he received it as part of
23       the medical school process prior to his dismissal?
24 A.   I do not, I am sorry to say.
25 Q.   Do you know whether or not he ever saw the underlying

Page 197

1   materials that were provided by Ms. Roe in connection
2   with her complaint regarding his behavior?
3 A.   My understanding is he received some of this. Whether
4       he received all of this I do not know.
5 Q.   And do you know whether or not he ever had an
6       opportunity for a hearing regarding the allegations of
7       his concerning behavior?
8 A.   That would depend on how you define a hearing.
9 Q.   Okay. You agree with me that he appeared before the
10      Professionalism Committee; correct?
11 A.   I do.
12 Q.   You agree with me that he appeared before the
13      Promotions Committee?
14 A.   I couldn't hear what you just said. You faded out.
15 Q.   Do you agree with me that he also appeared before the
16      Promotions Committee?
17 A.   I do.
18 Q.   And do you also agree with me that he was given an
19      opportunity to provide an additional statement in an
20      appeal back to the Promotions Committee?
21 A.   I do.
22 Q.   Okay. In Paragraph 72 you say, "It is somewhat
23      shocking that for such an important matter the
24      [Promotions] committee kept no minutes or records of
25      its proceedings." Do you see that?

Page 230

1    please.  Okay?
2 A.  All right.
3 Q.  I'm just asking you a hypothetical question.
4 A.  I think I've answered it.
5 Q.  Thank you.  Other than Ms. Camaj's deposition, what
6    other documents did you review before forming this
7    conclusion that Wayne State University created a
8    special -- secretly created a special procedure to
9    investigate Mr. Eid, deviating from its standard
10    investigative process?
11 A.  I looked at the deposition of Dr. Chadwell and
12    Exhibit B in that, which was email correspondence with
13    Ms. Robichaud who indicated before there was any
14    investigation that Ms. Robichaud thought that Mr. Eid
15    was guilty of various things, speculated that he
16    preyed on other students and that something had to be
17    done in this, and Ms. -- and Dr. Chadwell said agree,
18    and that --
19 Q.  That's it?
20 A.  There are -- there are discussions of a -- of another
21    committee, which is the Intervention Committee,
22    throughout the depositions.  It is not clear to me
23    what the Intervention Committee did, what it was
24    charged with doing, what it does, and therefore I -- I
25    can't have a full handle on what this Intervention

Page 231

1    Committee does, but it does seem to me that -- there's
2    also the chronology of events.  That is to say,
3    this -- this complaint was received I believe on
4    October 29, and under the university rules, the
5    university has to begin to process the complaint
6    against the individual within ten days, and the
7    university, in fact, waits almost a full month because
8    Mr. Eid does not come before Ms. Camaj I believe until
9    November 30th, so it seems to me that right there is a
10    substantial deviation from the university rules with
11    regard to student conduct that rather than doing this
12    within ten days they wait almost a month.
13         My sense from reading many cases involving
14    due process -- and I can think of one, for instance.
15    There's a California case that went to the Supreme
16    Court involving how quickly a -- the prosecutors need
17    to bring somebody before a court for a preliminary
18    hearing.  In that case, in a wonderful dissent,
19    Justice Scalia argued that keeping anybody in jail for
20    more than 24 hours before bringing them before a court
21    was a fishing expedition, and this goes very much to
22    very long -- I'm sorry.  I don't know -- I don't
23    remember the name of the case.  San Bernardino
24    County -- somebody versus San Bernardino County.  I
25    can get you the citation --

Page 232

1 Q.  Dr. Finkelman, I just want to make sure --
2 A.  No.  I'm answering your question.
3 Q.  Please stop.  I want to make sure I understand what
4    you just said.  Did you just reference a case
5    involving the issue being whether or not somebody was
6    brought before a judge too soon?
7 A.  No.  Not soon enough.
8 Q.  Not soon enough.  Okay.  Please proceed.  Please
9    proceed.
10 A.  In the San Bernardino County case, and I can get you
11    the full cite if you want, the -- the defendant -- the
12    person appealing the case was basically held in jail
13    for five days before he was brought before a judge,
14    and for a variety of reasons the court upheld this,
15    but in a -- I think a very powerful dissent Justice
16    Scalia argued that holding him in jail for any more
17    than 20 -- than 48 hours was simply a fishing
18    expedition to find something to charge him with, and
19    it strikes me that this is kind of analogous to Wayne
20    State University receiving a complaint and rather than
21    dealing with it right away and rather than going to
22    Mr. Eid right away and saying we have this complaint,
23    let's deal with it, within the ten days specified what
24    the school is doing is sitting on the complaint for a
25    month having this Intervention Committee and I don't

Page 233

1    know what else it's doing.  And the very fact that
2    Associate Dean Chadwell and Ms. Robichaud are talking
3    about his guilt on November 4th --
4 Q.  You've already said that.  You've already said that.
5 A.  -- the investigation is -- strikes me as -- as -- as
6    fundamental --
7 Q.  Dr. Finkelman, you are now repeating yourself.  You
8    are now repeating yourself.
9 A.  I'm sorry.
10         MR. PORTER:  Bob, you know, I retract my
11    estimate of being out of here by 6:00.  We're going to
12    be here a little bit longer.  I think you can
13    understand why.  But I am going to press ahead here.
14 BY MR. PORTER:
15 Q.  Does that complete your answer about what materials
16    you've looked at in order to form your conclusion that
17    Wayne State University deviated from its standard
18    practices and secretly created a special process just
19    for Mr. Eid?
20 A.  Yes.
21 Q.  Did you review the medical school handbook before
22    forming that opinion?
23 A.  I did not.
24 Q.  And you didn't also review the Professionalism
25    Committee bylaws; isn't that true?

PAUL  FINKELMAN, PH.D.
December 17, 2021

<table>
<tr><td>

**Page 234**

1 A.   I don't believe I did.

2 Q.   Did you review the Promotions Committee bylaws?

3 A.   I don't believe I did.

4 Q.   You've reviewed all of the depositions in this case;
5      correct?

6 A.   I did.

7 Q.   So you've read the testimony of Dr. Chadwell who
8      explained that Mr. Eid was processed through the
9      Professionalism and Promotions Committee process at
10     the School of Medicine; isn't that correct?

11 A.  That's what she said, yes.

12 Q.  Do you have any reason to doubt that?

13 A.  No.  No.  No.  I'm agreeing with it.

14 Q.  So if that's true, then why did you not read the Wayne
15     State School of Medicine Handbook setting out the
16     procedures in place for that process as well as the
17     Professionalism and Promotions Committee bylaws which
18     also lay out the process for that procedure?

19 A.  The reason I didn't read it was, first, because I have
20     something of a lack of time, but, secondly, because
21     this case did not go to the medical school.  It went
22     to Ms. Camaj.  And so if the case went to Ms. Camaj
23     first and it went to the dean of students at the
24     university, who Ms. Camaj works for, that seems to be
25     where the case went, but that there was a --

</td><td>

**Page 236**

1 Q.   -- who explained that Mr. Eid was processed through
2      the Professionalism and Promotions Committee process
3      at the School of Medicine, and I asked if you had any
4      reason to doubt her testimony and you said, "No.  No.
5      No.  I'm agreeing with it."  So you agree that this
6      was processed through the medical school's
7      Professionalism and Promotions Committee procedure?

8 A.   After Ms. Camaj had the case.

9 Q.   Okay.  So then I asked why didn't you read the School
10     of Medicine Handbook and the Promotions Committee and
11     Professionalism and Professionalism bylaws knowing that fact?

12 A.  And I said because while the -- and, again, I suppose
13     it's a question of what you mean by process.  As I
14     read Ms. Camaj's -- sorry.  As I read Dr. Chadwell's
15     deposition, the case comes to the medical school and
16     then it is sent to the dean of students of the
17     university, which would be a higher level of scrutiny
18     because it's the dean of students for the entire
19     university than the actions within a particular
20     college, and so it seems to me that it begins,
21     whether -- what door it comes through is not as
22     important as where it is sent, and if it comes through
23     the door of the medical school and the medical school
24     says, well, we are sending this to the -- to the dean
25     of students, and Ms. Camaj then handles it and then

</td></tr>
<tr><td>

**Page 235**

1      essentially a 30-day lapse between the time the
2      complaint was made and the time it went to Ms. Camaj.

3 Q.   Okay.  So if it went to the School of Medicine first
4      and then to Ms. Camaj, then your expert opinion would
5      change; correct?

6 A.   No.  Because if it went to the --

7 Q.   Okay.  If the answer is no, that's fine.  No.

8 A.   Okay.  I'll just say no.

9 Q.   You need to listen to the question, please.  This
10     is . . .
11                 Would you agree with me that if this case
12     first went to the medical school and then to Ms. Camaj
13     that the procedures that applied in Mr. Eid's case
14     would be covered by the School of Medicine's handbook
15     and the bylaws of the Promotions and Professionalism
16     Committees?

17 A.  I don't think so.

18 Q.  You just answered a moment ago that you didn't read
19     those three documents because this case did not go to
20     the medical school.

21 A.  Ask that question one more time that I responded to I
22     don't think so.

23 Q.  I've asked you -- I asked you if you've read the
24     deposition of Margaret Chadwell, --

25 A.  I did.

</td><td>

**Page 237**

1      she sends it back to the medical school where the
2      medical school processes it.  That is my understanding
3      of the process.  It doesn't begin with the
4      Professionalism.  It begins with the medical school
5      sending this over to Ms. Camaj, but that there is this
6      one-month period where we don't know what's happening.

7 Q.   Okay.  But you also agree with me, though, that
8      Ms. Camaj testified that what she did in Mr. Eid's
9      case was not what she does normally in the dean of
10     students' office as a student conduct officer;
11     correct?

12 A.  She said that it's not what she normally does.

13 Q.  Correct.  Right.

14 A.  Right.

15 Q.  So this was not processed or sent to her in her
16     capacity as student conduct officer in the dean of
17     students' office; correct?

18 A.  I do not know if that's correct.

19 Q.  Ms. Camaj just testified to that and you've just
20     acknowledged that she testified to it.

21 A.  No.  Ms. Camaj testified that she didn't do what she
22     normally does.

23 Q.  Okay.  If it is true, Dr. Finkelman, that Ms. Camaj
24     testifies that her involvement in this case was not as
25     a student conduct officer but as simply a person who

</td></tr>
</table>

PAUL   FINKELMAN, PH.D.
December 17, 2021

Page 254

1  opinion, draw any conclusion based on one of -- that
2  fact with any reasonable degree of certainty?
3 A.  Only -- only -- only if you are looking at two
4  specific statements and nothing else, no other part of
5  the deposition, no other facts in evidence, no other
6  documentation.  So if, for example, Ms. Canaj says
7  something and Mr. Eid says something else and there is
8  nothing else about it, yes.  But if there's other
9  evidence, then we have -- even if it's not directly on
10  this point, we have to take the totality of the
11  evidence.
12 Q.  I understand.  All right.  Thank you.  And you agree
13  that Mr. Eid was given the opportunity to appeal the
14  Promotions Committee decision to the provost; correct?
15 A.  I agree that he appealed the decision to the provost
16  and that, again, it is -- the record seems murky about
17  whether he had to make a choice between resigning from
18  the medical school or appealing to the provost, that
19  he could not appeal to the provost and then resign
20  from the medical school.  So if that's -- so -- so
21  there's an ability to appeal, but it's constricted by
22  a cost if you do that.
23 Q.  And how does that factor into your analysis about --
24  if that were true, how does that factor into your
25  analysis about whether or not the -- Mr. Eid was

Page 255

1  denied due process?
2 A.  Because if the institution says if you do not appeal
3  this to the next level, which is central
4  administration of the university, we will allow you
5  to -- we will consider your appeal and if we deny it,
6  you have a right to resign from the medical school.
7  But if you avail yourself of the ability to appeal to
8  the next level of the court, then we will not allow
9  you to resign from the medical school.
10 Q.  You agree with me, though, that that line of reasoning
11  depends on the premise that Mr. Eid had the right to
12  withdraw from medical school?
13 A.  Again, that's the -- that's in the depositions.
14 Q.  You just explained to me the rationale behind your
15  expert opinion for why it's a due process violation
16  for the school to tell Mr. Eid that if he appeals to
17  the provost office he can no longer withdraw from the
18  medical school.  I'm asking you isn't it true that
19  that line of reasoning relies on the premise that he
20  had a right to withdraw from the medical school?
21 A.  Yes.
22 Q.  And so if he did not have a right to withdraw from the
23  medical school, that line of reasoning falls away;
24  correct?
25 A.  I would assume it does, and then I would wonder if

Page 256

1  that's the case, assuming that Dr. Baker told him what
2  Mr. Eid says Dr. Baker told him, why Dr. Baker would
3  have told him that.
4 Q.  Have you ever been asked to be a due process expert in
5  a civil case before?
6      MR. FLORES:  I don't think he heard you.
7 A.  I did hear him.  I'm trying to remember.  I do not
8  think so.
9 BY MR. PORTER:
10 Q.  And you have never provided expert testimony in a
11  court of law on due process; is that correct?
12 A.  Well, I have to the extent that the due process clause
13  incorporates the Bill of Rights for the states.
14 Q.  And you've never been qualified as an expert by any
15  court; is that correct?
16 A.  I was qualified by the Middle District of Alabama I
17  assume since I testified.  I was qualified in the
18  San Francisco Superior Court since I testified, and I
19  was assume qualified in the Middle District of
20  Pennsylvania since the chief judge quoted my expert
21  report in his summary judgment opinion.
22 Q.  Did you undergo what is known as a Daubert hearing in
23  any of those cases you just mentioned?
24 A.  I did not -- no.  I did not have a Daubert hearing.
25 Q.  Did anybody assist you in preparing your report?

Page 257

1 A.  In what way?
2 Q.  Did they provide substantive input?
3 A.  No.
4 Q.  Did anybody provide formatting assistance?
5 A.  No.  I formatted it myself.
6 Q.  Did anybody provide any other types of assistance with
7  your report?
8 A.  Mr. Flores picked up a few typos in the draft I sent
9  him.
10 Q.  Did he review your report before you submitted it to
11  the defendants in this case?
12 A.  Yes.
13 Q.  Did he provide you any feedback on the content of the
14  report?
15 A.  He did not take me to -- he did not suggest I take
16  anything out of it, if that's what you mean.
17 Q.  Did he suggest that you add anything to the report?
18 A.  He asked me to elaborate on a couple of points and I
19  did.
20 Q.  What points?
21 A.  I actually don't remember.  And I'm not trying to be
22  evasive.  I really don't remember.
23      MR. FLORES:  That's privileged information.
24  David knows that.
25      MR. PORTER:  What privilege are you

PAUL   FINKELMAN, PH.D.
December 17, 2021

Page 258

1  referring to?
2          MR. FLORES:  The work product privilege.
3          MR. PORTER:  That is not work product
4  privilege, Mr. Flores.
5          MR. FLORES:  My conversations with my
6  expert are privileged.
7  BY MR. PORTER:
8  Q.  Do you have any drafts of your report?
9  A.  I do not.
10 Q.  Does this report represent your best work?
11 A.  This report represents the best work I can do on this
12     case in the time constraints allowed to provide this
13     report in writing.  I worked very hard on this report.
14     Put in many hours.
15 Q.  Are you willing to stake your professional reputation
16     on this report?
17 A.  My professional reputation?  My professional
18     reputation is usually based on things which are
19     published, that are published --
20          MR. FLORES:  Dr. Finkelman, can you
21     speak -- I can't hear you.
22 A.  I'm sorry.  My professional reputation is based on
23     things that I've published.  Publication process is
24     much longer, much more complicated.  There are, for
25     example, typos in this report.  I would not want my

Page 259

1     professional reputation to be based on the fact that
2     in attempting to put this report together in a
3     relatively short time that I have typos in it.  You
4     know, you have pointed out that I have made an error
5     in one of the pieces of the depositions that I have
6     used.  I certainly would not want my professional
7     reputation based on the fact that I had an error,
8     which is why in the academic world things are reviewed
9     and it's why, by the way, that briefs are reviewed and
10    read by many, many people.
11 BY MR. PORTER:
12 Q.  So is that a yes or a no?
13 A.  That's an answer.
14 Q.  Will you stake your professional reputation on the
15     written report that you've prepared and submitted in
16     this case?  Dr. Finkelman, you hold yourself out to
17     members of your profession as an expert in a variety
18     of fields, do you not?
19 A.  That's correct.
20 Q.  Okay.  You laud yourself in your CV as the expert
21     witness in a number of cases.  Okay?  So this is part
22     of your expert reputation that we're discussing right
23     now.
24 A.  And in that context --
25 Q.  My question to you, Dr. Finkelman, is, because this is

Page 260

1     part of your professional service, are you willing to
2     stake your reputation on the written work product that
3     you have submitted in connection with this case?
4  A.  And my answer to you is my reputation is much larger
5     than any single thing that I have ever produced or
6     written, just as I would assume your professional
7     reputation is not based on whether you won any single
8     event within your career.
9  Q.  Are you proud of the work product that you've put into
10    this report?
11 A.  Yes.
12 Q.  When formulating your opinions in this case, did you
13    do any additional research outside of using
14    HeinOnline?
15 A.  Well, I told you that I reread portions of Leonard
16    Levy's prize winning book on the Fifth Amendment.  I
17    looked at a number of other cases.
18 Q.  Did you look at any cases that are not cited in your
19    report?
20 A.  I honestly can't remember.  I looked at a -- I looked
21    at a case -- yeah.  I looked at a case involving
22    students, and I can't remember the name of it.  I
23    would have to look it up.  High school students who
24    were expelled from a school and the court ruled that
25    they had been denied their due process --

Page 261

1  Q.  Are you referring to Roth?
2  A.  Yes.
3  Q.  And --
4  A.  But I didn't put that in because --
5  Q.  You agree with me that you didn't cite Roth in your
6     report; correct?
7  A.  I did not.
8  Q.  Do you think that Roth is irrelevant to the facts of
9     this case?
10 A.  No.  I think there's simply only so much time one has,
11    and I looked at Roth and said that's interesting and
12    then I didn't get back to it.
13 Q.  You knew from reading the depositions, did you not,
14    that Wayne State University considered this to be a
15    professionalism issue; correct?
16 A.  I do.
17 Q.  And you knew that the School of Medicine has a
18    separate procedure involving the process of
19    professionalism issues; correct?
20 A.  I do.
21 Q.  And you knew that this involved the medical school
22    setting; is that correct?
23 A.  Yes, it is correct.
24 Q.  Knowing all that, did you do any research to determine
25    whether or not there are special due process

PAUL   FINKELMAN, PH.D.
December 17, 2021

Page 262

1   principles that apply to professionalism judgments
2   made by medical school administrators?
3 A.   I did not.
4 Q.   Did you search out any other authorities that would
5   contradict the position that Mr. Eid has taken in this
6   case?
7 A.   I did not.
8 Q.   Did you try to?
9 A.   No.
10 Q.   So it sounds to me that you allowed the conclusion
11   that Mr. Eid wanted to draw in this case to lead the
12   presentation and the research of your report?
13 A.   No.
14 Q.   You just agreed that you didn't search out contrary
15   authority; correct?
16 A.   Correct.
17 Q.   You didn't research additional materials outside of
18   that was given to you by Mr. Eid; correct?
19 A.   Mr. Eid's counsel, yes.
20 Q.   And is that something you would normally do as a legal
21   historian?
22          MR. FLORES:  I'm sorry.  I didn't hear the
23   last part of that question, David.
24 BY MR. PORTER:
25 Q.   That approach that I just mentioned, not looking for

Page 263

1   contrary authority and not searching out additional
2   materials that you already have, is that consistent
3   with what you do as a legal historian?
4 A.   When I write academic history -- when I write academic
5   legal history, I write scholarship in the law, I
6   sometimes can spend as little as nine months and as
7   much as eight years writing something, and so I try to
8   look at everything available in all contexts.  When I
9   have something where I essentially have three weeks to
10   write it, I work with what I have in the time frame
11   that I have it.
12          As -- as you implied at the very beginning
13   of this deposition, and it works quite well, my time
14   costs the client something and time constraints are
15   limited, and while I was, you know, working as hard as
16   I could and as fast as I could, there -- there's only
17   so much time that one can put into a -- into writing
18   an expert report, especially when there's a cost
19   involved in writing it.  So yeah, I didn't look at
20   everything in the universe.  By the way, I may decide
21   to write a law review article on this and then I will.
22 Q.   You said you didn't look at everything in the
23   universe.  You didn't even try to look at anything
24   outside of what was already provided to you by
25   Mr. Eid's counsel?

Page 264

1 A.   I did not have the time.
2          MR. PORTER:  Okay.  If you will indulge me,
3   I just need five minutes.  I'm going to review my
4   materials.  I will be right back.
5          (Recess taken at 6:06 p.m.)
6          (Back on the record at 6:09 p.m.)
7          MR. PORTER:  So that's all the questions I
8   have for you today.
9                EXAMINATION
10 BY MR. FLORES:
11 Q.   Dr. Finkelman, I have just a few.
12          During the course of today's questioning by
13   Mr. Porter, the issue of time, review, what you looked
14   at, all of those issues were raised multiple times.
15   Do you agree that there are three primary areas of
16   concern when you're talking about procedural due
17   process, the opportunity to be heard, the opportunity
18   to present evidence, and the opportunity to confront
19   the accuser or cross-examine?  Do you agree with that?
20 A.   I would simply add the fourth one the opportunity to
21   have the assistance of counsel.
22 Q.   In this case you've looked at a number of --
23 A.   I can't hear you.  I'm sorry.  You'll have to repeat
24   it.
25 Q.   Have you --

Page 265

1          MR. PORTER:  I don't mean to cut you off.
2   But it seemed --
3          MR. FLORES:  Let me see if they've charged.
4   Give me a moment.
5 BY MR. FLORES:
6 Q.   Okay.  Can you hear me?
7 A.   I can hear you fine.
8 Q.   Okay.  Good.  Okay.  So in reviewing the material that
9   you did look at in preparation of your report, did you
10   come across any information that my client had an
11   opportunity to cross-examine his accuser?
12 A.   No.  He never had any opportunity to cross-examine his
13   accuser or, as best I can tell, to cross-examine
14   anyone else who made any statements against him.  And,
15   by the way, it would be his accusers since the
16   accusation appears to be both the mother of Ms. Roe
17   and Ms. Roe herself, so it would be both accusers.
18 Q.   In preparation of your report, did you come across any
19   information that led you to believe that Mr. Eid had
20   received less than appropriate notice at one or more
21   stages of the process that the School of Medicine or
22   the university as a whole put him through?
23 A.   Yes.  I believe he did not have notice in a variety of
24   contexts.
25 Q.   Is there any question in your mind -- well, let me