

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

JAMES W. GREEN, an individual, and )
AMERICAN CIVIL LIBERTIES UNION )
OF OKLAHOMA, a non-profit corporation, )
)
      Plaintiffs, )
)
vs. ) NO. CIV-05-406-WH
)
BOARD OF COUNTY COMMISSIONERS )
OF THE COUNTY OF HASKELL, and )
SAM COLE, Haskell County Commissioner, )
Chairman, in his official capacity, )
)
      Defendants. )

*FILED*

*APR 1 0 2006*

*By WILLIAM B. GUTHRIE*
*Clerk, U.S. DISTRICT COURT*
*Deputy Clerk*

---

### APPENDIX VOLUME II TO
### PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO STRIKE
### PLAINTIFFS' OFFER OF PROOF FOR EXPERT REPORT
### OF PAUL FINKELMAN, Ph.D.

---

**TINA L. IZADI** OBA #17978
3000 Paseo Dr.
Oklahoma City, Oklahoma 73103
Telephone:    (405) 525-3831
Facsimile:     (405) 524-2296
Email:        tizadi@acluok.org

**MICHEAL SALEM** OBA #7876
*Salem Law Offices*
111 North Peters, Suite 100
Norman, Oklahoma 73069
Telephone    (405) 366-1234
Facsimile:     (405) 366-8329
Email:        msalem@msalemlaw.com

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

This is to certify that on the 10th day of April, 2006, a true and correct copy of the attached document was served to the following via U.S. regular mail:

Joel Oster
Kevin Theriot
David C. LaPlante
Alliance Defense Fund
Midwest Regional Service Center
15192 Rosewood
Leawood, Kansas 66224

*Attorneys for Defendants*

Tina L. Izadi

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

JAMES W. GREEN, an individual, and )
AMERICAN CIVIL LIBERTIES UNION )
OF OKLAHOMA, a non-profit corporation, )
                                      )
        Plaintiffs, )
                                        )
vs.                                      )   **NO. CIV-05-406-WH**
                                        )
BOARD OF COUNTY COMMISSIONERS )
OF THE COUNTY OF HASKELL, and )
SAM COLE, Haskell County Commissioner, )
Chairman, in his official capacity, )
                                        )
        Defendants. )

---

### EXPERT REPORT AND DECLARATION OF PAUL FINKELMAN, Ph.D.

---

**TINA L. IZADI** OBA #17978
3000 Paseo Dr.
Oklahoma City, Oklahoma 73103
Telephone:    (405) 525-3831
Facsimile:    (405) 524-2296
Email:         tizadi@acluok.org


**MICHEAL SALEM** OBA #7876
*Salem Law Offices*
111 North Peters, Suite 100
Norman, Oklahoma 73069
Telephone    (405) 366-1234
Facsimile:    (405) 366-8329
Email:         msalem@msalemlaw.com

ATTORNEYS FOR PLAINTIFFS

## EXPERT REPORT & DECLARATION OF PAUL FINKELMAN, Ph.D.

I, Paul Finkelman, declare that, if called upon, I could and would competently testify to the following:

1. I currently hold the Chapman Distinguished Chair in Law at the University of Tulsa College of Law. My title is Chapman Distinguished Professor of Law. Since coming to Tulsa in 1999 I have taught constitutional law, legal history and constitutional history. Immediately before coming to the University of Tulsa I held the John F. Seiberling Chair in Constitutional Law at the University of Akron School of Law. I have also been the Baker and Hostetler Visiting Professor at Cleveland-Marshall College of Law (Cleveland State University), a Distinguished Visiting Professor at Hamline Law School, and the Charlton W. Tebeau Visiting Research Professor of History at the University of Miami. I was a visiting professor at Brooklyn Law School and Chicago-Kent College of Law, and a summer visitor at Lewis and Clark College of Law. I have also taught in history departments at the University of California at Irvine, Washington University in St. Louis, the University of Texas at Austin, SUNY Binghamton, Virginia Polytechnic Institute and State University (Virginia Tech), and as a summer visitor at the University of Hawaii at Manoa.

2. I have a Bachelor of Arts in American Studies from Syracuse University (1971) and an M.A. and Ph.D. in history from the University of Chicago (1972 and 1976). I held a Mellon Post-Doctoral Fellowship at Washington University in St. Louis in 1977-78. In 1979, I held the J. Franklin Jamison Fellowship at the Library of Congress. I was a Fellow in Law and Humanities at Harvard Law School in 1982-83. While I have taught at law schools for the last decade, and hold a chair as a Distinguished Professor at a law school, I am not an attorney and

1

not a member of any bar.

3. A true and correct copy of my curriculum vita is attached to this Declaration as Exhibit A.

4. I have authored, co-authored, edited, or co-edited over twenty books and I have written more than fifty law review articles and approximately fifty other scholarly articles and book chapters. I have also edited a number of collections of reprinted articles and primary sources. Most of my published work has been on the history of American law and American legal institutions. I am the co-author of the second edition of *A March of Liberty: A Constitutional History of the United States* (2 vols. Oxford, 2001), co-author of *American Legal History: Cases and Materials* (3rd ed., Oxford, 2005), editor of *Religion and American Law: An Encyclopedia* (Garland, 2000) and co-author of *Landmark Decisions of the Supreme Court* (Congressional Quarterly Press, 2003). My curriculum vita includes a list of most of the publications I have authored, co-authored, edited, and co-edited during my academic career. In 2005 Justice John Paul Stevens twice favorably cited my article, *The Ten Commandments on the Courthouse Lawn and Elsewhere*, 73 FORDHAM L. REV. 1477-1520 (2005) in his dissenting opinion in *Van Orden v. Perry* (2005). A copy of this article is attached to this Declaration as Exhibit B.

5. I have given hundreds of public and academic lectures throughout the United States, as well as in Austria, Canada, Colombia, England, Germany, and Japan. The United States Information Agency and the United States Department of State sponsored some of these lectures. I have served as a consultant or an advisor to the Library of Congress, the National Parks Service, the Abraham Lincoln Bicentennial Commission, the New York Unified Court System, the U.S. Department of Education, and various television productions for PBS and the History

2

Channel. I have been an invited speaker at the annual meeting of the Society of American

Religion, and in the fall of 2006 I will give an invited presentation at annual meeting of the

Biblical Society of America. I have given talks at numerous churches in Tulsa, and have been a

guest teacher at the adult Sunday school of at least three Christian churches in Tulsa. I have

received grants and fellowships from, among other institutions and agencies, the National

Endowment for the Humanities, the American Council of Learned Societies, the American

Philosophical Society, the American Bar Foundation, the Library of Congress, the American

Historical Association, the Gilder Lehrman Institute, the Japan Society for the Promotion of

Science, Yale University, and Harvard Law School.

6. I am a member of three honorary societies: Phi Beta Kappa (1971), Phi Alpha Phi

(1971), and Phi Alpha Theta (1971). I am a life member of the American Society for Legal

History, the Organization of American Historians (OAH), and the Southern Historical

Association. Since 2001, I have been one of about fifty scholars who are available as speakers as

part of the "Distinguished Lecture Series" sponsored by the OAH.

7. I have twice testified as an expert witness. I was an expert witness in *Glassroth v.

Moore*, 229 F. Supp. 2d 1290 (M.D. Ala. 2002), a case involving a Ten Commandments

monument in the rotunda of the Alabama Supreme Court building. I was also a member of an

"experts panel" in a lawsuit over the ownership of the 73rd home run ball hit by San Francisco

Giants baseball player Barry Bonds in the 2001 baseball season. This case is reported as *Popov

v. Hayashi*, No. 400545, 2002 WL 31833731 (Cal. Superior 2002).

8. I have reserved the right to be compensated at a rate of $100 per hour by the American

Civil Liberties Union of Oklahoma ("the ACLU"). Any expenses I incur will, by agreement, be

3

reimbursed by the ACLU

9. I have been asked to express opinion on two issues connected to a public display of the Ten Commandments in Haskell County, Oklahoma. The first issue pertains to the sources of American constitutional, statutory, and common law, and in particular the influence of the Bible in general, and the Ten Commandments in particular, on American constitutional, statutory, and common law. The second is on the nature of text of the Ten Commandments used in the Haskell County monument, and whether it is possible to have a "neutral" Ten Commandments text on a monument that does not in effect endorse one or more religious faiths or denominations and by implication exclude, disrespect, or reject other religions or denominations.

10. I base the interpretations, analyses, and conclusions in this Report on my education, research, writing, and experience as a professional historian and legal scholar. It would be impossible for me to list every source that I drew on in forming my opinions in this case, as I have been an academic working on these and related issues for almost three decades. However, I have included as Exhibit C a list of secondary sources that address the topics on which I have reached opinions in this case, that provide the data or other information that I considered in forming my opinions, and that include the exhibits that may be used as a summary of or support for my opinions.

## OPINIONS AND BASES THEREFOR

### INTRODUCTION

11. The sources of law for the American colonies and later the United States are broad and varied. The principal early source is the common and statutory law of England, including the Magna Carta. Also influential was the law coming out of the non-common law courts of

4

England, such as equity, chancery, admiralty, orphans, and ecclesiastical. The founding generation – those who participated in the American Revolution and in the creation of the nation under the Constitution – was influenced by many English sources of law, such as the Magna Carta and the English Bill of Rights, as well as the works of such Enlightenment thinkers as John Locke, John Trenchard and Thomas Gordon, the authors of "Cato's Letters," and other English Libertarian Philosophers. Other sources of American law include Roman law, the civil law of continental Europe in the post-Roman period, private international law, biblical law, and Germanic tribal law.

12. Documents and texts that have significantly influenced the development of our law and/or are prominent reflections of its development include (but are certainly not limited to) the following: the Magna Carta, the writings of Sir Edward Coke, the English Bill of Rights, William Blackstone's *Commentaries on the Laws of England*, John Locke's *Second Treatise on Government*, Adam Smith's *The Wealth of Nations*, Baron Montesquieu's *The Spirit of the Laws*, the Mayflower Compact, the essays of John Trenchard and Thomas Gordon which are known as *Cato's Letters*, the Declaration of Independence, the debates in the Constitutional Convention of 1787, the *Federalist Papers*, the United States Constitution, the Bill of Rights, St. George Tucker's Americanized version of Blackstone's Commentaries (*Tucker's Blackstone*), Joseph Story's *Commentaries on the Constitution*, the writings and speeches of American leaders during the revolutionary and early national periods, and the writings and speeches of abolitionists and Republican leaders from the antebellum period through the end of Reconstruction.

13. Also central to the development of American law has been what Justice Oliver

5

American jurisprudence, most notably due process of law."[3]   The Magna Carta made no reference to either the Ten Commandments as a whole or any particular one of the Commandments.  While not guaranteeing religious freedom or separation of church and state, the most signification scholar of Magna Carta notes that the language of the great charter "was general and elastic" and was used, as early as the 1660s was "invoked in a Maryland court as guaranteeing freedom of religion."[4]

## *The Colonial Era*

15.  The concessions granted by King John I in the Magna Carta were largely limited to the baronial families at the top of the rigidly structured feudal system.  In the early seventeenth century, the great English lawyer Sir Edward Coke began to use the Magna Carta to argue for an expansion of rights and liberties to all people in Britain.  Coke had served as Attorney General for Queen Elizabeth and as Chief Justice under King James I.  In 1628, as an elected member of Parliament, he asserted on the floor of the House of Commons that the Magna Carta "will have no sovereign."[5]   Most of the early colonial charters contained a clause asserting that the colonists would have the rights of natural born English citizens.  As a result of Coke's influence, by 1630 – the year of the founding of the Massachusetts Bay colony – these "rights" had begun to include the rights, privileges, and protections found in the Magna Carta.  When American colonists spoke of their "rights as Englishmen," whether in the early colonial period or later at the time of

--------

[3]Id., at 1.

[4]Id. at 55.

[5]May 17, 1628 in debate in House of Commons, as quoted in J.R. Tanner, *English Constitutional Conflicts of the Seventeenth Century, 1603-1689* (1928, reprint 1960) 63 (citing to John Rushworth, 1 *Historical Collections* (1682) 562).

7

the Revolution, they had in mind, among other things, the rights and privileges found in the Magna Carta; indeed, the colonists incorporated many of the concepts of the Magna Carta, such as trial by jury, into their own political and legal systems. Coke also influenced the development of colonial law, and ultimately American law, through his four-volume treatise, *Institutes of the Laws of England*, which was widely read by American lawyers throughout the colonial period. This essentially secular text helped shape American notions of liberty.

16. In the period following the Glorious Revolution of 1689 in Great Britain, American colonists expanded the notion of the "rights of Englishmen." Americans now argued that their rights included the protections set out in the English Bill of Rights, which Americans of the revolutionary period often called "the second Magna Carta." The English Parliament passed the Bill of Rights in 1689 and required that the incoming monarchs, King William III and Queen Mary II, assent to it. Parliament invited William and Mary to take the English throne in 1689 in the wake of the "Glorious Revolution," which overthrew King James II and brought an end in Britain to the concept of divine right of kings. The English Bill of Rights was designed to make the King and Queen subject to the laws of Parliament and to control their power in relation to their subjects. It addressed various issues, including the passage of laws; taxation; the keeping of a standing army; the right to petition the Monarch for grievances; the election of legislators; and freedom of speech for members of Parliament. The Bill of Rights prohibited excessive bail and fines and cruel and unusual punishment while guaranteeing the right to a jury trial to all criminal defendants. Like the Magna Carta, the 1689 English Bill of Rights was highly influential in the colonies; many of the colonies incorporated liberties guaranteed by the Magna Carta and later the 1689 English Bill of Rights directly into their statutes. The English Bill of Rights did not

8

mention any one of the Ten Commandments or the Ten Commandments as a whole.

In addition to the Bill of Rights, Parliament in this period also passed The Toleration Act of 1689. This Act granted political equality to most Protestant dissenters in England. It is important to understand, however, that the laws passed after the Glorious Revolution, especially the Toleration Act, were incomplete protections of liberty. Circumstances in America led to greater expansions of liberty and religious freedom in the century between the adoption of the English Bill of Rights and the ratification of the far more expansive American Bill of Rights in 1791. Indeed, American constitutional and legal developments from the late seventeenth century until the eve of the American Revolution in the late eighteenth century rejected the more restrictive English rules in favor of a more expansive notion of fundamental liberties and a decreased power of the state to regulate personal behavior, including religious belief and practice. Significantly, the framers of the United States Constitution rejected the anti-Catholicism of the English Bill of Rights. The American founders also rejected the English tradition of a government supported religion, known as an established church.

Equally important, the delegates to the Constitutional Convention rejected the exiting English rules that placed religious tests on office holding. The framers of the Constitution emphatically rejected this concept by declaring that there could be no religious test for officeholders under the U.S Constitution.[6] The first Congress, led by James Madison, continued this rejection of their English heritage of tying religion to the government, in the opening words of what became the First American to the Constitution, declaring that "Congress shall make no

---

[6]U.S. Constitution, Art. VI , Cl. 3.

9

law respecting the establishment of religion. . . ."[7]

17. The Mayflower Compact, an agreement written and signed by the settlers of the
Plymouth Colony in 1620, is often seen as the first act of self-government in the American
colonies. This document mentions both "God" and the "Christian Faith," but makes no mention
of the Ten Commandments. Although these settlers were extremely religious, they did not turn
to biblical sources when stating the premise for the creation of their new government. Rather,
the Plymouth settlers pledged themselves to create a "Civil Body Politic" and to "enact,
constitute and frame such just and equal Laws, Ordinances, Acts, Constitutions and Offices, from
time to time, as shall be thought most meet and convenient for the general Good of the Colony."
Significantly, they viewed law as something to be created by man, and not something handed
down from God to man.

18. The Bible was certainly one of the many sources that influenced the development of
early colonial law. However, this influence was characterized by enormous temporal and
regional variations. Four early New England colonies – Plymouth, Massachusetts Bay,
Connecticut, and New Haven – were far more influenced by the Bible than the other colonies.
The influence of biblical law was at its apex in the Plymouth, Massachusetts Bay, Connecticut
and New Haven colonies between 1620 and the 1680's. On the other end of the spectrum was
Rhode Island, which was founded by Rev. Roger Williams, who had been exiled from
Massachusetts Bay in part because of his refusal to accept the religious aspects of its legal
culture. Williams and the Rhode Island colony he created explicitly rejected biblically-based

---

[7]U.S Constitution, Amend. I.

10

codes.

19. The restoration of the Stewart monarchy led to the revocation of the Massachusetts Bay Colony's charter and the disappearance of the separate Plymouth colony. The Glorious Revolution in England (1688-89) led to a new royal charter for Massachusetts Bay in 1691, ending the "experiment" of this extremely religious colony. The new charter removed almost all references to biblical law and replaced them with common law practices and procedures. Although Massachusetts law still retained a few remnants of biblical law after 1691, the laws of the colony in this period, and later the state, were essentially secular, based primarily on English law, indigenous law, local custom, and new laws that reflected Holmes's observation that the "life of the law has been experience."[8] The change in Massachusetts law after 1691 can also be seen as rejection of the earlier reliance on the Bible as a source of law. The reaction of colonists to the excesses of the Salem Witch Trials – where nineteen people were hanged and one man pressed to death – for what were essentially alleged offences against prevailing religious beliefs – further spurred the movement against public and civil law based on religion and the Bible.

20. In the four Massachusetts and Connecticut colonies, as in all the other colonies, biblical law should not be confused with the Ten Commandments. The Ten Commandments are but two short passages (Exod. 20; Deut, 5) within the many books of the Bible. Even in those colonies most influenced by the Bible, the influence of the Ten Commandments themselves (as opposed to the influence of biblical law as a whole) was proportionately insignificant. At most the Ten Commandments could be linked to only a few civil and criminal statutes – and judicial

---

[8]Holmes, *supra* note 1, at 5..

11

decisions interpreting those statutes – that were, or might have been – patterned after the Decalogue's provisions. Establishing these links is not easy or simple. It cannot be said that the English settlers of the New World would not have enacted these statutes absent the Ten Commandments. Laws punishing theft, illegal killing, and perjury, for example, are found in virtually every culture known to mankind (see ¶ 53 below), and were deeply ingrained in the laws of pre-Christian England as well as in the English common law. Thus, for example, it is not possible to argue that a law punishing theft in the one of the colonies was a result of the Ten Commandments. It is really quite impossible to find any culture that did not punish theft.

21. Those instances in which a biblical source existed for colonial statutes involved a small fraction of the laws as a whole (and the instances in which that source was the Ten Commandments were an even smaller subset of the laws). Vast areas of the law developed either wholly independently of the Bible (because the Bible was silent on these questions). Furthermore, as explained more fully below in ¶ 28, many areas of colonial and early American law developed in a fashion that was either antithetical to biblical teachings or totally irrelevant to them. Examples of this include the laws regulating indentured servants, agricultural inspection (especially tobacco in Virginia and Maryland), slaves, inheritance, wages and prices, the use of water (riparian law), land ownership (currently known as real estate law), taxation, relations with the Indians, trade, and the process of making laws and electing governors and legislative bodies. Most significantly, the very way in which the colonists created new law – through the legislation of popular elected assemblies and legislatures – runs counter the process in the Bible, through which the law was promulgated by the God of the Israelites.

22. Attached to this Report as Exhibit D are lists setting forth all of the codes or laws

12

passed by each of the colonies in their early years, created or taken from *The Colony Laws of North America Series* (ed. John D. Cushing). These codebooks demonstrate that only a small percentage of colonial statutes were religiously-based, and an even smaller fraction emanated from the Ten Commandments.

23. The early laws of Virginia illustrate the relative unimportance of the Bible and the Ten Commandments to the development of colonial law. I have used the laws of this colony because Virginia was, from its founding in 1607 until the Revolution, the largest, richest, most influential, and most important colony. In examining these statutes it must be remembered that Virginia, like most of the other colonies, had an established church, a practice that came to an end in most places in the decade after the end of the American Revolution. For this reason, the statute books of Virginia and most other colonies include various acts regulating the established church of the colony. Similarly, laws regulating ministers were common, because ministers were in effect civil servants, supported by tax dollars, and accountable, not only to their own ecclesiastical authorities, but also the legislature. Thus, in looking at the Virginia statutes it is important to understand the distinction between laws regulating the church or ministers and laws that might have reflected an intention to codify the Ten Commandments or even Biblical law more generally. As the analysis below will show, the Virginia legislature – the House of Burgesses – passed many laws that concerned the church as a public institution and the clergy as those officiating in that public institution, but relatively few laws that were connected with either the Ten Commandments or biblical law in general.

The first recorded laws passed by Virginia's House of Burgesses are from 1623-24, when the legislature passed thirty-five separate laws. Seven of these related to the established church

13

(one calling for the establishment of places "to meete for the worship of God"; another imposing a fine on anyone missing Sunday church services, but not otherwise requiring observance of the Sabbath; one regulating church attendance; another mandating that "the canons in England" be applied in Virginia "as neere as may be"; another limiting the number of religious holidays to be observed "by reason of our necessities"; one addressing the obligations and payment of ministers; and one prohibiting swearing and drunkenness). With the exception of the statute banning swearing, none were connected to the Ten Commandments. None of the other twenty-eight statutes dealt with the church or religious issues. Instead, they dealt with such issues as taxes, trade, military security, the night watch, the creation of courts, the price and storage of grain, and the regulation of movement within and outside the colony.[9]

24. If Virginia passed any statutes from 1624 through 1628 they have not survived. In the session of October 1629, the legislature passed nine acts, only one of which related to the Ten Commandments (requiring observance of the Sabbath), and only one other that had a relationship to the established church (pertaining to taxation to support ministers).

In the next session, ending in March 1630, the legislature passed nine acts. None of these touched on the Ten Commandments, and only one touched on the established church (requiring that ministers conform themselves according to the "canons of the church of England").

In the session of 1631-32, the legislature adopted sixty-eight separate laws, only three of which can reasonably be said to have anything to do with the Ten Commandments (one requiring ministers to teach children the Lord's Prayer, the catechism, and the Ten Commandments;

---

[9] 1 *The Statutes at Large; being A Collection of all the Laws of Virginia* (William Waller Hening, ed) (1823, reprint, 1969) 122-29 [hereinafter cited as Hening].

14

another prohibiting swearing; and another requiring church-wardens to report "common swearers, blasphemers, or drunkards," "adulterers or fornicators," those who "profane the saboth dayes," and neighbors engaged in "back bitinge"[10]). Another fifteen dealt with various aspects of the established church, such as church governance, ministers' salaries, the upkeep of church buildings, a requirement that fines paid by drunkards go to church-wardens, and a requirement that men attending church "beare armes."[11]

In sum, from the session of October 1629 to the end of the 1631-32 session only four of the eighty-six statutes passed by the Burgesses bore any relationship to the Ten Commandments. The vast bulk of the laws passed in this period dealt with regulating the government, the defense of the colony, animal production, trade, the Indians, servants, taxes, marriage, the failure of Frenchmen in the colony to successfully grow grapevines, ocean traffic, and tobacco.[12]

25. In the September 1632 session, the legislature passed sixty-one laws, only five of which are even arguably related to the Ten Commandments (one requiring Sunday church services; another restating the requirement that ministers teach the Ten Commandments, the Lord's Prayer, and catechism to children; another restating church-wardens' obligation to report instances of adultery and blasphemy; and two more punishing drunkenness and swearing).

Sixteen others were related to the established church, but even many of these were inherently secular, such as laws regulating church government, prohibiting ministers from "spending theire tyme idelie ... playingge at dice, cards, or any other unlawfull game," and

---

[10]Id. at 144, 157, 156.

[11]Id. at 155-77.

[12]Id. at 138-177.

15

requiring men to attend church armed. In the February 1632/33[13] session, the Burgesses passed six acts, with none touching on the Ten Commandments, although three regulated ministers. And in the August 1633 session, the legislature passed sixteen acts (mostly economic regulations), with none dealing with the church or the Ten Commandments. Thus, all but five of the eighty-three acts passed between September 1632 and 1633 had nothing to do with the Ten Commandments, and fifty-nine had nothing at all to do with the established church or religion. Rather, the legislators focused their energies on such issues as regulating tobacco, banning the exportation of cattle, and preventing the colonists from having contact with Indians.[14]

26. Apparently, no statutes were passed, or none survived, from the years 1634 to 1638. In the 1639-1640 legislative session Virginia passed thirty-four new statutes, with none of them pertaining to the Ten Commandments. Five related to the established church and the colony's official religion (one regulating the burial of the dead; another regarding the payment of ministers; two establishing new parishes in the colony; and one requiring church-wardens to report offenses to the courts). The remaining twenty-nine were unrelated to the church or religion, pertaining to such matters as keeping hogs in pens at night, the public levy (taxation), the price of tobacco, the purchase of wine and liquor, and trade with the Indians.

27. Moving forward to a time when Virginia was a more mature colony, in 1655-56, the colony passed at least thirty-three statutes (and numerous additional orders and resolutions) dealing with such matters as corn, Irish servants, black servants, Indians, trade, the importation of ministers, criminal courts, the militia, the planting of mulberry trees, and taxes. One statute

---

[13]Under modern dating, this would be 1633.

[14]Id. 179-222.

16

concerned the migration of ministers and none of these laws had a connection to the Ten Commandments or the Bible.[15]

28. In addition to passing laws that had little or nothing to do with the Ten Commandments or biblical law, many colonies passed laws that ran counter to biblical law. Some illustrations of those areas in which colonial law departed from biblical teachings are as follows:

A. The Bible calls for a slave who has been maimed to be freed by his master. But, prior to independence, virtually none of the colonies imposed any prohibitions on the types of punishment that could be inflicted upon slaves. Indeed, Virginia, the largest slaveholding colony, actually prohibited masters from manumitting their slaves, while in colonial South Carolina such punishments as branding, maiming, and hamstringing were not uncommon. The early colonial slave codes did not criminalize the intentional taking of innocent slaves' lives, despite the fact that the Ten Commandments would have prohibited such killing. The Bible envisions an event known as a "jubilee" at which all existing slaves are freed, to take place every fifty years (Leviticus 25:10), but American law did not recognize any such event.

B. Under biblical law, divorce could only be initiated by the husband. In contrast, some colonies allowed women to initiate divorce. And although the Bible allows polygamy – and with regard to some relations, like the levirate marriage,[16] seems to mandate it – all of the colonies

---

[15] Id. at 393-428.

[16] "Biblical law requires the brother of a deceased, childless man to marry the widow, in order that the 'firstborn will succeed in the name of the dead brother, and his name will not be blotted out of Israel.'" Daniel Sinclair, "Levirate Marriage," in R.J. Zwi Werblowsky and Geoffrey Wigoder, eds., *Oxford Dictionary of the Jewish Religion* (New York: Oxford Univ. Press, 1997) 416-17.

17

prohibited it. While the Bible required a many to marry the childless widow of his deceased brother, no American jurisdiction ever contemplated, much less required, such an act.

C. Even the regulation of sexual morality departed from biblical teachings in that the New England colonies punished pre-marital and non-marital sex, although Mosaic law does not. The other colonies similarly proscribed such behavior, although enforcement was rare unless men refused (or could not) marry women who they impregnated. Furthermore, none of the colonies, apart from those in Massachusetts and Connecticut, punished adultery by death, though the Bible decrees this to be the punishment for this offence which is listed in the Ten Commandments. Indeed, some of the colonies never criminalized adultery, leaving treatment of this behavior to the civil arena.

D. The Bible envisions that the first born son would receive a "double portion" of inheritance (Deut. 21:16). Massachusetts Bay adopted this provision in the seventeenth century, but outside New England the rest of the colonies rejected it, and instead accepted the English rules of primogeniture with the eldest son inheriting all of his father's land. Under biblical law the wife does not inherit, or at least this is implied by the levirate marriage (Deut. 25:5 and following). Rather, the brother of the deceased husband inherits by marrying the wife if she is childless. In all of the colonies, wives could inherit outright through provisions in wills, and even without wills they were entitled to their dower rights. In no colony was a man, even if single, expected to marry his brother's widow.

E. Exodus 21, which follows the Ten Commandments, sets out the Biblical rules for how a man can sell his daughter into slavery (Exod. 21:7-11). No colony or state ever allowed a father to sell his legitimate child into slavery. Indeed, unlike Biblical law, with a few exceptions,

18

it was impossible in the American colonies it was impossible to sell anyone *into* slavery.[17] The

same chapter of Exodus provides a death penalty for "Whoever reviles his father or mother"

(Exod. 21:17). No American jurisdiction ever adopted such a penalty, which can be seen as the

Biblical enforcement of the provision of the Ten Commandments requiring people to "honor"

their father and mother.

## *The Eighteenth Century & the Founding Period*

29. The influence of biblical law faded rapidly in the United States during the Eighteenth

Century, due in part to the increasing religious heterogeneity, secularization of the colonies, and

the almost universal negative response to the excess of the Salem Witch Trials.[18] The trend in

American law during this time was to limit and minimize the effect of biblical law on American

legal codes. By this time, even the most ardent supporters of religion fully understood that

biblical law was inadequate and often antithetical to the needs of the American colonies. For

example, while several early New England colonial statutes criminalized disrespecting one's

---

[17]With a few exceptions, American law only allowed the enslavement of people born *into* slavery or those people imported into the colonies or state as slaves. The most important exception is the enslavement of Indians captured in battle in the seventeenth century. The other exceptions involve a few instances in the early colonial period where blacks were sentenced to lifetime servitude and laws of the late antebellum period that allowed the enslavement of free blacks for if they failed to leave a state after gaining their freedom or entered a slave state in violation of state law. In the years just before the Civil War a few southern states also allowed free blacks to voluntarily enslave themselves.

[18]In 1684, Governor Thomas Dongan of the New York reported to his superiors in London that: "Here bee not many of the Church of England; [a] few Roman Catholicks; abundance of Quakers preachers men and women especially; Singing Quakers, Ranting Quakers; Sabbatarians; Antisabbatarians; Some Anabaptists; some Independents; some Jews; in short of all opinions there are some, and the most part none at all." "Governor Dongan's Report on the State of the Province," 2 *Ecclesiastical Records of the State of New York* 879-90 (Albany: James B. Lyon, State Printer, 1901).

19

parents, including an early Massachusetts law making such behavior a capital offense, none of those statutes survived into modern American law – virtually all of them, if not all, were in fact off the books by the end of the eighteenth century.

30. The experiences of the Puritan colonies had illustrated the dangers of a religiously-based legal system. Massachusetts Bay became notorious for implementing laws that came to be seen as bizarre, anti-democratic, and indeed "un-American." The Salem Witch trials are only the most obvious examples of how the legal culture of seventeenth century Massachusetts *did not* set a pattern for law in the United States. In the seventeenth century, Massachusetts hanged four Quakers for preaching in the colony. Massachusetts also rejected notions of tolerance and democracy, expelling religious dissidents like Roger Williams and Anne Hutchinson. Capital crimes included adultery and bestiality. And, while no American legal systems endorse such behavior, neither do they endorse capital punishment for such offences.[19] Much of what became the central legal rights of the United States – due process of law; fair jury trials; the right to confront witness; the right against self-incrimination; the right to counsel; prohibitions on cruel and unusual punishments; limitations on capital offenses; freedom of speech; and most of all freedom of religion – is properly seen as a reaction against the undue influence of religion in the legal culture of the Puritan colonies, and not as an endorsement of that culture.

31. During and after the Revolution leaders of the new nation were also uncomfortable with some of the religious aspects of the non-Puritan colonies. For example, colonial Virginia, like England, and like most of the other colonies, had an established church and required public

---

[19] It is arguable that under the Supreme Court's decision in *Lawrence v. Texas*, 539 U.S. 558 (2003) any law prohibiting adultery would violate the U.S. Constitution.

20

support of the Church and its ministers. In the decade before the Revolution, Virginia authorities jailed nearly fifty Baptist ministers for unlicensed preaching and other infractions.[20]  Immediately after the Revolution, Virginia retained a religious establishment, shifting from the Anglican Church to the Episcopal Church. During this period the Virginia authorities vigorously persecuted Baptists. But others who were not Anglicans (and later Episcopalians) – Methodists, Presbyterians, Lutherans, Quakers, Jews, Catholics and members of other faiths and denominations – were also forced to support the official church of the state, just as they had in the colonial period. This establishment in Virginia lasted until 1787, when Virginia effectively disestablished its established church. In the era of the American Revolution and the early national period, most other states eliminated their endorsements of religion and their ties to an established church, and the founders enacted as part of the First Amendment a prohibition on establishments of religion at the federal level.

32. Many Revolutionary-era American lawyers and judges relied heavily on Blackstone's *Commentaries*, four volumes totaling more than 1,875 pages, written in 1765-1769. The *Commentaries* was the most important legal treatise in England and America for more than half a century after its publication. Blackstone does not appear to have included a single mention of the "Decalogue" or the "Ten Commandments" in his treatise. Blackstone understood that the established church in Britain had influenced the development of the law, but the system of law he described was secular and non-biblical. Thus, throughout the *Commentaries*, Blackstone's discussion of property law, criminal law, marital law, inheritance law, and the rights of persons

---

[20]Thomas J. Curry, *The First Freedoms: Church and State in America to the Passage of the First Amendment* (New York: Oxford University Press, 1986) 135.

has little or nothing to do with, and is often even at odds with, biblical law. For example, while restitution and proportionality were important biblical principles, in Georgian England the death penalty was often imposed for relatively minor property crimes.

33. Most of the political documents coming out of Great Britain and the colonies, from the time of the Magna Carta to the time of the American Revolution and sometimes beyond, included perfunctory, formalistic references to "God." In understanding this, it must be remembered that Great Britain, and a majority of the early American colonies, had established churches (England still does today). The established churches were arms of the State, used by the State to implement its policies. The appropriation of religious terminology was an effort to cloak the actions of government, or the political goals of the document's drafters, with holy authority. Thus, for example, the Magna Carta, the English Bill of Rights, and Blackstone's *Commentaries*, while essentially secular, have some references to God. The substance of these documents and volumes, however, does not pertain to God's word or biblical law, but to the nature of civil government, land tenure, and the like. Moreover, the United States government rejected this superficial connection to religion with the adoption of the national constitution and the Bill of Rights, and most states disestablished their churches and abolished their religious tests for officeholding in the years following the Revolution.

34. The practice of invoking divine authority had ebbed by the time of the founding. The Declaration of Independence includes references in the beginning to the "Laws of Nature and of Nature's God" a "Creator," and a reference in the end to "divine Providence," but these are non-biblical references. The primary author of the Declaration, Thomas Jefferson, was a deist, and his references to a supreme being are clearly not references to the God of the Bible. Rather, they

22

are invocations of enlightenment notions of natural rights. As a Deist Jefferson notes that some basic concepts – equality and the rights to "Life, Liberty, and the Pursuit of Happiness" – are "self-evident" and are supported by "the Laws of Nature and Nature's God." But, these are not references to the God of the Bible or to a Christian God. Rather, they are to a more generic, non-sectarian higher authority. Equally important, Jefferson appeals to notions of popular sovereignty and self-determination in the Declaration. He asserts the right of the colonists to create their own nation, through self-government. Jefferson does not invoke God's name, or even "nature's God" to justify this. Nor does he claim that the new nation is formed on the basis of God's law or any Biblical authority. Rather, he argues, in language that becomes the basis of the American political structure, that "Governments are instituted among Men, deriving their just Powers from the Consent of the Governed." Jefferson reaffirms that governments are created by people – not by God or by Kings with divine rights to rule – and thus "it is the Right of the People to alter or to abolish" a government if they wish. The Declaration is devoid of any references to biblical law or the Ten Commandments.

35. The central legal documents of the United States – the Constitution and the Bill of Rights – did not include even a perfunctory or formalistic reference to God. Rather than relying on divine authority, the Constitution is "ordained" by "the People of the United States." The foundation of the law of the United States thus emanates from the nature of representative government – what Jefferson called "the consent of the governed" – and needs no external or divine authority for its support. Thus, the United States Constitution is devoid of religious references, apart from banning religious tests for holding office,[21] and giving the President and

---

[21]U.S. Constitution, Art. VI, cl. 3. Although the United States Constitution barred

23

other officers the choice of an oath or affirmation when taking office.[22]   Indeed, these two

clauses illustrate how the American founding was simultaneously deeply secular, respectful of

religious diversity, and conscious of the needs to protect religious minorities. The ban on

religious tests for officeholding (U.S. Constitution, Art. VI, ¶ 3) made the United States unique

among western nations. Throughout Europe officeholding was tied to religious belief.

Americans believed that an oath of some kind was necessary to hold office, but declined to make

it a *religious* oath, allowing officeholds to "swear (or affirm)" their support of the Constitution

(U.S. Constitution, Art. II, Sec. 1, Cl. 8 and Art. VI, ¶ 3). By allowing officeholders to "affirm"

their allegiance to the Constitution, the farmers made sure that Quakers, Mennonites, and

members of other pietistic faiths could hold office. Significantly, the clause of the Constitution

did not require that the oath be on a Bible and the oath did not invoke "God." Presidents may say

"so help me God" when the take the oath of office, but in so doing they are adding something to

the oath that the Framers did not include in the Constitution.

36. The Founders did not see the law as biblically-based. Rather, the founding generation

viewed the common law as a repository of human experience, embodying concepts of justice,

---

religious tests for office-holding, most of the early state constitutions did not; most state
constitutions abolished religious tests for voting, but contained religious tests for office-holding.
Most of the state constitutional provisions imposing religious tests for holding office were
removed by the 1820's.

[22]U.S. Constitution, Art. II, Sec. 1, ¶ 8 and Art. VI, ¶ 3.

24

equity, and the rule of law, rather than representing divine principles. American colonists cited the Magna Carta, Coke's *Institutes*, Blackstone's *Commentaries*, and other English legal sources in their struggle against the Crown and Parliament. At the time of the American Revolution, the substantive provisions of the Magna Carta and the English Bill of Rights became central to the process of the drafting of the state constitutions and, later, the United States Constitution. The United States Constitution and the Bill of Rights incorporated many of the substantive provisions of both documents, sometimes word-for-word. The Magna Carta and the English Bill of Rights are generally considered by historians and legal scholars to be precursors to the Declaration of Independence, the United States Constitution, and the American Bill of Rights.

37. The founding generation was also heavily influenced by the works of Enlightenment thinkers, principally John Locke's *Second Treatise on Government,* published in 1690, and Charles Louis de Secondat, Baron de Montesquieu, whose *Spirit of the Laws* was published in 1748. The founders were also influenced by the works of the radical whig philosophers, like John Trenchard and Thomas Gordon, the authors of *Cato's Letters*, which were written between 1720 and 1723. Trenchard and Gordon were strong advocates of freedom of expression and government accountability, and spoke out against corruption in the government and the Anglican Church. The founding generation also read, absorbed, and applied the writings of the Scottish Enlightenment, including those of Adam Smith, David Hume, and Francis Hutchinson.

25

38. Locke's political writings refuted the doctrine of the divine and absolute right of the monarch, and established a theory that reconciles the liberty of the citizen with political order. The thrust of his work was to describe the way in which civil society must organize itself. In his view, civil society originates when men agree to a "social contract" by which they delegate to government the responsibility to create an ordered society. Locke advocated that the purpose of government should be to protect life, liberty and property, and that the best way to do this is through a system in which government is established by the consent of the governed. Thus, Locke argued that the powers of government should be limited, and that the power to change the rules of society should remain in the hands of the governed. Locke's theories stand in sharp contrast to the notion of government in the Bible, which is based on the concept that God is the lawgiver and that the people should follow the law of God as implemented by unelected judges, kings, and religious leaders. Americans accepted and implemented Locke's theories during and after the Revolution. Jefferson succinctly described the moral foundation of American law in Lockean terms, declaring in the Declaration of Independence that "Governments are instituted among Men, deriving their just Powers from the Consent of the Governed."

39. Thus, Locke's political theories – and the philosophical and moral foundation of American constitutional democracy – were not rooted in the Ten Commandments. Locke himself noted in his famous and extremely influential *Letter Concerning Toleration* that "the care of souls is not committed to the civil magistrate," and thus the government should not be in the business of implementing religious law. Locke argued that "the magistrate's power extends not to the establishing of any articles of faith, or forms of worship, by the force of his laws." Rather, the job of the Magistrate was to secure a civil state through the passage and

26

implementation of law. Locke further argued that a modern, self-governing state was not

obligated to the "the law of Moses," which includes the Ten Commandments, because the law of

Moses was only "given" to the ancient Israelites. Implicit here was the notion that law derived

its authority from the law maker, or law giver, and that in a civil society, that power belonged to

the people. Jefferson would apply the logic of this in the Declaration of Independence, noting

that governments are "instituted among Men, deriving" its "just Powers from the Consent of the

Governed." Jefferson's application of Locke illustrates how Locke set the Anglo-American

world, and especially the colonists and the revolutionaries of 1775, on a road towards toleration

and secularization. The Founders took to heart Locke's assertion that "the business of laws is not

to provide for the truth of opinions, but for the safety and security of the commonwealth and of

every particular man's goods and person."[23]

40. Baron Montesquieu was a nobleman and a judge in a French court. His *Spirit of the*

*Laws* (1748) studied the relationship between human laws and a country's government, climate,

customs, and religion. He declared himself in favor of separating the executive, legislative and

judicial powers; condemned slavery and torture; and advocated gentler treatment of criminals,

toleration in religious belief, and freedom of worship. Although he addressed at length the

relationship between government and religion, he did so without any emphasis on the Ten

Commandments or Biblical law in general. In *The Spirit of the Laws*, Montesquieu argued that

"it is an important maxim that we ought to be very circumspect in the prosecution of witchcraft

---

[23]John Locke, *A Letter on Toleration* 115-17, 123 (Raymond Klibansky, ed.) (Clarendon
Press, 1968).

27

or heresy."[24]  This of course argues against following the Ten Commandments, which prohibit

heresy as well as other Biblical laws, such as the one declaring that you should not "suffer a

witch to live" (Exod. 22:18).  The rejection of God created laws is consistent with Montesquieu's

notion that "Human laws, made to direct the will, ought to give precepts, and not counsels;

religion, made to influence the heart, should give many counsels and few precepts."[25]  The

implication is clear, as the Founders understood, that the needs of religions were different from

the state and the two should be separate.  A body of religiously based rules, like the Ten

Commandments, belonged to the churches and the clergy, in Montesquieu's mind, not to the state

or the civil magistrates.

41.  Locke and Montesquieu, along with the philosophers of the Scottish Enlightenment,

were widely ready by the Founding Fathers, and are generally considered by historians and other

scholars to be central to the ideology of the founding of the nation.  Their writings were highly

influential on the legal and political documents of the founding era, including the Declaration of

Independence, the United States Constitution, and the American Bill of Rights.

42.  The debates over the United States Constitution in the Philadelphia Convention of

1787 illustrate the minor role of both the Bible and the Ten Commandments in American law.  In

these wide-ranging debates, the Founders mentioned Roman law, European Continental law,

British law, and various other legal systems, but no delegate ever mentioned the Ten

Commandments or the Bible.  The only serious discussion of religion led to the clause

---

[24]*The Spirit of the Laws* (1748) quoted in Philip B. Kurland and Ralph Lernder, *The Founders's Constitution* (Chicago: University of Chicago Press, 1987) 5:56.

[25]Id. at 57.

28

prohibiting religious tests for office-holding.

43. Indeed, many of the delegates to the Philadelphia Convention expressed the view that religion should be left to the private sphere. James Madison noted in one debate that "Religion itself may become a motive to persecution & oppression. – These observations are verified by the Histories of every Country antient & modern."[26] South Carolina's Charles Pinckney described "our true situation" as this: "a new extensive Country containing within itself the materials for forming a Government capable of extending to its citizens all the blessings of civil & religious liberty – capable of making them happy at home."[27] Similarly, George Read of Delaware declared, in a debate over the power of Congress that "the Legislature ought not to be too much shackled. It would make the Constitution like Religious Creeds, embarrassing to those bound to conform to them & more likely to produce dissatisfaction and Scism, than harmony and union."[28] These statements illustrate how the framers believed that minimizing the connection between religious law and civil law was integral to American liberty. Benjamin Franklin's famous final speech at the Convention further supports this analysis, as he used religious beliefs to illustrate his skepticism of those who claim to have a monopoly on truth. Franklin told the delegates:

> I confess that there are several parts of this constitution which I do not at present approve, but I am not sure I shall never approve them: For having lived long, I have experienced many instances of being obliged by better information or fuller consideration, to change opinions even on important subjects, which I once thought right, but found to be otherwise. It is therefore that the older I grow, the more apt I am to doubt my own judgment, and to pay more respect to the judgment of others. Most men indeed as well as most sects in Religion, think

---

[26] Max Farrand, 1 *The Records of the Federal Convention of 1787* (New Haven: Yale University Press, 1966) 135. [Hereinafter cited as Farrand.]

[27] 1 Farrand 402.

[28] 1 Farrand 582.

29

themselves in possession of all truth, and that whereever others differ from them it is so far error. Steele, a Protestant in a Dedication tells the Pope, that the only difference between our Churches in their opinions of the certainty of their doctrines is, the Church of Rome is infallible and the Church of England is never in the wrong. But though many private persons think almost as highly of their own infallibility as of that of their sect, few express it so naturally as a certain french lady, who in a dispute with her sister, said "I don't know how it happens, Sister but I meet with no body but myself, that's always in the right"-- *Il n'y a que moi qui a toujours raison.* "[29]

44. In the years immediately following the writing of the Constitution political and legal developments were highly influenced by the writings of James Madison, Alexander Hamilton, and John Jay in the *Federalist Papers*. These essays, written to explain the Constitution to the voters during the ratification process, are generally considered to be among the most important, if not the most important, discussions of the meaning of the United States Constitution at the time of ratification. The words "bible," "scripture," and "Ten Commandments" do not appear in any of the essays that make up the Federalist papers.[30] Clearly, the three authors saw no connection between either the Ten Commandments or the Bible and the Constitution they were defending. The authors of the *Federalist Papers* referred to the gods and religions of the ancient world in a few places and once to "the transcendent law of nature and of nature's God" (*Federalist* 43), but otherwise they never mention God. The reference to "nature's God" is suggestive of deist views similar to those of Jefferson, rather than to the God of the Old Testament, where the Ten Commandments are found. There are a few references to religion in the *Federalist Papers*, almost always to denounce intolerance and the mixing of church and state. In *Federalist* 10

---

[29]2 Farrand 641-42.

[30]This is based on a word search of *The Federalist Papers*, on the Thomas Databases, of the Library of Congress, at "www.thomas.loc.gov".

30

Madison famously pointed out, "A zeal for different opinions concerning religion, concerning government, and many other points, as well of speculation as of practice" has historically "divided mankind into parties, inflamed them with mutual animosity, and rendered them much more disposed to vex and oppress each other than to co-operate for their common good. So strong is this propensity of mankind to fall into mutual animosities, that where no substantial occasion presents itself, the most frivolous and fanciful distinctions have been sufficient to kindle their unfriendly passions and excite their most violent conflicts." In the first essay in the *Federalist Papers* Alexander Hamilton asserted that, "For in politics, as in religion, it is equally absurd to aim at making proselytes by fire and sword. Heresies in either can rarely be cured by persecution." Similarly, in *Federalist* 31, Hamilton declared that "those mysteries in religion, against which the batteries of infidelity have been so industriously leveled" are "incomprehensible to common-sense." Using examples of history to support the Constitution, *Federalist* 19 argued that in the Swiss Confederation "controversies on the subject of religion" had three times "kindled violent and bloody contests" that "severed the league." The implication of this point was that America was better off under a Constitution that effectively separated religious and political issues.

### *Post-Eighteenth Century*

45. Joseph Story published his *Commentaries on the Constitution of the United States* in 1833. Story was simultaneously a United States Supreme Court Justice and a Harvard law professor as well as the most prolific and best-known author of legal treatises in the first half of the nineteenth century in the United States. His *Commentaries*, considered the leading treatise on the United States Constitution, remained in print well past his death in 1845. Although he

31

noted the inter-relationship between law and religion in describing the history of the colonies, he generally did so critically. In his treatment of the history of the Revolution, the history of the adoption of the Constitution, or his lengthy commentary on the provisions of the Constitution, which made up the vast bulk of the three-volume publication, he placed no emphasis on religious influences. He never mentions the Ten Commandments in his treatise. His one mention of the Bible comes in his discussion of Freedom of the Press, (§ 1875), where he notes that some governments have regulated the printing of the Bible and its translation.

46. The developments that have taken place since the eighteenth century have further diluted religious influences on the law. The overwhelming majority of the statutory and common law that exists today developed with virtually no influence from the Ten Commandments. These areas of law include the law of corporations and business transactions; labor and employment law; zoning regulations; landlord-tenant law; securities law; riparian law; immigration law; tax law; environmental law; Federal Indian law; international human rights law; international business law; antitrust law; administrative law, bankruptcy; intellectual property law; civil rights law; estate planning & probate; women's rights law; education law; licensing and regulation of professions; copyright and patent; dram shop laws and liquor regulation; insurance law; traffic law; science and computer technology law; securities law; regulations regarding nudity and obscenity; criminal procedure including the rights to a jury trial and against self-incrimination; and criminal statutes prohibiting vagrancy, statutory rape, assault & battery, arson and property destruction, underage drinking, or the use of narcotics, and regulations of criminal procedure, including laws and decisions setting out the rules for searches and seizures, wiretaps, the interrogation of prisoners, and the rules regulating incarceration, punishment, and execution.

32

47. It is hard to find any aspect of contemporary American law that can be fully and directly traced to the Ten Commandments. Even Sunday closing laws are as much a result of calls by organized labor for a shorter workweek, as they are a representation of religious views. Significantly, at the height of the industrial revolution, many workers labored seven days a week in mines and factories. Sunday closing laws are one of many illustrations of Justice Holmes' observation that American law has changed over time in response to the experiences and controversies unique to America's history.

### Other Legal Influences

48. Legal history is replete with great lawgivers, such as Menes, Hammurabi, Solomon, Lycurgus, Solon, Confucius, Draco, Octavian, Justinian, Mohamed, Charlemagne, St. Louis, Grotius, Lord Mansfield, Chief Justice John Marshall, Napoleon, and St. Thomas Aquinas – as well as many other lawgivers who were giants in their fields, but less well known today, such as Stephen Langdon, Glanville, Alfonso the Wise, and Popes Innocent III and Gregory IX. Some of these persons, and the legal codes that they propounded or with which they are associated, made contributions, which, in varying degrees, have affected American law. Other legal scholars and philosophers, such as Ceasar marchese de Beccaria and Jean Jacques Rousseau, have also affected the development of American law.

49. Roman law, and its modern incarnation as "civil law," affected the development of American law in a variety of ways. In the early colonial period, Virginia, and later other colonies, specifically rejected common law rules on personal status, which held that a child gained status through the father. Instead, in 1662 the Virginia House of Burgesses adopted the Roman law rule for slaves, declaring that the children of African-American women would follow

33

the status of the mother. If the mother was a slave, the child would be a slave, no matter what the status or race of the father. This rule also allowed the colony to ignore its prohibitions on adultery when the act involved a slave woman, because there would be no investigation of the father of a child born to a slave woman.[31]  Similarly, under this law, men who fathered illegitimate children with slaves could avoid bastardy prosecutions, because the colonial government was unconcerned with the paternity of slave children.  In the antebellum period the Georgia Supreme Court used Roman law to conclude that the murder of a slave was not a crime.[32]

50.  Roman law also affected legal theory and legal education.  In 1829, Harvard added Roman law to its new law school curriculum.  Leaders of the Massachusetts bench and teachers at Harvard, like Joseph Story, John Pickering, and Simon Greenleaf, studied Roman and civil law and actively bought books in the field, and "used Roman and civilian principles in their legal work, and wrote critically of the subject."[33]  Chancellor James Kent of New York was also interested in Roman law and found it useful in developing his notions of American law. Similarly, in South Carolina the legal theorists Thomas Cooper, Francis Lieber, Hugh Swinton Legare, and James Murdock Walker wrote about Roman law.  Lieber is especially important in this regard because he later developed many of the modern laws or rules of warfare in his work for the Lincoln administration during the Civil War.  He drew on Roman law as well as European

---

[31]"Negro womens children to serve according to the condition of the mother," 2 Hening 170 (1662).

[32]Neal v. Farmer, 9 Ga. 555 (1851).

[33]Michael Hoeflich, "Relationships Among Roman Law, Common Law, and Modern Civil Law: Roman Law in American Legal Culture," 66 Tulane L. Rev. 1723 (1992), at 1730.

34

civil law for his sources.

51. Roman law worked its way into much of American civil law as the United States expanded into land previously held by France and Spain. In Louisiana, concepts of property ownership, the status of children, and the rights of heirs were deeply affected by Roman law. For example, unlike the common law jurisdictions, in Louisiana, parents could not disinherit their children without good cause. Louisiana also adopted the Roman law concept of redhibition, which allowed purchasers to return defective merchandise. The law of redhibition rejected the concept of caveat emptor adopted for the law of sales in most states.

52. In addition to Roman law, Americans borrowed other continental European legal sources. The best example of this is the concept of "community property" in marriage found throughout the American Southwest, from Louisiana to California. This legal concept was brought over from Spain, and apparently had its roots in the law of Goths. On a more national scale, American judges and legal commentators relied on the theories of continental jurists, trained in the Roman tradition, for our jurisprudence on conflict-of-laws. This was a vital area of law for the United States because, as a federal republic, jurists had to balance the laws of numerous jurisdictions. Joseph Story's *Commentaries on the Conflict of Laws* (1834) relied heavily on the writings of the important Dutch civilian Ulrich Huber. Story also read the works of Hugo Grotius, Samuel Freiherr Baron von Puffendorf, and Emerich de Vattel. In sum, Roman law, continental civil law, and the concepts of international law, conflicts of law, and the law of nations all affected the development of American law from the colonial period through the second half of the nineteenth century. These sources were, of course, non-biblical and non-religious.

35

53. Many of the rules set forth in the Ten Commandments also appear in other legal codes. Indeed, prohibitions against killing, theft, perjury, and adultery are virtually universal in human society, and were in place in societies that existed before the advent of Judaism and Christianity, as well as in later societies that were influenced minimally or not at all by Judaism and Christianity. The Code of Hammurabi, the earliest compilation of Babylonian law (*circa* 2200 B.C.), predated Mosaic law by one thousand years but prohibited murder, adultery, stealing, and bearing false witness. The Romans developed rules punishing murder, theft, adultery, and perjury independently of whatever Jewish law they may have encountered. Long before Christianity brought the Ten Commandments to the Germanic tribes of central Europe, or to the Celtic peoples of Britain, these societies too had adopted similar laws. Native Americans punished murder and theft, as did the cultures of China and India. Yet these societies had no knowledge of the Ten Commandments or the Bible. Indeed, it would be almost impossible to find a culture that did not punish all or most of these forms of behavior, and almost all of these cultures developed these rules without any knowledge of the Ten Commandments or the Bible.

### The Sources of Law in Historical Perspective

54. It would be impossible to describe in this Report all the sources that have influenced American law. In the remaining paragraphs of this section of my Report, I provide a summary of the principal sources that impacted the main bodies of American law.

55. The Ten Commandments represent a tiny slice of the heritage of American law. No respected scholar of legal history would assert that the Ten Commandments have played a dominant or major role, or even a very significant role, in the development of American law as a whole.

36

56. Far more influential than the Ten Commandments on the early American legal system was the heritage of English common and statutory law, including the Magna Carta, the writing of Edward Coke, the English Bill of Rights, and late in the colonial period the writings of Blackstone.

57. Our constitutional order owes far more to the great English lawyers of the seventeenth century like Sir Edward Coke and John Selden, and their understanding of Magna Carta, as well as to the ideas of John Locke, Adam Smith, and other Enlightenment philosophers, than to the Ten Commandments or any biblical source. This was obvious to the delegates at the Constitutional Convention, who never once mentioned the Bible or the Ten Commandments in debate, but often referred to these and similar sources. It was the thoughts of early American leaders, such as Madison's and Hamilton's writings in the *Federalist Papers* and Story's *Commentaries on the Constitution*, rather than any biblical sources, that had a major effect on the post-1787 development of America's political and legal system.

58. Similarly, the cornerstone principles of our criminal law – such as individualized responsibility, the presumption of innocence, and gradualized, individually tailored, and humane punishment – come not from the Ten Commandments, but from the works of Jeremy Bentham, James FitzJames, Cesare marchese de Beccaria, Immanuel Kant, and the English penal reformers of the late eighteenth and early nineteenth centuries.

59. Our basic notions of real property are derived from feudal concepts of land tenure as first set out and modified by Littleton and the great English jurists Edward Coke and William Blackstone. They were further modified to fit the context of the United States by such Americans as Thomas Jefferson, Joseph Story, and Chief Justice John Marshall. It would be

37

virtually impossible to find anything in this area of law – which has been central to the Anglo-American legal experience – that comes from the Ten Commandments.

60. Even those areas of law which seem to be most connected to religion – equity and chancery – owe little if anything to Ten Commandments but are derived from the English monarchs of the late fourteenth and early fifteenth centuries, who desired to do justice for individuals whose claims were precluded by the rigidity of the common law writ system.

61. International law, including the law merchant, admiralty law, and modern conflicts-of-laws doctrine, comes from such writers as the Dutch jurists Hugo Grotius and Ulrich Huber, the Spaniards Tomás Luis de Victoria and Francisco Suárez, John Selden of England, Francis Lieber, who was trained in Germany and worked in the United States, and of course Justice Joseph Story.

62. American civil liberties – including rights of free speech and freedom of religion – have no roots in the Ten Commandments, but are in fact antithetical to portions of the Ten Commandments. These ideas, which have been central to American law, emerged from the writing and legal practices of such lawyers and philosophers as Edward Coke, John Selden, John Locke, and John Stuart Mill in Great Britain, and Roger Williams, James Alexander (who represented John Peter Zenger), James Madison, Thomas Jefferson, Justice Oliver Wendell Holmes, Jr., Justice Louis D. Brandeis, and Justice Hugo Black. Finally, modern notions of equal protection begin, not with the Ten Commandments, but with Lord Mansfield's decision in *Somerset v. Stewart* (1772), which freed a slave brought to England, and developed through the ideas of such people as Wendell Phillips, Frederick Douglass, Elizabeth Cady Stanton, Congressman John Bingham, and Justice John Marshall Harlan. They were later refined and

38

expanded through the civil rights work of lawyers and non-lawyers, such as Ida B. Wells-Barnett, Charles Hamilton Houston, Thurgood Marshall, Pauli Murray, Rev. Martin Luther King, Jr., as well as scores of other men and women who fought racial equality and gender equality in the Twentieth Century.

63.  The claim that the Ten Commandments is a foundational document is not supported by the Supreme Court's jurisprudence. A Lexis search of Supreme Court opinions reveals that the term "Ten Commandments" has been used in only 25 cases in the entire history of the Court.[34] In none of these cases does the Court use the Ten Commandments as legal authority. A large number of the cases using the term "Ten Commandments" contain a reference to *Stone v. Graham*, 449 U.S. 39 (1980), and/or other cases involving the posting of the Ten Commandments. It is worth recalling that in *Stone v. Graham* the Court struck down a statute requiring the posting of the Ten Commandments in public schools. The Court subsequently applied the logic of this case to strike down the posting of the Ten Commandments in county courthouses in *McCrery County v. ACLU*, 125 S. Ct. 2722; 162 L. Ed. 2d 729 (2005). The closest any Justice comes to using the Ten Commandments for validation of a conclusion is in footnote 2 of Justice Potter Stewart's dissent in *Griswold v. Connecticut,* 381 U.S. 479 (1965). There Justice Stewart noted, "To be sure, the injunction contained in the Connecticut statute coincides with the doctrine of certain religious faiths. But if that were enough to invalidate a law under the provisions of the First Amendment relating to religion, then most criminal laws would

---

[34]The term actually comes up 26 times, but in one case, *Fay v. New York*, 32 U.S. 261 (1947) the reference is not to the Biblical commandments. There are also a smattering of cases which refer to one of the commandments, such as the "Fourth Commandment" or the "Third Commandment." See, Mitch*ell v. Helms*, 530 U.S. 793 (2000); *McGowan v. Maryland*, 366 U.S. 420 (1961).

39

be invalidated. See, e.g., the Ten Commandments. The Bible, Exodus 20:2-17 (King James)." This is at most, a recognition that some laws coincide with the doctrines of the Ten Commandments, and not a use of the Ten Commandments as a legal authority.

64. While the Supreme Court has never cited to the Ten Commandments as authority for law, or even as a source of law, it has cited many other sources mentioned in this Report. For example, there are thirty-eight Supreme Court citations to the Federalist Papers. Many of these citations use the *Federalist Papers* as an authority for a legal proposition or to support the Justice's legal analysis. For example in *United States v. Locke*, 529 U.S.89 (2000), Justice Kennedy wrote, "The authority of Congress to regulate interstate navigation, without embarrassment from intervention of the separate States and resulting difficulties with foreign nations, was cited in the Federalist Papers as one of the reasons for adopting the Constitution. *E.g.*, The Federalist Nos. 44, 12, 64." (529 U.S. at 99.) Even more recently, in *Cook v. Gralike*, 531 U.S. 510, 528 (2001), Justice Kennedy favorably quoted an earlier use of the *Federalist Papers* as a source for his decision: "As noted in the concurring opinion in *Thornton*, 'nothing in the Constitution or The Federalist Papers . . . supports the idea of state interference with the most basic relation between the National Government and its citizens, the selection of legislative representatives.'" Here he cited to *U.S. Term Limits v. Thornton*, 514 U.S. 779, 842 (1995). Significantly, the *Federalist Papers* have been cited as authority in some of our most important recent Supreme Court decision, including *Clinton v. New York*, 524 U.S. 417, 450 (1998); *Seminole Tribe v. Florida*, 517 U.S. 70, 92 (1996); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 842 (1995); and *United States v. Lopez*, 514 U.S. 549, 577 (1995).

40

65. The Court has also relied on other historical sources. The Supreme Court has cited the Declaration of Independence more than 200 times. In his dissent in *McConnell v. FEC,* 124 S. Ct. 619, 724 (2003), Justice Scalia cited the Declaration of Independence to bolster his interpretation of the First Amendment. Similarly, in *Grutter v. Bollinger*, 539 U.S. 306, 364 (2203), Justice Thomas cited the Declaration to argue that affirmative action violates the fundamental principle of equality set out in the Declaration. These citations illustrate that the Supreme Court views the Declaration of Independence as a foundational document for our legal system and our Constitutional order.

There are at least forty-eight cases citing to or quoting President Abraham Lincoln (this excludes references to things like "Fort Abraham Lincoln" or the "Abraham Lincoln Life Insurance Company). Many quote or cite to Lincoln favorably as a legitimate interpreter of American law. The Court has cited or referred to Thomas Jefferson in at least 175 cases (again, this number does not include references to the use of Jefferson's name, such as in Thomas Jefferson University.) There are over 350 cases citing to Blackstone's *Commentaries*, many using Blackstone as an authority for our law. The Court has also cited the great English jurist, Chief Justice Lord Mansfield in more than 325 cases. The Court has cited the Bill of Rights as a document in more than one thousand cases, which suggests how important that document is to the development of our legal culture. There are about 200 cases that cite the Magna Carta [sometimes spelled Magna Charta].

These citations to *The Federalist Papers*, Thomas Jefferson, Magna Carta, Abraham Lincoln, the English Bill of Rights, Blackstone's *Commentaries*, the Bill of Rights, and the Declaration of Independence illustrate the most important historical sources for our legal system

41

and our constitutional development. Significantly, the Ten Commandments does not appear to have been ever used as a source or an authority by the highest court of the United States.

66. Monuments to the Ten Commandments thus do not represent an objective or accurate representation of the historical development of American law. Rather, to a great extent they fly in the face of the evolution of American law, which has been towards secular freedoms and liberties and towards greater religious diversity. Furthermore, as this report has demonstrated, the Founders of the United States did not turn to biblical sources in general, or the Ten Commandments in particular, as a source of law. Thus, there is no historical foundation for a claim that a monument such as the one in this case is rooted in our legal and political history. The framers of the Constitution and the Founders of the nation valued freedom of expression, freedom of thought, and freedom of belief and worship – they thus rejected as a source of law a set of precepts or "commandments" that would have limited the right of people to believe what they want and worship as the wish.

67. More importantly, the Founders valued political self-determination. In creating the Constitution they did not appeal to the Bible, God, or the Ten Commandments for authority, but rather, declared "We the people . . . do ordain and establish this Constitution for the United States of America." In asserting their right to "ordain" their own form of government, the Framers merely implemented what Jefferson had proclaimed to the world: that "Governments are instituted among Men, deriving their just Powers from the Consent of the Governed. . . ." Such a theory of law and government precluded relying on laws that were handed down to the people by *any* outside authority. By declaring in our Constitution that there would be no religious tests for national officeholding, the Framers rejected the religious tests inherent in the Ten

42

Commandments. The Framers clearly rejected religious orthodoxy in what was already a religiously diverse nation.

### *The Impossibility of Neutrality in Ten Commandments Monuments*

68. Ten Commandments monuments run counter to the tradition of rejecting an official church and an official orthodoxy because such monuments are inherently sectarian. Such monuments always prefer one religion, or one sect, or one faith, over another. To understand this we must look at the text of the Ten Commandments and the way various faiths have both translated this text and interpreted it.

69. The Ten Commandments are found in two parts of the Bible, Exodus 20 and in a slightly different form in Deuteronomy 5. Since the Exodus text is the most commonly used, and the one on which the monument in this case appears to rely, I will limit my discussion to that text. The very structure of the Commandments in Exodus 20, however, is contested. As with the rest of Exodus, the verses are numbered. However, even this numbering is contested. Jews consider the Ten Commandments to come from verses 2-14 of Exodus 20. Traditional Catholic and Protestant Bibles take the same text, but reorganize the verses, numbering them 2-17.[35] As I will note below, Jews, Catholics, and Protestants have different numbering systems for the Commandments themselves. Thus, a reference to the 1st Commandment, or the 9th Commandment, might direct a Jew to one line of Exodus 20, a Catholic to another, a Lutheran to another, and a non-Lutheran Protestant to a yet another verse. Jews and non-Lutheran Protestants

---

*In the Jewish numbering system verse 13 reads as follows: "You shall not murder. You shall not commit adultery. You shall not steal. You shall not bear false witness again your neighbor." W. Gunther Plaut, ed., *The Torah: A Modern Commentary* (New York: Union of Hebrew Congregations, 1981). Catholic and Protestant translations separate these four statements into four separate verses, thus increasing the total number of verses by three.

43

have the same 9th Commandment, but that is only the 8th Commandment for Catholics and Lutherans. I will discuss this more fully in ¶71, below.

Exodus was of course written in Hebrew, so any English presentation of the Ten Commandments requires a translation. Various translations of those versus are found in Exhibit E attached to this report. One translation of the verses begins with the affirmative statement, "I the LORD am your God who brought you out of the land of Egypt, the house of bondage."[36] Other Bibles translate this line in different ways.

A cursory examination of the lines of the subsequent text – verses 3 through 14 (or 3 through 17 in the Christian numbering system) reveals that there are at least 13, and perhaps more than 20, separate commandments in this part of Exodus 20.[37] There are many different translations of these verses, as Exhibit E illustrates. In addition, various faiths and sects have different numbering systems for the Ten Commandments. For example, as I note in ¶71, the First Commandment for Jews is not considered to be a commandment for most Protestants; and the Eighth Commandment for the Catholics and Lutherans is the Ninth Commandment for Jews and most Protestants.

My task here is not to argue that one translation is "correct" or "right" or superior to another. Nor is it my intention to argue that one numbering system is better, more correct, or superior to another. The first task would require immense specialized knowledge in Hebrew and

---

[36]This is the translation found in W. Gunther Plaut, ed., *The Torah: A Modern Commentary* (New York: Union of Hebrew Congregations, 1981). The King James Version, which is the basis of the monument in this case, uses this language: "I am the LORD thy God, which have brought thee out of the land of Egypt, out of the house of bondage."

[37]It is possible to count 26 specific commandments to do, or not do, certain things in these verses.

44

translation, which I do not possess. The second would be impossible, since the numbering systems themselves are matters of faith for various religions. My goal here is much more straightforward. I wish to make two rather simple points. First, I will demonstrate that *any* monument with a translation of the Ten Commandments would involve privileging one faith's translation over another. Thus, a Ten Commandments Monument on government property would in fact be an endorsement of one faith and a rejection of other faiths. In other words, there can be no "neutral" display of the Ten Commandments. Similarly, any monument which numbers the Commandments, or has them displayed in an order that implies a numbering system, would also be an endorsement of one faith's understanding of Exodus 20 and a simultaneous rejection of another faith's. Thus, when the government puts up a Ten Commandments monument it in effect endorses one or more faiths and rejects others. Therefore the monument at issue in this litigation cannot be seen as either nonpreferential or non-sectarian. It in effect, chooses sides.

70. Translations of the Bible vary. A sampling of them are found in Exhibit E. A brief examination of the some of the translations illustrates the impossibility of having a "neutral" Ten Commandments monument.

A: The most famous example of a translation problem is the first line of verse 13 of the Jewish translation, which is also verse 13 of the Protestant and Catholic translations. The *King James Version* of the Bible translates the verse as "Thou shalt not kill" which is on the display at issue in this case. "Thou shalt not kill" is also the translation in the older "Geneva Bible," preferred by the Puritans and the American Standard Edition (1901). The *Revised Standard Version* modernizes the "Thou" to "you," translating the line into "You shall not kill." *The*

45

*Reader's Digest Bible* also uses this translation as do American Catholic Bibles, such as *The New American Bible*, The *Jerusalem Bible* and *The New Catholic Bible* (Douay and Confraternity-Douay editions).[38] Jewish Bibles translate this line as "You shall not murder" (Plaut translation and *Tanakh* translation of Jewish Publication Society). This is also the translation of the *New Revised Standard Bible*. The *Living Bible*, which is used in many Protestant churches in the United States translates this as "You must not murder." This is also the translation used by the Jehovah's Witnesses's Bible, *The New World Translation of the Hebrew Scriptures* (Watchtower Bible and Tract Society, 1953). *Luther's Small Catechism* (St.Louis: Concordia Publishing House, 1986) also uses this language. The *International Children's Bible* uses a variation of this language: "You must not murder anyone."

For some denominations and faiths this difference in translation is significant. There is a clear legal difference between to "kill" and to "murder," and this difference has and continues to have important theological implications. Members of pacifist denominations and faiths, such as Quakers and Mennonites, base their refusal to serve in the military on the grounds that "killing" violates the Ten Commandments. Various faiths place differing significance on the translation of the word. The Plaut commentary notes that "only unauthorized homicide is meant by the text, and that the older translation 'You shall not kill' was too general and did not represent the more specific meaning" of the original Hebrew. "Hence the claims of pacifists, who would see this

---

[38] *The Holy Bible: A Translation from the Vulgate Latin in the Light of the Hebrew and Greek Originals* (New York: Sheed & Ward, 1956) translates this as "Thou shalt do no murder." This volume was "authorized by the Hierarchy of England and Wales and the Hierarchy of Scotland." This appears to be a reprint of *The Old Testament: Newly Translated from the Vulgate Latin by Msgr. Ronald Knox at the Request of His Eminence The Cardinal Archbishop of Westminster* (New York: Sheed and Ward, 1950).

46

command as a prohibition of all killing including that legitimized by the state during warfare cannot be sustained. The same is true for the abolition of capital punishment."[39]   The point here is not whether this commentary is correct or not, but rather to illustrate how the choosing of one word – kill – rather than another word – murder – indicates that the Haskell County monument has in effect endorsed one religious and theological tradition and rejected another. Thus, the choice of one word over the other cannot be deemed neutral or nonpreferential.

B: The first line of the Haskell monument reads, "Thou shalt have no other gods before me." This is the same as verse 3 of the *King James Version.*   It differs, however, from Jewish and Catholic translations. The Catholic *New American Bible* translates this line as "You shall not have other gods besides me." The Catholic *Jerusalem Bible* translates this line as "You shall have no other gods except me." *The New Catholic Bible* uses the following translation: "Thou shalt not have strange gods before me."[40] Jewish translations also differ. The *Tanakh* by the Jewish Publication Society (JPS), translates this as "You shall have no other gods besides Me." But the Plaut translation reads "you shall have no other gods beside Me." The difference between "beside" and "besides" is substantial, and of course neither agrees with the Haskell monument's term "before me." The Protestant *Living Bible* uses this language: "You may worship no other god than me." The Jehovah's Witnesses Bible states it as: "You must never have any other gods against my face." The wording in the *International Children's Bible* is:

---

[39] W. Gunther Plaut, ed., *The Torah: A Modern Commentary* (New York: Union of Hebrew Congregations, 1981) 557.

[40] *The Holy Bible: A Translation from the Vulgate Latin in the Light of the Hebrew and Greek Originals*, the official English Catholic Bible, uses this language: "Thou shalt not defy me by making other gods thy own."

47

"You must not have any other gods except me." *Luther's Small Catechism* is a simple: "You shall have no other gods."

The differences in these phrases are substantial and have important and interesting theological implications. But for our purposes it is clear that this line on the monument favors one translation of the Bible over others, and some faiths and denominations over others.

C: The second line of the monument, which is designated as the Second Commandment through the use of the Roman Numeral II, reads: "Thou shall not make unto thee any graven image. [sic]" This is the first clause of verse 4 of Exodus 20, in the *King James* translation. By incorrectly adding a period at the end of the line the monument might mislead a casual reader into believing this is the full sentence from the Bible, when it is not. The full sentence in the *King James Version* of the Bible reads: "Thou shalt not make unto thee any graven image, or any likeness of any thing that is in heaven above, or that is in the earth beneath, or that is in the water under the earth." Different religious faiths and traditions translate this line in substantially different ways. The Catholic *New American Bible* states: "You shall not carve idols for yourselves in the shape of anything in the sky above or on the earth below or in the waters beneath the earth." This text does not separate the first part of the clause from the second, as the *King James Version* does. Thus, while truncating the line may be consistent with some Protestant interpretations of Exodus 20:4, it would undermine the Catholic meaning. Moreover, the Catholic translation to "not carve idols" is substantively different than the monument translation not to make "any grave images." This also differs from the Jewish understanding of the original Hebrew. Both the Plaut and the JPS translations use this language: "You shall not make for yourself a sculptured image, or any likeness of what is in the heavens above, or on the earth

48

below, or in the waters under the earth." This again is different than the language on the monument. The *Living Bible* translates this as "You shall not make yourselves any idols: no images of animals, birds, or fish." This is of course a very different meaning, allowing for all sorts of art and sculpture (as would the Catholic translation) that the *King James Version* might not allow. The Jehovah's Witness translation is says "You must not make a carved image or a form like anything that is in the heavens above or that is on the earth underneath or that is in the waters under the earth." The *International Children's Bible* offers what appears to be a simple paraphrasing of what the Hebrew text might plausibly mean: "You must not make for yourselves any idols. Don't make something that looks like anything in the sky above or on the earth below or in the water below the land." However, this is different in meaning and substance from the monument. Indeed, the interpretation of this text, and the translation of this text, is fraught with theological implications. Whether a house of worship can have statues or even artistic representation of humans, living creatures, or even angels, would depend in part on how a faith translates and interprets this text. Again, I do not make any claims about whose translation is correct or not. My point is to underscore that the text on the Haskell County monument at issue in this case differs in important ways from the text used by various faiths.

Equally important, the Haskell County monument designates this line as being the Second Commandment. But, this is only true for Protestants. As I will note in ¶ 71, *infra*, Catholics, Jews, and Lutherans have a different numbering scheme from most Protestants. Thus, for Catholics and Lutherans, this language is part of the First Commandment. For Jews it is the second part of the second commandment, but not the first line of the second commandment. Thus, by designating this the Second Commandment, the Haskell County monument places in

49

effect endorses most Protestant denominations and in effect disrespects the religious traditions of Jews, Catholics, and Lutherans.

D: Line 3 of the monument – "Thou shalt not take the name of the Lord thy God in vain" – is the same text as Exodus 20:7 in the *King James Version* of the Bible. Other Bibles have a very different text. The Plaut and JPS Jewish translations offer this text: "You shall not swear falsely by the name of the LORD your God." The *Living Bible* translates this as: "You shall not use the name of Jehovah your God irreverently, nor use it to swear to a falsehood." The Jehovah's Witness text is: "You must not take up the name of Jehovah your God in a worthless way." The *International Children's Bible* simply states: "You must not use the name of the Lord your God thoughtlessly." Catholic translations for this verse are inconsistent. *The Jerusalem Bible*, translates it as "You shall not utter the name of Yahweh your God to misuse it," while the *New American Bible* uses the same translation as *the King James Version*. The authorized translation for English Catholics is "Thou shalt not take the name of the Lord thy God lightly on thy lips." As with other verses, religions, denominations, and various Bibles offer different texts with different meanings. This underscores the sectarian nature – the preferentialism – of the monument.

71. The numbering structure of the Commandments is complicated and confusing. The Haskell County Monument numbers each of its lines according to the traditional Protestant numbering system.[41] This is not the same numbering system used by Jews, Catholics, and Lutherans. For example, the First Commandment on the Haskell Monument "Thou shalt have no

---

"Orthodox Christians also have a slightly different organizational scheme for the Commandments.

50

other gods before me" is the Second Commandment for Jews and is only part of the First

Commandment for Catholics and Lutherans. The Second Commandment on the Haskell

Monument ("Thou shall not make unto thee any graven image") is not considered a separate

commandment by Jews, Catholics, or Lutherans. For Jews this line of Exodus is part of their

Second Commandment, but is not the first line of that commandment. For Catholics and

Lutherans, this line of Exodus is part of their First Commandment. Commandments III-X on the

Haskell Monument are the same for Jews and most Protestants, but this numbering system is not

the same for Lutherans or Catholics. For example, Commandment VII on the Haskell monument

("Thou shall not commit adultry [sic]"[42]) is the Sixth Commandment for Roman Catholics and

Lutherans.

What follows is a brief explanation of the number of the commandments. As I noted

above, the commandments are found in Exodus 20, verses 2-14 for Jews and 2-17 for Christians.

As I noted earlier, there are at least 13 separate admonitions in these verses to "do" something, or

"not" do something. Different faiths divide these verses in different ways.

A: The Jewish Ten Commandments.

The Plaut translation of the Bible provides the following explanation for the Jewish Ten

Commandments[43]:

> ...the division of the commandments themselves is not certain. There are altogether
> thirteen sentences in the accepted Jewish versions (seventeen in the Christian) but we
> cannot conclude from the text itself what comprises the first commandment, what the
> second, and so forth. For while there are thirteen mitzvot [commandments] to be found
> in the text, their allocation to ten commandments can be done in various ways. It is not

---

[42]The Haskell monument incorrectly spells the word "adultery" as "adultry."

[43] W. Gunther Plaut, ed., *The Torah: A Modern Commentary* (New York: Union of Hebrew Congregations, 1981) 534.

51

surprising, therefore, that there are different traditions in this respect. The prevailing Jewish division is as follows:

    1st commandment: "I am the Lord..." (verse 2); this may be considered a
                  preamble, implying the duty to believe in God;
    2nd commandment: "You shall have no other gods beside Me.
                  You shall not make for yourself a sculptured image..."
                  (verses 3-6);
    3rd commandment: "You shall not swear falsely..." (verse 7)
    4th commandment: "Remember the sabbath day..." (verses 8-11);
    5th commandment: "Honor your father and your mother" (verse 12);
    6th commandment: "You shall not murder" (verse 13);
    7th commandment: "You shall not commit adultery" (verse 13);
    8th commandment: "You shall not steal" (verse 13)
    9th commandment: "You shall not bear false witness..." (verse 13);
    10th commandment: "You shall not covet..." (verse 14).

B: Common (non-Lutheran) Protestant Ten Commandments

Most Christians do not consider verse 2 to be one of the Ten Commandments. Rather,

they consider it more of a preamble to the Ten Commandments. Thus, what is the second

commandment for Jews is the first commandment for Protestants and Catholics. Obviously this

requires the Protestants and Catholics to renumber some other commandment to get to ten.

Protestants and Catholics do this in different ways. The traditional Protestant numbering of the

verses (using the *King James Version*) looks like this:

    1st commandment: "You shalt have no other gods before me." (verse 3)
    2nd commandment "Thou shalt not make unto thee any graven image. . ."
                  (verses 4-6);
    3rd commandment: "Thou shalt not take the name of the LORD thy God in
                  vain...." (verse 7)
    4th commandment: "Remember the sabbath day..." (verses 8-11);
    5th commandment: "Honour thy father and thy mother" (verse 12);
    6th commandment: "Thou shalt not kill" (verse 13);
    7th commandment: "Thou shalt not commit adultery" (verse 14);
    8th commandment: "Thou shalt not steal" (verse 15)
    9th commandment: "Thou shalt not bear false witness against thy neighbour..."
                  (verse 16);
    10th commandment: "Thou shalt not covet..." (verse 17).

52

C: The Roman Catholic Ten Commandments

The Catholic ordering of the Commandments is not the same as the Protestant. The key

difference is in the First and Second Commandments and the Ninth and Tenth Commandments.

The Catholic Church does not have a separate prohibition on "graven images." Rather, what is

the second commandment for Protestants is subsumed in the first commandment for Catholics.

To get to "ten" Commandments the Catholic Church ten divides what is the Tenth

Commandment for Jews and Protestants into two separate Commandments, making it the Ninth

and the Tenth Commandment. Thus, the Catholic numbering and translation, based on the

Catholic Catechism and using the New American Bible translation, looks like this:

> 1st commandment: "I, the LORD, am your God, who brought you out of the land of Egypt, that place of slavery. You shall not have other gods besides me. You shall not carve idols for yourselves in the shape of anything in the sky above or on the earth below or in the waters beneath the earth; you shall not bow down before them or worship them. (verses 2-6)
>
> 2nd commandment: "You shall not take the name of the LORD, your God, in vain." (verse 7)
>
> 3rd commandment: "Remember to keep holy the sabbath day." (verses 8-11)
>
> 4th commandment: "Honor your father and your mother" (verse 12)
>
> 5th commandment: "You shall not kill." (verse 13)
>
> 6th commandment: "You shall not commit adultery" (verse 14);
>
> 7th commandment: "You shall not steal" (verse 15)
>
> 8th commandment: "You shall bear false witness against your neighbor" (verse 16)
>
> 9th commandment: "You shall not covet your neighbor's house. You shall not covet your neighbor's wife, nor his male or female slave, nor his ox or ass, . . . (verse 17);
>
> 10th commandment: "You shall not covet... anything else that belongs to him" (verse 17).

D: The Lutheran Ten Commandments

The Lutheran ordering of the Commandments has elements of both the non-Lutheran

Protestants and the Roman Catholics. Like the Catholics, the Lutherans do not have a separate

prohibition on "graven images." Rather, what is the second commandment for most other

Protestants is subsumed in the first commandment for Lutherans. To get to "ten"

Commandments, the Lutheran Church, like the Catholic Church, divides what is the Tenth

Commandment for Jews and other Protestants into two separate Commandments. However,

according to the Lutheran Catechism, this is done by splitting verse 17 into two separate

commandments. Thus, the Lutheran Ten Commandments, from Luther's Small Catechism, look

like this:

> 1st commandment: "You shall have no other gods."
> 2nd commandment: "You shall not misuse the name of the LORD, your God."
> 3rd commandment: "Remember the Sabbath by keeping it holy."
> 4th commandment: "Honor your father and your mother"
> 5th commandment: "You shall not murder."
> 6th commandment: "You shall not commit adultery"
> 7th commandment: "You shall not steal"
> 8th commandment: "You shall not give false testimony against your neighbor"
> 9th commandment: "You shall not covet your neighbor's house."
> 10th commandment: "You shall not covet your neighbor's wife, nor his manservant or his maidservant, or his ox or donkey, or anything that belongs to your neighbor."

72. The Monument in this case is clearly not neutral. It is neither non-sectarian nor non-

denominational. Nor can be seen as "non-preferential."

73. As I have noted throughout this portion of my report and declaration, I offer no

opinion on which, if any, of these numbering schemes or translations is the best, most correct, or

most true to the original Hebrew. I have no scholarly opinion on which is "right." My only

purpose here is to demonstrate that the monument at issue in this litigation offers a translation

that endorses one common Protestant translation (the King James Version) and the traditional

Protestant numbering scheme of the Ten Commandments. As such, the government of Haskell

County has established the Protestant Ten Commandments as the official Ten Commandments of

54

the County, and by extension declared that the traditional Protestant faith is the official faith of the County. Protestants who do not use the *King James Bible*, as well as Jews, Catholics, Lutherans, Jehovah's Witnesses and Orthodox Christians have in effect been told that their faiths are unacceptable to the government of Haskell County.

74. This monument is not only sectarian with respect to Christians and Jews. It is also sectarian in the eyes of the many Americans who are neither Christian nor Jewish. The Ten Commandments is not part of the liturgy or text of many Native American religions, as well as Islam, Hinduism, Buddhism, Taoism, other non-Western faiths, and non-theistic belief systems. By endorsing the Protestant Ten Commandments Haskell County sends a message of inclusiveness to Protestants, while in effect implying to others – Jews, Catholics, followers of Native American religions, Muslims, Hindus, Buddhists, Taoists and others – that they are outsiders, and that their religious values and beliefs have less value within the political culture of the nation.

the County, and by extension declared that the traditional Protestant faith is the official faith of the County. Protestants who do not use the *King James Bible*, as well as Jews, Catholics, Lutherans, Jehovah's Witnesses and Orthodox Christians have in effect been told that their faiths are unacceptable to the government of Haskell County.

74. This monument is not only sectarian with respect to Christians and Jews. It is also sectarian in the eyes of the many Americans who are neither Christian nor Jewish. The Ten Commandments is not part of the liturgy or text of many Native American religions, as well as Islam, Hinduism, Buddhism, Taoism, other non-Western faiths, and non-theistic belief systems. By endorsing the Protestant Ten Commandments Haskell County sends a message of inclusiveness to Protestants, while in effect implying to others – Jews, Catholics, followers of Native American religions, Muslims, Hindus, Buddhists, Taoists and others – that they are outsiders, and that their religious values and beliefs have less value within the political culture of the nation.

I declare under penalty of perjury that the foregoing is true and correct and that this Declaration

was executed on March $\underline{12}$, 2006, in Tulsa, Oklahoma

Dr. Paul Finkelman