# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

ANTHONY EID, an individual,

     Plaintiff,

v.

WAYNE STATE UNIVERSITY,
WAYNE STATE UNIVERSITY
SCHOOL OF MEDICINE,
NIKOLINA CAMAJ, MARGIT
CHADWELL, MATT JACKSON,
RICHARD S. BAKER, and R. DARIN ELLIS,
in their individual and official capacities,
jointly and severally,

     Defendants.

Case No. 2:20-cv-11718

Hon. Gershwin A. Drain
Mag. Judge David R. Grand

---

## PLAINTIFF'S RESPONSE BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES …………………………………………………..ii-iii

STATEMENT OF ISSUES PRESENTED ……………………………………iv

CONTROLLING AUTHORITY ..……………………………………………....v

FACTS ……………………………………………………………..…… 1

      PLAINTIFF MEETS JANE ROE……………………………………...…1

      PLAINTIFF'S ACCOUNTS ARE HACKED……………………………2

      ROE FILES COMPLAINT AND DEFENDANTS LAUNCH A WIDE-RANGING INVESTIGATION OF HIS BEHAVIOR……..………...……2

      ROE DISCUSSES COMPLAINT WITH DEFENDANT CAMAJ…....……5

      CAMAJ NOTIFIES PLAINTIFF OF COMPLAINT ………………………6

LEGAL STANDARD ………………………………………………..…14

ARGUMENT …………………………………………………………..15

      I.    WAYNE STATE UNIVERSITY AND THE INDIVIDUALLY NAMED DEFENDANTS ARE NOT AFFORDED THE PROTECTIONS OF SOVEREIGN IMMUNITY …..……………15

      II.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ..……………………………….………………16

           A.   DEFENDANTS EXPULSION OF PLAINTIFF FROM THE WSU MEDICAL SCHOOL CREATES A COGNIZABLE LIBERTY INTEREST……………………………………..…16

               1.   PLAINTIFF WAS DENIED PROPER NOTICE….…..17

               2.   PLAINTIFF WAS DENIED HIS CLEARLY ESTABLISHED RIGHT TO A FAIR HEARING.…………………………………….…...20

a. CHADWELL'S DIRECT INVOLVEMENT IN TAMPERING WITH THE PROFESSIONALISM HEARING. …………………………...……...…20

b. ROBICHAUD'S DIRECT INVOLVEMENT TO INFLUENCE THE PROFESSIONALISM HEARING AND PREJUDICE JACKSON'S CONDUCT OF THE HEARING…...………..…21

c. THE INTERIM GUIDELINES APPLY TO THE SCHOOL OF MEDICINE……..……………….23

d. THE CONDUCT AT ISSUE IN THE PROFESSIONALISM HEARING FOCUSED ON SEXUAL HARASSMENT AND CYBERSTALKING…………………………...24

e. BAKER VIOLATED PLAINTIFF'S CLEARLY ESTABLISHED RIGHT TO A LEGITIMATE APPELLATE PROCESS……………...……….28

III. PLAINTIFF WAS TREATED DIFFERENTLY ON THE BASIS OF SEX……...………………………………………………...…30

IV. WSU PROMISED PLAINTIFF A PREDICTABLE DISCIPLINARY PROCESS ………………………………………………...…...32

V. PLAINTIFF'S FAIR AND JUST TREATMENT CLAIM APPLIES TO SOM HEARINGS……...………………………………….……33

VI. PLAINTIFF'S EMOTIONAL DISTRESS CLAIM IS NOT BARRED BY GOVERNMENTAL IMMUNITY……………….……….……34

CONCLUSION …………………………………………………...…35

# TABLE OF AUTHORITIES

**Cases**

*Celotex Corp. v. Catrett,*
477 U.S. 317, 322 (1986) …………………………………………...……………14,15

*Hancock v. Dodson,*
958 F.2d 1367, 1374 (6th Cir. 1992) ……………….…………………………14,15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
475 U.S. 574, 587-88 (1986) …………………………………………………..15

*Monroe v. Pape,*
365 U.S. 167, 170-1 (1961) …………………………………………………………15

*Exparte Young,*
209 U.S. 123, 158-59 (1908) ……………………………………..……………15

*Mitchell v. Schroeder,*
2022 U.S. Dist. LEXIS 16172, *18 (W.D. Mich. 2022) ………………………...15,16

*Fryberger v. Univ. of Arkansas,*
889 F.3d 471, 475 (8th Cir. 2018) ...…………… …………………………………...16

*Cannon v. University of Chicago,*
441 U.S. 677, 717 (1979) ...…………….……… ……………………………………16

*Franks v. Kentucky Scho. For the Deaf,*
142 F.3d 360, 363 (6th Cir. 1998)…… ………………………………………………16

*Jaksa v. Regents of Univ. of Mich.,*
597 F.Supp. 1245, 1247 (E.D.Mich. 1984) ……………………….……………16

*Goss v. Lopez,*
419 U.S. 565, 579 (1975)………………………...……… …………………….………16

*Wisconsin v. Constantineau,*
400 U.S. 433, 437 (1971) ...…………….……….……… …………………………..16

*Board of Regents v. Roth,*
408 U.S. 564, (1972) ...……………...……..… …………………………………………16

*Doe v. Baum,*
903 F.3d 575 (6th Cir. 2018) ...…………….…… …………….....……..19, 20, 26

*Doe v. Cincinnati,*
872 F.3d 393 (6th Cir. 2017) ...……………... ……………….…………....19, 26

*Hassan v. Gonzales,*
403 F.3d 429, 436 (6th Cir. 2005)……………... …………………….………..……23

*Zaremba Equip, Inc v Harco Nat'l Ins Co,*
280 Mich App 16, 41; 761 NW2d 151 (2008)……………... ……………….....……33

*Ammend v BioPort, Inc.,*
322F.Supp. 2d 848, 857(W.D. Mich. 2004)…....………………………….………34

*Sudul v City of Hamtramck,*
221 Mich App 455, 458; 562 NW2d 478 (1997)………………………………….……34

## Constitutional Provisions

Mich. Const. 1963 Art. I, § 17……………………….…….…………………….………34

Mich. Const. 1963 Art. VIII, § 4.……………………...…………………….…….………34

## STATEMENT OF ISSUES PRESENTED

1. Are WSU and the individually named Defendants afforded the protections of Sovereign Immunity?

2. Is the University entitled to summary judgment on Plaintiff's Due Process claim?

3. Is the University entitled to summary judgment on Plaintiff's Title IX claim?

4. Is the University entitled to summary judgment on Plaintiff's promissory estoppel claim?

5. Does the Fair and Just Treatment clause of the Michigan Constitution apply to SOM Hearings?

6. Does governmental immunity bar Plaintiff's intentional infliction of emotional distress claim?

# CONTROLLING AUTHORITY

*Goss v. Lopez,*
419 U.S. 565, 579 (1975)……………………...……… …………………….………16

*Doe v. Baum,*
903 F.3d 575 (6th Cir. 2018) ...……………...…… ……………...……..19, 20, 26

*Ammend v BioPort, Inc.,*
322F.Supp. 2d 848, 857(W.D. Mich. 2004)…....…………………………….……34

*Sudul v City of Hamtramck,*
221 Mich App 455, 458; 562 NW2d 478 (1997).…………………………….……34

## FACTS

### *Plaintiff Meets Jane Roe*

1.    Plaintiff participated in a campus orientation event, *Festifall 2016*, prior to the start of the 2016 academic year where he met freshman student Jane Roe.[1] Plaintiff was working at the WSU Student Government table and as Student Body President talking to new students about how student government could help students. Roe approached the table and they introduced themselves. **Ex. 1**, *Eid Dep.*, at 94-94. During the short conversation with Plaintiff, Roe admitted she was nervous about starting college. *Id.* at 95.

2.    Plaintiff, in an effort to help Roe succeed at WSU, offered Roe access to digital textbooks and practice exam questions he had used years earlier for a class that Roe would be taking and that he still had on his iCloud account.[2] Due to the file size, Plaintiff allowed Roe to access his iCloud account on her computer which she had with her. Plaintiff had no in-person contact with Roe after the initial meeting, and his only contact with Roe was via text message or via social media. *Id.* at 113.

### *Plaintiff's Accounts are Hacked*

---

[1] Plaintiff's accuser, who the parties have continually referred to as Jane Roe and her true name is not relevant for the purposes of this Response.

[2] It was fairly common for Plaintiff to provide other students with study materials and at the computer breaches began he would do so using either Google Drive or a flash drive. *See* Eid Deposition Transcript, at 112.

3. Shortly after assisting Roe, Plaintiff noticed that multiple of his accounts, including his iCloud account, were repeatedly breached and accessed by an individual without his authorization. *Id.* at 230. Roe was the only person Plaintiff had given access to his iCloud account. *Id.* at 103-104. To resolve this unauthorized access of his accounts, Plaintiff contacted Roe on a number of occasions, limiting his contact to written communications coinciding with ongoing incidents of unauthorized account access occurring sporadically over the course of two years.

4. In August 2018, Plaintiff received information that his accounts had again been breached from an address in Colorado where Plaintiff believed Roe now lived. *Id.* at 115-117. Sometime approximately between August 6, 2018 and October 27, 2018, Plaintiff contacted Roe by text message to again attempt to get help in securing his computer. *Id.* at 117-119.

### Roe Files Complaint and Defendants Launch a Wide-Ranging Investigation of His Behavior

5. On October 29, 2018, Roe filed an online complaint against Plaintiff alleging online harassment over a two-year period under the guise of needing Roe's help to stop his computer from being hacked; that Plaintiff pretended to be Roe to her photographer as Roe to get copies of photographs taken of Roe; and that Plaintiff had impersonated as an attorney to threaten her. (*See* **Exhibit 2**, *Defendant Camaj's Investigative Report*) (hereinafter, the "Camaj Report"), at

2

3-4 . At no time relevant to this case has Plaintiff admitted to contacting Roe to harass her, attempting to obtain photographs of Roe, or impersonating an attorney and Defendants have offered no evidence in support of such claims.

6.  On October 31, 2018, Pamela Roe, Roe's mother, contacted Defendant Chadwell ("Chadwell") about Plaintiff. Chadwell told Pamela Roe that this would be treated as a police matter and recommended that Jane Roe file a police report in Colorado and with the WSU police. *See* **Ex. 3**, *P. Roe email to Chadwell, October 31, 2018*. And Jane Roe did just that. Pamela Roe then emailed Chadwell stating her belief that the "lawyer letter" effort was done

> to lure [Jane Doe] to a specific location on a specific date, threaten her with up to a $5,000 claim to obtain money or to obain her passwords. As I mentioned during our discussion, I am very concerned about someone with this character becoming a doctor. I would not want this type of person caring for my family, friends or any patients/families.

*Id.* At no time did Roe proffer any evidence that Plaintiff was the source of the "lawyer letter" or that corroborated her other horrendous accusations. Yet, Roe implied that Plaintiff attempted to secure photographs that were intimate in her complaint and testified that they included nude photographs when appearing before the SOM Professionalism Committee ("SOMPC"), something Plaintiff only learned about during discovery.

7.  On November 1, 2018, Chadwell emailed Defendant Baker ("Baker") forwarding a copy of Roe's complaint against Plaintiff. Chadwell informed Baker that she discussed the matter with Dean Strauss ("Strauss") and that they had determined "at this time [they] agree[d] that it is a police matter and that has to take its course." **Exhibit 4**, *Chadwell email to Def. Baker, November 1, 2018*. Chadwell stated that she "plan[ned] to attend the Behavioral Intervention Team meeting this coming Monday on main campus where this issue will be brought forth with Linda Galante [Defendant's General Counsel], Lieutenant Scott [WSU Police], Dean Strauss [WSU Assistant Dean of Students], and others at the table." *Id.* pp. 1-2.  Chadwell then told Baker that Strauss informed her of a prior unsubstantiated Student Code of Conduct ("COC") investigation of Plaintiff which Chadwell believed raised questions about him. *Id.* at 2.

8.  On November 4, 2018, Defendant Robichaud ("Robichaud") emailed Chadwell about Plaintiff, expressing concern over the conduct contained in the complaint, "AE threats, harassment and cyberbullying … etc." **Ex. 5**, *Emails between Robichaud and Chadwell*. Robichaud added that she "read[s] the postings [as] [] sound[ing] like an assault …injury to her. … reads like a veiled threat/harassment." *Id.* Robichaud then asks Chadwell, "[d]o you think he preyed on any other students @ WSU? *Id.* "Let's not let this happen on our campus as it did @ MSU," a reference to Larry Nassar scandal at Michigan

State University. Chadwell responds thanking Robichaud for the letter, making no corrections, nor questioning her unsupported accusations and concerns about Plaintiff's conduct. *Id.*

9. On November 5, 2018, the Behavioral Intervention Team ("BIT") reviewed Roe's Complaint at their meeting[3]. **Exhibit 6** *Camaj Deposition Trans.,* at 69. Defendant Camaj ("Camaj") admits that the complaint was reviewed by the BIT and discussed among those in attendance[4]. Strauss then instructed Camaj, as Student Conduct Officer ("SCO"), to meet with the students, take down information and not make any determinations in her report. *Id.* at 86-87.

### Roe Discusses Complaint with Defendant Camaj

10. On November 15, 2018, Camaj called Roe, during which Camaj "reviewed her Complaint Report and confirmed that the statement she documented in the Complaint Report submitted on October 29, 2018 was accurate." **Exhibit 2** *Camaj Report* p 21. Camaj did not record in her Report making any effort to determine the veracity of the Complaint or ask for corroboration of Roe's allegations.

---

[3] Because of the presence of Counsel at the meeting, Defendants have refused to provide any information about what was discussed relative to Plaintiff's situation, thus precluding the use of a reliance of counsel defense at trial. *Id.* at 75(Defendants'
[4] Counsel claims all conversations during the BIT meeting relative to Plaintiff are covered by Attorney-Client Privilege).

11.   During this call, Roe agreed to provide text messages sent between Plaintiff and

Roe from November 17, 2016 until October 26, 2018. According to the Camaj

Report, Roe stated to Camaj that she filed a police report in Colorado and spoke

with the Wayne State University police department. *Id.* p 21. At no time did

Camaj make any effort to obtain a copy of the police reports Roe claimed to

have filed. **Ex. 6**, *Camaj Dep.*, at 117-118.

### *Camaj Notifies Plaintiff of Complaint*

12.   Plaintiff's initial contact with Defendant WSU in this matter occurred on

November 27, 2018, when Camaj invited Plaintiff to meet for a fact-finding

conference on November 30, 2018. **Exhibit 7** *Camaj Ltr. to Plaintiff*. Although

Plaintiff repeatedly inquired as to the nature, scope, and content of the meeting,

Camaj provided only the time, place and that it was "to discuss concerns

reported about alleged behavior on Wayne State university's campus.". **Ex. 6**,

*Camaj Dep.* at 94; *See also* **Exhibit 8** *Emails between Plaintiff and Camaj,*

*November 27, 2018*. By her own admission, Camaj regularly lured students to

her office to discuss COC violations without providing the required notice or

information necessary to prepare for such fact-finding meetings. **Ex. 6** *Camaj*

*Dep.*, at 94; 115-116.

13.   The meeting went forward on November 30, 2018. Only at the meeting did

Plaintiff receive notice that Camaj was "investigating a Complaint sent to the

Dean of Students Office and Medical College." **Ex. 2** *Camaj Report*, at 20-21.
After meeting with Camaj, and at her direction, Plaintiff prepared his statement
to be included alongside the report. **Ex. 1** *Eid Dep.*, at 147-148.

14. On December 4, 2018, Camaj filed her Report with Chadwell. Camaj
characterized her Report as an "investigation into the Complaint made …
against WSU medical student Anthony Eid by former WSU student Amanda
Burton," Camaj did not make any effort to corroborate, disprove, or verify the
veracity of claims made by Roe or explanations offered by Plaintiff. **Ex. 2**,
*Camaj Report*, at 1*; See* **Ex. 7**, *Camaj Dep.*, at126-127.

15. After receiving the Report, Chadwell "funnel[ed] [the] [Report] into the …
professionalism process through the Chair of that committee," Defendant
Matthew Jackson ("Jackson"). **Ex. 9**, *Chadwell Dep.*, at 55-56. Chadwell then
sent the Report to Baker, Chairman of the School of Medicine's Promotions
Committee ("SOMPrC"), tainting the decision-making process by providing an
individual who should have been an impartial decisionmaker with highly
prejudicial before it had been vetted by the SOMPC. *Id.* at 55.  Chadwell also
admitted when she forwarded the Report to Jackson, she did so without any
charge being attached. The SOMPC did not yet have proper adjudicative
jurisdiction over the matter even though it had been provided Camaj's Report,
because Chadwell refused the role of "Charging Party." *Id.* at 56.

16. To assume jurisdiction, a charging party must be found to bring the case to the Committee. *See* **Ex. 10**, *Prof. Comm. Man.*, at 9. On December 10, 2018, Jackson emailed Pamela Roe, copying Chadwell, regarding her daughter's complaint against Plaintiff. *See* **Ex. 11**, *Jackson email to Pamela Roe*. Not wanting to inconvenience Jane Roe, Jackson asked Pamela Roe if she would serve as the charging party to present the case and respond to questions. *Id.* Jackson chose this option knowing that Pamela Roe had already made sensational and wholly unverified accusations that Plaintiff represented a real threat to her physical safety and might seek to extort money from her. *See* **Ex. 3**, *P. Roe email to Chadwell, Oct. 31, 2018*.

17. Chadwell, now alerted to the fact that if she testified Jackson would likely need to show Plaintiff Pamela Roe's October 31, 2018 email to Chadwell, tampered with the record by convincing Jackson to remove evidence of her prior contact with Pamela Roe and Roe's accusations against Plaintiff. **Ex. 11,** at 1. This ensured that Plaintiff would have no notice of what Pamela Roe would likely testify to during her appearance before the Committee. on December 10, 2018, Chadwell emailed Jackson to remove the "email message from her [Pamela Roe] to me on October 31," from the Professionalism Packet that Jackson would show Plaintiff. *Id.* Thus, material and information that Plaintiff could have used in defending himself remained invisible to him. *See* **Ex. 12**, *Eid Declaration*.

Moreover, Plaintiff was unaware that in addition to the complaint, there was an ongoing effort to add prior "complaint[s] and finding[s] of against [Plaintiff]." **Ex. 13**, *Chadwell email to Camaj, December 5, 2018*. This deliberate omission resulted in a denial of meaningful notice to the Plaintiff. *Id.*

18. On December 12, 2018 Pamela Roe responded to Jackson's request to become the *Charging Party*. Roe stated, "I am willing to be present and respond to the best of my knowledge, although [Jane Roe] would be best to respond to questions that would be more detailed." *See* **Ex. 14** p. 4, *Pamela Roe emails with administration*.

19. On the 13th of December Jackson emailed Pamela Roe expressing empathy and his agreement that "we all realize how difficult this is for you an [*sic*][Jane Roe]. We can certainly arrange to have [your daughter] address the committee remotely with you present in person." *Id.* Jackson then goes on to prepare Pamela Roe to answer questions by telling her what the Committee would consider, to wit: "the relevant documents … the harassing text messages, false court docket, and emails, … your experiences over the past two years; [and] "you are both free to express anything that you believe is important for their consideration." *Id.* Jackson ends the email by letting Pamela Roe know that he planned on calling Jane Roe "to discuss [her testimony] prior to the hearing." *Id.* Ultimately, the hearing was set for the date requested by Pamela Roe,

February 7, 2018. Plaintiff was not offered such accommodations. There is no evidence that Jackson asked Plaintiff how much time he would need to prepare or whether he was available on February 7, 2018. Most disturbing is that the University official charged with holding a fair and impartial hearing, Jackson, had already come to the conclusion that "Pam… and her daughter will be very compelling [witnesses]." *See* **Ex. 14** p. 1*, Pamela Roe emails with administration*.

20. On December 14, 2018, Jackson sent an email to Plaintiff informing him that

> "the Wayne State … Student Conduct Officer concluded her investigation of a complaint filed against you by a former student and forwarded her report to the [SOM] for adjudication. Therefore, the [SOM] Professionalism Committee will convene on February 7, 2019 to hear your case."
> **Ex. 15***, Email from Jackson to Plaintiff, Dec. 14, 2018*.

This was the only time that Plaintiff was provided prior notice as to the conduct for which he was being investigated—the complaint filed against him. Jackson did not meet immediately with Plaintiff, instead he told Plaintiff that he would "be provided an opportunity to review the documentation that will be provided to the committee prior to the hearing. I will contact you in the new year to schedule the document review and to discuss the hearing process." *Id.*

21. On or about January 25, 2019, Jackson met with Plaintiff and provided him with notice of the hearing date and an opportunity to review the documents that he claimed were provided to the SOMPC. Plaintiff did not receive copies of the

documents he was shown. **Ex. 1**, *Eid Dep.*, at 170. Additionally, when asked if dismissal was possible, Jackson minimized the risk stating that the matter would likely result in a mark on Plaintiff's "MSPE"[5] letter, among the least severe outcomes possible. *Id.* at 359-360. When asked if Plaintiff should hire an attorney, Jackson told Plaintiff that he did not need to do so and that the lawyer would not be able to speak on his behalf or represent him during the Committee's meeting. *Id*. Jackson knew that the SOMPC had the authority to recommend the dismissal of Plaintiff to the SOMPrC, that such recommendation was a foreseeable outcome, that such outcome had been demanded and would be supported by testimony completely hidden from Plaintiff.

22. Under the Rules of the SOMPC, a student facing an accusation of Academic Misconduct is entitled to have the behavior reported first to one of three Assistant Deans (Student Affairs, Basic Sciences, or Clinical Sciences). The Dean engages in fact finding and based on their findings, recommend: remediation; that charges be filed with the Chair of the SOMPC; or that no further action is required. **Ex. 10,** *SOMPC Manual*, at 8, §5.0.

23. Plaintiff did not receive the benefit of this process as he was told that his alleged offenses involved non-academic offenses stemming from Jane Roe's

---

[5] (i.e., Medical Student Performance Evaluation)

complaint. **Ex. 7** *Camaj Ltr. to Plaintiff*. For that reason, the fact finding was done by the SCO, yet the SCO was ordered not to make a determination, but to forward her Report to Chadwell, who in turn forwarded the Report to the Chair of the SOMPC. **Ex. 6,** *Camaj Dep.*, at 86.

24. Ultimately, Jane Roe agreed to appear as the *Charging Party,* leaving Jackson, as Chair of the SOMPC free to take the next step required to expel Plaintiff. *See* **Ex. 10***, SOMPC Manual*, at 8-9.

25. On or about February 7, 2019 a SOMPC hearing was convened during which the SOMPC heard first from Roe and her mother who testified together. Plaintiff was not allowed to be present for the testimony, was not provided a transcript, and was not provided an opportunity to ask questions or submit areas for inquiry. **Ex. 1**, *Eid Dep.*, at 366-367; 378-379. Per the minutes of the SOMPC hearing, Mrs. Roe was "seriously concerned about potential retribution from Mr. Eid as a possible result from being dismissed from medical school". *Id.* at 378-379. When Plaintiff testified, he was left to guess at what evidence or testimony had been presented by both Jane and Pamela Roe and what testimony or evidence was of interest to the SOMPC.

26. On or about February 11, 2019, Plaintiff received a letter from the SOMPC setting forth their decision to refer the case to the SOMPrC with a recommendation for dismissal. **Ex. 16**, *Professionalism Committee Letter to*

*Eid*. No information about the decision, its basis, or what evidence was considered was included. Without such vital information, Plaintiff was required to submit a statement for the SOMPrC to consider. In preparing his statement, Plaintiff met with Robichaud for guidance, as suggested by Jackson and Baker. **Ex. 1**, *Eid Dep.*, at 313-314. Robichaud instructed Plaintiff to provide a statement and make a plan for improvement to provide to the SOMPrC. *Id.* at 391-392.

27. On February 27, 2019, the SOMPrC held their hearing, during which Plaintiff was not offered any record of the SOMPC hearing minutes nor was he provided with any opportunity to provide his professionalism record. *Id.* at 396-399. It was clear to Plaintiff that the SOMPrC had already made up their mind. (*Id.*) Immediately after the hearing, the SOMPrC issued a letter to Plaintiff informing him of their decision to dismiss him from the SOM.

28. On March 5, 2019, Plaintiff submitted questions to Robichaud to ascertain the process going forward to secure his option to withdraw if he was unable to persuade the SOMPrC to reconsider their decision. **Exhibit 17**, *Eid email to Robichaud March 5, 2019*. Robichaud refused to answer his questions and directed him to meet with Baker. *Id.*

29. On March 6, 2019, Plaintiff met with Baker. **Ex. 1**, *Eid Dep.*, at 409-410. At the meeting, Baker informed Plaintiff that he, as Chairman of the Committee,

13

would elect to reconvene the Committee and discuss the decision with them if Plaintiff appealed. *Id.* Baker informed Plaintiff that if the SOMPrC denied his appeal Plaintiff would still be able to withdraw as long as he did not appeal to the Provost's Office. *Id.* at 314-315. Based on Baker's representations, Plaintiff appealed to the SOMPrC to reconsideration of its decision.

30. On May 9, 2019, and in spite of Baker's assurance to Plaintiff, Plaintiff was not permitted to voluntarily withdraw after the SOMPrC's denial of Plaintiff's appeal. **Exhibit 18**, *Muhammad Email*. On May 10, 2019, Plaintiff was forced to and did appeal his termination to the Office of the Provost. Plaintiff appealed without the benefit of knowing the basis for the decision made by the SOMPC and without receiving a record of the proceedings or their reasoning.

31. On May 23, 2019, Defendant Dr. Darin Ellis, the Associate Provost, informed Plaintiff that his appeal was denied. In doing so, Defendant Ellis ignored the new *Interim Administrative Hearing Guidelines* that applied to Plaintiff's case and the established law in the Sixth Circuit. These *Guidelines* became effective on December 7, 2018, three days after Camaj's Report was completed. **Ex. 19**, *Interim Administrative Hearing Guidelines Student Code of Conduct,* at 4.

## <u>LEGAL STANDARD</u>

Summary judgment is only appropriate where no genuine issue of material fact exists so that the movant is entitled to a judgment as a matter of law. *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992). "If there are 'any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party,' then summary judgment may not be granted." *Id.* When making this determination, "inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

## ARGUMENT

### I.   WSU and The Individually Named Defendants Are Not Afforded The Protections Of Sovereign Immunity

Sovereign immunity does not prevent Plaintiff from recovering against defendants named in their individual capacity. *Monroe v. Pape,* 365 U.S. 167, 170-1 (1961). Under *Exparte Young,* 209 U.S. 123, 158-59 (1908), a state official sued in his official capacity for prospective equitable relief "is generally not regarded as 'the state' for purposes of the Eleventh Amendment and the case may proceed in federal court. "Therefore, to the extent Plaintiff …sue[d] … Defendants in their respective personal and official capacities, for prospective declaratory or injunctive relief, Plaintiff's claims may proceed. *Mitchell v. Schroeder,* 2022 U.S. Dist. LEXIS 16172, *18 (W.D. Mich. 2022). Defendant University can be held liable for prospective declaratory or injunctive relief and each individually named defendant

that is not entitled to qualified immunity is not immune from suit for monetary damages. *Id.*

The Remedies Equalization amendment unequivocally expresses [] [Defendant WSU's] consent to suit in federal court for violations of Title IX. *Fryberger v. Univ. of Arkansas,* 889 F.3d 471, 475 (8th Cir. 2018). *See Cannon v. University of Chicago,* 441 U.S. 677, 717 (1979). And this Circuit has stated clearly that "sovereign immunity is abrogated for Title IX claims against the university. *Franks v. Kentucky Scho. For the Deaf,* 142 F.3d 360, 363 (6th Cir. 1998). Accordingly, Plaintiff may sue for monetary relief under Title IX in federal court.

## II.    Defendants are not entitled to summary judgment in this case

### A.    Defendants expulsion of Plaintiff from the WSU Medical School creates a cognizable liberty interest.

"No state [or agency of a state] shall 'deprive any person of life, liberty, or property, without due process of law." *Jaksa v. Regents of Univ. of Mich.,* 597 F.Supp. 1245, 1247 (E.D.Mich. 1984). For almost fifty years it has been clear that a *liberty* interest is implicated where a student suffers: a significant suspension from school; damage to their good name and standing with their fellow pupils and teachers; interference with later opportunities for higher education and employment; or an inability to continue his education. *See Goss v. Lopez,* 419 U.S. 565, 579 (1975); *Wisconsin v. Constantineau,* 400 U.S. 433, 437 (1971); and *Board of Regents v. Roth, i408 U.S. 564, (1972).* In the seminal school case, *Goss,* the liberty

16

interest was violated when the student was suspended for ten days. It is beyond dispute that expulsion, the ultimate disciplinary sanction for a student, creates a cognizable liberty interest.

### 1.    **Plaintiff was Denied Proper Notice**

Under the COC Camaj had the responsibility,

> upon receipt of charges, … [to] initiate an investigation, which must include an opportunity for the student(s), … to participate in a factfinding conference with the Student Conduct Officer, … in order to determine whether further proceedings are appropriate… . 11.2 A notice shall be sent to the student(s) or to representative(s) of the student organization, with a copy to the Dean of Students or the Academic Dean, within ten school days of the Student Conduct Officer's receipt of the charges, and at least five school days prior to the conference. The notice shall contain the following information: a)  The alleged infraction; b)  The nature of the evidence submitted; c)  The time and place of the conference; d)  A copy of this code, with a statement that it is the governing policy and that the student should retain it for use throughout the proceeding. **Exh.  20**, *COC*, at 12 (quoting §§11.1-2).

Camaj's notice to Plaintiff was amazing in that it lacked *all* of the required information relevant to providing Plaintiff with notice as to what he was facing even after he specifically asked for this information. *See* **Ex. 8**, *Email response from Plaintiff to Camaj, Nov. 29, 2018*, at 12 (quoting §11.1). When her failure was brought to her attention she ignored Plaintiff's specific request for notice. *See Plaintiff's Statement of Facts* ("SOF"), at ¶12-13. Camaj's November 27, 2018 letter was drafted to preclude Plaintiff from knowing what procedural protections he was entitled to as it failed to state that the fact-finding conference involved COC violations. *See also,* **Ex. 6**, *Camaj Dep.,* at 95, Lines 4-7.

It is reasonable to infer on the basis of Camaj's testimony is that she understood that she violated Plaintiff's right to notice as she engaged in a concerted, but farcical effort to dissemble and deceive. When questioned about her failure to provide notice, she offered the following deceptive and inconsistent claims: (1) there were no charges to specify because no one had filed charges against Plaintiff *Camaj Dep.*, at 94, lines 11-13; that the matter was "not a Student Code of Conduct case because no charges were filed in the matter." *Id.* at 94, lines 23-25; that she only "wanted to discuss concerns reported about alleged behavior." *Id.* at 94, lines 23-25; and "that Jane Roe's complaint was not the filing of a charge against [Plaintiff]." *Id.* at 7-10.

Camaj's testimony is also contradicted by Jackson's actions. Jackson sought out Ms. Roe through her mother to serve as the *Charging Party.* SOF, at ¶24. Jackson exchanged multiple emails with Mrs. Roe in an effort to convince her that he would ensure that Mrs. Roe and her daughter would not see Plaintiff and they would be "free to express anything that you believe is important for the[] [Committee's] consideration. See **Ex. 14**, *Emails between Jackson, Mrs. Roe, and Chadwell* at 3. After these exchanges, Jackson wrote to Chadwell stating, "[y]es, I spoke with Pam today and she and her daughter will be very compelling. I think that the committee needs to hear from them." *Id.* at 1. It is clear that Jackson and Chadwell had already chosen between the competing narratives in favor of Roe prior to any hearing. There

is no serious question that Jane Roe was the *Charging Party,* her allegations constituted charges and that the only difference was that as the process unfolded, Ms. Roe's charges were embellished and expanded. Camaj knew Plaintiff had a clearly established right to notice of the charges, that her complaint constituted charges, and her effort to dissemble during her testimony to avoid having to admit it, raises material questions of fact that are in conflict and the reasonable inference to be drawn is that everything that Defendants did was designed to keep Plaintiff in the dark, denying him the notice required by due process.

### 2.  Plaintiff was denied his clearly established right to a fair hearing.

Defendant WSU issued *Interim Hearing Guidelines* ("Guidelines") to comport with *Doe v. Baum,* 903 F.3d 575 (6th Cir. 2018) controlling law in this Circuit now and at the time the Guidelines became effective on December 7, 2018. **Ex. 19**, *Guidelines*. This was not the first time this Circuit had spoken of the need to provide students facing significant disciplinary penalties as a result of a credibility contest with a hearing and opportunity to conduct cross-examination. In 2017, more than a year earlier than Roe's complaint was filed, this Circuit in *Doe v. Cincinnati,* 872 F.3d 393 (6th Cir. 2017) found a hearing and opportunity to contest credibility the minimal requirements of a university disciplinary process. Yet, WSU did not issue new rules, choosing to ignore the clear holding of the court until 2018, when the Sixth Circuit

> reiterate[d] the holding one again: if a public university has to
> choose between competing narratives to resolve a case, the
> university must give the accused student or his agent an
> opportunity to cross-examine the accuser and adverse witnesses
> in the presence of a neutral fact-finder. *Baum*, at 578.

Defendants' Guidelines prevent them from denying that these rights were clearly established in the Circuit or that they were unaware of their applicability to the entire University, including the SOM. The Guidelines went into effect three days after Camaj filed her report with Chadwell and the General Counsel and two months prior to the Professionalism hearing on February 7, 2019. *Id.* at 4. There was clearly sufficient time to provide Plaintiff with all of the required due process the Guidelines required. *See First Amended Complaint*, (**ECF 24**) ¶13. The Guidelines apply to all Defendants and no limiting language is contained in the Guidelines or SOM Handbook making them optional for the SOM. *See,* **Ex. 10***, Professionalism Committee Manual*, at 5; *See also,* **Ex. 20,** *COC* §15.9. Therefore, because Plaintiff's rights were clearly established at all relevant times, and Defendant WSU itself put the individually named Defendants on notice, their failure to provide those rights was unreasonable and the individually named Defendants cannot claim the benefit of qualified immunity in this case.

### a. Chadwell's direct involvement in tampering with the Professionalism Hearing.

On October 31, 2018, Mrs. Roe called Chadwell directly to talk to her about Jane Roe's complaint and ensure it was taken seriously. SOF, at ¶6. Chadwell took

on the role of factfinder, aligned with Jane Roe, and shared Mrs. Roe's highly charged accusations with Defendants Baker, Jackson, and Robichaud. *SOF*, at ¶¶ 7-8. Chadwell also tampered with the investigation and hearing by asking Jackson to remove evidence of her email communication with Mrs. Roe so that the Plaintiff would not see it when he reviewed documents prior to the SOMPC hearing. SOF, at 17. Because Defendants did not maintain a verified record that the documents Chadwell asked to have removed remained in the file and were reviewed by the Committee members, the inference most favorable to Plaintiff is that Jackson heeded Chadwell's request.

### b. Robichaud's direct involvement to influence the Professionalism hearing and prejudice Jackson's conduct of the Hearing.

Robichaud held the position of Counselor at WSU's SOM. In that role, she worked closely with the students assigned to her, including Plaintiff, was charged with helping them navigate problems, and serving as an advocate for the student. *Robichaud Dep.*, at 98. Nevertheless, at no time did Robichaud recuse herself from the disciplinary process or serving as Plaintiff's counselor despite of her belief of the allegations against Plaintiff and believed that the priority should be to protect the school. SOF, at ¶ 8.

Robichaud's duplicity was not merely outrageous, she evidenced a willingness to betray Plaintiff and that willingness worked its way directly into the

disciplinary process to which Plaintiff was subjected. Robichaud testified that she met with Plaintiff on January 25, 2019 "to prepare for the professionalism committee." *Robichaud Dep*., at 92. Robichaud admitted during her deposition that while the purpose of the meeting was the preparation of a statement and that it was her job to "assist with any editing or suggestions," she did not provide Plaintiff with any information about what charges he would face at the hearing. *See generally, Robichaud Dep.*, at 92-98. It is reasonable to infer from Robichaud's failure to provide Plaintiff with useful information for his defense and her email to Jackson that Plaintiff "continues to minimize his role," was meant to poison the well by influencing Jackson before he ever heard Plaintiff's statement at the hearing that it was going to be a continuation of Plaintiff's refusal to admit Ms. Roe's charges. *Id.*at 105.

Chadwell, Robichaud, and Jackson committed outrageous breaches of the SOM hearing procedures, including: acceptance of information from Pamela Roe to Chadwell containing unsubstantiated allegations that were added to the professionalism hearing *SOF*, at ¶25, *See also* **Exhibit 21,** *Hearing Minutes*; failing to disclose to Plaintiff until after he was expelled that such allegations had been made; discussion of baseless accusations between Robichaud and Chadwell *SOF* at ¶8; removing evidence from the document package to keep Plaintiff blind about actions and comments made by Chadwell and Mrs. Roe to protect Chadwell from

possibly becoming a witness before the Committee *SOF*, at ¶ 17; hiding a meeting of the BIT from Plaintiff where it was decided that Camaj would collect evidence without consideration of its veracity or reliability *SOF*, at ¶9; an effort to trap Plaintiff and cause him to forego rights; and prior comments prejudging the Plaintiff's guilt. These actions and depravations denied Plaintiff clearly established due process rights of notice and protection from prejudgement that made a fair hearing with a true opportunity to be heard impossible. *Hassan v. Gonzales,* 403 F.3d 429, 436 (6th Cir. 2005).

### c.    The Interim Guidelines apply to the School of Medicine

Plaintiff expects that in their reply brief the Defendants named in their individual capacity will claim that the Interim Rules do not apply to the SOM as: (1) no one had brought them to their attention or (2) they were instructed by the WSU general counsel that they did not apply. As to the first excuse, Plaintiff is entitled to the inference that as a result of having published these Guidelines, all of the Defendants were aware of their applicability. The second excuse raises a reliance of counsel defense that requires reopening discovery and allowing Plaintiff to depose the relevant members of the General Counsel's office. Such a challenge places material facts in dispute on the issue of qualified immunity, what rights Plaintiff was entitled under the School's Code of Conduct, and defeats Plaintiff's claim for summary judgment on these questions that must be decided at trial.

Finally, Plaintiff contends that Defendants themselves have removed any doubt as to whether Plaintiff received the proper notice and whether the *Interim Guidelines* apply to this type of case. Jackson, in answer to his own Counsel's question after Plaintiff's Counsel ended his direct examination makes clear this was a sexual harassment case at its core:

> Q. Okay, And what was just the – what was the overall description or nature of the charge against [Plaintiff]?
>
> A.  I think it was the cyberstalking and continued aggressive messages, unwanted messages, that he sent to Amanda. *Jackson Dep*., at 117.

Conduct that the School of Medicine's Handbook includes as one of its definitions of Sexual Harassment. **Ex. 22,** *SOM Handbook*, at 38.

### d.  The conduct at issue in the Professionalism hearing focused on sexual harassment and cyberstalking

Jackson testified that the hearing and its focus were on sexual harassment and cyberstalking. *Jackson Dep*., at 117. Indeed, the testimony before the SOMPC focused largely on allegations that Plaintiff made efforts obtain nude photographs of Ms. Roe, repeatedly pursued Plaintiff to get her to engage with him, and ultimately tried to gain physical control over Ms. Roe. *Prof. Hearing Minutes*, at 1-3. It is reasonable to infer in favor of Plaintiff is that the hearing focused on allegations of sexual predation and harassment that included the use of lies and impersonation.

Based on the meager record[6] before the Court of what transpired before the SOMPC, the inference to be drawn in favor of Plaintiff is that the alleged cyberstalking and impersonation of an attorney to get control over Roe is what the Committee based its decision on to recommend dismissal and that any questions about lying and harassment were of import only in so far as they were part of the cyberstalking. *Id.* at 4. Drawing all inferences in favor of Plaintiff, the "behavior [that] was not consistent with that of a future physician," involved his conduct as a stalker.

The SOMPC repeatedly questioned Plaintiff as to whether "he sent the email impersonating a lawyer or if he knew who would have done so on this behalf." *Id.* Plaintiff denied both the impersonation or knowledge as to who might have done so. *Id.* Yet, there were no questions posed to Plaintiff about his claims or explanations and his alleged pursuit of nude photographs of Ms. Roe or impersonating her to the her photographer did not come up in questioning and was hidden from him. The reasonable inference to draw is that this incendiary testimony was accepted as true without examination and intentionally kept from him to allow the uncontested and emotional testimony to *remain* unchallenged. It is a fair inference to be drawn that

---

[6] Plaintiff does not concede that that the minutes of the Professionalism Committee are complete, as they are not a recording or verbatim transcript, and are entirely self-serving to the Defendants' interests. Moreover, they were kept and prepared by Erika Roberts, an assistant to Jackson and not an independent party. Jackson Dep., at 72.

what Plaintiff was *not* asked about and *knew nothing* about was what actually formed the basis for their decision to recommend his dismissal. *Id.*

It is fair to infer that the hearing was scripted by Jackson to prevent Plaintiff from knowing that the charges now entailed sexual harassment and stalking—a flagrant denial of due process. Jackson could have, as the supposed *neutral fact-finder* required by *Baum,* brought to Plaintiff's attention the new evidence introduced through Ms. Roe's testimony before the Committee, but he did not. Jackson's effort to keep Plaintiff from hiring an attorney now bear fruit as he comes before the Committee without Counsel and is manipulated by the Committee. *SOF*, at ¶21.

Defendants' denial of Plaintiff's due process rights under *Baum* and their own Guidelines would have provided Plaintiff with an opportunity to both observe Ms. Roe and her mother as they testified and learn of these new allegations prior to testifying himself. Moreover, Plaintiff would have been able to subject their claims to what the Sixth Circuit called " 'the greatest legal engine ever invented' for uncovering truth." *Baum*, at 580,  (quoting *Doe v. University of Cincinnati*, 872 F.3d 393, 401-02. The reasonable inference to be drawn is that cross-examination would have disclosed that there was no reliable evidence that Plaintiff sought nude photographs of Roe or impersonated an attorney. In addition, he would have been able to challenge Roe's characterization of feeling horrified and fearful about him.

A fair hearing where Plaintiff could see Ms. Roe and her mother testify would have disclosed testimony that remained hidden until discovery—Roe's claim that she had located someone hacking her account at the cross-streets where Plaintiff lived. Plaintiff would also have been able to cross-examine Jackson, who when he engaged in the theatrical announcement of Plaintiff's address as being near Roe's location discovery, became a witness not just a hearing officer.[7] It is a reasonable inference that Jackson's involvement in testifying and putting his *imprimatur* of his position as Chairman on the ugliest allegation that Plaintiff was a stalker is that his testimony guaranteed that the Committee would accept the evidence without question. This underscores the harm Plaintiff suffered in being unable to cross-examine the witnesses against him. After all, Jackson did not investigate: the authenticity of the text and other messages presented to the Committee; whether Plaintiff's claims about being hacked were true; the provenance of the fabricated letter from a law firm; or whether Roe's claims to have felt harassed were supported by the evidence. No, the one claim he added his imprimatur as Chairman was the wholly unsubstantiated allegation that Plaintiff was trying to access Roe's snapchat

---

[7] The entire purpose of obtaining a charging party was to ensure that those hearing the charges and the Chairman who acted as hearing officer remained independent. Clearly, this did not happen here and the inference to be drawn is that it compromised the hearing and its ultimate recommendation.

account to obtain nude photographs. The most vile and sensational allegation that was entirely hidden from Plaintiff.

Cross examination would have allowed Plaintiff to identify the photographer and seek his testimony. In turn, it is reasonable to infer that such testimony would have allowed him to reopen the record of the SOMPC or bring new evidence to the SOMPrC for their consideration. Especially considering the evidence of the location of the individual supposedly hacking Roe's snapchat account was an image without metadata that could be analyzed and corroborated. Instead, the Committee accepted pictures that could easily have been created to support an argument rather than evidence that proves a charge. This lack of inquiry, applies equally to the Wolf-Smith law firm letter that Defendants, seeking metadata from Google were unable to find. It is reasonable to infer that the snapchat and attorney letter were just as likely created in support of Ms. Roe efforts to stop Plaintiff from looking at her conduct as the hacker who was gaining unauthorized access to his computer and banking accounts. Taking the facts as set forth by Plaintiff and drawing all reasonable inferences in his favor, cross examination would have clearly developed new evidence and information that placed Roe's testimony in serious question and therefore, would have resulted in a different result at the SOMPC level.

**e.      Baker violated Plaintiff's clearly established right to a legitimate appellate process.**

Baker admitted that the SOMPrC "oversees and is responsible for exploring the conduct of all medical students." *Baker Dep*., at 18-19. And that where a student engages in serious misconduct, it is the SOMPrC that determines whether they will continue their education. *Id.* Had conduct not been the focus of the Committee, the SOMPrC would not have accepted the additional information provided by the SOMPC containing detailed, but unsupported, allegations about nude photographs Plaintiff was accused of seeking and efforts made to take over Ms. Roe's snapchat and Instagram accounts. *Promotions Committee file*, attached as **Exhibit 23,** at 714-730.

After the SOMPrC issued its decision dismissing Plaintiff, Plaintiff met with Dr. Baker to discuss his due process rights of appeal. *Eid Dep.*, at 196. Dr. Baker was dismissive and flippant in his responses to serious questions from Plaintiff about the appeals process. *Eid Dep*., at 195. Desperate for information about the appeals process, Plaintiff continued to press for answers. Regarding appeal and voluntary withdrawal, Baker told Plaintiff "that [he] would still be able to withdraw from the university if [he] appealed the SOMPrC's decision as long as [he] didn't take it one further step and appeal to the Provost [sic] office. *Id.* a 196. Baker then undercut Plaintiff's ability to frame a proper appeal by refusing to tell Plaintiff what the SOMPrC thought he did, telling him that "he could not get into what the SOMPrC thought [he] did." *Eid Dep.*, at 196. Again, like Jackson, Baker denied Plaintiff

notice and a true opportunity to appeal. It is reasonable to infer that (1) Baker abandoned his independent role and responsibilities, having determined that he would not reverse the Committee's ruling, that the appeal process was a waste of time, and that the Committee's decision would not change; and (2) that Baker intentionally mislead Plaintiff so that he would avail himself of an illusory appellate process that would make it impossible for him to withdraw and transfer to another medical school. *See generally,* SOF, at ¶¶29-30.

## III.   **Plaintiff Was Treated Differently On The Basis of Sex**

Plaintiff alleges unequal treatment on the basis of his sex. *First Amended Complaint*, at 34 (**ECF 24**). This is a case of competing narratives requiring that a neutral fact-finder determine which account to credit. The comparator in this case is Jane Roe, a female, and Plaintiff, a man. Plaintiff has set forth sufficient facts demonstrating that it treated adversarial parties differently on the basis of sex and that taking the facts that he has alleged as true and considering all inferences in the light most favorable to Plaintiff, they support Plaintiff's Title IX claim.

Roe's complaint was accepted as true and not challenged by Camaj. Though directed by Strauss not to make a determination as to truth or veracity and simply collect statements and evidence when Plaintiff arrived for the fact-finding meeting, Camaj cross-examined Plaintiff about his conduct without showing him the

complaint and without having provided the required notice so that he could come prepared for the fact-finding conference. **Ex. 2,** at 21-22.

Chadwell, Robichaud, and Jackson all shared communications between themselves, directly or through email. They evinced a clear acceptance of Roe's statement as true long before the hearing and prior to Plaintiff's supposed opportunity to defend himself. *SOF*, at ¶¶7,8,14. Prior to the hearing, Ms. Roe and her mother were contacted by the supposedly neutral SOMPC Chairman Jackson who communicated that he believed Roe's account; let them know that they would ensure that they would not be confronted by the Plaintiff when they came to testify; and told them that they could tell the SOMPC whatever it was they felt important. *SOF*, at ¶14. In contrast, though advising him of the scheduled February 7, 2019 hearing on December 14, 2018, Dr. Jackson failed to provide Plaintiff with information that he could use to prepare his defense, leaving him with twelve days to prepare rather than the forty-two days he should have had and that Roe was provided. *SOF*, at ¶20.

At the hearing the differences continued. Plaintiff alone faced questions about his claims and was denied information as to what Roe and her mother had testified to before the SOMPC. In contrast, Roe was not challenged about her unsubstantiated charges that were based on hunches and received support from Jackson who testified on her behalf to buttress her claims. *Jackson Dep.*, at 74-75. Defendants' immediate

31

reaction to dismiss Plaintiff's denial of stalking Roe is consistent with a demonstrated bias in favor of Roe. The SOMPC Hearing Minutes verify that Roe admitted she had no way of proving her claims. **Ex. 21,** at 2.

Defendants' arguments in support of summary judgment on Plaintiff's Title IX claim are not appropriate at this stage. As previously discussed, Plaintiff did not admit to conduct that proves his inability to practice medicine or meet the profession's high standards of conduct. Plaintiff admitted only that he made some immaterial false representations in his pursuit to resolve the breaches to his accounts. Assuming that Plaintiff's material assertions of fact are true, Plaintiff is entitled to draw the inference that the SOMPC and SOMPrC would have reached a different conclusion if they had not simply assumed that Roe was right. It would be unreasonable to believe that Plaintiff would have been dismissed if the SOMPC had determined that Plaintiff was indeed being hacked and that he had not sent the lawyer letter or tried to get Roe's photographs. Accordingly, Plaintiff has met the burden in the context of this motion to put forth sufficient facts to support a denial of Defendants' Motion on the issues related to Title IX.

## IV.   WSU Promised Plaintiff A Predictable Disciplinary Process

"The elements of a promissory estoppel claim consist of (1) a promise (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee and (3) that, in fact, produced

reliance or forbearance of that nature (4) in circumstances requiring enforcement of the promise if injustice is to be avoided." *Zaremba Equip, Inc v Harco Nat'l Ins Co*, 280 Mich App 16, 41; 761 NW2d 151 (2008). When a student enrolls in WSU, whether as an undergraduate, or as an attendee of the school of medicine, the student is required to agree to abide by the terms of the COC. Additionally, the medical students agree to participate in the SOMPC process and the SOMPrC process at WSU. Such Committees are required to abide by the due process guidelines as enumerated in their bylaws. See **Ex. 21**, *SOMPC Bylaws* and **Ex. 24**, *SOMPrC Bylaws*. Plaintiff reasonably relied on the promises made in said guidelines, that he would be provided with the evidence and accusations made against him and afforded the opportunity to defend himself as well as to confront his accuser. *COC*, at §15.0., *Guidelines*, at 1-3. Defendants conveniently and selectively attempt to apply their own policies and procedures even in their pleadings so as to not paint the treatment of Plaintiff as it actually was, which was unjust and unfair. The university's failure to apply the policies as agreed to upon Plaintiff's enrollment at university represents a breach of such promises and accordingly the university is liable to Plaintiff for the breach of such promises.

## V.    Plaintiff's Fair And Just Treatment Claim Applies To SOM Hearings

Article 1, § 17 of Michigan's Constitution provides that "The right of all individuals, firms, corporations and voluntary associations to fair and just treatment

in the course of legislative and executive investigations and hearings shall not be infringed." Mich. Const. 1963 Art. I, § 17. "The legislature shall be given an annual accounting of all income and expenditures by each of these educational institutions." Mich. Const. 1963 Art. VIII, § 4. This legislative involvement in how university funds are allocated and the requirement to provide an annual accounting of all income and expenditures of the university to the legislature, places the university squarely within the executive branch of the Michigan government and accordingly must abide by Article 1, § 17 when conducting investigations and hearings. *Ammend v BioPort, Inc.,* 322F.Supp. 2d 848, 857(W.D. Mich. 2004). Plaintiff was never afforded a fair hearing, because a determination had been made prior to Plaintiff even having the opportunity to be heard by the SOMPC. Defendants repeatedly violated their own policies afforded to students in Plaintiff's disciplinary proceedings resulting in substantial harm to Plaintiff.

## VI. Plaintiff's Emotional Distress Claim is Not Barred By Governmental Immunity

Plaintiff's claim is not barred by governmental immunity and Defendants' deprivation of Plaintiff's rights to due process was in fact so outrageous as not to be tolerated by a civilized society. Michigan's governmental immunity statute does not shield an individual's intentional torts. *Sudul v City of Hamtramck*, 221 Mich App 455, 458; 562 NW2d 478 (1997). The individual defendants acted negligently and intentionally when exercising their authority in their deprivation of Plaintiff's due

process rights as enumerated by law and by the school's own policies. Defendants repeatedly told Plaintiff not to hire an attorney, though the school's own procedures provided for the ability to retain and bring an attorney to the proceedings. To allow a school to deprive a student of their protected rights to due process after accepting such large sums in tuition, as was done to Plaintiff, would certainly be regarded as atrocious and utterly intolerable to any civilized community.

## CONCLUSION

For all the foregoing reasons, Plaintiff respectfully requests that this Honorable Court deny Defendants' Motion for Summary Judgment.

Respectfully submitted,

**ROSSMAN P.C.**

By:   /s/ Elizabeth M. Vincent
　　　Mark C. Rossman (P63034)
　　　Elizabeth M. Vincent (P76446)
　　　2145 Crooks Road, Suite 220
　　　Troy, Michigan 48084
　　　Telephone: 248.385.5481
　　　mark@rossmanpc.com
　　　liz@rossmanpc.com
　　　J. Robert Flores
　　　10410 Hampton Road
　　　Fairfax Station, Virginia 22039
　　　Telephone: 703.609.87331
　　　rfloresesq@verizon.net
Dated: February 25, 2022　　　*Attorneys for Plaintiff*

35

## **<u>CERTIFICATE OF SERVICE</u>**

I certify that, on February 25, 2022, I caused the foregoing response to be filed using the Court's electronic filing system, thereby giving notice to all counsel of record and all other ECF participants.

/s/ Elizabeth M. Vincent