# EXHIBIT 6

IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE EASTERN DISTRICT OF MICHIGAN

JOHN PLAINTIFF,

            Plaintiff,

   vs.              Case No. 2:20-cv-11718-GAD-DRG

WAYNE STATE UNIVERSITY, WAYNE

STATE UNIVERSITY SCHOOL OF

MEDICINE, NICOLINA CAMAJ, MARGIT

CHADWELL, MATTHEW JACKSON,

RICHARD S. BAKER, R. DARIN ELLIS,

in their individual and official

capacities, jointly and severally,

            Defendants.

_____

    The Remote Zoom Videoconference Deposition of
NICOLINA CAMAJ,
Taken at 280 North Old Woodward Avenue,
Birmingham, Michigan,
Commencing at 10:04 a.m.,
Wednesday, October 6, 2021,
Before Leisa M. Pastor, CSR-3500, RPR, CRR.

**Fortz Legal Support**

**www.FortzLegal.com**

**844.730.4066**



1            IN THE DISTRICT COURT OF THE UNITED STATES

2                FOR THE EASTERN DISTRICT OF MICHIGAN

3

4   JOHN PLAINTIFF,

5                      Plaintiff,

6        vs.                      Case No. 2:20-cv-11718-GAD-DRG

7

8   WAYNE STATE UNIVERSITY, WAYNE

9   STATE UNIVERSITY SCHOOL OF

10  MEDICINE, NICOLINA CAMAJ, MARGIT

11  CHADWELL, MATTHEW JACKSON,

12  RICHARD S. BAKER, R. DARIN ELLIS,

13  in their individual and official

14  capacities, jointly and severally,

15                      Defendants.

16  _____

17

18       The Remote Zoom Videoconference Deposition of

19       NICOLINA CAMAJ,

20       Taken at 280 North Old Woodward Avenue,

21       Birmingham, Michigan,

22       Commencing at 10:04 a.m.,

23       Wednesday, October 6, 2021,

24       Before Leisa M. Pastor, CSR-3500, RPR, CRR.

25

1    APPEARANCES:

2

3    J. ROBERT FLORES

4    Gammon & Grange, PC

5    8280 Greensboro Drive

6    Suite 140

7    McLean, Virginia 22102

8    (703) 609-8731

9    jrf@gg-law.com

10        Appearing on behalf of Plaintiff.

11

12   DAVID A. PORTER

13   Kienbaum, Hardy, Viviano, Pelton & Forrest, PLC

14   280 North Old Woodward Avenue

15   Suite 400

16   Birmingham, Michigan 48009

17   (248) 645-0000

18   dporter@khvpf.com

19        Appearing on behalf of Defendants.

20

21

22

23

24

25

1    KRISTEN COOK

2    Wayne State University Office of General Counsel

3    656 West Kirby Street

4    Detroit, Michigan 48202

5    (313) 577-3991

6    kristen.cook@wayne.edu

7         Appearing on behalf of Defendants.

8

9    ALSO PRESENT:

10   Bailey Wellman - Exhibit Technician

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                      TABLE OF CONTENTS

2

3    WITNESS                                    PAGE

4    NICOLINA CAMAJ

5

6    EXAMINATION BY MR. FLORES                    5

7

8                         EXHIBITS

9

10   EXHIBIT                                    PAGE

11    (Exhibits attached to transcript.)

12

13   EXHIBIT C                                  39

14   EXHIBIT E                                  96

15   EXHIBIT F                                  92

16   EXHIBIT G                                  93

17   EXHIBIT H                                 100

18

19

20

21

22

23

24

25
```

```
 1  Birmingham, Michigan
 2  Wednesday, October 6, 2021
 3  10:04 a.m.
 4
 5                        NICOLINA CAMAJ,
 6       was thereupon called as a witness herein, and after
 7       having first been duly sworn to testify to the truth,
 8       the whole truth and nothing but the truth, was
 9       examined and testified as follows:
10                            EXAMINATION
11  BY MR. FLORES:
12  Q.   Good morning, Ms. Camaj.
13  A.   Good morning.
14  Q.   I'm sure Mr. Porter has told you my name is Bob
15       Flores.  I am Mr. Eid's attorney, and I'm going to be
16       doing this deposition today.
17            I'd like to try to keep this as a -- kind
18       of a conversation.  There may be times that I ask a
19       question that's confusing.  Rather than try to answer
20       it, if you would just kind of stop me and just let me
21       know that it's confusing, that would be great.  I know
22       that sometimes we can end up talking over each other,
23       so I will do my best to try to wait until you've
24       finished your answer before I start talking.
25       Otherwise, that will probably create some problems
```

```
 1        with Zoom.
 2                    Just to have an idea as to -- with your
 3        familiarity to these kinds of issues in this kind of a
 4        situation, have you ever testified as a witness in a
 5        trial prior to your testimony today?
 6   A.   No.
 7   Q.   And have you ever given any kind of testimony under
 8        oath?
 9   A.   No.
10   Q.   Have you ever been a party to a lawsuit?
11   A.   No.
12   Q.   And just in terms of how I'd like to conduct this and,
13        obviously, you know, your lawyer's going to have his
14        own thoughts about what his role is, but generally
15        speaking, the purpose for the deposition is to get as
16        much information as possible so we could narrow the
17        issues if and when we go to trial.
18                    To that end, you have to answer all the
19        questions I ask, although they may be objectionable
20        from your attorney's perspective, and they may object,
21        they'll object.  They'll state their reason for the
22        objection, but for purposes of the deposition, you'll
23        then answer the question unless it's a matter of
24        privilege, and then the lawyers will kind of work that
25        out as quickly as possible to get back to your
```

1       deposition, but it's not like a courtroom where you

2       actually have, like, a judge making a final ruling

3       where a judge would say that's, you know, I'm going to

4       exclude that or I'm not going to allow that question

5       or rephrase it.  We're not kind of in that situation

6       today because we don't have a neutral arbitrator like

7       a judge or a magistrate.

8                   If you need to take a break, sometimes I

9       end up getting so involved in the deposition answering

10      questions I forget about what time it is, just let me

11      know.  I think I'm going to try to take a break at

12      least once every 45 minutes to an hour for about five

13      minutes just to give people a break in case they've

14      got to make a call or they've got to take care of some

15      other things.

16                  Obviously, any exhibits that you will need

17      in order to be able to answer a question need to be

18      provided by me.  So just to ask right now, you don't

19      have any documents in front of you or any other

20      material that you've been given either by counsel or

21      that you've prepared that are with you right now; is

22      that right?

23  A.  Right, I don't have anything in front of me.

24  Q.  Great.  If during the time that I'm asking you

25      questions there is a document that you know of that

1        would refresh your recollection, I may very well be

2        getting to it later on in the deposition, but just let

3        me know, and then we'll try to figure out if I don't

4        have it if we can get it and that will help you

5        refresh your recollection because, obviously, we want

6        you to testify today from your current recollection.

7        So there may be things that you just don't remember

8        because time has passed.

9                Most of these questions are going to

10       involve my asking you about whether you've met with

11       your lawyers or done things like that.  I want to be

12       very clear at any time during the deposition, I am not

13       asking you about what you told your attorneys or what

14       your attorneys told you.  I'm just trying to get a

15       sense for time and space of when you may have started

16       to prepare and those kinds of things.

17               So is it fair to say that you had at least

18       one meeting with your lawyers or a member of your

19       lawyer's firm in preparing for your deposition today?

20  A.   Yes.

21  Q.   And did you spend a significant amount of time with

22       them, or was it just kind of in passing?

23               MR. PORTER:  Objection, form.

24  BY MR. FLORES:

25  Q.   You can go ahead and answer if you can.

1   A.   I don't know what "significant time" means but...

2   Q.   Did you spend a couple hours with them --

3   A.   Yes.

4   Q.   -- or was it just a few --

5   A.   A few hours, yes.

6   Q.   I apologize for that; let me ask the question again.

7        Did you spend several hours with your attorneys

8        preparing for the deposition?

9   A.   I don't know that I would define several hours but a

10       few hours, yes.

11  Q.   And where did that take place?

12  A.   Virtually.

13  Q.   And did you prepare any documents as part of your

14       preparation for the deposition?

15  A.   Not during the conversation with my attorney, no.

16  Q.   Did you take any notes or make any writings as part of

17       your preparation for the deposition?

18  A.   Yes, I reread the investigation report I submitted

19       just to refresh my memory of what it said so that --

20       because it had happened so many years ago.

21  Q.   Okay.  Did you take any notes as you made that review?

22  A.   No.  I just read the document.

23  Q.   And I already asked you about documents that you may

24       have with you.  Your testimony is there's nothing in

25       front of you as you testified this morning?

1    A.   No, there's nothing in front of me other than a

2         computer screen.

3    Q.   Now, we submitted several requests for documents to

4         your attorneys, and they provided a host of documents

5         in return.  I'd like to know whether or not you

6         participated in searching for or producing those

7         documents?

8    A.   I'm not sure I know what you're referring to in terms

9         of documents.

10   Q.   I'm sorry, I cut you off.

11   A.   That's okay, I'm just not sure in terms of what

12        documents I would have sent other than my report with

13        the included evidence that was submitted.  I didn't

14        have any other additional documents.

15   Q.   All right.  So you did not provide any additional

16        documents beyond your report to your attorneys?

17   A.   Right, anything that was related to my submitting the

18        report, that's what I submitted.  To the best of my

19        recollection, I don't -- yeah, yeah.

20   Q.   Other than your attorneys, did you receive help from

21        anyone else in preparing for your deposition?

22   A.   No.

23   Q.   Did you discuss your deposition with anyone other than

24        your lawyers?

25   A.   No.

1   Q.   Did you speak to anybody in the general counsel's

2        office in preparation for your deposition?

3   A.   Well, our general counsel is here, Kristen, and so she

4        was present, yeah.

5   Q.   I'm sorry?

6   A.   She was present when the lawyer was speaking to me.

7   Q.   Okay.

8   A.   So I didn't have additional meetings.

9   Q.   All right.  Do you keep a personal calendar or a

10       journal that has your daily activities in it?

11                  MR. PORTER:  Objection, form.

12  BY MR. FLORES:

13  Q.   Do you keep a daily journal?

14  A.   No, I don't have a journal, and I have a work calendar

15       but not a personal calendar.

16  Q.   Where do you -- how do you keep that work calendar?

17  A.   It's Outlook.  I do my best to keep it updated.  It's

18       not always accurate but I do my best.

19  Q.   Okay.  Thank you.  Do you have a secretary that works

20       for you?

21  A.   Not a personal secretary, no.

22  Q.   Administrative assistant?

23  A.   I don't -- under me, I don't have anybody that works

24       for me in my line of work.

25  Q.   And do you work exclusively in the office or do you

| 1  |     | work from home? |
|----|-----|-----------------|
| 2  | A.  | I work in the office; however, during the pandemic, I |
| 3  |     | was working remotely, and currently, I'm doing one day |
| 4  |     | remote and four days in the office. |
| 5  | Q.  | And do you remember when you -- approximately when you |
| 6  |     | started working from home? |
| 7  | A.  | Sure.  It was, I think, March -- it probably was |
| 8  |     | March 13th was our last day.  That's when we were sent |
| 9  |     | home.  I feel like the 13th is the correct answer, in |
| 10 |     | March. |
| 11 | Q.  | And does the university provide you with a work cell |
| 12 |     | phone? |
| 13 | A.  | No. |
| 14 | Q.  | So the only communications device that you have is |
| 15 |     | your personal phone? |
| 16 | A.  | Right.  Yes. |
| 17 | Q.  | Can I have that telephone number, please? |
| 18 |     | MR. PORTER:  Objection.  Why are you -- why |
| 19 |     | do you need her personal information? |
| 20 |     | MR. FLORES:  I don't need to provide you |
| 21 |     | with that information.  You have your objection.  It's |
| 22 |     | not privileged. |
| 23 | A.  | I can -- would it be appropriate for me to give you my |
| 24 |     | office phone number since they're both linked |
| 25 |     | together? |

```
 1    BY MR. FLORES:

 2    Q.   No, I'd like to have your cell phone number.

 3    A.   Okay.  (586) 214-8250.

 4    Q.   And you have a desk phone, as well?

 5    A.   Yep.

 6    Q.   And what is the telephone number for that line?

 7    A.   It's (313) 577-8063.

 8    Q.   Let me just read that last number back to you:

 9         (313) 577-8063?

10    A.   Yes.

11    Q.   And have you had -- approximately how long have you

12         had the cell phone number?

13    A.   I think I had it since 2013, end of 2013.

14    Q.   And have you had the same desk line since you started

15         working at Wayne State?

16    A.   Yes, it was assigned to me, yep.

17    Q.   Do you have any other telephone numbers that you may

18         use for work or receive work phone calls on?

19    A.   Not me personally, no.  I have one phone number.

20    Q.   Can you tell me when -- what degrees you hold?

21    A.   Sure, I have a Bachelor's of Science in Secondary

22         Education from Central Michigan University with a

23         specialization in secondary education in mathematics

24         and geography, and I have a degree from Clemson

25         University in the -- excuse me, Masters of Counselor
```

1        Education with a specialty in student affairs and
2        administration.
3   Q.   And in addition to those -- I'm sorry, can you tell me
4        when you obtained those degrees?
5   A.   Sure, Central Michigan I obtained a degree in August
6        of 2001.  In Clemson, I obtained a degree in May of
7        2003.
8   Q.   You don't hold any other degrees or certificates?
9   A.   No.
10  Q.   So am I correct in understanding that you -- well, let
11       me -- let me withdraw that.  Do you have any training
12       in police administration?
13  A.   I'm not familiar what that means, police
14       administration.  I'm not sure I understand the
15       question.
16  Q.   Have you received any training as part of your
17       master's degree in the operation of police
18       departments, police -- proper police administration,
19       investigation of school matters, anything like that?
20            MR. PORTER:  Objection, form.
21  A.   Since I was a resident assistant, I've been working
22       closely with police in my job when I've been serving
23       as an oncall professional staff member for 20-plus
24       years, so from being a resident assistant to hall
25       director, community director, assistant director, I've

1       served in a role where I am working with police in

2       terms of responding to student needs in, you know,

3       when I'm on call.

4   Q.  Have you taken any criminal justice courses?

5   A.  I have not.

6   Q.  Have you taken any courses in computer forensics?

7   A.  I have not.

8   Q.  Do you know, have you trained yourself or have you

9       learned how to conduct basic computer forensic exams?

10  A.  I have not.

11  Q.  You're not a licensed private investigator?

12  A.  I do not have a license to be a private investigator,

13      no.

14  Q.  And do you have any training with respect to the

15      investigation of civil rights cases?

16  A.  No, that's not -- no.

17  Q.  Could you expand a little bit and tell me a little bit

18      more about your master's degree?

19  A.  In terms of?

20  Q.  What had prepared you for the kinds of courses that

21      you took just to get a better idea as to exactly what

22      that degree is about since I'm not familiar with it?

23  A.  Sure.  So when you study in the field of student

24      affairs in higher eduction, you could have many

25      specialties, and in my case, my specialty was working

1    within residential life but also being exposed to

2    other specialties like conduct and orientation and

3    admissions.  So there are several different

4    departments that are campus services, and you really

5    focused on student development and how you can help a

6    student progress in the -- in their -- you know, when

7    they're seeking a degree.

8              And so with my degree while I was getting

9    my master's, I had to work full time as a hall

10   director.  So that's part of the experience is that

11   you're gaining on-the-spot experience and knowledge

12   along with a degree, and in -- in Clemson, I began

13   severing as a conduct officer, what we called a

14   hearing officer.  So I would follow up with students

15   when violations -- alleged violations would take

16   place, and I would make decisions on cases.

17             So since then, I have been serving in some

18   type of role as a hearing officer more broadly

19   speaking.  In other places, I've been called a conduct

20   officer, so different titles, but you're still doing

21   student conduct in every single place I've worked.  So

22   that's 20-plus years of conduct experience.

23   Q.   All right.  Thank you very much.  That's very helpful.

24   A.   You're welcome.

25   Q.   After you graduated from Clemson, did you stay there

```
 1          for a while as an employee or did you go to -- did you
 2          have -- did you find other work?
 3   A.    I found other work.
 4   Q.    Where did you -- where were you employed?
 5   A.    Six months later, I received a position in Southern
 6          Illinois University - Carbondale.
 7   Q.    And what was the position?
 8   A.    Sure, I served as a hall director for an 800-person
 9          building consisting of freshman where I also had
10          probably 10 to 20 conduct cases a week I had to follow
11          up with, and I served --
12                      (Attorney and witness speak over each
13                      other.)
14   A.    Yeah, and I served in an on-call capacity too, so both
15          administrative responsibilities, oncall
16          responsibilities, and hearing officer
17          responsibilities, and I did that for a year and a half
18          there.
19   Q.    So during that employment, you were pretty much a
20          one-person band?
21   A.    No, we have a team we work with.  So when you're --
22          when you're on call, you're not the only person on
23          call, but when you do get assigned your conduct cases
24          for your building, you're the one making the
25          decisions.
```

```
 1    Q.   What was the scope of your authority in terms of
 2         decision making when you were dealing with a conduct
 3         case?
 4    A.   Sure, I was able to determine if a student was
 5         responsible/not responsible or the case had no further
 6         action due to a lack of evidence, and if a student was
 7         found responsible, I was able to determine sanctions.
 8    Q.   And were those decisions all subject to review by
 9         whoever was your boss, or were they left at your
10         level?
11    A.   Yeah, of course I have a supervisor, and so they would
12         monitor us as a professional.  They evaluate you to
13         make sure they're following your policies and
14         expectations according to whichever university you're
15         at, you want to make sure you're following their
16         policies.
17    Q.   And how long, again, did you hold that position?
18    A.   That was for about a year and a half.
19    Q.   And what was the reason you left?
20    A.   I got a position in New York City.
21    Q.   What was that?
22    A.   Again, I served as a hall director on an urban campus.
23         So the reason for my move is to move to the East
24         Coast, and again, I served in a similar role, hall
25         director, had the similar responsibility; however, it
```

1        was in a large setting, so it was a large urban

2        environment compared to a rural environment, so I just

3        wanted to more experience, and that was the reason for

4        my move, but similar experience.

5   Q.   And what was the school?

6   A.   It was called The New School.

7   Q.   Oh, okay.

8   A.   That's where they had the Parsons School of Design and

9        the Actors Studio at the time.

10  Q.   Yeah, I was a district attorney in New York, so I'm

11       familiar with definitely a different type of student

12       that attends that school.

13            And how long did you stay The New School?

14  A.   Sure.  I stayed there for a year, and then I got a

15       higher paying position with the Fashion Institute of

16       Technology a couple blocks down where I served --

17       they're -- called us resident counselors, but we

18       served as hall directors.  It's just we have a lot of

19       different titles in our field, so a resident counselor

20       at FIT served the same role as what a hall director

21       would be called, and again, I supervised two buildings

22       over there in Chelsea, and I had similar

23       responsibilities meeting with students for conduct

24       matters, being on call in the city, and severing in a

25       similar fashion.

1    Q.    And how long did you stay at FIT?

2    A.    I stayed there for a year before I got recruited to

3          work for Blackstone in their Blackstone property

4          management sector in London, England.

5    Q.    Now that's kind of a very different change.  How long

6          was that, and where were you in London?

7    A.    Yeah, Blackstone Property Management was investing in

8          luxury residence halls and their relationships with

9          university students that would be living in London and

10         studying, and so they built these residence halls, and

11         some of our clientele was coming from America, so they

12         needed somebody with experience that I had because

13         they didn't have that in London, so they recruited me

14         to work there as their residence manager, and I had a

15         supervisor who managed the whole -- the two complexes,

16         and it involved having a cafeteria onsite, laundry

17         room onsite, it was just a huge complex, and so I was

18         responsible for residential life experience of several

19         thousand students, and I also served in a capacity

20         where I was a hearing officer and would follow up with

21         students for conduct matters.

22                   And then my second year there, I became the

23         residence manager, so I was promoted, and so for the

24         last two years, I was there serving in a higher role

25         where I was responsible for students from 80 different

1        countries and -- and again, severing in a conduct

2        hearing capacity, as well.

3   Q.   And was that complex connected to a particular

4        university?

5   A.   No, we worked with several universities, both

6        internationally and locally, so you know, the

7        University College of London is one, for example,

8        King's College, so several of the London universities

9        but also places like New York University and other

10       institutions like University of North Carolina that

11       would come stay in our residence hall, so we would

12       develop relationships with universities so their

13       students could stay in our building.

14  Q.   So, basically, Blackstone was commodifying the student

15       hall kind of opportunity so schools didn't have to

16       spend the money to build something --

17  A.   Right.  Right.  They could stay with us.

18  Q.   Great.  And after Blackstone, when did you come back

19       to the -- or did you take another posting in Europe?

20  A.   I came back to the United States, I think it was 2010,

21       and then I took some time off before I started at

22       Brown University in Providence, Rhode Island, and I

23       was there for a year severing as a community director.

24       Again, I was supervising their themed housing that

25       involved Greek live students and other themed housing,

1           again, severing in a capacity of being oncall and
2           being a hearing officer.
3   Q.  And the community director, that was, again, kind of
4           the same type of position --
5   A.  Yeah, you just -- you just have more buildings, yeah,
6           you just have several more buildings on campus that
7           you're in charge of.
8   Q.  And during what period were you at Brown?  What years?
9   A.  I think it was 2012-2013.  I lost my father, I
10          think -- I think it was the end of 2013, so I ended up
11          staying in America for a year to be with my family, so
12          I didn't work at all so I could help my family, and
13          that's when I was job searching, and after my Brown
14          University experience, I stayed home for about a year,
15          a year and a half, and then I started searching again,
16          and I found myself working and got recruited to work
17          at New Orleans University of -- Loyola University of
18          New Orleans in Louisiana, and I was there for three
19          years severing as the assistant director for
20          residential life -- assistant director for -- they
21          gave me a really long title, but my main purpose was
22          to be in charge of the conduct system there and to be
23          trained as a Maxient software administrator that would
24          receive all reports and manage the community
25          director's experience as conduct hearing officers, so

```
 1          I had a higher level role there as a conduct officer
 2          for the campus.
 3  Q.   So let me make sure that I understand that.  So at
 4          Loyola, you are now managing other conduct officers?
 5  A.   Right, right, right.
 6  Q.   Okay.  So you weren't doing as many of the direct
 7          investigations at that point; you were supervising the
 8          information and then what the conduct officers were
 9          doing?
10  A.   No, I was still doing investigations because I served
11          in a dual role, so not only was I the assistant
12          director.  I think they called it residential
13          education, but that education was the conduct side.  I
14          also served as a community director on the law school
15          campus, so I had my own students that I was
16          responsible for and hearing -- in cases, I heard
17          additionally, the other role I had there was a Title
18          IX investigator on campus.
19  Q.   And how was the Title IX responsibility, how was that
20          different than what you had been doing up through that
21          time in terms of your career?
22  A.   Sure.  So Title IX investigator required training, so
23          I had to go to a week's worth of training to make sure
24          that I understood the policies and procedures
25          associated with Title IX, and so then when cases were
```

1          assigned to me, I would, you know, go forward as the

2          policy dictated and pursue case -- and investigate

3          cases.

4    Q.    And who offered that training?

5    A.    I -- the ASCA.  It's the conduct association that was

6          doing it, and it's called the Gehring Institute [sic].

7    Q.    Do you know how that's spelled?  Is it G-e-h-r --

8    A.    Gehring -- Gehring has an "h" in it, so it might be

9          G-h-e-r-i-n-g, or I might have misspelled that, but

10         it's called the Gehring Institute, and it's run

11         through the ACSA, ASC -- American Student College

12         [sic] Association -- or conduct officer, and I

13         attended that two years in a row.  It's a five-day

14         training, and then after you do that, as I continued

15         in my third year, we brought them to campus, we

16         brought trainers to campus to train us because every

17         year you need to be -- you have -- what is it

18         called -- additional training every year.

19   Q.    So that was part of, like, a continuing education

20         program that --

21   A.    Right, right, right.  As long as you're serving as a

22         Title IX investigator, there are certain requirements

23         that need to be made or met and training requirements

24         in terms of you serving as a Title IX investigator.

25   Q.    And the requirement comes from Title IX, itself, or

```
 1            from the university?
 2    A.    Both.  University wants -- want their Title IX
 3          investigators trained, as well as, you know, the
 4          associations will tell you and the laws will tell you
 5          that you want trained investigators serving in -- at
 6          your universities, the guidance, I should say.
 7    Q.    So while you were at Loyola, did you stay in that job
 8          the entire time?
 9    A.    I did.  I stayed there for three years, yep, in that
10          same role.
11    Q.    And that was approximately from 2015 until --
12    A.    2018, June.
13    Q.    During your time at Loyola, did you have -- can you
14          estimate how many investigations of sexual abuse or
15          sexual harassment you investigated?
16    A.    50-plus a year estimated.  That's how many cases ran
17          through our office.
18    Q.    And was your experience that most of those cases were
19          well-founded?
20                MR. PORTER:  Objection, form.
21    A.    I'm not sure what that means.
22    BY MR. FLORES:
23    Q.    Sure.  From -- of the -- let's just assume for
24          purposes of this question that there were 50 cases
25          each year.  Can you estimate approximately how many of
```

```
 1          those 50 cases ended up with a finding that the
 2          allegation was true?
 3   A.     That --
 4                   MR. PORTER:  Objection, form, calls for
 5          speculation.
 6   A.     I don't know the configuration, but I would say more
 7          students were found responsible than not, but I don't
 8          know the numbers.
 9   BY MR. FLORES:
10   Q.     And can you tell me the most prevalent type of
11          complaint that would have made up -- that would have
12          been part of those 50?
13                   MR. PORTER:  Objection, form, foundation.
14   A.     So specifically Title IX, it would have been sexual
15          assault, and it would have been sexual harassment, it
16          would have been stalking.  We saw a -- we saw it
17          almost every different -- how they're defined, we saw
18          just about every type of case, but those were probably
19          the ones I can mainly think of.
20   BY MR. FLORES:
21   Q.     Did you ever have a situation where the allegation of
22          sexual abuse was made by a man?
23   A.     Yes.
24   Q.     Was that exceedingly rare or fairly common?
25                   MR. PORTER:  Objection, form.
```

1   A.   I would say rare.  Specifically, if you look at -- if
2        you look at the national figures, that's in line with
3        the national figures, so it's not unusual that you
4        would have less males reporting than you would have
5        females, and that's in line with the national numbers.
6   Q.   Can you assign a percentage to what would have been
7        the number of male victims or alleged male victims?
8                    MR. PORTER:  Objection, form.
9   A.   Unfortunately, I can't give you a percentage.  I just
10       know it was less than female.
11  BY MR. FLORES:
12  Q.   Okay.  What type of case made up the largest part of
13       your case load, male on female, female on male, male
14       on male or female on female?
15  A.   I would say male to female.
16  Q.   With the male as the aggressor?
17  A.   Mm-hmm.  Which is, again, in line with the national
18       statistics, yeah.  Yeah.  In terms of what gets
19       reported.
20  Q.   Prior to coming to Loyola, had you received -- had you
21       received any training with respect to Title IX?
22  A.   Other than the policies.  So we, as residential life
23       staff at every institution that I've been a part of,
24       we need to be informed so that if we saw a Title IX
25       matter appear, we were responsible employees and had

1        to report that up to the director of Title IX at that

2        institution, and so I've experienced that almost in

3        every single place I've worked other than London

4        because we didn't have, let's say, a Title IX director

5        because it was Europe.  So that would be the one place

6        where I didn't have that, but we always had to be

7        informed of where we can send a student if they needed

8        information or we saw a report come through with a

9        Title IX matter.

10   Q.   At Loyola, did you ever investigate allegations where

11        the aggressor was allegedly a member of the faculty or

12        staff?

13            MR. PORTER:  Objection.  I'm sorry, I just

14        have to make sure I understand.  Are you asking her

15        personally, or are you talking about the institution?

16            MR. FLORES:  No, her personally.

17   A.   No, that was not my responsibility.

18   BY MR. FLORES:

19   Q.   So you dealt exclusively with student cases?

20   A.   Correct.

21   Q.   Prior to the training -- well, let me ask can you

22        please describe the subject matter and the different

23        types of areas where you received training where you

24        went for that ASCA training course?

25   A.   Well, sure, they train you on the policies that have

1        been instituted by the government.  You learn about

2        various laws that impact the policy changes, and then

3        you also -- you also review your own campus policies

4        too, and so you're trained on how to investigate.  We

5        were also trained on, I think it was my second year,

6        what's called trauma informed training that was added

7        the second year.  So that way we knew what to do with

8        both students who were reporting it and give -- and

9        making sure that we were considering the trauma that

10       can be impacted by students who are respondents and

11       complainants.

12              And then you're trained on any new laws

13       that are added or changed, new policies and

14       procedures.  So each year -- and that's why we have

15       the review each year to make sure we are up to date on

16       what is current.

17   Q.  Okay.  So you attended that training for two years?

18   A.  Mm-hmm.

19   Q.  And then the third year you brought trainers to the

20       campus?

21   A.  Right, right.  Yeah, the training was a bit different,

22       it was on campus, yeah.

23   Q.  And are you familiar with -- well, let me go back.

24       Let's talk a little bit about the actual investigation

25       training.

```
 1   A.   Mm-hmm.

 2   Q.   Did that include training on how to conduct

 3        interviews?

 4   A.   Yes.

 5   Q.   And did that include training on how to protect the

 6        chain of evidence?

 7   A.   I'm not sure what you mean in terms of, like, when you

 8        receive information, how to protect it; is that what

 9        you mean?

10   Q.   Yeah, how to protect or preserve the chain of

11        evidence.  So whether it's a statement or it's an item

12        of clothing, did you --

13   A.   Yes.

14   Q.   -- receive training in those courses on how to

15        maintain that chain of custody?

16   A.   Yeah, something that was talked about was definitely

17        if a victim was raped, you know, that you would want,

18        you know, discussions about how to preserve the

19        clothing or even reminding students if you have any

20        evidence not to delete it and save it.  So that's

21        something that we would -- when we would meet during

22        our investigations, we would inform the

23        complainant/respondent that if you do have any

24        evidence to share, don't delete it, and you can submit

25        it to us if that's related to the case.
```

1   Q.   And did you receive any training to equip you so that
2        you could go out and collect evidence about an alleged
3        student conduct violation?
4   A.   Yes.  In terms of if, for instance -- I can give you
5        an example.  If I'm aware that somebody mentions that
6        there was a -- something happened in a residence hall
7        and I'm aware that there's cameras in the lobby and
8        there was an incident in the lobby, I would then seek
9        out to see can I get ahold of that camera to see if I
10       can find any video if I -- if I'm aware that the
11       evidence is there.  And that's why we always ask the
12       respondent and the complainant if there's any evidence
13       that you have to add to the case, please let us know
14       so we can add it to the case.
15  Q.   Okay.  What was your responsibility as a Title IX
16       investigator in terms of maintaining evidence?
17  A.   You mean like once it was submitted to me?
18  Q.   Right, what was your responsibility or what were you
19       trained to do?
20  A.   Yeah, so I would save that evidence.  Obviously, I
21       wouldn't share it with anyone, you just save it, and
22       then you add it to the report as an appendix.
23  Q.   Okay.  So let me just give you a hypothetical, just I
24       need to tease this out, I want to get a better sense
25       of what that training involved.  Let's suppose there

```
 1            was an allegation that some type of sexual event had
 2            happened in a dorm room and there was -- someone got
 3            hurt on top of that, so there may have been some
 4            blood, there may have been other body fluids.  Would
 5            you, as a Title IX investigator, would you be the
 6            person responsible to go and collect that, or would
 7            you reach out to the police department, what's -- how
 8            do you deal with that knowledge?  What's your
 9            responsibility?
10                      MR. PORTER:  Objection, form, foundation.
11    A.    I wouldn't request somebody to give me that data, but
12            if it was available by a police report, and I'm made
13            aware of it, it's something that I could request
14            depending on the campus I'm working at.  So every
15            campus has different measures of what you can do, but
16            I, myself, I would never go and ask for blood samples
17            or anything like that.
18    BY MR. FLORES:
19    Q.    If there's no police report made as part of the
20            Title IX investigation, what happens then with that
21            evidence?
22                      MR. PORTER:  Objection, form, foundation.
23    BY MR. FLORES:
24    Q.    So if someone provided to you a piece of hard
25            evidence, whether it was clothing, whether it was a
```

 1        bottle of beer, whether it was something tangible,

 2        what would your responsibility be in terms of

 3        safeguarding that particular item of evidence?

 4   A.   Well, I wouldn't collect it personally because I would

 5        not be able to process it, and so what I would do is I

 6        would advise the student if they want to move forward,

 7        they can report it to the police so they can help them

 8        further, or if it's something that a nurse in a

 9        hospital can do testing on a doctor so they can get

10        evidence and pursue it through the police matter, you

11        know, if they're going to take it to a civil court,

12        then I would advise them that's one of their options,

13        but I, myself, would not handle any evidence like

14        that.

15   Q.   So if a student actually provided that evidence, you

16        would tell them I'm sorry, I can't accept that

17        evidence, you'll have to either take that to the

18        police or some other law enforcement agency?

19   A.   Right.

20   Q.   While you were at Loyola, you were there for three

21        years; is that right?

22   A.   Yes.

23   Q.   Did you as part of your training become familiar with

24        misdemeanor and felony violations related to sexual

25        harassment, sexual assault, the kinds of cases that

1        you would be responsible for as a Title IX

2        coordinator?

3                    MR. PORTER:  Objection, form.

4    A.   No, I -- that's not my responsibility as a Title IX

5        investigator.

6    BY MR. FLORES:

7    Q.   So you --

8    A.   So I wouldn't -- I would defer students to the experts

9        in that matter if they had questions specifically

10       about the definitions of what they are or the

11       different laws, you know, whether it's a police matter

12       or a lawyer needs to get involved, I would defer

13       students to go to the experts.

14   Q.   Did you ever -- did you ever testify at -- in a

15       criminal case or a civil case at -- while you were at

16       Loyola as a witness to what you had been told by a

17       student or evidence that you are aware of?

18                    MR. PORTER:  Objection, form.

19   A.   No.

20   BY MR. FLORES:

21   Q.   How large was the Loyola Title IX office while you

22       were there?

23   A.   There was three of us when I started, and with that

24       office, if I include the general counsel, and also,

25       the next year we added more investigators, so it grew

1       to about five or six, and I think it even expanded my

2       third year just to have more investigators, so it was

3       a small team to start and then it expanded.

4    Q. In Title IX matters, what's your understanding of what

5       the evidence standard is for proving a Title IX

6       violation?

7    A. Right.  So there's a preponderance of evidence

8       standard, and then it changes.  Some institutions

9       might do clear and convincing, so depending on the

10      institution that you're at, but it's a preponderance

11      of evidence.

12   Q. At Loyola, do you remember what it was?

13   A. I believe we dealt with preponderance of evidence, if

14      I can recall, yes.

15   Q. Under Title IX, who bore the burden of proof in a

16      case?

17   A. The university.

18   Q. And how does that differ from a typical civil case if

19      you know?

20   A. I'm not sure I know a civil case, I don't know.

21   Q. Now, I had asked you earlier if you had ever been

22      involved in a -- in a case or in a lawsuit where you

23      were involved as a witness.  Were you ever involved in

24      a lawsuit while you were at Loyola as a defendant?

25   A. No.

1    Q.   Are you familiar or do you remember the case Broussard

2         versus Loyola?

3    A.   I was not involved with that.

4                   MR. PORTER:  Can you say that name again?

5                   MR. FLORES:  Yeah, Broussard,

6         B-r-o-u-s-s-a-r-d, versus Loyola.

7    A.   The name sounds familiar but I --

8    BY MR. FLORES:

9    Q.   Well, this was a case in 2018 that was brought by a

10        law student, and for at least the initial filing and

11        for a period of time, you were a named defendant.

12   A.   Yeah, the name is familiar, yeah, yeah.

13   Q.   Okay.

14   A.   But I had no -- I was never asked to go to court,

15        never asked to give a statement at all.

16   Q.   Did you ever talk with the general counsel's office

17        about it at Loyola?

18   A.   Yes, because we were in communication with them

19        because it's a Title IX office, but I never was asked

20        to participate in a lawsuit.

21   Q.   Okay.  Are you familiar with an organization called

22        ATIXA or A-T-I-X-A, the Association of Title IX

23        Administrators?

24   A.   Mm-hmm.

25   Q.   Are you a member or have you received training from

```
 1          them?
 2    A.    I'm not a member but our director at Wayne State
 3          University is a member, and so she will organize
 4          trainings for us making sure that we meet the
 5          standards, and so a lot of times ATIXA shares
 6          information with her about our training needs.
 7    Q.    All right.  Let's, if we can, it's about 10:53.  Are
 8          you good or would you like a five-, ten-minute break?
 9    A.    I'm good if you want to continue.
10    Q.    Let's move to your tenure at Wayne State.
11    A.    Okay.
12    Q.    When did you start working for Wayne State?
13    A.    In July 2018.  So a month after I left Loyola.
14    Q.    And did you leave Loyola with that job already having
15          been hired for it?
16    A.    No, I left Loyola to be closer to family in Michigan
17          knowing that I would be searching for jobs when I came
18          back in June, and they had an opening, and so I went
19          ahead and applied.
20    Q.    And do you remember who you interviewed with?
21    A.    Yes, I had interviewed with Dean Strauss for my
22          current position as a Title -- excuse me, as an
23          associate director for this position.
24    Q.    So can you give me the actual title that you ended up
25          receiving after being hired?
```

1   A.   Sure.  My title is associate director and student

2        conduct officer in the dean of students office.

3   Q.   And Dean Strauss was the dean for the offices of the

4        student office -- the office for students?

5   A.   Yes, he's the current dean, yes.

6   Q.   I apologize, I need to just go back real quick to

7        Loyola.  While you were at Loyola, one of the -- there

8        have been over the last couple of years a number of

9        student led efforts to try to address violence on

10       campus, and one of those was the It's on Us campaign;

11       are you familiar with it?

12  A.   I'm familiar with the campaign, yes.  That started, I

13       believe, with the government.

14  Q.   And do you know if the campaign was active at Loyola?

15  A.   I know we had campaigns, but I can't recall right now

16       which ones we dealt with, which ones we held.

17  Q.   Okay.  And you don't -- were you personally involved

18       in any of those campaigns as a Title IX coordinator?

19  A.   No, as an investigator, I -- if I'm asked to be

20       present at something to help answer any questions, I

21       would go, so that, you know, in my role.  I mainly

22       served as a investigator, and if I needed to provide

23       education to students and answer questions, I would

24       always make myself available on campus.

25  Q.   In 2011, the Assistant Secretary For the Office of

1        Civil Rights for the United States Department of

2        Education sent out what is colloquially called a Dear

3        Colleague letter dealing with Title IX.  Does that

4        ring a bell?  Are you familiar with that letter?

5    A.   I have familiarity.  I would need to reread it because

6        it's been such a long time, but I -- we are aware,

7        it's part of our training to be notified that the

8        government sends Dear Colleague letters that we should

9        be aware of.

10                 MR. FLORES:  If I could have -- Bailey, if

11       you could put up on the screen Exhibit C?

12                 VIDEO TECHNICIAN:  One moment.

13                 MR. FLORES:  And if you could go down.

14                 MR. PORTER:  Will this also be provided in

15       the chat?

16                 VIDEO TECHNICIAN:  Yes, one moment.

17                 MR. FLORES:  Bailey, let me know when you

18       can see it, okay?

19                 MR. PORTER:  Oh, I see it, thank you.

20                 MR. FLORES:  Okay.

21                 INTRODUCED FOR DISCUSSION:

22                 EXHIBIT C

23                 10:58 a.m.

24   BY MR. FLORES:

25   Q.   Ms. Camaj, can you see it, as well?

1    A.    Yes, I see it.

2    Q.    This is the letter that I'm referring to which is a

3          2011 letter, and it was put out by the office for

4          civil rights, and your testimony is that you were --

5          you're generally familiar with that Dear Colleague

6          letter?

7    A.    Yes.

8    Q.    And can you recall that one of the major portions of

9          that letter dealt with what the proper standard of

10         evidence would be -- should be in a Title IX case --

11   A.    I would --

12   Q.    I'm sorry.

13   A.    That's okay.  I would have to read it because I -- I

14         don't recall off the top of my head, but I'd want to

15         make sure to read it and then answer your question.

16   Q.    Okay.  So I'm just trying to think.  This is several

17         pages long, and most of what is in here is really

18         unnecessary for purposes of answering my questions.

19              MR. FLORES:  If we can -- Bailey, is it

20         possible for you to, let's see, scroll down to -- just

21         keep going page by page, and I'll identify the area,

22         the portion that I'd like Ms. Camaj to read just to

23         see if it refreshes her recollection.

24              EXHIBIT TECHNICIAN:  Yes, I can also give

25         you control of the document if you'd like.

1                    MR. FLORES:  Okay.

2                    EXHIBIT TECHNICIAN:  There you go.

3                    MR. FLORES:  All right, bear with me,

4        Ms. Camaj, until I get down to that section.

5                    MR. PORTER:  I've also printed it out, and

6        I'm handing it to the witness.

7                    MR. FLORES:  Okay.

8                    MR. PORTER:  While you find that, do you

9        mind if we take a quick five-minute break?

10                   MR. FLORES:  Yeah, that's fine.

11                   MR. PORTER:  Okay.

12                   MR. FLORES:  Why don't we get back here at

13       11:10?

14                   MR. PORTER:  That's fine by me, that will

15       work.  Thank you.

16                   MR. FLORES:  And Bailey, if you'll work

17       with me, then I'll have that identified for Ms. Camaj.

18                   EXHIBIT TECHNICIAN:  Sure.

19                   (Recess taken at 11:01 a.m.)

20                   (Back on the record at 11:09 a.m.)

21                   MR. PORTER:  Obviously you're not waiting

22       on us.  I think we're all set over here.

23                   MR. FLORES:  Okay, great.

24   BY MR. FLORES:

25   Q.  So let me direct your attention to the last paragraph

```
 1        on what is marked in blue at the top, page 11 of 20,
 2        and ask you or give you time to read that paragraph.
 3   A.   Is this the one that I'm looking at?
 4   Q.   Let's make sure it is.
 5   A.   It starts with "As noted above..."?
 6                    MR. FLORES:  Bailey?
 7                    EXHIBIT TECHNICIAN:  Yes.
 8                    THE WITNESS:  Okay.
 9                    MR. FLORES:  Yeah, so if you'll read that
10        last paragraph, and then it flips over to the next
11        page.  Bailey, when she's ready, just move it to that
12        next page so she can read the remainder of that
13        paragraph.
14                    EXHIBIT TECHNICIAN:  Yes.
15                    THE WITNESS:  Okay, I'm ready.
16                    Okay.
17   BY MR. FLORES:
18   Q.   Okay.  Does that refresh your recollection about the
19        required standard of evidence that the civil rights
20        office said was applicable in Title IX cases?
21   A.   Yes.
22   Q.   And your testimony earlier was that at Wayne State or,
23        rather, at Loyola, the standard of evidence was a
24        preponderance of the evidence; is that correct?
25   A.   Yes.
```

1    Q.   What was the standard of evidence when you arrived at
2         Wayne State Title IX cases?
3                   MR. PORTER:   Objection, foundation.
4    BY MR. FLORES:
5    Q.   Do you -- I'm sorry, let me rephrase it.   When you
6         first arrived at Wayne State, did you take time to
7         familiarize yourself with the Title IX process as it
8         was carried out at Wayne State?
9    A.   I will say that I was not a Title IX investigator my
10        first year at Wayne State, and of course, I
11        familiarized myself as a part of our training in being
12        a responsible employee, and it was a preponderance of
13        evidence.
14   Q.   So from 2018 until sometime in 2019, you were not a
15        Title IX investigator?
16   A.   Correct.
17   Q.   What was your title?
18   A.   Associate director and student conduct officer.
19   Q.   And how did the responsibilities of that job differ
20        from a Title IX investigator?
21   A.   Well, I'm not responsible to hear Title IX cases or
22        investigate them.
23   Q.   One of the reasons that -- or, rather, are you aware
24        that when the -- that the Department of Civil -- the
25        Office of Civil Rights' Dear Colleague letter created

1        a stir within the Title IX community?  Are you

2        familiar with that?

3                    MR. PORTER:  Objection to form.

4     A.   I'm not sure what you're referring to.

5     BY MR. FLORES:

6     Q.   Well, let's just skip that.  Let's go to page 17 of

7        this document, please, Bailey.  And go down a little

8        farther.  Stop right there.  Can you please read that

9        paragraph to yourself, Ms. Camaj, the top paragraph?

10    A.   The top?

11    Q.   It starts with "When OCR finds...".

12    A.   Okay.

13    Q.   Do you understand who the letter is referring to when

14       it talks about "recipient"?

15    A.   I'm going to assume it's the -- the university.

16    Q.   That's correct.  That's my understanding, as well.

17                   So in your words, can you tell me based on

18       this paragraph what one of the major penalties the OCR

19       can impose on a university if they fail to properly

20       enforce Title IX?

21                   MR. PORTER:  Objection, form.

22    A.   Well, it says it right there in the last sentence,

23       "funding."

24    BY MR. FLORES:

25    Q.   Okay.  Did you ever receive any training once you

 1          became a Title IX investigator as to the consequences
 2          of not performing your job properly?
 3                    MR. PORTER:  Objection, form.
 4     A.   Not specifically other than to say, you know, but we
 5          are aware that we must follow proceedings because they
 6          will take funding away, so that's something that we
 7          were aware of, that I was aware of.
 8     BY MR. FLORES:
 9     Q.   All right, thank you.
10                    MR. FLORES:  All right, you can take that
11          document down, Bailey.
12     BY MR. FLORES:
13     Q.   Now, do you remember whether or not you disclosed to
14          Wayne State that you were sued in federal court, you
15          were a named defendant for a period of time while you
16          were at Loyola?
17                    MR. PORTER:  I'm sorry, can you repeat
18          the -- I didn't catch the first part of that question.
19     BY MR. FLORES:
20     Q.   Did you disclose to Wayne State when you were being
21          interviewed that you had been sued in federal court
22          for violating Title IX?
23     A.   No, because I was not a part -- I never participated
24          in the proceedings.
25     Q.   But you knew that you were a named party to that

1        lawsuit though?

2   A.   To be honest, I don't recall being -- I really don't

3        remember.

4   Q.   Okay.  That's fine, thank you.

5   A.   Yeah.

6   Q.   During your first year at Wayne State, what were your

7        primary duties on a daily basis?

8   A.   Okay.  So I was serving as a student conduct officer.

9        I also supervised our office staff along with

10       Dr. Strauss.  We also in our office received CARE

11       reports from the community about concerns they have

12       about students, so I served as what you would call a

13       CARE officer and respond and contact students and

14       offer resources, so I would serve in both of those

15       roles.  I would also offer trainings about academic

16       misconduct process, and so that was the extent, and

17       meet with other departments to train their faculty

18       about the procedures and their responsibility in the

19       process.

20  Q.   So you seem to be making a distinction between student

21       conduct offenses and Title IX offenses.  Can you

22       explain what the difference is?

23  A.   Well, Title IX, if you violate a Title IX pol -- it's

24       in the code.  But what I'm making the distinction on

25       is the types of responses in terms of investigation

1          because Title IX has specific procedures to follow

2          that differ with my day-to-day job.  So when I meet

3          with students for concerns, it differs.  I don't have

4          any of the same responsibilities that I would to

5          Title IX procedures.

6     Q.   So is it fair to say that you might be investigating

7          the exact same type of case, but sometimes it is

8          covered by Title IX and sometimes it isn't?

9     A.   No.

10                    MR. PORTER:  Objection, form.

11    A.   No, that's not what I'm saying.

12    BY MR. FLORES:

13    Q.   Okay.  Give me an example of a typical student conduct

14         offense that you would investigate.

15    A.   If there was a fight between students and somebody

16         filed charges alleging that one or the other violated

17         the code, and a typical charge in that code might be

18         under the section 4.3 or 4.6 of our student code, so

19         it could be physical or verbal threats or abuse, or

20         you could file a 4.6, which is disorderly behavior,

21         and so I could hear that case and make a

22         determination, and then the student, in turn, gets to

23         accept or deny my determination.  So that's one

24         example.

25    Q.   Okay.  And is -- can you describe a Title IX case that

1          you would during your first year not have authority to

2          investigate?

3    A.    I wouldn't investigate anything Title IX because I'm

4          not an investigator at that time.

5    Q.    So any --

6    A.    If anything -- if I hear about a Title IX matter, I

7          would forward it on to the director because I didn't

8          serve in that capacity.

9    Q.    Were there any significant differences in how student

10         conduct cases were handled at Loyola and Wayne State?

11                    MR. PORTER:  Objection, form.

12   A.    In Loyola, I -- the students didn't have the

13         opportunity to accept or deny the addition of a

14         hearing officer, whereas with the Student Code of

15         Conduct, they have that opportunity, so that's one

16         difference.

17                    And of course, language is different, but

18         you know, every code's language was a bit different.

19   Q.    Did you receive any training when you first arrived at

20         Wayne State on the Wayne State Student Code of

21         Conduct?

22   A.    I had meetings with the previous person in that

23         position.

24   Q.    Did you receive materials or binders or any kind of

25         other documentation about what the responsibilities

1           were for someone assuming your position from --
2    A.    We had -- you have the student code of conduct that
3           tells you what is expected of you.
4    Q.    Was there any -- I'm sorry.
5    A.    Another --
6    Q.    Was there any other material?  Was there any other
7           material?
8    A.    Sure, sure.  Materials in terms of, you know, sample
9           letters that you would normally send out to students
10          or sample, what do you call it, outcome letters, like,
11          what I'm referring to, when a decision is made to make
12          sure you include all the information for the student
13          when they receive your letter about your outcome.  So
14          I got to see what was sent out before.
15   Q.    And I may have cut you off.  Was there an additional
16          manual or policy manual that also was included in the
17          material that you were provided?
18   A.    Everything is online, so everything there is to read
19          about our policies and procedures is all available
20          online.
21   Q.    Have you had a chance to read the complaint filed in
22          this case?
23   A.    No.
24   Q.    I want to talk a little bit about kind of generic
25          investigation directives and policies that you may or

```
 1          may not have had at Wayne State just to get an idea as
 2          to what parameters you were working within during that
 3          first year.  Would you agree or disagree with the
 4          statement that every investigation is unique?
 5                    MR. PORTER:  Objection, form.
 6    A.    Every investigation can be unique.
 7    BY MR. FLORES:
 8    Q.    Okay.  You're making a distinction different from my
 9          statement.  Can you explain that?
10    A.    You may have similarities in investigations, so in a
11          lot of ways, they could be similar, and then in other
12          ways, it could be unique just on virtue of different
13          human beings participating.
14    Q.    Okay.  Would you agree that it's important to have a
15          strategy when starting an investigation?
16    A.    I would say yeah, you want to strategize, sure,
17          mm-hmm.
18    Q.    And would you agree that an experienced and
19          well-trained investigator typically has a well
20          developed strategy that he or she uses to make sure
21          that all aspects of the case are covered?
22                    MR. PORTER:  Objection, foundation.  Are
23          you asking her about her Title IX investigation
24          duties --
25                    THE WITNESS:  Yeah.
```

1              MR. PORTER:  -- or her role as Student Code

2        of Conduct --

3              MR. FLORES:  Let me rephrase.

4    BY MR. FLORES:

5    Q.   With respect to title -- to your responsibilities as a

6        Title IX investigator, which you assumed in your

7        second year, would you agree that a well developed

8        strategy is necessary in order to make sure all of the

9        bases are covered?

10   A.   Yeah.

11   Q.   So as a student conduct officer, you have different

12       responsibilities, but you're also conducting

13       investigations; is that correct?

14   A.   Mm-hmm.

15   Q.   Can you tell me just generically when you receive a

16       complaint, what was your -- typically your first

17       action after receiving the complaint?

18   A.   It depends on how I received the complaint.  Is it via

19       email, is it via phone call, is it via the forms we

20       have online and which form is used?  There's a

21       complaint form, there's a nonacademic misconduct form,

22       and there's an academic misconduct form, so depending

23       on the form and what's written, I would respond by

24       writing to the reporter and ask them to specify what

25       their concerns are, and if it's a -- where -- if it's

1         a nonacademic misconduct form that's submitted, that's

2         typically indicative of someone who wants to file

3         charges against a student because they believe they

4         violated the code of conduct, and even then, I clarify

5         the charges they selected because they're not all

6         experts in the code, and so sometimes they select a

7         charge that's not to relevant to what they're sharing

8         in terms of the information they're concerned about,

9         and then I would clarify that, and so it becomes a

10        code of conduct, that's how I would proceed.

11                 I would just always reply to the person

12        filing the report to get a better understanding of the

13        complaint so I know, you know, which way to proceed.

14   Q.   So once you've had a chance to talk to the reporter

15        and provide that reporter with some additional

16        information, what's the next step?

17   A.   Well, if it's not a conduct charge, it depends on what

18        the desired outcome is.  Is it coming from a faculty

19        member?  Is it coming from a student?  Is it coming

20        from staff?  It could be anything that we -- we get

21        all kinds of reports, so we really have to assess what

22        are we following up with.  Are we following up with

23        the student's concerning behavior that needs to stop?

24        Are we following up with a simple question?  It just

25        really varies.

1   Q.   Let's take a complaint from one student against

2        another.  You had received a complaint, you've now

3        responded to the reporter to try and narrow and

4        clarify what they're complaining about, and after that

5        takes place, what's the next step for you?

6   A.   Sure.  If it's a -- if it's a student who's -- let's

7        say it's a roommate or someone like that or they're

8        concerned about a friend's behavior and they would

9        like us to just have a conversation with the student

10       about their concerning behavior and then we will do

11       that, we'll follow up with that other student and have

12       a conversation.

13                   If it's an issue where they would like to

14       file charges against the roommate because they have

15       been affected and they thought that the student

16       violated the policy, then I would proceed by inviting

17       the student to meet with me and deal with it in a

18       conduct matter.

19   Q.   How would you reach out to the student that is accused

20        in a student conduct case?

21   A.   Sending them a letter.

22   Q.   And is that -- that's not snail mail, that's an

23        electronic letter; is that correct?

24   A.   We transitioned to both.  When I first started at

25        Wayne State, we would send letters via mail, and then

1        we transitioned to electronically, and we use our

2        Maxient software system to send students letters to

3        invite them to meetings with us, both concerning

4        behavior meetings, complaint meetings, and also

5        conduct meetings.  They all get the letter from

6        Maxient software.

7   Q.   Are there any time limitations or time recommendations

8        in order to -- from the time that you get a complaint

9        until the time that you reach out to the accused

10       student?

11  A.   Not with concerning behavior or -- and if a

12       complaint -- if it's a conduct matter, we try to be --

13       we try to expedite matters.  The only time that we

14       cannot be, you know, timely is if we have taken

15       vacation days or typically in the beginning of the

16       school year when we have more cases, it takes up a lot

17       of our time, so it could be delayed by a week, but

18       it's always our intention to respond quickly.  So I

19       know myself personally, I never have the intention to

20       delay, and I can only be impacted if I've taken time

21       away or I have trainings to attend to that keep me out

22       of the office.

23  Q.   And is there typically a timeframe that you gave to

24       the accused in terms of when they need to respond back

25       with you?

1    A.   I typically don't give a timeframe in terms of -- it

2         depends on is it my outcome letter that they need to

3         respond to or my -- to meet with me after I assign

4         them a meeting time?  I'm not sure what you're asking.

5    Q.   Yeah, I'm still at the requesting a meeting with that

6         student.

7    A.   Mm-hmm.

8    Q.   So --

9    A.   Yeah, I will -- I will select the date, and they're

10        told if they're not able to make that meeting time,

11        they need to contact me within 48 hours, and I will

12        reschedule our meeting.  And I'm very flexible with

13        that.

14   Q.   Now --

15   A.   Especially if a student has to go on vacation or

16        something, I can meet with them later on.

17   Q.   Okay.  So there's flexibility --

18   A.   Yes.

19   Q.   -- in the timing of --

20   A.   Right.

21   Q.   -- meeting with you?

22   A.   Right.

23   Q.   And where does the meeting with you typically take

24        place?

25   A.   Typically in my office, and then when we are remote,

1           it will be, obviously, on Teams video or Zoom
2           depending on what the student has at their desktop.
3   Q.   So during the first year that you were at Wayne State,
4           you would meet in your office with any student that
5           was coming at your invitation?
6   A.   Right.
7   Q.   And what happens if a student declines your
8           invitation, says I don't want to meet with you?
9   A.   It depends on what I'm asking them to meet for.  You
10          know, when I reach out to students to offer them
11          resources and support as -- in my role as a care
12          officer, that's fine, they don't have to meet with me.
13                  If it's a behavioral concern where I'm
14          requesting them to meet with me and it's something
15          that the dean of students is aware of, I will let him
16          know that, hey, this student hasn't met with me, and
17          then, and then he will make a determination if he will
18          meet with them and follow up.  And if a student
19          doesn't meet with me for conduct, it goes over to the
20          dean, and that's on 11 -- in section 11, it tells you
21          that if a student fails to show up, then the conduct
22          officer needs to refer the case to the dean of
23          students.  So anyone that doesn't meet with me, I
24          notify the dean of students to let him know in any
25          case.

1   Q.   When you meet with a student, are you in a separate

2        room, or are you out in the open with the student?

3        What are the circumstances of that, the physical

4        circumstances of that meeting?

5   A.   Sure.  The dean of students has an office suite, and

6        inside that suite, I have my own office.  The students

7        are positioned by the door, and I'm positioned on the

8        far wall behind a desk, and I allow the student to

9        keep the door open or to close the door depending on

10       their comfortability.

11  Q.   And what's your -- how do you typically present

12       materials in a student conduct situation to the

13       student that's come in to -- for this meeting?

14  A.   Well, the student code tells the student, and I know a

15       lot of students don't read the code, it tells them

16       that if you wanted materials presented to you prior to

17       your meeting, you can contact the conduct officer, and

18       that will be supplied to you, obviously redacted if

19       there's any information that needs to be redacted, and

20       then during my meeting, I let the -- well, before

21       that, in the letter that's sent to them, they are

22       notified of the specific charge, so they will be told,

23       you know, this is the violation that's alleged to have

24       occurred, 4.6, 4.3, and we give them the specifics of

25       the account, about two or three sentences about what

```
1         we're talking about because that's what's requested by
2         the Student Code of Conduct, so I'm required to put
3         that in a letter when I send that to students whenever
4         there's a conduct matter that charges have been filed.
5                   In a -- so, hopefully, that answers your
6         question.
7   Q.    Is it fair to say that some students that you meet
8         with in that -- or that you met with in that context
9         would come extremely emotional, agitated, I mean they
10        were anxious to kind of -- coming to sit down with you
11        to talk about the student conduct issue?  Is that
12        fair?
13                  MR. PORTER:  Objection, form.
14  A.    I -- I'm aware that students can get nervous coming to
15        the Dean of Students Office to meet with me, and I,
16        you know, I take students as they are.
17  BY MR. FLORES:
18  Q.    If a student comes in pretty agitated, do you -- what
19        techniques do you use to kind of lower the temperature
20        and...
21  A.    I -- I let the student know why they're meeting with
22        me and my role and responsibility within the meeting.
23        So if it's a CARE meeting, I let them know that I'm
24        here to offer resources.  If it's a concerning -- if
25        we have concerns about a student's behavior or we
```

1      received a complaint, I will let the student know,

2      hey, we received a complaint and I want to discuss it

3      with you and concerning behavior, let's say classroom

4      behavior, I will let them know what the issue is

5      there, answer any questions they have, and I will

6      clarify for them if I have a role in determining

7      anything that I would need, and typically in a CARE

8      case, in a concerning behavior case, I don't make any

9      determinations other than to tell the student what we

10     expect of them if it's a concerning behavior and what

11     we expect of their behavior in the classroom.  So

12     that's just an example.

13               If I'm meeting with a student for a CARE

14     case, I'm providing them resources.  Typically, you

15     can say to CAPS Counseling or Students With

16     Disabilities Services Office, hoping to connect them

17     so that they can get assistance for whatever they

18     need, and if it's a conduct case, I let them know -- I

19     actually ask them if it's a conduct case are they

20     familiar with the proceedings and would they like me

21     to review anything.  And I let them know about section

22     4.0, which is the alleged violations.  I let them know

23     about section 5.0, which is the sanctions.  I let them

24     know their rights in terms of if I'm permitted to make

25     a decision, they're permitted to accept or deny, and I

```
 1            let them know how that would happen, and then I let
 2            them know that if they deny, it would proceed to the
 3            Dean of Students Office -- the dean of students who
 4            will give them the option of meeting with him or a
 5            hearing committee, and I also let them know that
 6            during the meeting, during a conduct case, they're
 7            more than welcome to have somebody present with them
 8            to serve as an adviser, and then I'd just make myself
 9            available to ask any questions -- to answer any
10            questions they have about the process.  And then I
11            tell them, too, that throughout the entire process
12            before it's concluded, if they have additional
13            information, they can always contact me.
14     Q.    Let's take a step back.  Let's talk about conduct
15            cases.
16     A.    Mm-hmm.
17     Q.    And you said that there's no timeframe that's required
18            between the time a complaint comes in and you meet
19            with a student but that you try to do that as quickly
20            as possible; is that right?
21     A.    Yeah, the code says the language "reasonable time," so
22            whenever, you know, if a charge is filed, it needs to
23            be charged -- it needs to be filed in a reasonable
24            time, and then we are -- we should be responding in a
25            reasonable time.  So that's just best practice for our
```

```
 1          office, and I've done that throughout my experience
 2          with code of conduct at different universities since
 3          I've started as a hearing officer.  So we've always
 4          tried to, you know, follow up in a timely manner.
 5   Q.     Okay.  And between the time that you get the complaint
 6          and the time that the student comes in to talk about
 7          the conduct offense, are you doing your own
 8          independent investigation of that complaint during
 9          that period of time?
10   A.     Yeah, if it's a conduct case, I'm looking into the
11          matter, and I'm also asking the person filing the
12          charges if they haven't done so, that's one of the
13          reasons I'll reply to them, especially if they haven't
14          submitted the evidence they're talking about, so
15          somebody might say that they were impacted and use a
16          frame of reference to something, and if I don't see
17          that attached, I'll let them know hey, can you send me
18          that material?  And even during the conduct hearing,
19          I'll let them know at any point in time, you can
20          submit any evidence both to the complainant and the
21          respondent, I will let them know you can submit any
22          evidence that you may have that's relevant to the
23          case.  And additionally, you know, statements are
24          evidence too, so as you said, students can be nervous
25          when they come talk to me and answer my questions, so
```

1          I always let them know that if they would like, they

2          can add an additional statement after our meeting and

3          email it to me.  If they felt they couldn't express

4          themselves accurately during my meeting, I always let

5          students submit a statement if they felt like they

6          wanted to share more information after our meeting.

7    Q.    In the event that the complainant's account and the

8          accused student's account remain at odds with each

9          other after they come in to talk with you, what's your

10         responsibility in terms of trying to determine which

11         account is accurate?

12                    MR. PORTER:  Objection, form.  Are you

13         referring to a conduct case or a case of concern --

14                    MR. FLORES:  No.  Still talking about

15         conduct cases.

16                    MR. PORTER:  Okay.

17   A.    Yeah, so I believe the evidence, and is it more likely

18         than not that what the other person is saying is

19         truthful and they have presented truthful information

20         to me based on their statements, based on the evidence

21         provided, so that's what I look at.  And in a lot of

22         cases where I don't have evidence, I'm not able to

23         find the student responsible even though they -- they

24         may have done it, I cannot find them responsible if I

25         don't have the preponderance of evidence, and so

1        that -- that's how I typically proceed.

2   Q.   Now, under the code and the school's policies, the

3        student conduct officer has the authority to resolve a

4        complaint at their level; is that correct?

5               MR. PORTER:  Objection, form.

6   A.   I have the responsibility to make a determination,

7        then let the student accept it or deny it, and then if

8        a student's not there, it automatically goes to the

9        dean, but if they are there and they deny it, it goes

10       to the dean.  So students don't have to accept my

11       decision.

12  BY MR. FLORES:

13  Q.   But you're able to make a determination and if they

14       accept it, that's where the case dies, basically?

15  A.   Right, right, right.

16  Q.   And are there certain kinds of cases that lend

17       themselves more often to that kind of a resolution --

18               MR. PORTER:  Objection, form.

19  BY MR. FLORES:

20  Q.   -- in your experience?

21  A.   To which resolution?

22  Q.   To a resolution where you make the determination, the

23       student accepts it, and that's as far as it goes.

24  A.   Yes, most of my cases, students accept my

25       determination.  In the very few cases they don't, they

| 1  |    | are referred to the dean of students. |
|----|----|----|
| 2  | Q. | And are there ever cases where you don't make a |
| 3  |    | determination, you just automatically send them to the |
| 4  |    | dean? |
| 5  | A. | If they don't show up. |
| 6  | Q. | Do you give them more than one chance to show up? |
| 7  | A. | I do.  I don't have to, but I try to call the student |
| 8  |    | at the time they should be present, and sometimes I |
| 9  |    | catch the student, they answer the phone and I -- they |
| 10 |    | can come really quick because they forgot.  A couple |
| 11 |    | other times, I can call the student the day after and |
| 12 |    | say I'm still available to meet with you or I refer |
| 13 |    | the case to the dean of students.  So I really don't |
| 14 |    | have to offer them another opportunity to meet with |
| 15 |    | me, I can just refer directly to the dean, but I try |
| 16 |    | to do my due diligence to get the student to meet with |
| 17 |    | me. |
| 18 | Q. | The code of conduct -- the Student Code of Conduct at |
| 19 |    | Wayne State provides some parameters as to what types |
| 20 |    | of cases are appropriate for resolution by the |
| 21 |    | university, and one of them is where the offense takes |
| 22 |    | place.  So if it doesn't take place in a dorm or on |
| 23 |    | school property, is there ever jurisdiction by the |
| 24 |    | university over a case? |
| 25 |    | MR. PORTER:  Objection, form and |

1           foundation.

2    A.    On -- so sometimes when a complaint comes in, they

3           will let you know the person making the complaint

4           where it occurred, and then, you know, when you go

5           forward, you discover that it may have been off campus

6           or on campus, you're not sure, and so if it's on

7           campus, we have jurisdiction.  If it's off campus, we

8           don't have jurisdiction.

9    Q.    And when you're talking about on campus, does that

10          include a student's apartment if it's not part of the

11          university's housing?

12                    MR. PORTER:  Objection, form and

13          foundation.

14   A.    If they are not on the property of Wayne State or are

15          not on something affiliated with Wayne State's

16          educational program, then it's off campus.

17   BY MR. FLORES:

18   Q.    All right.  Let's talk about -- let's talk about this

19          particular case.  Do you remember how the complaint

20          came to your attention?

21   A.    Yes, it was brought to my attention in the -- in our

22          office.

23   Q.    Do you remember if it was online, if it was a

24          telephone call, if it was some other direct contact?

25   A.    I was made aware of this complaint by staff.

1    Q.   So do you know how it came into the office?

2    A.   Yes.  It came in by a form.

3    Q.   When you say "a form," do you mean an electronic form?

4    A.   Yeah, a complaint form.

5    Q.   And earlier you testified that there were several

6         types of forms that could be used by --

7    A.   Right.

8    Q.   -- a student --

9    A.   Right.

10   Q.   -- or by anybody making a complaint?

11   A.   Right.

12   Q.   Can you just go through the list of what those are?

13   A.   Sure.  It's on our -- for your frame of reference,

14        it's on our website at doso.wayne.edu, it's all -- you

15        know, Title IX is a form, a timeline report, that's

16        from the Title IX office.  The dean of students has

17        the -- our new COVID noncompliance form.  It has the

18        nonacademic misconduct form, the academic misconduct

19        form, the complaint form, and the CARE report form.

20        We also have what's called an ask-a-question form, and

21        we have another student organization form where people

22        can submit questions about the organizations.

23   Q.   At the -- at the time that the complaint came in,

24        there were those all possible forms with the exception

25        of the COVID form, I'm assuming?

1   A.   Mm-hmm.

2   Q.   Is that correct?

3   A.   Yeah, the newer forms are ask-a-question and the COVID

4        form.  Those are new this year, yeah, this past year.

5   Q.   And you testified earlier that at Loyola, it wasn't

6        uncommon to get 50 -- have 50 conduct issues arise in

7        the course of a year.  I'm assuming that Wayne State,

8        as a larger university, had even more on an annual

9        basis; is that a safe assumption?

10  A.   No.

11                  MR. PORTER:  Objection, form.

12  BY MR. FLORES:

13  Q.   No?

14  A.   No, you said conduct.  Your question to me was about

15       Title IX earlier --

16  Q.   I'm sorry.

17                  (Attorney and witness speak over each

18                  other.)

19  A.   -- Title IX.

20  Q.   So do you have a sense of how many, on average,

21       conduct cases came before you during the time that you

22       were working on those types of cases at Wayne State?

23  A.   Yeah, and that's public information to the board of

24       governors, information that's public at their

25       meetings.  Off the top of my head, I couldn't tell

1        you, but I'd want to give you accurate information,

2        but it's all online.

3    Q.  Okay.  If more than one complaint comes in

4        electronically through the use of those forms that you

5        mentioned, do they go to a particular person's

6        mailbox?

7    A.  Depending on who has responsibility.  So I receive the

8        non -- the nonacademic misconduct reports and the

9        academic misconduct reports, as I am the person who's

10       handling that matter, as I'm the student conduct

11       officer, so those forms would come to me.

12   Q.  And do they come directly from the complaining student

13       or reporter, or do they come from a staff member?

14   A.  No, the form comes directly to me in my inbox.

15   Q.  So in this particular case, you received a complaint

16       from, we'll refer to her as Jane Doe, through the use

17       of a form --

18   A.  Mm-hmm.

19   Q.  -- and that form went directly from that student into

20       your mailbox?

21   A.  It goes to the dean of students.  The dean of students

22       has a responsibility to receive all the complaints,

23       and although I have the ability to see them, I don't

24       look at them because that's his responsibility, and I

25       only get involved when he tells me that I need to

1          somehow be involved.  So that's something that

2          Dr. Strauss handles.

3    Q.    Okay.  So the complaint from Jane Doe in this case

4          went from her to the complaint mailbox for the dean of

5          students?

6    A.    Mm-hmm.

7    Q.    Is that correct?

8    A.    Yeah.

9    Q.    Okay.  And then from -- and then at some point

10         thereafter, you received that complaint from the dean

11         of students?

12   A.    I received the information that I would need to

13         investigate the matter.

14   Q.    Okay.  And you received that information from whom?

15   A.    It was determined at a behavioral intervention team

16         meeting that I should be the one to investigate the

17         case further.

18   Q.    What is the behavioral -- what is the behavioral team?

19   A.    Sure.  It's a team of directors in their different

20         departments that come together to discuss concerning

21         students that reach a high risk level.  One example is

22         what if a student's suicidal.  So any team member can

23         bring forward a student that they're concerned about,

24         if they're especially high risk, and the behavior --

25   Q.    And -- I'm sorry.

1   A.    The behavioral intervention team comes out of the Dean

2         of Students Office, but we -- it involves many

3         different departments, and that's all public

4         information that's online.

5   Q.    Okay.  So when Jane Doe filled out her complaint, I'm

6         trying to identify who would get -- who would be the

7         first person at Wayne State who would have seen that

8         complaint?

9   A.    Well, the complaint comes to the dean of students.

10  Q.    And so the dean of students in this case then referred

11        it to whom?

12              MR. PORTER:  Objection, form, foundation.

13  BY MR. FLORES:

14  Q.    Did the dean of students send it directly to you?

15  A.    No.

16  Q.    It went to the behavioral intervention team first?

17  A.    For discussion, yes.

18  Q.    And who makes the determination that it should go to

19        the behavioral intervention team?

20  A.    All of us have a say in what cases we bring forward.

21        So each of us have a role in bringing forward students

22        or concerns to that meeting.

23  Q.    Okay.  But you didn't bring this particular complaint

24        to the behavioral intervention team, the dean of

25        students did that?

1            MR. PORTER:  Objection, form, foundation.

2    A.   Yeah, I didn't bring it forward, no.

3    BY MR. FLORES:

4    Q.   So are you part of the behavioral intervention team?

5    A.   I am.

6    Q.   And you were on -- in October of 2018, you were part

7         of that team?

8    A.   Yes.

9    Q.   So the first that you saw of the complaint by Jane Doe

10        was when you received it as part of the behavioral

11        intervention team?

12   A.   When you say "received," you mean discussed or...

13   Q.   Saw it, got your hands on it.

14   A.   Well, it was discussed.

15   Q.   Okay.  Was that the first time that you had seen it

16        when you were with -- discussing it with the

17        behavioral --

18   A.   Right.

19   Q.   -- intervention team?

20   A.   Right.  Right because I don't -- go ahead.

21            MR. PORTER:  Well, I'm going to -- sorry,

22        I'm going to cut in and object and instruct the

23        witness not to answer if it calls for the, you know,

24        the recitation or disclosure of attorney-client

25        privileged information.

```
 1              Bob, I don't want to -- I don't want to
 2       step on your toes here, but it might benefit, move
 3       things along if you ask who was all present at these
 4       meetings, that might help.
 5              MR. FLORES:  Yep.
 6  BY MR. FLORES:
 7  Q.   Can you tell me who attended that behavioral
 8       intervention team meeting when the Jane Doe complaint
 9       was discussed?
10  A.   Sure.  The people we had a part on, it would be the
11       director of counseling, it would be our -- the office
12       of general counsel, it would be the lieutenant from
13       the police department, it would be myself, it would be
14       one of my colleagues within our office of the
15       coordinator.  It would be, at the time, she doesn't
16       work here anymore, the chief nursing officer or
17       someone from the Campus Health Center, who am I --
18       Student Disability Services Office, just trying to go
19       around the room and see if I've covered everyone.
20              Yeah, so those are typically the
21       departments that are there.
22  Q.   And what's the purpose of that meeting?
23  A.   It's to review concerns about students and to see how
24       we can help them and to make sure that they're safe on
25       campus and to determine risk, you know, what is the
```

1        student's behavior, what's the risk for them being on

2        campus, and what's the risk for their, you know, it

3        depends on the situation.  So we're assessing the risk

4        and how we can help the student further and what

5        resources that we need to connect them to.

6    Q.  Just to be clear, when you're talking about assessing

7        the risk about the student, are you talking about the

8        complainant or are you talking about the accused?

9    A.  No, I'm talking about a student on campus who maybe

10       was suicidal, and so we wanted to make sure were they

11       offered all the proper services, are they in the

12       hospital, are they safe, are they coming back to

13       campus, who do we need to make sure reaches out to

14       them?  And so a lot of times, we're determining who's

15       that next staff member that's going to reach out to

16       the student.  Are they in housing?  Are they off

17       campus?  You know, what's the nature of the issue?

18                   So it could be, you know, a report from

19       anywhere that we would discuss about the student -- or

20       that we're concerned about a student.

21   Q.  So in this case, the student you were discussing was

22       Mr. Eid; is that right?

23   A.  Yeah, we were discussing the complaint, yes.

24   Q.  And you were discussing risks associated with Mr. Eid?

25                   MR. PORTER:  Objection.  I instruct the

1      witness --

2  A.    Yeah.

3             MR. PORTER:  -- not to answer if it

4      requires you to divulge attorney-client privileged

5      information.

6             MR. FLORES:  Okay.  Let's take a break

7      because it's noon, but David, if you could stay on

8      because I think we -- you and I just need to have a

9      little discussion about the privilege claim.

10             MR. PORTER:  Sure.

11             MR. FLORES:  So if we could have the

12      stenographer stay on with us, Bailey, no need for you

13      to stay on right now, and Ms. Camaj, you can take a

14      break.

15             Can we reconvene at 12:45?  That would

16      give -- is that enough time for people to get a break

17      and get something to eat?

18             I can't hear you.  David, I can't hear you.

19      Still can't hear you.

20             THE WITNESS:  Okay.  Go ahead now.  The

21      line's unmuted.

22             MR. FLORES:  Okay.  The intervention team

23      involves five or six different people, and from what I

24      just heard from Ms. Camaj, the purpose of that was not

25      to get the legal advice for the purposes of

1       litigation; it was for purposes of adjudicating and

2       deciding the risk to a particular student.  So I don't

3       see how the privilege applies just because counsel's

4       present in the room.

5                    MR. PORTER:  So I think what you heard her

6       say was what the typical purpose of these meetings

7       are.  I can tell you that the purpose of the

8       discussions involving Eid involving general counsel

9       did involve the provision of legal advice about, you

10      know -- well, I'm not going to tell you what it was

11      about, but it was the provision of legal advice, and

12      those around the table relied on that in order to make

13      decisions on behalf of Wayne State.

14                   MR. FLORES:  Okay.  I think the best way

15      forward is to -- I'll deal with it in the way that

16      you've said.  I'm not agreeing to it, so I may follow

17      the deposition up with a motion to the Court asking

18      for an adjudication as to whether or not I'm entitled

19      to this information, but if we do that, it will be

20      afterwards, and I don't think it's -- it's an

21      appropriate use of everybody's time here to kind of

22      gum this up and start playing around with it in the

23      middle of the day.

24                   MR. PORTER:  I understand.

25                   MR. FLORES:  Okay?  All right, I'm going to

```
1       stop my video and mute me for -- and I'll be back at

2       12:45.

3                     (Recess taken at 12:00 p.m.)

4                     (On the record at 12:47 p.m.)

5                     MR. FLORES:  Okay.  Let's go back to -- I

6       want to make sure that it's clear how that complaint

7       came in and who saw it and under what circumstances,

8       and Ms. Camaj, David, I'm sure you've talked to her,

9       you are -- the university is claiming privilege over

10      the legal advice that was provided during the course

11      of the meeting.  I'm going to, obviously, ask

12      questions which may result in David reasserting the

13      privileges as to specific questions.  On the privilege

14      question, don't answer because we'll have to deal with

15      that later on, but if there's no privilege asserted,

16      then you can answer that question.  I'm going to do my

17      best to try to avoid those just because David and I

18      have already kind of talked about how we're going to

19      proceed, and it's not necessary to bother you with

20      that.

21   BY MR. FLORES:

22   Q.   So the complaint came to your attention as a result of

23        your being involved in a behavioral intervention team

24        meeting; is that correct?

25   A.   Yes.
```

1   Q.   And do you remember when that meeting occurred?

2   A.   I do not.

3   Q.   Do you know if it was shortly after the complaint came

4        in or several days after?

5   A.   It may have been shortly after the complaint came in.

6   Q.   I'm going to just ask a few questions, see if I can

7        help you remember.  You may not be able to give us

8        more than that.  On November 15th of 2018, you ended

9        up having a telephone call with the complainant; do

10       you remember that?

11  A.   Yes.

12  Q.   Do you remember whether or not the behavioral

13       interventional team meeting was shortly before that

14       phone call or was quite a bit of time prior to that?

15  A.   If I can recall, typically what happens if we receive

16       a complaint that's brought to BIT, we talk about it at

17       the next meeting.  So the date of that complaint

18       coming in, we would have done our best if it was

19       submitted to BIT or discussed at BIT to review it that

20       next week or pretty soon thereafter.

21              So I'm not very sure what that date would

22       have been.  I don't remember the date of the

23       complaint.  It may have been in October?

24  Q.   Yeah, it was October 29th.

25  A.   Yeah, yeah.  So we would have probably met that

1         following week to discuss it if not the next week

2         depending on sometimes our BIT meetings can be weekly,

3         sometimes they can be biweekly, depending on the

4         team's availability so I would have --

5    Q.   And is there an official record kept of the BIT

6         meetings?

7    A.   No.

8    Q.   So -- and who schedules them?  Who's the chair of

9         that?

10   A.   The dean of students.

11   Q.   So does his office or her office schedule that on a

12        regular basis?

13   A.   The dean of students schedules the meetings, yes, he's

14        responsible for scheduling those meetings.

15   Q.   So if anybody knew the specific date of that meeting,

16        it would be his office?

17   A.   Right.

18   Q.   Where does that meeting take place?

19   A.   Dean of Students Office conference room, and when

20        we're virtual, it's virtual.  You know, we're on Teams

21        video.

22   Q.   Okay.  And back in 2018, pre-COVID, that was an

23        in-person meeting?

24   A.   In-person, yes.

25   Q.   Okay.  And does someone take notes during the course

1              of the BIT meeting?

2    A.    No, not one person is designated to take notes.

3    Q.    So each person to the extent they want to, who is

4          attending that meeting, can take whatever notes they

5          want to?

6    A.    Yes.

7    Q.    Okay.  And those notes are for their purposes, their

8          private purposes?

9    A.    Yes.

10   Q.    In terms of doing their job as opposed to having to

11         circulate them or for some other reasons?

12   A.    Right.

13   Q.    Okay.  Did you make any notes during that meeting?

14   A.    No.  Again, I was not involved with the complaint.  So

15         I wouldn't have needed to take notes.

16   Q.    Okay.  So at that time, you attended that particular

17         behavioral intervention team meeting, but you were

18         just there as an observer with respect to that

19         complaint?

20   A.    Yeah, because I wasn't personally involved in

21         dealing -- no decisions were made at that point, so I

22         was not taking notes about the case at that point.

23   Q.    Okay.  Do you remember whether the discussion

24         involving my client resulted in the creation of a

25         threat assessment?

```
 1              MR. PORTER:  Objection, foundation.

 2    BY MR. FLORES:

 3    Q.   Was one of the tasks that the behavioral intervention

 4         team was responsible for, was one of those tasks, did

 5         that involve sometimes creating a threat assessment

 6         with respect to a student?

 7              MR. PORTER:  I'm sorry, I just want to

 8         understand the question.  Are you just speaking

 9         generally as a typical matter?

10              MR. FLORES:  Yeah, just generally with

11         respect to the BIT right now.

12    A.   It depends on the type of situation it is and what's

13         coming into BIT and what you mean by risk assessment.

14         Official risk assessment versus us discussing risk,

15         that's two different things.

16    BY MR. FLORES:

17    Q.   Okay.  So on the WSU website, the information about

18         the behavioral intervention team lists as one of the

19         tasks that it may do is the creation of a threat

20         assessment.

21    A.   Mm-hmm.

22    Q.   Can you tell me what that involves, if you know?

23    A.   So if it goes beyond us, then we would get different

24         campus partners involved in terms of where the risk is

25         and who needs to be involved, getting general counsel
```

1        involved to make sure we're making the best decisions

2        depending on where the scenario is taking place or

3        what the issue is.  Something can be of a counseling

4        matter, something could be of a housing matter, we

5        just -- it depends on the case.

6   Q.   So do you remember whether on that date as it

7        pertained to my client there was any discussion of a

8        threat assessment being created?

9                  MR. PORTER:  I will object and instruct the

10       witness not to answer if it requires her to divulge

11       any communications that are protected by

12       attorney-client privilege.  But if it does not, then

13       you can answer the question.

14  A.   I will just say I don't remember at this point.

15  BY MR. FLORES:

16  Q.   I'm going to just go down the list of the different

17       representative offices because I know sometimes not

18       everybody shows up at the meeting.  They may send a

19       colleague or no one may show up.  To the extent that

20       you remember, do you remember who attended on behalf

21       of the dean of students?

22  A.   The dean of students.

23  Q.   Do you remember whether the associate dean of students

24       and student conduct officer -- would that have been

25       you who attended --

```
1   A.   Yeah, I'm the conduct officer, yep.  That would have
2        been me.
3   Q.   Do you know who attended on behalf of the director of
4        counseling and psychological services?
5   A.   Yeah, Jeff.
6   Q.   Do you know a last name?
7   A.   We can submit -- Jeff Kuentzel.
8   Q.   Okay.  Do you know who attended on behalf of the
9        director of student disability services?
10  A.   Randie Kruman.
11  Q.   Do you know who attended on behalf of the office of
12       general counsel?
13  A.   Would have been Linda Galante at that time.
14  Q.   Do you know who attended on behalf of the director of
15       the office of housing and residential life?
16  A.   I think -- I don't remember her last name, but Janine.
17       It may have been Janine.  Janine was leaving the
18       institution, so I don't remember the date she left,
19       and then they were hiring, so I -- it would have been
20       her if there was somebody.
21  Q.   And do you know who attended on behalf of the crime
22       prevention section of the police department?
23  A.   Yes, Lieutenant Scott.
24  Q.   Do you remember during that meeting any discussion of
25       information that had been provided by Dean Chadwell?
```

```
 1                    MR. PORTER:  Objection.  Instruct the
 2         witness not to answer if it requires you to divulge
 3         communications that are protected by the
 4         attorney-client privilege.  To the extent that it does
 5         not, you are free to answer.
 6                    THE WITNESS:  I'm going reserve my -- not
 7         answer.
 8    BY MR. FLORES:
 9    Q.   I'm sorry?
10    A.   I'm not going to answer.
11                    MR. PORTER:  I think based on my
12         instruction, she's decided that she cannot answer that
13         question?
14                    MR. FLORES:  And, obviously, I'm not
15         agreeing to that claim of privilege, David.  We'll
16         deal with it later.
17    BY MR. FLORES:
18    Q.   Do you know whether or not any discussion took place
19         involving information received from Loretta Robichaud?
20    A.   I -- I don't recall.
21    Q.   Did you make any record of having reviewed the
22         complaint involving my client at the BIT, any notes,
23         any other writings?
24    A.   Me personally, no.
25    Q.   And as a result of the BIT, did there come a time that
```

1        they assigned the complaint to you for investigation?

2   A.   There was a time where I was informed that I should be

3        the person to speak to the complainant and to speak to

4        the respondent.

5   Q.   Was any other conduct officer or person in a similar

6        position to you assigned to work with you on this

7        case?

8   A.   No.

9   Q.   And was that standard operating procedure because of

10       the size or the nature of the complaint?

11  A.   I'm the only student conduct officer at the

12       university.

13  Q.   But there are other investigators that are part of

14       your office; is that correct?

15  A.   The dean of students office?  No.  There's nobody with

16       the title called "investigator."

17  Q.   So there are no other -- other than yourself, there

18       was nobody else, unless it was going to be referred to

19       the police department, who could do any kind of

20       investigation; is that correct?

21               MR. PORTER:  Objection.  Are you referring

22       to just this specific case?  Or any case.

23               MR. FLORES:  This specific case.

24  A.   As far as I know, the decision was that I should be

25       the person to deal with the case.

```
 1   BY MR. FLORES:

 2   Q.   And who made that decision?

 3              MR. PORTER:  I would object and instruct

 4        the witness not to answer if it requires you to

 5        divulge attorney-client privileged communications, but

 6        to the extent that it doesn't, you are free to answer.

 7   A.   I will just say it was determined that I should be the

 8        one to meet with the students.

 9   BY MR. FLORES:

10   Q.   Were you given a timetable in which to do that?

11   A.   No, I wasn't given any specifics of a timetable other

12        than to typically do what we normally do and do our

13        best to schedule meetings and contact the -- both

14        parties and do our best depending on our schedule.

15   Q.   Did you handle that matter in the same way that you

16        handle other investigations?

17              MR. PORTER:  Objection, form.

18   A.   I'm not sure I understand your question.

19   BY MR. FLORES:

20   Q.   Had you ever received direction to handle a particular

21        conduct investigation at a previous meeting of the

22        BIT?

23   A.   Well, at that time, I was new to Wayne State, so I

24        would not have been asked to because it was my first,

25        you know, because of the nature of me, you know,
```

1          starting that semester for the first time.

2    Q.    Okay.  Were you given any guidance by the BIT in terms

3          of how you should handle this matter?

4                    MR. PORTER:  Objection.  Based on

5          attorney-client privilege, I would instruct you not to

6          answer if it requires to you divulge attorney-client

7          privileged communications, but to the extent that it

8          doesn't, you are, obviously, free to answer.

9    BY MR. FLORES:

10   Q.    Can you answer that question?

11   A.    I'm not going to comment, no.

12                   MR. FLORES:  For the record, I'm taking an

13         exception to that claim of privilege.

14   BY MR. FLORES:

15   Q.    After you received, read, and discussed the complaint

16         at the meeting, did you receive any other instructions

17         from anyone else after the meeting as to how to handle

18         the investigation?

19   A.    No.  I was just asked to meet with both students and

20         gather the statements and forward them onward and not

21         to make a determination in the case.

22   Q.    Okay.  I just want to make sure that I understand.

23         Your responsibility was to talk with both parties,

24         correct?

25   A.    Mm-hmm.

1    Q.    Could you answer just "yes" or "no" for the record?

2    A.    Oh, sorry, yes.  Sorry, yes.

3    Q.    And once you'd taken their statements to submit a

4          report?

5    A.    Yeah.  The -- not only the statements but also if

6          there's any evidence for them to share and to document

7          that and submit it forward.

8    Q.    But you were told not to make a determination as to

9          who was right or wrong or --

10   A.    Right.

11   Q.    -- who was truthful or not truthful?

12   A.    Right, I was not to make a determination; that was not

13         my role in this matter.

14   Q.    Okay.  And then who did you forward your report to?

15   A.    So the final report was emailed to Margit Chadwell,

16         Linda Galante, and also the respondent.

17   Q.    Ms. Galante was general counsel?

18   A.    Yes.

19   Q.    And the -- I'm sorry, so it was to Dean Chadwell, to

20         general counsel's office, and then who else?

21   A.    The respondent.

22   Q.    So that would have been my client?

23   A.    Yes.

24   Q.    Were you directed by anyone not to investigate the

25         case beyond taking statements?

1   A.   No.

2   Q.   And after getting the -- after having the conversation

3        with the complainant and getting copies of text

4        messages, did you do anything to corroborate or

5        disprove any of the complainant's account?

6   A.   Just confirming the student's status, you know, that,

7        you know, like what she was studying and confirming

8        she, obviously, that she was a student, but no.

9   Q.   At the time that you spoke with her in October of

10       2018, was she still a student at WSU?

11  A.   No --

12            MR. PORTER:  Objection, foundation.  Did

13       you say October or November?

14            MR. FLORES:  I said October of 2018.

15  A.   I believe she was not a student at the time.

16  BY MR. FLORES:

17  Q.   Do you know how long -- did you come to learn how long

18       she attended Wayne State?

19  A.   I don't recall off the top of my head, but I recall

20       possibly that she would have left Wayne State soon

21       after filing the complaint.  I mean graduated.

22  Q.   She started as a freshman in 2016.

23  A.   Okay.

24  Q.   I'm just giving you that information.  Typically, she

25       would have graduated after four years, which would

```
1          have placed it 2020.
2     A.   I should correct myself, I moved on from the
3          university.
4     Q.   Oh, so your departure?
5     A.   No, no, I'm saying her departure from the university.
6          So she was not a student at the time.
7     Q.   Okay.  So at the time she made the complaint, she was
8          not a student?
9     A.   Right.
10    Q.   And you don't know, as you're sitting here today, when
11         she was -- when she left the school after starting in
12         2016?
13    A.   I would have to look at my records that's -- to gather
14         that information.
15    Q.   At the time that you spoke with the complainant, do
16         you know where she was located?
17    A.   Yeah, she was out of state.
18    Q.   Do you know what state she was in?
19    A.   I believe, if I recall, I'd have to check, but I think
20         she said she may have been in Colorado.
21    Q.   And --
22    A.   But I would have to check.
23    Q.   I'm sorry, could you repeat that answer for the
24         record?
25    A.   Yeah, I would have to check because I don't remember,
```

1          it was so long ago, I would just have to check, but I

2          know that she was out of state.

3    Q.    And at the time that you interviewed her by telephone,

4          did the school have access to a videoconference?

5    A.    It wasn't something we used, and so I didn't use

6          videoconferencing with her, with the complainant.

7    Q.    So you were not able to see any facial expressions or

8          who else might have been in the room with her while

9          she was talking to you; all of that information was

10         not available to you?

11   A.    Well, I didn't see her on video.  I just spoke to her

12         over the phone.

13   Q.    So you did not know if there was anyone in the room

14         with her while you were talking with her?

15   A.    Yeah, I wouldn't have been able to see.

16   Q.    And you didn't -- did you ask her whether or not there

17         was anyone there when she was talking to you?

18   A.    I don't recall asking her because the meeting was just

19         between me and her, but I don't remember her saying

20         that there was anybody else in the room.  I believe

21         she was the only one on the phone at the time, and I

22         didn't hear anyone else commenting or making noises

23         during our conversation.

24   Q.    Okay.  How -- let's go back and talk now about your

25         contact with my client.

1    A.    Mm-hmm.

2    Q.    Normally, you said you would have an electronic

3          message sent to the student informing them that there

4          was a letter for them; is that correct?

5    A.    No.

6    Q.    How would you normally --

7    A.    I would send them a letter via Maxient software

8          inviting them to meet with me.

9    Q.    In this particular case, however, you sent to my

10         client a note from the dean of students informing him

11         that there was a letter waiting for him from the dean

12         of students; do you remember that?

13   A.    No.

14   Q.    Just give me a moment.

15   A.    I -- yeah.  That's probably electronic information

16         coming from Maxient letting the student know there's

17         an electronic letter from the dean of students office

18         that they have to sign into.  Once they sign in with

19         their banner ID, they can open the letter that I would

20         have sent electronically.  So I think that's what you

21         might be referring to is the automated message that

22         all students get from me via Maxient software.

23              MR. FLORES:  Okay.  Let me just -- Bailey,

24         if you would put on the screen Exhibit F, please.

25              EXHIBIT TECHNICIAN:  One moment.

```
 1                    INTRODUCED FOR DISCUSSION:

 2                    EXHIBIT F

 3                    1:11 p.m.

 4    BY MR. FLORES:

 5    Q.   And if you would go to the second page.  Scroll down

 6         to the bottom half.

 7    A.   Yep, that's from Maxient.  That's automatic messaging

 8         from Maxient.

 9    Q.   And your letter to them triggers that because you send

10         it through the Maxient system?

11    A.   Correct, so anything coming out of the dean of

12         students office.  It lets the student know that it's

13         coming from the dean of students office.

14    Q.   Okay.  Why don't you just leave that up there for just

15         a second so I can ask some related questions.

16                    Now that email from the -- via Maxient goes

17         to the student's student email address; is that

18         correct?

19    A.   Correct.

20    Q.   And does it come with a flag or some type of attention

21         grabbing symbol to let the student know that they've

22         got an important piece of correspondence from the

23         dean's office?

24    A.   It just comes to their email.  As far as I know, it

25         comes to their email.
```

1   Q.   And it looks the same as any other email?

2   A.   It will say it's from Maxient software.  It will say

3        Maxient in the subject header.

4   Q.   But it's not flagged as "Attention" or flagged as

5        "Important" or "Immediate Request"?

6   A.   No, it's --

7   Q.   There's no --

8                 (Attorney and witness speak over each

9                 other.)

10  Q.   -- attached to it is my question.

11  A.   Yeah, Maxient doesn't give you the option to put an

12       alert on the email --

13  Q.   Okay.

14  A.   -- to, like, ping a student, or something like that,

15       that would alert them in the email, but it will say

16       the subject -- that's the subject header, "Official

17       Correspondence From the Dean of Students Office."

18                 MR. FLORES:  Okay.  And if you would,

19       Bailey, put up Exhibit G.

20                 EXHIBIT TECHNICIAN:  One moment.

21                 INTRODUCED FOR DISCUSSION:

22                 EXHIBIT G

23                 1:14 p.m.

24                 MR. FLORES:  Okay.  If you could just show

25       that, just scroll through that slowly.  Just stop

```
 1           at -- yeah, put the text in the middle.
 2   BY MR. FLORES:
 3   Q.   Ms. Camaj, that is the letter that you wrote to
 4        Anthony?
 5   A.   Mm-hmm.  Yes, sorry, I should say yes.
 6   Q.   And what was the stated purpose for the meeting?
 7   A.   To discuss concerns reported about alleged behavior on
 8        Wayne State University's campus.
 9   Q.   And at the time that you sent that, did you also
10        include a statement of the charges for the complaint?
11   A.   There were no charges filed in this case, so I
12        wouldn't have included charges because there was no
13        charges filed.
14   Q.   Did you provide my client with a statement of why he
15        was being -- the purpose for the fact-finding
16        conference?
17   A.   No, because I'm not required to, and -- and I just
18        included in there I wanted to discuss reported
19        concerns.
20   Q.   So you're telling me that under the Student Code of
21        Conduct, you had no responsibility to advise him of
22        what he was going to be meeting with you about?
23   A.   This is not a Student Code of Conduct case because no
24        charges were filed in the matter, in this matter, I
25        should say.
```

1    Q.   Okay.  Even though that the letter says it's a -- the

2         matter involves a violation of the Student Code of

3         Conduct?

4    A.   It says it may, and the information that was in the

5         complaint could have resulted in such and that's the

6         reason I wanted to discuss this concerning behavior.

7         It didn't say it did, it said may have.

8    Q.   Well, this just seems to be an effort to make sure

9         that he had no idea why he was going to meet with you.

10                  MR. PORTER:  Objection, form.

11   A.   That's not the intention.  It's to get the student in

12        my office to discuss concerning behaviors that have

13        been reported to our office, and that's typically what

14        I do.  I'll invite students to meet with me to discuss

15        concerning behaviors, and then I let them know the

16        information when they meet with me, and it's not a

17        conduct case, so I'm not required to share anything

18        further.

19   BY MR. FLORES:

20   Q.   Why wasn't this a conduct case?

21   A.   Because no charges were filed.

22   Q.   When you say "charge," can you define how you're using

23        that term?

24   A.   Sure.  In the Code of Conduct, it indicates that

25        charges can be filed against the student, and that's

```
 1              the Code of Conduct term, and so if I'm informed that
 2              someone on campus -- or has alleged to have -- excuse
 3              me.  If somebody on campus is alleged to have violated
 4              the Code of Conduct, and somebody wants to file
 5              charges, they can contact our office and file charges.
 6              In this case, no charges were filed.
 7   Q.    So your testimony is that Jane Doe's complaint was not
 8              the filing of a charge against my client?
 9   A.    Right.  If it was -- if it was, it would have been
10              indicated in the letter.
11   Q.    And what additional step would the complainant have to
12              have taken to turn her complaint into a charge?
13   A.    Notify me that she wanted to pursue a charge.  They
14              just -- anybody who wants to file a charge just needs
15              to let me know that that is what they intend -- that
16              that is what they want.
17                   MR. FLORES:  Bailey, if you would please
18              publish Exhibit E.
19                   EXHIBIT TECHNICIAN:  One moment.
20                   INTRODUCED FOR DISCUSSION:
21                   EXHIBIT E
22                   1:19 p.m.
23   BY MR. FLORES:
24   Q.    And go to page 3.  Do you see that paragraph that
25              starts with "Complaint" --
```

1   A.   Mm-hmm.

2   Q.   -- Ms. Camaj?

3   A.   Mm-hmm.

4   Q.   Okay.  And then goes to the next page and stop there.

5            Do you see what the -- there's a question

6        there that reads "What is the outcome you are

7        requesting?"

8   A.   Mm-hmm.

9   Q.   Could you read that to yourself and let me know when

10       you're done?

11  A.   Okay.

12  Q.   And so is it your testimony today that in spite of the

13       fact that she asked to have my client held accountable

14       and that he be reprimanded, that this is not a request

15       for him to be charged with having harassed her; is

16       that your testimony?

17  A.   My testimony is that charges were not filed with me.

18  Q.   Were they filed with anyone else?

19  A.   Not at the time, nope.  Nobody -- no one filed charges

20       against your client.

21  Q.   Did there come a time that charges were filed against

22       my client?

23  A.   No, and if charges were filed, your client would have

24       been notified.

25  Q.   So is it your testimony that the complainant did not

1         want any action to be taken against my client?

2                    MR. PORTER:  Objection, form.

3     A.   My testimony is that charges were not filed.

4     BY MR. FLORES:

5     Q.   Have you had a chance to read that section under the

6          question "What is the outcome you are requesting?"

7     A.   Yes.

8     Q.   Can you tell me what you believe Jane Doe is

9          requesting?

10    A.   She's requesting some type of action against the

11         respondent.

12    Q.   And can you please tell me what that action is?

13    A.   She says a reprimand.

14    Q.   And is there something that, you know, within the

15         Student Code of Conduct that would meet the definition

16         of a reprimand?

17    A.   Yes, under section 5.0, it can be determined that a

18         student is held responsible with the sanction of

19         disciplinary reprimand.

20    Q.   And in talking with the complainant on November 15th,

21         did you discuss holding my client accountable for what

22         she alleged was done?

23    A.   We discussed her complaint, and we discussed her

24         wishes that he be held accountable.  She didn't

25         specify to which level the accountability needed to

```
1         take place, but at this -- at that point, no charges
2         were filed.
3    Q.   So she did not ask to have him dismissed from school
4         or expelled?
5    A.   The word "expelled" was never used with me.
6    Q.   Did she ask to have him removed from the school?
7    A.   That was never said to me.
8    Q.   Did she ask that he should be suspended from the
9         school?
10   A.   That was -- I can't recall her saying that.  I just
11        can't recall that ever being said.
12   Q.   Okay.  Let me go back.  At the time that you were
13        asked to handle this complaint, you had been employed
14        at Wayne State for approximately three months; is that
15        correct?
16   A.   Yes, I started in July, yes.
17   Q.   And between the time you were hired and the time that
18        you took on this complaint, how many other complaints
19        had you adjudicated or worked on?
20   A.   I did not adjudicate this case, but I had worked on
21        other cases.  The number I cannot recall, but I had
22        worked on other cases.
23   Q.   Do you think it was more than ten or less than ten?
24   A.   It would have been less than ten just because of the
25        timing.  Because school may have started at the end of
```

```
 1        August, early September that year, I'd have to check
 2        the records.  So obviously, if I'm asking somebody to
 3        meet with me in October or November, it wouldn't have
 4        been that many cases at that time.
 5   Q.   So you invited my client to meet with you on -- as a
 6        result of the complaint --
 7   A.   Mm-hmm.
 8   Q.   -- that had been made, and he wrote back to you.
 9               MR. FLORES:  If you would -- Bailey, if you
10        would publish Exhibit H.
11               EXHIBIT TECHNICIAN:  One moment.
12               INTRODUCED FOR DISCUSSION:
13               EXHIBIT H
14               1:26 p.m.
15   BY MR. FLORES:
16   Q.   If you could take a look, Ms. Camaj, at the email
17        above the line.
18   A.   Uh-huh, yes.
19   Q.   And tell me what that date is stamped on that email.
20   A.   November 27th, 2018.
21   Q.   And can you determine whether that was an email from
22        my client to you or from you to my client?
23   A.   That would have been from the respondent to me
24        according to his -- to what you're showing me.
25   Q.   And I'm going to ask the question "What is this
```

```
 1         fact-finding session regarding?"
 2                  And you -- and he followed it up with a
 3         statement saying that he was not aware of any Code of
 4         Conduct charges that were filed against him.  Do you
 5         remember whether you responded to that email?
 6    A.   I don't recall.  I do my best to respond to students.
 7         I do get lots of emails throughout the day as I am a
 8         person who receives a lot of CARE reports and conduct
 9         reports and correspondence from faculty and students.
10         So it would have been one where if I didn't respond,
11         it wouldn't have been my intention not to respond, I
12         just don't recall.
13    Q.   Okay.  Let's see if we can refresh your recollection a
14         bit.
15                  MR. FLORES:  If you would publish Exhibit
16         F, please, Bailey.
17                  EXHIBIT TECHNICIAN:  I believe we have F
18         up, I'm sorry.
19                  MR. FLORES:  And go to the top of that
20         page.  Okay, right there.
21    BY MR. FLORES:
22    Q.   Would you go ahead and read that email to yourself,
23         Ms. Camaj, and then let me know when you're done.
24    A.   Okay.
25    Q.   Based on that email, does it help you remember whether
```

1           or not you responded to the 11/27 email that we

2           previously viewed and discussed?

3    A.    No, it -- I just really don't remember, and again,

4           it's never my intention not to respond to students as,

5           you know, when I make meetings, I typically will

6           respond if they do correspond with me, and the only

7           reason why I could assume why I maybe would have

8           missed it was just because of the number of emails

9           that I would have gotten at that time, but I really

10          don't recall.

11   Q.    All right.  If you take a look at this, the part of

12          that email that starts with section 11.2, is it your

13          testimony that you had no obligation to provide this

14          information because no charges had been filed?

15   A.    No.  My testimony is that I'm not required as it's not

16          a Code of Conduct matter, and so I typically tell

17          students I'd like to discuss their concerning

18          behavior, that's just been my practice over the years.

19          I don't write in my email typically all the details of

20          what my concerns are because I want to meet with them

21          in my office and discuss the concerns in person, and

22          again, this was not a Code of Conduct charge.

23   Q.    So this was -- how would you describe this matter?

24   A.    This was -- this was a complaint and -- about

25          concerning behavior that I was asked to speak to two

```
 1           sides with and then submit a report with the

 2           statements that were provided to me.

 3    Q.    So charges and a concerning behavior complaint, those

 4           are two distinct things in your mind?

 5    A.    No.  Yes, they are different.  It's not in my mind,

 6           it's the specification of my job that when charges are

 7           filed, I have to tell the student that charges have

 8           been filed against them.  That's my duty and my

 9           position.  But if charges were filed, I don't have to

10           submit any further information.

11    Q.    Based on your training and your time at WSU, would it

12           have been possible for the university to press charges

13           using as its basis the complaint received by the -- or

14           based on the complaint made by Jane Doe?

15    A.    Do you mean filed charges?

16    Q.    Could the university have filed charges based on that

17           complaint?

18    A.    Yes, anyone in the university can file charges at any

19           time.  Typically, it wouldn't be me because I'm the

20           conduct officer, but anyone is permitted to file

21           charges.

22    Q.    And in your -- based on your training, there was

23           sufficient information in that complaint to justify a

24           charge; is that correct?

25    A.    That's not what I said.
```

1   Q.   I'm asking you a new question.

2   A.   Yes.

3   Q.   Based on your training, was there sufficient

4        information in that complaint to justify a charge?

5                    MR. PORTER:  Objection, form.

6   A.   It's not for me to determine who should file charges.

7        It's for me to answer questions to the person who

8        wants to file charges if that's what they wish to do

9        and, you know, and, again, provide those who want to

10       file charges the information of how they can do it and

11       how it would be proceeded.

12  BY MR. FLORES:

13  Q.   Let's try this as a hypothetical.

14                   Suppose I was the complainant in this case,

15       and I called and you and I had a conversation, and you

16       asked me "Do you want to file charges," and I said

17       "Yes," what would you tell me to do?

18  A.   I would ask you to submit a report, and I would send

19       you the link or advise you to go to the DOSO website

20       and complete the nonacademic misconduct reporting

21       form, and that way you can still inform me which

22       charges -- our form lists all the possible violations

23       in 4.0 that can be selected, and then I would ask you

24       to submit that form, and if you should have technical

25       errors, you could always send me an email with the

```
 1        list of charges.
 2   Q.   If you -- based on the list of possible charges, had
 3        she gone and filled out that form, what charges would
 4        be sustainable on the basis of the information
 5        contained in her complaint?
 6                  MR. PORTER:  Objection, form and
 7        foundation.
 8   A.   Again, I'm not the one who chooses the charges.  So
 9        she would have had to choose the charge that would
10        have been relevant to this case.
11   BY MR. FLORES:
12   Q.   And I'm asking you tell me what charges that are
13        listed would be satisfied by the information in the
14        complaint?
15                  MR. PORTER:  Objection, form and
16        foundation.
17   A.   It would depend.  It would depend on the use of
18        technological resources, so did the student send the
19        text messages while they were on campus?  Was -- were
20        they using any of the computers on, you know, the
21        internet while they were on campus to send messages to
22        the other student?  Was there any issue of harassment
23        on campus during that time?
24                  And then you would look at charges for,
25        possibly, what -- one of the charges that could be
```

```
 1           selected was the internet charge, and then also --
 2           misuse of internet, and then also disorderly behavior
 3           could be one.  And then if there were threats made in
 4           messaging, because at the time of the complaint, I
 5           didn't have the text messages, so if there were
 6           threatening messages being shared, you could also
 7           select section 4.3.  So it really depends on what the
 8           specifics of the charges are that would be brought
 9           forward by the complainant.
10    Q.     Thank you.  Now in the criminal law, there are charges
11           which are very specific, and there are charges which
12           are general, so you could be charged with disorderly
13           conduct, which incorporates a wide variety of
14           material.
15                    MR. FLORES:  You can remove Exhibit F.
16    BY MR. FLORES:
17    Q.     So you have one charge, disorderly conduct.  It covers
18           a lot of different types of behaviors, but it's just
19           one charge.  You could also charge somebody with grand
20           larceny auto, which is a fairly specific charge
21           because you have to steel a car, it's what you would
22           expect.
23                    Charges that are listed in section 4 of the
24           Student Code of Conduct, those are set forth with some
25           specificity; are they not?
```

1   A.   Sure.  They're set forth to, you know, to reflect what

2        could be possible campus violations.

3   Q.   And they include a definition?

4   A.   Right.

5   Q.   In this case, you're telling me there was no charge

6        that was filed because this was a conduct, an

7        investigation into conduct, not an -- not an

8        investigation into a specific charge; is that right?

9                   MR. PORTER:  Objection, form.  It misstates

10       her prior testimony.

11  BY MR. FLORES:

12  Q.   And what was your --

13  A.   In my letter, it specifies that I was going to be

14       meeting with the respondent about some concerning

15       behavior that was reported to our office.  So it was

16       about --

17  Q.   Concerning --

18  A.   Concerning behavior, correct, that was reported to our

19       office that we needed to get more information on.

20  Q.   Okay.  Thank you for refreshing my recollection.  That

21       was the phrase I was searching for, "concerning

22       behavior."

23                   Is that defined anywhere in the Student

24       Code of Conduct?

25  A.   No, because, again, it's not a charge.

1  Q.  Is it described, to your knowledge, in any policy

2      statement or regulation or rule that the university

3      has published?

4  A.  Not that I'm aware of.

5  Q.  So when you hear the term "concerning behavior," will

6      you give me your definition of that phrase?

7  A.  Yeah.  You might be doing something that's concerning

8      to the greater community, it could be concerning to

9      your person, like maybe you are hurting yourself

10     individually, you are hurting others on campus, or

11     somehow your behavior is impacting others, it could

12     be -- it's very broad, so just concerning behaviors

13     that could be an issue that we want to, you know,

14     figure out what's going on.  So it's very broad.

15 Q.  So did there come a time where my client finally had a

16     chance to meet with you?

17 A.  Yes, he did meet with me.

18 Q.  And do you remember what date that was?

19 A.  It would have been in my report that I would have

20     indicated.  I don't recall off the top of my head, but

21     it would be in the documents.

22 Q.  If I told you it was November 30th, would that seem

23     right?

24 A.  Possibly, yes, yes, that makes sense.

25 Q.  So right near the end of the month?

1    A.    Mm-hmm.

2    Q.    And you had received this complaint sometime between

3          November -- October 29th, when it was made, and

4          November 15th, when you talked to her, when you

5          attended the behavioral intervention team meeting, so

6          someplace between the 29th of October and November

7          15th?

8    A.    Yeah.

9    Q.    So somewhere two weeks later, two and a half weeks

10         later, you finally met with my client?

11   A.    Right, yes.

12   Q.    And you met with him alone?

13   A.    Yes.

14   Q.    And you met with him in your office?

15   A.    Yes.

16   Q.    Do you remember who started the conversation?

17   A.    I did.

18   Q.    And can you tell me what, if anything, you said to

19         him?

20   A.    Yes, the nature of the beginning of my conversation

21         was to inform him that I will be speaking to him about

22         concerning behavior and that this was not a conduct

23         matter that I would be making a determination on and

24         that I would be taking a statement based on concerns I

25         have gotten from a complainant, the complainant, and

```
 1           that I would be forwarding the case to the medical

 2           school, and the other piece that I said was I'm trying

 3           to remember just going down the line.

 4                     So after I informed him of what was going

 5           to happen, I never shut the door, so I always let the

 6           student shut the door, and if the student definitely

 7           needs a break, I let them know, but that was the

 8           beginning of our conversation in terms of me asking

 9           questions, and then we began by me asking him what --

10           does he know the respondent, and what's the nature of

11           their relationship?

12    Q.     In a case where you're looking at concerning behavior

13           rather than a charge, even with respect to just

14           concerning behavior, did you have authority at that

15           time to simply address the matter just at your level,

16           or was this case different and you had to send it up

17           to Dean Chadwell?

18    A.     It's not what I was asked to do.  I was asked to --

19    Q.     Okay --

20                     (Attorney and witness speak over each

21                     other.)

22    A.     -- right, so I -- I would not have been able to exert

23           any authority over this matter.

24    Q.     So in this particular case, you were simply an

25           information provider and an information collector, and
```

```
1        then you were sending that forward to your boss who

2        was Dean Chadwell?

3   A.   Dean Chadwell's not my boss.

4   Q.   I'm sorry, Dean Strauss?

5   A.   I was moving it forward to Dr. Chadwell and to Linda

6        Galante as requested.

7   Q.   So you didn't send it to Dean Strauss?

8   A.   No.

9   Q.   Okay.  That's a little bit out of the normal ordinary

10       course; is that right?

11  A.   Well, I typically don't send my outcomes in conduct

12       cases to Dr. Strauss.  The code says that I do not

13       have to send him my outcome cases.  I only send Dean

14       Strauss the cases that -- my cases when I invite the

15       student to meet with them to make him aware of the

16       charges, but I don't share the outcome with him.

17  Q.   Okay.  So would you say this was unusual that you were

18       in this role and sending the information you collected

19       to Dean Chadwell?

20            MR. PORTER:  Objection, form.

21  A.   I don't know about unusual, but it was because of the

22       nature of the timing of my starting there, it would

23       have been one of the first cases I would have done

24       that with just by the pure nature of me being there at

25       that time.
```

1    BY MR. FLORES:

2    Q.   But was it because you just were inexperienced and

3         they didn't think you could handle that?

4    A.   That was not my directive.  It's not about my

5         experience being inexperienced in that -- that's not

6         for me to make a determination on.  That was not what

7         I was asked to do.

8    Q.   The head of the behavioral intervention team was the

9         person who gave you your assignment; is that right?

10                   MR. PORTER:  Objection based on

11        attorney-client privilege.  If it requires you to

12        divulge attorney-client communications, I'd ask you

13        not to answer.

14   A.   Okay.  I will not answer.

15   BY MR. FLORES:

16   Q.   I'm taking an exception to that.

17                   Had you ever sent any of your work directly

18        to Dean Chadwell?

19   A.   At that time, no.

20   Q.   Had you ever sent any of your work to anyone other

21        than Dean Strauss as of that date?

22   A.   As of that date, I don't -- I don't remember.  But

23        I -- because it was so early on in my time at Wayne

24        State, I don't know that I had any other cases I would

25        have been assigning to anybody, I mean to forward to

| | | |
|---|---|---|
| 1 | | anybody else at the time. |
| 2 | Q. | Okay.  Are you familiar with the Office of the |
| 3 | | Ombudsman? |
| 4 | A. | Yes, I am. |
| 5 | Q. | And what does the ombudsman's office -- what are they |
| 6 | | responsible for? |
| 7 | A. | So one of their main purposes, and we include the |
| 8 | | ombud's letter in our correspondence to students, to |
| 9 | | provide them information about the policies and |
| 10 | | procedures at Wayne State University.  So they are not |
| 11 | | ones to make decisions on cases, like in a conduct |
| 12 | | case, but they are ones to provide students |
| 13 | | information about proceedings. |
| 14 | Q. | And is this -- |
| 15 | A. | And policies. |
| 16 | Q. | I'm sorry. |
| 17 | A. | Go ahead. |
| 18 | Q. | I didn't hear the last part of your answer. |
| 19 | A. | Sorry.  They -- I just repeated what I said that they |
| 20 | | informed students about procedural matters and |
| 21 | | policies. |
| 22 | Q. | And in this case, did you refer my client to the |
| 23 | | office of the ombudsman? |
| 24 | A. | No, because I wasn't required to. |
| 25 | Q. | And that was because it wasn't -- there were no |

```
1          charges --
2   A.     Correct.
3   Q.     -- it was just a concerning behavior matter?
4   A.     Correct.
5   Q.     Okay.  Based on your training, is a matter of
6          concerning behavior more serious or less serious than
7          charges being leveled at a student?
8                   MR. PORTER:  Objection, form.
9   A.     It depends on the situation.  I've had it where the
10         concerning behavior could be worse based on the
11         students that respond -- excuse me, the student's
12         behavior in the classroom could have been a little
13         more dangerous versus conduct charges, where some
14         conduct charges could have been less.  So I've seen
15         both.
16  BY MR. FLORES:
17  Q.     Did Mr. -- did my client raise any questions with you
18         that you could not answer?
19  A.     If there were any questions about medical school
20         stuff, I would not be able it answer, but I don't
21         recall him asking me that.  But if he were to ask me
22         anything about conduct, I would have definitely
23         answered it for him, and especially if he asked me can
24         he -- he asked if he could include an apology letter.
25         I said absolutely you can include that.  I informed
```

```
 1            him he can provide me a statement after our meeting,
 2            and he said he would, and I answered questions about
 3            how he could send that to me by email.  So that's what
 4            I can recall at that time.
 5    Q.    Did you share with him at any point in your meeting
 6            that you believed this was a very serious case?
 7    A.    I don't recall using that word, no.
 8    Q.    Do you remember -- do you recall what word you might
 9            have used to describe this case?
10    A.    I don't think I would have described it.  I would have
11            said "concerning behavior" because, again, it wasn't
12            for me to make a determination.  So I don't know that
13            I would have made a value judgment on the type of case
14            or the seriousness of it.
15    Q.    Do you remember having a conversation with him at the
16            beginning where he asked you why you had not answered
17            his emails?
18    A.    Possibly.  It was so long, I -- I may have told him
19            similar to what I told you where, again, it's not my
20            intention to ignore students.
21    Q.    Do you remember telling him that you didn't provide
22            any information because that was your -- your typical
23            strategy, you waited until someone came to your office
24            and then you confronted them in person to see if you
25            could shake their story?
```

```
 1   A.   I would never say that.  I don't -- I don't ever
 2        remember saying that.  Typically, I ask the students
 3        to come and meet with me, and then I discuss the
 4        concerning behavior that was reported in front of
 5        them.
 6   Q.   Between the time that you spoke with the complainant
 7        and you spoke to my client, did you do any independent
 8        investigation to either verify or contradict either
 9        person's statement?
10            MR. PORTER:  Objection, asked and answered.
11        You may answer.
12   A.   Okay.  So when the complainant stated that text
13        messages were sent, I noticed that I couldn't open
14        them, so I did request that they be sent to me again,
15        and also, when the complainant made her statements in
16        the complaint, itself, I verified that what was said,
17        there was text messages to corroborate as --
18        corroborate as she indicated to see that they matched
19        up.
20            And then waiting, then, I waited to speak
21        to the respondent to confirm that he was in a text
22        message situation with the complainant to confirm that
23        these were sent by him, as well.  So that's -- that's
24        all I did is just to confirm that text messages were
25        sent between the two parties.
```

1   Q.   Did you do any work to confirm or disprove any of the

2        allegations pertaining to hacking of my client's

3        computers?

4   A.   No, because that's not my expertise, and I recall the

5        respondent mentioning that and us talking about what

6        he did in terms of reporting it to other parties such

7        as C&IT or Apple, I think it was Apple at the time

8        that he was consulting with, and so I -- because

9        that's not my expertise.  So I would ask them did they

10       do any work to see who may have hacked them?  And then

11       also with the police.

12  Q.   Okay.  And do you know whether or not Wayne State

13       Police Department or Wayne State's Computer Science

14       Department have forensic specialists that could have

15       done that investigation?

16            MR. PORTER:  Objection, form.

17  A.   I don't know.  I -- our C&IT office is always willing

18       to help students.  So if someone has questions about

19       internet and technologies, they could answer basic

20       questions, and then if something's happening on

21       campus, they could look into it, but something

22       external, that would assume that the police would need

23       to be involved.  It was, like, an outside source,

24       like, somebody else -- like a Snapchat, which was

25       mentioned, and someone's phones.  I would assume that

```
 1            phone companies have resources for that.

 2    Q.    But you did not ask the Wayne State Police Department

 3          or anyone else to verify whether or not my client's

 4          claims about being hacked were true?

 5    A.    Right.  Because that would have to come from the

 6          companies who owned that software and owned, you know,

 7          owned the devices, they would have to check that.

 8    Q.    But you don't know if the Wayne State Police

 9          Department has that capability, do you?

10    A.    I don't, and -- because I know typically I refer

11          students, if they have a complaint about a software

12          program, for instance, Facebook, I would state to them

13          to contact Facebook to get more information if your

14          Facebook has been hacked, if that's an issue.

15    Q.    But Ms. Camaj --

16    A.    And then the police, our Wayne State Police Department

17          can meet with a student and give them more information

18          if they can be of further assistance, but that's not

19          my expertise.

20    Q.    Was there anything in the complainant's account that

21          you thought didn't make sense or didn't have the ring

22          of truth to it?

23                    MR. PORTER:  Objection to form.

24    A.    No, there was nothing that was stated that appeared to

25          be made with intent to be false, and so as the -- I
```

```
 1           read the complaints and spoke with the complainant,
 2           the complainant repeated the complaints and then
 3           submitted text messages to corroborate the discussion
 4           that, excuse me, the text messages between her and the
 5           respondent, and so all of that was corroborated by my
 6           conversation, by the complainant's report, and the
 7           text messages.
 8   Q.      So when you say you were able to confirm it or
 9           corroborate it, what you mean is she did not change
10           her story --
11   A.      Right.
12   Q.      -- between the time --
13   A.      Correct.
14   Q.      -- that she filed the complaint and you reviewed it
15           with her?
16   A.      Correct.  There was no changes in her statement.
17   Q.      Did she include in her complaint any reference to
18           other people beyond herself and the accused?
19   A.      What do you mean other people?
20   Q.      Well, she included information about a photographer;
21           is that right?
22   A.      I'm not sure I'm following you.
23   Q.      In pictures that were taken, do you remember that?
24   A.      Nope.  All I -- all I reviewed was text messages.
25   Q.      So just give me a moment.
```

```
 1   A.   Yeah, if you can help me.

 2   Q.   Yep.  I certainly would not expect you to remember all

 3        of this just to be clear, and if you need to take a

 4        break, please let me know.

 5             MR. FLORES:  Okay, Bailey, if you would

 6        post Exhibit E.

 7             EXHIBIT TECHNICIAN:  One moment.

 8             MR. PORTER:  Okay.

 9             MR. FLORES:  Okay.  If you can go up a

10        little bit higher, or I'm sorry, go back down to where

11        the complaint starts, I'm sorry.  Yeah, go to page 2,

12        yeah, right -- yeah.  Keep going.  It's the last --

13        okay, right there.

14   BY MR. FLORES:

15   Q.   So Ms. Camaj, just to maybe save some time overall, if

16        you would take a look and just reread the complaint,

17        it's pretty short, and then let me know when you're

18        done.

19   A.   Okay.

20             MR. FLORES:  And can you go to the next

21        page and let her read the second part?

22   A.   Okay.

23   BY MR. FLORES:

24   Q.   So with respect to -- there was an allegation made as

25        part of the complaint that had to do with some
```

```
 1        photographs.

 2   A.   The pictures?

 3   Q.   Yeah, pictures.  Do you remember that?

 4   A.   Well, yeah, it's in the complaint.  I never received

 5        those.

 6   Q.   Did you discuss it with her at all?

 7   A.   Well, I asked her to send me anything she had as

 8        evidence.

 9   Q.   Did see send you any photographs or pictures?

10   A.   All I can recall her sending me is text messages and

11        possibly -- it's whatever I submitted with my report.

12   Q.   Okay.  Did you ask her for the name and telephone

13        number of this photographer?

14   A.   No.

15   Q.   Did you ask or get a telephone number for the alleged

16        law firm that was identified by my client to harass

17        the complainant?

18   A.   No.

19   Q.   And you did not ever call or make any effort to call

20        the Wolf Smith Law Firm that's listed here in the

21        complaint?

22   A.   No.

23   Q.   So you simply talked with her, reaffirmed that she was

24        sticking by this complaint, and asked her to resend

25        the text messages?
```

```
 1   A.   Yeah, because I couldn't open them.
 2   Q.   Do you remember approximately how long this telephone
 3        call took place or lasted?
 4   A.   I think with each party, it was about an hour, I feel,
 5        but I'm not sure, I didn't time it.
 6   Q.   Do you remember if you talked to her on your cell
 7        phone or on your desk phone?
 8   A.   It would have been my desk phone.
 9                 MR. FLORES:  All right.  You can take --
10        you can pull that down.  Thank you, Bailey.
11   BY MR. FLORES:
12   Q.   Do you remember whether or not the complainant
13        provided any additional facts that were not in her
14        online complaint?
15   A.   I don't remember additional facts.
16   Q.   And did you take notes as you were talking with her?
17   A.   I do both.  I type what the statement is coming from
18        the complainant and respondent, and then if I need to
19        make some notes on the actual evidence, like text,
20        I'll print out the text messages, I might make some
21        notes just so that I make sure that I'm referring that
22        I discussed it with them, but typically I'm typing it.
23   Q.   And did you take notes in this particular case?
24   A.   You mean typing?
25   Q.   Yeah, did you do --
```

1   A.   Yeah, I typed -- I type what the students say, so that

2        way I can make sure I reflect accurately what they've

3        told me in the report.

4   Q.   And do you still have those notes?

5   A.   No, because once I make sure I have entered everything

6        correctly, I shred everything.

7   Q.   And did somebody ask you to do that shredding?

8   A.   No, that's just my practice, so I don't -- I typically

9        operate, with everything online, as the Maxient

10       administrator, everything is online for me and saved.

11       So I don't really need to keep paper notes.

12  Q.   But there's no way for me now to take a look at your

13       notes and verify that your notes reflect accurately

14       what you put into any other document, is there?

15                  MR. PORTER:  Objection, form.

16  BY MR. FLORES:

17  Q.   If I wanted to verify that your notes were accurately

18       reflected in the complaint or in any other writing,

19       there's no way for me to do that now; is that right?

20                  MR. PORTER:  Objection to form.  You can

21       answer.

22  A.   It's my practice to share the final outcome to make

23       sure that I would take my notes and accurately reflect

24       it to the final report, but they would -- I would not

25       share my notes.

1   BY MR. FLORES:

2   Q.   But you're telling -- your testimony today is that

3        your notes no longer exist --

4   A.   Correct.

5   Q.   -- because they've been shredded?

6   A.   Right.  Because that's what I typically do if I do

7        have any notes because I wouldn't want anybody to find

8        them or, you know, get ahold of them, and so if I

9        don't need them anymore because I reflected everything

10       accurately on the final report, then I don't need to

11       keep them any longer.

12  Q.   But how do I know that?

13                  MR. PORTER:  Objection, form.

14  A.   You'd have to take my word for it and that I've been

15       doing this for 20-plus years, and I, you know, I've

16       always submitted things with the final report when

17       I've been asked to and have tried my best to

18       accurately represent what the students are telling me.

19  BY MR. FLORES:

20  Q.   You'll excuse me if I don't take your word for it.

21  A.   That's fine.

22  Q.   Let's move forward.

23                  Do you remember receiving a statement from

24       my client over the weekend or immediately after the

25       meeting as he had promised you he was going to do?

1    A.    Yeah, I -- I do recall -- I was looking for it because

2          he told me he would send it to me as soon as possible.

3    Q.    And you attached that to your report?

4    A.    Correct, because I told him that any statement he

5          provides to me I would add it to the report as his

6          statement because I told him that, you know, sometimes

7          students aren't able to articulate everything during

8          my meeting, and so they have an opportunity to submit

9          a statement and that I wanted to make sure I reflected

10         that by adding it to the report.

11   Q.    Did you do -- did you take any steps to verify or to

12         corroborate or disprove any of the statements that he

13         made in the submitted statement?

14   A.    Well, I remember reading it.  And then I wanted to

15         make sure I include it along with the report.

16   Q.    But because you were not responsible for actually

17         doing an investigation in this case, you didn't

18         attempt to verify or check the veracity of his

19         statement?

20   A.    I would check his statement by asking him questions

21         on, like, during our meeting, and then some of the

22         technical stuff like phone -- the phone stuff, I

23         wouldn't have been able -- that wasn't my expertise to

24         check the hacking.

25   Q.    And you didn't ask anybody else whose expertise -- who

1          had expertise in that area to make that --

2    A.    No, no.

3                    MR. FLORES:  I'm just trying to see if we

4          can skip over what we've already talked about.  Sorry,

5          David.  Sorry, Ms. Camaj.

6                    THE WITNESS:  No worries, no worries.

7                    MR. PORTER:  That's fine.  If you need to

8          take a break, let us know.

9                    MR. FLORES:  We're already at 2:00, huh?

10         Let's take a ten-minute break and that way...

11                    (Witness and both counsel speaking over

12                    each other.)

13                    (Recess taken at 2:05 p.m.)

14                    (On the record at 2:15 p.m.)

15   BY MR. FLORES:

16   Q.    If we can -- okay, Ms. Camaj, to be clear, because

17         this was an inquiry into concerning behavior, you did

18         not have the responsibility of investigating the

19         different claims being made by the complainant and my

20         client; is that correct?

21   A.    I -- yeah, I was there to take their statement

22         information, and if I could figure information out, I

23         should definitely do so if I had the ability to.

24   Q.    But this wasn't a case where you were charged with

25         going out and trying to collect evidence and trying to

1        resolve the matter?

2    A.   Right.  I was not asked to resolve the matter, to

3        gather data.

4    Q.   And as a result of confirming the complaint, you did

5        not find any evidence that my client sent the

6        complainant any inappropriate pictures?

7    A.   I was not sent any evidence.  Not that I didn't find.

8        I was not sent anything.

9    Q.   Right, so -- but no -- no evidence of my client

10       sending inappropriate pictures to the complainant were

11       discovered by you, collected by you, or in any way

12       assembled by you that you included and just -- I don't

13       see them in the report so they didn't --

14   A.   If I would have received them, I would have included

15       them.  Anything I received from both parties, I made

16       sure to include whether it was a statement, a letter,

17       or text messages.

18   Q.   Excellent.  And did you discover any obscene speech

19       made by my client?

20   A.   What do you mean, "discover"?

21   Q.   Did you come across it?  Were you provided with

22       obscene messages?

23   A.   I was only provided the text messages.

24   Q.   So the answer would be no?

25   A.   It depend on the definition of obscene, but I don't --

1       I don't recall him calling her any kind of name or

2       saying anything obscene, as you would say.

3   Q.  Now, the result, again, is that you only collected

4       information and confirmed the complaint?

5   A.  I collected the information, and I shared everything I

6       gathered with the parties that I've specified.

7               MR. FLORES:  I would like you, Bailey, if

8       you would, publish Exhibit E again, please.  Just the

9       first full page, not the title page.

10              EXHIBIT TECHNICIAN:  One moment.

11              MR. FLORES:  You can go all the way up to

12      the top.  Yeah, that page right there, right there.

13  BY MR. FLORES:

14  Q.  Would you read into the record, Ms. Camaj, from "Dear

15      Margit," to your -- the conclusion?

16  A.  "I have concluded my investigation into the

17      complainant -- complaint made on October 29th, 2018,

18      against WSU medical student, Anthony Eid, by former

19      WSU student, Amanda Burton.  Attached you will find

20      the investigation report, statements and evidence."

21  Q.  Okay.  So even though all you did was you collected

22      the information and confirmed the complaint and

23      forwarded it along, you created a document which would

24      lead the reader to believe that you actually conducted

25      an investigation; is that true?

 1   A.    I created a document to show that I investigated the

 2         complaint and spoke to the respondents.

 3   Q.    But you didn't investigate the complaint, did you?

 4         You didn't independently try to verify, you didn't

 5         collect names, you didn't ask for information, you

 6         didn't try to shop talk with witnesses, you didn't do

 7         any of those things because by your testimony today,

 8         that was not what you were charged to do?

 9                   MR. PORTER:  Objection to form.

10   BY MR. FLORES:

11   Q.    Am I correct that that was not your portfolio of

12         responsibilities?

13   A.    Yeah, what I was asked to do is speak to both parties

14         and gather as much evidence as I can that was

15         submitted to me.

16   Q.    And is that an investigation?

17   A.    It can be.

18   Q.    Your testimony is that in collecting that information

19         and not independently verifying it or engaging in any

20         other activity, that's what constitutes an

21         investigation in this case where my client is now out

22         of school and may never practice medicine?  That's

23         your testimony?

24                   MR. PORTER:  Objection, form,

25         argumentative.

1    A.   That's not what I said.

2                    MR. FLORES:  I'll withdraw it.

3    BY MR. FLORES:

4    Q.   Is there a reason that you waited so late to contact

5         my client and ask to meet with him?

6    A.   No, it would have just been my scheduling because I

7         have my calendar, and if I -- my calendar is booked,

8         then I would have delayed the meeting, but there was

9         no ill intent to delay the meeting at all.

10   Q.   And you submitted that report on December 4th, 2018;

11        is that correct?

12   A.   Yeah, that's the date on the report.

13   Q.   And do you remember what day of the week that was?

14   A.   I don't.  I would have to check the calendar; I don't

15        remember.

16   Q.   Do you remember if you worked the full month of

17        December?

18   A.   What do you mean?  Like was I in the office?

19   Q.   Were you in the office?  Did you take off for

20        Christmas break?

21   A.   I believe I was, I -- all of us have the same

22        Christmas break at Wayne State, so it would have

23        started on the 23rd or 22nd, because I usually take my

24        time off when most students take time off.  So that

25        would have been that week where we get off for Wayne

```
 1        State.
 2   Q.   All right.  Now, how did you transmit your report to
 3        Dean Chadwell?
 4   A.   Maxient.
 5   Q.   And he is not at the university but in the medical
 6        school; is that correct?
 7                   MR. PORTER:  Objection, form.
 8   BY MR. FLORES:
 9   Q.   Do you know where Dr. Chadwell works?
10   A.   Yeah, if you look at her letterhead -- if you look at
11        the letter, it says that she's at the University
12        School of Medicine.
13   Q.   And so that system can send information from the Dean
14        of Students Office anywhere in the university; is that
15        correct?
16   A.   The Maxient software has email capabilities, and then
17        you can send emails to anybody that you choose to send
18        emails to.
19   Q.   And that's how you communicated, and that's how you
20        sent this particular report?
21   A.   Yes.
22   Q.   And did that report include the attachments, the text
23        messages?
24   A.   Yes, it should have included everything.  I believe it
25        did.  There should be about 11 to 12 pages of text
```

```
 1        messages that I should have included.  Some of it may
 2        have been repeated, but all of them should have been
 3        there.
 4   Q.   After you sent the report to Dean Chadwell, did you
 5        have any direct communication with her by telephone or
 6        in person?
 7   A.   No, because my role was done.
 8   Q.   Did you ever talk with Dean Jackson at the medical
 9        school?
10   A.   Not about this case, nope.
11   Q.   How about Dean Richard Baker?
12   A.   No.
13   Q.   Did you ever speak with Loretta Robichaud about this
14        case?
15   A.   No.
16   Q.   Did you ever talk to Jane Doe's mother?
17   A.   No, I did not.
18   Q.   Do you know whether or not Jane Doe provided
19        information to anyone at the university?
20   A.   I don't.  I just -- what I know is I got the -- we
21        reviewed the complaint, so I don't know what else
22        happened after that.  After I submitted my report, I'm
23        not involved in the case.
24   Q.   When you joined Wayne State your first year, you were
25        a student conduct officer, not a Title IX
```

| | |
|---|---|
| 1 | investigator; is that correct? |
| 2 | A.   Yes. |
| 3 | Q.   Nevertheless, did there come a time that you became |
| 4 | aware that there was an investigation by the |
| 5 | Department of Education's Office of Civil Rights of |
| 6 | the WSU Medical School for retaliation against a |
| 7 | female student? |
| 8 | A.   It may have been spoken about in front of me in the |
| 9 | meetings that I was, but I was never part of that |
| 10 | discussion and had no knowledge of the proceedings. |
| 11 | Q.   As a Title IX investigator, though, are you aware that |
| 12 | an investigation by the Office of Civil Rights is a |
| 13 | serious matter? |
| 14 | MR. PORTER:  Objection, form. |
| 15 | A.   Yes, I am aware. |
| 16 | BY MR. FLORES: |
| 17 | Q.   And during your time working for WSU in any capacity, |
| 18 | did you ever have an occasion to speak to an |
| 19 | investigator from the Office of Civil Rights from the |
| 20 | Department of Education? |
| 21 | A.   No. |
| 22 | Q.   Are you aware that at the conclusion of the Office For |
| 23 | Civil Rights' investigation, they found by a |
| 24 | preponderance of the evidence that the School of |
| 25 | Medicine had, in fact, retaliated against that female |

1     medical student by expelling her?

2             MR. PORTER:  Objection, form.

3   A.   No, I don't know the details of the case.

4   BY MR. FLORES:

5   Q.   Did you ask -- did you ever ask the complainant for an

6        opportunity to speak to her mother or her father?

7   A.   No.

8   Q.   And even though she stated in her complaint that she

9        had recently talked to her parents about this matter,

10       you made no effort to speak to them?

11  A.   No, I did not contact the parents.

12  Q.   Because there was no charge in this case for you to

13       investigate, and my client was being -- the inquiry

14       focused on concerning behavior, did my client have an

15       obligation under the school conduct code to meet with

16       you?

17  A.   Again, this was not a conduct matter so --

18  Q.   So the answer would be no?

19  A.   Right:

20  Q.   Did you tell him that he had no obligation to meet

21       with you?

22  A.   No, I don't typically say that to students, they have

23       no obligation.  That's just not language that I use.

24  Q.   Well, is there some language that you could use to

25       communicate that?

1   A.   It's just not something that I -- I do.

2   Q.   Of course not.

3   A.   Right.

4   Q.   Because if you told them that, they didn't need to

5        come and talk with you, many of them would not; is

6        that right?

7                  MR. PORTER:  Objection, calls for

8        speculation.

9                  MR. FLORES:  Withdrawn.

10  BY MR. FLORES:

11  Q.   And your testimony is that after you submitted that

12       report on December 4th, you had no further contact or

13       anything to do with this case, and you had no

14       conversations with anyone, including anyone in the

15       general counsel's office or counsel for the

16       university?

17  A.   Yeah, I had no further involvement in the case.  I

18       don't even know what was decided or the outcome.  So

19       I, again, I was only there to investigate.

20                 MR. FLORES:  Okay.  All right, well,

21       Ms. Camaj, I -- this is a serious matter, and if I was

22       a little too aggressive, I apologize, I didn't mean to

23       do that; it's the nature of the process sometimes.

24                 David, I want to thank you for your

25       cooperation here.  We should probably have an

```
 1      off-camera discussion.  I can't do that until Friday

 2      since I'm going to apparently do -- I'm going to be

 3      handling the deposition tomorrow.  So I've got to get

 4      preparing for that, but if we can set aside, if you

 5      can let me know Friday what might work for you in

 6      terms of a call or maybe with you and Ms. Hardy, that

 7      would be good.

 8              MR. PORTER:  Yeah, that sounds good, we'll

 9      set it up.

10              MR. FLORES:  Thank you very much.  Do you

11      need any other information from me, Leisa?

12              COURT REPORTER:  Just your transcript

13      orders.  Did you want to order the transcript?

14              MR. FLORES:  Yes.

15              COURT REPORTER:  And did you need this

16      expedited?

17              MR. FLORES:  As quickly as you can get it.

18      I don't know what your schedule is, so...

19              COURT REPORTER:  On Friday?

20              MR. FLORES:  That's great.

21              COURT REPORTER:  Did you want a copy,

22      Mr. Porter?

23              MR. PORTER:  You know what, I need to

24      follow up with you on that.  I'll be in touch.

25              (The deposition was concluded at 2:33 p.m.
```

1              Signature of the witness was not requested

2              by counsel for the respective parties

3              hereto.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF NOTARY

2   STATE OF MICHIGAN)

3                         ) SS

4   COUNTY OF MONROE )

5

6              I, LEISA PASTOR, certify that this

7         deposition was taken before me on the date

8         hereinbefore set forth; that the foregoing questions

9         and answers were recorded by me stenographically and

10        reduced to computer transcription; that this is a

11        true, full and correct transcript of my stenographic

12        notes so taken; and that I am not related to, nor of

13        counsel to, either party nor interested in the event

14        of this cause.

15

16

17

18

19

20

21                         *Leisa Pastor*

22                         LEISA PASTOR, CSR-3500, CRR,

23                         Notary Public,

24                         Monroe County, Michigan

25                         My Commission expires:  9/7/27

## EXHIBITS

EXHIBIT C          39
EXHIBIT E          96
EXHIBIT F          92
EXHIBIT G          93
EXHIBIT H          100

Case 2:20-cv-11718-GAD-DRG ECF No. 54-7, PageID.2198 Filed 02/25/22 Page 142 of 168
JOHN PLAINTIFF vs WAYNE STATE UNIVERSITY
CAMAJ, NICOLINA 10/06/2021

Job 16300
Index: 10..accept

**Exhibit C** 4:13 39:11,22

**Exhibit E** 4:14 96:18,21 120:6 128:8

**Exhibit F** 4:15 91:24 92:2 101:15,16 106:15

**Exhibit G** 4:16 93:19,22

**Exhibit H** 4:17 100:10,13

---

**1**

---

**10** 17:10

**10:04** 5:3

**10:53** 37:7

**10:58** 39:23

**11** 42:1 56:20 131:25

**11.2** 102:12

**11/27** 102:1

**11:01** 41:19

**11:09** 41:20

**11:10** 41:13

**12** 131:25

**12:00** 76:3

**12:45** 74:15 76:2

**12:47** 76:4

**13th** 12:8,9

**15th** 77:8 98:20 109:4,7

**17** 44:6

**1:11** 92:3

**1:14** 93:23

**1:19** 96:22

**1:26** 100:14

---

**2**

---

**2** 120:11

**20** 17:10 42:1

**20-plus** 14:23 16:22 124:15

**2001** 14:6

**2003** 14:7

**2010** 21:20

**2011** 38:25 40:3

**2012-2013** 22:9

**2013** 13:13 22:10

**2015** 25:11

**2016** 88:22 89:12

**2018** 25:12 36:9 37:13 43:14 71:6 77:8 78:22 88:10,14 100:20 128:17 130:10

**2019** 43:14

**2020** 89:1

**2021** 5:2

**22nd** 130:23

**23rd** 130:23

**27th** 100:20

**29th** 77:24 109:3,6 128:17

**2:00** 126:9

**2:05** 126:13

**2:15** 126:14

**2:33** 136:25

---

**3**

---

**3** 96:24

**30th** 108:22

**313 577-8063** 13:7,9

---

**4**

---

**4** 106:23

**4.0** 59:22 104:23

**4.3** 47:18 57:24 106:7

**4.6** 47:18,20 57:24

**45** 7:12

**48** 55:11

**4th** 130:10 135:12

---

**5**

---

**5.0** 59:23 98:17

**50** 25:24 26:1,12 67:6

**50-plus** 25:16

**586 214-8250** 13:3

---

**6**

---

**6** 5:2

---

**8**

---

**80** 20:25

**800-person** 17:8

---

**A**

---

**A-T-I-X-A** 36:22

**a.m.** 5:3 39:23 41:19,20

**ability** 68:23 126:23

**able** 7:17 18:4,7 33:5 55:10 62:22 63:13 77:7 90:7,15 110:22 114:20 119:8 125:7,23

**about** 6:14 7:10,12 8:10,13 9:23 15:18,22 18:18 22:14 26:18 28:15 29:1,24 30:16,18 31:2 34:10 35:1 36:17 37:6,7 42:18 44:14 46:11,12,15,18 48:6,25 49:13,19,24 50:23 52:8 53:4,8,10 57:25 58:1,11, 25 59:21,23 60:10,14 61:6,14 62:14 65:9,18 66:22 67:14 69:23 72:23 73:6,7,8,9,19,20 74:9 75:9,11 76:18 77:16 79:22 80:17 90:24 94:7,22 102:24 107:14,16 109:21 111:21 112:4 113:9,13,20 114:19,22 115:2 117:5,18 118:4,11 119:20 122:4 126:4 131:25 132:10,11,13 133:8 134:9

**above** 42:5 100:17

**absolutely** 114:25

**abuse** 25:14 26:22 47:19

**academic** 46:15 51:22 66:18 68:9

**accept** 33:16 47:23 48:13 59:25 63:7,10,14,24

**accepts** 63:23

**access** 90:4

**according** 18:14 100:24

**account** 57:25 62:7,8,11 88:5 118:20

**accountability** 98:25

**accountable** 97:13 98:21,24

**accurate** 11:18 62:11 68:1

**accurately** 62:4 123:2,13,17, 23 124:10,18

**accused** 53:19 54:9,24 62:8 73:8 119:18

**across** 127:21

**ACSA** 24:11

**action** 18:6 51:17 98:1,10,12

**active** 38:14

**activities** 11:10

**activity** 129:20

**Actors** 19:9

**actual** 29:24 37:24 122:19

**actually** 7:2 33:15 59:19 125:16 128:24

**add** 31:13,14,22 62:2 125:5

**added** 29:6,13 34:25

**adding** 125:10

**addition** 14:3 48:13

**additional** 10:14,15 11:8 24:18 49:15 52:15 60:12 62:2 96:11 122:13,15

**additionally** 23:17 61:23

**address** 38:9 92:17 110:15

**adjudicate** 99:20

**adjudicated** 99:19

**adjudicating** 75:1

**adjudication** 75:18

**administration** 14:2,12,14,18

**administrative** 11:22 17:15

**administrator** 22:23 123:10

**Administrators** 36:23

**admissions** 16:3

**advice** 74:25 75:9,11 76:10

**advise** 33:6,12 94:21 104:19

**adviser** 60:8

**affairs** 14:1 15:24

**affected** 53:15

**affiliated** 65:15

**after** 5:6 16:25 21:18 22:13 24:14 37:13,25 51:17 53:4 55:3 62:2,6,9 64:11 77:3,4,5 86:15,17 88:2,21,25 89:11 110:4 115:1 124:24 132:4,22 135:11

**afterwards** 75:20

**again** 9:6 18:17,22,24 19:21 21:1,24 22:1,3,15 27:17 36:4 79:14 102:3,22 104:9 105:8 107:25 115:11,19 116:14 128:3,8 134:17 135:19

**against** 52:3 53:1,14 95:25 96:8 97:20,21 98:1,10 101:4 103:8 128:18 133:6,25

**agency** 33:18

**aggressive** 135:22

**aggressor** 27:16 28:11

**agitated** 58:9,18

**ago** 9:20 90:1

**agree** 50:3,14,18 51:7

**agreeing** 75:16 83:15

**ahead** 8:25 37:19 71:20 74:20 101:22 113:17

**ahold** 31:9 124:8

**alert** 93:12,15

**allegation** 26:2,21 32:1 120:24

**allegations** 28:10 117:2

**alleged** 16:15 27:7 31:2 57:23 59:22 94:7 96:2,3 98:22 121:15

**allegedly** 28:11

**alleging** 47:16

**allow** 7:4 57:8

**almost** 26:17 28:2

**alone** 109:12

**along** 16:12 46:9 72:3 125:15 128:23

**already** 9:23 37:14 76:18 126:4,9

**also** 16:1 17:9 20:19 21:9 23:14 29:3,5 34:24 39:14 40:24 41:5 46:9,10,15 49:16 51:12 54:4 60:5 61:11 66:20 87:5,16 94:9 106:1,2,6,19 116:15 117:11

**although** 6:19 68:23

**always** 11:18 28:6 31:11 38:24 52:11 54:18 60:13 61:3 62:1,4 104:25 110:5 117:17 124:16

**Amanda** 128:19

**America** 20:11 22:11

**American** 24:11

**amount** 8:21

**annual** 67:8

**another** 21:19 49:5 53:2 64:14 66:21

**answer** 5:19,24 6:18,23 7:17 8:25 12:9 38:20,23 40:15 59:5 60:9 61:25 64:9 71:23 74:3 76:14,16 81:10,13 83:2,5,7,10, 12 85:4,6 86:6,8,10 87:1 89:23 104:7 112:13,14 113:18 114:18,20 116:11 117:19 123:21 127:24 134:18

**answered** 114:23 115:2,16 116:10

**answering** 7:9 40:18

**answers** 58:5

**Anthony** 94:4 128:18

**anxious** 58:10

**any** 6:7 7:16,19 8:12 9:13,16, 21 10:14,15 13:17 14:8,11,16 15:4,6,14 27:21 29:12 30:19, 23 31:1,10,12 33:13 38:18,20 44:25 47:4 48:5,9,19,24 49:4,6 54:7 56:4,24 57:19 59:5,8 60:9

61:19,20,21 69:22 79:13 81:7,
11 82:24 83:18,21,22,23 84:5,
19,22 85:11 86:2,16 87:6 88:5
90:7 93:1 98:1 101:3 103:10,
18 105:20,22 108:1 110:23
112:17,20,24 114:17,19 115:5,
22 116:7 117:1,10 119:17
121:9,19 122:13 123:14,18
124:7,11 125:4,11,12 127:5,6,
7,11,18 128:1 129:7,19 132:5
133:17 136:11

**anybody**  11:1,23 66:10 78:15
90:20 96:14 112:25 113:1
124:7 125:25 131:17

**anymore**  72:16 124:9

**anyone**  10:21,23 31:21 56:23
86:17 87:24 90:13,17,22 97:18
103:18,20 112:20 118:3
132:19 135:14

**anything**  7:23 10:17 14:19
32:17 48:3,6 52:20 59:7,21
88:4 92:11 95:17 109:18
114:22 118:20 121:7 127:8,15
128:2 135:13

**anywhere**  73:19 107:23
131:14

**apartment**  65:10

**apologize**  9:6 38:6 135:22

**apology**  114:24

**apparently**  136:2

**appear**  27:25

**appeared**  118:24

**appendix**  31:22

**Apple**  117:7

**applicable**  42:20

**applied**  37:19

**applies**  75:3

**appropriate**  12:23 64:20
75:21

**approximately**  12:5 13:11
25:11,25 99:14 122:2

**arbitrator**  7:6

**are**  7:21 8:9 12:18 16:3,4 23:4
24:22 28:14,15 29:10,13,15,23
34:10,17 36:1,21,25 37:7

38:11 39:4,6 43:23 44:1 45:5
50:21,22 51:9,25 52:22,24
54:7 55:25 57:1,2,3,7,21 58:16
59:19 60:24 61:7,23 62:12
63:9,16 64:1,2,20 65:14 66:12
67:3,4 71:4 72:20,21 73:7,8,
11,12,16 75:7 76:9 79:7 80:8
81:11 83:3,5 84:13,17,21 85:6
86:8 97:6 98:6 102:20 103:4,5,
6 105:12 106:8,10,11,12,23,
24,25 108:9,10 113:2,5,10,12
124:18 133:11,22

**area**  40:21 126:1

**areas**  28:23

**aren't**  125:7

**argumentative**  129:25

**arise**  67:6

**around**  72:19 75:12,22

**arrived**  43:1,6 48:19

**articulate**  125:7

**ASC**  24:11

**ASCA**  24:5 28:24

**aside**  136:4

**ask**  5:18 6:19 7:18 9:6 28:21
31:11 32:16 42:2 51:24 59:19
60:9 72:3 76:11 77:6 90:16
92:15 99:3,6,8 100:25 104:18,
23 112:12 114:21 116:2 117:9
118:2 121:12,15 123:7 125:25
129:5 130:5 134:5

**ask-a-question**  66:20 67:3

**asked**  9:23 35:21 36:14,15,19
38:19 85:24 86:19 97:13 99:13
102:25 104:16 110:18 112:7
114:23,24 115:16 116:10
121:7,24 124:17 127:2 129:13

**asking**  7:24 8:10,13 28:14
50:23 55:4 56:9 61:11 75:17
90:18 100:2 104:1 105:12
110:8,9 114:21 125:20

**aspects**  50:21

**assault**  26:15 33:25

**assembled**  127:12

**asserted**  76:15

**assess**  52:21

**assessing**  73:3,6

**assessment**  79:25 80:5,13,
14,20 81:8

**assign**  27:6 55:3

**assigned**  13:16 17:23 24:1
84:1,6

**assigning**  112:25

**assignment**  112:9

**assistance**  59:17 118:18

**assistant**  11:22 14:21,24,25
22:19,20 23:11 38:25

**associate**  37:23 38:1 43:18
81:23

**associated**  23:25 73:24

**association**  24:5,12 36:22

**associations**  25:4

**assume**  25:23 44:15 102:7
117:22,25

**assumed**  51:6

**assuming**  49:1 66:25 67:7

**assumption**  67:9

**ATIXA**  36:22 37:5

**attached**  61:17 93:10 125:3
128:19

**attachments**  131:22

**attempt**  125:18

**attend**  54:21

**attended**  24:13 29:17 72:7
79:16 81:20,25 82:3,8,11,14,
21 88:18 109:5

**attending**  79:4

**attends**  19:12

**attention**  41:25 65:20,21
76:22 92:20 93:4

**attorney**  5:15 9:15 17:12
19:10 67:17 93:8 110:20

**attorney's**  6:20

**attorney-client**  71:24 74:4
81:12 83:4 85:5 86:5,6 112:11,
12

**attorneys**  8:13,14 9:7 10:4,

16,20

**August** 14:5 100:1

**authority** 18:1 48:1 63:3
110:14,23

**auto** 106:20

**automated** 91:21

**automatic** 92:7

**automatically** 63:8 64:3

**availability** 78:4

**available** 32:12 38:24 49:19
60:9 64:12 90:10

**average** 67:20

**avoid** 76:17

**aware** 31:5,7,10 32:13 34:17
39:6,9 43:23 45:5,7 56:15
58:14 65:25 101:3 108:4
111:15 133:4,11,15,22

**away** 45:6 54:21

---

**B**

**B-R-O-U-S-S-A-R-D** 36:6

**Bachelor's** 13:21

**back** 6:25 13:8 21:18,20 29:23
37:18 38:6 41:12,20 54:24
60:14 73:12 76:1,5 78:22
90:24 99:12 100:8 120:10

**Bailey** 39:10,17 40:19 41:16
42:6,11 44:7 45:11 74:12
91:23 93:19 96:17 100:9
101:16 120:5 122:10 128:7

**Baker** 132:11

**band** 17:20

**banner** 91:19

**based** 44:17 62:20 83:11 86:4
101:25 103:11,14,16,22 104:3
105:2 109:24 112:10 114:5,10

**bases** 51:9

**basic** 15:9 117:19

**basically** 21:14 63:14

**basis** 46:7 67:9 78:12 103:13
105:4

**bear** 41:3

**became** 20:22 45:1 133:3

**because** 7:6 8:5,8 9:20 20:12
23:10 24:16 28:4,5 33:4 36:18,
19 39:5 40:13 45:5,23 47:1
48:3,7 52:3,5 53:14 58:1 64:10
68:24 71:20 74:7,8 75:3 76:14,
17 79:20 81:17 84:9 85:24,25
89:25 90:18 92:9 94:12,17,23
95:21 99:24,25 102:8,14,20
103:19 106:4,21 107:6,25
111:21 112:2,23 113:24,25
115:11,22 117:4,8 118:5,10
122:1 123:5 124:5,6,7,9 125:1,
4,6,16 126:16 129:7 130:6,23
132:7 134:12 135:4

**become** 33:23

**becomes** 52:9

**been** 5:7 6:10 7:20 14:21,22
16:17,19 23:20 26:12,14,15,16
27:6,23 29:1 32:3,4 34:16
35:21 37:15 38:8 39:6 45:21
53:15 58:4 65:5 77:5,22,23
81:24 82:2,13,17,19,25 85:24
87:22 89:20 90:8,15 95:13
96:9 97:24 99:13,24 100:4,8,
23 101:10,11 102:14,18 103:8,
12 105:10 108:19 110:22
111:23 112:25 114:12,14
118:14 122:8 124:5,14,17
125:23 130:6,25 132:2 133:8

**beer** 33:1

**before** 5:24 20:2 21:21 49:14
57:20 60:12 67:21 77:13

**began** 16:12 110:9

**beginning** 54:15 109:20
110:8 115:16

**behalf** 75:13 81:20 82:3,8,11,
14,21

**behavior** 47:20 52:23 53:8,10
54:4,11 58:25 59:3,4,8,10,11
69:24 73:1 94:7 95:6 102:18,
25 103:3 106:2 107:15,18,22
108:5,11 109:22 110:12,14
114:3,6,10,12 115:11 116:4
126:17 134:14

**behavioral** 56:13 69:15,18
70:1,16,19,24 71:4,10,17 72:7
76:23 77:12 79:17 80:3,18

109:5 112:8

**behaviors** 95:12,15 106:18
108:12

**behind** 57:8

**being** 14:24 16:1 19:24 22:1,2
37:25 43:11 45:20 46:2 73:1
76:23 81:8 94:15 99:11 106:6
111:24 112:5 114:7 118:4
126:19 134:13

**beings** 50:13

**believe** 35:13 38:13 52:3
62:17 88:15 89:19 90:20 98:8
101:17 128:24 130:21 131:24

**believed** 115:6

**bell** 39:4

**benefit** 72:2

**best** 5:23 10:18 11:17,18
60:25 75:14 76:17 77:18 81:1
85:13,14 101:6 124:17

**better** 15:21 31:24 52:12

**between** 46:20 47:15 60:18
61:5 90:19 99:17 109:2,6
116:6,25 119:4,12

**beyond** 10:16 80:23 87:25
119:18

**binders** 48:24

**Birmingham** 5:1

**bit** 15:17 29:21,24 48:18 49:24
77:14,16,19 78:2,5 79:1 80:11,
13 83:22,25 85:22 86:2 101:14
111:9 120:10

**biweekly** 78:3

**Blackstone** 20:3,7 21:14,18

**blocks** 19:16

**blood** 32:4,16

**blue** 42:1

**board** 67:23

**Bob** 5:14 72:1

**body** 32:4

**booked** 130:7

**bore** 35:15

**boss** 18:9 111:1,3

**both** 12:24 17:14 21:5 25:2 29:8 46:14 53:24 54:3 61:20 85:13 86:19,23 114:15 122:17 126:11 127:15 129:13

**bother** 76:19

**bottle** 33:1

**bottom** 92:6

**break** 7:8,11,13 37:8 41:9 74:6,14,16 110:7 120:4 126:8, 10 130:20,22

**bring** 69:23 70:20,23 71:2

**bringing** 70:21

**broad** 108:12,14

**broadly** 16:18

**brought** 24:15,16 29:19 36:9 65:21 77:16 106:8

**Broussard** 36:1,5

**Brown** 21:22 22:8,13

**build** 21:16

**building** 17:9,24 21:13

**buildings** 19:21 22:5,6

**built** 20:10

**burden** 35:15

**Burton** 128:19

---

**C**

**C&it** 117:7,17

**cafeteria** 20:16

**calendar** 11:9,14,15,16 130:7, 14

**call** 7:14 15:3 17:22,23 19:24 46:12 49:10 51:19 64:7,11 65:24 77:9,14 121:19 122:3 136:6

**called** 5:6 16:13,19 19:6,17,21 23:12 24:6,10,18 29:6 36:21 39:2 66:20 84:16 104:15

**calling** 128:1

**calls** 13:18 26:4 71:23 135:7

**Camaj** 5:5,12 39:25 40:22 41:4,17 44:9 74:13,24 76:8

94:3 97:2 100:16 101:23 118:15 120:15 126:5,16 128:14 135:21

**came** 21:20 37:17 65:20 66:1, 2,23 67:21 76:7,22 77:3,5 115:23

**camera** 31:9

**cameras** 31:7

**campaign** 38:10,12,14

**campaigns** 38:15,18

**campus** 16:4 18:22 22:6 23:2, 15,18 24:15,16 29:3,20,22 32:14,15 38:10,24 65:5,6,7,9, 16 72:17,25 73:2,9,13,17 80:24 94:8 96:2,3 105:19,21, 23 107:2 108:10 117:21

**can** 5:22 8:4,25 12:17,23 13:20 14:3 16:5 25:13,25 26:10,19 27:6 28:7,21 29:10 30:24 31:4,9,10,14 32:15 33:7, 9 35:14 36:4 37:7,24 39:18,25 40:8,19,24 42:12 44:8,17,19 45:10,17 46:21 47:25 50:6,9 51:15 54:20 55:16 57:17 58:14 59:15,17 60:13 61:17,19,21,24 62:2 64:10,11,15 66:12,22 69:22 72:7,24 73:4 74:13,15 75:7 76:16 77:6,15 78:2,3 79:4 80:22 81:3,13 82:7 86:10 91:19 92:15 95:22,25 96:5 98:8,12,17 100:21 101:13 103:18 104:10,21,23 106:15 109:18 114:23,25 115:1,4 118:17,18 120:1,9,20 121:10 122:9,10 123:2,20 126:4,16 128:11 129:14,17 131:13,17 136:4,5,17

**can't** 27:9 33:16 38:15 74:18, 19 99:10,11 136:1

**cannot** 54:14 62:24 83:12 99:21

**capabilities** 131:16

**capability** 118:9

**capacity** 17:14 20:19 21:2 22:1 48:8 133:17

**CAPS** 59:15

**car** 106:21

**Carbondale** 17:6

**care** 7:14 46:10,13 56:11 58:23 59:7,13 66:19 101:8

**career** 23:21

**Carolina** 21:10

**carried** 43:8

**case** 7:13 15:25 18:3,5 24:2 26:18 27:12,13 30:25 31:13,14 34:15 35:16,18,20,22 36:1,9 40:10 47:7,21,25 49:22 50:21 53:20 56:22,25 59:8,14,18,19 60:6 61:10,23 62:13 63:14 64:13,24 65:19 68:15 69:3,17 70:10 73:21 79:22 81:5 84:7, 22,23,25 86:21 87:25 91:9 94:11,23 95:17,20 96:6 99:20 104:14 105:10 107:5 110:1,12, 16,24 113:12,22 115:6,9,13 122:23 125:17 126:24 129:21 132:10,14,23 134:3,12 135:13, 17

**cases** 15:15 16:16 17:10,23 23:16,25 24:3 25:16,18,24 26:1 28:19 33:25 42:20 43:2, 21 48:10 54:16 60:15 62:15,22 63:16,24,25 64:2,20 67:21,22 70:20 99:21,22 100:4 111:12, 13,14,23 112:24 113:11

**catch** 45:18 64:9

**cell** 12:11 13:2,12 122:6

**Center** 72:17

**Central** 13:22 14:5

**certain** 24:22 63:16

**certainly** 120:2

**certificates** 14:8

**Chadwell** 82:25 87:15,19 110:17 111:2,5,19 112:18 131:3,9 132:4

**Chadwell's** 111:3

**chain** 30:6,10,15

**chair** 78:8

**chance** 49:21 52:14 64:6 98:5 108:16

**change** 20:5 119:9

**changed** 29:13

**changes** 29:2 35:8 119:16

**charge** 22:7,22 47:17 52:7,17 57:22 60:22 95:22 96:8,12,13, 14 102:22 103:24 104:4 105:9 106:1,17,19,20 107:5,8,25 110:13 134:12

**charged** 60:23 97:15 106:12 126:24 129:8

**charges** 47:16 52:3,5 53:14 58:4 61:12 94:10,11,12,13,24 95:21,25 96:5,6 97:17,19,21, 23 98:3 99:1 101:4 102:14 103:3,6,7,9,12,15,16,18,21 104:6,8,10,16,22 105:1,2,3,8, 12,24,25 106:8,10,11,23 111:16 114:1,7,13,14

**chat** 39:15

**check** 89:19,22,25 90:1 100:1 118:7 125:18,20,24 130:14

**Chelsea** 19:22

**chief** 72:16

**choose** 105:9 131:17

**chooses** 105:8

**Christmas** 130:20,22

**circulate** 79:11

**circumstances** 57:3,4 76:7

**city** 18:20 19:24

**civil** 15:15 33:11 34:15 35:18, 20 39:1 40:4 42:19 43:24,25 133:5,12,19,23

**claim** 74:9 83:15 86:13

**claiming** 76:9

**claims** 118:4 126:19

**clarify** 52:4,9 53:4 59:6

**classroom** 59:3,11 114:12

**clear** 8:12 35:9 73:6 76:6 120:3 126:16

**Clemson** 13:24 14:6 16:12,25

**client** 79:24 81:7 83:22 87:22 90:25 91:10 94:14 96:8 97:13, 20,22,23 98:1,21 100:5,22 108:15 109:10 113:22 114:17 116:7 121:16 124:24 126:20 127:5,9,19 129:21 130:5

134:13,14

**client's** 117:2 118:3

**clientele** 20:11

**close** 57:9

**closely** 14:22

**closer** 37:16

**clothing** 30:12,19 32:25

**Coast** 18:24

**code** 46:24 47:17,18 48:14,20 49:2 51:1 52:4,6,10 57:14,15 58:2 60:21 61:2 63:2 64:18 94:20,23 95:2,24 96:1,4 98:15 101:3 102:16,22 106:24 107:24 111:12 134:15

**code's** 48:18

**colleague** 39:3,8 40:5 43:25 81:19

**colleagues** 72:14

**collect** 31:2 32:6 33:4 126:25 129:5

**collected** 111:18 127:11 128:3,5,21

**collecting** 129:18

**collector** 110:25

**College** 21:7,8 24:11

**colloquially** 39:2

**Colorado** 89:20

**come** 21:11,18 28:8 57:13 58:9 61:25 62:9 64:10 68:11, 12,13 69:20 83:25 88:17 92:20 97:21 108:15 116:3 118:5 127:21 133:3 135:5

**comes** 24:25 58:18 60:18 61:6 65:2 68:3,14 70:1,9 92:24,25

**comfortability** 57:10

**coming** 20:11 27:20 52:18,19 56:5 58:10,14 73:12 77:18 80:13 91:16 92:11,13 122:17

**comment** 86:11

**commenting** 90:22

**committee** 60:5

**commodifying** 21:14

**common** 26:24

**communicate** 134:25

**communicated** 131:19

**communication** 36:18 132:5

**communications** 12:14 81:11 83:3 85:5 86:7 112:12

**community** 14:25 21:23 22:3, 24 23:14 44:1 46:11 108:8

**companies** 118:1,6

**compared** 19:2

**complainant** 31:12 61:20 73:8 77:9 84:3 88:3 89:15 90:6 96:11 97:25 98:20 104:14 106:9 109:25 116:6,12,15,22 119:1,2 121:17 122:12,18 126:19 127:6,10 128:17 134:5

**complainant's** 62:7 88:5 118:20 119:6

**complainant/respondent** 30:23

**complainants** 29:11

**complaining** 53:4 68:12

**complaint** 26:11 49:21 51:16, 17,18,21 52:13 53:1,2 54:4,8, 12 59:1,2 60:18 61:5,8 63:4 65:2,3,19,25 66:4,10,19,23 68:3,15 69:3,4,10 70:5,8,9,23 71:9 72:8 73:23 76:6,22 77:3, 5,16,17,23 79:14,19 83:22 84:1,10 86:15 88:21 89:7 94:10 95:5 96:7,12,25 98:23 99:13,18 100:6 102:24 103:3, 13,14,17,23 104:4 105:5,14 106:4 109:2 116:16 118:11 119:14,17 120:11,16,25 121:4, 21,24 122:14 123:18 127:4 128:4,17,22 129:2,3 132:21 134:8

**complaints** 68:22 99:18 119:1,2

**complete** 104:20

**complex** 20:17 21:3

**complexes** 20:15

**computer** 10:2 15:6,9 117:13

**computers** 105:20 117:3

**concern** 56:13 62:13

**concerned** 52:8 53:8 69:23 73:20

**concerning** 52:23 53:10 54:3, 11 58:24 59:3,8,10 69:20 95:6, 12,15 102:17,25 103:3 107:14, 17,18,21 108:5,7,8,12 109:22 110:12,14 114:3,6,10 115:11 116:4 126:17 134:14

**concerns** 46:11 47:3 51:25 58:25 70:22 72:23 94:7,19 102:20,21 109:24

**concluded** 60:12 128:16 136:25

**conclusion** 128:15 133:22

**conduct** 6:12 15:9 16:2,13,19, 21,22 17:10,23 18:2 19:23 20:21 21:1 22:22,25 23:1,4,8, 13 24:5,12 30:2 31:3 38:2 43:18 46:8,21 47:13 48:10,15, 21 49:2 51:2,11 52:4,10,17 53:18,20 54:5,12 56:19,21 57:12,17 58:2,4,11 59:18,19 60:6,14 61:2,7,10,18 62:13,15 63:3 64:18 67:6,14,21 68:10 81:24 82:1 84:5,11 85:21 94:21,23 95:3,17,20,24 96:1,4 98:15 101:4,8 102:16,22 103:20 106:13,17,24 107:6,7, 24 109:22 111:11 113:11 114:13,14,22 132:25 134:15, 17

**conducted** 128:24

**conducting** 51:12

**conference** 78:19 94:16

**configuration** 26:6

**confirm** 116:21,22,24 117:1 119:8

**confirmed** 128:4,22

**confirming** 88:6,7 127:4

**confronted** 115:24

**confusing** 5:19,21

**connect** 59:16 73:5

**connected** 21:3

**consequences** 45:1

**considering** 29:9

**consisting** 17:9

**constitutes** 129:20

**consulting** 117:8

**contact** 46:13 55:11 57:17 60:13 65:24 85:13 90:25 96:5 118:13 130:4 134:11 135:12

**contained** 105:5

**context** 58:8

**continue** 37:9

**continued** 24:14

**continuing** 24:19

**contradict** 116:8

**control** 40:25

**conversation** 5:18 9:15 53:9, 12 88:2 90:23 104:15 109:16, 20 110:8 115:15 119:6

**conversations** 135:14

**convincing** 35:9

**cooperation** 135:25

**coordinator** 34:2 38:18 72:15

**copies** 88:3

**copy** 136:21

**correct** 12:9 14:10 28:20 42:24 43:16 44:16 51:13 53:23 63:4 67:2 69:7 76:24 84:14,20 86:24 89:2 91:4 92:11,18,19 99:15 103:24 107:18 114:2,4 119:13,16 124:4 125:4 126:20 129:11 130:11 131:6,15 133:1

**correctly** 123:6

**correspond** 102:6

**correspondence** 92:22 93:17 101:9 113:8

**corroborate** 88:4 116:17,18 119:3,9 125:12

**corroborated** 119:5

**could** 6:16 15:17,24 21:13,17 22:12 31:2 32:13 39:10,11,13 47:19,20,21 50:11,12 52:20 54:17 66:6 73:18 74:7,11 81:4 84:19 87:1 89:23 93:24 95:5 97:9 100:16 102:7 103:16

104:25 105:25 106:3,6,12,19 107:2 108:8,11,13 112:3 114:10,12,14,18,24 115:3,25 117:14,19,21 126:22 134:24

**couldn't** 62:3 67:25 116:13 122:1

**counsel** 7:20 11:3 34:24 72:12 75:8 80:25 82:12 87:17 126:11 135:15 137:2

**counsel's** 11:1 36:16 75:3 87:20 135:15

**counseling** 59:15 72:11 81:3 82:4

**counselor** 13:25 19:19

**counselors** 19:17

**countries** 21:1

**couple** 9:2 19:16 38:8 64:10

**course** 18:11 28:24 43:10 48:17 67:7 76:10 78:25 111:10 135:2

**courses** 15:4,6,20 30:14

**court** 33:11 36:14 45:14,21 75:17 136:12,15,19,21

**courtroom** 7:1

**covered** 47:8 50:21 51:9 72:19

**covers** 106:17

**COVID** 66:17,25 67:3

**create** 5:25

**created** 43:25 81:8 128:23 129:1

**creating** 80:5

**creation** 79:24 80:19

**crime** 82:21

**criminal** 15:4 34:15 106:10

**current** 8:6 29:16 37:22 38:5

**currently** 12:3

**custody** 30:15

**cut** 10:10 49:15 71:22

## D

**daily** 11:10,13 46:7

**dangerous** 114:13

**data** 32:11 127:3

**date** 29:15 55:9 77:17,21,22
78:15 81:6 82:18 100:19
108:18 112:21,22 130:12

**David** 74:7,18 76:8,12,17
83:15 126:5 135:24

**day** 12:3,8 64:11 75:23 101:7
130:13

**day-to-day** 47:2

**days** 12:4 54:15 77:4

**deal** 32:8 53:17 75:15 76:14
83:16 84:25

**dealing** 18:2 39:3 79:21

**dealt** 28:19 35:13 38:16 40:9

**dean** 37:21 38:2,3,5 56:15,20,
22,24 57:5 58:15 60:3 63:9,10
64:1,4,13,15 66:16 68:21 69:4,
10 70:1,9,10,14,24 78:10,13,
19 81:21,22,23 82:25 84:15
87:19 91:10,11,17 92:11,13
93:17 110:17 111:2,3,4,7,13,
19 112:18,21 131:3,13 132:4,
8,11

**dean's** 92:23

**Dear** 39:2,8 40:5 43:25 128:14

**December** 130:10,17 135:12

**decided** 83:12 135:18

**deciding** 75:2

**decision** 18:2 49:11 59:25
63:11 84:24 85:2

**decisions** 16:16 17:25 18:8
75:13 79:21 81:1 113:11

**declines** 56:7

**defendant** 35:24 36:11 45:15

**defer** 34:8,12

**define** 9:9 95:22

**defined** 26:17 107:23

**definitely** 19:11 30:16 110:6
114:22 126:23

**definition** 98:15 107:3 108:6
127:25

**definitions** 34:10

**degree** 13:24 14:5,6,17 15:18,
22 16:7,8,12

**degrees** 13:20 14:4,8

**delay** 54:20 130:9

**delayed** 54:17 130:8

**delete** 30:20,24

**deny** 47:23 48:13 59:25 60:2
63:7,9

**department** 32:7 39:1 43:24
72:13 82:22 84:19 117:13,14
118:2,9,16 133:5,20

**departments** 14:18 16:4
46:17 69:20 70:3 72:21

**departure** 89:4,5

**depend** 105:17 127:25

**depending** 32:14 35:9 51:22
56:2 57:9 68:7 78:2,3 81:2
85:14

**depends** 51:18 52:17 55:2
56:9 73:3 80:12 81:5 106:7
114:9

**deposition** 5:16 6:15,22 7:1,9
8:2,12,19 9:8,14,17 10:21,23
11:2 75:17 136:3,25

**describe** 28:22 47:25 102:23
115:9

**described** 108:1 115:10

**Design** 19:8

**designated** 79:2

**desired** 52:18

**desk** 13:4,14 57:8 122:7,8

**desktop** 56:2

**details** 102:19 134:3

**determination** 47:22,23
56:17 63:6,13,22,25 64:3
70:18 86:21 87:8,12 109:23
112:6 115:12

**determinations** 59:9

**determine** 18:4,7 62:10 72:25
100:21 104:6

**determined** 69:15 85:7 98:17

**determining** 59:6 73:14

**develop** 21:12

**developed** 50:20 51:7

**development** 16:5

**device** 12:14

**devices** 118:7

**dictated** 24:2

**did** 8:21 9:2,7,11,13,16,21
10:15,20,23 11:1 16:25 17:1,2,
4,17 18:17 19:13 20:1 21:18,
19 25:7,9,13 26:21 28:10 30:2,
5,12 31:1 33:23 34:14 36:16
37:12,14 43:6,19 44:25 45:20
48:19,24 70:14,25 75:9 79:13
80:4 83:21,25 85:15 86:16
87:14 88:4,12,17 90:4,13,16
94:9,14 95:7 97:21,25 98:21
99:3,6,8,20 105:18 108:15,17
109:17 110:14 113:22 114:17
115:5 116:7,14,24 117:1,6,9
118:2 119:9,17 121:6,9,12,15,
19 122:16,23,25 123:7 125:11
126:17 127:4,18,21 128:21
129:3 130:19 131:2,22,25
132:4,8,13,16,17 133:3,18
134:5,11,14,20 136:13,15,21

**didn't** 10:13 11:8 20:13 21:15
22:12 28:4,6 45:18 48:7,12
70:23 71:2 90:5,11,16,22 95:7
98:24 101:10 106:5 111:7
112:3 113:18 115:21 118:21
122:5 125:17,25 127:7,13
129:3,4,5,6 135:4,22

**dies** 63:14

**differ** 35:18 43:19 47:2

**difference** 46:22 48:16

**differences** 48:9

**different** 16:3,20 19:11,19
20:5,25 23:20 26:17 28:22
29:21 32:15 34:11 48:17,18
50:8,12 51:11 61:2 69:19 70:3
74:23 80:15,23 81:16 103:5
106:18 110:16 126:19

**differs** 47:3

**diligence** 64:16

**direct** 23:6 41:25 65:24 132:5

**directed** 87:24

**direction** 85:20

**directive** 112:4

**directives** 49:25

**directly** 64:15 68:12,14,19 70:14 112:17

**director** 14:25 16:10 17:8 18:22,25 19:20 21:23 22:3,19, 20 23:12,14 28:1,4 37:2,23 38:1 43:18 48:7 72:11 82:3,9, 14

**director's** 22:25

**directors** 19:18 69:19

**Disabilities** 59:16

**disability** 72:18 82:9

**disagree** 50:3

**disciplinary** 98:19

**disclose** 45:20

**disclosed** 45:13

**disclosure** 71:24

**discover** 65:5 127:18,20

**discovered** 127:11

**discuss** 10:23 59:2 69:20 73:19 78:1 94:7,18 95:6,12,14 98:21 102:17,21 116:3 121:6

**discussed** 71:12,14 72:9 77:19 86:15 98:23 102:2 122:22

**discussing** 71:16 73:21,23, 24 80:14

**discussion** 39:21 70:17 74:9 79:23 81:7 82:24 83:18 92:1 93:21 96:20 100:12 119:3 133:10 136:1

**discussions** 30:18 75:8

**dismissed** 99:3

**disorderly** 47:20 106:2,12,17

**disprove** 88:5 117:1 125:12

**distinct** 103:4

**distinction** 46:20,24 50:8

**district** 19:10

**divulge** 74:4 81:10 83:2 85:5 86:6 112:12

**doctor** 33:9

**document** 7:25 9:22 40:25 44:7 45:11 87:6 123:14 128:23 129:1

**documentation** 48:25

**documents** 7:19 9:13,23 10:3,4,7,9,12,14,16 108:21

**Doe** 68:16 69:3 70:5 71:9 72:8 98:8 103:14 132:18

**Doe's** 96:7 132:16

**door** 57:7,9 110:5,6

**dorm** 32:2 64:22

**DOSO** 104:19

**doso.wayne.edu** 66:14

**down** 19:16 39:13 40:20 41:4 44:7 45:11 58:10 81:16 92:5 110:3 120:10 122:10

**Dr** 46:10 69:2 111:5,12 131:9

**dual** 23:11

**due** 18:6 64:16

**duly** 5:7

**during** 7:24 8:12 9:15 12:2 17:19 22:8 25:13 30:21 46:6 48:1 50:2 56:3 57:20 60:6 61:8,18 62:4 67:21 76:10 78:25 79:13 82:24 90:23 105:23 125:7,21 133:17

**duties** 46:7 50:24

**duty** 103:8

---

**E**

---

**earlier** 35:21 42:22 66:5 67:5, 15

**early** 100:1 112:23

**East** 18:23

**eat** 74:17

**education** 13:22,23 14:1 23:13 24:19 38:23 39:2 133:20

**Education's** 133:5

**educational** 65:16

**eduction** 15:24

**effort** 95:8 121:19 134:10

**efforts** 38:9

**Eid** 73:22,24 75:8 128:18

**Eid's** 5:15

**either** 7:20 33:17 116:8

**electronic** 53:23 66:3 91:2, 15,17

**electronically** 54:1 68:4 91:20

**else** 10:21 84:18 86:17 87:20 90:8,20,22 97:18 113:1 117:24 118:3 125:25 132:21

**email** 51:19 62:3 92:16,17,24, 25 93:1,12,15 100:16,19,21 101:5,22,25 102:1,12,19 104:25 115:3 131:16

**emailed** 87:15

**emails** 101:7 102:8 115:17 131:17,18

**emotional** 58:9

**employed** 17:4 99:13

**employee** 17:1 43:12

**employees** 27:25

**employment** 17:19

**end** 5:22 6:18 7:9 13:13 22:10 99:25 108:25

**ended** 22:10 26:1 37:24 77:8

**enforce** 44:20

**enforcement** 33:18

**engaging** 129:19

**England** 20:4

**enough** 74:16

**entered** 123:5

**entire** 25:8 60:11

**entitled** 75:18

Case 2:20-cv-11718-GAD-DRG  ECF No. 54-7  PageID.2207  Filed 02/25/22  Page 151 of 168
JOHN PLAINTIFF vs WAYNE STATE UNIVERSITY
CAMAJ, NICOLINA 10/06/2021
Job 16300
Index: environment..filed

**environment** 19:2

**equip** 31:1

**errors** 104:25

**especially** 55:15 61:13 69:24
114:23

**estimate** 25:14,25

**estimated** 25:16

**Europe** 21:19 28:5

**evaluate** 18:12

**even** 30:19 35:1 52:4 61:18
62:23 67:8 95:1 110:13 128:21
134:8 135:18

**event** 32:1 62:7

**ever** 6:4,7,10 26:21 28:10
34:14 35:21,23 36:16 44:25
64:2,23 85:20 99:11 112:17,20
116:1 121:19 132:8,13,16
133:18 134:5

**every** 7:12 16:21 24:16,18
26:17,18 27:23 28:3 32:14
48:18 50:4,6

**everybody** 81:18

**everybody's** 75:21

**everyone** 72:19

**everything** 49:18 123:5,6,9,
10 124:9 125:7 128:5 131:24

**evidence** 10:13 18:6 30:6,11,
20,24 31:2,11,12,16,20 32:21,
25 33:3,10,13,15,17 34:17
35:5,7,11,13 40:10 42:19,23,
24 43:1,13 61:14,20,22,24
62:17,20,22,25 87:6 121:8
122:19 126:25 127:5,7,9
128:20 129:14 133:24

**exact** 47:7

**exactly** 15:21

**EXAMINATION** 5:10

**examined** 5:9

**example** 21:7 31:5 47:13,24
59:12 69:21

**exams** 15:9

**exceedingly** 26:24

**Excellent** 127:18

**exception** 66:24 86:13 112:16

**exclude** 7:4

**exclusively** 11:25 28:19

**excuse** 13:25 37:22 96:2
114:11 119:4 124:20

**exert** 110:22

**Exhibit** 39:11,22 40:24 41:2,
18 42:7,14 91:24,25 92:2
93:19,20,22 96:18,19,21
100:10,11,13 101:15,17
106:15 120:6,7 128:8,10

**exhibits** 7:16

**exist** 124:3

**expand** 15:17

**expanded** 35:1,3

**expect** 59:10,11 106:22 120:2

**expectations** 18:14

**expected** 49:3

**expedite** 54:13

**expedited** 136:16

**expelled** 99:4,5

**expelling** 134:1

**experience** 16:10,11,22 19:3,
4 20:12,18 22:14,25 25:18
61:1 63:20 112:5

**experienced** 28:2 50:18

**expertise** 117:4,9 118:19
125:23,25 126:1

**experts** 34:8,13 52:6

**explain** 46:22 50:9

**exposed** 16:1

**express** 62:3

**expressions** 90:7

**extent** 46:16 79:3 81:19 83:4
85:6 86:7

**external** 117:22

**extremely** 58:9

---

**F**

---

**Facebook** 118:12,13,14

**facial** 90:7

**fact** 97:13 133:25

**fact-finding** 94:15 101:1

**facts** 122:13,15

**faculty** 28:11 46:17 52:18
101:9

**fail** 44:19

**fails** 56:21

**fair** 8:17 47:6 58:7,12

**fairly** 26:24 106:20

**false** 118:25

**familiar** 14:13 15:22 19:11
29:23 33:23 36:1,7,12,21
38:11,12 39:4 40:5 44:2 59:20
113:2

**familiarity** 6:3 39:5

**familiarize** 43:7

**familiarized** 43:11

**family** 22:11,12 37:16

**farther** 44:8

**fashion** 19:15,25

**father** 22:9 134:6

**federal** 45:14,21

**feel** 12:9 122:4

**felony** 33:24

**felt** 62:3,5

**female** 27:10,13,14,15 133:7,
25

**females** 27:5

**field** 15:23 19:19

**fight** 47:15

**figure** 8:3 108:14 126:22

**figures** 27:2,3

**file** 47:20 52:2 53:14 96:4,5,14
103:18,20 104:6,8,10,16

**filed** 47:16 49:21 58:4 60:22,
23 94:11,13,24 95:21,25 96:6
97:17,18,19,21,23 98:3 99:2
101:4 102:14 103:7,8,9,15,16
107:6 119:14

Case 2:20-cv-11718-GAD-DRG ECF No. 54-7 PageID.2208 Filed 02/25/22 Page 152 of 168
JOHN PLAINTIFF vs WAYNE STATE UNIVERSITY                                    Job 16300
CAMAJ, NICOLINA 10/06/2021                                          Index: filing..government

**filing** 36:10 52:12 61:11 88:21 96:8

**filled** 70:5 105:3

**final** 7:2 87:15 123:22,24 124:10,16

**finally** 108:15 109:10

**find** 17:2 31:10 41:8 62:23,24 124:7 127:5,7 128:19

**finding** 26:1

**finds...".** 44:11

**fine** 41:10,14 46:4 56:12 124:21 126:7

**finished** 5:24

**firm** 8:19 121:16,20

**first** 5:7 43:6,10 45:18 46:6 48:1,19 50:3 51:16 53:24 56:3 70:7,16 71:9,15 85:24 86:1 111:23 128:9 132:24

**FIT** 19:20 20:1

**five** 7:12 35:1 74:23

**five-** 37:8

**five-day** 24:13

**five-minute** 41:9

**flag** 92:20

**flagged** 93:4

**flexibility** 55:17

**flexible** 55:12

**flips** 42:10

**Flores** 5:11,15 8:24 11:12 12:20 13:1 25:22 26:9,20 27:11 28:16,18 32:18,23 34:6, 20 36:5,8 39:10,13,17,20,24 40:19 41:1,3,7,10,12,16,23,24 42:6,9,17 43:4 44:5,24 45:8, 10,12,19 47:12 50:7 51:3,4 58:17 62:14 63:12,19 65:17 67:12 70:13 71:3 72:5,6 74:6, 11,22 75:14,25 76:5,21 80:2, 10,16 81:15 83:8,14,17 84:23 85:1,9,19 86:9,12,14 88:14,16 91:23 92:4 93:18,24 94:2 95:19 96:17,23 98:4 100:9,15 101:15,19,21 104:12 105:11 106:15,16 107:11 112:1,15 114:16 120:5,9,14,20,23

**fluids** 32:4

**focused** 16:5 134:14

**follow** 16:14 17:10 20:20 45:5 47:1 53:11 56:18 61:4 75:16 136:24

**followed** 101:2

**following** 18:13,15 52:22,24 78:1 119:22

**follows** 5:9

**forensic** 15:9 117:14

**forensics** 15:6

**forget** 7:10

**forgot** 64:10

**form** 8:23 11:11 14:20 25:20 26:4,13,25 27:8 32:10,22 34:3, 18 44:3,21 45:3 47:10 48:11 50:5 51:20,21,22,23 52:1 58:13 62:12 63:5,18 64:25 65:12 66:2,3,4,15,17,18,19,20, 21,25 67:4,11 68:14,17,19 70:12 71:1 85:17 95:10 98:2 104:5,21,22,24 105:3,6,15 107:9 111:20 114:8 117:16 118:23 123:15,20 124:13 129:9,24 131:7 133:14 134:2

**former** 128:18

**forms** 51:19 66:6,24 67:3 68:4,11

**forth** 106:24 107:1

**forward** 24:1 33:6 48:7 65:5 69:23 70:20,21 71:2 75:15 86:20 87:7,14 106:9 111:1,5 112:25 124:22

**forwarded** 128:23

**forwarding** 110:1

**found** 17:3 18:7 22:16 26:7 133:23

**foundation** 26:13 32:10,22 43:3 50:22 65:1,13 70:12 71:1 80:1 88:12 105:7,16

**four** 12:4 88:25

**frame** 61:16 66:13

**free** 83:5 85:6 86:8

**freshman** 17:9 88:22

**Friday** 136:1,5,19

**friend's** 53:8

**front** 7:19,23 9:25 10:1 116:4 133:8

**full** 16:9 128:9 130:16

**funding** 44:23 45:6

**further** 18:5 33:8 69:17 73:4 95:18 103:10 118:18 135:12, 17

---

**G**

**G-E-H-R** 24:7

**G-H-E-R-I-N-G** 24:9

**gaining** 16:11

**Galante** 82:13 87:16,17 111:6

**gather** 86:20 89:13 127:3 129:14

**gathered** 128:6

**gave** 22:21 54:23 112:9

**Gehring** 24:6,8,10

**general** 11:1,3 34:24 36:16 72:12 75:8 80:25 82:12 87:17, 20 106:12 135:15

**generally** 6:14 40:5 80:9,10

**generic** 49:24

**generically** 51:15

**geography** 13:24

**give** 7:13 12:23 27:9 29:8 31:4,23 32:11 36:15 37:24 40:24 42:2 47:13 55:1 57:24 60:4 64:6 68:1 74:16 77:7 91:14 93:11 108:6 118:17 119:25

**given** 6:7 7:20 85:10,11 86:2

**giving** 88:24

**good** 5:12,13 37:8,9 136:7,8

**government** 29:1 38:13 39:8

**governors** 67:24

**grabbing** 92:21

**graduated** 16:25 88:21,25

**grand** 106:19

**great** 5:21 7:24 21:18 41:23 136:20

**greater** 108:8

**Greek** 21:25

**grew** 34:25

**guidance** 25:6 86:2

**gum** 75:22

---

### H

**hacked** 117:10 118:4,14

**hacking** 117:2 125:24

**half** 17:17 18:18 22:15 92:6 109:9

**hall** 14:24 16:9 17:8 18:22,24 19:18,20 21:11,15 31:6

**halls** 20:8,10

**handing** 41:6

**handle** 33:13 85:15,16,20 86:3,17 99:13 112:3

**handled** 48:10

**handles** 69:2

**handling** 68:10 136:3

**hands** 71:13

**happen** 60:1 110:5

**happened** 9:20 31:6 32:2 132:22

**happening** 117:20

**happens** 32:20 56:7 77:15

**harass** 121:16

**harassed** 97:15

**harassment** 25:15 26:15 33:25 105:22

**hard** 32:24

**Hardy** 136:6

**he** 50:20 56:17 68:25 94:14,22 95:9 97:14 98:24 99:8 100:8 101:2,3 108:17 110:10 114:21, 23,24 115:1,2,3,16 116:21 117:6,8 124:25 125:2,4,12 131:5 134:20

**he's** 38:5 78:13

**head** 40:14 67:25 88:19 108:20 112:8

**header** 93:3,16

**Health** 72:17

**hear** 43:21 47:21 48:6 74:18, 19 90:22 108:5 113:18

**heard** 23:16 74:24 75:5

**hearing** 16:14,18 17:16 20:20 21:2 22:2,25 23:16 48:14 60:5 61:3,18

**held** 38:16 97:13 98:18,24

**help** 8:4 10:20 16:5 22:12 33:7 38:20 72:4,24 73:4 77:7 101:25 117:18 120:1

**helpful** 16:23

**her** 12:19 28:14,16 37:6 40:23 50:23 51:1 68:16 69:4 70:5 75:5 76:8 78:11 81:10 82:16, 20 88:9 89:5 90:3,6,8,11,14, 16,18,19 96:12 97:15 98:23 99:10 105:5 107:10 109:4 116:15 119:4,10,15,16,17 120:21 121:6,7,10,12,23,24 122:6,13,16 128:1 131:10 132:5 134:1,6,8,9

**here** 11:3 40:17 41:12,22 58:24 72:2,16 75:21 89:10 121:20 135:25

**herein** 5:6

**hereto** 137:3

**herself** 119:18

**hey** 56:16 59:2 61:17

**high** 69:21,24

**higher** 15:24 19:15 20:24 23:1 120:10

**him** 56:15,24 60:4 91:10,11 94:21 97:15 99:3,6 101:4 109:12,14,19,21 110:4,9 111:13,15,16 114:21,23 115:1,

5,15,18,21 116:23 125:4,6,20 128:1 130:5 134:20

**hired** 37:15,25 99:17

**hiring** 82:19

**his** 6:13,14 68:24 78:11,16 100:24 115:17 125:5,18,20

**hold** 13:20 14:8 18:17

**holding** 98:21

**home** 12:1,6,9 22:14

**honest** 46:2

**hopefully** 58:5

**hoping** 59:16

**hospital** 33:9 73:12

**host** 10:4

**hour** 7:12 122:4

**hours** 9:2,5,7,9,10 55:11

**housing** 21:24,25 65:11 73:16 81:4 82:15

**huge** 20:17

**human** 50:13

**hurt** 32:3

**hurting** 108:9,10

**hypothetical** 31:23 104:13

---

### I

**ID** 91:19

**idea** 6:2 15:21 50:1 95:9

**identified** 41:17 121:16

**identify** 40:21 70:6

**ignore** 115:20

**ill** 130:9

**Illinois** 17:6

**Immediate** 93:5

**immediately** 124:24

**impact** 29:2

**impacted** 29:10 54:20 61:15

**impacting** 108:11

**important** 50:14 92:22 93:5

**impose** 44:19

**in-person** 78:23,24

**inappropriate** 127:6,10

**inbox** 68:14

**incident** 31:8

**include** 30:2,5 34:24 49:12 65:10 94:10 107:3 113:7 114:24,25 119:17 125:15 127:16 131:22

**included** 10:13 49:16 94:12, 18 119:20 127:12,14 131:24 132:1

**including** 135:14

**incorporates** 106:13

**independent** 61:8 116:7

**independently** 129:4,19

**indicated** 96:10 108:20 116:18

**indicates** 95:24

**indicative** 52:2

**individually** 108:10

**inexperienced** 112:2,5

**inform** 30:22 104:21 109:21

**information** 6:16 12:19,21 23:8 28:8 30:8 37:6 49:12 52:8,16 57:19 60:13 62:6,19 67:23,24 68:1 69:12,14 70:4 71:25 74:5 75:19 80:17 82:25 83:19 88:24 89:14 90:9 91:15 95:4,16 102:14 103:10,23 104:4,10 105:4,13 107:19 110:25 111:18 113:9,13 115:22 118:13,17 119:20 126:22 128:4,5,22 129:5,18 131:13 132:19 136:11

**informed** 27:24 28:7 29:6 84:2 96:1 110:4 113:20 114:25

**informing** 91:3,10

**initial** 36:10

**inquiry** 126:17 134:13

**inside** 57:6

**instance** 31:4 118:12

**Institute** 19:15 24:6,10

**instituted** 29:1

**institution** 27:23 28:2,15 35:10 82:18

**institutions** 21:10 35:8

**instruct** 71:22 73:25 81:9 83:1 85:3 86:5

**instruction** 83:12

**instructions** 86:16

**intend** 96:15

**intent** 118:25 130:9

**intention** 54:18,19 95:11 101:11 102:4 115:20

**internationally** 21:6

**internet** 105:21 106:1,2 117:19

**intervention** 69:15 70:1,16, 19,24 71:4,11,19 72:8 74:22 76:23 79:17 80:3,18 109:5 112:8

**interventional** 77:13

**interviewed** 37:20,21 45:21 90:3

**interviews** 30:3

**INTRODUCED** 39:21 92:1 93:21 96:20 100:12

**investigate** 24:2 28:10 29:4 43:22 47:14 48:2,3 69:13,16 87:24 129:3 134:13 135:19

**investigated** 25:15 129:1

**investigating** 47:6 126:18

**investigation** 9:18 14:19 15:15 29:24 32:20 46:25 49:25 50:4,6,15,23 61:8 84:1,20 85:21 86:18 107:7,8 116:8 117:15 125:17 128:16,20,25 129:16,21 133:4,12,23

**investigations** 23:7,10 25:14 30:22 50:10 51:13 85:16

**investigator** 15:11,12 23:18, 22 24:22,24 31:16 32:5 34:5 38:19,22 43:9,15,20 45:1 48:4 50:19 51:6 84:16 133:1,11,19

**investigators** 25:3,5 34:25 35:2 84:13

**investing** 20:7

**invitation** 56:5,8

**invite** 54:3 95:14 111:14

**invited** 100:5

**inviting** 53:16 91:8

**involve** 8:10 75:9 80:5

**involved** 7:9 20:16 21:25 31:25 34:12 35:22,23 36:3 38:17 68:25 69:1 76:23 79:14, 20 80:24,25 81:1 117:23 132:23

**involvement** 135:17

**involves** 70:2 74:23 80:22 95:2

**involving** 75:8 79:24 83:19,22

**Island** 21:22

**issue** 53:13 58:11 59:4 73:17 81:3 105:22 108:13 118:14

**issues** 6:3,17 67:6

**item** 30:11 33:3

**IX** 23:18,19,22,25 24:22,24,25 25:2 26:14 27:21,24 28:1,4,9 31:15 32:5,20 34:1,4,21 35:4, 5,15 36:19,22 38:18 39:3 40:10 42:20 43:2,7,9,15,20,21 44:1,20 45:1,22 46:21,23 47:1, 5,8,25 48:3,6 50:23 51:6 66:15,16 67:15,19 132:25 133:11

---

**J**

**Jackson** 132:8

**Jane** 68:16 69:3 70:5 71:9 72:8 96:7 98:8 103:14 132:16, 18

**Janine** 82:16,17

**Jeff** 82:5,7

**job** 14:22 22:13 25:7 37:14 43:19 45:2 47:2 79:10 103:6

**jobs** 37:17

**joined** 132:24

**journal** 11:10,13,14

**judge** 7:2,3,7

**judgment** 115:13

**July** 37:13 99:16

**June** 25:12 37:18

**jurisdiction** 64:23 65:7,8

**justice** 15:4

**justify** 103:23 104:4

### K

**keep** 5:17 11:9,13,16,17 40:21 54:21 57:9 120:12 123:11 124:11

**kept** 78:5

**kind** 5:17,20 6:3,7,24 7:5 8:22 20:5 21:15 22:3 48:24 49:24 58:10,19 63:17 75:21 76:18 84:19 128:1

**kinds** 6:3 8:16 15:20 33:25 52:21 63:16

**King's** 21:8

**knew** 29:7 45:25 78:15

**know** 5:21 6:13 7:3,11,25 8:3 9:1,9 10:5,8 15:2,8 16:6 21:6 24:1,7 25:3 26:6,8 27:10 30:17,18 31:13 33:11 34:11 35:19,20 38:14,15,21 39:17 45:4 48:18 49:8 52:13 54:14, 19 56:10,16,24 57:14,23 58:16,21,23 59:1,4,18,21,22, 24 60:1,2,5,22 61:4,17,19,21, 23 62:1 65:3,4 66:1,15 71:23 72:25 73:2,17,18 75:10 77:3 78:20 80:22 81:17 82:3,6,8,11, 14,21 83:18 84:24 85:25 88:6, 7,17 89:10,16,18 90:2,13 91:16 92:12,21,24 95:15 96:15 97:9 98:14 101:23 102:5 104:9 105:20 107:1 108:13 110:7,10 111:21 112:24 115:12 117:12, 17 118:6,8,10 120:4,17 124:8, 12,15 125:6 126:8 131:9 132:18,20,21 134:3 135:18 136:5,18,23

**knowing** 37:17

**knowledge** 16:11 32:8 108:1 133:10

**Kristen** 11:3

**Kruman** 82:10

**Kuentzel** 82:7

### L

**lack** 18:6

**language** 48:17,18 60:21 134:23,24

**larceny** 106:20

**large** 19:1 34:21

**larger** 67:8

**largest** 27:12

**last** 12:8 13:8 20:24 38:8 41:25 42:10 44:22 82:6,16 113:18 120:12

**lasted** 122:3

**late** 130:4

**later** 8:2 17:5 55:16 76:15 83:16 109:9,10

**laundry** 20:16

**law** 23:14 33:18 36:10 106:10 121:16,20

**laws** 25:4 29:2,12 34:11

**lawsuit** 6:10 35:22,24 36:20 46:1

**lawyer** 11:6 34:12

**lawyer's** 6:13 8:19

**lawyers** 6:24 8:11,18 10:24

**lead** 128:24

**learn** 29:1 88:17

**learned** 15:9

**least** 7:12 8:17 36:10

**leave** 37:14 92:14

**leaving** 82:17

**led** 38:9

**left** 18:9,19 37:13,16 82:18 88:20 89:11

**legal** 74:25 75:9,11 76:10

**Leisa** 136:11

**lend** 63:16

**less** 27:4,10 99:23,24 114:6, 14

**lets** 92:12

**letter** 39:3,4 40:2,3,6,9 43:25 44:13 49:13 53:21,23 54:5 55:2 57:21 58:3 91:4,7,11,17, 19 92:9 94:3 95:1 96:10 107:13 113:8 114:24 127:16 131:11

**letterhead** 131:10

**letters** 39:8 49:9,10 53:25 54:2

**letting** 91:16

**level** 18:10 23:1 63:4 69:21 98:25 110:15

**leveled** 114:7

**license** 15:12

**licensed** 15:11

**lieutenant** 72:12 82:23

**life** 16:1 20:18 22:20 27:22 82:15

**like** 5:17 6:12 7:1,2,6 8:11 10:5 12:9 13:2 14:19 16:2 21:9,10 24:19 30:7 31:17 32:17 33:13 37:8 40:22,25 49:10 53:7,9,13 59:20 62:1,5 88:7 93:14 102:17 108:9 113:11 117:23, 24 122:19 125:21,22 128:7 130:18

**likely** 62:17

**limitations** 54:7

**Linda** 82:13 87:16 111:5

**line** 11:24 13:6,14 27:2,5,17 100:17 110:3

**line's** 74:21

**link** 104:19

**linked** 12:24

**list** 66:12 81:16 105:1,2

**listed** 105:13 106:23 121:20

Case 2:20-cv-11718-GAD-DRG ECF No. 54-7, PageID.2212 Filed 02/25/22 Page 156 of 168
JOHN PLAINTIFF vs WAYNE STATE UNIVERSITY
CAMAJ, NICOLINA 10/06/2021
Job 16300
Index: lists..means

**lists** 80:18 104:22

**litigation** 75:1

**little** 15:17 29:24 44:7 49:24 74:9 111:9 114:12 120:10 135:22

**live** 21:25

**living** 20:9

**load** 27:13

**lobby** 31:7,8

**locally** 21:6

**located** 89:16

**London** 20:4,6,9,13 21:7,8 28:3

**long** 13:11 18:17 19:13 20:1,5 22:21 24:21 39:6 40:17 88:17 90:1 115:18 122:2

**longer** 124:3,11

**look** 27:1,2 62:21 68:24 89:13 100:16 102:11 105:24 117:21 120:16 123:12 131:10

**looking** 42:3 61:10 110:12 125:1

**looks** 93:1

**Loretta** 83:19 132:13

**lost** 22:9

**lot** 19:18 37:5 50:11 54:16 57:15 62:21 73:14 101:8 106:18

**lots** 101:7

**Louisiana** 22:18

**lower** 58:19

**Loyola** 22:17 23:4 25:7,13 27:20 28:10 33:20 34:16,21 35:12,24 36:2,6,17 37:13,14, 16 38:7,14 42:23 45:16 48:10, 12 67:5

**luxury** 20:8

---

**M**

---

**made** 9:21 24:23 26:11,22 27:12 32:12,19 49:11 65:25 79:21 85:2 89:7 100:8 103:14

**106**:3 109:3 115:13 116:15 118:25 120:24 125:13 126:19 127:15,19 128:17 134:10

**magistrate** 7:7

**mail** 53:22,25

**mailbox** 68:6,20 69:4

**main** 22:21 113:7

**mainly** 26:19 38:21

**maintain** 30:15

**maintaining** 31:16

**major** 40:8 44:18

**make** 7:14 9:16 16:16 18:13, 15 23:3,23 28:14 29:15 38:24 40:15 42:4 47:21 49:11 50:20 51:8 55:10 56:17 59:8,24 60:8 63:6,13,22 64:2 72:24 73:10, 13 75:12 76:6 79:13 81:1 83:21 86:21,22 87:8,12 95:8 102:5 111:15 112:6 113:11 115:12 118:21 121:19 122:19, 20,21 123:2,5,22 125:9,15 126:1

**makes** 70:18 108:24

**making** 7:2 17:24 18:2 29:9 37:4 46:20,24 50:8 65:3 66:10 81:1 90:22 109:23

**male** 27:7,13,14,15,16

**males** 27:4

**man** 26:22

**manage** 22:24

**managed** 20:15

**management** 20:4,7

**manager** 20:14,23

**managing** 23:4

**manner** 61:4

**manual** 49:16

**many** 9:20 15:24 23:6 25:14, 16,25 67:20 70:2 99:18 100:4 135:5

**March** 12:7,8,10

**Margit** 87:15 128:15

**marked** 42:1

**master's** 14:17 15:18 16:9

**Masters** 13:25

**matched** 116:18

**material** 7:20 49:6,7,17 61:18 106:14

**materials** 48:24 49:8 57:12,16

**mathematics** 13:23

**matter** 6:23 27:25 28:9,22 33:10 34:9,11 48:6 53:18 54:12 58:4 61:11 68:10 69:13 80:9 81:4 85:15 86:3 87:13 94:24 95:2 102:16,23 109:23 110:15,23 114:3,5 127:1,2 133:13 134:9,17 135:21

**matters** 14:19 19:24 20:21 35:4 54:13 113:20

**Maxient** 22:23 54:2,6 91:7,16, 22 92:7,8,10,16 93:2,3,11 123:9 131:4,16

**maybe** 73:9 102:7 108:9 120:15 136:6

**me** 5:20 7:10,18,23 8:3 9:6 10:1 11:6,23,24 12:23 13:8,16, 19,20,25 14:3,11 15:17 20:13 22:21 23:3 24:1 26:10 28:21 29:23 31:17,23 32:11 37:22,24 39:17 41:3,14,17,25 43:5 44:17 47:13 51:3,15 53:17 54:21 55:3,11 56:12,14,16,19, 23 58:15,22 59:20 60:13 61:17,25 62:3,20 64:15,17 67:14 68:11,14,25 72:7 76:1 80:22 82:2 83:24 85:25 90:19 91:8,14,22,23 94:20 95:14,16 96:3,13,15 97:9,17 98:8,12 99:5,7,12 100:3,19,23,24 101:23 102:6 103:2,19 104:6, 7,16,17,21,25 105:12 107:5 108:6,17 109:18 110:8,9 111:24 112:6 114:11,21,23 115:1,3,12 116:3,14 119:4,25 120:1,4,17 121:7,10 123:3,10, 12,19 124:18,20 125:2,5 129:15 133:8 136:5,11

**mean** 30:7,9 31:17 58:9 66:3 71:12 80:13 88:21 103:15 112:25 119:9,19 122:24 127:20 130:18 135:22

**means** 9:1 14:13 25:21

**measures** 32:15

**medical** 110:1 114:19 128:18
131:5 132:8 133:6 134:1

**medicine** 129:22 131:12
133:25

**meet** 30:21 37:4 46:17 47:2
53:17 55:3,16 56:4,8,9,12,14,
18,19,23 57:1 58:7,15 60:18
64:12,14,16 85:8 86:19 91:8
95:9,14,16 98:15 100:3,5
102:20 108:16,17 111:15
116:3 118:17 130:5 134:15,20

**meeting** 8:18 19:23 55:4,5,10,
12,21,23 57:4,13,17,20 58:21,
22,23 59:13 60:4,6 62:2,4,6
69:16 70:22 72:8,22 76:11,24
77:1,13,17 78:15,18,23 79:1,4,
13,17 81:18 82:24 85:21
86:16,17 90:18 94:6,22 107:14
109:5 115:1,5 124:25 125:8,21
130:8,9

**meetings** 11:8 48:22 54:3,4,5
67:25 72:4 75:6 78:2,6,13,14
85:13 102:5 133:9

**member** 8:18 14:23 28:11
36:25 37:2,3 52:19 68:13
69:22 73:15

**memory** 9:19

**mentioned** 68:5 117:25

**mentioning** 117:5

**mentions** 31:5

**message** 91:3,21 116:22

**messages** 88:4 105:19,21
106:5,6 116:13,17,24 119:3,4,
7,24 121:10,25 122:20 127:17,
22,23 131:23 132:1

**messaging** 92:7 106:4

**met** 8:10 24:23 56:16 58:8
77:25 109:10,12,14

**Michigan** 5:1 13:22 14:5
37:16

**middle** 75:23 94:1

**might** 24:8,9 35:9 47:6,17
61:15 72:2,4 90:8 91:21 108:7
115:8 122:20 136:5

**mind** 41:9 103:4,5

**minutes** 7:12,13

**misconduct** 46:16 51:21,22
52:1 66:18 68:8,9 104:20

**misdemeanor** 33:24

**missed** 102:8

**misspelled** 24:9

**misstates** 107:9

**misuse** 106:2

**mm-hmm** 27:17 29:18 30:1
36:24 50:17 51:14 55:7 60:16
67:1 68:18 69:6 80:21 86:25
91:1 94:5 97:1,3,8 100:7 109:1

**moment** 39:12,16 91:14,25
93:20 96:19 100:11 119:25
120:7 128:10

**money** 21:16

**monitor** 18:12

**month** 37:13 108:25 130:16

**months** 17:5 99:14

**more** 15:18 16:18 19:3 22:5,6
26:6 34:25 35:2 54:16 60:7
62:6,17 63:17 64:6 67:8 68:3
77:8 99:23 107:19 114:6,13
118:13,17

**morning** 5:12,13 9:25

**most** 8:9 25:18 26:10 40:17
63:24 130:24

**mother** 132:16 134:6

**motion** 75:17

**move** 18:23 19:4 33:6 37:10
42:11 72:2 124:22

**moved** 89:2

**moving** 111:5

**mute** 76:1

_____

**N**

_____

**name** 5:14 36:4,7,12 82:6,16
121:12 128:1

**named** 36:11 45:15,25

**names** 129:5

**narrow** 6:16 53:3

**national** 27:2,3,5,17

**nature** 73:17 84:10 85:25
109:20 110:10 111:22,24
135:23

**near** 108:25

**necessary** 51:8 76:19

**need** 7:8,16,17 12:19,20
24:17,23 27:24 31:24 38:6
39:5 54:24 55:2,11 59:7,18
68:25 69:12 73:5,13 74:8,12
117:22 120:3 122:18 123:11
124:9,10 126:7 135:4 136:11,
15,23

**needed** 20:12 28:7 38:22
79:15 98:25 107:19

**needs** 15:2 34:12 37:6 52:23
56:22 57:19 60:22,23 80:25
96:14 110:7

**nervous** 58:14 61:24

**neutral** 7:6

**never** 32:16 36:14,15,19 45:23
54:19 99:5,7 102:4 110:5
116:1 121:4 129:22 133:9

**Nevertheless** 133:3

**new** 18:20 19:6,10,13 21:9
22:17,18 29:12,13 66:17 67:4
85:23 104:1

**newer** 67:3

**next** 34:25 42:10,12 52:16
53:5 73:15 77:17,20 78:1 97:4
120:20

**NICOLINA** 5:5

**nobody** 84:15,18 97:19

**noises** 90:22

**non** 68:8

**nonacademic** 51:21 52:1
66:18 68:8 104:20

**noncompliance** 66:17

**noon** 74:7

**nope** 97:19 119:24 132:10

**normal** 111:9

**normally** 49:9 85:12 91:2,6

**North** 21:10

Case 2:20-cv-11718-GAD-DRG   ECF No. 54-7  PageID.2214   Filed 02/25/22   Page 158 of 168
JOHN PLAINTIFF vs WAYNE STATE UNIVERSITY
CAMAJ, NICOLINA 10/06/2021
Job 16300
Index: note..other

**note** 91:10

**noted** 42:5

**notes** 9:16,21 78:25 79:2,4,7, 13,15,22 83:22 122:16,19,21, 23 123:4,11,13,17,23,25 124:3,7

**nothing** 5:8 9:24 10:1 118:24

**noticed** 116:13

**notified** 39:7 57:22 97:24

**notify** 56:24 96:13

**November** 77:8 88:13 98:20 100:3,20 108:22 109:3,4,6

**number** 12:17,24 13:2,6,8,12, 19 27:7 38:8 99:21 102:8 121:13,15

**numbers** 13:17 26:8 27:5

**nurse** 33:8

**nursing** 72:16

---

### O

**oath** 6:8

**object** 6:20,21 71:22 81:9 85:3

**objection** 6:22 8:23 11:11 12:18,21 14:20 25:20 26:4,13, 25 27:8 28:13 32:10,22 34:3, 18 43:3 44:3,21 45:3 47:10 48:11 50:5,22 58:13 62:12 63:5,18 64:25 65:12 67:11 70:12 71:1 73:25 80:1 83:1 84:21 85:17 86:4 88:12 95:10 98:2 104:5 105:6,15 107:9 111:20 112:10 114:8 116:10 117:16 118:23 123:15,20 124:13 129:9,24 131:7 133:14 134:2 135:7

**objectionable** 6:19

**obligation** 102:13 134:15,20, 23

**obscene** 127:18,22,25 128:2

**observer** 79:18

**obtained** 14:4,5,6

**obviously** 6:13 7:16 8:5 31:20 41:21 56:1 57:18 76:11 83:14

86:8 88:8 100:2

**occasion** 133:18

**occurred** 57:24 65:4 77:1

**OCR** 44:11,18

**October** 5:2 71:6 77:23,24 88:9,13,14 100:3 109:3,6 128:17

**odds** 62:8

**off-camera** 136:1

**offense** 47:14 61:7 64:21

**offenses** 46:21

**offer** 46:14,15 56:10 58:24 64:14

**offered** 24:4 73:11

**office** 11:2,25 12:2,4,24 25:17 34:21,24 36:16,19 38:2,4,25 40:3 42:20 43:25 46:9,10 54:22 55:25 56:4 57:5,6 58:15 59:16 60:3 61:1 65:22 66:1,16 70:2 72:11,14,18 78:11,16,19 82:11,15 84:14,15 87:20 91:17 92:12,13,23 93:17 95:12,13 96:5 102:21 107:15,19 109:14 113:2,5,23 115:23 117:17 130:18,19 131:14 133:5,12,19, 22 135:15

**officer** 16:13,14,18,20 17:16 20:20 22:2 23:1 24:12 38:2 43:18 46:8,13 48:14 51:11 56:12,22 57:17 61:3 63:3 68:11 72:16 81:24 82:1 84:5, 11 103:20 132:25

**officers** 22:25 23:4,8

**offices** 38:3 81:17

**official** 78:5 80:14 93:16

**ombud's** 113:8

**ombudsman** 113:3,23

**ombudsman's** 113:5

**on-call** 17:14

**on-the-spot** 16:11

**oncall** 14:23 17:15 22:1

**once** 7:12 31:17 44:25 52:14 87:3 91:18 123:5

**one** 8:18 12:3 13:19 17:24 21:7 28:5 33:12 38:7,10 39:12, 16 40:8 42:3 43:23 44:18 47:16,23 48:15 53:1 61:12 64:6,21 68:3 69:16,21 72:14 79:2 80:3,4,18 81:19 85:8 90:21 91:25 93:20 96:19 97:19 100:11 101:10 105:8,25 106:3, 17,19 111:23 113:7 120:7 128:10

**one-person** 17:20

**ones** 26:19 38:16 113:11,12

**online** 49:18,20 51:20 65:23 68:2 70:4 122:14 123:9,10

**only** 12:14 17:22 23:11 54:13, 20 68:25 84:11 87:5 90:21 102:6 111:13 127:23 128:3 135:19

**onsite** 20:16,17

**onward** 86:20

**open** 57:2,9 91:19 116:13 122:1

**opening** 37:18

**operate** 123:9

**operating** 84:9

**operation** 14:17

**opportunity** 21:15 48:13,15 64:14 125:8 134:6

**opposed** 79:10

**option** 60:4 93:11

**options** 33:12

**order** 7:17 51:8 54:8 75:12 136:13

**orders** 136:13

**ordinary** 111:9

**organization** 36:21 66:21

**organizations** 66:22

**organize** 37:3

**orientation** 16:2

**Orleans** 22:17,18

**other** 5:22 7:15,19 10:1,12,14, 20,23 13:17 14:8 16:2,19 17:2, 3,13 21:9,25 23:4,17 27:22

28:3 32:4 33:18 45:4 46:17
47:16 48:25 49:6 50:11 53:11
59:9 62:9,18 64:11 65:24
67:18 79:11 83:23 84:5,13,17
85:11,16 86:16 93:1,9 99:18,
21,22 105:22 110:2,21 112:20,
24 117:6 119:18,19 123:14,18
126:12 129:20 136:11

**others** 108:10,11

**Otherwise** 5:25

**our** 11:3 12:8 19:19 20:11
21:11,13 25:17 30:22 37:2,6
39:7 43:11 46:9,10 47:18
49:19 54:1,17,18 55:12 60:25
62:2,6 65:21 66:13,14,17
72:11,14 77:18 78:2 85:12,14
90:23 95:13 96:5 104:22
107:15,18 110:8 113:8 115:1
117:17 118:16 125:21

**out** 6:25 8:3 31:2,9,24 32:7
39:2 40:3 41:5 43:8 49:9,14
53:19 54:9,21 56:10 57:2 70:1,
5 73:13,15 89:17 90:2 92:11
105:3 108:14 111:9 122:20
126:22,25 129:21

**outcome** 49:10,13 52:18 55:2
97:6 98:6 111:13,16 123:22
135:18

**outcomes** 111:11

**Outlook** 11:17

**outside** 117:23

**over** 5:22 17:12 19:22 38:8
41:22 42:10 56:19 64:24 67:17
76:9 90:12 93:8 102:18
110:20,23 124:24 126:4,11

**overall** 120:15

**own** 6:14 23:15 29:3 57:6 61:7

**owned** 118:6,7

---

**P**

**p.m.** 76:3,4 92:3 93:23 96:22
100:14 126:13,14 136:25

**page** 40:21 42:1,11,12 44:6
92:5 96:24 97:4 101:20
120:11,21 128:9,12

**pages** 40:17 131:25

**pandemic** 12:2

**paper** 123:11

**paragraph** 41:25 42:2,10,13
44:9,18 96:24

**parameters** 50:2 64:19

**parents** 134:9,11

**Parsons** 19:8

**part** 9:13,16 14:16 16:10 24:19
26:12 27:12,23 32:19 33:23
39:7 43:11 45:18,23 65:10
71:4,6,10 72:10 84:13 102:11
113:18 120:21,25 133:9

**participate** 36:20

**participated** 10:6 45:23

**participating** 50:13

**particular** 21:3 33:3 65:19
68:5,15 70:23 75:2 79:16
85:20 91:9 110:24 122:23
131:20

**parties** 85:14 86:23 116:25
117:6 127:15 128:6 129:13
137:2

**partners** 80:24

**party** 6:10 45:25 122:4

**passed** 8:8

**passing** 8:22

**past** 67:4

**paying** 19:15

**penalties** 44:18

**people** 7:13 66:21 72:10
74:16,23 119:18,19

**percentage** 27:6,9

**performing** 45:2

**period** 22:8 36:11 45:15 61:9

**permitted** 59:24,25 103:20

**person** 17:22 32:6 48:22
52:11 61:11 62:18 65:3 68:9
70:7 79:2,3 84:3,5,25 101:8
102:21 104:7 108:9 112:9
115:24 132:6

**person's** 68:5 116:9

**personal** 11:9,15,21 12:15,19

**personally** 13:19 28:15,16
33:4 38:17 54:19 79:20 83:24

**perspective** 6:20

**pertained** 81:7

**pertaining** 117:2

**phone** 12:12,15,24 13:2,4,12,
18,19 51:19 64:9 77:14 90:12,
21 118:1 122:7,8 125:22

**phones** 117:25

**photographer** 119:20 121:13

**photographs** 121:1,9

**phrase** 107:21 108:6

**physical** 47:19 57:3

**pictures** 119:23 121:2,3,9
127:6,10

**piece** 32:24 92:22 110:2

**ping** 93:14

**place** 9:11 16:16,21 28:3,5
53:5 55:24 64:22 78:18 81:2
83:18 99:1 122:3

**placed** 89:1

**places** 16:19 21:9

**playing** 75:22

**please** 12:17 28:22 31:13
44:7,8 91:24 96:17 98:12
101:16 120:4 128:8

**point** 23:7 61:19 69:9 79:21,
22 81:14 99:1 115:5

**pol** 46:23

**police** 14:12,13,17,18,22 15:1
32:7,12,19 33:7,10,18 34:11
72:13 82:22 84:19 117:11,13,
22 118:2,8,16

**policies** 18:13,16 23:24 27:22
28:25 29:3,13 49:19,25 63:2
113:9,15,21

**policy** 24:2 29:2 49:16 53:16
108:1

**Porter** 5:14 8:23 11:11 12:18
14:20 25:20 26:4,13,25 27:8
28:13 32:10,22 34:3,18 36:4
39:14,19 41:5,8,11,14,21 43:3
44:3,21 45:3,17 47:10 48:11
50:5,22 51:1 58:13 62:12,16

63:5,18 64:25 65:12 67:11
70:12 71:1,21 73:25 74:3,10
75:5,24 80:1,7 81:9 83:1,11
84:21 85:3,17 86:4 88:12
95:10 98:2 104:5 105:6,15
107:9 111:20 112:10 114:8
116:10 117:16 118:23 120:8
123:15,20 124:13 126:7 129:9,
24 131:7 133:14 134:2 135:7
136:8,22,23

**portfolio** 129:11

**portion** 40:22

**portions** 40:8

**position** 17:5,7 18:17,20
19:15 22:4 37:22,23 48:23
49:1 84:6 103:9

**positioned** 57:7

**possible** 6:16,25 40:20 60:20
66:24 103:12 104:22 105:2
107:2 125:2

**possibly** 88:20 105:25 108:24
115:18 121:11

**post** 120:6

**posting** 21:19

**practice** 60:25 102:18 123:8,
22 129:22

**pre-covid** 78:22

**preparation** 9:14,17 11:2

**prepare** 8:16 9:13

**prepared** 7:21 15:20

**preparing** 8:19 9:8 10:21
136:4

**preponderance** 35:7,10,13
42:24 43:12 62:25 133:24

**present** 11:4,6 38:20 57:11
60:7 64:8 72:3 75:4

**presented** 57:16 62:19

**preserve** 30:10,18

**press** 103:12

**pretty** 17:19 58:18 77:20
120:17

**prevalent** 26:10

**prevention** 82:22

**previous** 48:22 85:21

**previously** 102:2

**primary** 46:7

**print** 122:20

**printed** 41:5

**prior** 6:5 27:20 28:21 57:16
77:14 107:10

**private** 15:11,12 79:8

**privilege** 6:24 74:9 75:3 76:9,
13,15 81:12 83:4,15 86:5,13
112:11

**privileged** 12:22 71:25 74:4
85:5 86:7

**privileges** 76:13

**probably** 5:25 12:7 17:10
26:18 77:25 91:15 135:25

**problems** 5:25

**procedural** 113:20

**procedure** 84:9

**procedures** 23:24 29:14
46:18 47:1,5 49:19 113:10

**proceed** 52:10,13 53:16 60:2
63:1 76:19

**proceeded** 104:11

**proceedings** 45:5,24 59:20
113:13 133:10

**process** 33:5 43:7 46:16,19
60:10,11 135:23

**producing** 10:6

**professional** 14:23 18:12

**program** 24:20 65:16 118:12

**progress** 16:6

**promised** 124:25

**promoted** 20:23

**proof** 35:15

**proper** 14:18 40:9 73:11

**properly** 44:19 45:2

**property** 20:3,7 64:23 65:14

**protect** 30:5,8,10

**protected** 81:11 83:3

**provide** 10:15 12:11,20 38:22
52:15 94:14 102:13 104:9
113:9,12 115:1,21

**provided** 7:18 10:4 32:24
33:15 39:14 49:17 62:21 76:10
82:25 103:2 122:13 127:21,23
132:18

**Providence** 21:22

**provider** 110:25

**provides** 64:19 125:5

**providing** 59:14

**proving** 35:5

**provision** 75:9,11

**psychological** 82:4

**public** 67:23,24 70:3

**publish** 96:18 100:10 101:15
128:8

**published** 108:3

**pull** 122:10

**pure** 111:24

**purpose** 6:15 22:21 72:22
74:24 75:6,7 94:6,15

**purposes** 6:22 25:24 40:18
74:25 75:1 79:7,8 113:7

**pursue** 24:2 33:10 96:13

**put** 39:11 40:3 58:2 91:24
93:11,19 94:1 123:14

---

## Q

**question** 5:19 6:23 7:4,17 9:6
14:15 25:24 40:15 45:18 52:24
58:6 67:14 76:14,16 80:8
81:13 83:13 85:18 86:10 93:10
97:5 98:6 100:25 104:1

**questions** 6:19 7:10,25 8:9
34:9 38:20,23 40:18 59:5 60:9,
10 61:25 66:22 76:12,13 77:6
92:15 104:7 110:9 114:17,19
115:2 117:18,20 125:20

**quick** 38:6 41:9 64:10

**quickly** 6:25 54:18 60:19
136:17

**quite** 77:14

---

**R**

**raise** 114:17

**ran** 25:16

**Randie** 82:10

**raped** 30:17

**rare** 26:24 27:1

**reach** 32:7 53:19 54:9 56:10 69:21 73:15

**reaches** 73:13

**read** 9:22 13:8 40:13,15,22 42:2,9,12 44:8 49:18,21 57:15 86:15 97:9 98:5 101:22 119:1 120:21 128:14

**reader** 128:24

**reading** 125:14

**reads** 97:6

**ready** 42:11,15

**reaffirmed** 121:23

**real** 38:6

**really** 16:4 22:21 40:17 46:2 52:21,25 64:10,13 102:3,9 106:7 123:11

**reason** 6:21 18:19,23 19:3 95:6 102:7 130:4

**reasonable** 60:21,23,25

**reasons** 43:23 61:13 79:11

**reasserting** 76:12

**recall** 35:14 38:15 40:8,14 46:2 77:15 83:20 88:19 89:19 90:18 99:10,11,21 101:6,12 102:10 108:20 114:21 115:4,7, 8 117:4 121:10 125:1 128:1

**receive** 10:20 13:18 22:24 30:8,14 31:1 44:25 48:19,24 49:13 51:15 68:7,22 77:15 86:16

**received** 14:16 17:5 27:20,21 28:23 36:25 46:10 51:18 53:2 59:1,2 68:15 69:10,12,14 71:10,12 83:19 85:20 86:15 103:13 109:2 121:4 127:14,15

**receives** 101:8

**receiving** 37:25 51:17 124:23

**recently** 134:9

**recess** 41:19 76:3 126:13

**recipient** 44:14

**recitation** 71:24

**recollection** 8:1,5,6 10:19 40:23 42:18 101:13 107:20

**recommendations** 54:7

**reconvene** 74:15

**record** 41:20 76:4 78:5 83:21 86:12 87:1 89:24 126:14 128:14

**records** 89:13 100:2

**recruited** 20:2,13 22:16

**redacted** 57:18,19

**refer** 56:22 64:12,15 68:16 113:22 118:10

**reference** 61:16 66:13 119:17

**referred** 64:1 70:10 84:18

**referring** 10:8 40:2 44:4,13 49:11 62:13 84:21 91:21 122:21

**reflect** 107:1 123:2,13,23

**reflected** 123:18 124:9 125:9

**refresh** 8:1,5 9:19 42:18 101:13

**refreshes** 40:23

**refreshing** 107:20

**regarding** 101:1

**regular** 78:12

**regulation** 108:2

**related** 10:17 30:25 33:24 92:15

**relationship** 110:11

**relationships** 20:8 21:12

**relevant** 52:7 61:22 105:10

**relied** 75:12

**remain** 62:8

**remainder** 42:12

**remember** 8:7 12:5 35:12 36:1 37:20 45:13 46:3 65:19, 23 77:1,7,10,12,22 79:23 81:6, 14,20,23 82:16,18,24 89:25 90:19 91:12 101:5,25 102:3 108:18 109:16 110:3 112:22 115:8,15,21 116:2 119:23 120:2 121:3 122:2,6,12,15 124:23 125:14 130:13,15,16

**reminding** 30:19

**remote** 12:4 55:25

**remotely** 12:3

**remove** 106:15

**removed** 99:6

**repeat** 45:17 89:23

**repeated** 113:19 119:2 132:2

**rephrase** 7:5 43:5 51:3

**reply** 52:11 61:13

**report** 9:18 10:12,16,18 28:1,8 31:22 32:12,19 33:7 52:12 66:15,19 73:18 87:4,14,15 103:1 104:18 108:19 119:6 121:11 123:3,24 124:10,16 125:3,5,10,15 127:13 128:20 130:10,12 131:2,20,22 132:4, 22 135:12

**reported** 27:19 94:7,18 95:13 107:15,18 116:4

**reporter** 51:24 52:14,15 53:3 68:13 136:12,15,19,21

**reporting** 27:4 29:8 104:20 117:6

**reports** 22:24 46:11 52:21 68:8,9 101:8,9

**represent** 124:18

**representative** 81:17

**reprimand** 98:13,16,19

**reprimanded** 97:14

**request** 32:11,13 93:5 97:14 116:14

**requested** 58:1 111:6 137:1

**requesting** 55:5 56:14 97:7 98:6,9,10

**requests** 10:3

**required** 23:22 42:19 58:2 60:17 94:17 95:17 102:15 113:24

**requirement** 24:25

**requirements** 24:22,23

**requires** 74:4 81:10 83:2 85:4 86:6 112:11

**reread** 9:18 39:5 120:16

**reschedule** 55:12

**resend** 121:24

**reserve** 83:6

**residence** 20:8,10,14,23 21:11 31:6

**resident** 14:21,24 19:17,19

**residential** 16:1 20:18 22:20 23:12 27:22 82:15

**resolution** 63:17,21,22 64:20

**resolve** 63:3 127:1,2

**resources** 46:14 56:11 58:24 59:14 73:5 105:18 118:1

**respect** 15:14 27:21 51:5 79:18 80:6,11 110:13 120:24

**respective** 137:2

**respond** 46:13 51:23 54:18, 24 55:3 101:6,10,11 102:4,6 114:11

**responded** 53:3 101:5 102:1

**respondent** 31:12 61:21 84:4 87:16,21 98:11 100:23 107:14 110:10 116:21 117:5 119:5 122:18

**respondents** 29:10 129:2

**responding** 15:2 60:24

**responses** 46:25

**responsibilities** 17:15,16,17 19:23 43:19 47:4 48:25 51:5, 12 129:12

**responsibility** 18:25 23:19 28:17 31:15,18 32:9 33:2 34:4 46:18 58:22 62:10 63:6 68:7, 22,24 86:23 94:21 126:18

**responsible** 18:5,7 20:18,25 23:16 26:7 27:25 32:6 34:1 43:12,21 62:23,24 78:14 80:4 98:18 113:6 125:16

**responsible/not** 18:5

**result** 76:12,22 83:25 100:6 127:4 128:3

**resulted** 79:24 95:5

**retaliated** 133:25

**retaliation** 133:6

**return** 10:5

**review** 9:21 18:8 29:3,15 59:21 72:23 77:19

**reviewed** 83:21 119:14,24 132:21

**Rhode** 21:22

**Richard** 132:11

**right** 7:18,21,22,23 10:15,17 11:9 12:16 16:23 21:17 23:5 24:21 29:21 31:18 33:19,21 35:7 37:7 38:15 41:3 44:8,22 45:9,10 55:20,22 56:6 60:20 63:15 65:18 66:7,9,11 71:18, 20 73:22 74:13 75:25 78:17 79:12 80:11 87:9,10,12 89:9 96:9 101:20 102:11 107:4,8 108:23,25 109:11 110:22 111:10 112:9 118:5 119:11,21 120:12,13 122:9 123:19 124:6 127:2,9 128:12 131:2 134:19 135:3,6,20

**rights** 15:15 39:1 40:4 42:19 59:24 133:5,12,19

**Rights'** 43:25 133:23

**ring** 39:4 118:21

**risk** 69:21,24 72:25 73:1,2,3,7 75:2 80:13,14,24

**risks** 73:24

**Robichaud** 83:19 132:13

**role** 6:14 15:1 16:18 18:24 19:20 20:24 23:1,11,17 25:10 38:21 51:1 56:11 58:22 59:6 70:21 87:13 111:18 132:7

**roles** 46:15

**room** 20:17 32:2 57:2 72:19

75:4 78:19 90:8,13,20

**roommate** 53:7,14

**row** 24:13

**rule** 108:2

**ruling** 7:2

**run** 24:10

**rural** 19:2

---

**S**

**safe** 67:9 72:24 73:12

**safeguarding** 33:3

**said** 9:19 42:20 60:17 61:24 67:14 75:16 88:14 89:20 91:2 95:7 99:7,11 103:25 104:16 109:18 110:2 113:19 114:25 115:2,11 116:16 130:11

**same** 13:14 19:20 22:4 25:10 47:4,7 85:15 93:1 130:21

**sample** 49:8,10

**samples** 32:16

**sanction** 98:18

**sanctions** 18:7 59:23

**satisfied** 105:13

**save** 30:20 31:20,21 120:15

**saved** 123:10

**saw** 26:16,17 27:24 28:8 71:9, 13 76:7

**say** 7:3 8:17 25:6 26:6 27:1,15 28:4 36:4 43:9 45:4 47:6 50:16 53:7 58:7 59:3,15 61:15 64:12 66:3 70:20 71:12 75:6 81:14 85:7 88:13 93:2,15 94:5,25 95:7,22 111:17 116:1 119:8 123:1 128:2 134:22

**saying** 47:11 62:18 89:5 90:19 99:10 101:3 116:2 128:2

**says** 44:22 56:8 60:21 95:1,4 98:13 111:12 131:11

**scenario** 81:2

**schedule** 78:11 85:13,14 136:18

Case 2:20-cv-11718-GAD-DRG   ECF No. 54-7   PageID.2219   Filed 02/25/22   Page 163 of 168
JOHN PLAINTIFF vs WAYNE STATE UNIVERSITY                                          Job 16300
CAMAJ, NICOLINA 10/06/2021                                               Index: schedules..six

**schedules** 78:8,13

**scheduling** 78:14 130:6

**school** 14:19 19:5,6,8,12,13 23:14 54:16 64:23 89:11 90:4 99:3,6,9,25 110:2 114:19 129:22 131:6,12 132:9 133:6, 24 134:15

**school's** 63:2

**schools** 21:15

**Science** 13:21 117:13

**scope** 18:1

**Scott** 82:23

**screen** 10:2 39:11 91:24

**scroll** 40:20 92:5 93:25

**searching** 10:6 22:13,15 37:17 107:21

**second** 20:22 29:5,7 51:7 92:5,15 120:21

**secondary** 13:21,23

**secretary** 11:19,21 38:25

**section** 41:4 47:18 56:20 59:21,23 82:22 98:5,17 102:12 106:7,23

**sector** 20:4

**see** 31:9 39:18,19,25 40:1,20, 23 49:14 61:16 68:23 72:19,23 75:3 77:6 90:7,11,15 96:24 97:5 101:13 115:24 116:18 117:10 121:9 126:3 127:13

**seek** 31:8

**seeking** 16:7

**seem** 46:20 108:22

**seems** 95:8

**seen** 70:7 71:15 114:14

**select** 52:6 55:9 106:7

**selected** 52:5 104:23 106:1

**semester** 86:1

**send** 28:7 49:9 53:25 54:2 58:3 61:17 64:3 70:14 81:18 91:7 92:9 104:18,25 105:18,21 110:16 111:7,11,13 115:3 121:7,9 125:2 131:13,17

**sending** 53:21 111:1,18 121:10 127:10

**sends** 39:8

**sense** 8:15 31:24 67:20 108:24 118:21

**sent** 10:12 12:8 39:2 49:14 57:21 91:3,9,20 94:9 112:17, 20 116:13,14,23,25 127:5,7,8 131:20 132:4

**sentence** 44:22

**sentences** 57:25

**separate** 57:1

**September** 100:1

**serious** 114:6 115:6 133:13 135:21

**seriousness** 115:14

**serve** 46:14 48:8 60:8

**served** 15:1 17:8,11,14 18:22, 24 19:16,18,20 20:19 23:10,14 38:22 46:12

**services** 16:4 59:16 72:18 73:11 82:4,9

**serving** 14:22 16:17 20:24 24:21,24 25:5 46:8

**session** 101:1

**set** 41:22 106:24 107:1 136:4, 9

**setting** 19:1

**several** 9:7,9 10:3 16:3 20:18 21:5,8 22:6 40:16 66:5 77:4

**severing** 16:13 19:24 21:1,23 22:1,19

**sexual** 25:14,15 26:14,15,22 32:1 33:24,25

**shake** 115:25

**share** 30:24 31:21 62:6 87:6 95:17 111:16 115:5 123:22,25

**shared** 106:6 128:5

**shares** 37:5

**sharing** 52:7

**she** 11:3,6 37:3 42:12 50:20 72:15 82:18 83:12 88:7,8,10, 15,18,20,22,24 89:6,7,11,16,

17,18,20 90:2,9,17,21 96:13 97:13 98:13,22,24 99:3,6,8 105:3,9 116:18 119:9,14,17,20 121:7,23 134:8

**she's** 42:11 83:12 98:10 131:11

**shop** 129:6

**short** 120:17

**shortly** 77:3,5,13

**should** 25:6 39:8 40:10 60:24 64:8 69:16 70:18 84:2,24 85:7 86:3 89:2 94:5,25 99:8 104:6, 24 126:23 131:24,25 132:1,2 135:25

**show** 56:21 64:5,6 81:19 93:24 129:1

**showing** 100:24

**shows** 81:18

**shred** 123:6

**shredded** 124:5

**shredding** 123:7

**shut** 110:5,6

**sic** 24:6,12

**side** 23:13

**sides** 103:1

**sign** 91:18

**Signature** 137:1

**significant** 8:21 9:1 48:9

**similar** 18:24,25 19:4,22,25 50:11 84:5 115:19

**similarities** 50:10

**simple** 52:24

**simply** 110:15,24 121:23

**since** 12:24 13:13,14 14:21 15:22 16:17 61:2 136:2

**single** 16:21 28:3

**sit** 58:10

**sitting** 89:10

**situation** 6:4 7:5 26:21 57:12 73:3 80:12 114:9 116:22

**six** 17:5 35:1 74:23

Case 2:20-cv-11718-GAD-DRG    ECF No. 54-7  PageID.2220   Filed 02/25/22   Page 164 of 168
JOHN PLAINTIFF vs WAYNE STATE UNIVERSITY
CAMAJ, NICOLINA 10/06/2021

Job 16300
Index: size..stop

**size** 84:10

**skip** 44:6 126:4

**slowly** 93:25

**small** 35:3

**Smith** 121:20

**snail** 53:22

**Snapchat** 117:24

**software** 22:23 54:2,6 91:7,22
93:2 118:6,11 131:16

**some** 5:25 7:14 16:17 20:11
21:21 32:1,3 33:18 35:8 52:15
58:7 64:19 65:24 69:9 79:11
92:15,20 98:10 106:24 107:14
114:13 120:15,25 122:19,20
125:21 132:1 134:24

**somebody** 20:12 31:5 32:11
47:15 60:7 61:15 82:20 96:3,4
100:2 106:19 117:24 123:7

**somehow** 69:1 108:11

**someone** 32:2,24 49:1 52:2
53:7 72:17 78:25 96:2 115:23
117:18

**someone's** 117:25

**someplace** 109:6

**something** 21:16 30:16,21
31:6 32:13 33:1,8 38:20 45:6
55:16 56:14 61:16 65:15 69:1
74:17 81:3,4 90:5 93:14 98:14
108:7 117:21 135:1

**something's** 117:20

**sometime** 43:14 109:2

**sometimes** 5:22 7:8 47:7,8
52:6 64:8 65:2 78:2,3 80:5
81:17 125:6 135:23

**somewhere** 109:9

**soon** 77:20 88:20 125:2

**sorry** 10:10 11:5 14:3 28:13
33:16 40:12 43:5 45:17 49:4
67:16 69:25 71:21 80:7 83:9
87:2,19 89:23 94:5 101:18
111:4 113:16,19 120:10,11
126:4,5

**sounds** 36:7 136:8

**source** 117:23

**Southern** 17:5

**space** 8:15

**speak** 11:1 17:12 67:17 84:3
93:8 102:25 110:20 116:20
129:13 132:13 133:18 134:6,
10

**speaking** 6:15 11:6 16:19
80:8 109:21 126:11

**specialists** 117:14

**specialization** 13:23

**specialties** 15:25 16:2

**specialty** 14:1 15:25

**specific** 47:1 57:22 76:13
78:15 84:22,23 106:11,20
107:8

**specifically** 26:14 27:1 34:9
45:4

**specification** 103:6

**specificity** 106:25

**specifics** 57:24 85:11 106:8

**specified** 128:6

**specifies** 107:13

**specify** 51:24 98:25

**speculation** 26:5 135:8

**speech** 127:18

**spelled** 24:7

**spend** 8:21 9:2,7 21:16

**spite** 97:12

**spoke** 88:9 89:15 90:11 116:6,
7 119:1 129:2

**spoken** 133:8

**staff** 14:23 27:23 28:12 46:9
52:20 65:25 68:13 73:15

**stalking** 26:16

**stamped** 100:19

**standard** 35:5,8 40:9 42:19,
23 43:1 84:9

**standards** 37:5

**start** 5:24 35:3 37:12 75:22

**started** 8:15 12:6 13:14 21:21

22:15 34:23 38:12 53:24 61:3
88:22 99:16,25 109:16 130:23

**starting** 50:15 86:1 89:11
111:22

**starts** 42:5 44:11 96:25
102:12 120:11

**state** 6:21 13:15 37:2,10,12
42:22 43:2,6,8,10 45:14,20
46:6 48:10,20 50:1 53:25 56:3
64:19 65:14 67:7,22 70:7
75:13 85:23 88:18,20 89:17,18
90:2 94:8 99:14 112:24 113:10
117:12 118:2,8,12,16 130:22
131:1 132:24

**State's** 65:15 117:13

**stated** 94:6 116:12 118:24
134:8

**statement** 30:11 36:15 50:4,9
62:2,5 94:10,14 101:3 108:2
109:24 115:1 116:9 119:16
122:17 124:23 125:4,6,9,13,
19,20 126:21 127:16

**statements** 61:23 62:20
86:20 87:3,5,25 103:2 116:15
125:12 128:20

**States** 21:20 39:1

**statistics** 27:18

**status** 88:6

**stay** 16:25 19:13 20:1 21:11,
13,17 25:7 74:7,12,13

**stayed** 19:14 20:2 22:14 25:9

**staying** 22:11

**steel** 106:21

**stenographer** 74:12

**step** 52:16 53:5 60:14 72:2
96:11

**steps** 125:11

**sticking** 121:24

**still** 16:20 23:10 55:5 62:14
64:12 74:19 88:10 104:21
123:4

**stir** 44:1

**stop** 5:20 44:8 52:23 76:1
93:25 97:4

**story** 115:25 119:10

**strategize** 50:16

**strategy** 50:15,20 51:8 115:23

**Strauss** 37:21 38:3 46:10 69:2 111:4,7,12,14 112:21

**student** 14:1 15:2,23 16:5,6, 21 18:4,6 19:11 21:14 24:11 28:7,19 31:3 33:6,15 34:17 36:10 38:1,4,9 43:18 46:8,20 47:13,18,22 48:9,14,20 49:2, 12 51:1,11 52:3,19 53:1,6,9, 11,15,17,19,20 54:10 55:6,15 56:2,4,7,16,18,21 57:1,2,8,12, 13,14 58:2,11,18,21 59:1,9,13 60:19 61:6 62:23 63:3,7,23 64:7,9,11,16,18 66:8,21 68:10, 12,19 69:23 72:18 73:4,7,9,16, 19,20,21 75:2 80:6 81:24 82:9 84:11 88:8,10,15 89:6,8 91:3, 16 92:12,17,21 93:14 94:20,23 95:2,11,25 98:15,18 103:7 105:18,22 106:24 107:23 110:6 111:15 114:7 118:17 128:18,19 132:25 133:7 134:1

**student's** 52:23 58:25 62:8 63:8 65:10 69:22 73:1 88:6 92:17 114:11

**students** 16:14 19:23 20:9,19, 21,25 21:13,25 23:15 26:7 29:8,10 30:19 34:8,13 38:2,4, 23 46:12,13 47:3,15 48:12 49:9 54:2 56:10,15,23,24 57:5, 6,15 58:3,7,14,15,16 59:15 60:3 61:24 62:5 63:10,24 64:1, 13 66:16 68:21 69:5,11,21 70:2,9,10,14,21,25 72:23 78:10,13,19 81:21,22,23 84:15 85:8 86:19 91:10,12,17,22 92:12,13 93:17 95:14 101:6,9 102:4,17 113:8,12,20 114:11 115:20 116:2 117:18 118:11 123:1 124:18 125:7 130:24 131:14 134:22

**Studio** 19:9

**study** 15:23

**studying** 20:10 88:7

**stuff** 114:20 125:22

**subject** 18:8 28:22 93:3,16

**submit** 30:24 61:20,21 62:5

66:22 82:7 87:3,7 103:1,10 104:18,24 125:8

**submitted** 9:18 10:3,13,18 31:17 52:1 61:14 77:19 119:3 121:11 124:16 125:13 129:15 130:10 132:22 135:11

**submitting** 10:17

**such** 39:6 95:5 117:6

**sued** 45:14,21

**sufficient** 103:23 104:3

**suicidal** 69:22 73:10

**suite** 57:5,6

**supervised** 19:21 46:9

**supervising** 21:24 23:7

**supervisor** 18:11 20:15

**supplied** 57:18

**support** 56:11

**suppose** 31:25 104:14

**sure** 5:14 10:8,11 12:7 13:21 14:5,14 15:23 17:8 18:4,13,15 19:14 23:3,22,23 25:21,23 28:14,25 29:9,15 30:7 35:20 37:4 38:1 40:15 41:18 42:4 44:4 49:8,12 50:16,20 51:8 53:6 55:4 57:5 65:6 66:13 69:19 72:10,24 73:10,13 74:10 76:6,8 77:21 81:1 85:18 86:22 95:8,24 107:1 119:22 122:5,21 123:2,5,23 125:9,15 127:16

**suspended** 99:8

**sustainable** 105:4

**sworn** 5:7

**symbol** 92:21

**system** 22:22 54:2 92:10 131:13

---

**T**

**table** 75:12

**take** 7:8,11,14 9:11,16,21 16:15 21:19 33:11,17 41:9 43:6 45:6,10 53:1 55:23 58:16 60:14 64:22 74:6,13 78:18,25 79:2,4,15 99:1 100:16 102:11

120:3,16 122:9,16,23 123:12, 23 124:14,20 125:11 126:8,10, 21 130:19,23,24

**taken** 15:4,6 41:19 54:14,20 76:3 87:3 96:12 98:1 119:23 126:13

**takes** 53:5 54:16 64:21

**taking** 79:22 81:2 86:12 87:25 109:24 112:16

**talk** 29:24 36:16 49:24 52:14 58:11 60:14 61:6,25 62:9 65:18 77:16 86:23 90:24 129:6 132:8,16 135:5

**talked** 30:16 76:8,18 109:4 121:23 122:6 126:4 134:9

**talking** 5:22,24 28:15 58:1 61:14 62:14 65:9 73:6,7,8,9 90:9,14,17 98:20 117:5 122:16

**talks** 44:14

**tangible** 33:1

**tasks** 80:3,4,19

**team** 17:21 35:3 69:15,18,19, 22 70:1,16,19,24 71:4,7,11,19 72:8 74:22 76:23 77:13 79:17 80:4,18 109:5 112:8

**team's** 78:4

**Teams** 56:1 78:20

**tease** 31:24

**technical** 104:24 125:22

**TECHNICIAN** 39:12,16 40:24 41:2,18 42:7,14 91:25 93:20 96:19 100:11 101:17 120:7 128:10

**techniques** 58:19

**technological** 105:18

**technologies** 117:19

**Technology** 19:16

**telephone** 12:17 13:6,17 65:24 77:9 90:3 121:12,15 122:2 132:5

**tell** 13:20 14:3 15:17 25:4 26:10 33:16 44:17 51:15 59:9 60:11 67:25 72:7 75:7,10 80:22 98:8,12 100:19 102:16 103:7 104:17 105:12 109:18

Case 2:20-cv-11718-GAD-DRG ECF No. 54-7, PageID.2222 Filed 02/25/22 Page 166 of 168
JOHN PLAINTIFF vs WAYNE STATE UNIVERSITY
CAMAJ, NICOLINA 10/06/2021

Job 16300
Index: telling..typing

134:20

**telling** 94:20 107:5 115:21
124:2,18

**tells** 49:3 56:20 57:14,15
68:25

**temperature** 58:19

**ten** 99:23,24

**ten-minute** 37:8 126:10

**tenure** 37:10

**term** 95:23 96:1 108:5

**terms** 6:12 10:8,11 15:2,19
18:1 23:21 24:24 27:18 30:7
31:4,16 33:2 46:25 49:8 52:8
54:24 55:1 59:24 62:10 79:10
80:24 86:2 110:8 117:6 136:6

**testified** 5:9 6:4 9:25 66:5
67:5

**testify** 5:7 8:6 34:14

**testimony** 6:5,7 9:24 40:4
42:22 96:7 97:12,16,17,25
98:3 102:13,15 107:10 124:2
129:7,18,23 135:11

**testing** 33:9

**text** 88:3 94:1 105:19 106:5
116:12,17,21,24 119:3,4,7,24
121:10,25 122:19,20 127:17,
23 131:22,25

**themed** 21:24,25

**things** 7:15 8:7,11,16 72:3
80:15 103:4 124:16 129:7

**think** 7:11 12:7 13:13 21:20
22:9,10 23:12 26:19 29:5 35:1
40:16 41:22 74:8 75:5,14,20
82:16 83:11 89:19 91:20 99:23
112:3 115:10 117:7 122:4

**third** 24:15 29:19 35:2

**thought** 53:15 118:21

**thoughts** 6:14

**thousand** 20:19

**threat** 79:25 80:5,19 81:8

**threatening** 106:6

**threats** 47:19 106:3

**three** 22:18 25:9 33:20 34:23

57:25 99:14

**through** 23:20 24:11 25:17
28:8 33:10 66:12 68:4,16
92:10 93:25

**throughout** 60:11 61:1 101:7

**time** 7:10,24 8:8,12,15,21 9:1
16:9 19:9 21:21 23:21 25:8,13
36:11 39:6 42:2 43:6 45:15
48:4 54:7,8,9,13,17,20 55:4,10
60:18,21,24,25 61:5,6,9,19
64:8 66:23 67:21 71:15 72:15
74:16 75:21 77:14 79:16 82:13
83:25 84:2 85:23 86:1 88:9,15
89:6,7,15 90:3,21 94:9 97:19,
21 99:12,17 100:4 102:9
103:11,19 105:23 106:4
108:15 110:15 111:25 112:19,
23 113:1 115:4 116:6 117:7
119:12 120:15 122:5 130:24
133:3,17

**timeframe** 54:23 55:1 60:17

**timeline** 66:15

**timely** 54:14 61:4

**times** 5:18 37:5 64:11 73:14

**timetable** 85:10,11

**timing** 55:19 99:25 111:22

**title** 22:21 23:17,19,22,25
24:22,24,25 25:2 26:14 27:21,
24 28:1,4,9 31:15 32:5,20
34:1,4,21 35:4,5,15 36:19,22
37:22,24 38:1,18 39:3 40:10
42:20 43:2,7,9,15,17,20,21
44:1,20 45:1,22 46:21,23 47:1,
5,8,25 48:3,6 50:23 51:5,6
66:15,16 67:15,19 84:16 128:9
132:25 133:11

**titles** 16:20 19:19

**today** 5:16 6:5 7:6 8:6,19
89:10 97:12 124:2 129:7

**toes** 72:2

**together** 12:25 69:20

**told** 5:14 8:13,14 34:16 55:10
57:22 87:8 108:22 115:18,19
123:3 125:2,4,6 135:4

**tomorrow** 136:3

**top** 32:3 40:14 42:1 44:9,10
67:25 88:19 101:19 108:20

128:12

**touch** 136:24

**train** 24:16 28:25 46:17

**trained** 15:8 22:23 25:3,5
29:4,5,12 31:19

**trainers** 24:16 29:19

**training** 14:11,16 15:14 23:22,
23 24:4,14,18,23 27:21 28:21,
23,24 29:6,17,21,25 30:2,5,14
31:1,25 33:23 36:25 37:6 39:7
43:11 44:25 48:19 103:11,22
104:3 114:5

**trainings** 37:4 46:15 54:21

**transcript** 136:12,13

**transitioned** 53:24 54:1

**transmit** 131:2

**trauma** 29:6,9

**trial** 6:5,17

**triggers** 92:9

**true** 26:2 118:4 128:25

**truth** 5:7,8 118:22

**truthful** 62:19 87:11

**turn** 47:22 96:12

**two** 19:21 20:15,24 24:13
29:17 57:25 80:15 102:25
103:4 109:9 116:25

**type** 16:18 19:11 22:4 26:10,
18 27:12 32:1 47:7 80:12
92:20 98:10 115:13 122:17
123:1

**typed** 123:1

**types** 28:23 46:25 64:19 66:6
67:22 106:18

**typical** 35:18 47:13,17 75:6
80:9 115:22

**typically** 50:19 51:16 52:2
54:15,23 55:1,23,25 57:11
59:7,14 63:1 72:20 77:15
85:12 88:24 95:13 102:5,16,19
103:19 111:11 116:2 118:10
122:22 123:8 124:6 134:22

**typing** 122:22,24

Case 2:20-cv-11718-GAD-DRG ECF No. 54-7, PageID.2223 Filed 02/25/22 Page 167 of 168
JOHN PLAINTIFF vs WAYNE STATE UNIVERSITY
CAMAJ, NICOLINA 10/06/2021

Job 16300
Index: Uh-huh..wide

## U

**Uh-huh** 100:18

**uncommon** 67:6

**under** 6:7 11:23 35:15 47:18 63:2 76:7 94:20 98:5,17 134:15

**understand** 14:14 23:3 28:14 44:13 75:24 80:8 85:18 86:22

**understanding** 14:10 35:4 44:16 52:12

**understood** 23:24

**Unfortunately** 27:9

**unique** 50:4,6,12

**United** 21:20 39:1

**universities** 21:5,8,12 25:6 61:2

**university** 12:11 13:22,25 17:6 18:14 20:9 21:4,7,9,10,22 22:14,17 25:1,2 35:17 37:3 44:15,19 64:21,24 67:8 76:9 84:12 89:3,5 103:12,16,18 108:2 113:10 131:5,11,14 132:19 135:16

**university's** 65:11 94:8

**unless** 6:23 84:18

**unmuted** 74:21

**unnecessary** 40:18

**until** 5:23 25:11 41:4 43:14 54:9 115:23 136:1

**unusual** 27:3 111:17,21

**up** 5:22 7:9 16:14 17:11 20:20 22:10 23:20 26:1,11 27:12 28:1 29:15 37:24 39:11 52:22, 24 53:11 54:16 56:18,21 61:4 64:5,6 75:17,22 77:9 81:18,19 92:14 93:19 101:2,18 110:16 116:19 120:9 128:11 136:9,24

**updated** 11:17

**urban** 18:22 19:1

**use** 13:18 54:1 58:19 61:15 68:4,16 75:21 90:5 105:17 134:23,24

**used** 51:20 66:6 90:5 99:5 115:9

**uses** 50:20

**using** 95:22 103:13 105:20 115:7

**usually** 130:23

## V

**vacation** 54:15 55:15

**value** 115:13

**varies** 52:25

**variety** 106:13

**various** 29:2

**veracity** 125:18

**verbal** 47:19

**verified** 116:16

**verify** 116:8 118:3 123:13,17 125:11,18 129:4

**verifying** 129:19

**versus** 36:2,6 80:14 114:13

**victim** 30:17

**victims** 27:7

**video** 31:10 39:12,16 56:1 76:1 78:21 90:11

**videoconference** 90:4

**videoconferencing** 90:6

**viewed** 102:2

**violate** 46:23

**violated** 47:16 52:4 53:16 96:3

**violating** 45:22

**violation** 31:3 35:6 57:23 95:2

**violations** 16:15 33:24 59:22 104:22 107:2

**violence** 38:9

**virtual** 78:20

**Virtually** 9:12

**virtue** 50:12

## W

**wait** 5:23

**waited** 115:23 116:20 130:4

**waiting** 41:21 91:11 116:20

**wall** 57:8

**wanted** 19:3 57:16 62:6 73:10 94:18 95:6 96:13 123:17 125:9,14

**Wayne** 13:15 37:2,10,12 42:22 43:2,6,8,10 45:14,20 46:6 48:10,20 50:1 53:25 56:3 64:19 65:14,15 67:7,22 70:7 75:13 85:23 88:18,20 94:8 99:14 112:23 113:10 117:12, 13 118:2,8,16 130:22,25 132:24

**ways** 50:11,12

**website** 66:14 80:17 104:19

**Wednesday** 5:2

**week** 17:10 54:17 77:20 78:1 130:13,25

**week's** 23:23

**weekend** 124:24

**weekly** 78:2

**weeks** 109:9

**welcome** 16:24 60:7

**well** 8:1 11:3 13:4 14:10 21:2 25:3 28:21,25 29:23 33:4 36:9 39:25 43:21 44:6,16,22 46:23 50:19 51:7 52:17 57:14,20 70:9 71:14,21 75:10 85:23 90:11 95:8 111:11 116:23 119:20 121:4,7 125:14 134:24 135:20

**well-founded** 25:19

**well-trained** 50:19

**went** 28:24 37:18 68:19 69:4 70:16

**whichever** 18:14

**whole** 5:8 20:15

**wide** 106:13

**willing** 117:17

**wishes** 98:24

**withdraw** 14:11 130:2

**Withdrawn** 135:9

**witnesses** 129:6

**Wolf** 121:20

**word** 99:5 115:7,8 124:14,20

**words** 44:17

**work** 6:24 11:14,16,24,25
12:1,2,11 13:18 16:9 17:2,3,21
20:3,14 22:12,16 41:15,16
72:16 84:6 112:17,20 117:1,10
136:5

**worked** 16:21 21:5 28:3
99:19,20,22 130:16

**working** 12:3,6 13:15 14:21
15:1,25 22:16 32:14 37:12
50:2 67:22 133:17

**works** 11:19,23 131:9

**worries** 126:6

**worse** 114:10

**worth** 23:23

**write** 102:19

**writing** 51:24 123:18

**writings** 9:16 83:23

**written** 51:23

**wrong** 87:9

**wrote** 94:3 100:8

**WSU** 80:17 88:10 103:11
128:18,19 133:6,17

_____

**Y**

_____

**year** 17:17 18:18 19:14 20:2,
22 21:23 22:11,14,15 24:15,
17,18 25:16,25 29:5,7,14,15,
19 34:25 35:2 43:10 46:6 48:1
50:3 51:7 54:16 56:3 67:4,7
100:1 132:24

**years** 9:20 14:24 16:22 20:24
22:8,19 24:13 25:9 29:17
33:21 38:8 88:25 102:18
124:15

**York** 18:20 19:10 21:9

_____

**Z**

_____

**Zoom** 6:1 56:1