# EXHIBIT 9

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

ANTHONY EID,

            Plaintiff,

                        Case No. 2:20-cv-GAD-DRG

   -vs-

WAYNE STATE UNIVERSITY, WAYNE STATE
UNIVERSITY SCHOOL OF MEDICINE, NIKOLINA
CAMAJ, MARGIT CHADWELL, MATTHEW JACKSON,
RICHARD S. BAKER, R. DARIN ELLIS, in
their individual and official capacities,
jointly and severally,

            Defendants.
_____/

    ZOOM DEPOSITION OF MARGIT CHADWELL, M.D., F.A.A.F.P.

Taken remotely via video conference by the Plaintiff on

Thursday, the 7th day of October, 2021 in Birmingham,

Michigan at 10:00 a.m.

APPEARANCES:

For the Plaintiff:  J. ROBERT FLORES (VA Bar No. 42080)
                  10410 Hampton Road
                  Fairfax Station, Virginia 22039
                  (703) 761-5021
                  Rfloreseq@me.com


For the Defendants: DAVID A. PORTER (P76785)
                  Kienbaum Hardy Viviano Pelton & Forrest
                  280 North Old Woodward Avenue, Suite 400
                  Birmingham, Michigan 48009
                  (248) 645-0000
                  dporter@khvpf.com


Job No. 16301

1                  UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF MICHIGAN
2


3     ANTHONY EID,

4                    Plaintiff,
                                         Case No. 2:20-cv-GAD-DRG
5         -vs-

6     WAYNE STATE UNIVERSITY, WAYNE STATE
      UNIVERSITY SCHOOL OF MEDICINE, NIKOLINA
7     CAMAJ, MARGIT CHADWELL, MATTHEW JACKSON,
      RICHARD S. BAKER, R. DARIN ELLIS, in
8     their individual and official capacities,
      jointly and severally,
9
                     Defendants.
10    _____/

11        ZOOM DEPOSITION OF MARGIT CHADWELL, M.D., F.A.A.F.P.

12    Taken remotely via video conference by the Plaintiff on

13    Thursday, the 7th day of October, 2021 in Birmingham,

14    Michigan at 10:00 a.m.

15

      APPEARANCES:
16

17    For the Plaintiff:  J. ROBERT FLORES (VA Bar No. 42080)
                          10410 Hampton Road
18                        Fairfax Station, Virginia 22039
                          (703) 761-5021
19                        Rfloreseq@me.com

20
      For the Defendants: DAVID A. PORTER (P76785)
21                        Kienbaum Hardy Viviano Pelton & Forrest
                          280 North Old Woodward Avenue, Suite 400
22                        Birmingham, Michigan 48009
                          (248) 645-0000
23                        dporter@khvpf.com

24

25    Job No. 16301

```
 1                        MARK C. ROSSMAN (P63034)

 2                        Rossman, P.C.

 3                        2145 Crooks Road, Suite 220

 4                        Troy, Michigan 48084-5539

 5                        (248) 385-5481

 6                        mark@rossmanpc.com

 7

 8                        KRISTEN COOK (P75034)

 9                        Wayne State University

10                        Office of General Counsel

11                        656 West Kirby Street

12                        Detroit, Michigan 48202

13                        (313) 577-3991

14                        kristen.cook@wayne.edu

15

16      Reported By:      Heidi A. Cook, CSR 4827

17      Remotely

18

19      Video Tech:       Bailey Wellman

20      Remotely

21

22

23

24

25
```

```
 1                    EXAMINATION INDEX

 2      ----------------------------------------------------

 3      ATTORNEY'S NAME      DIRECT   CROSS   REDIRECT   RECROSS

 4      ----------------------------------------------------

 5      BY MR. FLORES:          4

 6

 7              *             *             *

 8

 9                      EXHIBIT INDEX

10      ----------------------------------------------------

11      EXHIBIT                 MARKED       IDENTIFIED

12      ----------------------------------------------------

13      Deposition Exhibit A      4            25

14         (E-mail from P. Burton to M. Chadwell)

15      Deposition Exhibit B      4            42

16         (Chadwell/Robichaud E-mail)

17      Deposition Exhibit C      4            53

18         (Investigation Report)

19      Deposition Exhibit D      4            37

20         (E-mail)

21      Deposition Exhibit E      4            36

22         (12/5/18 E-mail)

23      Deposition Exhibit G      4            67

24         (E-mail with M. Jackson)

25              *             *             *
```

1                               Thursday, October 7, 2021

2                               Birmingham, Michigan

3                               10:01 a.m.

4              *               *               *

5            (Deposition Exhibits A-E and G

6             marked for identification.)

7         MARGIT CHADWELL, M.D., F.A.A.F.P.

8    Having been first duly sworn, testified as follows:

9            MR. FLORES:  Thank you.

10                    DIRECT EXAMINATION

11   BY MR. FLORES:

12 Q  Dr. Chadwell, if we can, if you would just give me your full

13    name, and spell your last name just to make sure we get that

14    right for the court reporter.

15 A  Sure.  It's Margit Cornelia Chadwell, C-h-a-d-w-e-l-l.

16 Q  Dr. Chadwell, I'm sure that David has told you, I'm Bob

17    Flores, I represent Mr. Eid, and we're going to have a

18    conversation this morning, which is really all a deposition

19    is.  I try to get as much information as possible so that we

20    can narrow the issues, and hopefully simplify the case for

21    the Court.

22        I'm going to ask you questions, and you'll answer them

23    to the best of your ability.  And I'm just curious, have you

24    ever been a witness in a trial prior to today's testimony at

25    a deposition?

1   A      No.

2   Q      And have you ever given testimony of any kind under oath?

3   A      I've given a brief deposition once on a clinical case.

4              MR. FLORES:  Her microphone -- you're coming across

5          pretty garbled.  Can everyone else hear her?

6              MR. PORTER:  I can, because I'm sitting right next

7          to her.

8              THE WITNESS:  I just turned up my microphone.  Is

9          it better?

10             COURT REPORTER:  I can hear, but it is a little

11         garbled; I agree.

12             MR. FLORES:  I think that -- whatever she did, that

13         fixed it.

14             THE WITNESS:  Okay.

15  Q      (BY MR. FLORES)  And have you ever been party to a lawsuit?

16  A      No.

17  Q      In a deposition, you know, with few exceptions, there's a

18         requirement to answer all questions that I pose to you.

19         You've got your attorney, Mr. Porter, sitting next to you,

20         and if he believes that there's an objection to be made as to

21         a question, he'll make a short objection on the record.  That

22         will preserve it, and then after he's done with that, please

23         go ahead and answer the question.

24             Yesterday there were some moments when the objection he

25         was raising was one involving a privilege, so an

1       attorney/client privilege, or there are other types of

2       privileges.  In the event that he raises that type of a

3       privilege, you're not going to need to answer the question,

4       but we do want to get his objection, and then he and I will

5       deal with those objections at a later date.

6   A   Okay.

7   Q   The reason, as I said, for this deposition, is really to try

8       and narrow some of the issues for trial, and save the Court's

9       time.  And so sometimes I get in the midst of a series of

10      questions, lose track of time, and I can go for a long period

11      of time without taking a break.  If you need a break, please

12      let me know.  I'm going to try to break once an hour, at

13      least for 10 minutes, whether we need it or not.  There might

14      be some phone calls or things that need to be returned that

15      can't wait until the end of the day.

16  A   Okay.  Sounds good.

17  Q   Now, you're sitting right next to David, I assume, or close

18      by?

19  A   Me?  Yes.  Right.

20  Q   During the course of the deposition, I will be showing you

21      some documents, and asking you to either read them, read them

22      out loud, or just use them to help refresh your

23      recollection.  And I'll try to do that by showing you the

24      document and having you read it, and that way we won't have

25      to go back and forth, back and forth; I can ask you a series

1    of questions after you've had a chance to read it.  Hopefully

2    that will save a little bit of time.

3         As a result of my providing those documents, that also

4    reminds me to tell you, you may not have any documents with

5    you, unless David identifies what they are, or they're a copy

6    of what I'm showing you.

7         We have a tech, an exhibit tech with us, Bailey Wellman,

8    and she's the one that is going to make sure you can see

9    these documents.  At my age, I'm not as tech savvy as the

10   younger people, and so I did not want to take that

11   responsibility on; that causes us to lose a lot of time.

12        One of the answers that you may provide me after I ask

13   you a question is that you simply don't remember or you don't

14   know, but you are aware that there may be a document, or some

15   other material that would refresh your recollection.

16   A    (Witness nodding head.)

17   Q    In that case, feel free to identify that document.  If I have

18        it, I'll display it; if not, we'll figure out how to deal

19        with that, and that's sometimes what we take care of during

20        the breaks.

21   A    Okay.

22   Q    Now, what I'm -- I'm not assuming you're going to do this,

23        but it's just part of my typical introduction.  There are

24        some witnesses who come to a deposition and mysteriously have

25        forgotten everything that they've ever known about the case,

1    and so I end up having to spend a lot of time showing them a

2    document, asking them to read it, refreshing their

3    recollection, and going back and forth.

4         That's really kind of counterproductive.  I don't expect

5    that you're going to do that, because your time is extremely

6    valuable, but nonetheless, if we end up going down that kind

7    of a route, it's going to take a lot of time.

8         So let's get started now with some questions about your

9    prep for the deposition.  And, again, I want to say, if I

10   ever ask you a question about a conversation, or did you meet

11   with your lawyer, or did you spend time with them, I'm not

12   asking for you to tell me what you told them, or what they

13   told you.  I'm simply asking you for facts just to create a

14   record, to make sure that certain things were done, and are

15   not going to come back later on in the course of the case.

16        So, Dr. Chadwell, did you meet with your attorney, or a

17   member of your lawyer's firm to prepare for the deposition?

18  A  Yes.

19  Q  How much time did you spend in preparation with them, if you

20     can recall?

21  A  About two and a half hours.

22  Q  And when did that take place?

23  A  On Tuesday afternoon of this week.

24  Q  And you're a little bit garbled.  Can you --

25  A  Okay.  I'll move up to the microphone more.  About two and a

```
 1        half hours on Tuesday afternoon of this week.

 2   Q    Okay.

 3   A    Can you hear me?

 4   Q    That's much better; it just may be me.

 5   A    Okay.

 6   Q    So that was in person, not on video or Zoom?

 7   A    It was on Zoom.

 8   Q    Did you prepare any documents in preparation for this

 9        deposition?

10   A    I did not, except for what I provided quite some time ago in

11        terms of the communications.

12   Q    All right.  So you did not take any notes, or make any

13        writings as part of your preparation for today?

14   A    No, I don't have anything.

15   Q    We submitted some document requests quite some time ago to

16        your attorneys, and I'm sure that they asked you about them.

17        Did you personally participate in searching for, or providing

18        documents as part of that document request, if you know?

19   A    Yes, I did a query of my E-mail communications in the time

20        frame that I was provided, and then I also asked, you know,

21        IT to do a bigger search to catch everything, and I think

22        Kristen Cook saw to it that that happened.

23   Q    Other than your lawyers, or members of their offices, did you

24        receive any help from anyone else in preparing for the

25        deposition?
```

| | | |
|---|---|---|
| 1 | A | No, not for this. |
| 2 | Q | Do you keep a personal calendar? |
| 3 | A | I have an Outlook Calendar, yes. |
| 4 | Q | And do you use that for personal and professional scheduling, |
| 5 | | or just one or the other? |
| 6 | A | I do both.  Yeah, it's primarily for professional, but I do |
| 7 | | add some personal things, just to keep myself organized. |
| 8 | Q | And do you have a secretary? |
| 9 | A | I have -- no, I don't have a personal secretary; I have a |
| 10 | | team, a staff, and I have a supervisor that helps to support |
| 11 | | me, but I don't have a designated personal secretary. |
| 12 | Q | And do they work with you in your office, or have they been |
| 13 | | remote for the last year? |
| 14 | A | I'm sorry.  You know, it says my bandwidth is low, and so |
| 15 | | it's getting a little -- you look frozen on the screen, off |
| 16 | | and on. |
| 17 | Q | Okay. |
| 18 | | MR. PORTER:  Bob, can I suggest that -- let me |
| 19 | | suggest, we're using a different laptop than we did |
| 20 | | yesterday.  Give us just a few minutes.  Let me go get the |
| 21 | | other laptop, I'll get her hooked up on that, and I think |
| 22 | | that will solve our problems. |
| 23 | | MR. FLORES:  All right.  We'll take a break. |
| 24 | | (Whereupon, a short break was taken.) |
| 25 | | MR. FLORES:  One other thing I wanted to add, I've |

| | |
|---|---|
| 1 | got you all on one monitor, I've got my questions on another, |
| 2 | and some documents in front of me.  So if I pause, it's |
| 3 | usually because I'm trying to see if I can skip some |
| 4 | questions because you've given me the answer that I needed, |
| 5 | so I can move forward. |
| 6 | THE WITNESS:  Do you mind just turning your volume |
| 7 | up just a little bit. |
| 8 | MR. FLORES:  Is that better? |
| 9 | THE WITNESS:  It's okay. |
| 10 | (Off the record discussion.) |
| 11 | Q (BY MR. FLORES)  All right.  Does the University provide you, |
| 12 | Dr. Chadwell, with a telephone or cell phone? |
| 13 | A No. |
| 14 | Q So you use only your personal telephone, is that right? |
| 15 | A Correct. |
| 16 | Q And the cell phone number for your personal phone, could you |
| 17 | provide that, please? |
| 18 | A It's (313) 452-3646. |
| 19 | Q And you have a desk line at your desk? |
| 20 | A I do. |
| 21 | Q Is that a direct dial? |
| 22 | A Yeah.  Yes.  I don't even know what that number is, because |
| 23 | it goes, typically, through the reception desk to my line. |
| 24 | Q When you give out a number for your desk line, or for your |
| 25 | office, what number do you give out? |

```
1   A    It's (313) 577-1463.

2   Q    And do you keep a -- is your Outlook Calendar paired with

3        your cell phone?

4   A    Yes.

5   Q    And with respect to this case, do you remember ever making

6        telephone calls, or receiving telephone calls related to this

7        case on anything other than your desk line or your office

8        line, and your personal cell phone?

9   A    No.

10            MR. PORTER:  Objection, foundation.

11  Q    (BY MR. FLORES)  And your answer was no?

12            MR. PORTER:  So, you still can answer after I

13       object, unless I instruct you not to.

14            THE WITNESS:  I don't remember getting any other

15       phone calls on any other devices.

16  Q    (BY MR. FLORES)  Okay.  Let's talk -- let me just get on the

17       record your educational background.  Dr. Chadwell, where did

18       you earn your medical degree?

19  A    At Wayne State University, School of Medicine.

20  Q    And what years were you there?

21  A    From 1990 to 1994.

22  Q    And after your -- after you concluded your, you got your

23       degree, where did you do your residency?

24  A    I did my family medicine residency training at Oakwood

25       Hospital in Dearborn, Michigan from 1994 to 1997.
```

1  Q   And after Oakwood, what was your next job?

2  A   I came on to the faculty of that residency program.

3  Q   Was that a residency program that was run by Wayne State, as

4      well, or a different medical school?

5  A   We were affiliated with Wayne State, but it was run by

6      Oakwood Hospital, itself.

7  Q   And when did you start working at Wayne State in an academic

8      posting?

9  A   In June of 2010.

10 Q   And what was that position?

11 A   I came on as the Clerkship Director for the Family Medicine

12     Clerkship in that department, in Family Medicine and Public

13     Health Sciences.

14 Q   And that was a -- can you describe what that entailed?

15 A   Sure.  So I was responsible for the core clerkship in Family

16     Medicine, which is one of seven core clerkships, it was at

17     the time, that all students complete in their third year of

18     clinical training, and so I was responsible for coordinating

19     that for all the students going through that program.

20         I also had responsibility for a student run free clinic

21     that was just starting out, and I was the Medical Director

22     for that, and did some other teaching for the Medical School

23     as an Assistant Professor.

24 Q   And when did -- how long did you hold that position?

25 A   Until March of 2017.

1  Q   And what position did you take at that time?

2  A   I took the position as Associate Dean of Student Affairs and

3      Career Development.

4  Q   That's the position that you're currently in?

5  A   Correct.

6  Q   Do you hold any other medical or academic appointments?

7  A   I'm Associate Professor still within my department, home

8      department of Family Medicine and Public Health Sciences.

9  Q   Do you teach classes, as well?

10 A   No, not at this time.

11 Q   And could you give me an idea as to, generally speaking, what

12     are the responsibilities in your current position?

13 A   So my core responsibilities are for 1,200 medical students

14     across all four years so, basically, from matriculation to

15     graduation.  I oversee any student issues that come to my

16     attention; I uphold the ideals of what it means to become a

17     medical professional physician in training, and I help guide

18     them through the medical school process, successfully into

19     their specialty residency training.

20 Q   You mentioned ideals that the school holds for the students;

21     can you tell me what those are?

22 A   So everything related to professional standards, technical

23     standards, just to make sure that students are developing

24     professionally in terms of, you know, all around

25     academically, personally in terms of, you know, upholding

1       integrity; how to act as a physician, essentially.  What is

2       expected of them as a physician as they transition through

3       the various stages into residency.

4    Q  And with so much cultural change going on, does that look

5       different today in terms of what the ideals are than it did,

6       say, when you became a medical doctor?

7    A  They are different in the sense, for sure, in terms of having

8       a lot more awareness in terms of social determinants of

9       health, social justice issues, those types of things that we

10      have now incorporated into our curriculum, and make sure that

11      students are aware of that.  Implicit bias training, things

12      like that, which were not part of the medical school training

13      that I went through at Wayne.  But, yes, it has changed a

14      lot, but I would say the basic essence of professional

15      development are still the same in medicine; medicine is still

16      pretty traditional still.

17   Q  In your work as the Associate Dean, and with all those

18      students, is Title 10 something that you touch on in terms of

19      your responsibility, although, I realize you're not the Title

20      9 Coordinator, but what's your involvement with Title 9?

21   A  Sure.  So, yes, Title 9 is something that touches my office

22      when a student has a concern, and that comes to me, or

23      bubbles up through either directly from a student or through

24      one of the counselors that works in our office.  And then I,

25      you know, help to work through that with the Title 9 Officer

1        on Main Campus if it comes to that level.

2    Q   So do you have regular meetings with the Title 9 Coordinator,

3        or is it just as necessary?

4    A   As needed, but we have an ongoing, yeah, relationship, so --

5    Q   And since you took the position as Associate Dean, has the

6        Title 9 Coordinator remained the same during your tenure?

7    A   I think Brandy Banks, I can't remember how long she's been in

8        her position.  I believe there was a changeover, but the

9        person I've been mostly dealing with is Brandy Banks in the

10       last few years that I've been in the position.

11   Q   Do you recall whether she was there in 2018?

12   A   I don't know the exact time that she started.

13   Q   Okay.  The Office for Civil Rights at the Department of

14       Education that administers Title 9 requires that certain

15       faculty, certain officials receive training on Title 9, and

16       the changes that happen.  They primarily focus on the Title 9

17       Coordinator, but have you received any training with respect

18       to Title 9 while you've been Associate Dean?

19   A   Yes.

20   Q   And was that provided internally, or did you go to a

21       conference, or attend some seminar for that?

22   A   Internally, yeah.  And then peripherally through conferences,

23       issues, you know, it would be part of some presentation,

24       sometimes at conferences, but like the AAMC, for example, but

25       primarily internally.

1   Q   Can you give me again, you said it pretty quickly, the name
2       of that association?
3   A   The AAMC, the American Academy of Medical Colleges.
4   Q   Thank you.  Sometimes I'll do that just to help out the court
5       reporter, because she may not catch that.
6   A   Sure.  Sure.
7   Q   And do you remember when the last time was that you received
8       any training on that?
9   A   I believe it was last summer, and that was an internal
10      presentation.
11  Q   So that would have been summer of '21?
12  A   No, 2020.  I guess we're in the fall now so, yeah, last
13      summer I'm referring, yeah, 2020.
14  Q   And do you remember whether or not you were provided
15      materials as part of that training?
16  A   It was a PowerPoint presentation on -- yeah, I don't
17      remember, like, reviewing a packet or something like that; it
18      wasn't like that.
19  Q   I went on your -- I went on the School of Medicine's website,
20      and I took a look at how the website describes your mission,
21      and I'm going to just read you what that quote is.
22          It says, Providing students with a welcoming
23      environment, timely and accurate advising, programs designed
24      to enhance student well-being, and major school events to
25      celebrate the milestones of your medical school careers.

1   Students are encouraged to meet with our staff or the

2   Assistant Dean at any time, knowing that confidentiality is

3   respected and upheld.  Our office provides a variety of

4   services, all central to your well-being and development.

5        Is that close or consistent with what you know to be the

6   mission of your office?

7  A   Yes.

8  Q   At the schools that I have attended, the person at the top

9   usually is, whether you're talking about a Principal, or a

10   Superintendent, or a Dean, those are people who don't get

11   nearly as many problems presented to them as the assistants

12   underneath.  So whether it's the Vice Principal, or an

13   Associate Dean, or an Assistant Dean, or it seems like the

14   assistants deal with a lot of the pain and anguish, and the

15   Deans, and the Principals, and the Superintendents are there

16   to make sure they're smiling, they're representing the

17   school, and everybody likes them.

18        So I just wanted to get a sense, because sometimes

19   websites, even though that's the stated mission, the reality

20   is a little bit different.  And so I wanted to ask you, when

21   you think about yourself relative to the Dean of the Medical

22   School, are you kind of the good cop or the bad cop, or is

23   there any kinds of situation like that?

24             MR. PORTER:  Objection, form and foundation.

25  Q   (BY MR. FLORES)  If you can answer that question, I'd

```
 1        appreciate it.

 2                    MR. PORTER:  Go ahead.

 3                    THE WITNESS:  Can you repeat the question.

 4   Q    (BY MR. FLORES)  Are you -- do you view yourself, in terms of

 5        the mission of your office, in your particular role, would

 6        you see yourself as someone that the students would see as,

 7        I'm going to go to talk to Dean Chadwell, because she can

 8        help me or, I don't really want to talk to Dean Chadwell

 9        because she's like the disciplinarian within the Medical

10        School?

11   A    It's definitely number one.

12   Q    All right.  Good.

13   A    That's my life.

14   Q    Do you address both behavioral and academic issues for

15        students, or does someone else, do you share that

16        responsibility with someone else?

17   A    It's a shared responsibility with other offices.  Student

18        Affairs is not primarily academic, although, obviously, yes,

19        we provide a lot of support for students with academic

20        challenges, as well as behavioral aspects, too.

21   Q    So it's fair to say that students are encouraged to look at

22        you and your office in a positive way, where they should go

23        to get help if they're having a problem?

24   A    That's true.

25   Q    Do you know my client, Anthony Eid?
```

1   A   Excuse me?

2   Q   Do you know my client, Anthony Eid?

3   A   I know him as a student, former student, yes.

4   Q   And when he was a former student, did he hold any student

5       government position?

6   A   He did.  He was the President of his class.

7   Q   I want to direct your attention now -- I want to focus a

8       little bit more on the actual case, so I want to direct your

9       attention first to October 31, 2018.  And on that date did

10      you have a discussion with a woman by the name of, with the

11      first name of Pamela?

12  A   I did.

13  Q   At the time that you had that conversation, had you ever met

14      her previously?

15  A   I had not.

16  Q   And did you learn her last name?

17  A   Yes, I did.

18  Q   And the last name?

19  A   Excuse me.

20  Q   Last name?

21  A   Burton.

22  Q   And how did it -- how did you come to talk with her on that

23      date?

24  A   My receptionist provided me with a, basically put forward a

25      message, that this Pamela Burton wanted to speak with me.  I

| | |
|---|---|
| 1 | had no idea what it was about.  I called -- I returned the |
| 2 | call from my desk phone that afternoon. |
| 3 | Q   And approximately how long did that telephone call last? |
| 4 | A   It was maybe 10, 15, about a 15-minute conversation, I would |
| 5 | say. |
| 6 | Q   And could you, to the best of your recollection, please |
| 7 | describe that telephone conversation in detail? |
| 8 | A   So she called me with a lot of seriousness in her demeanor, |
| 9 | her voice over the phone, and basically let me know that she |
| 10 | was encouraged to give me a call.  She was encouraged by Dr. |
| 11 | Friday, who was a colleague, and a strong faculty member in |
| 12 | the School of Medicine for many, many years, and worked at |
| 13 | Children's Hospital; she was the Pediatric Clerkship |
| 14 | Director, and this Pam Burton was a nurse, she told me, at |
| 15 | Children's Hospital. |
| 16 | So she had worked with Dr. Friday, and had recounted the |
| 17 | same thing she was about to tell me to Dr. Friday, and Dr. |
| 18 | Friday said, you know, you ought to give the School of |
| 19 | Medicine a call, and let them know this and see, you know, |
| 20 | you know, where this might go.  And so that's -- so on that |
| 21 | encouragement, she called me that day and recounted her |
| 22 | story. |
| 23 | Q   So just to be clear, the doctor who you've just mentioned, |
| 24 | that's Dr. Friday, as in the day of the week? |
| 25 | A   Yes, Dr. Friday.  Uh-huh. |

1   Q   Children's Hospital?

2   A   Yes.

3   Q   That's in Detroit?

4   A   Right.

5   Q   And now, when she -- well, what did she tell you about the

6       case she was calling you about; what did she say?

7   A   She told me about her daughter, who was a Wayne State

8       undergraduate student, and her connection with one of our

9       medical students, Mr. Eid, and that there had been ongoing

10      issues in terms of communications that were troublesome.  And

11      that there had also been a posting of what seemed to be a

12      fake Court case and, essentially, there were just these --

13      and that turned out to be something that wasn't real.

14          And because of all the troublesome communication between

15      her daughter and Anthony Eid, and she also recounted her

16      daughter felt unnerved by this, that she had already

17      proceeded to go to the Wayne State Police on this, and she

18      just wanted it to stop.

19          And she just, you know, didn't really know where else,

20      what else to do with this, but she felt very strongly that,

21      you know, once she found out Mr. Eid was a medical student,

22      that that is not in holding with, you know, how a medical

23      student or future physician should conduct themselves.

24          So that's what she basically recounted to me in terms

25      of, yeah, there was definitely high seriousness and concern

1    on her part and there was, yeah, the semblance of behavior

2    that seemed to be very out of touch with what we would expect

3    from a medical student.

4  Q   And let me just go back just a couple questions.  So at one

5    point during the conversation did she talk about the Wayne

6    State Police Department?

7  A   She mentioned Wayne State Police, and I believe they had

8    already -- they were in the process of filing a report with

9    them at the time.  I mean, they had -- it sounded like they

10   had endured a couple of years, almost, of these inappropriate

11   interactions, and it just had come to a point where they felt

12   like they needed help from the University.

13  Q   When you say they, you're talking about the Burtons --

14  A   I am.

15  Q   -- making a complaint?

16  A   Right.

17  Q   And your recollection is that these allegations about

18   troubling behavior lasted a couple of years; that's your

19   recollection?

20  A   It seemed like they, they had been quite protracted.  Yeah,

21   it seems like they had been -- because her daughter was an

22   undergraduate student, so Anthony was a year two student at

23   the time, so that would have had to been a few years ongoing

24   from what she was telling me.

25  Q   At the time that you spoke with Pamela Burton, was her

1      daughter a current student at Wayne State?

2  A   I believe she had actually transferred, or decided to move

3      out West, I believe it was Colorado, and I think that was

4      just in process, or -- but, yeah.  She was referring to what

5      had happened when they were both students at Wayne.

6  Q   So do you remember whether or not, at the time you took the

7      phone call in 2018, whether she was or was not a student at

8      that time?

9  A   I don't know the exact dates of when her daughter, you know,

10     left Wayne State, or if she had left at that very point.  All

11     I know is that what she was recounting happened while she was

12     a student at Wayne, as was Anthony.

13 Q   Is there anything else that you remember from that phone

14     call?

15 A   I remember that she just had this real urgency about it, and

16     a real seriousness, as I said before, and maybe even a

17     little, like, some, like, angst and fear.  I mean, that's why

18     the police issue, you know, that came up as them proceeding

19     with that.  And I think the Court case, the fictitious Court

20     case, that was really troublesome to them, and really

21     worrisome.

22         And so, yeah, they -- that's what I remember distinctly

23     from that conversation, that this had been just really

24     bothersome to the entire family, and really scary to the

25     whole family.  She was worried for her daughter, clearly.

| 1 | | MR. FLORES:  Bailey, if you would publish Exhibit A |

1          MR. FLORES:  Bailey, if you would publish Exhibit A

2  so that Dr. Chadwell and the others can take a look at that

3  document, please.

4          EXHIBIT TECH:  One moment.  And I'm going to drop

5  it in the chat.  We were having a little problem with Drop

6  Box this morning, so I'm going to drop the pdf in there, so

7  it will actually have to be downloaded to be viewed.

8          THE WITNESS:  So I should click on the chat?

9          EXHIBIT TECH:  Or you can look at the shared screen

10  here, and Mr. Flores will direct me as to what we want to

11  look at.

12          MR. FLORES:  Go down to the first full page.

13  Q  (BY MR. FLORES)  Do you recognize what that is, Dr. Chadwell?

14  A  Yeah, this is the, it looks like the follow-up of her, that

15    she wrote me after our conversation.

16  Q  So if I -- let me give you a moment for you to read that

17    E-mail through in its entirety, and then let me know when

18    you're done.

19  A  Okay.  I'm going to have to minimize my gallery view here.

20    Okay.

21  Q  First, let me ask if you could please tell me what

22    suggestions after, or as a result of talking to Jane Doe's

23    mother, what suggestions did you make that she's referring to

24    here in the first sentence of that E-mail?

25  A  So the suggestions were, since she brought me the complaint,

1    I needed some more substantive, something substantive to go

2    off of.  I can't just -- you know, I wanted her to provide me

3    with some substantive elements to this complaint before I

4    would further that, and consider it, because she told me a

5    lot in that conversation.  And so I said, well, you know,

6    whatever you have to provide me to substantiate what you told

7    me, that would be helpful in considering what I ought to do

8    with it.  And so that was one of the suggestions.

9         Another suggestion was, because of the safety concerns

10   and the angst that she had about the situation, that she -- I

11   said, you know, you always have, since you're already

12   involved with Wayne State Police, you have the option for a

13   PPO; you could follow up on that, depending on where you're

14   at with this.  So those were the two suggestions that I

15   remember.

16   Q   Okay.  When you made those suggestions to what you described

17       as a clearly distraught mother, what authority were you

18       relying on to be able to provide that advice?

19   A   Well, my own authority in terms of it was just common sense

20       to say, I'm not going to act on something without having some

21       substantive, something to look, you know, to substantiate her

22       complaint.  So that was just my own authority, as an

23       institutional official, that I was doing due diligence.  And

24       then, obviously, with Wayne State Police already being in the

25       picture, I made that suggestion about, you could initiate a

1      PPO if that's where you feel like you need to go with this.

2  Q   And at the time that you made the recommendation for a PPO

3      which, am I correct, it's my understanding that you're

4      referring to a Personal Protective Order?

5  A   Well, I want to say I didn't make the recommendation; I said

6      it was an option, since she had already been in contact with

7      police.  So it was not my personal recommendation, it was

8      just an option that she had, that I pointed out to her.

9  Q   I just want to make sure, you've referred to it as a PPO

10     several times.  We're talking about a Personal --

11 A   Yes, a Personal Protection Order.

12 Q   At the time that you spoke with her earlier that day, do you

13     know whether anyone had actually made a complaint to the

14     Wayne State Police Department?

15 A   No, I was not aware of that.

16 Q   And do you know what other police departments cover Wayne

17     State?

18 A   Well, Detroit Police Department, I think, works in tandem

19     with Wayne State Police, but typically, Wayne State, it

20     covers our square mile, if you will, of our campus, like

21     pretty much, they are the go-to for anything that happens on

22     the campus.

23 Q   But you were not told by Mrs. Burton that Anthony had been

24     arrested, or that any other legal action had been taken at

25     that time against my client?

1  A    No, she told me that this Police Report was in progress.

2  Q    And you thought -- is it fair to say that you thought it was

3       appropriate, given the circumstances, to discuss a student at

4       the Medical School with a third party, even though you didn't

5       really know who you were talking about, you just knew how she

6       was representing herself?

7  A    No, that's not fair to say, because I did not discuss him, I

8       was taking in her complaint, because there was no reason for

9       me to discuss him.  I was simply the receptor receiving her

10      complaint, and basically that was the point of the

11      conversation.  It came out of the blue on that afternoon, as

12      you know.

13 Q    At any time in that conversation did you have any concerns

14      that you might be violating FERPA, known by the Family

15      Education Records Protection Act?

16               MR. PORTER:  Objection, foundation.

17 Q    (BY MR. FLORES)  Are you familiar with the privacy rights of

18      students, Dr. Chadwell?

19 A    Of course.

20 Q    Are you familiar with what I'm referring to as FERPA?

21 A    Yes.

22 Q    And were you -- did you have any concern whatsoever as to

23      whether or not there might be a violation of FERPA in even

24      having this telephone call with someone who you did not know,

25      but was representing themselves as a victim?

1    A    There were no educational records shared, nothing that was

2         specific to Mr. Eid.  It was simply an intake, and that's why

3         I asked her, for her to -- the burden was on her to provide

4         me with additional substantive reports, which she did in this

5         E-mail, to even see if this was valid, and something that

6         would need to be advanced.

7    Q    And just to be clear, did you raise the issue of the PPO, or

8         did she?

9    A    She -- it was in the course of the conversation, and her

10        telling me about the Police Report, and just wanting, her

11        daughter wanting to just be left alone, and so it was in that

12        context.  And so, again, it was more a discussion of options,

13        you know, while you're talking with the police, you could

14        explore that, but it was not a recommendation; it was simply

15        that's something that you would talk to, you could talk to

16        the police about.

17   Q    You simply raised it, you did not recommend it?

18   A    Right.  No, there was -- right, it was just based on that

19        initial conversation.  I had no reason to recommend that.

20   Q    I'd like to direct your attention to the bottom, the last

21        couple sentences of the E-mail.  Do you still have it visible

22        to yourself?

23   A    I do.  Yep, I do.

24   Q    Is it fair to say that the parent did not, was very

25        uncomfortable with the notion that Mr. Eid would become a

1        doctor, and have the responsibility to care for patients?

2    A   Well, it's just what she said here.  She was very -- I am

3        very concerned about someone with this character becoming a

4        doctor.  That's her words.

5    Q   And did you share that concern?

6    A   Share that concern, with --

7    Q   Based on what the parent had just told you.

8                  MR. PORTER:  I'm sorry, Bob.

9                  THE WITNESS:  Share it with --

10                 MR. PORTER:  I didn't catch the first part of that.

11   Q   (BY MR. FLORES)  Based on the E-mail and the earlier

12       conversation with Pam Burton, did you share her concern about

13       Mr. Eid becoming a doctor?

14   A   Well, it wasn't specific.  I mean, this just -- she -- this

15       happened with Mr. Eid, and what she was telling me, but

16       anyone who would do, you know, what she claimed, would

17       warrant some, you know, would be a concern in terms of

18       honesty and, yes, would be concerning as far as our

19       professional, if I hold it up to our professional Code of

20       Conduct for our physicians in training.

21           It could be any student.  If there was no name attached

22       to this, and this was just sent to me just at random, then,

23       yes, it's concerning at face value.

24   Q   And while you were talking with Pam Burton earlier in the

25       day, did you take any notes while you were having that

1      conversation?

2  A   Not that I remember.  I mean, again, I put the onus -- it was

3      kind of at the end of, I think the end of the afternoon; I

4      was getting ready to wrap things up, and this phone call came

5      in.  And so that's why I said, you know, send me what you

6      would like to substantiate, or like to, you know,

7      substantiate this conversation as much as you want.  And so

8      the onus was really on her, but I don't remember taking any

9      notes or -- all I had was, I think, the little piece of paper

10     with her name and the phone number from the receptionist,

11     that's about it.

12  Q  Did you do anything related to this complaint after having

13     that conversation with Pamela Burton?

14  A  Yeah, so -- so, obviously, this has now reached me, elevated,

15     or encouraged by a highly regarded and knowledgeable faculty

16     member that this Pamela Burton worked with, namely, Dr.

17     Friday.  And now she sent me all this supplemental

18     information, you know, materials in support of what she told

19     me during the conversation.

20          So as an -- now it's institutional knowledge, because

21     I'm the institutional person responsible for our student body

22     at the Medical School.  So, yes, so I definitely had to think

23     through, what do I do with this information.  And so two

24     things, one is anything of this level of concern is not

25     something I would look at on my own, and make a

1      determination.  It's something I would always share with my

2      boss, the Vice Dean of Medical Education, to make him aware,

3      and so that's what I did.  I did share this with my boss, and

4      we talk about all of these sorts of issues, student issues on

5      a weekly basis.

6             And the second thing that came out of it is, basically,

7      that, you know, whether or not it's true, I didn't know.  I

8      mean, I don't know how much credibility there is, where this

9      was all going, but I had to share that with, also, Dr.

10     Jackson, who was the Chair of the Professionalism Committee,

11     to look into it, because that was not my job to verify this,

12     to look into it.

13            But the complaints were definitely serious enough in

14     terms of our professional expectations of our own students,

15     that it needed to be at least funneled to the person who

16     could do a deeper look at this, and determine if this is

17     something that would rise to a professionalism, you know,

18     hearing or charge, if you will.  And so that's why I sent

19     that to Dr. Jackson.

20            And one other person that would need to know this, that

21     I shared it with, is the counselor for Mr. Eid, and that's

22     Mrs. Robichaud, just as an awareness.

23  Q   On that -- after you received the call from Pam Burton, did

24     you reach out to Dr. Friday to confirm that the

25     representation that was being made by Ms. Burton, was

1       actually true?

2   A   I don't think I -- I don't recall, like, reaching out to

3       her.  I may have seen her in the hallway, but I mean, it's --

4       I didn't -- I didn't think that was -- that was not, like, a

5       priority in terms of, because I had so much that was sent to

6       me and relayed to me here in terms of material from Ms.

7       Burton, to substantiate what her initial complaint was, or to

8       round out her complaint.

9           So I think I, you know, I would frequently see, you

10      know, occasionally, I would say, see Dr. Friday coming

11      through our office suite, and I may have, you know, said

12      something to her about it then, but really, that wasn't

13      something that I felt needed to be tracked down.

14  Q   Okay.  So prior to distributing this information that you

15      received from an individual identifying herself as Pam

16      Burton, and working at Children's with Dr. Friday, before

17      you -- you went ahead and circulated this information before

18      confirming any of the information that Ms. Burton provided

19      you with Dr. Friday, is that correct?

20  A   Well, circulating is not the right word.  There's no

21      circulation; these are very sensitive things that come to me,

22      and like I said, they were pinpoint directed at three

23      particular individuals who I felt needed to know.  And so,

24      again, that was Dr. Baker, my Vice Dean of Medical Education;

25      Dr. Jackson, the Chair of the Professionalism Committee, and

1       the class counselor, as just an awareness, FYI.

2            So the onus wasn't on me at all to, in my capacity to,

3       you know, verify the information before I sent it, or I

4       shared that with what was in my context of my

5       responsibility.  So, no, I didn't go back and start the

6       fact-finding and verifying and all that; it was simply for

7       consultation, where do we go from here, and the individuals

8       who could actually do that.

9    Q  Again, I just want to confirm, you viewed your responsibility

10      as needing to provide this information that you received to

11      Dr. Jackson, to Dr. Baker, and to Mrs. Robichaud, is that

12      correct?

13   A  What was your question, if it was my responsibility?

14   Q  If it was your responsibility, after receiving the complaint,

15      to send this information to Dr. Jackson, to Dr. Baker, and to

16      provide it to Mrs. Robichaud?

17   A  I felt that that was my responsibility, to those select

18      individuals, for very specific reasons.

19   Q  So, and this was done -- I'll withdraw it.

20           Okay.  So at the time that you sent this, or received

21      this E-mail, you had had three or four hours to kind of think

22      about the complaint.  Were you concerned; were you anxious

23      about this, were you -- did you think this was a real

24      emergency?  What was your thinking about this complaint at

25      that time, at the very beginning?

1  A    It definitely gave me some pause for, cause for pause, in

2       terms of really having to think through it, and it was

3       troublesome, very troublesome to hear this.  And it was very

4       much a, if true, very much a significant issue that I knew

5       was going to have to be addressed in the right, with the

6       right individuals that I just mentioned, and in the process

7       of the medical school to be looked into.  I mean, I knew at

8       least that, that this has to be looked into, because it

9       really was a professionalism, and it looked like an honesty

10      issue that she was recounting to me, an interpersonal

11      relationship issues.  Those are specific things within our

12      Code of Professionalism for our physicians in training that

13      really seemed out of kilter.

14          So it just seemed like a very bizarre, almost, story

15      that, but she had this, you know, these attachments that were

16      supporting her, her complaint to me.  And they, for sure,

17      needed to be looked into within the right process and that's

18      -- yeah, so during those hours I definitely felt the, you

19      know, I thought, well, this is very serious sounding, and I

20      was awaiting her substantiation before I did anything with

21      it.

22  Q   And you had been in your current position for about a year, a

23      year and a half at the time that this complaint came to your

24      attention, is that correct?

25  A   Correct.

1  Q   Had you dealt with anything like this in that, you know,

2      during those previous months?

3  A   Yes, I have -- I have dealt with many professionalism issues,

4      severe, significant, some not so -- the whole spectrum, and

5      also had served previously on the Professionalism Committee

6      for many years as a faculty member, was invited to serve on

7      that Professionalism Committee.  And so I had seen quite a

8      few, I would say the most egregious issues that bubble up in

9      a medical school setting.  And so I felt like a gauge, had a

10     pretty good gauge about how serious this was, or could be.

11              MR. FLORES:  If we would -- if you would go ahead

12     and -- let me just make sure it's the right document.  Could

13     you please publish Exhibit E.

14              EXHIBIT TECH:  One moment.

15              MR. FLORES:  And go down to the second page where

16     the E-mail starts.  Okay.  Go down further to the bottom half

17     of the page; one more.  Is that the end of the document right

18     there?

19              EXHIBIT TECH:  Yeah.  Yeah, that's just --

20  Q   (BY MR. FLORES)  Okay.  So this -- do you recognize this, Dr.

21     Chadwell?

22  A   Sure, uh-huh.

23  Q   And can you read the date on what's been marked as Exhibit

24     E.

25  A   An E-mail from December 5, 2018.

```
1  Q   And can you tell me what time?

2  A   8:22 a.m.

3  Q   So on December 5th, early in the morning, you sent a copy of

4      the -- do you remember what you sent to Dr. Baker, as

5      attached to this E-mail?

6  A   It was Nikolina Camaj's report regarding her, yeah, her

7      report of Anthony Eid.

8  Q   Give me just a moment.  Okay.  And do you remember sending

9      the report, also, to Dr. Jackson?

10 A   I don't know if he received it separately, or if I sent it.

11 Q   All right.

12             MR. FLORES:  Could you please publish Exhibit D.

13             EXHIBIT TECH:  Was that B; B as in boy?

14             MR. FLORES:  David.

15             EXHIBIT TECH:  D, as in David.

16             MR. FLORES:  And go down to the second page.

17 Q   (BY MR. FLORES)  Take a look at that E-mail, and see if that

18     refreshes your recollection as to what, or whether you sent

19     the report to Dr. Jackson?

20 A   Okay.  Yeah, it looks like the same thing.  He may have

21     received it separately, I don't know, but I -- yeah,

22     because -- yeah, I felt like he should have it.

23             MR. FLORES:  Okay.  You can take that off the

24     screen.

25 Q   (BY MR. FLORES)  Now, are you familiar with something called
```

1        the Behavioral Intervention Team?

2   A    Yes.

3   Q    Can you tell me what that is?

4   A    So it's a Main Campus Team Meeting Committee, if you will,

5        made up of various components of the University,

6        representatives of the University, including police, Title 9,

7        Code of Conduct Officer, legal counsel, and they'd look at

8        and review student issues, complaints.

9   Q    And is this something that -- is it also referred to as BIT?

10  A    I think so, yeah.  BIT, B-I-T, uh-huh.

11  Q    And does this committee meet on a regular basis, or on an ad

12       hoc, as necessary basis?

13  A    I don't know for sure.

14  Q    Do you remember attending a meeting of the Behavioral

15       Intervention Team shortly after getting the complaint from

16       Pamela Burton?

17  A    Yes, I did meet with them.  Uh-huh.

18  Q    Okay.  And at that meeting, did you discuss the complaint?

19  A    Actually, the complaint --

20            MR. PORTER:  Well, I would object and instruct the

21       witness not to answer if it requires you to disclose

22       privileged confidential communications between counsel and

23       those around the BIT meeting.  But if you do not need to

24       disclose privileged information or communications to answer

25       his question of whether it was discussed, yes or no, then you

1        can answer.
2                    THE WITNESS:  Okay.  Yeah, I was simply going to
3        say, it was their meeting, it was on their agenda.  That's
4        about it, yeah.
5    Q   (BY MR. FLORES)  Do you know who placed it on the agenda?
6    A   I have no idea.
7    Q   And does that Behavioral Intervention Team deal with minor
8        cases, or cases of some seriousness?
9                    MR. PORTER:  Objection, form and foundation.
10   Q   (BY MR. FLORES)  What kinds of cases came before the
11       Behavioral Intervention Team while you were participating?
12                   MR. PORTER:  Objection, foundation.
13   Q   (BY MR. FLORES)  You can go ahead and answer.
14   A   Are you referring to that particular meeting, or in general?
15   Q   At the time that you were Associate Dean, up until today,
16       have you participated in Behavioral Intervention Team
17       meetings?
18   A   No.
19   Q   So the only Behavioral Intervention Team meeting that you
20       ever attended was the one involving a discussion of Mr. Eid?
21   A   On request, yes.
22   Q   Does anyone from your office typically attend those meetings
23       when they're held?
24   A   No.
25   Q   So this was a serious -- you perceived this -- is it fair to

1    say that you perceived this to be a serious escalation in how

2    the school was dealing with this complaint?

3             MR. PORTER:  Objection, form and foundation.

4    Anytime I object, unless I tell you not to answer, you can

5    just go ahead and proceed to answer; I'm just putting an

6    objection on the record, that's all.

7             THE WITNESS:  Okay.  So it wasn't an elevation, I

8    would say, from the School of Medicine.  Dean Strauss had

9    already been involved, so I would say, I mean, I don't know

10   what his process is for BIT; as I said, that was the only

11   time I was requested to join them.  So it seemed to be an

12   escalation, or a seriousness placed on that from the

13   University's standpoint, as well as ours, because we had

14   discussed that, you know, Dean Strauss and I often talk about

15   difficult cases that kind of cross over into our various

16   realms.  And so, yeah, it was, it was a serious issue,

17   obviously, for both, both the University at large and the

18   School of Medicine.

19   Q   (BY MR. FLORES)  At that meeting, was Dr. Strauss in

20       attendance?

21   A   He was.

22   Q   Prior to that meeting, did you have an opportunity to discuss

23       that matter with Dr. Strauss?

24   A   We had a brief discussion, yes.

25   Q   Where did that take place?

1   A    It was phone.  It was, yeah, I think it was right after the

2        phone call from, shortly after the phone call from Pamela

3        Burton, because she had -- they had already been -- Dean

4        Strauss already knew about it because of Wayne State Police.

5   Q    How did you find out that Dean Strauss already knew about the

6        case?

7   A    He, I think, was copied on a, I'm trying to remember, on some

8        of the communication that I saw from her, and so I reached

9        out to him, and we briefly discussed it.

10  Q    When you say copied by her, who are you referring to?

11  A    He was on some kind of, on some of the communications that

12       she had sent, I believe he was already, what I recall, he was

13       already on some of, cc'd on something, whether -- I don't

14       know if it was directly from her, but it was on one of the

15       reports.  I think he gets copied on whatever, the University

16       procedures on the reports.

17  Q    I'm just trying to get the name of the person -- you used a

18       pronoun, she, that Dr. Jackson was copied by her, or is that,

19       is that Pamela Burton?

20  A    I was talking about Dean Strauss.

21  Q    My apologies.  I'm trying to figure out who you're referring

22       to copied Dr. Strauss?

23  A    Okay.  So when Pamela Burton supplied me with that E-mail on

24       October 31st that evening, with her materials attached, I

25       believe he was -- what I recall, is that he was on -- I'd

1    have to go back and look at this, but I saw that he had

2    already been copied on some of that.  And I don't remember

3    which exact piece was an attachment, but that told me that he

4    already was somewhat aware of what was going on.

5          And so whenever, you know, there's crossover, like I

6    said, of issues of an undergraduate student and the Medical

7    School, you know, we often connect with each other, and just

8    make sure that we're, we're understanding, and we're in

9    collaboration and coordination, that we know what needs to be

10   done.

11              MR. FLORES:  Okay.  If you would publish Exhibit B,

12   please.

13              EXHIBIT TECH:  One moment.

14              MR. FLORES:  And if you would go down to page two.

15 Q  (BY MR. FLORES)  Dr. Chadwell, if you would read this E-mail,

16   and then the one below it, and let me know when you're done.

17   And you can just ask the technician to scroll when you're

18   ready.

19 A  Okay.  You can scroll.  Okay.

20 Q  So if you go to the top E-mail first.  So this E-mail, is it

21   fair to say, is a response by you to Loretta Robichaud on

22   November 5th, and that this E-mail also refers to the meeting

23   with the Behavioral Intervention Team, is that correct?

24 A  Well, yeah, it is referencing that BIT meeting, and it is an

25   acknowledgment; it says, Thank you, Loretta, of her E-mail.

1  Q   So the meeting that's referenced in that first sentence is a

2      meeting with the Behavioral Intervention Team, is that

3      correct?

4  A   I think that was the date, yes.

5  Q   And you -- had you already sent Dr. Baker an E-mail prior to

6      his return that's reflected in sentence number one?

7  A   I had, as I said before, alerted him to, yeah, shared the

8      information with him.

9  Q   And you were letting Ms. Robichaud know that you would be

10     discussing it further with Dr. Baker when he returned?

11 A   That's what I said there, yep.

12             MR. FLORES:  Can we go down to the second E-mail.

13 Q   (BY MR. FLORES)  Now, are you familiar with the post that

14     Loretta Robichaud holds at Wayne State?

15 A   Yes.

16 Q   What is that?

17 A   She is a counselor, a long-standing counselor at the School

18     of Medicine, in the Office of Student Affairs.

19 Q   And what -- do you know what the job of the counselor is?

20 A   Yes.  Did I miss something?

21 Q   Could you please tell me what the job of counselor entails?

22 A   Sure.  So each class of 300 in the School of Medicine has a

23     dedicated, designated class counselor, and their role is to

24     provide personal support.  It's not therapeutic counseling in

25     that sense, but it's personal support for any kind of

1    challenges that that student, their class, individual

2    students may encounter from the time they matriculate all the

3    way through to graduation.

4            So, and they also are responsible for, you know,

5    providing resources external to the School of Medicine, and

6    that could be, you know, really any kind of resources that

7    the student might need for support, academic; it could be

8    personal, it could be mental health resources.

9            So that's, essentially, what counselors do, is they

10    provide that personal one-on-one support, and also for the

11    class at large, that they're responsible for.

12  Q   And to your knowledge, was Ms. Robichaud assigned to my

13    client's class?

14  A   Yes.

15  Q   Now, is it fair to say that Ms. Robichaud, at the time that

16    she wrote this E-mail, was extremely upset?

17            MR. PORTER:  Objection, foundation.

18            THE WITNESS:  I have no idea if she was upset or

19    not when she was writing this.

20  Q   (BY MR. FLORES)  Have you had a chance to reread that E-mail?

21  A   Yeah, I mean she's obviously concerned and unnerved by it,

22    but she -- I don't know what her, like, emotional state was

23    when she was writing it, if that was the question.

24  Q   But it's fair to say she was upset when she wrote this

25    E-mail?

1          MR. PORTER:  Objection, foundation.

2          THE WITNESS:  Well, she, again, she's expressing

3     extreme concern, but that's obvious.

4  Q  (BY MR. FLORES)  Did she express a concern that, as a result

5     of the University's knowledge of this complaint, that the

6     University could be liable?

7  A  Well, she's referencing MSU.  I know from Mrs. Robichaud that

8     she is extremely student, you know, protective, and advocates

9     for her students more than most anybody would.  And so, yeah,

10    I think she was concerned about, you know, if this is, you

11    know, if this bears out in the meeting that was referenced

12    then or, you know, if it was, whatever steps were going

13    forward, that that could be problematic, you know, for the

14    University.

15 Q  Did she include in this E-mail any caution to you that it's

16    too early to decide whether or not Anthony represents a risk

17    to the school or to himself, because nothing has been proven,

18    and there's no, no investigation has taken place; is there

19    any caution on her part reflected in this E-mail?

20         MR. PORTER:  Objection, form and foundation.

21         THE WITNESS:  Well, she says, I was thinking about

22    the meeting coming up, so she was processing it, it looks

23    like, you know, in her own, from what she knew about it at

24    that point.  And I'm sure she was putting it in the context

25    of the entire medical school, her class, all the students

1    and, you know, so as far as -- I think she was trying to err

2    on the side of, you know, caution.  What was our

3    responsibility in terms of making sure that there was no risk

4    to, you know, as an institutional office that's responsible

5    for students.

6  Q  (BY MR. FLORES)  Is it fair to say that this E-mail reflects

7    her concern for the University as a whole, rather than for my

8    client?

9              MR. PORTER:  Objection, form.

10             THE WITNESS:  She -- I can tell you, having gone

11   through the entire process with Mr. Eid, that he couldn't

12   have had a more, a stronger advocate, if you will,

13   throughout.  And that is one of the fillers, I would say, of

14   what we do in Student Affairs, is that regardless of, you

15   know, what the situation is, our primary purpose is to really

16   provide as much advocacy as we can.

17       Obviously, sometimes things, you know, become really

18   difficult in terms of, like, this complaint that came to us

19   to, you know, provide that support and be that advocate,

20   while also looking into real concerns, real professional

21   concerns.  So that's what I see here.

22  Q  (BY MR. FLORES)  But she didn't provide any of that

23   information about concern for Anthony in this E-mail, did

24   she?

25  A  Well, she -- again, it looks like she was processing her own

1   thoughts about it, and about the meeting that was coming up.

2   And I think her support of Anthony was continuous all the way

3   until the very, until the very end and, you know, but that

4   doesn't discount, you know, the fact that she has had

5   personal reflection on the complaint, and on the concerns

6   that were being moved forward.

7  Q   Dr. Chadwell, this is a fairly simple question.  Does this

8   E-mail, to you, focus on the concerns that she had for the

9   school, or the concerns she had for Anthony, just this

10   E-mail?

11  A   Okay.  Well --

12            MR. PORTER:  Objection to form, and it calls for

13   speculation.

14            THE WITNESS:  I would --

15            MR. FLORES:  She can tell me what her impression

16   is.

17            THE WITNESS:  Yeah, my impression is completely her

18   concern was for students at Wayne State University as a

19   whole, and that includes Anthony Eid in that, too.  So the

20   concern is 360, so it's all students that, you know, could be

21   at risk if this were the case, and it's students, in general,

22   I think is the concern.

23  Q   (BY MR. FLORES)  The second sentence in this E-mail says,

24   Let's not let this happen on our campus as it did at MSU.

25       Do you understand what she was referring to?

1   A   I don't remember what the exact reference is to.  I think

2       there was something going on at Michigan State at the time in

3       terms of -- but honestly, I don't remember what she was

4       referencing, like the exact case.

5   Q   Are you familiar with the name, Larry Nassar?

6   A   Of course.

7   Q   Do you remember what school he worked at?

8   A   I believe it was MSU.

9   Q   Do those two pieces of information -- if you will reread that

10      second sentence, can you tell me what she was referring to?

11              MR. PORTER:  Objection, asked and answered.

12  Q   (BY MR. FLORES)  If you could reread it, and just tell me how

13      you can answer the question.  Do you know what she was

14      referring to when she wrote that second sentence?

15              MR. PORTER:  Objection, asked and answered.

16              MR. FLORES:  You need to answer the question.

17              THE WITNESS:  I should answer?

18              MR. PORTER:  Yes, every time unless I tell you not

19      to.

20              THE WITNESS:  Okay.  I just hadn't heard you say

21      that phrase, asked and answered.  Okay.  So I should go ahead

22      and answer?  Okay.

23          So, yeah, I mean, thinking back, that was probably when

24      that was going on, but I think it wasn't an inference to

25      Nassar, in particular.  I mean, I think it was, again, more

1    the, you know, a university at large incurring a risk because

2    of an individual.  That's the way I -- that's the way I

3    remember thinking about it.  I mean, that's the way it still

4    strikes me right now when I'm reading it.

5            MR. FLORES:  Okay.  It is 11:30 and, again, I'm

6    sorry, I should have taken a break a little while ago, but

7    why don't we take a 10-minute break, and be back at 11:40.

8    Does that work for you, David?

9            MR. PORTER:  Yep, that sounds good.  Thank you.

10           (Whereupon, a short break was taken.)

11  Q  (BY MR. FLORES)  Okay.  I'd like to go back to the BIT

12   meeting that you attended.  So we just discussed the E-mail

13   from Loretta Robichaud to you, in which she expressed

14   concerns.  And is it fair to say your conclusion was that she

15   was concerned for everybody, all students --

16  A  Yeah.

17  Q  -- not just --

18  A  I think, based on what she wrote, Wayne State University was

19   clearly in there, yep.

20  Q  And it's also -- is it fair to say that she was alarmed by

21   the allegations?

22           MR. PORTER:  Objection, it calls for speculation.

23           THE WITNESS:  She was expressing her, I think,

24   yeah, her concern, really, you know, in what she learned

25   about her student, just in the initial complaint.

1   Q    (BY MR. FLORES)  And you responded to her on November 5th,

2        letting her know that you had gotten the E-mail from her, and

3        informing her that you would be talking with Dr. Baker, and

4        also attending the BIT meeting on Monday?

5   A    I didn't say BIT meeting, but yeah, that was what I think I

6        was referring to, yep.

7   Q    So did there come a time that -- or rather, what time did

8        that meeting take place, if you remember, on Monday, November

9        5th?

10  A    I think it was an afternoon, an afternoon meeting, I want to

11       say, but I'm not -- I can't remember for sure.

12  Q    And do you remember who was present?

13  A    It was -- I don't know all the members of that group, but I

14       think it's their standing members, of which I only knew

15       several.  Like I said, Dean Strauss was there, legal counsel

16       was there, the Code of Conduct Officer, the Title 9 Officer,

17       and a police representative.  That's -- those are the people

18       that I recognized.  And I think also the Director of the

19       CAPS, which is the psychological services on Main Campus.

20       Yeah, those are the ones I recognized.

21  Q    Can you tell me what that acronym, CAPS, stands for?

22  A    It's Counseling and Psychological Services.

23  Q    Okay.  Did someone lead the discussion when it turned to a

24       discussion of Mr. Eid?

25  A    I think they have kind of -- I don't know.  It was on the

1     agenda.  It seemed like I was called in just for that part.

2     And I want to say it was Dean Strauss who -- he's probably

3     the head of that.  I don't even know if he's the head of that

4     committee or not, but that's what I remember, that he was

5     carrying the conversation on it.

6   Q   Did you make any comments during the meeting?

7           MR. PORTER:  Objection.  I'll instruct the witness

8     not to answer if it requires you to divulge attorney/client

9     privileged communications.

10          THE WITNESS:  Okay.  Well, I was obviously invited

11    to participate, so I couldn't remain mute the whole time.

12    So, yes, I provided some, you know, answers to -- or just, it

13    was more of, like, a conversation, discussion.

14  Q   (BY MR. FLORES)  Did you have an opportunity to provide to

15    the members of the team the facts, as you understood them in

16    your telephone conversation with Pamela Burton?

17          MR. PORTER:  I'm going to instruct the witness not

18    to answer if it requires to disclose attorney/client

19    privileged communications, which includes communications from

20    team members to legal counsel, and legal counsel to team

21    members as part of the discussion of this matter.

22          THE WITNESS:  Okay.  Then I'll refrain.

23  Q   (BY MR. FLORES)  What did you say to the team regarding

24    Anthony Eid?

25          MR. PORTER:  Same objection, to the same question.

1              MR. FLORES:  I take exception.  I don't believe the

2       privilege applies in this context, and it doesn't cover her

3       recitation of factual information.

4   Q   (BY MR. FLORES)  Did there come a time in the meeting that

5       the legal counsel gave you legal advice?

6              MR. PORTER:  Objection.

7              THE WITNESS:  Well, the legal counsel was sitting

8       there the entire time, and was part of the active discussion

9       they were having, so in the flow of that, it would be hard to

10      tease out, yeah.

11             MR. PORTER:  I just caution you not to refer to or

12      describe the communications between counsel and the team.

13             MR. FLORES:  And I'm taking exception to that,

14      David.  We'll have to deal with that afterwards.

15  Q   (BY MR. FLORES)  Okay.  So did you -- did you talk to anyone

16      after the BIT meeting about Mr. Eid?

17  A   Oh, just what I said, that I would, you know, let Dr. Baker

18      know how it goes and what, you know, next steps are, as my

19      boss.

20  Q   What did you tell Dr. Baker?

21  A   That the meeting happened, who was present and that,

22      essentially, that Dean Strauss was taking the complaint that

23      came to him, as well through his own process, before it came

24      back to the Medical School.

25  Q   And do you know if, as a result, or after the BIT meeting, an

| | | |
|---|---|---|
| 1 | | investigation was launched as to the complaint? |
| 2 | A | My understanding is that Dean Strauss did initiate a process |
| 3 | | of fact-finding, and a report that emanated from that. |
| 4 | Q | And do you remember who was assigned to do the fact-finding? |
| 5 | A | That was Nikolina Camaj. |
| 6 | Q | And what position did she hold, to your knowledge? |
| 7 | A | She is the Code of Conduct Officer. |
| 8 | Q | And to your knowledge, did she conduct a fact-finding |
| 9 | | investigation? |
| 10 | A | Well, I received her report so, yes. |
| 11 | Q | And do you remember when you would have received that report? |
| 12 | A | I think it was that November, that E-mail when she sent it to |
| 13 | | me, I think it was the 5th, maybe, of November.  You had it |
| 14 | | up earlier. |
| 15 | Q | Okay.  Hold on a second. |
| 16 | A | Or maybe it was later than that.  I don't remember the exact |
| 17 | | date. |
| 18 | | MR. FLORES:  Please publish Exhibit C, please. |
| 19 | | EXHIBIT TECH:  One moment. |
| 20 | Q | (BY MR. FLORES)  Please take a look at that, Dr. Chadwell, |
| 21 | | and tell me if that refreshes your recollection as to when |
| 22 | | you received the Investigation Report from Nikolina Camaj? |
| 23 | A | Sure.  Yep, that looks correct. |
| 24 | Q | The date? |
| 25 | A | December 4, 2018. |

1   Q   Now, between the time that you went to the Behavioral

2       Intervention Team meeting and receiving this report on

3       December 4th, did you have any other meetings or

4       conversations with any other Wayne State University officials

5       about my client, Anthony Eid?

6   A   I think we were just -- I don't recall that.  We were just in

7       a holding pattern on waiting on Dean Strauss to complete his

8       process, so there really wasn't anything more to do at that

9       point.  So, yeah, I don't remember anything active happening

10      during that period.

11  Q   And did you keep Mrs. Burton apprised of the status of the

12      University's progress?

13  A   I didn't have, like, a check-in with her, if that's what you

14      mean, like a regular check-in with her to keep her informed,

15      no.

16  Q   Did you ever call her back and let her know whether things

17      were moving, or if the University was moving on?

18  A   No, it was really, like I said, I mean, I passed it to the

19      responsible parties in terms of, it was really out of my

20      purview to do that.  It was Dr. Jackson who, you know, who

21      took it from, after I shared the materials with him, it was

22      really up to him.

23  Q   So you had no further conversation after October 31st with

24      Pamela Burton, is that correct?

25  A   That's correct.

1   Q    Now, let's just, for a moment, assume that the allegations

2        were true.  If they were true, is it fair to say that you

3        knew that a possible outcome of any process could result in

4        Mr. Eid's expulsion from the Medical School?

5                  MR. PORTER:  Objection, form.  What process are you

6        referring to?

7                  MR. FLORES:  Official process that the University

8        has, or the Medical School has.

9                  THE WITNESS:  So honestly, my mind didn't go that

10       far, to reach that conclusion.  I really just wanted things

11       to take their course because, I mean, Anthony, he was the

12       Class President, and I, you know, I had an actual, like, a

13       good relationship with him, I would say.

14           I had invited him up to the stage with me when we

15       welcomed our new incoming class, and had him say words of

16       welcome at the orientation.  So I, you know, I did not want

17       to believe that that was the case, that he would, that that's

18       where this would end.  I just -- that's not ever what I want

19       to happen to my students, especially, you know, knowing the

20       investment in their education as upcoming physicians.

21           So, no, that's not where my mind immediately went.  My

22       whole focus was on, you know, I felt like I did my diligence

23       for the University, because that's what I was -- that's my

24       responsibility to do in terms of funneling it into the right

25       processes, which was the professionalism process through the

1       Chair of that committee, and to my immediate boss for

2       consultation and advice about anything else that may need to

3       be done.

4   Q   (BY MR. FLORES)  All right.  Let's talk a little bit about

5       the Professionalism Committee and the process of, the

6       judicial process of the Medical School.

7           When a complaint is made against a medical student that

8       involves a possible violation of the professionalism rule,

9       how is that adjudicated; how is that dealt with?

10  A   Okay.  So typically, when a complaint surfaces we have a, you

11      know, designated Chair of the Professionalism Committee, who

12      then, the onus is on them to look into that and to, you know,

13      do some initial fact-finding, and to see if this warrants,

14      you know, further action in terms of, is there a charging

15      party that would elevate this to the level of a hearing to

16      the entire committee.  Is this something remediable that

17      doesn't need that kind of action.  You know, is this -- you

18      know, so it's really in their purview to look at this, and to

19      make a determination as to what's next.  But to actually go

20      to the level of a professionalism hearing, you know, it

21      requires a charge, if you will, a charging party.

22  Q   And were you the charging party in this case?

23  A   No, I was not.

24  Q   So when you got the report from Nikolina Camaj, what did you

25      do with it?

1   A    I simply forwarded it to round out the, to supplement the

2        materials I had already provided to Dr. Jackson as the Chair

3        of the Professionalism Committee, and to Dr. Baker so that it

4        could be part of the whole package of looking at the case.

5   Q    Did you make any recommendations when you sent the package

6        along to Dr. Baker and Dr. Jackson?

7   A    None.  It was out of my purview at that point.  It was just,

8        I was responsible for making sure that they had the

9        information.

10  Q    So once you transmitted the package, your work was done on

11       this case?

12  A    Right.  Right.

13  Q    After they received the report, did Dr. Baker or Dr. Jackson

14       talk with you about the report?

15  A    I don't recall that, like, it was -- I mean, I had read the

16       report and it was -- yeah, I don't recall having a meeting or

17       conversation about what to do, nothing like that, just an

18       acknowledgment that, you know, that they got it, and it's now

19       part of the rest of the materials.

20  Q    If the Professionalism Committee decides that the charges are

21       well taken, what does the Professionalism Committee do with

22       that decision?

23  A    What do you mean by, the charges are well taken?

24  Q    Suppose they have a hearing, and they find that the charges

25       are, according to the Professionalism Committee, demonstrated

 1     by a preponderance of the evidence, what do they do next?

 2 A   It can go various ways.  I mean, the Professionalism

 3     Committee can make various recommendations.  So they can

 4     either pump things to the Vice Dean for a decision, they can

 5     pump things to, back to the University at large.  They can

 6     decide that there's a remediation plan that can be followed

 7     that's sufficient with follow-up.  I mean, there's just any

 8     number of recommendations that they can come up with and

 9     make, given the particular situation.

10 Q   Is one of the recommendations they can make to the Promotions

11     Committee to dismiss the student?

12 A   That's often the recommendation, yes.  The recommendation, by

13     the way, is not to dismiss the student; the recommendation is

14     to the Promotions Committee for review.  Yeah, they can't

15     make the recommendation to dismiss; they can only make the

16     recommendation to the Promotions Committee, who has the sole

17     power to dismiss.

18 Q   Correct, but they can express a -- they can take a position

19     with the recommendation of dismissal, even though they can't

20     dismiss the student, themselves, is that correct?

21 A   That's not -- they could, but typically they would only say

22     that they would make the recommendation just for Promotions

23     Committee review and hearing at that level, and then it's up

24     to the Promotions Committee to decide.  So they typically

25     don't qualify that recommendation with a call for dismissal.

```
 1   Q    So you would be surprised to know that in this case, the
 2        Professionalism Committee recommended dismissal?
 3                   MR. PORTER:  Objection, form and foundation.
 4                   THE WITNESS:  Well, I've been in enough
 5        Professionalism hearings to know that that's definitely a
 6        possibility if it's egregious enough.  For example, if
 7        someone cheated, yes, something to the level of where the
 8        Professionalism Committee was sufficiently concerned, and had
 9        enough reason to elevate it to that level, for sure, they
10        can -- like I said, they can make any recommendation that
11        they want, so it's up to them to do that.
12            So, yeah, but I wasn't privy to the Professionalism
13        proceedings, so I don't know what the actual recommendation
14        was that came out of that, or the minutes or anything like
15        that.
16   Q    (BY MR. FLORES)  Thank you.  Dr. Chadwell, I want to go
17        through a little bit of your personal background, and how you
18        became a doctor, why you became a doctor, and I understand
19        that it's quite a compelling personal story.
20   A    I don't know if I can promise you that, but --
21   Q    Well, it's not the average ordinary story.  I understand that
22        you're an immigrant, is that correct?
23   A    That's correct.
24   Q    What country were you born in?
25   A    Germany.
```

```
1   Q   And when you arrived in this country, how old were you?

2   A   I turned 10 the summer we moved here.

3   Q   Did you speak English at the time?

4   A   No.

5   Q   So you learned to speak English going to school, and facing

6       all the challenges that are involved in that; is that fair to

7       say?

8   A   That's fair.

9   Q   I think, as we mentioned earlier, culture has changed quite a

10      bit, and you would have been certainly unique, probably, in

11      your class, as someone who was from a different country, and

12      didn't speak English well.  And I'm just curious, was that

13      something that the kids rewarded you with, or was it a

14      penalty?

15  A   Well, actually, are you referring to Wayne State's School of

16      Medicine, or just school in general.

17  Q   Back in elementary school, and then middle school and high

18      school?

19  A   Well, I was -- you know, we had lots of immigrant kids:

20      Chaldeans, Germans, Italians in our neighborhood; there was

21      Iraqis.  So it was very much an immigrant community, and

22      that's why we came to that community.

23          So, no, I didn't -- I didn't stick out like a sore

24      thumb, if you will.  I mean, I was the German kid, or the

25      Swiss kid; actually, we had moved to Switzerland before we
```

1    came so -- yeah, no, I -- I mean, I guess we had a little bit

2    of a celebrity status, but we quickly learned -- in fact, we

3    learned English so quickly that -- and I was used to Swiss

4    schools, which were very tough.

5         So within one year -- they put us in the kindergarten

6    reading, and within one year they had to get the books from

7    the 8th grade, from junior high, because we read -- we tested

8    out of everything.  So we were very -- in math, everything

9    was pretty easy for us.  So it was just once we learned the

10   language and got hold of that, yeah, the rest is history.

11 Q   Did you encounter much in the way of either discrimination or

12   bias while you were growing up?

13 A   Not really.  I mean, I had a very happy childhood, a very

14   fascinating childhood; traveled to 20 different, almost 20

15   different countries before I was 18, went to college, so --

16   and I think that's why I'm still at Wayne State, and I love

17   the diversity and the -- I feel like I have a lot of

18   connection -- I understand I've been in the Middle East, I've

19   been in South America, and just all over Europe, so I think I

20   have a pretty -- and our parents lugged us around everywhere,

21   let's just say that.  And so we had a pretty good

22   adaptability, you know.

23        I wasn't raised with the feeling like being

24   discriminated against; it was more, actually, embracing

25   cultures.  We had missionaries all over the world who stayed

1    with us very often, so --

2  Q   And as you progressed in school, and you applied for medical

3     school, you got in, did you face any kind of discrimination,

4     or any kind of harassment as a result of being a woman in a

5     field that, even at that time, women were making great

6     strides, but not everyone was happy about having women

7     significantly increasing their presence in the profession?

8              MR. PORTER:  Objection, foundation.

9              THE WITNESS:  Again, I never really -- maybe I was

10     just an ignorant kid, a happy kid, but I never had that

11     sense.  Wayne State was the only school I applied to, and my

12     dad said, hey, there's a great school down the street, you

13     can be a doctor just like everybody else.

14         So I applied to Wayne, and I'm still there, so I

15     definitely have a fit, but I never felt -- I always felt it

16     was welcoming, and I never had that sense of male/female or,

17     like, some kind of lightning rod because I was a female or --

18     I've been the only female in the board room many, many times

19     over the years but, yeah, no, I don't look at it like that at

20     all, or didn't feel that way.

21  Q   (BY MR. FLORES)  In your role as Associate Dean, though, have

22     you talked with students who have experienced discrimination,

23     or experienced harassment, and had to deal with the issue

24     from that perspective?

25  A   For sure, for sure.  And I totally understand how that can

1    easily be something that many students and many cultures

2    face.  I mean, my parents just happened to raise us with a

3    very positive outlook, but definitely, because I was exposed

4    to so much, and had traveled so much, I definitely saw all of

5    that, it's just I didn't have a personal, sort of, sort of

6    stumbling block with that but, yes, it's something I see

7    routinely.

8              MR. FLORES:  It would help me, if we can go ahead

9    and take down the exhibit, just so I can see everyone's

10   features a little larger.

11 Q  (BY MR. FLORES)  So I want to just ask, as a woman in a high

12   level, and very visible role at Wayne State, do you feel any

13   obligation, or do you take it upon yourself to work, to make

14   sure that women are being advanced in the Medical School at

15   Wayne State?

16 A  There are -- there are committees to that, which I have not

17   been a part of.  I know there are, you know, definitely ways

18   to get involved with that particular objective, but I have

19   not been involved with that because, yeah, my focus is on the

20   students, and all students.  And about half of our students,

21   actually, now we tipped over to more than half are women and

22   so, yeah, it's changed a lot.  The culture has changed a lot

23   in the last, like you said, you know, years that I've been a

24   student.

25              And so, yeah, I don't have a particular agenda, if you

1       will, for advancing, but I'm very open door towards women,

2       obviously, and all students, but I know that everybody has

3       their own issues, you know.  Women medical students having

4       children during medical school, I mean, those are things they

5       can definitely come and talk to me about, but there's no

6       particular initiative or agenda I would have to advance the

7       women students over anyone else.

8    Q  I just want to go back and revisit the report that you

9       received from Ms. Camaj.  When you reviewed it, did you do

10      the review before you sent it along to Dr. Jackson and Dr.

11      Baker, or did you send it first, and then when you had time

12      later on, review the documents?

13   A  I usually don't forward things that I don't at least read, so

14      I probably skimmed through it.  I'm sure I skimmed through

15      it.  I think it was pretty early in the morning when I sent

16      it, if I remember the time stamp.  Yeah, so I'm sure I just,

17      I read it, and then forwarded it, because Dr. Baker would

18      have expected that.

19   Q  And did you have any responsibility to make sure that Ms.

20      Camaj had done a full investigation before accepting it, and

21      then turning around and sending it to Dr. Baker and Dr.

22      Jackson?

23              MR. PORTER:  Object to form.

24              THE WITNESS:  I have no control over that process,

25      or authority over Nikolina, whatsoever.  So it came to me, I

| | |
|---|---|
| 1 | read it, I passed it on.  That's basically it. |
| 2 | MR. FLORES:  Okay.  Give me a second.  I think I |
| 3 | can jump over quite a bit, so if you'd just bear with me for |
| 4 | a moment. |
| 5 | THE WITNESS:  Sure. |
| 6 | Q  (BY MR. FLORES)  Okay.  During the time that you have been in |
| 7 | your position, your current position, has the Medical School |
| 8 | come under investigation by the Office for Civil Rights as |
| 9 | part of -- |
| 10 | A  During -- there has been -- I know of a complaint, yes. |
| 11 | Q  Okay.  And did that involve a medical student by the name of |
| 12 | Ms. Rubenstein? |
| 13 | A  That's correct. |
| 14 | Q  And do you know what the ultimate finding of the Office for |
| 15 | Civil Rights was after they concluded their investigation? |
| 16 | A  I don't know. |
| 17 | Q  Would it be a surprise to you to find out that the Office for |
| 18 | Civil Rights found that Wayne State had retaliated against |
| 19 | her by expelling her? |
| 20 | MR. PORTER:  Objection, form. |
| 21 | THE WITNESS:  Yeah, I don't -- I never got a report |
| 22 | about that. |
| 23 | Q  (BY MR. FLORES)  Did you -- were you aware that the |
| 24 | University agreed, had an agreement with the Office for Civil |
| 25 | Rights at the conclusion of their investigation? |

1  A    Was I -- can you repeat that.

2  Q    Are you aware that the Medical School signed an agreement

3       with the Office for Civil Rights at the conclusion of the

4       Civil Rights investigation?

5  A    No, I'm not aware of that.

6  Q    And within the last year, or rather, I guess, within the last

7       12 months, have you received any training, vis-a-vis,

8       retaliation and the Title 9 provided either by the General

9       Counsel's office, or by another provider?

10              MR. PORTER:  Objection, asked and answered.

11              THE WITNESS:  I have not received anything in terms

12      of training for retaliation, and I already referenced the

13      Title 9 update presentation that was provided internally last

14      summer sometime.

15  Q   (BY MR. FLORES)  Thank you.  You testified just a few moments

16      ago that you had no control over Nikolina Camaj, is that

17      correct?

18  A    Correct.

19  Q    Do you know what Dean, or what University official she

20      answers to?

21  A    I believe it's Dean Strauss.

22              MR. FLORES:  Okay.  Could you publish Exhibit G for

23      me.

24              EXHIBIT TECH:  One moment.

25              MR. FLORES:  David, I don't have a lot of

| | |
|---|---|
| 1 | additional questions, so I think I can probably get through |
| 2 | in about the next 20 to 30 minutes, so rather than taking a |
| 3 | break for lunch, I'd like to do that, if that's okay with |
| 4 | you. |
| 5 |       MR. PORTER:  Yeah, that works for us.  Thank you. |
| 6 |       MR. FLORES:  All right.  Can you go down to the |
| 7 | bottom of that document, please.  Okay.  Stop right there. |
| 8 | Go up a little more.  Okay. |
| 9 | Q  (BY MR. FLORES)  Dr. Chadwell, will you do me a favor, and |
| 10 | just read that to yourself, and let me know when you're |
| 11 | done. |
| 12 | A  Okay.  Okay. |
| 13 | Q  Can you tell me what that E-mail refers to? |
| 14 | A  Dr. Jackson's E-mail here?  It looks like he's trying to |
| 15 | coordinate an actual hearing for the Professionalism |
| 16 | Committee. |
| 17 | Q  Do you know to whom that E-mail is addressed? |
| 18 | A  Well, it looks like to Ms. Burton, and referencing charging, |
| 19 | being the charging party. |
| 20 | Q  So approximately -- well, let me ask you this question. |
| 21 | From that E-mail, can you determine the name of the |
| 22 | person who will be the charging party at that hearing? |
| 23 | A  Well, it looks like an inquiry from Dr. Jackson, because he |
| 24 | was ready to move it forward, and the E-mail obviously went |
| 25 | to Ms. Burton, but I don't know if she ultimately, I mean, it |

1   doesn't say that definitively she was going to have that

2   role.

3  Q   So if she -- if the original complainant did not serve as the

4   charging party at a Professionalism Hearing, who could

5   substitute, if you know, for that party?

6  A   It could be various individuals, but in this case, it was

7   most appropriate for Ms. Burton to serve in that role.

8  Q   But that's also a role that Dean Jackson could play if she

9   was unavailable?

10 A   No, typically, as the Chair, he would not be the charging

11   party.

12 Q   So your testimony is, based on this, it was only Ms. Burton,

13   Amanda Burton?

14           MR. PORTER:  Objection, misstates her prior

15   testimony.

16           THE WITNESS:  I'm not sure what you mean, it was

17   only Ms. Burton.  This looks like this was an initial inquiry

18   to her, to see if this was something she could -- yeah, so

19   it's -- yeah, that's what it looks like to me.  It was just

20   his initial inquiry of her, to serve in that role, which was

21   most appropriate.

22           MR. FLORES:  If you would scroll to the top of the

23   page, what's been marked as page one in the other E-mail.

24 Q   (BY MR. FLORES)  Can you just read that to yourself, and let

25   me know when you're done.

1   A   All set.

2   Q   And what does that E-mail refer to?

3   A   That's the original E-mail, yeah, that you showed me in the

4       beginning, from Ms. Burton.

5   Q   Well, this E-mail is from you to Dr. Jackson on December

6       10th, isn't that correct?

7   A   Right.

8   Q   And in that E-mail, isn't it correct that you're asking Dr.

9       Jackson to remove some information from the Professionalism

10      packet that will be distributed to the members of the

11      committee?

12  A   I'm not asking him to do that; I said it would be a

13      preference, and that's because that initial E-mail, in that

14      initial E-mail she referenced a PPO.  And when I spoke with

15      Dr. Jackson, sorry, Dean Strauss about this way back when he,

16      you know, he -- we were kind of going back and forth about

17      what should be done next.  And so he had, you know, he said,

18      it may not be at that level or, you know, as far as a PPO, we

19      don't know yet, and that.

20          So my point in sending this to Dr. Jackson to not

21      include that was because I thought it could taint Anthony's

22      perception, I guess, the perception of him to the

23      Professional Committee, because there was no PPO, that I was

24      aware of at that moment; it was just that, like, that was

25      just an option that Ms. Burton had at her disposal.

1              So that was my reason for asking, or expressing my

2       preference, that it not be included in the Professionalism

3       packet, so that out of the gate it wouldn't, like, taint

4       Anthony, and let the rest of the fact-finding speak for

5       itself.

6    Q   You didn't include any of this explanation that you're

7       providing today in this very short E-mail?

8    A   No.

9    Q   Did you speak with my client after the Professionalism

10      Committee determined to recommend dismissal to the Promotions

11      Committee?

12   A   We didn't have, like, one-on-one meetings.  I would see him

13      come in to meet with Mrs. Robichaud as she was, like, you

14      know, serving the role of the counselor, you know, her

15      counseling role.

16             So, yeah, I would see him, like, sort of peripherally in

17      the hallways, but we didn't -- I mean, it may have been just

18      -- you know, I try to be as encouraging to students as I

19      can.  So if I saw him -- I think I saw him in the hallway.

20      I'm trying to remember, in passing and, like, I knew he was

21      going through -- it was obviously challenging on his end, as

22      it was for us, and so just trying to get us to kind of stay

23      the course, and let everything proceed the way it needed to.

24             MR. FLORES:  Okay.  I don't have any further

25      questions for the witness, so let me release her.

1              (Off the record discussion.)

2              MR. FLORES:  Dr. Chadwell, thank you very much for

3      your time and your attention, and the information you were

4      able to provide today.

5              (Whereupon, Deposition concluded at 12:20 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    STATE OF MICHIGAN    )
                          )SS
2    COUNTY OF CLINTON    )

3                    CERTIFICATE OF NOTARY PUBLIC

4            I certify that this transcript is a complete, true

5    and correct record of the testimony of the witness held in

6    this case.

7            I also certify that prior to taking this

8    deposition, the witness was duly sworn or affirmed to tell

9    the truth.

10           I further certify that I am not a relative or an

11   employee of or an attorney for a party; and that I am not

12   financially interested, directly or indirectly, in the

13   matter.

14

15   *Heidi A. Cook*

16                       Heidi A. Cook, RPR/CSR-4827
                         Certified Shorthand Reporter,
17                       Registered Professional Reporter, and
                         Notary Public, County of Clinton,
18                       State of Michigan.

19                       My Commission Expires:  06-02-2026

20

21

22

23

24

25

**Exhibits**

**Exhibit A** 3:13 25:1
**Exhibit B** 3:15 42:11
**Exhibit C** 3:17 53:18
**Exhibit D** 3:19 37:12
**Exhibit E** 3:21 36:13,23,24
**Exhibit G** 3:23 66:22

**1**

**1,200** 14:13
**10** 6:13 15:18 21:4 60:2
**10-minute** 49:7
**10:01** 4:3
**10th** 69:6
**11:30** 49:5
**11:40** 49:7
**12** 66:7
**12:20** 71:5
**15** 21:4
**15-minute** 21:4
**18** 61:15
**1990** 12:21
**1994** 12:21,25
**1997** 12:25

**2**

**20** 61:14 67:2
**2010** 13:9
**2017** 13:25
**2018** 16:11 20:9 24:7 36:25 53:25
**2020** 17:12,13
**2021** 4:1
**21** 17:11

**3**

**30** 67:2
**300** 43:22
**31** 20:9
**313 452-3646** 11:18
**313 577-1463** 12:1
**31st** 41:24 54:23
**360** 47:20

**4**

**4** 53:25
**4th** 54:3

**5**

**5** 36:25
**5th** 37:3 42:22 50:1,9 53:13

**7**

**7** 4:1

**8**

**8:22** 37:2
**8th** 61:7

**9**

**9** 15:20,21,25 16:2,6,14,15,16, 18 38:6 50:16 66:8,13

**A**

**A-E** 4:5
**a.m.** 4:3 37:2
**AAMC** 16:24 17:3
**ability** 4:23
**able** 26:18 71:4
**about** 7:25 8:8,10,21,25 9:16 18:9,21 21:1,4,17 22:5,6,7

23:5,13,17 24:15 26:10,25 27:10 28:5 29:10,16 30:3,12 31:11 32:4 33:12 34:22,23,24 35:22 36:10 39:4 40:14 41:4,5, 20 45:10,21,23 46:23 47:1 49:3,25 52:16 54:5 56:2,4 57:14,17 62:6 63:20 64:5 65:22 67:2 69:15,16

**academic** 13:7 14:6 19:14,18, 19 44:7
**academically** 14:25
**Academy** 17:3
**accepting** 64:20
**according** 57:25
**accurate** 17:23
**acknowledgment** 42:25 57:18
**acronym** 50:21
**across** 5:4 14:14
**act** 15:1 26:20 28:15
**action** 27:24 56:14,17
**active** 52:8 54:9
**actual** 20:8 55:12 59:13 67:15
**actually** 24:2 25:7 27:13 33:1 34:8 38:19 56:19 60:15,25 61:24 63:21
**ad** 38:11
**adaptability** 61:22
**add** 10:7,25
**additional** 29:4 67:1
**address** 19:14
**addressed** 35:5 67:17
**adjudicated** 56:9
**administers** 16:14
**advance** 64:6
**advanced** 29:6 63:14
**advancing** 64:1
**advice** 26:18 52:5 56:2
**advising** 17:23
**advocacy** 46:16

Case 2:20-cv-11718-GAD-DRG   ECF No. 54-10,   PageID.2305   Filed 02/25/22   Page 76 of 93
ANTHONY EID vs WAYNE STATE UNIVERSITY                                        Job 16301
CHADWELL, MARGIT 10/07/2021                                     Index: advocate..aware

advocate 46:12,19

advocates 45:8

Affairs 14:2 19:18 43:18 46:14

affiliated 13:5

after 5:22 7:1,12 12:12,22 13:1 25:15,22 31:12 32:23 34:14 38:15 41:1,2 52:16,25 54:21, 23 57:13 65:15 70:9

afternoon 8:23 9:1 21:2 28:11 31:3 50:10

afterwards 52:14

again 8:9 17:1 29:12 31:2 33:24 34:9 45:2 46:25 48:25 49:5 62:9

against 27:25 56:7 61:24 65:18

age 7:9

agenda 39:3,5 51:1 63:25 64:6

ago 9:10,15 49:6 66:16

agree 5:11

agreed 65:24

agreement 65:24 66:2

ahead 5:23 19:2 33:17 36:11 39:13 40:5 48:21 63:8

alarmed 49:20

alerted 43:7

allegations 23:17 49:21 55:1

almost 23:10 35:14 61:14

alone 29:11

along 57:6 64:10

already 22:16 23:8 26:11,24 27:6 40:9 41:3,4,5,12,13 42:2, 4 43:5 57:2 66:12

also 7:3 9:20 13:20 22:11,15 32:9 36:5 37:9 38:9 42:22 44:4,10 46:20 49:20 50:4,18 68:8

although 15:19 19:18

always 26:11 32:1 62:15

Amanda 68:13

America 61:19

American 17:3

angst 24:17 26:10

anguish 18:14

another 11:1 26:9 66:9

answer 4:22 5:18,23 6:3 11:4 12:11,12 18:25 38:21,24 39:1, 13 40:4,5 48:13,16,17,22 51:8, 18

answered 48:11,15,21 66:10

answers 7:12 51:12 66:20

Anthony 19:25 20:2 22:15 23:22 24:12 27:23 37:7 45:16 46:23 47:2,9,19 51:24 54:5 55:11 70:4

Anthony's 69:21

anxious 34:22

any 5:2 7:4 9:8,12,24 12:14,15 14:6,15 16:17 17:8 18:2,23 20:4 27:24 28:13,22 30:21,25 31:8 33:18 43:25 44:6 45:15, 19 46:22 51:6 54:3,4 55:3 57:5 58:7 59:10 62:3,4 63:12 64:19 66:7 70:6,24

anybody 45:9

anyone 9:24 27:13 30:16 39:22 52:15 64:7

anything 9:14 12:7 24:13 27:21 31:12,24 35:20 36:1 54:8,9 56:2 59:14 66:11

Anytime 40:4

apologies 41:21

applied 62:2,11,14

applies 52:2

appointments 14:6

appreciate 19:1

apprised 54:11

appropriate 28:3 68:7,21

approximately 21:3 67:20

are 6:1 7:5,14,23 8:14 14:12, 13,21,23 15:5,7,11,15 18:1,10, 15,22 19:4,21 27:21 28:17,20 33:21 35:11 37:25 39:14 41:10

43:13 44:4 48:5 50:17,20 52:18 55:5 57:20,23,25 60:6, 15 63:14,16,17,21 64:4 66:2

around 14:24 38:23 61:20 64:21

arrested 27:24

arrived 60:1

ask 4:22 6:25 7:12 8:10 18:20 25:21 42:17 63:11 67:20

asked 9:16,20 29:3 48:11,15, 21 66:10

asking 6:21 8:2,12,13 69:8,12 70:1

aspects 19:20

assigned 44:12 53:4

Assistant 13:23 18:2,13

assistants 18:11,14

Associate 14:2,7 15:17 16:5, 18 18:13 39:15 62:21

association 17:2

assume 6:17 55:1

assuming 7:22

attached 30:21 37:5 41:24

attachment 42:3

attachments 35:15

attend 16:21 39:22

attendance 40:20

attended 18:8 39:20 49:12

attending 38:14 50:4

attention 14:16 20:7,9 29:20 35:24 71:3

attorney 5:19 8:16

attorney/client 6:1 51:8,18

attorneys 9:16

authority 26:17,19,22 64:25

average 59:21

awaiting 35:20

aware 7:14 15:11 27:15 32:2 42:4 65:23 66:2,5 69:24

**awareness** 15:8 32:22 34:1

---

**B**

**B-I-T** 38:10

**back** 6:25 8:3,15 23:4 34:5 42:1 48:23 49:7,11 52:24 54:16 58:5 60:17 64:8 69:15, 16

**background** 12:17 59:17

**bad** 18:22

**Bailey** 7:7 25:1

**Baker** 33:24 34:11,15 37:4 43:5,10 50:3 52:17,20 57:3,6, 13 64:11,17,21

**bandwidth** 10:14

**Banks** 16:7,9

**based** 29:18 30:7,11 49:18 68:12

**basic** 15:14

**basically** 14:14 20:24 21:9 22:24 28:10 32:6 65:1

**basis** 32:5 38:11,12

**bear** 65:3

**bears** 45:11

**became** 15:6 59:18

**because** 5:6 8:5 11:3,4,22 17:5 18:18 19:7,9 22:14 23:21 26:4,9 28:7,8 31:20 32:11 33:5 35:8 37:22 40:13 41:3,4 45:17 49:1 55:11,23 61:7 62:17 63:3, 19 64:17 67:23 69:13,21,23

**become** 14:16 29:25 46:17

**becoming** 30:3,13

**been** 4:8,24 5:15 10:12 16:7,9, 10,18 17:11 22:9,11 23:20,21, 23 24:23 27:6,23,24 35:22 36:23 40:9 41:3 42:2 45:17 59:4 60:10 61:18,19 62:18 63:17,19,23 65:6,10 68:23 70:17

**before** 24:16 26:3 33:16,17 34:3 35:20 39:10 43:7 52:23 60:25 61:15 64:10,20

**beginning** 34:25 69:4

**behavior** 23:1,18

**behavioral** 19:14,20 38:1,14 39:7,11,16,19 42:23 43:2 54:1

**being** 26:24 32:25 47:6 61:23 62:4 63:14 67:19

**believe** 16:8 17:9 23:7 24:2,3 41:12,25 48:8 52:1 55:17 66:21

**believes** 5:20

**below** 42:16

**best** 4:23 21:6

**better** 5:9 9:4 11:8

**between** 22:14 38:22 52:12 54:1

**bias** 15:11 61:12

**bigger** 9:21

**Birmingham** 4:2

**bit** 7:2 8:24 11:7 18:20 20:8 38:9,10,23 40:10 42:24 49:11 50:4,5 52:16,25 56:4 59:17 60:10 61:1 65:3

**bizarre** 35:14

**block** 63:6

**blue** 28:11

**board** 62:18

**Bob** 4:16 10:18 30:8

**body** 31:21

**books** 61:6

**born** 59:24

**boss** 32:2,3 52:19 56:1

**both** 10:6 19:14 24:5 40:17

**bothersome** 24:24

**bottom** 29:20 36:16 67:7

**Box** 25:6

**boy** 37:13

**Brandy** 16:7,9

**break** 6:11,12 10:23,24 49:6,7, 10 67:3

**breaks** 7:20

**brief** 5:3 40:24

**briefly** 41:9

**brought** 25:25

**bubble** 36:8

**bubbles** 15:23

**burden** 29:3

**Burton** 20:21,25 21:14 23:25 27:23 30:12,24 31:13,16 32:23,25 33:7,16,18 38:16 41:3,19,23 51:16 54:11,24 67:18,25 68:7,12,13,17 69:4, 25

**Burtons** 23:13

---

**C**

**C-H-A-D-W-E-L-L** 4:15

**calendar** 10:2,3 12:2

**call** 21:2,3,10,19 24:7,14 28:24 31:4 32:23 41:2 54:16 58:25

**called** 21:1,8,21 37:25 51:1

**calling** 22:6

**calls** 6:14 12:6,15 47:12 49:22

**Camaj** 53:5,22 56:24 64:9,20 66:16

**Camaj's** 37:6

**came** 13:2,11 24:18 28:11 31:4 32:6 35:23 39:10 46:18 52:23 59:14 60:22 61:1 64:25

**campus** 16:1 27:20,22 38:4 47:24 50:19

**can** 4:12,20 5:5,6,10 6:10,25 7:8 8:20,24 9:3 10:18 11:3,5 12:12 13:14 14:21 17:1 18:25 19:3,7 25:2,9 36:23 37:1,23 38:3 39:1,13 40:4 42:17,19 43:12 46:10,16 47:15 48:10,13 50:21 58:2,3,4,5,6,8,10,15,18 59:10,20 62:13,25 63:8,9 64:5 65:3 66:1 67:1,6,13,21 68:24 70:19

**can't** 6:15 16:7 26:2 50:11 58:14,19

**capacity** 34:2

**CAPS** 50:19,21

**care** 7:19 30:1

**Career** 14:3

**careers** 17:25

**carrying** 51:5

**case** 4:20 5:3 7:17,25 8:15
12:5,7 20:8 22:6,12 24:19,20
41:6 47:21 48:4 55:17 56:22
57:4,11 59:1 68:6

**cases** 39:8,10 40:15

**catch** 9:21 17:5 30:10

**cause** 35:1

**causes** 7:11

**caution** 45:15,19 46:2 52:11

**cc'd** 41:13

**celebrate** 17:25

**celebrity** 61:2

**cell** 11:12,16 12:3,8

**central** 18:4

**certain** 8:14 16:14,15

**certainly** 60:10

**Chadwell** 4:7,12,15,16 8:16
11:12 12:17 19:7,8 25:2,13
28:18 36:21 42:15 47:7 53:20
59:16 67:9 71:2

**Chair** 32:10 33:25 56:1,11
57:2 68:10

**Chaldeans** 60:20

**challenges** 19:20 44:1 60:6

**challenging** 70:21

**chance** 7:1 44:20

**change** 15:4

**changed** 15:13 60:9 63:22

**changeover** 16:8

**changes** 16:16

**character** 30:3

**charge** 32:18 56:21

**charges** 57:20,23,24

**charging** 56:14,21,22 67:18,
19,22 68:4,10

**chat** 25:5,8

**cheated** 59:7

**check-in** 54:13,14

**childhood** 61:13,14

**children** 64:4

**Children's** 21:13,15 22:1
33:16

**circulated** 33:17

**circulating** 33:20

**circulation** 33:21

**circumstances** 28:3

**Civil** 16:13 65:8,15,18,24 66:3,
4

**claimed** 30:16

**class** 20:6 34:1 43:22,23 44:1,
11,13 45:25 55:12,15 60:11

**classes** 14:9

**clear** 21:23 29:7

**clearly** 24:25 26:17 49:19

**clerkship** 13:11,12,15 21:13

**clerkships** 13:16

**click** 25:8

**client** 19:25 20:2 27:25 46:8
54:5 70:9

**client's** 44:13

**clinic** 13:20

**clinical** 5:3 13:18

**close** 6:17 18:5

**Code** 30:19 35:12 38:7 50:16
53:7

**collaboration** 42:9

**colleague** 21:11

**college** 61:15

**Colleges** 17:3

**Colorado** 24:3

**come** 7:24 8:15 14:15 20:22
23:11 33:21 50:7 52:4 58:8

64:5 65:8 70:13

**comes** 15:22 16:1

**coming** 5:4 33:10 45:22 47:1

**comments** 51:6

**committee** 32:10 33:25 36:5,
7 38:4,11 51:4 56:1,5,11,16
57:3,20,21,25 58:3,11,14,16,
23,24 59:2,8 67:16 69:11,23
70:10,11

**committees** 63:16

**common** 26:19

**communication** 22:14 41:8

**communications** 9:11,19
22:10 38:22,24 41:11 51:9,19
52:12

**community** 60:21,22

**compelling** 59:19

**complainant** 68:3

**complaint** 23:15 25:25 26:3,
22 27:13 28:8,10 31:12 33:7,8
34:14,22,24 35:16,23 38:15,
18,19 40:2 45:5 46:18 47:5
49:25 52:22 53:1 56:7,10
65:10

**complaints** 32:13 38:8

**complete** 13:17 54:7

**completely** 47:17

**components** 38:5

**concern** 15:22 22:25 28:22
30:5,6,12,17 31:24 45:3,4
46:7,23 47:18,20,22 49:24

**concerned** 30:3 34:22 44:21
45:10 49:15 59:8

**concerning** 30:18,23

**concerns** 26:9 28:13 46:20,
21 47:5,8,9 49:14

**concluded** 12:22 65:15 71:5

**conclusion** 49:14 55:10
65:25 66:3

**conduct** 22:23 30:20 38:7
50:16 53:7,8

**conference** 16:21

**conferences** 16:22,24

**confidential** 38:22

**confidentiality** 18:2

**confirm** 32:24 34:9

**confirming** 33:18

**connect** 42:7

**connection** 22:8 61:18

**consider** 26:4

**considering** 26:7

**consistent** 18:5

**consultation** 34:7 56:2

**contact** 27:6

**context** 29:12 34:4 45:24 52:2

**continuous** 47:2

**control** 64:24 66:16

**conversation** 4:18 8:10
20:13 21:4,7 23:5 24:23 25:15
26:5 28:11,13 29:9,19 30:12
31:1,7,13,19 51:5,13,16 54:23
57:17

**conversations** 54:4

**Cook** 9:22

**coordinate** 67:15

**coordinating** 13:18

**coordination** 42:9

**Coordinator** 15:20 16:2,6,17

**cop** 18:22

**copied** 41:7,10,15,18,22 42:2

**copy** 7:5 37:3

**core** 13:15,16 14:13

**Cornelia** 4:15

**correct** 11:15 14:5 27:3 33:19
34:12 35:24,25 42:23 43:3
53:23 54:24,25 58:18,20
59:22,23 65:13 66:17,18 69:6,
8

**could** 11:16 14:11 21:6 25:21
26:13,25 29:13,15 30:21 32:16
34:8 36:10,12 37:12 43:21
44:6,7,8 45:6,13 47:20 48:12
55:3 57:4 58:21 66:22 68:4,6,

8,18 69:21

**couldn't** 46:11 51:11

**counsel** 38:7,22 50:15 51:20
52:5,7,12

**Counsel's** 66:9

**counseling** 43:24 50:22
70:15

**counselor** 32:21 34:1 43:17,
19,21,23 70:14

**counselors** 15:24 44:9

**counterproductive** 8:4

**countries** 61:15

**country** 59:24 60:1,11

**couple** 23:4,10,18 29:21

**course** 6:20 8:15 28:19 29:9
48:6 55:11 70:23

**court** 4:14,21 5:10 17:4 22:12
24:19

**Court's** 6:8

**cover** 27:16 52:2

**covers** 27:20

**create** 8:13

**credibility** 32:8

**cross** 40:15

**crossover** 42:5

**cultural** 15:4

**culture** 60:9 63:22

**cultures** 61:25 63:1

**curious** 4:23 60:12

**current** 14:12 24:1 35:22 65:7

**currently** 14:4

**curriculum** 15:10

---

**D**

**dad** 62:12

**date** 6:5 20:9,23 36:23 43:4
53:17,24

**dates** 24:9

**daughter** 22:7,15,16 23:21
24:1,9,25 29:11

**David** 4:16 6:17 7:5 37:14,15
49:8 52:14 66:25

**day** 6:15 21:21,24 27:12 30:25

**deal** 6:5 7:18 18:14 39:7 52:14
62:23

**dealing** 16:9 40:2

**dealt** 36:1,3 56:9

**Dean** 14:2 15:17 16:5,18 18:2,
10,13,21 19:7,8 32:2 33:24
39:15 40:8,14 41:3,5,20 50:15
51:2 52:22 53:2 54:7 58:4
62:21 66:19,21 68:8 69:15

**Deans** 18:15

**Dearborn** 12:25

**December** 36:25 37:3 53:25
54:3 69:5

**decide** 45:16 58:6,24

**decided** 24:2

**decides** 57:20

**decision** 57:22 58:4

**dedicated** 43:23

**deeper** 32:16

**definitely** 19:11 22:25 31:22
32:13 35:1,18 59:5 62:15 63:3,
4,17 64:5

**definitively** 68:1

**degree** 12:18,23

**demeanor** 21:8

**demonstrated** 57:25

**department** 13:12 14:7,8
16:13 23:6 27:14,18

**departments** 27:16

**depending** 26:13

**deposition** 4:5,18,25 5:3,17
6:7,20 7:24 8:9,17 9:9,25 71:5

**describe** 13:14 21:7 52:12

**described** 26:16

**describes** 17:20

**designated** 10:11 43:23

Case 2:20-cv-11718-GAD-DRG ECF No. 54-10, PageID.2309 Filed 02/25/22 Page 80 of 93
ANTHONY EID vs WAYNE STATE UNIVERSITY
CHADWELL, MARGIT 10/07/2021

Job 16301
Index: designed..embracing

56:11

**designed** 17:23

**desk** 11:19,23,24 12:7 21:2

**detail** 21:7

**determinants** 15:8

**determination** 32:1 56:19

**determine** 32:16 67:21

**determined** 70:10

**Detroit** 22:3 27:18

**developing** 14:23

**development** 14:3 15:15 18:4

**devices** 12:15

**dial** 11:21

**did** 5:12 7:10 8:10,11,16,19,22
9:8,10,12,17,19,23 10:19
12:17,23,24 13:7,22,24 14:1
15:5 16:20 20:4,6,9,12,16,17,
22 21:3 22:5,6 23:5 25:23
28:7,13,22,24 29:4,7,8,17,24
30:5,12,25 31:12 32:3,23
34:23 35:20 38:17,18 40:22,25
41:5 43:20 45:4,15 46:23
47:24 50:7,23 51:6,14,23 52:4,
15,20 53:2,6,8 54:3,11,16
55:16,22 56:24 57:5,13 60:3
61:11 62:3 64:9,11,19 65:11,
23 68:3 70:9

**didn't** 22:19 27:5 28:4 30:10
32:7 33:4 34:5 46:22 50:5
54:13 55:9 60:12,23 62:20
63:5 70:6,12,17

**different** 10:19 13:4 15:5,7
18:20 60:11 61:14,15

**difficult** 40:15 46:18

**diligence** 26:23 55:22

**direct** 4:10 11:21 20:7,8 25:10
29:20

**directed** 33:22

**directly** 15:23 41:14

**Director** 13:11,21 21:14 50:18

**disciplinarian** 19:9

**disclose** 38:21,24 51:18

**discount** 47:4

**discriminated** 61:24

**discrimination** 61:11 62:3,22

**discuss** 28:3,7,9 38:18 40:22

**discussed** 38:25 40:14 41:9
49:12

**discussing** 43:10

**discussion** 11:10 20:10
29:12 39:20 40:24 50:23,24
51:13,21 52:8 71:1

**dismiss** 58:11,13,15,17,20

**dismissal** 58:19,25 59:2
70:10

**display** 7:18

**disposal** 69:25

**distinctly** 24:22

**distraught** 26:17

**distributed** 69:10

**distributing** 33:14

**diversity** 61:17

**divulge** 51:8

**doctor** 15:6 21:23 30:1,4,13
59:18 62:13

**document** 6:24 7:14,17 8:2
9:15,18 25:3 36:12,17 67:7

**documents** 6:21 7:3,4,9 9:8,
18 11:2 64:12

**Doe's** 25:22

**door** 64:1

**down** 8:6 25:12 33:13 36:15,
16 37:16 42:14 43:12 62:12
63:9 67:6

**downloaded** 25:7

**Dr** 4:12,16 8:16 11:12 12:17
21:10,16,17,24,25 25:2,13
28:18 31:16 32:9,19,24 33:10,
16,19,24,25 34:11,15 36:20
37:4,9,19 40:19,23 41:18,22
42:15 43:5,10 47:7 50:3 52:17,
20 53:20 54:20 57:2,3,6,13
59:16 64:10,17,21 67:9,14,23
69:5,8,15,20 71:2

**drop** 25:4,5,6

**due** 26:23

**duly** 4:8

**during** 6:20 7:19 16:6 23:5
31:19 35:18 36:2 51:6 54:10
64:4 65:6,10

---

### E

**E-MAIL** 9:19 25:17,24 29:5,21
30:11 34:21 36:16,25 37:5,17
41:23 42:15,20,22,25 43:5,12
44:16,20,25 45:15,19 46:6,23
47:8,10,23 49:12 50:2 53:12
67:13,14,17,21,24 68:23 69:2,
3,5,8,13,14 70:7

**earlier** 27:12 30:11,24 53:14
60:9

**early** 37:3 45:16 64:15

**earn** 12:18

**easily** 63:1

**East** 61:18

**easy** 61:9

**education** 16:14 28:15 32:2
33:24 55:20

**educational** 12:17 29:1

**egregious** 36:8 59:6

**Eid** 4:17 19:25 20:2 22:9,15,21
29:2,25 30:13,15 32:21 37:7
39:20 46:11 47:19 50:24 51:24
52:16 54:5

**Eid's** 55:4

**either** 6:21 15:23 58:4 61:11
66:8

**elementary** 60:17

**elements** 26:3

**elevate** 56:15 59:9

**elevated** 31:14

**elevation** 40:7

**else** 5:5 9:24 19:15,16 22:19,
20 24:13 56:2 62:13 64:7

**emanated** 53:3

**embracing** 61:24

**emergency** 34:24

**emotional** 44:22

**encounter** 44:2 61:11

**encouraged** 18:1 19:21 21:10 31:15

**encouragement** 21:21

**encouraging** 70:18

**end** 6:15 8:1,6 31:3 36:17 47:3 55:18 70:21

**endured** 23:10

**English** 60:3,5,12 61:3

**enhance** 17:24

**enough** 32:13 59:4,6,9

**entailed** 13:14

**entails** 43:21

**entire** 24:24 45:25 46:11 52:8 56:16

**entirety** 25:17

**environment** 17:23

**err** 46:1

**escalation** 40:1,12

**especially** 55:19

**essence** 15:14

**essentially** 15:1 22:12 44:9 52:22

**Europe** 61:19

**even** 11:22 18:19 24:16 28:4, 23 29:5 51:3 58:19 62:5

**evening** 41:24

**event** 6:2

**events** 17:24

**ever** 4:24 5:2,15 7:25 8:10 12:5 20:13 39:20 54:16 55:18

**every** 48:18

**everybody** 18:17 49:15 62:13 64:2

**everyone** 5:5 62:6

**everyone's** 63:9

**everything** 7:25 9:21 14:22

**61:8** 70:23

**everywhere** 61:20

**evidence** 58:1

**exact** 16:12 24:9 42:3 48:1,4 53:16

**EXAMINATION** 4:10

**example** 16:24 59:6

**except** 9:10

**exception** 52:1,13

**exceptions** 5:17

**Excuse** 20:1,19

**exhibit** 7:7 25:1,4,9 36:13,14, 19,23 37:12,13,15 42:11,13 53:18,19 63:9 66:22,24

**Exhibits** 4:5

**expect** 8:4 23:2

**expectations** 32:14

**expected** 15:2 64:18

**expelling** 65:19

**experienced** 62:22,23

**explanation** 70:6

**explore** 29:14

**exposed** 63:3

**express** 45:4 58:18

**expressed** 49:13

**expressing** 45:2 49:23 70:1

**expulsion** 55:4

**external** 44:5

**extreme** 45:3

**extremely** 8:5 44:16 45:8

---

## F

**F.A.A.F.P.** 4:7

**face** 30:23 62:3 63:2

**facing** 60:5

**fact** 47:4 61:2

**fact-finding** 34:6 53:3,4,8 56:13 70:4

**facts** 8:13 51:15

**factual** 52:3

**faculty** 13:2 16:15 21:11 31:15 36:6

**fair** 19:21 28:2,7 29:24 39:25 42:21 44:15,24 46:6 49:14,20 55:2 60:6,8

**fairly** 47:7

**fake** 22:12

**fall** 17:12

**familiar** 28:17,20 37:25 43:13 48:5

**family** 12:24 13:11,12,15 14:8 24:24,25 28:14

**fascinating** 61:14

**favor** 67:9

**fear** 24:17

**features** 63:10

**feel** 7:17 27:1 61:17 62:20 63:12

**feeling** 61:23

**felt** 22:16,20 23:11 33:13,23 34:17 35:18 36:9 37:22 55:22 62:15

**female** 62:17,18

**FERPA** 28:14,20,23

**fictitious** 24:19

**field** 62:5

**figure** 7:18 41:21

**filing** 23:8

**fillers** 46:13

**find** 41:5 57:24 65:17

**finding** 65:14

**firm** 8:17

**first** 4:8 20:9,11 25:12,21,24 30:10 42:20 43:1 64:11

**fit** 62:15

**fixed** 5:13

**Flores** 4:9,11,17 5:4,12,15 10:23,25 11:8,11 12:11,16

18:25 19:4 25:1,10,12,13
28:17 30:11 36:11,15,20
37:12,14,16,17,23,25 39:5,10,
13 40:19 42:11,14,15 43:12,13
44:20 45:4 46:6,22 47:15,23
48:12,16 49:5,11 50:1 51:14,
23 52:1,4,13,15 53:18,20 55:7
56:4 59:16 62:21 63:8,11 65:2,
6,23 66:15,22,25 67:6,9 68:22,
24 70:24 71:2

**flow** 52:9

**focus** 16:16 20:7 47:8 55:22
63:19

**follow** 26:13

**follow-up** 25:14 58:7

**followed** 58:6

**follows** 4:8

**forgotten** 7:25

**form** 18:24 39:9 40:3 45:20
46:9 47:12 55:5 59:3 64:23
65:20

**former** 20:3,4

**forth** 6:25 8:3 69:16

**forward** 11:5 20:24 45:13 47:6
64:13 67:24

**forwarded** 57:1 64:17

**found** 22:21 65:18

**foundation** 12:10 18:24 28:16
39:9,12 40:3 44:17 45:1,20
59:3 62:8

**four** 14:14 34:21

**frame** 9:20

**free** 7:17 13:20

**frequently** 33:9

**Friday** 21:11,16,17,18,24,25
31:17 32:24 33:10,16,19

**front** 11:2

**frozen** 10:15

**full** 4:12 25:12 64:20

**funneled** 32:15

**funneling** 55:24

**further** 26:4 36:16 43:10
54:23 56:14 70:24

**future** 22:23

**FYI** 34:1

---

### G

**gallery** 25:19

**garbled** 5:5,11 8:24

**gate** 70:3

**gauge** 36:9,10

**gave** 35:1 52:5

**general** 39:14 47:21 60:16
66:8

**generally** 14:11

**German** 60:24

**Germans** 60:20

**Germany** 59:25

**give** 4:12 10:20 11:24,25
14:11 17:1 21:10,18 25:16
37:8 65:2

**given** 5:2,3 11:4 28:3 58:9

**go-to** 27:21

**good** 6:16 18:22 19:12 36:10
49:9 55:13 61:21

**government** 20:5

**grade** 61:7

**graduation** 14:15 44:3

**great** 62:5,12

**group** 50:13

**growing** 61:12

**guess** 17:12 61:1 66:6 69:22

**guide** 14:17

---

### H

**half** 8:21 9:1 35:23 36:16
63:20,21

**hallway** 33:3 70:19

**hallways** 70:17

**happen** 16:16 47:24 55:19

**happened** 9:22 24:5,11 30:15
52:21 63:2

**happening** 54:9

**happens** 27:21

**happy** 61:13 62:6,10

**harassment** 62:4,23

**hard** 52:9

**he** 5:20,24 6:2,4 20:4,6 37:10,
20,22 40:21 41:7,11,12,15,25
42:1,3 43:10 46:11 48:7 51:4
55:11,17 67:23 68:10 69:15,
16,17 70:20

**he'll** 5:21

**he's** 5:22 51:2,3 67:14

**head** 7:16 51:3

**health** 13:13 14:8 15:9 44:8

**hear** 5:5,10 9:3 35:3

**heard** 48:20

**hearing** 32:18 56:15,20 57:24
58:23 67:15,22 68:4

**hearings** 59:5

**held** 39:23

**help** 6:22 9:24 14:17 15:25
17:4 19:8,23 23:12 63:8

**helpful** 26:7

**helps** 10:10

**her** 5:4,5,7 10:21 16:8 20:14,
16,22 21:8,9,21 22:7,8,15
23:1,21,25 24:9,25 25:14 26:2,
21 27:8,12 28:8,9 29:3,9,10
30:4,12 31:8,10 33:3,7,8,12
35:16,20 37:6 41:8,10,14,18,
24 42:25 44:22 45:9,19,23,25
46:7,25 47:2,15,17 49:23,24,
25 50:1,2,3 52:2 53:10 54:13,
14,16 65:19 68:14,18,20 69:25
70:14,25

**here** 25:10,19,24 30:2 33:6
34:7 46:21 60:2 67:14

**herself** 28:6 33:15

**hey** 62:12

**high** 22:25 60:17 61:7 63:11

**highly** 31:15

**him** 20:3 28:7,9 32:2 41:9
43:7,8 52:23 54:21,22 55:13,

14,15 69:12,22 70:12,16,19

**himself** 45:17

**his** 6:4 20:6 38:25 40:10 43:6
52:23 54:7 68:20 70:21

**history** 61:10

**hoc** 38:12

**hold** 13:24 14:6 20:4 30:19
53:6,15 61:10

**holding** 22:22 54:7

**holds** 14:20 43:14

**home** 14:7

**honestly** 48:3 55:9

**honesty** 30:18 35:9

**hooked** 10:21

**hopefully** 4:20 7:1

**Hospital** 12:25 13:6 21:13,15
22:1

**hour** 6:12

**hours** 8:21 9:1 34:21 35:18

---

**I**

**idea** 14:11 21:1 39:6 44:18

**ideals** 14:16,20 15:5

**identification** 4:6

**identifies** 7:5

**identify** 7:17

**identifying** 33:15

**ignorant** 62:10

**immediate** 56:1

**immediately** 55:21

**immigrant** 59:22 60:19,21

**Implicit** 15:11

**impression** 47:15,17

**inappropriate** 23:10

**include** 45:15 69:21 70:6

**included** 70:2

**includes** 47:19 51:19

**including** 38:6

**incoming** 55:15

**incorporated** 15:10

**increasing** 62:7

**incurring** 49:1

**individual** 33:15 44:1 49:2

**individuals** 33:23 34:7,18
35:6 68:6

**inference** 48:24

**information** 4:19 31:18,23
33:14,17,18 34:3,10,15 38:24
43:8 46:23 48:9 52:3 57:9 69:9
71:3

**informed** 54:14

**informing** 50:3

**initial** 29:19 33:7 49:25 56:13
68:17,20 69:13,14

**initiate** 26:25 53:2

**initiative** 64:6

**inquiry** 67:23 68:17,20

**institutional** 26:23 31:20,21
46:4

**instruct** 12:13 38:20 51:7,17

**intake** 29:2

**integrity** 15:1

**interactions** 23:11

**internal** 17:9

**internally** 16:20,22,25 66:13

**interpersonal** 35:10

**Intervention** 38:1,15 39:7,11,
16,19 42:23 43:2 54:2

**introduction** 7:23

**investigation** 45:18 53:1,9,22
64:20 65:8,15,25 66:4

**investment** 55:20

**invited** 36:6 51:10 55:14

**involve** 65:11

**involved** 26:12 40:9 60:6
63:18,19

**involvement** 15:20

**involves** 56:8

**involving** 5:25 39:20

**Iraqis** 60:21

**issue** 24:18 29:7 35:4,10
40:16 62:23

**issues** 4:20 6:8 14:15 15:9
16:23 19:14 22:10 32:4 35:11
36:3,8 38:8 42:6 64:3

**Italians** 60:20

---

**J**

**Jackson** 32:10,19 33:25
34:11,15 37:9,19 41:18 54:20
57:2,6,13 64:10,22 67:23 68:8
69:5,9,15,20

**Jackson's** 67:14

**Jane** 25:22

**job** 13:1 32:11 43:19,21

**join** 40:11

**judicial** 56:6

**jump** 65:3

**June** 13:9

**junior** 61:7

**justice** 15:9

---

**K**

**keep** 10:2,7 12:2 54:11,14

**kid** 60:24,25 62:10

**kids** 60:13,19

**kilter** 35:13

**kind** 5:2 8:4,6 18:22 31:3
34:21 40:15 41:11 43:25 44:6
50:25 56:17 62:3,4,17 69:16
70:22

**kindergarten** 61:5

**kinds** 18:23 39:10

**knew** 28:5 35:4,7 41:4,5 45:23
50:14 55:3 70:20

**know** 5:17 6:12 7:14 9:18,20

Case 2:20-cv-11718-GAD-DRG ECF No. 54-10, PageID.2313 Filed 02/25/22 Page 84 of 93
ANTHONY EID vs WAYNE STATE UNIVERSITY                                    Job 16301
CHADWELL, MARGIT 10/07/2021                                     Index: knowing..me

10:14 11:22 14:24,25 15:25
16:12,23 18:5 19:25 20:2,3
21:9,18,19,20 22:19,21,22
24:9,11,18 25:17 26:2,5,11,21
27:13,16 28:5,12,24 29:13
30:16,17 31:5,6,18 32:7,8,17,
20 33:9,10,11,23 34:3 35:15,
19 36:1 37:10,21 38:13 39:5
40:9,14 41:14 42:5,7,9,16
43:9,19 44:4,6,22 45:7,8,10,
11,12,13,23 46:1,2,4,15,17,19
47:3,4,20 48:13 49:1,24 50:2,
13,25 51:3,12 52:17,18,25
54:16,20 55:12,16,19,22
56:11,12,14,17,18,20 57:18
59:1,5,13,20 60:19 61:22
63:17,23 64:2,3 65:10,14,16
66:19 67:10,17,25 68:5,25
69:16,17,18,19 70:14,18

**knowing** 18:2 55:19

**knowledge** 31:20 44:12 45:5
53:6,8

**knowledgeable** 31:15

**known** 7:25 28:14

**Kristen** 9:22

---

**L**

**language** 61:10

**laptop** 10:19,21

**large** 40:17 44:11 49:1 58:5

**larger** 63:10

**Larry** 48:5

**last** 4:13 10:13 16:10 17:7,9,
12 20:16,18,20 21:3 29:20
63:23 66:6,13

**lasted** 23:18

**later** 6:5 8:15 53:16 64:12

**launched** 53:1

**lawsuit** 5:15

**lawyer** 8:11

**lawyer's** 8:17

**lawyers** 9:23

**lead** 50:23

**learn** 20:16

**learned** 49:24 60:5 61:2,3,9

**least** 6:13 32:15 35:8 64:13

**left** 24:10 29:11

**legal** 27:24 38:7 50:15 51:20
52:5,7

**letting** 43:9 50:2

**level** 16:1 31:24 56:15,20
58:23 59:7,9 63:12 69:18

**liable** 45:6

**life** 19:13

**lightning** 62:17

**like** 15:12 16:24 17:17,18
18:13,23 19:9 23:9,12,20,21
24:17 25:14 27:1,20 29:20
31:6 33:2,4,22 35:9,14 36:1,9
37:20,22 42:5 44:22 45:23
46:18,25 48:4 49:11 50:15
51:1,13 54:13,14,18 55:12,22
57:15,17 59:10,14 60:23
61:17,23 62:13,17,19 63:23
67:3,14,18,23 68:17,19 69:24
70:3,12,13,16,20

**likes** 18:17

**line** 11:19,23,24 12:7,8

**little** 5:10 7:2 8:24 10:15 11:7
18:20 20:8 24:17 25:5 31:9
49:6 56:4 59:17 61:1 63:10
67:8

**long** 6:10 13:24 16:7 21:3

**long-standing** 43:17

**look** 10:15 15:4 17:20 19:21
25:2,9,11 26:21 31:25 32:11,
12,16 37:17 38:7 42:1 53:20
56:12,18 62:19

**looked** 35:7,8,9,17

**looking** 46:20 57:4

**looks** 25:14 37:20 45:22 46:25
53:23 67:14,18,23 68:17,19

**Loretta** 42:21,25 43:14 49:13

**lose** 6:10 7:11

**lot** 7:11 8:1,7 15:8,14 18:14
19:19 21:8 26:5 61:17 63:22
66:25

**lots** 60:19

**loud** 6:22

**love** 61:16

**low** 10:14

**lugged** 61:20

**lunch** 67:3

---

**M**

**M.D.** 4:7

**made** 5:20 26:16,25 27:2,13
32:25 38:5 56:7

**Main** 16:1 38:4 50:19

**major** 17:24

**make** 4:13 5:21 7:8 8:14 9:12
14:23 15:10 18:16 25:23 27:5,
9 31:25 32:2 36:12 42:8 51:6
56:19 57:5 58:3,9,10,15,22
59:10 63:13 64:19

**making** 12:5 23:15 46:3 57:8
62:5

**male/female** 62:16

**many** 18:11 21:12 36:3,6
62:18 63:1

**March** 13:25

**Margit** 4:7,15

**marked** 4:6 36:23 68:23

**material** 7:15 33:6

**materials** 17:15 31:18 41:24
54:21 57:2,19

**math** 61:8

**matriculate** 44:2

**matriculation** 14:14

**matter** 40:23 51:21

**maybe** 21:4 24:16 53:13,16
62:9

**me** 4:12 6:12,19 7:4,12 8:12
9:3,4 10:11,18,20 11:2,4 12:16
14:11,21 15:22 17:1 19:8 20:1,
19,24,25 21:8,9,10,14,17,21
22:7,24 23:4,24 25:10,15,16,
17,21,25 26:2,4,6,7 28:1,9
29:4,10 30:15,22 31:5,14,17,

Case 2:20-cv-11718-GAD-DRG ECF No. 54-10, PageID.2314 Filed 02/25/22 Page 85 of 93
ANTHONY EID vs WAYNE STATE UNIVERSITY
CHADWELL, MARGIT 10/07/2021

Job 16301

Index: mean..objection

19 33:6,21 34:2 35:1,10,16
36:12 37:1,8 38:3 41:23 42:3,
16 43:21 47:15 48:10,12 49:4
50:21 53:13,21 55:14 63:8
64:5,25 65:2,3 66:23 67:9,10,
13,20 68:19,25 69:3 70:25

**mean** 23:9 24:17 30:14 31:2
32:8 33:3 35:7 40:9 44:21
48:23,25 49:3 54:14,18 55:11
57:15,23 58:2,7 60:24 61:1,13
63:2 64:4 67:25 68:16 70:17

**means** 14:16

**medical** 12:18 13:4,21,22
14:6,13,17,18 15:6,12 17:3,25
18:21 19:9 22:9,21,22 23:3
28:4 31:22 32:2 33:24 35:7
36:9 42:6 45:25 52:24 55:4,8
56:6,7 62:2 63:14 64:3,4 65:7,
11 66:2

**medicine** 12:19,24 13:11,12,
16 14:8 15:15 21:12,19 40:8,
18 43:18,22 44:5 60:16

**Medicine's** 17:19

**meet** 8:10,16 18:1 38:11,17
70:13

**meeting** 38:4,14,18,23 39:3,
14,19 40:19,22 42:22,24 43:1,
2 45:11,22 47:1 49:12 50:4,5,
8,10 51:6 52:4,16,21,25 54:2
57:16

**meetings** 16:2 39:17,22 54:3
70:12

**member** 8:17 21:11 31:16
36:6

**members** 9:23 50:13,14
51:15,20,21 69:10

**mental** 44:8

**mentioned** 14:20 21:23 23:7
35:6 60:9

**message** 20:25

**met** 20:13

**Michigan** 4:2 12:25 48:2

**microphone** 5:4,8 8:25

**middle** 60:17 61:18

**midst** 6:9

**might** 6:13 21:20 28:14,23
44:7

**mile** 27:20

**milestones** 17:25

**mind** 11:6 55:9,21

**minimize** 25:19

**minor** 39:7

**minutes** 6:13 10:20 59:14
67:2

**miss** 43:20

**mission** 17:20 18:6,19 19:5

**missionaries** 61:25

**misstates** 68:14

**moment** 25:4,16 36:14 37:8
42:13 53:19 55:1 65:4 66:24
69:24

**moments** 5:24 66:15

**Monday** 50:4,8

**monitor** 11:1

**months** 36:2 66:7

**more** 8:25 15:8 20:8 26:1
29:12 36:17 45:9 46:12 48:25
51:13 54:8 61:24 63:21 67:8

**morning** 4:18 25:6 37:3 64:15

**most** 36:8 45:9 68:7,21

**mostly** 16:9

**mother** 25:23 26:17

**move** 8:25 11:5 24:2 67:24

**moved** 47:6 60:2,25

**moving** 54:17

**MSU** 45:7 47:24 48:8

**mute** 51:11

**mysteriously** 7:24

---

## N

**name** 4:13 17:1 20:10,11,16,
18,20 30:21 31:10 41:17 48:5
65:11 67:21

**namely** 31:16

**narrow** 4:20 6:8

**Nassar** 48:5,25

**nearly** 18:11

**necessary** 16:3 38:12

**need** 6:3,11,13,14 27:1 29:6
32:20 38:23 44:7 48:16 56:2,
17

**needed** 11:4 16:4 23:12 26:1
32:15 33:13,23 35:17 70:23

**needing** 34:10

**needs** 42:9

**neighborhood** 60:20

**never** 62:9,10,15,16 65:21

**new** 55:15

**next** 5:6,19 6:17 13:1 52:18
56:19 58:1 67:2 69:17

**Nikolina** 37:6 53:5,22 56:24
64:25 66:16

**nodding** 7:16

**None** 57:7

**nonetheless** 8:6

**notes** 9:12 30:25 31:9

**nothing** 29:1 45:17 57:17

**notion** 29:25

**November** 42:22 50:1,8
53:12,13

**number** 11:16,22,24,25 19:11
31:10 43:6 58:8

**nurse** 21:14

---

## O

**Oakwood** 12:24 13:1,6

**oath** 5:2

**object** 12:13 38:20 40:4 64:23

**objection** 5:20,21,24 6:4
12:10 18:24 28:16 39:9,12
40:3,6 44:17 45:1,20 46:9
47:12 48:11,15 49:22 51:7,25
52:6 55:5 59:3 62:8 65:20
66:10 68:14

---

**objections** 6:5

**objective** 63:18

**obligation** 63:13

**obvious** 45:3

**obviously** 19:18 26:24 31:14 40:17 44:21 46:17 51:10 64:2 67:24 70:21

**occasionally** 33:10

**October** 4:1 20:9 41:24 54:23

**office** 10:12 11:25 12:7 15:21, 24 16:13 18:3,6 19:5,22 33:11 39:22 43:18 46:4 65:8,14,17, 24 66:3,9

**Officer** 15:25 38:7 50:16 53:7

**offices** 9:23 19:17

**official** 26:23 55:7 66:19

**officials** 16:15 54:4

**once** 5:3 6:12 22:21 57:10 61:9

**one** 5:25 7:8,12 10:5,25 11:1 13:16 15:24 19:11 22:8 23:4 25:4 26:8 31:24 32:20 36:14, 17 39:20 41:14 42:13,16 43:6 46:13 53:19 58:10 61:5,6 66:24 68:23

**one-on-one** 44:10 70:12

**ones** 50:20

**ongoing** 16:4 22:9 23:23

**only** 11:14 39:19 40:10 50:14 58:15,21 62:11,18 68:12,17

**onus** 31:2,8 34:2 56:12

**open** 64:1

**opportunity** 40:22 51:14

**option** 26:12 27:6,8 69:25

**options** 29:12

**Order** 27:4,11

**ordinary** 59:21

**organized** 10:7

**orientation** 55:16

**original** 68:3 69:3

**other** 6:1 7:15 9:23 10:5,21,25

12:7,14,15 13:22 14:6 19:17 27:16,24 32:20 42:7 54:3,4 68:23

**others** 25:2

**ought** 21:18 26:7

**our** 10:22 15:10,24 18:1,3 22:8 25:15 27:20 30:18,19,20 31:21 32:14 33:11 35:11,12 40:15 46:2,15 47:24 55:15 60:20 61:20 63:20

**ours** 40:13

**out** 6:22 7:18 11:24,25 13:21 17:4 22:13,21 23:2 24:3 27:8 28:11 32:6,24 33:2,8 35:13 41:5,9,21 45:11 52:10 54:19 57:1,7 59:14 60:23 61:8 65:17 70:3

**outcome** 55:3

**outlook** 10:3 12:2 63:3

**over** 21:9 40:15 61:19,25 62:19 63:21 64:7,24,25 65:3 66:16

**oversee** 14:15

**own** 26:19,22 31:25 32:14 45:23 46:25 52:23 64:3

---

**P**

**p.m.** 71:5

**package** 57:4,5,10

**packet** 17:17 69:10 70:3

**page** 25:12 36:15,17 37:16 42:14 68:23

**pain** 18:14

**paired** 12:2

**Pam** 21:14 30:12,24 32:23 33:15

**Pamela** 20:11,25 23:25 31:13, 16 38:16 41:2,19,23 51:16 54:24

**paper** 31:9

**parent** 29:24 30:7

**parents** 61:20 63:2

**part** 7:23 9:13,18 15:12 16:23 17:15 23:1 30:10 45:19 51:1, 21 52:8 57:4,19 63:17 65:9

**participate** 9:17 51:11

**participated** 39:16

**participating** 39:11

**particular** 19:5 33:23 39:14 48:25 58:9 63:18,25 64:6

**parties** 54:19

**party** 5:15 28:4 56:15,21,22 67:19,22 68:4,5,11

**passed** 54:18 65:1

**passing** 70:20

**patients** 30:1

**pattern** 54:7

**pause** 11:2 35:1

**pdf** 25:6

**Pediatric** 21:13

**penalty** 60:14

**people** 7:10 18:10 50:17

**perceived** 39:25 40:1

**perception** 69:22

**period** 6:10 54:10

**peripherally** 16:22 70:16

**person** 9:6 16:9 18:8 31:21 32:15,20 41:17 67:22

**personal** 10:2,4,7,9,11 11:14, 16 12:8 27:4,7,10,11 43:24,25 44:8,10 47:5 59:17,19 63:5

**personally** 9:17 14:25

**perspective** 62:24

**phone** 6:14 11:12,16 12:3,8, 15 21:2,9 24:7,13 31:4,10 41:1,2

**phrase** 48:21

**physician** 14:17 15:1,2 22:23

**physicians** 30:20 35:12 55:20

**picture** 26:25

**piece** 31:9 42:3

Case 2:20-cv-11718-GAD-DRG ECF No. 54-10 PageID.2316 Filed 02/25/22 Page 87 of 93
ANTHONY EID vs WAYNE STATE UNIVERSITY
CHADWELL, MARGIT 10/07/2021

Job 16301
Index: pieces..putting

**pieces** 48:9

**pinpoint** 33:22

**place** 8:22 40:25 45:18 50:8

**placed** 39:5 40:12

**plan** 58:6

**play** 68:8

**please** 5:22 6:11 11:17 21:6
25:3,21 36:13 37:12 42:12
43:21 53:18,20 67:7

**point** 23:5,11 24:10 28:10
45:24 54:9 57:7 69:20

**pointed** 27:8

**police** 22:17 23:6,7 24:18
26:12,24 27:7,14,16,18,19
28:1 29:10,13,16 38:6 41:4
50:17

**Porter** 5:6,19 10:18 12:10,12
18:24 19:2 28:16 30:8,10
38:20 39:9,12 40:3 44:17 45:1,
20 46:9 47:12 48:11,15,18
49:9,22 51:7,17,25 52:6,11
55:5 59:3 62:8 64:23 65:20
66:10 67:5 68:14

**pose** 5:18

**position** 13:10,24 14:1,2,4,12
16:5,8,10 20:5 35:22 53:6
58:18 65:7

**positive** 19:22 63:3

**possibility** 59:6

**possible** 4:19 55:3 56:8

**post** 43:13

**posting** 13:8 22:11

**power** 58:17

**Powerpoint** 17:16

**PPO** 26:13 27:1,2,9 29:7
69:14,18,23

**preference** 69:13 70:2

**prep** 8:9

**preparation** 8:19 9:8,13

**prepare** 8:17 9:8

**preparing** 9:24

**preponderance** 58:1

**presence** 62:7

**present** 50:12 52:21

**presentation** 16:23 17:10,16
66:13

**presented** 18:11

**preserve** 5:22

**President** 20:6 55:12

**pretty** 5:5 15:16 17:1 27:21
36:10 61:9,20,21 64:15

**previous** 36:2

**previously** 20:14 36:5

**primarily** 10:6 16:16,25 19:18

**primary** 46:15

**Principal** 18:9,12

**Principals** 18:15

**prior** 4:24 33:14 40:22 43:5
68:14

**priority** 33:5

**privacy** 28:17

**privilege** 5:25 6:1,3 52:2

**privileged** 38:22,24 51:9,19

**privileges** 6:2

**privy** 59:12

**probably** 48:23 51:2 60:10
64:14 67:1

**problem** 19:23 25:5

**problematic** 45:13

**problems** 10:22 18:11

**procedures** 41:16

**proceed** 40:5 70:23

**proceeded** 22:17

**proceeding** 24:18

**proceedings** 59:13

**process** 14:18 23:8 24:4 35:6,
17 40:10 46:11 52:23 53:2
54:8 55:3,5,7,25 56:5,6 64:24

**processes** 55:25

**processing** 45:22 46:25

**profession** 62:7

**professional** 10:4,6 14:17,22
15:14 30:19 32:14 46:20 69:23

**professionalism** 32:10,17
33:25 35:9,12 36:3,5,7 55:25
56:5,8,11,20 57:3,20,21,25
58:2 59:2,5,8,12 67:15 68:4
69:9 70:2,9

**professionally** 14:24

**Professor** 13:23 14:7

**program** 13:2,3,19

**programs** 17:23

**progress** 28:1 54:12

**progressed** 62:2

**promise** 59:20

**Promotions** 58:10,14,16,22,
24 70:10

**pronoun** 41:18

**Protection** 27:11 28:15

**protective** 27:4 45:8

**protracted** 23:20

**proven** 45:17

**provide** 7:12 11:11,17 19:19
26:2,6,18 29:3 34:10,16 43:24
44:10 46:16,19,22 51:14 71:4

**provided** 9:10,20 16:20 17:14
20:24 33:18 51:12 57:2 66:8,
13

**provider** 66:9

**provides** 18:3

**providing** 7:3 9:17 17:22 44:5
70:7

**psychological** 50:19,22

**Public** 13:12 14:8

**publish** 25:1 36:13 37:12
42:11 53:18 66:22

**pump** 58:4,5

**purpose** 46:15

**purview** 54:20 56:18 57:7

**put** 20:24 31:2 61:5

**putting** 40:5 45:24

## Q

**qualify** 58:25

**query** 9:19

**question** 5:21,23 6:3 7:13 8:10 18:25 19:3 34:13 38:25 44:23 47:7 48:13,16 51:25 67:20

**questions** 4:22 5:18 6:10 7:1 8:8 11:1,4 23:4 67:1 70:25

**quickly** 17:1 61:2,3

**quite** 9:10,15 23:20 36:7 59:19 60:9 65:3

**quote** 17:21

## R

**raise** 29:7 63:2

**raised** 29:17 61:23

**raises** 6:2

**raising** 5:25

**random** 30:22

**reach** 32:24 55:10

**reached** 31:14 41:8

**reaching** 33:2

**read** 6:21,24 7:1 8:2 17:21 25:16 36:23 42:15 57:15 61:7 64:13,17 65:1 67:10 68:24

**reading** 49:4 61:6

**ready** 31:4 42:18 67:24

**real** 22:13 24:15,16 34:23 46:20

**reality** 18:19

**realize** 15:19

**really** 4:18 6:7 8:4 19:8 22:19 24:20,23,24 28:5 31:8 33:12 35:2,9,13 44:6 46:15,17 49:24 54:8,18,19,22 55:10 56:18 61:13 62:9

**realms** 40:16

**reason** 6:7 28:8 29:19 59:9 70:1

**reasons** 34:18

**recall** 8:20 16:11 33:2 41:12, 25 54:6 57:15,16

**receive** 9:24 16:15

**received** 16:17 17:7 32:23 33:15 34:10,20 37:10,21 53:10,11,22 57:13 64:9 66:7, 11

**receiving** 12:6 28:9 34:14 54:2

**reception** 11:23

**receptionist** 20:24 31:10

**receptor** 28:9

**recitation** 52:3

**recognize** 25:13 36:20

**recognized** 50:18,20

**recollection** 6:23 7:15 8:3 21:6 23:17,19 37:18 53:21

**recommend** 29:17,19 70:10

**recommendation** 27:2,5,7 29:14 58:12,13,15,16,19,22,25 59:10,13

**recommendations** 57:5 58:3,8,10

**recommended** 59:2

**record** 5:21 8:14 11:10 12:17 40:6 71:1

**records** 28:15 29:1

**recounted** 21:16,21 22:15,24

**recounting** 24:11 35:10

**refer** 52:11 69:2

**reference** 48:1

**referenced** 43:1 45:11 66:12 69:14

**referencing** 42:24 45:7 48:4 67:18

**referred** 27:9 38:9

**referring** 17:13 24:4 25:23 27:4 28:20 39:14 41:10,21 47:25 48:10,14 50:6 55:6 60:15

**refers** 42:22 67:13

**reflected** 43:6 45:19

**reflection** 47:5

**reflects** 46:6

**refrain** 51:22

**refresh** 6:22 7:15

**refreshes** 37:18 53:21

**refreshing** 8:2

**regarded** 31:15

**regarding** 37:6 51:23

**regardless** 46:14

**regular** 16:2 38:11 54:14

**related** 12:6 14:22 31:12

**relationship** 16:4 35:11 55:13

**relative** 18:21

**relayed** 33:6

**release** 70:25

**relying** 26:18

**remain** 51:11

**remained** 16:6

**remediable** 56:16

**remediation** 58:6

**remember** 7:13 12:5,14 16:7 17:7,14,17 24:6,13,15,22 26:15 31:2,8 37:4,8 38:14 41:7 42:2 48:1,3,7 49:3 50:8,11,12 51:4 53:4,11,16 54:9 64:16 70:20

**reminds** 7:4

**remote** 10:13

**remove** 69:9

**repeat** 19:3 66:1

**report** 23:8 28:1 29:10 37:6,7, 9,19 53:3,10,11,22 54:2 56:24 57:13,14,16 64:8 65:21

**reporter** 4:14 5:10 17:5

**reports** 29:4 41:15,16

**represent** 4:17

**representation** 32:25

**representative** 50:17

**representatives** 38:6

**representing** 18:16 28:6,25

**represents** 45:16

**request** 9:18 39:21

**requested** 40:11

**requests** 9:15

**requirement** 5:18

**requires** 16:14 38:21 51:8,18
56:21

**reread** 44:20 48:9,12

**residency** 12:23,24 13:2,3
14:19 15:3

**resources** 44:5,6,8

**respect** 12:5 16:17

**respected** 18:3

**responded** 50:1

**response** 42:21

**responsibilities** 14:12,13

**responsibility** 7:11 13:20
15:19 19:16,17 30:1 34:5,9,13,
14,17 46:3 55:24 64:19

**responsible** 13:15,18 31:21
44:4,11 46:4 54:19 57:8

**rest** 57:19 61:10 70:4

**result** 7:3 25:22 45:4 52:25
55:3 62:4

**retaliated** 65:18

**retaliation** 66:8,12

**return** 43:6

**returned** 6:14 21:1 43:10

**review** 38:8 58:14,23 64:10,12

**reviewed** 64:9

**reviewing** 17:17

**revisit** 64:8

**rewarded** 60:13

**right** 4:14 5:6 6:17,19 9:12
10:23 11:11,14 19:12 22:4
23:16 29:18 33:20 35:5,6,17
36:12,17 37:11 41:1 49:4
55:24 56:4 57:12 67:6,7 69:7

**rights** 16:13 28:17 65:8,15,18,
25 66:3,4

**rise** 32:17

**risk** 45:16 46:3 47:21 49:1

**Robichaud** 32:22 34:11,16
42:21 43:9,14 44:12,15 45:7
49:13 70:13

**rod** 62:17

**role** 19:5 43:23 62:21 63:12
68:2,7,8,20 70:14,15

**room** 62:18

**round** 33:8 57:1

**route** 8:7

**routinely** 63:7

**Rubenstein** 65:12

**rule** 56:8

**run** 13:3,5,20

_____

**S**

**safety** 26:9

**said** 6:7 17:1 21:18 24:16
26:5,11 27:5 30:2 31:5 33:11,
22 40:10 42:6 43:7,11 50:15
52:17 54:18 59:10 62:12 63:23
69:12,17

**same** 15:15 16:6 21:17 37:20
51:25

**save** 6:8 7:2

**savvy** 7:9

**saw** 9:22 41:8 42:1 63:4 70:19

**say** 8:9 15:6,14 19:21 21:5
22:6 23:13 26:20 27:5 28:2,7
29:24 33:10 36:8 39:3 40:1,8,9
41:10 42:21 44:15,24 46:6,13
48:20 49:14,20 50:5,11 51:2,
23 55:2,13,15 58:21 60:7
61:21 68:1

**says** 10:14 17:22 42:25 45:21
47:23

**scary** 24:24

**scheduling** 10:4

**school** 12:19 13:4,22 14:18,

20 15:12 17:19,24,25 18:17,22
19:10 21:12,18 28:4 31:22
35:7 36:9 40:2,8,18 42:7
43:17,22 44:5 45:17,25 47:9
48:7 52:24 55:4,8 56:6 60:5,
15,16,17,18 62:2,3,11,12
63:14 64:4 65:7 66:2

**schools** 18:8 61:4

**Sciences** 13:13 14:8

**screen** 10:15 25:9 37:24

**scroll** 42:17,19 68:22

**search** 9:21

**searching** 9:17

**second** 32:6 36:15 37:16
43:12 47:23 48:10,14 53:15
65:2

**secretary** 10:8,9,11

**see** 7:8 11:3 19:6 21:19 29:5
33:9,10 37:17 46:21 56:13
63:6,9 68:18 70:12,16

**seemed** 22:11 23:2,20 35:13,
14 40:11 51:1

**seems** 18:13 23:21

**seen** 33:3 36:7

**select** 34:17

**semblance** 23:1

**seminar** 16:21

**send** 31:5 34:15 64:11

**sending** 37:8 64:21 69:20

**sense** 15:7 18:18 26:19 43:25
62:11,16

**sensitive** 33:21

**sent** 30:22 31:17 32:18 33:5
34:3,20 37:3,4,10,18 41:12
43:5 53:12 57:5 64:10,15

**sentence** 25:24 43:1,6 47:23
48:10,14

**sentences** 29:21

**separately** 37:10,21

**series** 6:9,25

**serious** 32:13 35:19 36:10
39:25 40:1,16

**seriousness** 21:8 22:25 24:16 39:8 40:12

**serve** 36:6 68:3,7,20

**served** 36:5

**services** 18:4 50:19,22

**serving** 70:14

**set** 69:1

**setting** 36:9

**seven** 13:16

**several** 27:10 50:15

**severe** 36:4

**share** 19:15 30:5,6,9,12 32:1, 3,9

**shared** 19:17 25:9 29:1 32:21 34:4 43:7 54:21

**she** 5:12 16:11,12 17:5 19:7 21:8,9,10,13,14,16,17,21 22:5, 6,7,15,16,17,19,20,21,24 23:5, 7,24 24:2,4,7,10,11,15,25 25:15,25 26:4,10 27:6,8 28:1,5 29:4,8,9 30:2,14,15,16 31:17, 18 35:10,15 41:3,12,18 43:17 44:16,18,19,22,23,24 45:2,4,8, 10,15,21,22,23,24 46:1,10,22, 24,25 47:4,8,9,15,25 48:3,10, 13,14 49:13,14,18,20,23,24 53:6,7,8,12 66:19 67:25 68:1, 3,8,18 69:14 70:13

**she's** 7:8 16:7 19:9 25:23 44:21 45:2,7

**short** 5:21 10:24 49:10 70:7

**shortly** 38:15 41:2

**should** 19:22 22:23 25:8 37:22 48:17,21 49:6 69:17

**showed** 69:3

**showing** 6:20,23 7:6 8:1

**side** 46:2

**signed** 66:2

**significant** 35:4 36:4

**significantly** 62:7

**simple** 47:7

**simplify** 4:20

**simply** 7:13 8:13 28:9 29:2,14, 17 34:6 39:2 57:1

**since** 16:5 25:25 26:11 27:6

**sitting** 5:6,19 6:17 52:7

**situation** 18:23 26:10 46:15 58:9

**skimmed** 64:14

**skip** 11:3

**smiling** 18:16

**social** 15:8,9

**sole** 58:16

**solve** 10:22

**some** 5:24 6:8,14,21 7:14,24 8:8 9:10,15 10:7 11:2,3 13:22 16:21,23 24:17 26:1,3,20 30:17 35:1 36:4 39:8 41:7,11, 13 42:2 51:12 56:13 62:17 69:9

**someone** 19:6,15,16 28:24 30:3 50:23 59:7 60:11

**something** 15:18,21 17:17 22:13 26:1,20,21 29:5,15 31:25 32:1,17 33:12,13 37:25 38:9 41:13 43:20 48:2 56:16 59:7 60:13 63:1,6 68:18

**sometime** 66:14

**sometimes** 6:9 7:19 16:24 17:4 18:18 46:17

**somewhat** 42:4

**sore** 60:23

**sorry** 10:14 30:8 49:6 69:15

**sort** 63:5 70:16

**sorts** 32:4

**sounded** 23:9

**sounding** 35:19

**sounds** 6:16 49:9

**South** 61:19

**speak** 20:25 60:3,5,12 70:4,9

**speaking** 14:11

**specialty** 14:19

**specific** 29:2 30:14 34:18 35:11

**spectrum** 36:4

**speculation** 47:13 49:22

**spell** 4:13

**spend** 8:1,11,19

**spoke** 23:25 27:12 69:14

**square** 27:20

**staff** 10:10 18:1

**stage** 55:14

**stages** 15:3

**stamp** 64:16

**standards** 14:22,23

**standing** 50:14

**standpoint** 40:13

**stands** 50:21

**start** 13:7 34:5

**started** 8:8 16:12

**starting** 13:21

**starts** 36:16

**state** 12:19 13:3,5,7 22:7,17 23:6,7 24:1,10 26:12,24 27:14, 17,19 41:4 43:14 44:22 47:18 48:2 49:18 54:4 61:16 62:11 63:12,15 65:18

**State's** 60:15

**stated** 18:19

**status** 54:11 61:2

**stay** 70:22

**stayed** 61:25

**steps** 45:12 52:18

**stick** 60:23

**still** 12:12 14:7 15:15,16 29:21 49:3 61:16 62:14

**stop** 22:18 67:7

**story** 21:22 35:14 59:19,21

**Strauss** 40:8,14,19,23 41:4,5, 20,22 50:15 51:2 52:22 53:2 54:7 66:21 69:15

**street** 62:12

**strides** 62:6

**strikes** 49:4

**strong** 21:11

**stronger** 46:12

**strongly** 22:20

**student** 13:20 14:2,15 15:22, 23 17:24 19:17 20:3,4 22:8,21, 23 23:3,22 24:1,7,12 28:3 30:21 31:21 32:4 38:8 42:6 43:18 44:1,7 45:8 46:14 49:25 56:7 58:11,13,20 63:24 65:11

**students** 13:17,19 14:13,20, 23 15:11,18 17:22 18:1 19:6, 15,19,21 22:9 24:5 28:18 32:14 44:2 45:9,25 46:5 47:18, 20,21 49:15 55:19 62:22 63:1, 20 64:2,3,7 70:18

**stumbling** 63:6

**submitted** 9:15

**substantiate** 26:6,21 31:6,7 33:7

**substantiation** 35:20

**substantive** 26:1,3,21 29:4

**substitute** 68:5

**successfully** 14:18

**sufficient** 58:7

**sufficiently** 59:8

**suggest** 10:18,19

**suggestion** 26:9,25

**suggestions** 25:22,23,25 26:8,14,16

**suite** 33:11

**summer** 17:9,11,13 60:2 66:14

**Superintendent** 18:10

**Superintendents** 18:15

**supervisor** 10:10

**supplement** 57:1

**supplemental** 31:17

**supplied** 41:23

**support** 10:10 19:19 31:18 43:24,25 44:7,10 46:19 47:2

**supporting** 35:16

**Suppose** 57:24

**sure** 4:13,15,16 7:8 8:14 9:16 13:15 14:23 15:7,10,21 17:6 18:16 27:9 35:16 36:12,22 38:13 42:8 43:22 45:24 46:3 50:11 53:23 57:8 59:9 62:25 63:14 64:14,16,19 65:5 68:16

**surfaces** 56:10

**surprise** 65:17

**surprised** 59:1

**Swiss** 60:25 61:3

**Switzerland** 60:25

**sworn** 4:8

---

### T

**taint** 69:21 70:3

**take** 7:10,19 8:7,22 9:12 10:23 14:1 25:2 30:25 37:17,23 40:25 49:7 50:8 52:1 53:20 55:11 58:18 63:9,13

**taken** 10:24 27:24 45:18 49:6, 10 57:21,23

**taking** 6:11 28:8 31:8 52:13, 22 67:2

**talk** 12:16 19:7,8 20:22 23:5 29:15 32:4 40:14 52:15 56:4 57:14 64:5

**talked** 62:22

**talking** 18:9 23:13 25:22 27:10 28:5 29:13 30:24 41:20 50:3

**tandem** 27:18

**teach** 14:9

**teaching** 13:22

**team** 10:10 38:1,4,15 39:7,11, 16,19 42:23 43:2 51:15,20,23 52:12 54:2

**tease** 52:10

**tech** 7:7,9 25:4,9 36:14,19 37:13,15 42:13 53:19 66:24

**technical** 14:22

**technician** 42:17

**telephone** 11:12,14 12:6 21:3,7 28:24 51:16

**tell** 7:4 8:12 14:1 21:17 22:5 25:21 37:1 38:3 40:4 43:21 46:10 47:15 48:10,12,18 50:21 52:20 53:21 67:13

**telling** 23:24 29:10 30:15

**tenure** 16:6

**terms** 9:11 14:24,25 15:5,7,8, 18 19:4 22:10,24 26:19 30:17 32:14 33:5,6 35:2 46:3,18 48:3 54:19 55:24 56:14 66:11

**tested** 61:7

**testified** 4:8 66:15

**testimony** 4:24 5:2 68:12,15

**therapeutic** 43:24

**thing** 10:25 21:17 32:6 37:20

**things** 6:14 8:14 10:7 15:9,11 31:4,24 33:21 35:11 46:17 54:16 55:10 58:4,5 64:4,13

**think** 5:12 9:21 10:21 16:7 18:21 24:3,19 27:18 31:3,9,22 33:2,4,9 34:21,23 35:2 38:10 41:1,7,15 43:4 45:10 46:1 47:2,22 48:1,24,25 49:18,23 50:5,10,14,18,25 53:12,13 54:6 60:9 61:16,19 64:15 65:2 67:1 70:19

**thinking** 34:24 45:21 48:23 49:3

**third** 13:17 28:4

**thought** 28:2 35:19 69:21

**thoughts** 47:1

**three** 33:22 34:21

**through** 11:23 13:19 14:18 15:2,13,23,25 16:22 25:17 31:23 33:11 35:2 44:3 46:11 52:23 55:25 59:17 64:14 67:1 70:21

**throughout** 46:13

**thumb** 60:24

**Thursday** 4:1

**time** 6:9,10,11 7:2,11 8:1,5,7,

11,19 9:10,15,19 13:17 14:1,
10 16:12 17:7 18:2 20:13 23:9,
23,25 24:6,8 27:2,12,25 28:13
34:20,25 35:23 37:1 39:15
40:11 44:2,15 48:2,18 50:7
51:11 52:4,8 54:1 60:3 62:5
64:11,16 65:6 71:3

**timely** 17:23

**times** 27:10 62:18

**tipped** 63:21

**Title** 15:18,19,20,21,25 16:2,6,
14,15,16,18 38:6 50:16 66:8,
13

**today** 9:13 15:5 39:15 70:7
71:4

**today's** 4:24

**told** 4:16 8:12,13 21:14 22:7
26:4,6 27:23 28:1 30:7 31:18
42:3

**top** 18:8 42:20 68:22

**totally** 62:25

**touch** 15:18 23:2

**touches** 15:21

**tough** 61:4

**towards** 64:1

**track** 6:10

**tracked** 33:13

**traditional** 15:16

**training** 12:24 13:18 14:17,19
15:11,12 16:15,17 17:8,15
30:20 35:12 66:7,12

**transferred** 24:2

**transition** 15:2

**transmitted** 57:10

**traveled** 61:14 63:4

**trial** 4:24 6:8

**troublesome** 22:10,14 24:20
35:3

**troubling** 23:18

**true** 19:24 32:7 33:1 35:4 55:2

**Tuesday** 8:23 9:1

**turned** 5:8 22:13 50:23 60:2

**turning** 11:6 64:21

**two** 8:21,25 23:22 26:14 31:23
42:14 48:9

**type** 6:2

**types** 6:1 15:9

**typical** 7:23

**typically** 11:23 27:19 39:22
56:10 58:21,24 68:10

_____

**U**

**uh-huh** 21:25 36:22 38:10,17

**ultimate** 65:14

**ultimately** 67:25

**unavailable** 68:9

**uncomfortable** 29:25

**under** 5:2 65:8

**undergraduate** 22:8 23:22
42:6

**underneath** 18:12

**understand** 47:25 59:18,21
61:18 62:25

**understanding** 27:3 42:8
53:2

**understood** 51:15

**unique** 60:10

**university** 11:11 12:19 23:12
38:5,6 40:17 41:15 45:6,14
46:7 47:18 49:1,18 54:4,17
55:7,23 58:5 65:24 66:19

**University's** 40:13 45:5 54:12

**unless** 7:5 12:13 40:4 48:18

**unnerved** 22:16 44:21

**until** 6:15 13:25 39:15 47:3

**up** 5:8 8:1,6,25 10:21 11:7
15:23 24:18 26:13 30:19 31:4
36:8 38:5 39:15 45:22 47:1
53:14 54:22 55:14 58:8,23
59:11 61:12 67:8

**upcoming** 55:20

**update** 66:13

**upheld** 18:3

**uphold** 14:16

**upholding** 14:25

**upon** 63:13

**upset** 44:16,18,24

**urgency** 24:15

**use** 6:22 10:4 11:14

**used** 41:17 61:3

**using** 10:19

**usually** 11:3 18:9 64:13

_____

**V**

**valid** 29:5

**valuable** 8:6

**value** 30:23

**variety** 18:3

**various** 15:3 38:5 40:15 58:2,
3 68:6

**verify** 32:11 34:3

**verifying** 34:6

**Vice** 18:12 32:2 33:24 58:4

**victim** 28:25

**video** 9:6

**view** 19:4 25:19

**viewed** 25:7 34:9

**violating** 28:14

**violation** 28:23 56:8

**vis-a-vis** 66:7

**visible** 29:21 63:12

**voice** 21:9

**volume** 11:6

_____

**W**

**wait** 6:15

**waiting** 54:7

**wanted** 10:25 18:18,20 20:25
  22:18 26:2 55:10

**wanting** 29:10,11

**warrant** 30:17

**warrants** 56:13

**Wayne** 12:19 13:3,5,7 15:13
  22:7,17 23:5,7 24:1,5,10,12
  26:12,24 27:14,16,19 41:4
  43:14 47:18 49:18 54:4 60:15
  61:16 62:11,14 63:12,15 65:18

**ways** 58:2 63:17

**website** 17:19,20

**websites** 18:19

**week** 8:23 9:1 21:24

**weekly** 32:5

**welcome** 55:16

**welcomed** 55:15

**welcoming** 17:22 62:16

**well** 13:4 14:9 19:20 22:5 26:5,
  19 27:5,18 30:2,14 33:20
  35:19 38:20 40:13 42:24 45:2,
  7,21 46:25 47:11 51:10 52:7,
  23 53:10 57:21,23 59:4,21
  60:12,15,19 67:18,20,23 69:5

**well-being** 17:24 18:4

**Wellman** 7:7

**went** 15:13 17:19 33:17 54:1
  55:21 61:15 67:24

**West** 24:3

**whatsoever** 28:22 64:25

**whole** 24:25 36:4 46:7 47:19
  51:11 55:22 57:4

**withdraw** 34:19

**witnesses** 7:24

**woman** 20:10 62:4 63:11

**women** 62:5,6 63:14,21 64:1,
  3,7

**word** 33:20

**words** 30:4 55:15

**work** 10:12 15:17,25 49:8
  57:10 63:13

**worked** 21:12,16 31:16 48:7

**working** 13:7 33:16

**works** 15:24 27:18 67:5

**world** 61:25

**worried** 24:25

**worrisome** 24:21

**wrap** 31:4

**writing** 44:19,23

**writings** 9:13

**wrote** 25:15 44:16,24 48:14
  49:18

---

### Y

**year** 10:13 13:17 23:22 35:22,
  23 61:5,6 66:6

**years** 12:20 14:14 16:10 21:12
  23:10,18,23 36:6 62:19 63:23

**yesterday** 5:24 10:20

**younger** 7:10

---

### Z

**Zoom** 9:6,7