UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTHONY EID,

    Plaintiff,

        v.

WAYNE STATE UNIVERSITY, et al.,

    Defendants.

_____/

Case No. 20-cv-11718

U.S. District Court Judge
Gershwin A. Drain

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. #43)

### I.   INTRODUCTION

On June 26, 2020, Plaintiff Anthony Eid initiated this action disputing his dismissal from the Wayne State University School of Medicine ("SOM"). ECF No. 1. He alleges that Defendants Wayne State University ("WSU"), SOM,[1] Nikolina Camaj, Margit Chadwell, Matt Jackson, Richard Baker, and R. Darrin Ellis violated his Fourteenth Amendment rights to due process (Count I) and equal protection

_____

[1] Defendants assert the School of Medicine is not properly listed as a defendant as it "is not a separate legal entity but is merely part of the University." ECF No. 43, PageID.783 n. 12 (citing *Saqr v. Univ. of Cincinnati*, Case No. 18-cv-542, n.1 (S.D. Ohio Dec. 2, 2019)).

1

(Count III), violated his rights to due process and fair and just treatment under Article 1 § 17 of the Michigan Constitution (Count V), and intentionally inflicted him with emotional distress (Count VI). Am. Compl., ECF No. 24, PageID.544-58. He also brings a claim under Title IX of the Education Amendments of 1972 ("Tile IX") (Count II) and a state law claim for estoppel and reliance (Count IV) against WSU. *Id*.

Presently before the Court is the Defendants' Motion for Summary Judgment. ECF No. 43. Plaintiff filed a timely Response, ECF No. 54, and Defendants replied, ECF No. 57. The Court held a hearing on the matter on April 11, 2022. For the following reasons, the Court will **GRANT** Defendants Motion for Summary Judgment (ECF No. 43).

## II. BACKGROUND

### A. Factual Background

#### 1. Professionalism at WSU

Wayne State University's School of Medicine includes professionalism as one of its "domains of competency" necessary to graduate with an M.D. SOM Handbook, ECF No. 43-3, PageID.829; *see also* Prof. Comm. Bylaws, ECF No. 43-5, PageID.958. As defined by the SOM Handbook and Policies, "Professionalism includes honesty, respect for colleagues, faculty, staff and peers

2

and behavior in public that is not embarrassing to the ideal of the physician. Continual self-reflection about one's attitudes and behaviors must occur as one strives to be a better physician." SOM Handbook, ECF No. 43-3, PageID.894. Thus, WSU has developed six core professional values and attributes to which medical students must adhere: professional responsibility, competence and self-improvement, respect for others and professional relationships, honesty including academic integrity, professional responsibility, and social responsibility. Prof. Comm. Bylaws, ECF No. 43-5, PageID.964-65. Of particular relevance for this case, "Medical students are committed to honesty at all times. . . . As with other core values, honesty is not limited to the School of Medicine and its teaching affiliates. The public expects honesty in its physicians as much as the School of Medicine expects it in its students." *Id.* at PageID.964.

To "ensure[] the ongoing development of explicit and appropriate professional behaviors in medical students," the SOM established the Professionalism Committee. *Id.* at PageID.958. Among other duties, the Committee, "[c]onduct[s] investigations of all reports of unprofessional conduct referred to the committee." *Id.* If unprofessional behavior is reported to the Assistant Dean of Student Affairs, or his or her designee, the Assistant Dean, or his or her designee, conducts fact finding. *Id.* at PageID.962. The Assistant Dean can

3

then recommend remediation, file charges with the Chair of the Professionalism Committee, or take no further action. *Id.*

Then, the Chair of the Professionalism Committee conducts fact finding. *Id.* at PageID.963. If the student is found in violation, the Chair may recommend remediation or convene a formal hearing of the Professionalism Committee. *Id.* This hearing will result in a remediation plan which can either be accepted by the Committee, in which situation the case would be resolved, or rejected by the Committee. *Id.*

Students may appeal decisions made by the Professionalism Committee to the Promotions Committee within ten days. *Id.* at PageID.965. If a student does so, the Promotions Committee will hold a hearing to review the student's appeal request and the Professionalism Committee's decision. *Id.* The student will have the opportunity to summarize his or her position to the Promotions Committee members and answer any questions they may have; the Committee will also review the student's entire academic record to date. *Id.* A student appearing before the Promotions Committee is permitted bring a support person to their hearing, but the student must give ten days' notice if that person will be an attorney. Prom. Comm. Bylaws, ECF No. 43-4, PageID.952. Decisions by the Promotions Committee on appeal are final unless the Committee choses to dismiss the student, in which case

4

the student may appeal to the WSU Provost within thirty days.  Prof. Comm. Bylaws,

ECF No. 43-5, PageID.966.

## 2.  Plaintiff's Interactions with Jane Roe[2]

Prior to the start of the 2016-2017 academic year, Plaintiff Anthony Eid

participated in WSU's orientation event, *FestiFall* 2016, in his role as Student Body

President for his class at the SOM.  Eid Dep., ECF No. 54-2, PageID.1843-44.

Plaintiff met incoming freshman student, Jane Roe, when she approached the table

at which he was stationed.  *Id.* at PageID.1844-45.  They spoke for about ten or

fifteen minutes, during which Roe shared that she was nervous about starting college

and her upcoming coursework.  *Id.* at PageID.1845.  Thus, Plaintiff provided Roe,

who had her computer with her, his iCloud password so that she could download

practice exam questions from his account.  *Id.* at PageID.1849-50.  Plaintiff had

provided study materials to others before Roe, usually using a Google Drive link or

flash drive, but he could not remember to whom or how many people when asked.

*Id.*  at PageID.1862.  Other than this initial face-to-face meeting, Plaintiff's

communication with Roe was all via text message or Facebook.  *Id.* at PageID.1847.

---

[2] In his Complaint and Amended Complaint, Plaintiff referred to his accuser
pseudonymously as "Jane Roe," and the parties have continued to do so because her
identity is not relevant for the purposes of this Motion.  ECF No. 43, PageID.771 n.
1; ECF No. 54, PageID.1711 n. 1.  As such, the Court will also use the pseudonym.

5

On November 17, 2016, Plaintiff texted Roe saying his account "was hacked . . . by someone in Asia, and they stole thousands of dollars from [him]."  Roe-Eid Texts, ECF No. 43-7, PageID.991.  He went on to say that Apple had advised him to log on to Roe's account from his computer to secure his account.  *Id.* ("So basically would it be cool if I logged into your account, deleted the saved cookies from my computer, then log off?  I'm [*sic*] won't hack you or anything.  I'm just trying to make sure my account is secure so this doesn't happen again.").  Roe responded once on November 22 to say she had not received any text messages, *id.* at PageID.993, but otherwise did not answer Plaintiff's several overtures.  *Id.* at PageID.991-95.  After offering to meet on campus, Plaintiff paused attempting to contact Roe on November 29.  *Id.* at PageID.995.

Plaintiff contacted her again in January 2017, again asking to meet on campus and also offering to provide Roe with additional study materials.  *Id*.  Then, on February 4, Plaintiff stated Apple had suggested Roe needed to turn off two-step verification on her iCloud account.  *Id*.  Later that day and again later that month, he asked her to check her Facebook messages.[3]  Plaintiff's messages in late February and early March grew progressively more frustrated until he states on March 9 that

---

[3] These messages have not been provided to the Court, but Plaintiff testified to making similar requests through that medium as well.

he will be filing a complaint in state court the next day if she does not help him.  *Id.* at PageID.997.  Over the next couple weeks, Roe sent plaintiff various passwords that Plaintiff said were incorrect.  *Id.* at PageID.997-1001.  In addition to telling her to reset the password instead, which Roe was unwilling to do, and again suggesting Roe turn off two-step verification, Plaintiff threatened to file a report with the University.  *Id.* at PageID.999.  Roe eventually stopped answering, and Plaintiff stopped texting her in April.  *Id.* at PageID.1001-02.

Roe reached out to Plaintiff in October 2017 to, presumably, determine whether he had hacked various social media accounts and pretended to be her to solicit personal information from Roe's friends because one of her accounts was logged into from Detroit, near WSU's campus.  *Id.* at PageID.1003.  Plaintiff claimed ignorance and explained how to check login locations through Google.  *Id.* at PageID.1007.

Some unknown time later, and in response to an unknown message, Roe told Plaintiff she was seeing someone and not interested in making new male friends.  *Id.* at PageID.1010.  Plaintiff responded, *inter alia*, that he was in an eight-year relationship and "just trying to be friendly," "could be a good resource" for Roe, was "pretty much the #1 leader in the community," and "could change [her] life if she "would give [him] more of a chance."  *Id.* at PageID.1010-11.

7

In August 2018, Plaintiff contacted Roe saying one of his social media accounts had been hacked, he had filed a police report, and the police had tracked the IP address and linked it to her. *Id.* at PageID.1012-13. He said the police recommended reaching out to her and asked if she would be willing to give him her password so he could unlink their accounts. *Id.* at PageID.1013. Roe declined and asked him to "[p]lease stop contacting [her]." *Id*. Plaintiff responded that he would file a lawsuit in state court for damages and Roe "may hear from [his] lawyer if this is not resolved." *Id.* at PageID.1014.

On October 25, 2018, Roe received an email from wolffsmithlawfirm@gmail.com.[4] Atty Email, ECF No. 43-8, PageID.1015. The email purported to be from Alexander Wolff-Smith, an attorney representing Plaintiff in a case against Roe in the 36th District Court. *Id.* He warned that failure to appear at the preliminary hearing could result in a fine of up to $5000 and "strongly encourage[d]" Roe to settle. *Id.* The next day, Plaintiff followed up saying his "lawyer told [Plaintiff] he emailed [Roe] yesterday" and that she should review

---

[4]   According to business records subpoenaed from Google, the "wolffsmithlawfirm@gmail.com" account was created the same day, just over an hour before the email was sent. Google Records, ECF No. 43-10, PageID.1021.

8

the email and let Plaintiff know how she wanted to proceed.[5]  Roe-Eid Texts, ECF No. 43-7, PageID.1014.

### 3.  The WSU Process

*The Complaint*

On October 29, 2018, Roe filed an online complaint against Plaintiff using WSU's general complaint form.  Camaj Report, ECF No. 43-6, PageID.968.  She alleged Plaintiff had been "harassing" her since 2016 and relayed their interactions to date.  *Id.* at PageID.968-69.  She surmised that his goal in obtaining her social media passwords was to retrieve pictures saved in the applications.  *Id.* at PageID.969.  Roe also posited Plaintiff had pretended to be her in an attempt obtain photos from a photographer she had worked with in the past, although she could not be sure it was him.  *Id*.  Roe stated she called the Wolff-Smith law firm and confirmed the email she received did not come from any of their employees and then called the 36th District Court to confirm she was not on the docket for the date listed in the email.  *Id*.  Roe indicated that in addition to "no longer being harassed," her desired outcome was for Plaintiff "to be held accountable for targeting impressionable female students" because he was "abusing his power as being one of

---

[5] This is the only text message Plaintiff disputes sending, although he does not know how it ended up in the conversation thread.  Eid Dep. II, ECF No. 46-1, PageID.1174.

9

the top of the class at med school." *Id*. Roe did not specify that she would like to file charges against Plaintiff under the WSU Student Code of Conduct, so no charges were filed. Camaj Dep., ECF No. 44-5, PageID.1131.

Roe's mother, a nurse, worked with a physician on the SOM faculty. Chadwell Dep. ECF No. 44-4, PageID.1116. After she mentioned the situation, the physician encouraged her to report it to the SOM. *Id*. Mrs. Roe contacted Defendant Chadwell, the Associate Dean of Student Affairs and Career Development, on October 31, and they spoke over the phone for about fifteen minutes. *Id*. Mrs. Roe sent a follow-up email thanking Dr. Chadwell for her suggestions for further actions and mentioning that Jane Roe was attempting to file police reports in Detroit and Colorado, where she now lived. Mrs. Roe Email, ECF No. 43-9, PageID.1017. The email also included several attachments, including samples of the text messages Plaintiff had sent Roe, the Wolff-Smith law email, and the 36th District Court docket. *Id*. Mrs. Roe speculated the day of the fake hearing was used to scare her daughter because someone of the same name was on the docket and the purpose might have been to "lure" Roe to a specific location on a specific date, using the threat of the $5000 fine, "to obtain money or to obtain her passwords." *Id*. Finally, Mrs. Roe expressed, as she had during their phone conversation, that she was "very concerned about someone with this character becoming a doctor" because she

10

"would not want this type of person caring for [her] family, friends or any patients/families." *Id.*

*The Fact-Finding*

Defendant Chadwell shared the complaint with Defendant Baker, the Vice Dean of Medical Education, on November 1, 2018, and then forwarded the email to Defendant Robichaud, Plaintiff's counselor through the SOM.  Chadwell-Baker-Robichaud Emails, ECF No. 54-5, PageID.2051.  Chadwell stated there was a police report in progress, but Mrs. Roe was encouraged to reach out to her. *Id.*  At the time of the email, Chadwell and Dean Strauss, WSU's Assistant Dean of Students who was copied on the complaint, "agree[d] it [was] a police matter and that has to take its course," but Chadwell wanted Baker's input as well. *Id*.  She planned to raise the issue at the Behavioral Intervention Team ("BIT") meeting the following Monday.[6] *Id*.

Chadwell was

"concern[ed]" the issue would "be handled correctly as this is [an SOM] student and [the SOM] ha[s] [its] own professionalism standards to uphold . . . . Also, [the SOM] ha[s] to look at the development of this in the context of the academic integrity concerns that have emerged about Anthony.  Of note, Dean Strauss mentioned in passing that Anthony had a Code of Conduct investigation this Summer for

---

[6] Defendants have claimed attorney-client privilege over this meeting as it included their General Counsel.

11

> Computer Fraud that was unsubstantiated.[7]  [The SOM] w[as] never
> notified about this.  Anthony's leadership position surely lends gravity
> to the constellation of concerns about him."

*Id.* at PageID.2051-52.

On November 4, 2020 Robichaud emailed Chadwell about the BIT meeting and wondered if WSU was at risk now that they knew of Plaintiff's "threats, harassment[,] and cyberbullying."  Robichaud-Chadwell Emails, ECF No. 54-6, PageID.2056.  She said, "Let's not let this happen on our campus as it did @ MSU. We have a duty here."  *Id*.  Robichaud goes on to question whether Plaintiff's actions influenced Roe's decision to transfer given that she was pre-med while at WSU.  *Id*. She also asks whether Chadwell thinks Plaintiff "preyed on any other students @ WSU."  *Id*.  Chadwell responds that she will be participating in the meeting and discussing the issue with Dr. Baker.  *Id*.

The BIT assigned Defendant Camaj, a Student Conduct Officer in the WSU Dean of Student's Office, to speak with the complainant and respondent in the case. Camaj Dep., ECF No. 44-5, PageID.1124, PageID.1128.  She was not tasked with

---

[7] Chadwell tried to obtain records of the computer fraud complaint and finding from Camaj, but the Student Conduct Office did not have records to provide because that complaint ended up being unsubstantiated.  Chadwell-Camaj Emails, ECF No. 43-12, PageID.1023

12

making any credibility determinations or drawing any conclusions; nor was she tasked with investigating beyond taking statements. *Id.* at PageID.1129.

Defendant Camaj interviewed Jane Roe via telephone on November 15, 2018. Camaj Report, ECF No. 43-6, PageID.986. Roe confirmed the accuracy of her complaint and that she had corroborating evidence. *Id.*; Camaj Dep., ECF No. 44-5, PageID.1134. She also stated she filed a police report in Colorado and had spoken to the WSU Police Department. Camaj Report, ECF No. 43-6, PageID.986. After the call, Roe sent Camaj the text messages again because Camaj was unable to open the files submitted with the complaint. Camaj Dep., ECF No. 44-5, PageID.1134.

On November 27, 2018, Camaj emailed Plaintiff inviting him to a "Fact-Finding Conference to discuss concerns reported to [her] about [his] alleged behavior." Camaj Letter, ECF No. 43-11, PageID.1022. She stated his behavior "may be in violation of the Student Code of Conduct." *Id*. The letter provided Camaj's name and title and the time, location, and instructions for arriving at the meeting, but did not contain further details. *See generally id*. On November 29, Plaintiff emailed Camaj asking whether there were any charges currently pending against him or whether the purpose of the meeting was to determine whether charges would be filed. Eid-Camaj Emails, ECF No. 54-9, PageID.2228. He cited the WSU Student Code of Conduct and requested the alleged infraction and the nature of the

13

evidence submitted; he also noted that Camaj's email did not include a copy of the Code.  *Id*.  During her deposition, Camaj stated she did not include charges in the letter because no charges were filed under the Student Code of Conduct, so she was "not required to share anything further."  Camaj Dep., ECF No. 44-5, PageID.1131. She explained that the letter "says it may, and the information that was in the complaint could have resulted in [a violation] and that's the reason [Camaj] wanted to discuss this concerning behavior.  [The letter] didn't say it did, it said it may have." *Id*.

Plaintiff and Camaj met on November 30, 2018.  During the meeting, Camaj explained her role as investigator and that the matter would be referred to the SOM's Professionalism Committee.  Chadwell-Camaj Emails, ECF No. 43-12, PageID.1023.  Plaintiff and Camaj also reviewed the evidence, including the complaint and text messages.  *Id*.  Plaintiff confirmed he knew Roe and explained he had been contacting her in an effort to secure his accounts.  Camaj Report, ECF No. 43-6, PageID.987.  Plaintiff admitted he "stretched the truth" in claiming he had received instruction from Apple about how to fix his account, stating he had a

14

lawyer, or stating he had filed a police report.  *Id.*  Plaintiff, however, denied sending an email pretending to be an attorney.[8]  *Id.*

Plaintiff asked Camaj if he could include an apology letter in the materials for the Professionalism Committee, and she told him he could send it to her via email after the meeting.  Camaj Dep., ECF No. 44-5, PageID.1134.  In his letter, Plaintiff explained how he met Jane Roe, that he was concerned for her mental health after seeing some of her posts on Twitter, and how he thought, "in [his] immaturity[,] . . . that appealing to vanity might help foster a closer friendship" but he intended for it to be a platonic one.  Camaj Report, ECF No. 43-6, PageID.988.  Plaintiff also explained his belief that Roe was routinely accessing his iCloud account, which is why he reached out to her about meeting in person or obtaining a temporary password—so he could secure his account.  *Id.*  Plaintiff said that his last communication with Roe was on October 27—presumably of 2018—when he received eight phone calls from a private number and one from a Colorado number, which he assumes was Roe or one of her associates.  *Idi.*  The person on the phone called Plaintiff a "dirty Arab" and told him to "enjoy this country while [he] is still

---

[8]According to business records subpoenaed from Google, the "wolffsmithlawfirm@gmail.com" account was deleted by the account holder about fifteen minutes after Plaintiff responded to Camaj's email requesting a meeting. Google Records, ECF No. 43-10, PageID.1021.

15

in it." *Id.* Plaintiff did not report this incident to the police or WSU because Roe

was not a student at the time and filing a police report felt like unnecessary stress at

the time. *Id.* at PageID.988-89.

Plaintiff stated:

I take full responsibility for the text messages/Facebook messages that
were to [Jane Roe]. I deeply regret how this incident has taken place.
I understand that I lied to person about many things, and I am very sorry
about that. I never had a lawyer like I stated I did in the messages, and
while I did consider suing for damages in civil court regarding this
issue, I never did go file in court for any such damages. I said these
things so [Roe] would work with me to fix the issue with my account
and so she would take me seriously. It was wrong, and I should have
been more honest with her. This represents a major character flaw that
I know I feel terribly about. I promise that I will be working on myself
to fix this flaw, through deep self-reflection and perhaps professional
help if deemed necessary. . . .
                                    . . .
In my eyes, while these actions do represent a character flaw that I
deeply regret, I think it is also important to note that the actions in
themselves are not a medical school issue, but rather a civil one. It is
not against the student code of conduct of the medical school to mislead
a 3rd part individual, who was *not a student* at the time the alleged
incident took place, about a private matter that has nothing to do with
the University, Medicine, the or [*sic*] my studies. I also do not think
this meets the legal criteria of "harassment", and to the best of my
knowledge, I have not been charged with any crime alleging
harassment, or any other charges related to this incident. This incident
has no bearing, in any way on my studies, and the alleged harassment
did not take place on campus grounds. If [Roe] would like to file civil

16

charges against me, I would be happy to defend myself in a court of law.

*Id.* at PageID.989-90.

On December 4, 2018, after interviewing both parties and collecting any documents they wished to share, Camaj forwarded the packet to Defendant Chadwell, WSU's General Counsel, and Plaintiff.   Camaj Dep., ECF No. 44-5, PageID.1129.

*The Professionalism Committee*

Chadwell sent the report to the Chair of the Professionalism Committee, Defendant Jackson.  Chadwell Dep., ECF No. 54-10, PageID.2286-87.  She also sent it to Defendant Baker, the Chair of the Promotions Committee.  *Id.* at PageID.2288.

On December 10, 2018, Jackson emailed Mrs. Roe and asked if she would be willing to present on behalf of her daughter during the hearing because Jane Roe was out of state.   Jackson-Mrs. Roe-Chadwell Emails, ECF No. 54-12, PageID.2337. Mrs. Roe responded that she was "willing to be present and respond to the best of [her] knowledge," but her daughter would be better.  Mrs. Roe-SOM Emails, ECF No. 54-15, PageID.2350.  She then asked if it would be possible for Jane Roe to attend via videocall if Mrs. Roe was also there in person.  *Id*.  Jackson agreed and then explained the hearing process.  *Id.* at PageID.2349.  After some discussion about scheduling, they settled on a date in early February 2019.  *Id.* at PageID.2348.

17

When Chadwell expressed that seemed "really far away" but that it was important to accommodate the Roe's presence at the hearing, Jackson agreed that they would be "very compelling" and that "the committee needs to hear from them." *Id.* at PageID.2347.

Chadwell contacted Jackson to request that he not include Mrs. Roe's email to Chadwell in the Committee packet.   Jackson-Mrs. Roe-Chadwell Emails, ECF No. 54-12, PageID.2337.   During her deposition, Chadwell explained that she requested the email be removed because it suggested Roe could obtain a personal protection order against Plaintiff.   Chadwell Dep., ECF No. 44- 4, PageID.1122.   As Chadwell and Dean Strauss were not sure Plaintiff's conduct rose to the level of warranting a personal protective order or whether Roe had obtained one, Chadwell did not want that suggestion to taint the Committee's consideration of Plaintiff's professionalism. *Id.*

On December 14, 2018, Defendant Jackson emailed Plaintiff to inform him Camaj concluded her investigation on December 4 and forwarded her report to the SOM for adjudication and that the Professionalism Committee would convene on February 7, 2019 to hear his case.   Jackson-Eid Email, ECF No. 43-13, PageID.1025. Jackson explained Plaintiff would have the opportunity to appear before the Committee at the hearing and that he would have the chance to review the

18

documentation provided to the Committee prior to the hearing.  *Id*.  Plaintiff subsequently met with Defendant Jackson on January 25, 2019.  Eid Dep., ECF No. 45-1, PageID.1158.  He reviewed Camaj's report and supporting documentation.[9] *Id*.; Jackson Dep., ECF No. 44-6, PageID.1140.  Plaintiff testified that, during this meeting, Jackson minimized his risk of dismissal and instead suggested the matter would result in a mark on his Medical Student Performance Evaluation.  ECF No. 54, PageID.1721 (citing Eid Dep. at 359-60).

Jane Roe and her mother presented first at the Professionalism Committee hearing.  Prof. Comm. Minutes, ECF No. 43-14, PageID.1026.  Roe recounted her interactions with Plaintiff over the preceding two years.  *Id*.  She described his insistence in obtaining her iCloud password to "allegedly unlink" their accounts.  *Id*. Despite believing Plaintiff's explanation was "spurious," Roe created a temporary password and shared it with Plaintiff in the hope that he would stop contacting her. *Id*.  However, Roe suspected Plaintiff had hacked her due to some unusual activity on her accounts.  *Id*.  She also reiterated that an email from an unfamiliar Gmail account had been sent to a photographer asking for pictures from an intimate shoot. *Id*.  She also shared that someone hacked into her Snapchat account to ask an ex-

---

[9] Plaintiff disputes how much of the report was available for him to review. Specifically, he says he did not see the allegations that he had attempted to hack Roe's Snapchat until his appeal.  Eid Dep., ECF No. 45-1, PageID.1158.

boyfriend to send nude pictures of her. *Id*. After viewing the application's GPS features, Roe determined the hacker had accessed her account from Detroit, near WSU's campus. *Id.* at PageID.1027. Although she did not have proof, Roe suspected Plaintiff had accessed her account because he was the only person with the login information. *Id*. At this juncture, Defendant Jackson reviewed Plaintiff's student profile and confirmed that he lived at the intersection from which Roe's account was accessed. *Id*.

Roe then explained how Plaintiff contacted her in October 2018 about hearing from his lawyer as well as her efforts to verify the legitimacy of the Wolff-Smith law email and the hearing date. *Id*. Roe shared that she "felt horrified during the two-year period of harassment" and that it was part of the reason why she withdrew from WSU and moved to Colorado. *Id*. Roe's mother explained that she contacted Defendant Chadwell after being encouraged by her coworkers when the investigation through the main campus Dean of Students Office "did not fully address the incident nor involve the SOM." *Id*. Both Roe and her mother were "worried" about Plaintiff "doing the same thing or much worse to others, especially vulnerable individuals as a medical student and future physician." *Id.* at PageID.1028.

20

Plaintiff began by reading his statement to the Committee.  *Id*.  He also committed to a remediation plan that included regular meetings with a psychiatrist; regular meetings with Defendant Robichaud, his counselor; taking an online ethics course; writing an apology letter to Roe for someone else to deliver; and writing a reflection on the incident.  *Id*.  Plaintiff then explained that his accounts, including that of his credit card, began getting hacked three to four months after he met Roe.  *Id*.  He believed she was responsible because he was still getting hacked despite changing his passwords, his accounts were all linked to his iCloud account, and he had given her his iCloud password to give her the study materials.  *Id*.  Plaintiff "admitted to lying to [Jane Roe] so that she would take the situation seriously" because she was the only person who had his iCloud password.  *Id*.  Plaintiff also admitted to lying about engaging with Apple Support, the police, or a lawyer.  *Id*.  However, Plaintiff denied sending the email impersonating the lawyer or knowing who would have done so on his behalf.  *Id*.  He did not answer the Committee's question about why he had sent the text about whether Roe had seen the email from his attorney but agreed with a Committee member who stated that "habitual lying is a character flaw."  *Id.* at PageID.1029.

Plaintiff denied accessing any of Roe's accounts.  *Id.* He did, however, confirm his address as the same one listed in his student profile.  *Id*.   When asked,

21

Plaintiff stated he did not know the formal definition of harassment, but he did not think his conduct toward Roe constituted such. *Id*. Plaintiff noted this was his only incident of unprofessional behavior during his nine years at WSU and that he did not want to tarnish his reputation. *Id*.

During its deliberations, the Committee was not certain whether Plaintiff sent the email impersonating the attorney but felt the other evidence was sufficient to make a decision. *Id*. Specifically, based on his "repeated lying and harassment towards [Jane Roe] as well as the screenshot of [Roe'] Snapchat location appearing as Mr. Eid's residence," the Committee unanimously decided his "behavior was not consistent with that of a future physician" and that they did "not feel comfortable letting Mr. Eid further purse his medical education." *Id*.

On February 11, 2019, Defendant Jackson sent Plaintiff a notice reiterating that the Professionalism Committee convened "to review reported violations of the Wayne State University School of Medicine professionalism standards." Prof. Comm. Letter, ECF No. 43-15, PageID.1030. The letter detailed what had happened in Plaintiff's case thus far, including Roe's complaint, Plaintiff's meeting with Camaj, Camaj forwarding her report to the Committee, and Plaintiff's opportunity to review documents. *Id*. Jackson further stated, "The Professionalism Committee has decided to refer your case to the School of Medicine [P]romotions [C]committee

22

with a recommendation for dismissal" based on Plaintiff's demonstrated "pattern of harassment and misrepresentation that is not consistent with the values and attributes that are the core professionalism standards for Wayne State University School of Medicine: [p]rofessional responsibility, [c]ompetence and self-improvement, [r]espect for others and for professional relationships, [h]onesty including academic integrity, personal responsibility, [and] [s]ocial responsibility." *Id.*

*The Promotions Committee*

As he did for the Professionalism Committee, Plaintiff submitted a statement for the Promotions Committee.  Prom. Comm. Statement, ECF No. 43-16.  He met with Defendant Robichaud for guidance in preparing the statement.  ECF No. 54, PageID.1723 (citing Eid Dep. at 313-14). It began: "Medical school is more than learning about the art of healing—it's also a time to develop the traits of a physician: honesty, professionalism, and integrity.  When it came to exhibit these important qualities, I was severely lacking."  Prom. Comm. Statement, ECF No. 43-16, PageID.1032.   Other than the introduction and when he addresses the Professionalism Committee's decision, the Promotions Committee statement is substantively, if not exactly, the same as the Professionalism Committee statement. *Compare* Camaj Report, ECF No. 43-6, PageID.988-90 *with* Prom. Comm.

23

Statement, ECF No. 43-16.  Notably, Plaintiff again "[took] full responsibility for the text messages/Facebook messages that were sent to [Roe]." *Id.* at PageID.1033.

Regarding the Professionalism Committee's recommendation, Plaintiff stated, he was "confused as to which specific code of conduct or school of medicine policies" he had broken.  *Id.* at PageID.1034.  He emphasized that it was "important to note that the actions in themselves are not a medical school issue, but rather a civil one," and that his "accuser was not a student at the time the alleged incident took place and was only a student at this university for one semester[,] . . . so I do not understand how this could fall under student mistreatment." *Id.*  Plaintiff further stated he was "confused as to how the professionalism committee's decision [could] accuse [him] of [harassment and misrepresentation] even though [he had] not been by the proper authorities." *Id.*  He "reiterate[d] that this whole situation has no bearing, in any way[,] on [his] studies, [his] future patients, or any other members of the SOM community." *Id.*  Finally, Plaintiff stated he "believe[d] the recommendation of professionalism committee to be extreme for the actions that have taken place, like [he was] receiving the death penalty for shoplifting." *Id.* at PageID.1035.

Plaintiff concluded his letter by sharing that being a medical student was "the single defining factor of [his] identity." *Id.* at PageID.1036.  He asserted "irreputable

24

harm" would be done to his future if he was dismissed because he has wanted to be a physician since he was five years old.  *Id*.

The Promotions Committee convened on February 27, 2019.  Prom. Comm. Minutes, ECF No. 43-17, PageID.1037.  The Committee reviewed this statement in addition to the Professionalism Committee hearing minutes and the documents reviewed by that Committee.  *Id.*  The Promotions Committee also reviewed Plaintiff's academic performance and interviewed Plaintiff at "great length" regarding the information both he and the Professionalism Committee provided.  *Id*. While asking Plaintiff questions, "[t]he committee noted that the student provided conflicting details that did not coincide with the information noted in several documents reviewed by the committee."  *Id*.  In addition, when the Committee questioned Plaintiff's integrity, the members noted "his total disregard for accepting any responsibility for his actions."  *Id*.  They were "extremely concern[ed]" that he never "admit[ted] to any wrong doing [*sic*] on his part."  *Id*.  "After a lengthy deliberation" the Promotions Committee unanimously decided "to dismiss the student from medical school based on his professionalism actions and lack of integrity."  *Id*.

In affidavits submitted to the Court, members of the Promotions Committee explained they were troubled by the "inconsistencies in [Plaintiff's] written

25

statements between his purported acknowledgment of wrongdoing and his assertions that it did not bear on his fitness to be a doctor." Gray Decl., ECF No. 43-2, PageID.808; *see also* Waineo Decl., ECF No. 43-20, PageID.1052; Braun Decl., ECF No. 43-19, PageID.1045-46.

Later the same day, Defendant Baker, the chair of the Promotions Committee sent Plaintiff a letter informing him of the Committee's decision. Prom. Committee Letter, ECF No. 43-21, PageID.1057. It explained that the "decision was reached after careful committee deliberation based upon an evaluation and discussion of [Plaintiff's] entire academic record/academic progress and the information [Plaintiff] provided to the committee at [his] hearing." *Id*. The letter informed Plaintiff that he had "the option to voluntarily withdraw from the School of Medicine or to appeal this decision" to the Promotions Committee and that a letter stating his intention must be received within ten business days. *Id*. Further, any such appeal must be based on new information only. *Id*. Lastly, the letter stated Plaintiff could request Provost Review within thirty days once he had exhausted the internal SOM appeal process. *Id*.

*The Appeals*

On March 5, 2019, Plaintiff emailed Defendant Robichaud various questions he wanted to ask Dr. Baker, which Robichaud then forwarded to Vickie Muhammad,

26

Baker's assistant. Eid-Robichaud-Muhammad Emails, ECF No. 43-22, PageID.1058. Plaintiff wanted to ask Defendant Baker, *inter alia*, for more time to decide between voluntarily withdrawing and appealing because "ten days [was] simply not enough time for [him] to make a decision of this magnitude" and whether he could retain the option to voluntarily withdraw even if he appeals through the Provost level and is denied. *Id.* According to an email Muhammad sent to Chadwell to keep her in the loop, Defendant Baker and Plaintiff met the following day, and Baker "gave him an extension beyond the 10 business days (March 13th) . . . to March 20th to submit his appeal or withdraw . . . ."[10] Muhammad-Chadwell Emails, ECF No. 43-23, PageID.1060.

On March 20, 2019, Plaintiff emailed Defendant Baker appealing his dismissal. Prom Comm. Appeal, ECF No. 43-24, PageID.1062. In his appeal packet, Plaintiff submitted, *inter alia*, his proposed letter to Jane Roe and her family that apologized for not believing her when she said she was not accessing his accounts, *id.* at PageID.1071, screenshots showing Plaintiff's Apple ID was being accessed from Colorado, *id.* at PageID.1072-73, screenshots showing Plaintiff's

---

[10] Prior to his appeal to the Provost and during his deposition, Plaintiff stated Baker had instead informed him that he could still voluntarily withdraw after appealing to the Promotions Committee as long as he did not appeal to the Provost's Office. ECF No. 54, PageID.1724 (citing Eid Dep. at 314-15).

27

credit card, Google, and debit card accounts were compromised, *id.* at PageID.1074-94, and a letter from the WSU Physician Group stating that Plaintiff was seeing a therapist and psychiatrist and focusing on reflection and self-awareness during his sessions, *id.* at PageID.1095.

Plaintiff's appeal letter stated he "was not surprised, but very upset and distraught to receive" notice of his dismissal. *Id.* at PageID.1067. He further stated he "underst[ood] the issues that [Dean Baker] and the committee [were] worried about." *Id.* Plaintiff explained that the only reason he contacted Roe was because a message from Apple said his account had been accessed in Colorado, and he kept contacting her because of other notifications regarding strange account activity. *Id.* He reiterated how much becoming a doctor means to him, *id.*, and discussed the issues this news has caused in his personal relationships, *id.* at PageID.1068. Plaintiff also shared that he and his therapist had concluded his traumatic childhood likely factored into the way he handled the situation with Roe. *Id.* Finally, Plaintiff reiterated his commitment to improving his behavior. *Id.* at PageID.1068-1069. Plaintiff stated he "ha[d] owned up to [his] actions, with full honesty, taken responsibility for them, ha[d] put in motion/ha[d] started to execute a plan of action to better [him]self . . . ." *Id.* at PageID.1069. Via addendum, Plaintiff also "ma[d]e

28

it as clear as possible that [he] never, in any way, tried to obtain or view any photos, videos or any other content related to [Roe]." *Id.* at PageID.1102.

The Promotions Committee reviewed Plaintiff's appeal at a meeting on April 10, 2019. Eid-Muhammad-Robichaud Emails, ECF No. 44-2, PageID.1109. The Committee denied Plaintiff's appeal because his written statement and additional information were "not sufficient to reverse their decision of dismissal." ECF No. 43, PageID.781 (citing Prom. Comm. Appeal Letter). On May 6, 2019, Plaintiff responded to Muhammad, who had sent him the decision letter on April 10, saying Defendant Baker had told him he could still withdraw if the appeal to the Promotions Committee was unsuccessful and asking how he should go about doing so. Eid-Muhammad-Robichaud Emails, ECF No. 44-2, PageID.1109. Muhammad responded that while Defendant Baker did meet with Plaintiff on March 6, "he did not change the SOM policy in that regard," and Plaintiff's choice, "which was clearly articulated to [him] both in [Plaintiff's] dismissal letter of February 27, 2019 and in [their] meeting of March 6, 2019" was to withdraw *or* appeal to the Promotions Committee and then to the Provost. *Id.* at PageID.1108.

Thus, Plaintiff appealed to the WSU Provost Office. Provost Appeal, ECF No. 44-1. Plaintiff asserted the process violated his right to due process as well as the Student Code of Conduct and the Professionalism Committee Bylaws because

29

(1) Camaj had not answered his requests for information about the nature of their meeting, in violation of the Student Code of Conduct; (2) the case was referred to the SOM for adjudication instead of remaining at the University level; (3) two of the student members of the Professionalism Committee were not present; (4) none of the Professionalism Committee's procedural steps were followed other than holding a formal hearing; (5) he was not provided the Professionalism Committee's notes prior to the Promotions Committee hearing; and (6) the Promotions Committee did not review the peer reviews he submitted. *Id.* at PageID.1104-05.

Plaintiff also averred that Defendants Baker and Robichaud had assured him he would be able to withdraw if his appeal to the Promotions Committee was unfavorable. *Id.* at PageID.1106. He also stated he was never given the formal letter indicating his dismissal. *Id.* Further, Plaintiff argued the dismissal was arbitrary and capricious because he was not aware dismissal was an option based on the complaint that had been filed against him and was told that he did not need an attorney during the process. *Id.* Moreover, he was not aware "what the actual specific and explicit parts of the student code of conduct or the school of medicine student handbook [he] violated." *Id.* Finally, Plaintiff contended "Dismissal from medical school [did] not appear to be the next logical step in a first-time infraction

30

for non-criminal, non-violent offense that has nothing to do with medicals school or the practice of medicine." *Id*.

Associate Provost Dr. Darin Ellis issued a decision denying Plaintiff's appeal. Provost Letter, ECF No. 44-3. Dr. Ellis found: neither the fact-finding conference with Camaj nor forwarding the Plaintiff's case to the SOM Professionalism Committee were improper; students on the Professionalism Committee serve an advisory role and are not necessary for quorum; the Professionalism Committee followed its procedure as laid out in its Bylaws; the Professionalism Committee's deliberative notes are confidential and Plaintiff was not entitled to see them; Plaintiff was adequately prepared for the hearing because Defendants Chadwell and Robichaud met with Plaintiff to discuss the Promotions Committee hearing and Plaintiff's preparations; Plaintiff did not need to submit his peer reviews as the Promotions Committee had access to them and was allowed to review them if deemed relevant; and Plaintiff was informed through various means of the Promotions Committee's decision and a read receipt indicated accessed the letter on April 15. *Id.* at PageID.1112-13. Thus, Dr. Ellis "found that evidence was appropriately considered and that [Plaintiff was] afforded the fullest extent of due process procedures." *Id.* at PageID.1113. Moreover, he "could find no evidence that the evaluation of [Plaintiff's] case was based on criteria not directly reflective

31

of [his] professionalism relative to the school's requirements.  In fact, all evidence points to the fact that the decision to dismiss [Plaintiff] was based solely upon the collective academic decision making of the Promotions Committee." *Id*.

### B. Procedural Background

Plaintiff initially filed a 119-page anonymous Complaint alleging violations of his Fourteenth Amendment right to due process and equal protection, Title IX, and Michigan's Due Process and Fair and Just Treatment Clauses as well as bringing claims for promissory estoppel and intentional infliction of emotional dismiss. Compl., ECF No. 1.  Defendants moved to dismiss the Complaint without prejudice for failure to "name all the parties" as required by Fed. R. Civ. P. 10(a) and violating the letter and spirit of Fed. R. Civ. P. 8's requirements that complaints consist of a "short and plain statement of [each] claim showing that the pleader is entitle to relief," and that each allegation "be simple, concise, and direct."  ECF No. 5, PageID.273.  The Court subsequently granted Defendants' Motion to Dismiss and denied Plaintiff's later-filed Motion for Protective Order to Permit Plaintiff to Proceed Anonymously (ECF No. 8).  ECF No. 23.

Plaintiff filed an Amended Complaint asserting the same claims.  ECF No. 24. Specifically, he alleges all Defendants violated his Fourteenth Amendment right to due process (Count I) and equal protection (Count III), violated his right to due

32

process and fair and just treatment under Article 1 § 17 of the Michigan Constitution (Count V), and intentionally inflicted him with emotional distress (Count VI).  Am. Compl., ECF No. 24, PageID.544-58.  He also brings a claim under Title IX (Count II) and a state law claim for estoppel and reliance (Count IV) against WSU.  *Id*.

The Defendants moved for summary judgment on several grounds.  ECF No. 43.  Their arguments, and Plaintiff's responses, ECF No. 54, are discussed in greater detail *infra*.

## III.   LAW & ANALYSIS

### A. Legal Standard

"Summary judgment is appropriate when there is 'no genuine dispute as to any material fact' and the moving party 'is entitled to judgment as a matter of law." *F.P. Dev., LLC v. Charter Twp. of Canton, Michigan*, 16 F.4th 198, 203 (6th Cir. 2021) (quoting Fed. R. Civ. P. 56(a)).  "A fact is material if its resolution will affect the outcome of the lawsuit."  *Id*.  The court must view the facts, and draw reasonable inferences from those facts, in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986).  To support their arguments for or against summary judgment, parties may "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for

33

purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). They may also "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).

Ultimately, the court evaluates "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52; *see also Tolan v. Cotton*, 572 U.S. 650, 656 (2014) ("[The] general rule [is] that a judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.") (internal quotation marks omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

34

"[T]he standard that a movant must meet to obtain summary judgment depends on who will bear the burden of proof at trial." *Pineda v. Hamilton Cty., Ohio*, 977 F.3d 483, 491 (6th Cir. 2020) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  Thus, if the nonmoving party will bear the burden of proof on a claim, the movant "need only demonstrate that the nonmoving party has failed to 'make a showing sufficient to establish the existence of an essential element' of that claim." *Id.* (quoting *Celotex*, 477 U.S. at 322).

## B. Discussion

### 1. Sovereign immunity bars Eid's requests for monetary damages or retroactive injunctive relief from WSU and the individual Defendants in their official capacities on all Counts but Count II.

First, Defendants argue Plaintiff's claims are barred by sovereign immunity to the extent they seek monetary damages or retrospective injunctive relief against WSU, which is an arm of the state of Michigan, or the individual Defendants in their official capacities.  ECF No. 43, PageID.784 (citing *Kreipke v. Wayne State Univ.*, 807 F.3d 768, 781 (6th Cir. 2015); *Kentucky v. Graham*, 473 U.S. 159, 167 (1985)).  Because sovereign immunity applies to § 1983 and state law claims, *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66 (1989*); Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984), they contend Counts I and III, IV, V, and VI should be dismissed "to the extent they seek monetary damages or retroactive

35

injunctive relief from the University or the individual [D]efendants in their official capacity." *Id.* at PageID.785.

Plaintiff does not actually dispute this argument. Instead, Plaintiff asserts the individual Defendants can be sued for damages in their *personal* capacities. ECF No. 54, PageID.1725 (citing *Monroe v. Pape*, 365 U.S. 167, 170- 1 (1961)). Moreover, Plaintiff avers state officials can be sued in their respective personal and official capacities for *prospective* declaratory or injunctive relief. *Id.* (citing *Mitchell v. Schroeder*, 2022 U.S. Dist. LEXIS 16172, *18 (W.D. Mich. 2022)). Thus, Plaintiff maintains "Defendant University can be held liable for prospective declaratory or injunctive relief and each individually named defendant that is not entitled to qualified immunity is not immune from suit for monetary damages." *Id.* at PageID.1725-26.

Notably, Defendants did not seek dismissal of Count II on sovereign immunity grounds. *See generally* ECF No. 43, PageID.784-85. Nevertheless, Plaintiff is correct in pointing out that the Sixth Circuit has held that "Congress successfully abrogated the states' Eleventh Amendment immunity from Title IX lawsuits." *Franks v. Kentucky Sch. For the Deaf*, 142 F.3d 360, 363 (6th Cir. 1998).

As the parties are in agreement and have correctly stated the law, the Court will dismiss Count I, Count III, Count IV, Count V, and Count VI to the extent they

36

seek monetary damages or retroactive injunctive or declaratory relief from WSU or the individual Defendants in their official capacities.  Ordinarily these claims would be dismissed without prejudice.  *See Hess v. Port Auth. Trans–Hudson Corp.,* 513 U.S. 30, 39 (1994) ("The Eleventh Amendment largely shields States from suit in federal court without their consent, leaving parties with claims against a State to present them, if the State permits, in the State's own tribunals.").  However, for the reasons discussed *infra*, Defendants are entitled to summary judgment on the merits of Plaintiff's claims.

## 2. Defendants are entitled to summary judgment on Eid's due process claim

Second, Defendants argue they are entitled to summary judgment on Count I, Plaintiff's Fourteenth Amendment due process claim on several grounds. Specifically, they assert Plaintiff (1) cannot establish a procedural due process claim because he has not demonstrated a protected property or liberty interest, and to the extent that he has alleged a protected interest, he received sufficient process for the deprivation; (2) substantive due process does not protect a medical student's interest in his enrollment; and (3) the individual Defendants are entitled to qualified immunity on Count I.

37

i.   **Regardless of whether Eid has a protected interest, he received sufficient process for an academic dismissal.**

As a threshold matter, the Court must determine whether Plaintiff has established a protected interest that is cognizable under the Fourteenth Amendment's Due Process Clause.

Plaintiff first asserts "a protected liberty interest in, *inter alia*, his good name reputation, honor and integrity." Am. Compl., ECF No. 24, PageID.545. Defendants do not contest the existence of such a right, but argue that to establish its violation, "he must show, among other things, that the University publicly disclosed stigmatizing information in connection with his dismissal." ECF No. 43, PageID.785-86 (citing *Paul v. Davis*, 424 U.S. 693, 710–12 (1976); *Siegert v. Gilley*, 500 U.S. 226, 233 (1991)). They aver Plaintiff is unable to satisfy this requirement because "the only communications about Eid's dismissal were private letters issued to him and University officials involved that simply set forth the Committee's decision." *Id.* (citing Prof. Comm. Letter, ECF No. 43-15; Prom. Comm. Letter, ECF No. 43-21).

Notably, in his Amended Complaint, Plaintiff himself implied WSU did not publicly release any information about his dismissal, leaving his former classmates to speculate about what happened. Am. Compl., ECF No. 24, PageID.542 ("Because Plaintiff's wrongful dismissal resulted in his virtual disappearance from the SOM's

38

Board activities and student government, Plaintiff's professional reputation in the SOM community and larger University community has been damaged, as rumors and innuendo have raised questions about Plaintiff, his conduct, and his reasons for disappearance from the SOM."). Regardless, Plaintiff did not respond to Defendants' argument that he has not established the school violated his liberty interest in his reputation and effectively conceded the issue. *See Degolia v. Kenton Cty.*, 381 F. Supp. 3d 740, 759–60 (E.D. Ky. 2019) ("[I]t is well understood . . . that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.") (quoting *Rouse v. Caruso*, No. 6-cv-10961-DT, 2011 WL 918327, at *18 (E.D. Mich. Feb. 18, 2011)) (internal quotation marks omitted).

Plaintiff also asserts "a protected property interest in, *inter alia*, pursuing his medical school education as well as in future education and employment opportunities and liberty to pursue other opportunities." Am. Compl., ECF No. 24, PageID.545. He further claims his "Constitutionally protected property interest in his Constitutionally protect right to continued enrollment at WSU [] arises from the express and implied contract between Plaintiff and WSU, the policies and procedures set forth by WSU in its Student Code of Conduct together with the

39

practices, patterns of conduct, and understandings established by WSU." *Id.* at PageID.546.

Defendants point out that this assertion "overlooks that the promotions and graduation requirements [pursuant to which Plaintiff was dismissed] come from the School of Medicine's handbook, not the Code of Conduct." ECF No. 43, PageID.785. Additionally, they maintain that Michigan does not recognize this kind of property interest. *Id.* (citing *Ewing v. Bd. of Regents of Univ. of Michigan*, 559 F. Supp. 791, 800 (E.D. Mich. 1983); *Cuddihy v. Wayne State Univ.*, 413 N.W.2d 692, 695 (Mich. Ct. App. 1987)). Plaintiff counters that a student's liberty interest is implicated when he is suspended or expelled from school. ECF No. 54, PageID.1727 ("It is beyond dispute that expulsion, the ultimate disciplinary sanction for a student, creates a cognizable liberty interest.").

"Because property interests are creatures of state law, [Plaintiff] would have been required to show at trial that [his] seat at the Medical School was a 'property' interest recognized by [Michigan] state law." *Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 82 (1978). However, as with the liberty interest in his reputation, Plaintiff did not respond to Defendants' argument that he has not asserted a property interest and has also conceded this issue. Thus, the Court will instead address Plaintiff's newly asserted liberty interest in his continued enrollment.

40

In *Flaim v. Medical College of Ohio*, the Sixth Circuit stated, "In this Circuit we have held that the Due Process Clause is implicated by higher education disciplinary decisions."[11]  418 F.3d 629, 633 (6th Cir. 2005) (collecting cases). However, the amount of process due varies according to the facts of the situation and is determined using the framework set by the Supreme Court in *Mathews v. Elridge*, 424 U.S. 319 (1976).  *Id.*  Without determining whether there is a constitutionally protected interest in pursuing a medical career, the Supreme Court held dismissal based on "the failure of a student to meet academic standards" "calls for far less stringent procedural requirements" than those based on "the violation by a student of valid rules of conduct."  *Horowitz*, 435 U.S. at 86.

Defendants aver Plaintiff was subject to an academic dismissal and received "all the process ordinarily due for academic dismissals and then some."  ECF No. 43, PageID.787.  Plaintiff does not directly respond to this argument.  However, he implicitly argues the dismissal was disciplinary in nature because the

---

[11] Although stated as such in the *Flaim* opinion, this is by no means a settled issue within the Sixth Circuit.  *See McGee v. Schoolcraft Cmty. Coll.,* 167 Fed. App'x. 429, 437 (6th Cir. 2006) ("The issue of whether a student's interest in continued enrollment at a post-secondary institution is protected by procedural due process has not been resolved. Courts have avoided this issue where possible by assuming for the sake of argument that such an interest exists.").  This Court is in good company, then, in assuming, *arguendo*, that Plaintiff does have a protected liberty interest in his continued enrollment and proceeding on that basis.

41

Professionalism Committee hearing focused on sexual harassment and cyberstalking. ECF No. 54, PageID.1734-35. Defendants contest this characterization. ECF No. 57, PageID.2637.

As this Court has previously noted, "[i]n the Sixth Circuit, dismissing a medical student for lack of professionalism is academic evaluation." *Yaldo v. Wayne State Univ.*, 266 F. Supp. 3d 988, 1005 (E.D. Mich. 2017) (citing *Al-Dabagh v. Case W. Rsrv. Univ.*, 777 F.3d 355, 360 (6th Cir. 2015)). When assessing whether an academic dismissal constituted a due process violation, "[a] court must 'show great respect for the faculty's professional judgment' and may not 'override' that judgment 'unless it is such a substantial departure from accepted academic norms as to demonstrate that the . . . committee responsible did not actually exercise professional judgment.'" *Al-Dabagh*, 777 F.3d at 359 (quoting *Regents of Univ. of Mich. v. Ewing,* 474 U.S. 214, 225 (1985)). "Where dismissals are considered academic in nature, procedural due process does not require a hearing before a decisionmaking body either before or after the termination decision is made." *Fuller v. Schoolcraft Coll.*, 909 F. Supp. 2d 862, 876 (E.D. Mich. 2012) (citing *Horowitz,* 435 U.S. at 87–91; *Fenje v. Feld*, 398 F.3d 620, 626 (7th Cir. 2005); *Senu–Oke v. Jackson State Univ.,* 283 Fed. App'x. 236, 240 (5th Cir. 2008)). Rather, "when the student has been fully informed of the faculty's dissatisfaction with the student's

42

academic progress and when the decision to dismiss was careful and deliberate, the Fourteenth Amendment's procedural due process requirement has been met." *Ku v. State of Tennessee*, 322 F.3d 431, 436 (6th Cir. 2003) (citing *Horowitz,* 435 U.S. at 85–86).

Here, it is clear Plaintiff was dismissed for lack of professionalism. For example, Defendant Chadwell, the first person at the SOM to become involved in Plaintiff's case, expressed her concerns about the SOM's "professionalism standards" and "academic integrity" the day after she learned of the allegations from Mrs. Roe. Chadwell-Baker-Robichaud Emails, ECF No. 54-5, PageID.2051. Further, Defendant Baker, the Chair of the Promotions Committee, testified their decision to terminate Plaintiff "w[as] not based" on Jane Roe's allegations; instead, it was "based upon what had transpired in the room and the interaction with [Plaintiff] and the members of the [Promotions] [C]ommittee in that room that day." Baker Dep., ECF No. 46, PageID.1169. He went on to say the Promotions Committee had "concerns relative to veracity of statements, to integrity in terms of issues relative to a lack of awareness for what was perceived by that committee as unprofessional behavior." *Id.* at PageID.1170.

Similarly, the Promotions Committee hearing minutes state the members noted Plaintiff's "total disregard for accepting any responsibility for his actions" and

43

were "extremely concern[ed]" that he never "admit[ted] to any wrong doing [*sic*] on his part." Prom. Comm. Minutes, ECF No. 43-17, PageID.1037. The minutes also explicitly state the Committee dismissed Plaintiff "for his professionalism actions and lack of integrity." *Id*. Indeed, Plaintiff himself admitted he was "severely lacking" honesty, *professionalism*, and integrity and that these are "important qualities" for a physician. Prom. Comm. Statement, ECF No. 43-16, PageID.1032. As the Sixth Circuit has noted, "there can also be no doubt that in the context of medical school, academic evaluations are not limited to consideration of raw grades or other objective criteria." *Ku*, 322 F.3d at 436 (citing *Horowitz,* 435 U.S. at 89–90). It appears Plaintiff knew this, as his appeal to the Promotions Committee stated he "was not surprised, but very upset and distraught" by their decision to dismiss him. Prom. Comm. Appeal, ECF No. 43-24, PageID.1067.

It is also clear Plaintiff was afforded more process than is constitutionally required for an academic dismissal. Plaintiff was "fully informed of the faculty's dissatisfaction" with his compliance with the SOM's professionalism standards when Defendant Jackson informed him Camaj had concluded her investigation and forwarded his case for adjudication to the Professionalism Committee on December 14, 2018 and then met with him to review the documentation that would be before the Committee on January 25, 2019. *See Ku*, 322 F.3d at 436 (6th Cir. 2003) (citing

44

*Horowitz,* 435 U.S. at 85–86).   He was also able to meet with Robichaud, his counselor to prepare for the Promotions Committee hearing. The Promotions Committee's decision to dismiss was "careful and deliberate."  *Ku*, 322 F.3d at 436 (6th Cir. 2003) (citing *Horowitz,* 435 U.S. at 85–86).   And then, Plaintiff went through two rounds of appeals, well beyond what is constitutionally required. Moreover, Plaintiff himself admitted he "was severely lacking" when "it came time to exhibit" honesty, professionalism, and integrity—which he described as "important qualities" of a physician.    Prom. Comm. Letter, ECF No. 43-16, PageID.1032; *see also* Camaj Report, ECF No. 43-6, PageID.989 (stating his dishonesty with Roe "represents a major character flaw").

To the extent Plaintiff argues he was entitled to greater process for his academic dismissal than that required by the Fourteenth Amendment due to the policies set out in WSU Student Code of Conduct and Interim Administrative Hearing Guidelines, ECF No. 54, PageID.1727, PageID.1733-34, the Court disagrees.  The Professionalism Committee Bylaws state: "The School of Medicine Professionalism Committee will conform to the due process procedures of the Wayne State University Student Code of Conduct and the guidelines for implementing the Student Code of Conduct *as adopted by the School of Medicine*." Prof. Comm. Bylaws, ECF No. 43-5, PageID.959 (emphasis added).  Defendant

45

Jackson, the Chair of the Professionalism Committee, confirmed under oath that the Committee is not bound by the Student Code of Conduct.  Jackson Dep., ECF No. 44-6, PageID.1143.  Plaintiff also contends the process transformed into a Student Code of Conduct case because Defendant Jackson approached Ms. Roe about serving as the "Charging Party." ECF No. 54, PageID.1728-29.  However, the procedure outlined in the Professionalism Committee Bylaws refers to charges being filed with the Chair of the Committee, Prof. Comm. Bylaws, ECF No. 43-5, PageID.962-63, so Plaintiff's semantic argument is unavailing.

The Court recognizes that Defendant Camaj's notice letter to Plaintiff caused some understandable confusion.  *See* ECF No. 54-8, PageID.2226 ("I would like to meet with you for a Fact-Finding Conference to discuss concerns reported to me about your alleged behavior on Wayne State University's campus *which may be in violation of the Student Code of Conduct*.") (emphasis added).  However, the content of this letter does not change that, as discussed *supra*, the Student Code of Conduct does not apply to the SOM Professionalism Committee.  Further, Defendant Camaj testified at her deposition that no charges were filed against Plaintiff under the Code of Conduct.  ECF No. 44-5, PageID.1131. Moreover, Camaj told Plaintiff his case was being referred to the Professionalism Committee at their meeting.  Chadwell-Camaj Emails, ECF No. 43-12, PageID.1023.

46

Additionally, the Interim Administrative Hearing Guidelines

apply only in those cases in which:
1. Wayne State University undertakes an investigation into alleged student misconduct, whether by a Tile IX investigator or by an individual authorized to conduct investigations under the Student Code of Conduct[;]
2. The investigation documents competing narratives about the alleged sexual misconduct such that credibility is an issue that is material to the outcome; . . . .

ECF No. 54-20, PageID.2365.  Despite Plaintiff's implications to the contrary, *see* ECF No. 54, PageID.1734-35, the Professionalism and Promotions Committee were not investigating sexual misconduct.   Defendants Jackson and Baker, the Chairs of the Professionalism and Promotions Committees, respectively, testified that the Committees did not consider Plaintiff's conduct sexual in nature.  Jackson Dep., ECF No. 57-1, PageID.2645 ("I don't recall there being the discussion in the committee that there was like a sexual element of it.  In general, he just wanted access to all her accounts."); Baker Dep., ECF No. 46, PageID.1170 (testifying he did not remember "allegations involve[ing] sexual harassment related to nude photographs").  Furthermore, Dr. Rodney Braun, a voting member of the Promotions Committee, stated in his affidavit that "[t]he questions [posed to Plaintiff] were geared towards gaining insight into whether Mr. Eid understood the professionalism concerns raised by his conduct—namely, the troubling false and misleading texts

47

that he admitted to sending to Ms. Roe—and its bearing on his fitness to be a medical doctor."  Braun Decl., ECF No. 43-19, PageID.1042; *see also* Waineo Decl., ECF No. 43-20, PageID.1051 (same).   Moreover, Camaj, who conducted the investigation, was not a Title IX investigator at the time and thus could not serve in that capacity.  Camaj Dep., ECF No. 44-5, PageID.1124.  Thus, for these and the reasons discussed *supra*, the Interim Administrative Hearing Guidelines could not apply to Plaintiff's hearings before the Professionalism and Promotions Committees.

To the extent Plaintiff would argue he should nonetheless have been able to cross-examine Jane Roe because he disputed the evidence she presented to the Committee, the Court again disagrees.  *Doe v. Baum*, on which Plaintiff relies, does not apply to his situation because he was subject to an academic dismissal.  *Cf.* 903 F.3d 575, 581 (6th Cir. 2018) ("Time and again, this circuit has reiterated that students have a substantial interest at stake when it comes to school *disciplinary* hearings for sexual misconduct.") (emphasis added).  Even if *Baum* applied, Plaintiff would not have been entitled to cross-examination because he admitted to the conduct at issue.  Camaj Report, ECF No. 43-6, PageID.989 ("I take full responsibility for the text messages/Facebook messages that were sent to [Jane Roe]. . . . I understand that I lied to this person about many things, and I am very sorry about that. . . . This represents a major character flaw that I know I feel terribly

48

about."); *see also* Prom. Comm. Statement, ECF No. 43-16, PageID.1033 ("I take full responsibility for the text messages/Facebook messages that were sent to [Jane Roe]. . . . I understand that I lied to this person about many things, and I am very sorry about that. . . . None the less, I did send the text messages."). The Sixth Circuit "has long held that cross-examination is unnecessary if a student admits to engaging in misconduct." *Baum*, 903 F.3d at 584 (citing *Flaim*, 418 F.3d at 641). Plaintiff cannot retroactively fault the Professionalism Committee for not allowing him to cross examine Jane Roe when the statement he submitted to them prior to his hearing said he "took full responsibility" for the conduct at issue.[12] Indeed, it is not clear that the opportunity for cross examination would have made a difference; three voting members of the Promotions Committee have submitted affidavits stating they did not make any credibility determinations between Roe and Plaintiff and instead based their decisions on Plaintiff's conduct—i.e., his oral and written statements and his presentation before the Committee. *See* Waineo Decl., ECF No. 43-20, PageID.1055; Braun Decl., ECF No. 43-19, PageID.1045; Gray Decl., ECF No. 43-2, PageID.810.

---

[12] Unlike Plaintiff, Jane Roe did not present at the Promotions Committee hearing, so Plaintiff could not have cross-examined her then.

49

Accordingly, Defendants are entitled to summary judgment on Plaintiff's procedural due process claim.

### ii.    Eid cannot establish a substantive due process claim.

Defendants also argue Plaintiff's substantive due process claim fails as a matter of law.  ECF No. 43, PageID.789-90.

The Supreme Court has "assumed, without deciding, that federal courts can review an academic decision of a public educational institution under a substantive due process standard."  *Ewing*, 474 U.S. at 222 (citing *Horowitz*, 435 U.S. 78, 91–92 (1978)).  However, in the time since *Ewing*, the Sixth Circuit "has rejected the notion that substantive due process protects a medical or nursing student's interest in his or her continued enrollment."  *Yoder v. Univ. of Louisville*, 526 F. App'x 537, 549 (6th Cir. 2013) (citing *Rogers v. Tenn. Bd. of Regents,* 273 Fed. App'x. 458, 463 (6th Cir. 2008); *Bell v. Ohio State Univ.,* 351 F.3d 240, 249–51 (6th Cir. 2003)).  Accordingly, Plaintiff's substantive due process claim must fail.

Notably, even if the Sixth Circuit had not barred such a claim, Plaintiff would not have met the high bar necessary to proceed.  The Supreme Court has held that "[w]hen judges are asked to review the substance of a genuinely academic decision . . . they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not

50

actually exercise professional judgment." *Ewing*, 474 U.S. at 225.  For that reason, courts have upheld the dismissal of medical students for infractions seemingly more innocuous than Plaintiff's admitted lack of honesty.  *See, e.g.*, *Horowitz*, 435 U.S. at 91 (upholding dismissal of medical student for failing to observe "personal hygiene" and "timeliness"); *Firester v. Bd. of Governors of Wayne State Univ.*, 908 F.2d 973 (6th Cir. 1990) (upholding dismissal for failing to exhibit "proper attitudes toward patients").  Indeed, another court in this District has upheld dismissal based on "lack of candor." *Fuller v. Schoolcraft Coll.*, 909 F. Supp. 2d 862, 876 (E.D. Mich. 2012).

Accordingly, Defendants are also entitled to summary judgment on Plaintiff's substantive due process claim.  As Plaintiff has failed to establish both his due process claims, the Court will dismiss Count I in its entirety.  Thus, the Court need not address the individual Defendants' argument that they are entitled to qualified immunity on this Count.  To the extent Count V alleges a due process claim under Article 1, § 17 of the Michigan Constitution, Defendants are entitled to summary judgment on that as well.  *Vigil v. Regents of Univ. of Michigan*, 980 F. Supp. 2d 790, 804 (E.D. Mich. 2013) (applying same analysis to due process claims under federal and Michigan state Constitutions), *aff'd sub nom. Vigil v. Regents of the Univ. of Michigan*, 609 F. App'x 349 (6th Cir. 2015).

51

### 3.  Eid has not established a Title IX claim.

Third, Defendants argue Plaintiff's Title IX claim fails because he does not provide evidence that gender bias influenced the Committee's decision.  ECF No. 43, PageID.792.

Title IX provides that, subject to certain exceptions not relevant here, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a). "Title IX is enforceable through a judicially implied private right of action, through which monetary damages are available."  *Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018) (quoting *Klemencic v. Ohio State Univ.*, 263 F.3d 504, 510 (6th Cir. 2001)).  The Sixth Circuit has "recognized at least four theories of Title IX liability in cases alleging gender bias in university disciplinary proceedings: (1) erroneous outcome, (2) selective enforcement, (3) deliberate indifference, and (4) archaic assumptions."  *Doe v. Univ. of Dayton*, 766 F. App'x 275, 280 (6th Cir. 2019). Plaintiff has alleged erroneous outcome and—seemingly—selective enforcement theories.  Am. Compl., ECF No. 24, PageID.548.

52

i. **Eid cannot establish a claim based on the erroneous outcome theory because he admitted to the facts that served as the basis for his dismissal.**

Plaintiff asserts, "Defendants' decision to deprive Plaintiff of his right to cross-examine or question witnesses against him did not only constitute a risk of an erroneous deprivation of a private interest in remaining a student, it led to his actual dismissal." *Id.*

To present a Title IX claim under the erroneous outcome theory, a plaintiff must allege "facts sufficient to (1) 'cast some articulable doubt' on the accuracy of the disciplinary proceeding's outcome, and (2) demonstrate a 'particularized causal connection between the flawed outcome and gender bias.'" *Baum*, 903 F.3d at 585 (ellipsis omitted) (quoting *Miami Univ.*, 882 F.3d at 592).

Here, Plaintiff fails on the first prong. Plaintiff has not alleged facts sufficient to cast some articulable doubt on the accuracy of his Committee hearings. As discussed *supra*, Plaintiff admitted to sending deceitful texts and Facebook messages to obtain access to Roe's accounts. *See* Camaj Report, ECF No. 43-6, PageID.989; Prom. Comm. Statement, ECF No. 43-16, PageID.1033. That conduct, in addition to his behavior during the hearing itself, is what gave the Professionalism and Promotions Committees concern over Plaintiff's fitness to be a doctor. *See* Baker Dep., ECF No. 46, PageID.1169. "[Plaintiff's] concession is enough to dispel the

53

notion that his hearing resulted in an 'erroneous outcome.'" *Doe v. Case W. Rsrv.*

*Univ.*, 809 F. App'x 276, 280 (6th Cir. 2020).

Plaintiff contends he "did not admit to conduct that proves his inability to practice medicine or meet the profession's high standards of conduct" and instead "only" "made some immaterial false representations in his pursuit to resolve the breaches to his accounts." ECF No. 54, PageID.1742. Thus, Plaintiff argues the Court should infer the Professionalism and Promotions Committees "would have reached a different conclusion if they had not simply assumed that Roe was right" because "[i]t would be unreasonable to believe that Plaintiff would have been dismissed if the [Professionalism Committee] had determined that Plaintiff was indeed being hacked and that he had not sent the lawyer letter or tried to get Roe's photographs." *Id*. The Court disagrees with the premise of this assessment. It would be entirely justified for the Professionalism Committee to determine someone who responded in such a manner to being hacked—repeatedly texting and lying to an underclassman—would not be able to handle the high-pressure environment of being a doctor. Regardless, the fact of the matter is that Plaintiff *did* admit to engaging in conduct the Committee found unprofessional, and that is sufficient to end the inquiry. *See Case W. Rsrv. Univ.*, 809 F. App'x at 280 ("True, there is some dispute over the extent of the non-consensual sexual activity that occurred. But that dispute,

54

at most, goes to the *degree* to which John violated the policy, not *whether* he violated the policy in the first instance.") (emphasis in original).

Accordingly, WSU is entitled to summary judgment on Plaintiff's erroneous outcome claim.

### ii. Eid cannot establish a claim based on the selective enforcement theory because he has not presented a proper comparator.

Plaintiff contends "Defendants treated Plaintiff and Roe differently on the basis of sex." Am. Compl., ECF No. 24, PageID.548.

"To prevail on a 'selective enforcement' claim, the plaintiff must show that a similarly-situated member of the opposite sex was treated more favorably than the plaintiff due to his or her gender. *Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016). Plaintiff offers Jane Roe as a comparator. ECF No. 54, PageID.1740. He argues that she was treated more favorably throughout the investigation and hearing process and that her version of events was given credence over Plaintiff's. *Id.* at PageID.1740-42.

However, even if she was treated more favorably than Plaintiff, Roe cannot act as a comparator for Plaintiff in this case because she is not similarly situated to him. Indeed, they played opposite roles in this process, and it is understandable that they would be treated differently as a result. To establish selective enforcement,

55

Plaintiff should have offered evidence of a woman accused of similar conduct who received a more favorable outcome. *See Doe v. Univ. of Dayton*, 766 F. App'x 275, 284 (6th Cir. 2019) (finding plaintiff's selective enforcement theory failed because he "has not identified any woman accused of sexual assault at Dayton University who was not referred to disciplinary proceedings"); *Doe v. Case W. Rsrv. Univ.*, No. 1:17 CV 414, 2019 WL 1982266, at *13 (N.D. Ohio May 2, 2019) ("In this case Plaintiff has failed to identify a similarly situated female who was treated more favorably by CWRU when facing similar charges. Until Plaintiff can make that showing, an inference of gender bias does not arise."), *aff'd*, 809 F. App'x 276 (6th Cir. 2020).

Accordingly, WSU is entitled to summary judgment on Plaintiff's selective enforcement claim. Because Plaintiff has not established a claim under either Title IX theory, the Court will grant WSU summary judgment as to Count II.

### 4. Eid's equal protection claim also fails for lack of a proper comparator.

Fourth, Defendants argue Plaintiff's equal protection claim also fails for lack of a proper comparator. The Court agrees.

"In order to state a claim for an equal protection violation based upon gender discrimination, Plaintiff must demonstrate that he was treated differently—under the same facts and circumstances—than a member of the opposite gender." *Lipian v.*

56

*Univ. of Michigan*, 453 F. Supp. 3d 937, 964 (E.D. Mich. 2020), *motion to certify appeal denied,* No. 18-13321, 2020 WL 3402013 (E.D. Mich. June 19, 2020).  In any equal protection case, it is an "absolute requirement" for the plaintiff to provide evidence "that a similarly situated person outside [his] category" was treated differently.  *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000).

For the reasons discussed *supra*, Jane Roe cannot serve as a proper comparator for Plaintiff.  *See Lipian*, 453 F. Supp. at 964 (dismissing equal protection claim because plaintiff alleging Title IX process discriminated against male complainants did "not provide any comparators, i.e., similarly situated women who were the victims of sexual assault and were treated better by the University").  Accordingly, Defendants are entitled to summary judgment on Plaintiff's equal protection claim and Count III will be dismissed.

### 5.  Eid has failed to establish a promissory estoppel claim.

Fifth, Defendants aver Plaintiff is unable to establish a promissory estoppel claim because "courts applying Michigan law have repeatedly rejected Eid's position that student handbooks and other informational material published by a university constitute promises that induce reasonable reliance."  ECF No.43, PageID.794.  Moreover, they argue Plaintiff has not identified the specific promise

57

contained in the University policies that induced his reasonable reliance. *Id.* at PageID.795.

Plaintiff counters that enrolling in WSU requires abiding by the terms of the Student Code of Conduct and attending the SOM requires agreeing to participate in the Professional and Promotional Committee processes, which are governed by those committees' Bylaws. ECF No. 54, PageID.1743. Thus, he argues "Plaintiff reasonably relied on the promises made in said guidelines, that he would be provided with the evidence and accusations made against him and afforded the opportunity to defend himself as well as to confront his accuser." ECF No. 54, PageID.1743.

Notably, Plaintiff did not address Defendants' argument that courts applying Michigan law have already held students cannot bring promissory estoppel claims based on statements in university publications. He has thus effectively conceded the issue. *See Degolia*, 381 F. Supp. 3d at 759–60 ("[I]t is well understood . . . that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.") (quoting *Rouse*, 2011 WL 918327, at *18)) (internal quotation marks omitted); *see also Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("[A] plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.").

58

Regardless, Defendants' assessment of the law is correct. *Ewing*, 474 U.S. at 223 (affirming district court's dismissal of plaintiff's promissory estoppel claim based on pamphlet distributed by medical school indicating students would receive a second chance at exams); *see also Cuddihy v. Wayne State Univ. Bd. of Governors*, 163 Mich. App. 153, 158, 413 N.W.2d 692, 695 (1987) ("Further, it strains credulity to suggest that a student in a rigorous academic environment would 'rely' on a 'promise' by her academic adviser that she could graduate soon without also being cognizant that she must maintain her grades and pass her examinations. It is unlikely that a graduate student believed that merely by paying her tuition fees she was entitled to graduate with a master[']s degree.").

Additionally, as discussed *supra*, the Student Code of Conduct did not apply to this process. Moreover, Defendants generally complied with the procedures outlined in the Professionalism and Promotions Committees bylaws.[13] To the extent

---

[13] Defendant Chadwell, the Associate Dean of Student Affairs and Career Development was made aware of the complaint filed against Plaintiff. After meeting with the BIT, she authorized Defendant Camaj, a Student Conduct Officer, to conduct fact finding on her behalf. Camaj submitted her report to Chadwell, who forwarded it (and the complaint) to Defendant Jackson, the Chair of the Professionalism Committee. While it is not clear that Defendant Jackson did additional factfinding prior to convening the Professionalism Committee hearing, he did meet with Plaintiff prior to the hearing. Plaintiff also proposed a remediation plan that was implicitly rejected when the Committee recommended his dismissal. Then, Plaintiff was permitted to dispute this recommendation before the Promotions Committee, where he had a hearing. Plaintiff also takes issue with the fact that he

59

they deviated from the outlined procedures, such deviations are insufficient to substantiate Plaintiff's promissory estoppel claim. [14] "Sixth Circuit precedent 'does not require strict adherence to administrative procedures, rather, courts must consider whether the university abused its discretion in applying the disciplinary grievance procedure." *Doe v. Case W. Rsrv. Univ.*, No. 1:17 CV 414, 2019 WL 1982266, at *6 (N.D. Ohio May 2, 2019), *aff'd,* 809 F. App'x 276 (6th Cir. 2020) (quoting *Faparusi v. Case W. Reserve Univ.*, No. 1:16CV1586, 2017 WL 759024,

---

did not have an attorney present at that hearing despite being allowed a support person under the Promotions Committee Bylaws. After the Promotions Committee hearing, Plaintiff underwent two rounds of appeals: first back to the Promotions Committee for reconsideration of its determination and then again to the Provost's Office. Thus, the procedures for both Committees were generally followed. Even assuming, *arguendo*, that Defendants affirmatively prohibited Plaintiff from bringing an attorney to the hearing, doing so was not an abuse of discretion. *See Flaim*, 418 F.3d at 640 (6th Cir. 2005) (holding plaintiff's procedural due process rights were not violated due to attorney's inability to participate in school disciplinary proceedings where university was not represented by counsel and the hearing was procedurally complex).

[14] Plaintiff also argues the Professionalism Committee lacked jurisdiction over his case because Mrs. Roe was asked to serve as the Charging Party after Camaj's report was sent to the Committee. ECF No. 54, PageID.1718. First, it is not clear that Defendants acted in error as the procedure merely says the first step is for charges to be filed with the Chair of the Professionalism Committee, Prof. Comm. Bylaws, ECF No. 43-5, PageID.963, which ostensibly happened through Roe's complaint, Camaj's investigation, and the submission of Camaj's report—with Roe's complaint—to Jackson. Nevertheless, the Court finds asking Mrs. Roe to present on behalf of her out-of-state daughter was not an abuse of discretion. Plaintiff, having already met and discussed the issue with Camaj, was well aware Jane Roe had brought a complaint against him and that it would be adjudicated by the Professionalism Committee.

60

at *2 (N.D. Ohio Feb. 28, 2017), *aff'd* 711 F. App'x 269 (6th Cir. 2017), *reh'g denied* (Oct. 18, 2017), *cert. denied*, 138 S. Ct. 1445 (2018)).

### 6. Eid's fair and just treatment claim is barred by sovereign immunity.

Sixth, Defendants assert Plaintiff is unable to establish his claim under the Fair and Just Treatment Clause of the Michigan Constitution. ECF No.43, PageID.795-96. The clause provides, in relevant part: "The right of all individuals . . . to fair and just treatment in the course of legislative and executive investigations and hearings shall not be infringed. Mich. Const. 1963 Art. 1, § 17. Defendants contend Plaintiff's claim is deficient because that clause does not apply to WSU as the professionalism hearing process does not constitute an executive investigation or hearing, and regardless, Plaintiff received more process than he was due. ECF No.43, PageID.795-96. Plaintiff counters that the requirement that WSU provide a financial accounting to the Michigan Legislature on an annual basis "places the university squarely within the executive branch of the Michigan government" such that it "must abide by Article 1, § 17 when conducting investigations and hearings." ECF No. 54, PageID.1744 (citing *Ammend v BioPort, Inc.*, 322 F. Supp. 2d 848, 857 (W.D. Mich. 2004)).

The relevance of the case Plaintiff cites in response is not entirely clear. *Ammend v. BioPort* is a dispute between military members, government contractors,

61

and their spouses and the Michigan Department of Public Health, Michigan Biologic Products Institute, BioPort, and an individually named doctor over harm allegedly caused by an anthrax vaccine. *See generally* 322 F. Supp. 2d.  In the section Plaintiff cites, the Western District of Michigan was determining whether the Michigan Department of Public Health and Michigan Biologic Products Institute are "arm[s] of the state" such that they would be subject to sovereign immunity, and the court analyzed whether the state may be legally liable for their actions.  *Id.* at 857. However, eleven years after this case was decided, as discussed *supra*, the Sixth Circuit determined "WSU is an arm of the State of Michigan." *Kreipke*, 807 F.3d at 781.  That WSU is an arm of the Michigan does not necessarily mean that the academic process Plaintiff underwent was an "executive investigation [or] hearing" subject to the Fair and Just Treatment Clause.  Nevertheless, The Court need not determine whether the Fair and Just Treatment Clause applies to academic (or disciplinary) dismissals in higher education institutions such as WSU because the claim is barred.

"Under Michigan law, a plaintiff seeking damages under Michigan's Constitution must sue state officials in their official capacities." *Courser v. Allard*, 969 F.3d 604, 618 (6th Cir. 2020) (citing *Smith v. Dep't of Pub. Health*, 428 Mich. 540 (1987), *affirmed sub nom. Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71

62

(1989)).  However, as discussed in Section III.B.2. *supra*, sovereign immunity bars Plaintiff from pursuing monetary damages or retroactive injunctive or declaratory relief from WSU or the individual Defendants in their official capacities.  Plaintiff's requested relief for this Count consists of monetary damages and declaratory relief "declaring WSU's disciplinary process as applied to him [was] unconstitutional, and concomitantly expunging/vacating the findings and sanctions resulting from the unconstitutional process" as well as injunctive relief "enjoining violations of the Fourteenth Amendment in the process of investigating and adjudicating sexual misconduct complaints and requiring WSU to destroy all disciplinary records concerning Plaintiff."  Am. Compl., ECF No. 24, PageID.556.  Plaintiff's requested relief is retroactive nature,[15] thus, "[b]ecause [Plaintiff's] fair-and-just-treatment claim is proper only insofar as it is brought against the defendants in their official capacities, [Plaintiff's] claim is barred by the Eleventh Amendment." *Courser*, 969 F.3d at 618.

---

[15] To the extent Plaintiff has also requested prospective injunctive relief enjoining future Fourteenth Amendment violations in the process of investigating and adjudicating sexual misconduct complaints, Plaintiff has failed to establish such a claim for all the reasons discussed in Sections III.B.2 and III.B.4 *supra*.

### 7. Eid cannot establish an emotional distress claim because he has not demonstrated extreme or outrageous conduct.

Finally, Defendants aver Plaintiff's emotional distress claim is barred by governmental immunity, and even if it were not, their conduct was not "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community." ECF No.43, PageID.796 (quoting *Linebaugh v. Sheraton Michigan Corp*, 497 N.W.2d 585, 588 (Mich. Ct. App. 1993).   Plaintiff counters that governmental immunity does not shield an individual's intentional torts and that depriving Plaintiff of his right to due process—including his ability to retain an attorney—while accepting large sums in tuition "would certainly be regarded as atrocious and utterly intolerable to any civilized community."

> Generally, under state law, state-government employees acting within the scope of their authority are immune from tort liability unless their actions constitute gross negligence, MCL 691.1407(2), and even if governmental employees are found liable for gross negligence, the state may not be held vicariously liable unless an exception to governmental immunity applies under the governmental tort liability act, MCL 691.1401 *et seq.*

*Mays v. Governor of Michigan*, 506 Mich. 157, 198 (2020).  Moreover, contrary to Plaintiff's assertions, Michigan law does permit officials who are alleged to have committed intentional torts to benefit from governmental immunity when:

64

(a) The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority,

(b) the acts were undertaken in good faith, or were not undertaken with malice, and

(c) the acts were discretionary, as opposed to ministerial.

*Odom v. Wayne Cty.*, 482 Mich. 459, 480 (2008).

Regardless of whether the individual Defendants are entitled to governmental immunity, Plaintiff has not established an emotional distress claim.

"The elements of intentional infliction of emotional distress are: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress." *Doe v. Roman Cath. Archbishop of Archdiocese of Detroit*, 264 Mich. App. 632, 643 (2004) (quoting *Johnson v. Wayne Co.,* 213 Mich. App. 143, 161 (1995)). "'[O]nly when a plaintiff can demonstrate that the defendant's conduct is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community' will liability attach." *Dalley v. Dykema Gossett*, 287 Mich. App. 296, 321 (2010) (quoting *Walsh v. Taylor*, 263 Mich. App. 618, 634 (2004) (alteration in original) (internal quotation marks omitted). "'[M]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities' do not give

65

rise to liability for intentional infliction of emotional distress." *Id.* (quoting *Doe v. Mills*, 212 Mich. App. 73, 91 (1995)).

Plaintiff cannot establish the first element of his cause of action. For all the reasons discussed in Section III.B.2. *supra*, Plaintiff was not deprived of his right to due process. Plaintiff admitted to the conduct—dishonesty and lack of integrity over a two-year period—that served as the basis of his dismissal for lack of professionalism, and the Committees generally followed the procedures outlined in their bylaws. To the extent the Committees did deviate from their procedures, such deviations did not rise to the level of a constitutional due process violation. That Plaintiff paid tuition in order to attend the SOM does not change the analysis, nor elevate Defendants' conduct to a level so "atrocious" as to be "utterly intolerable in a civilized community." *Dalley*, 287 Mich. App. at 321 (quoting *Walsh*, 263 Mich. App. at 634). As such Defendants are entitled to summary judgment on Plaintiff's emotion distress claim.

## IV.   CONCLUSION

Thus, for the reasons articulated above, the Court finds Defendants are entitled to summary judgment on all of Plaintiff's claims. Accordingly, **IT IS HEREBY ORDERED** that the Court **GRANTS** Defendants Motion for Summary Judgment (ECF No. 43).

66

**IT IS SO ORDERED**.


s/Gershwin A. Drain
GERSHWIN A. DRAIN
UNITED STATES DISTRICT JUDGE

Dated:  April 20, 2022


CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
April 20, 2022, by electronic and/or ordinary mail.
/s/ Teresa McGovern
Case Manager

67